# EXHIBIT A

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D N Y

★    DEC 1 9 2008    ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x Civil Action No:

JOHN KOGUT,

                            Plaintiff,

                v.

THE COUNTY OF NASSAU, POLICE COMMISSIONER
DONALD KANE, POLICE COMMISSIONER WILLIAM
J. WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE,  DETECTIVE SEAN SPILLANE
(HEAD OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HENRY WALTMAN,
P.O. MICHAEL CONNAUGHTON, P.O. WILLIAM DIEHL,
and JOHN DOES 1-5 ,

                            Defendant(s).
------------------------------------------------------x

COMPLAINT and
JURY DEMAND

CV - 06  6695

SEYBERT, J.

WALL, M.J.

          Plaintiff, by and through his attorneys, GRANDINETTE & SERIO, LLP., and

PAUL CASTELEIRO, ESQ, hereby states for his Complaint against the defendants, THE

COUNTY OF NASSAU, POLICE COMMISSIONER DONALD KANE, POLICE

COMMISSIONER WILLIAM J. WILLETT (2005), POLICE COMMISSIONER JAMES

LAWRENCE, DETECTIVE SEAN SPILLANE (HEAD OF HOMICIDE 1985), DETECTIVE

DENNIS FARRELL (HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,

DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT MARTINO, DETECTIVE

WAYNE BIRDSALL, DETECTIVE MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,

DETECTIVE FRANK SIRIANNI, DETECTIVE HENRY WALTMAN, P.O. MICHAEL

CONNAUGHTON, P.O. WILLIAM DIEHL, and JOHN DOES 1-5 ,following:

2

## INTRODUCTORY STATEMENTS

This is an action for damages sustained by a resident of the United States against the above named defendants for various State and Federal constitutional and civil rights violations including but not limited to false arrest, false imprisonment, malicious prosecution, battery committed in performance of public duty or authority, denial of claimants right to due process of law, coercion of a confession, falsification of documents, denial of the right against self incrimination, denial of the right to counsel, denial of the right to consult with his loved ones, and conspiracy to commit each of these acts and for maintaining policies and customs intentionally, or deliberate indifference, resulting in the depravation of the constitutional rights of its citizens.

## JURISDICTION

This Court has jurisdiction of this case under 42 U.S.C. §1981, 1983 and §1985,  U.S.C. §1331, 28 U.S.C. §1343(1)(2)(3)(4) and the first, fourth, fifth, sixth, eighth and fourteenth amendments to the Constitution of the United States.  This Court has pendent jurisdiction over the various New York State law claims.

## PARTIES

1. Plaintiff, JOHN KOGUT (hereinafter **KOGUT**), was a legal resident of Island Park, County of Nassau, State of New York, and at all times relevant to the allegations of this complaint did so reside.

2. At all times relevant hereto, defendant, **DETECTIVE JOSEPH VOLPE** (hereinafter **VOLPE**), was a detective employed by the Nassau County

3

Police Department to perform duties therein including investigating homicides originating in the County of Nassau. **VOLPE** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

3.    At all times relevant hereto, defendant, DETECTIVE ROBERT DEMPSEY (hereinafter **DEMPSEY**), was a detective employed by the Nassau County Police Department to perform duties therein including investigating homicides originating in the County of Nassau. **DEMPSEY** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

4.    At all times relevant hereto, defendant, DETECTIVE SEAN SPILLANE, HEAD OF HOMICIDE 1985, (hereinafter **SPILLANE**), was the commanding officer of the Nassau County Homicide Bureau. That as such he was responsible for the training, supervision and policy implementation of his department and its personnel. **SPILLANE** was acting in such capacity as an agent, servant and employee of the defendant, COUNTY OF NASSAU. He is sued individually and in his official capacity.

5.    At all times relevant hereto, defendant, DETECTIVE DENNIS FARRELL, HEAD OF HOMICIDE 2005, (hereinafter **FARRELL**), was the commanding officer of the Nassau County Homicide Bureau. That as such he was responsible for the training, supervision and policy implementation of his department and its personnel. **FARRELL** was

4

Department. **FRAAS** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

10.     At all times relevant hereto, defendant, **DETECTIVE FRANK SIRIANNI** (hereinafter **SIRIANNI**), was employed by the Nassau County Police Department. **SIRIANNI** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

11.     At all times relevant hereto, defendant, **DETECTIVE HENRY WALTMAN** (hereinafter **WALTMAN**), was employed by the Nassau County Police Department. **WALTMAN** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

12.     At all times relevant hereto, defendant, **P.O. MICHAEL CONNAUGHTON** (hereinafter **CONNAUGHTON**), was employed by the Nassau County Police Department. **CONNAUGHTON was** acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

13.     At all times relevant hereto, defendant, **P.O. WILLIAM DIEHL** (hereinafter **DIEHL**), was employed by the Nassau County Police Department. **DIEHL** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

6

acting in such capacity as an agent, servant and employee of the defendant, COUNTY OF NASSAU. He is sued individually and in his official capacity.

6.    At all times relevant hereto, defendant, DETECTIVE ALBERT MARTINO (hereinafter **MARTINO**), was a detective employed by the Nassau County Police Department to perform duties therein including investigating homicides originating in the County of Nassau. **MARTINO** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

7.    At all times relevant hereto, defendant, DETECTIVE WAYNE BIRDSALL (hereinafter **BIRDSALL**), was a detective employed by the Nassau County Police Department to perform duties therein including investigating homicides originating in the County of Nassau. **BIRDSALL** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

8.    At all times relevant hereto, defendant, DETECTIVE MILTON G. GRUBER (hereinafter **GRUBER**), was employed by the Nassau County Police Department. **GRUBER** was acting in such capacity as an agent, servant and employee of the defendant, County of Nassau. He is sued individually and in his official capacity.

9.    At all times relevant hereto, defendant, DETECTIVE CHARLES FRAAS (hereinafter **FRAAS**), was employed by the Nassau County Police

14.    At all times relevant hereto, defendant, DONALD KANE (hereinafter

KANE), was the duly appointed Commissioner of the Nassau County

Police Department from 1992-2000. As such, he was the commanding

officer of defendants DETECTIVE SEAN SPILLANE (HEAD OF

HOMICIDE 1985), DETECTIVE DENNIS FARRELL (HEAD OF

HOMICIDE 2005), DETECTIVE JOSEPH VOLPE, DETECTIVE ROBERT

DEMPSEY, DETECTIVE ALBERT MARTINO, DETECTIVE WAYNE

BIRDSALL, DETECTIVE MILTON G. GRUBER, DETECTIVE CHARLES

FRAAS, DETECTIVE FRANK SIRIANNI, DETECTIVE HENRY

WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O. WILLIAM DIEHL,

and JOHN DOES 1-5 and was responsible for their training, supervision,

and conduct. He was also responsible for instituting and enforcing official

policies and regulations of the Nassau County Police Department and for

ensuring that Nassau County police personnel obey the laws of the State

of New York and of the United States. At all relevant times, he was acting

in such capacity as the agent, servant and employee of the defendant,

COUNTY OF NASSAU. He is sued individually and in his official capacity

15.    At all times relevant hereto, defendant, WILLIAM J. WILLET (hereinafter

WILLETT), was the duly appointed Commissioner of the Nassau County

Police Department in 2005 the year of KOGUT's re-trial. As such, he was

the commanding officer of defendants DETECTIVE SEAN SPILLANE

(HEAD OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL (HEAD

OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE, DETECTIVE

7

ROBERT DEMPSEY, DETECTIVE ALBERT MARTINO, DETECTIVE

WAYNE BIRDSALL, DETECTIVE MILTON G. GRUBER, DETECTIVE

CHARLES FRAAS, DETECTIVE FRANK SIRIANNI, DETECTIVE HENRY

WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O. WILLIAM DIEHL,

and JOHN DOES 1-5 and was responsible for their training, supervision,

and conduct. He was also responsible for instituting and enforcing official

policies and regulations of the Nassau County Police Department and for

ensuring that Nassau County police personnel obey the laws of the State

of New York and of the United States. At all relevant times, he was acting

in such capacity as the agent, servant and employee of the defendant,

COUNTY OF NASSAU. He is sued individually and in his official capacity.

16.    At all times relevant hereto, defendant, JAMES LAWRENCE (hereinafter

**LAWRENCE**), was the duly appointed Commissioner of the Nassau

County Police Department in 2005 the year of KOGUT's re-trial. As such,

he was the commanding officer of defendants DETECTIVE SEAN

SPILLANE (HEAD OF HOMICIDE 1985), DETECTIVE DENNIS

FARRELL (HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,

DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT MARTINO,

DETECTIVE WAYNE BIRDSALL, DETECTIVE MILTON G. GRUBER,

DETECTIVE CHARLES FRAAS, DETECTIVE FRANK SIRIANNI,

DETECTIVE HENRY WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.

WILLIAM DIEHL, and JOHN DOES 1-5 and was responsible for their

training, supervision, and conduct. He was also responsible for instituting

8

and enforcing official policies and regulations of the Nassau County Police Department and for ensuring that Nassau County police personnel obey the laws of the State of New York and of the United States. At all relevant times, he was acting in such capacity as the agent, servant and employee of the defendant, COUNTY OF NASSAU. He is sued individually and in his official capacity

17.     The defendant, COUNTY OF NASSAU (hereinafter **"COUNTY"**), is a municipal corporation within the State of New York and at all relevant times, it employed defendants.

18.     At all times relevant hereto, defendant, JOHN DOES 1-5 , were officers and/or detectives employed by the Nassau County Police Department to perform duties therein.

19.     At all times relevant hereto all named defendants were acting under color of law and pursuant to their authority as police personnel.

## FACTUAL ALLEGATIONS

20.     Theresa Fusco was last seen alive at approximately 9:47 p.m., on November 10, 1984, after being terminated from her job at Hot Skates, located at 14 Merrick Road, in the City of Lynbrook, County of Nassau, State of New York.

21.     On or about November 11, 1984, a missing persons report was filed by Theresa Fusco's mother with the Lynbrook Police Department.

22.    On or about December 5, 1984, at approximately 4:12 pm, 25 days after her disappearance,  the body of Theresa Fusco was discovered.

23.    Her body was discovered by two boys in a wooded area, under some leaves and wooden pallets, on the north side of the Long Island Rail Road tracks, running parallel to Sunrise Highway, between Rocklyn Avenue and Park Drive in Lynbrook, New York. This area was used as a short cut by local residents. It was a local hangout for many youths who commonly referred to the area as the Fort.

24.    The location where Fusco's body was found was off Rocklyn Avenue. Upon information and belief Rocklyn Avenue is a roadway which Theresa Fusco would regularly walk between her home and place of employment at Hot Skates.

25.    After Theresa Fusco's body was discovered, the Nassau County Police Crime Scene Unit responded to the scene to preserve and gather evidence.

26.    The evidence and information gathered by the crime scene unit was disseminated to the defendants VOLPE, DEMPSEY, MARTINO, SIRIANNI and WALTMAN, amongst other defendants.

27.    Thereafter, the body of Theresa Fusco was removed to the Nassau County Coroners Office.  An autopsy was performed.  Defendants VOLPE, DEMPSEY, MARTINO, SIRIANNI and WALTMAN, amongst others, were provided with a copy of the autopsy report on or about December 6, 1984.

10

28. Accordingly, defendants VOLPE, DEMPSEY, MARTINO, SIRIANNI, WALTMAN, and others, both named and unnamed, possessed specific medical and factual details about the death of Theresa Fusco long before their initial interview of KOGUT.  Factual and medical information KOGUT had no way of knowing.

29. The autopsy report classified the case a homicide by ligature strangulation.  Further, semen and spermatozoa was recovered in Theresa Fusco's vaginal cavity.  The medical examiner estimated the time of death at 7-14 days prior to the discovery of the body (between November 21-28, 1984).

30. On December 6, 1984 after the autopsy, Detective WALTMAN of the Nassau County Homicide Bureau took possession of the decedent's hair and blood samples from Detective Robert Bauman.

31. Defendants conducted numerous interviews between November 10, 2004 - March 5, 1985, surrounding the disappearance, murder and rape of Theresa Fusco.

32. On March 5, 1985, John Restivo was taken into the homicide bureau for questioning.

33. VOLPE, DEMPSEY and others continued an illegal and unconstitutional interrogation of Restivo well into the following day, March 6, 1985.  During this illegal and involuntary interrogation, Restivo's constitutional rights were repeatedly violated (which reflects  a pattern and practice of the Nassau Police Department Homicide Bureau).

11

34. It was during this illegal interrogation of Restivo, that VOLPE and DEMPSEY assert that Restivo voluntarily "inculpated" Dennis Halstead as being involved with and/or having knowledge about Theresa Fusco's rape and murder. KOGUT's name is mentioned in the following context. KOGUT was a part time employee in Restivo's moving company. KOGUT is a friend of Brian Skellington, who was a cousin of David Skellington, who was friend of Dennis Halstead. Restivo never suggests, either in his statement or during the interrogation, that KOGUT is involved with, or has any knowledge about, Theresa Fusco's disappearance, murder or rape.

35. On March 7, 1985, immediately after being released by VOLPE and DEMPSEY, Restivo contacted Theodore Robinson, Esq.  Thereafter, Theodore Robinson contacted DEMPSEY and VOLPE by phone and/or writing and complains regarding the mistreatment of Restivo over the course of the proceeding two day interrogation.

36. On March 12, 1985, after the illegal and unconstitutional interrogation of Restivo, an eavesdropping warrant is applied for by Defendants for Halstead's home phone. That application was granted by Justice Stuart Ain, Judge of County Court, Nassau County.

37. On March 13, 1985, Halstead is stopped in the street and interviewed by VOLPE and DEMPSEY at which time he denies any involvement or knowledge about Theresa Fusco's disappearance, rape and death.

38.    On or about March 21, 1985, defendants CONNAUGHTON and DIEHL are directed by VOLPE to pick up KOGUT and bring him to the homicide bureau for questioning.

39.    On March 21, 1985, at approximately 6 p.m., CONNAUGHTON and DIEHL respond to 161 Traymore Boulevard, Island Park, New York, KOGUT'S residence, and request he come to headquarters for questioning. KOGUT complies with this request and is driven by CONNAUGHTON and DIEHL in a squad car to the homicide bureau where he arrives at approximately 6:30 p.m.

40.    KOGUT is introduced to, and then questioned by, VOLPE. KOGUT denies any involvement and/or knowledge regarding Theresa Fusco's disappearance, death, and possible rape. KOGUT agreed to consent to a polygraph test after being questioned by defendant VOLPE. VOLPE advised KOGUT that he would call KOGUT to schedule a date and time to arrange a polygraph exam.

41.    On or about March 25, 1985, despite KOGUT's prior denials regarding any knowledge and/or involvement with Theresa Fusco, VOLPE directed CONNAUGHTON and DIEHL to respond to KOGUT'S residence to see if CONNAUGHTON could get KOGUT to come to headquarters to take a polygraph test.

42.    On March 25, 1985, at approximately 6 pm, again CONNAUGHTON and DIEHL arrive at KOGUT'S Island Park residence. KOGUT advises CONNAUGHTON that although he is willing to comply with VOLPE'S

13

request to take a polygraph test, he had consumed both alcohol and marijuana a short time prior to CONNAUGHTON'S arrival.

43.    CONNAUGHTON notifies Detective SIRIANNI of the homicide bureau regarding KOGUT'S alcohol and drug use. SIRIANNI directs CONNAUGHTON to bring KOGUT to headquarters.

44.    At approximately 6:30 p.m., despite having the knowledge that KOGUT consumed drugs and alcohol, KOGUT was brought to police headquarters for questioning regarding the murder and rape.  Notwithstanding the fact that he consumed drugs and alcohol, no Breathalyzer or urine test was administered to KOGUT prior to his questioning.

45.    Shortly thereafter, KOGUT is given a polygraph test by Detective Gruber. Polygraph tests were, and still are, inadmissable evidence under New York State law in criminal proceedings. VOLPE, DEMPSEY and other defendants were aware of this fact, KOGUT was not.

46.    This began a series of deceptive and unlawful acts, by DEFENDANTS, against PLAINTIFF.

47.    At approximately 9:30 p.m., PLAINTIFF was told he had to wait for VOLPE, who wanted to speak with him. PLAINTIFF was  not permitted to leave the precinct, but rather, was escorted by CONNAUGHTON to room # 219, within Police Headquarters, where PLAINTIFF was watched by DIEHL and not permitted to leave.

48.    The PLAINTIFF repeatedly denied any involvement with, or knowledge of the disappearance, murder or rape of Theresa Fusco to defendants

14

VOLPE, DEMPSEY, SIRIANNI, CONNAUGHTON, DIEHL, GRUBER AND OTHERS.

49.     VOLPE, DEMPSEY and MARTINO began another interrogation of KOGUT on March 25, 1985, at approximately 10 p.m.  Thereafter, KOGUT is taken from room 219 to the homicide bureau, where the interrogation is continued by VOLPE and DEMPSEY.

50.      When the interrogation began VOLPE, DEMPSEY, and MARTINO had specific knowledge pertaining to KOGUT's family, educational, and social background making KOGUT a particularly easy target for intimidation, deceit and manipulation.  Furthermore, and of great significance, all of the factual details leading up to and including Ms. Fusco's death and which were ultimately contained in KOGUT'S confession, were known to and provided by the defendants.

51.     At no time before or during the course of this interrogation was KOGUT ever read or advised about his right to remain silent or his right to counsel. KOGUT was told to sign a rights card, and did so, on March 26, 1985, after he signed his coerced confession. Thereafter, defendants lied about this issue at multiple stages of KOGUT's criminal proceedings, claiming that KOGUT was advised of his constitutional protections and voluntarily waived them prior to the start of the interrogation on March 25, 1985, at approximately 10:00 p.m.

52.     Beginning with the commencement of KOGUTS interrogation, at approximately 10 pm on March 25, 1985, and continuing throughout the

15

night and early morning, KOGUT was verbally and physically intimidated, threatened, and the victim of specific physical acts by DEFENDANTS, constituting battery. Specifically, VOLPE, DEMPSEY, and MARTINO repeatedly called KOGUT a liar when professing his innocence concerning any knowledge of, or participation in, the disappearance and death of Theresa Fusco. VOLPE and DEMPSEY verbally and physically abused KOGUT, directing KOGUT to sit down and shut up, physically obstructing his exit from the room, and thereafter, KOGUT was physically impeded and restrained by DEMPSEY.

53.    As the interrogation continued, Defendant's VOLPE and DEMPSEY repeatedly told KOGUT how Theresa Fusco was raped and killed and how he participated in the murder. These same defendant's repeatedly ignored, and thereby violated, KOGUT'S invocation of his constitutional rights under the Fifth and Sixth Amendments, and due process of law. KOGUT made these requests in simple, clear and unequivocal language along with physical attempts to leave the precinct in an attempt to terminate the extremely hostile interrogation and invoke his constitutional privileges. For example, KOGUT, over the course of this coercive and illegal interrogation which lasted 16 consecutive hours, repeatedly made the following statements, requests, and took the following actions:
A) told defendants' that he was innocent, to leave him alone, and cease the interrogation (5th amendment);

b) told defendants' that he knew nothing about murder, told them they must be high on drugs or crazy to be accusing him of being involved with the murder and that he was leaving (5th amendment);

c) KOGUT repeatedly got up during the interrogation and attempted to leave the homicide bureau (5th amendment), but was verbally intimidated and physically prevented from doing so by Defendants VOLPE, DEMPSEY and MARTINO.

d) repeatedly told defendants he wished to make a phone call, his only means of seeking outside assistance from a legal representative(6th amendment) and/or a third party and was maliciously denied any such request.

54.     On March 25, 1985, KOGUT's fiancé, Lisa Price, called homicide on three separate occasions attempting to contact KOGUT.  At approximately 11:30 p.m. Ms. Price spoke with VOLPE.  After inquiring about KOGUT, VOLPE lied to Ms. Price advising her KOGUT would be brought home by police within the hour. VOLPE deliberately misleads Ms. Price knowing that she previously appeared at headquarters to pickup KOGUT on March 21, 1985.  Additionally, by advising Ms. Price that KOGUT would be dropped off she would not have reason to suspect that KOGUT needed legal assistance.   VOLPE lied to KOGUT's fiancé to insure she would not discover that KOGUT was being held against his will and thereby insuring she would not hire counsel on his behalf.

17

55.   VOLPE and DEMPSEY lied to KOGUT throughout the course of the interrogation. KOGUT'S pleas of innocence were always rebutted by fictitious physical, scientific and forensic evidence which Defendants told KOGUT proved his guilt of the crimes. Defendants provided KOGUT with detailed facts concerning the crime including but not limited to displaying the crime scene photos repeatedly to KOGUT.

56.   KOGUT was interrogated on March 25, 1985, commencing at 6:30 pm until approximately 1:30 p.m. on March 26, 1985, a period of 19 hours. KOGUT signed a coerced and fabricated confession around 9:30 am on March 26, 1985, at the insistence of VOLPE and DEMPSEY, after being abused while in police custody for 15 hours. At this same time, KOGUT was told to sign a rights card.

57.   Thereafter, plaintiff was arrested and charged with the rape and murder of Theresa Fusco.

58.   Throughout the course of the subsequent criminal proceedings against KOGUT, the defendants' conspired, reached a mutual understanding, and thereafter agreed to lie about the interrogation issues. Specifically, the Defendants' lied when testifying that KOGUT was read his constitutional rights, that he understood them, and waived same, prior to being questioned, when in fact, KOGUT repeatedly asserted his constitutional rights to remain silent, and to counsel and was repeatedly denied these constitutional privileges by defendants. The Defendants further agreed to, and thereafter lied, claiming that KOGUT provided the factual information

18

contained in the confession, and he did so voluntarily. Defendants' further agreed to lie concerning issues related to verbal and physical abuse of KOGUT and defendant's refusal to allow KOGUT to leave the precinct. Defendant's further lied by denying that they placed any undue or improper duress and intimidation upon KOGUT, or that they made any false promises or intentionally mislead KOGUT by informing him of the existence of evidence they knew to be false or non-existent. Defendant's conspired to mislead his fiancé Lisa Price, by telling her the interrogation of KOGUT was over and that KOGUT would be brought right home so as to ensure no third party would hire counsel on KOGUT'S behalf. Thereafter, defendant conspired to lie about this issue at all subsequent criminal proceedings.

59.   Throughout the course of this 15 hours, Defendant VOLPE and/or other Defendants', personally wrote out, in long hand, some 5 or 6 written confessions, allegedly attributable to KOGUT, prior to settling on the last version.

60.   After repeated, intentional constitutional deprivations, by VOLPE and DEMPSEY, DEFENDANTS' eventually secured KOGUT'S signature on the coerced and fabricated written confession, which was a document, created by VOLPE and DEMPSEY from specific facts acquired by them during the course of their investigation. These facts were incorporated by DEFENDANTS' in order to create the appearance of a "voluntary confession" and to create the illusion that KOGUT had specific personal

19

knowledge about the victim, her manner of death, and the location of the body, amongst other things.

61.    In furtherance of their conspiracy, by under taking specific overt acts, defendants intentionally and/or with reckless disregard, mislead and deceived KOGUT throughout the interrogation. For example, had KOGUT sign a photograph of Fusco during the interrogation, even though KOGUT told the defendants that he did not recognize the person in the photograph. Subsequently, both VOLPE and DEMPSEY testified that KOGUT identified the victim during his interrogation and signed her photograph as proof thereof.

62.    Additional examples of overt actions in furtherance of the conspiracy include SIRIANNI and WALTMAN, at the behest of defendants VOLPE and DEMPSEY, taking KOGUT to Lynbrook, they secured the coerced and fabricated confession, and driving KOGUT to the locations written in the confession by co-conspirators VOLPE and DEMPSEY, and later testifying that KOGUT lead them to these locations. Locations that were known to or created by the defendants, and conversely, were unknown to KOGUT.    Despite these facts, SIRIANNI created a map of the crime scene which he claimed KOGUT provided the factual basis upon which he created it.

63.    Thereafter, VOLPE and DEMPSEY by various means of threats, deception and false promise convinced KOGUT that it was necessary for him to repeat "his story" on video tape to A.D.A.  Peck.

In fact, just immediately prior to meeting with ADA Peck, VOLPE threatened KOGUT "you better not screw this up".

64.   Thereafter, VOLPE, DEMPSEY and other DEFENDANTS' knowingly created documents containing material misrepresentations of fact, which they knew to be false. These false and misleading documents were thereafter filed with the Nassau County District Attorney's Office and the Nassau County Criminal Clerk's Office. At the time of the submission of these false and materially misleading documents the DEFENDANTS' knew said false documents would be relied upon by the District Attorney's Office and the presiding Justice handling KOGUTS case. Said documents' directly affected the defendant's constitutional right to be free from false arrest, malicious prosecution, unlawful imprisonment, due process of law and unjust conviction amongst other claims.

65.   The named Defendants, conspired with each other and thereafter presented false evidence and testimony against KOGUT at the grand jury, hearing and trial stages.

66.   All named Defendants involved with the investigation of this matter played roles in varying degrees in the conspiracy to "frame" and ultimately convict JOHN KOGUT for crimes they knew or should have known he took no part in.

67.   Some of the acts and/or conduct engaged in by the several defendants that amount to conspiracy include, but are not limited to the following: by acting together, and in the presence of each other, defendants VOLPE,

21

DEMPSEY and MARTINO alternately denied KOGUT his right to counsel; acting together and in the presence of each other alternately denied KOGUT his right to remain silent; by acting together, and in the presence of each other, defendants VOLPE, DEMPSEY and MARTINO did so act with the deliberate intent and singular reason of obtaining a false confession; all defendants who testified at any of the criminal proceedings did so falsely and knowingly in an attempt to prosecute and convict KOGUT of crimes he did not commit. Upon information and belief all such defendants communicated with each other so as to ensure their respective "false testimony" would be consistent with each other, all in an effort to ensure the conviction of an innocent man; further support for the allegation of conspiracy can be found in the alleged finding of decedents hair in the vehicle she was purportedly raped and murdered in.

68.    At the initial trial of this matter taking place in 1986, testimony was elicited concerning Theresa Fusco's pulled head hairs. The pulled head hairs were the only physical evidence linking Theresa Fusco and KOGUT, HALSTEAD and RESTIVO.

69.    That some or all of the several defendants conspired with each other when the victims pulled head hairs were removed from her body and thereafter, either DELIBERATELY and/or with RECKLESS disregard linked to the van owned by RESTIVO. In furtherance of their conspiracy the defendants, BIRDSALL and FRAAS, in an concerted effort to substantiate the fabricated case against KOGUT, knowingly testified

22

falsely and/or in reckless disregard of the truth about "finding" the victims pulled head hair during a search of RESTIVO'S van conducted on March 26, 1986.  Said untruthful testimony was done so knowingly and maliciously with reckless disregard of the truth and/or with the specific intent to deceive the jury presiding over KOGUT's criminal trial into believing the victim was in the RESTIVO van in order to falsely corroborate KOGUT'S false confession.  Furthermore, by "establishing" that the victims hair was found where it was claimed,  the defendants provided the jury with the only physical link between the victim and KOGUT, RESTIVO and HALSTEAD.  Additionally, such a finding of the victims pulled head hair would work to corroborate the false confession of KOGUT.

70.     The named Defendants knew that physical evidence, which placed the victim in the van owned by Restivo, would be heavily relied upon by the trial jury.

71.     In 2005, the criminal case against KOGUT was retried.  The defendants continued in their conspiracy by again falsely testifying that the victim's pulled head hair was found in Restivo's van.

72.     During that trial, scientific evidence concerning the pulled head hair and "hair root bands" was introduced that established that the hairs in question could not have been left in the van by the decedent at the time the crime allegedly took place.

23

73. In fact, Victor Ort, the justice whom presided over the three month KOGUT retrial, held that..."it is the finding of this Court that I do not believe that the question hairs were left in the van on or about November 10th of 1984, and absent those hairs, there is no corroboration, whatsoever, for the defendant's confession concerning the count of rape.

74. By engaging in conduct under color of State law, the defendants violated claimant's right to a fair trial and due process of law in that acting alone and or together did falsify documents purported to be, amongst other things, an admission against claimant's penal interest, as well as false statements created and utilized to provide false evidence against the claimant while knowing such evidence was false and would be relied upon by a judge and Jury, at the Grand Jury, pre-trial hearing and trial stages, all against the rights guaranteed KOGUT by the United States and New York State Constitutions.

75. That as a direct result of defendants' presentation of false and misleading evidence to the grand jury, as to material issues of fact, on May 8, 1985, KOGUT, was indicted for two counts of murder in the second degree and one count of rape in the first degree, of Theresa Fusco.

76. That as a direct result of defendants' presentation of false and misleading evidence at the pre-trial hearings and KOGUT'S trial, as to material issues of fact, on May 28, 1986, KOGUT was convicted of all three counts.

77. On June 27, 1986, KOGUT was sentenced to an aggregate indeterminate term of imprisonment of 31.5 years to life.

24

78.  KOGUT was 21 years of age when he was arrested. KOGUT was 22 years of age when he was convicted and sentenced.  KOGUT was 40 years of age when he was released from prison.

## APPELLATE HISTORY

79.  On October 17, 1991, the Appellate Division, 2nd Department, affirmed KOGUT'S conviction.

80.  On November 21, 1991, KOGUT sought leave to appeal to the Court of Appeals. Leave to appeal was denied on January 28, 1992.

## DNA EVIDENCE AND VACATING THE CRIMINAL CONVICTION

81.  Beginning in 1993 and continuing into 2003, DNA tests on vaginal smears and swabs obtained during the autopsy of the decedent were conducted. Throughout the DNA testing, the plaintiff, Restivo and Halstead were excluded on five separate occasions as the contributors of the semen recovered from the decedent.  However, it wasn't until a previously untested swab, taken from the decedent, which was ironically located by the criminal defense attorneys and thereafter tested in 2003, that the District Attorney finally agreed to vacate the convictions of all three men.

82.  Based upon the accuracy and reliability of DNA testing, and the conclusion reached in testing the vaginal smears and swabs of Theresa Fusco in this case, the Nassau County District Attorney's Office eventually stipulated to an entry of an Order vacating the criminal convictions against John KOGUT pursuant to N.Y. Criminal Proc. Law sections 440.10(1)(g),

and 440.30(3), dated June 11, 2003. Similarly, consent orders were also ordered into by the Nassau District Attorney's Office with respect to HALSTEAD and RESTIVO.

83.    On June 11, 2003, KOGUT was released from prison on $350,000.00 surety bond. This was the first time KOGUT was free since March 25, 1985 (eighteen years).

84.    KOGUT'S relief is short lived, after a eighteen year battle to establish his innocence of this vicious and heinous crime, the Nassau District Attorney announced its intention to retry KOGUT despite the DNA evidence.

85.    On April 10, 2005, pretrial hearings commenced. KOGUTS retrial began on September 26, 2005, and concluded on December 21, 2005, with KOGUT'S acquittal of all charges. In fact, Justice Ort concluded: "I believe that the scientific evidence in this case proves that too many material facts set forth in the defendant's confession are clearly not truthful".

## MONELL CLAIM

86.    It was and still is the policy and/or custom of the homicide squad to avoid applying for arrest warrants to avoid the suspects constitutional right to counsel, to  isolate criminal suspects prior to arresting them thus eliminating the possibility of a third party retaining counsel on the suspects behalf.  Thereafter, suspects are taken to the homicide bureau and interrogated without the advisement of their constitutional protections. If they request counsel or invoke the right to remain silent, those requests are ignored.  The homicide squad through their intentional acts prevent,

mislead and lie to suspects and their family members to deprive them of their constitutional rights against illegal searches and seizure, right to remain silent and their right to counsel. Members of the homicide squad routinely lie regarding the existence of various forms of incriminating evidence, threaten, intimidate and engage in false promise to secure confessions in violation of suspects 5th amendment privileges.

87. It was and is the policy and/or custom for supervisors to participate in said constitutional violations and/or supervise and discipline officers inadequately, including the named and unnamed officers, thereby failing to discourage constitutional violations on the part of its officers.

88. Police officers of the County of Nassau have for years engaged in a pattern and practice of actively and passively covering up the misconduct of fellow officers by failing to come forward or failing to accurately give evidence as to misconduct which they are aware, thereby establishing and perpetuating a "code of silence" which in turn has perpetuated the homicide bureau's continuing pattern of denial of constitutional protections to homicide suspects.

89. That through a series of law suits and by other means, the Nassau County Police Department, the Homicide Bureau and its supervisors have been placed on notice that the Homicide Bureau has secured multiple false "confessions" for the crime of murder from innocent parties.

90. That these innocent parties have alleged a deprivation of constitutional protections and the violation of local, state, and federal law regarding their apprehension, during the interrogation process, and subsequent criminal

27

proceedings, and no remedial steps have been taken to correct the problem.

91. The supervising and policy making personnel of the defendants have simply refused to take steps to institute policies to ensure compliance with local state and federal law.

92. The Nassau County Police Department Homicide Bureau has refused to tape record or video tape the advisement of the defendants rights and/or the interrogation and subsequent "confessions", or to employ independent observers during interrogations.

93. That the supervising personnel of the Homicide Bureau and their supervisors are aware of, or should be aware, that these constitutional violations are allowed to continue on a regular basis as a means to obtain evidence despite the obvious violations of local, state and federal laws.

94. The defendants, individually and together, have actively and passively covered up the misconduct of their fellow officers.

95. That numerous cases have been brought to the attention of the police commissioner and other policy makers of the Nassau County Police Department pertaining to the homicide bureau's unconstitutional practices:

    a)    <u>Robert Moore</u> - confession to murder of Joshua Chisolm taken by Det. Volpe; criminal charges dismissed; County settled civil rights claim alleging impropriety by Nassau Homicide Detectives during interrogation for $90,000.

    b)    <u>Shonnard Lee</u> - confession to murder of neighbor Sammy Jones taken by Det. Dempsey; Lee acquitted after trial.  County lost civil

rights claim alleging impropriety by the Nassau Homicide Detectives during interrogation. The jury awarded Lee two million dollars ($2,000,000.00), one million two hundred and fifty thousand dollars ($1,250,000.00) of which was a punitive damage award against Dempsey for his actions surrounding the arrest, interrogation and subsequent criminal proceedings.

    c)    <u>Jose Martinez</u> - confession to murder of his best friend Jose Alberto Cruz taken by Detective Trujillo; criminal charges dismissed; County settled civil rights claim alleging impropriety by Nassau Homicide Detectives during interrogation for nine hundred fifty thousand dollars ($950,000.00).

96.    Other Nassau County criminal cases such as Blair Gardner and Michael Prince, raised similar issues concerning illegal conduct by Homicide Detectives during interrogations resulting in alleged confessions, both written and oral, which were specifically brought to the attention of policy makers within the Nassau County Police Department, after their respective acquittal.

97.    On April 11, 2005, Nassau Police Commissioner James Lawrence publically stated his intention to start video taping and/or taping of homicide interrogations to preserve the integrity of the process.

98.    The police commissioner also represented that a panel was created to review the issue and make recommendations on video taping and/or taping of homicide interrogation including their implementation.

29

99. Despite these facts, Nassau County Police Department policy makers have done nothing regarding the illegal practices of the homicide bureau, and so their unconstitutional practices continue resulting in additional false confession cases.

100. Knowing that two of the three (VOLPE & DEMPSEY) detectives in the KOGUT case were involved in securing false confessions in the Moore (VOLPE) and Lee (DEMPSEY) cases, the County defendants maliciously moved forward in the re-trial of KOGUT given the proof that the factual content of the confession was obviously false.

101. The allegations set forth in paragraphs 1 through 101 are incorporated herein by reference.

102. The NCPD had a custom and policy or pattern and practice of improperly training, supervising and/or disciplining their subordinate police personnel concerning basic homicide investigation techniques, constitutionally adequate interrogation methods and the obligation to disclose exculpatory and impeachment material to the prosecution of criminal defendants.

103. The herein above described actions and omissions, engaged in under color of state authority by the defendants, including defendant County, sued as a person, responsible because of their authorization, condonation and ratification thereof for the acts of their agents, deprived the plaintiff of rights secured to him by the Constitution of the United States under 42 U.S.C. §1983.

COUNT 1 - 42 U.S.C. §1983 - False Imprisonment

104.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

105.    False Imprisonment by their conduct and under color of law, defendant(s) deprived MR. KOGUT of his constitutional right to be free from false imprisonment.

COUNT 2 - 42 U.S.C. §1983 - False Arrest

106.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

107.    False Arrest by their conduct and under color of law, defendant(s) deprived MR. KOGUT of his constitutional right to be free from false arrest.

COUNT 3 - 42 U.S.C. §1983 - Malicious Prosecution

108.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

109.    Malicious Prosecution by their conduct and under color of law, defendant(s) deprived MR. KOGUT of his constitutional right to be free from malicious prosecution.

31

<u>COUNT 4 - 42 U.S.C. §1983 - Malicious Prosecution</u>

110.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs
and further alleges as follows.

111.    Malicious Prosecution by their conduct and under color of law,
defendant(s), by subjecting the plaintiff to a second criminal trial in the
year 2005, continued to deprive MR. KOGUT of his constitutional right to
be free from malicious prosecution.

<u>COUNT 5 - 42 U.S.C. §1983 - 14th Amendment -Falsification of Evidence</u>

112.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs
and further alleges as follows.

113.    The Nassau County Police Department created and falsified evidence
likely to influence a jury's decision and forwarded those documents to
prosecutors thereby depriving plaintiff his constitutional right to due
process and a fair trial.

<u>COUNT 6- 42 U.S.C. 1983- 14th Amendment -  Falsification Of Documents</u>

114.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs
and further alleges as follows.

115.    The Nassau County Police Department falsified documents likely to
influence a jury's decision and forwarded those documents to prosecutors
thereby depriving plaintiff his constitutional right to due process and a fair
trial.

32

<u>COUNT 7 - 42 U.S.C. §1983 - Conspiracy I</u>

116.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

117.   Conspiracy, under color of law, the defendants conspired with each other and others, reached a mutual understanding, and acted to undertake a course of conduct to deny, injure, oppress, threaten, trick, and deceive MR. KOGUT in the free exercise and enjoyment of the rights and privileges secured to him by the Constitution, including the right to be free from unreasonable searches and seizures; right to counsel, right to remain silent and right to due process of the law;

In further of the conspiracy the defendants:

a)   falsely arrested and imprisoned MR. KOGUT;

b)   engaged in a course of conduct to illicit a false confession;

c)   agreed to and thereafter did lie about the facts and circumstances surrounding KOGUT's interrogation and alleged voluntary confession.

d)   submitted false reports , statements and evidence to further the conspiracy;

e)   withheld relevant evidence and various brady material which exonerated MR. KOGUT of wrong doing;

f)   employed the practice known as the "code of silence" to conceal their misconduct.

33

COUNT 8 - 42 U.S.C. §1983 - Conspiracy II

118.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

119.   Nassau County Police Department by and through its supervising officers, together with the County of Nassau by and through its final policymakers, throughout the course of many years engaged in a course of conduct  whereby they allowed, permitted, condoned, and otherwise acquiesced in a practice wherein various homicide detectives would intentionally and or with reckless disregard, engage in a course of conduct that amounted to, and acted as, a continuing and illegal deprivation of the Constitutional rights of homicide suspects in an effort to secure criminal convictions without regard for the actual guilt or innocence of the suspect. Specifically, in several prior actions against the County of Nassau and individual police officers involved, to wit: John Kogut, Robert Moore, Shonnard Lee and Jose Anibal Martinez and others,  by intentionally depriving these individuals of their constitutional rights whereby false confessions were obtained and utilized against said individuals during their criminal prosecution,  amounts to a conspiracy amongst said supervisors and policy makers.  This conduct amounts to an conspiracy and agreement to violate the constitutional rights of a multitude of persons suspected to be involved in Nassau County homicides.

34

COUNT 9 - 42 U.S.C. §1983 - County Liability - Monell Claim

120.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

121.   The Nassau County police department, developed and maintained policies and customs exhibiting deliberate indifference or with the intentional objective to illegally seize suspects and to deprive them of their constitutional protections against self incrimination, their right to counsel and due process of law.

122.   It was and still is the policy and/or custom of the homicide squad to avoid applying for arrest warrants to avoid the attachment of the right to counsel, to  isolate criminal suspects prior to arresting them thus eliminating the possibility of a third party retaining counsel on the suspects behalf.  Thereafter, they are taken to the homicide bureau and interrogated without the advisement of their constitutional rights.  If they request counsel, and/or invoke the right to remain silent, those requests are ignored.  The homicide squad through deliberate indifference and/or their intentional acts prevent, mislead and lie to suspects and their family members to deprive them of their constitutional rights against illegal searches and seizure, right to remain silent  and their right to counsel.  It was and is the custom and/or practice of the homicide bureau to lie regarding the existence of incriminating evidence, threaten, intimidate and engage in false promise to secure confessions in violation of suspects 5th amendment privileges.

123. It was and is the policy and/or custom for supervisors to participate in said constitutional violations and/or supervise and discipline officers inadequately, including the named and unnamed officers, thereby failing to discourage constitutional violations on the part of its officers.

124. Police officers of the County of Nassau have for years engaged in a pattern and practice of actively and passively covering up the misconduct of fellow officers by failing to come forward or failing to accurately give evidence as to misconduct which they are aware, thereby establishing and perpetuating a "code of silence" which in turn has perpetuated the homicide bureau's denial of constitutional protections to homicide suspects. Despite paying millions of dollars in both compensatory and punitive damages, the Internal Affairs Unit of the County police department either is not required to investigate these abuses by the homicide bureau, or merely issues a self serving report suggesting no impropriety by the homicide detectives thereby perpetuating the continued unconstitutional policies.

125. In short, the homicide detectives lie regarding their conduct, and the Internal Affairs Bureau of the same police force covers up their misconduct.

COUNT 10 - 42 U.S.C. § 1983 Monell Claim Against Nassau County:
<u>Unconstitutional Pattern and Practice and Failure to Train and Supervise</u>

126. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

36

127.    Nassau County, by and through its final policymakers, maintained a custom, policy, or practice of condoning, facilitating, or promoting the use of unconstitutional investigative techniques, including coercing witnesses and suspects, fabricating inculpatory evidence, manipulating interrogations to make them appear non-custodial, coercing or fabricating physical injury and Miranda waiver forms, manufacturing false police reports, failing to adequately investigate other leads, withholding exculpatory evidence from prosecutors, and suborning perjury of witnesses and police officers.

Further, the County of Nassau, by and through its final policymakers, failed to provide or provided grossly inadequate training, supervision, and discipline regarding basic homicide investigation practices, constitutionally adequate interrogation techniques, and the obligation to disclose exculpatory evidence to prosecutors.

## COUNT 11 - 42 U.S.C. §1983- Brady Violations

128.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

129.    The Nassau County Police Department deliberately and/or with reckless disregard, failed to disclose exculpatory evidence concerning the Plaintiff thereby depriving him of a fair trial and due process all in violation of federal law.

37

## PENDENT CAUSES OF ACTION

130.   The allegation set forth in paragraph 1 through 103 are incorporated herein by reference.

131.   Heretofore and on or about the 17th day of March, 2006, the plaintiff caused a written verified Notice of Claim to be filed with and served upon the proper officers, agents and employees of the defendant County and the New York State Attorney Generals Office pursuant to the statutes in such cases made and provided.  A copy of the Notice is annexed hereto as Exhibit A and made a part hereof.

132.   That more than thirty days have elapsed since the service of such Notice of Claim, and adjustment or payment thereof has been neglected or refused.

133.   The acts and conduct hereinbefore alleged constitute false arrest and imprisonment, battery committed in performance of public duty or authority, malicious prosecution, the deprivation of State law and constitutional rights based upon several grounds.  This Court has pendent jurisdiction to hear and adjudicate these claims.

### COUNT 12 - Battery Committed in
### Performance of Public Duty or Authority

134.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

135.    DEMPSEY committed acts of battery against KOGUT.  The County is responsible for the battery of KOGUT by DEMPSEY because it occurred while DEMPSEY was acting in the scope of his employment.

### COUNT 13 - Pendant Claim of False Arrest

136.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

137.    KOGUT was wrongfully, unlawfully and unjustifiably charged and arrested without a warrant and without probable cause.

The County is responsible for the false arrest because it occurred while the defendant(s) and other employees were acting in the scope of their employment.

### COUNT 14 - Pendant Claim of False Imprisonment

138.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

139.    KOGUT was wrongfully, unlawfully and unjustifiably detained and deprived of his liberty against his will and imprisoned by defendant(s) without probable cause and without a warrant.

The County is responsible for the false imprisonment of KOGUT because at the time the defendant(s) and other employees were acting within the scope of their employment.

## COUNT 15 - Pendent Claim of Malicious Prosecution

140.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

141.    KOGUT was wrongfully, unlawfully, unjustifiably and maliciously prosecuted against his will between March 26, 1985, and December 21, 2005, during the majority of which he was incarcerated.

142.    The County is responsible for the malicious prosecution of KOGUT because at the time the defendant(s) and other employees were acting within the scope of their employment.

## COUNT 16 - State Law Claim for
## Negligent Infliction of Emotional Distress

143.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

144.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

145.    The defendants negligently and grossly negligently, and in breach of their duties owed to him to refrain from fabricating evidence, coercing witnesses, withholding material, exculpatory and impeachment evidence, and otherwise acting to deny him due process of law, directly and proximately caused Mr. KOGUT, an innocent men, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for nearly eighteen years. Defendants' actions caused Mr. KOGUT to suffer physical harm, including physical ailments resulting from the circumstances and duration of his

wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post conviction incarceration.

### Count 17 - State Law Respondeat
### Superior Claim Against Nassau County

146.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

147.   At all times relevant to this complaint the individual defendants acted as agents of, and in the scope of their employment with, Nassau County. The conduct by which defendants committed the torts of false arrest, malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while defendants were on duty, carrying out their routine investigative functions as NCPD detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer. Indeed, the specific conduct of defendants Volpe and Dempsey was known by, should have been known by, and/or was reasonably foreseeable to NCPD supervisors.

148.   Nassau County is liable for its agents' state law torts of malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

41

<u>COUNT 18 - State Law Negligent Supervision Claim</u>

149.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

150.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

151.   Defendants Edwards and John and Jane Doe Supervisors were grossly negligent and negligent in the training, supervision, and discipline of the defendant detectives, Volpe and Dempsey.

152.   Defendants Edwards and John and Jane Doe Supervisors knew or, but for their grossly negligent and negligent training, supervision, and discipline, should have known that defendants Volpe and Dempsey engaged in investigative misconduct including coercing witnesses, fabricating evidence, and failing to document and disclose material, exculpatory and impeachment evidence, and that they thereby caused Mr. KOGUT to be maliciously prosecuted and falsely arrested.

153.   As a proximate result of the gross negligence and negligence of defendants Edwards and John and Jane Doe Supervisors, defendants Volpe and Dempsey engaged in the previously set forth misconduct and caused the above-described acts of malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress inflicted upon Mr. KOGUT, which directly and proximately caused his wrongful conviction and eighteen

years of imprisonment, as well as the other grievous and continuing

injuries and damages set forth above.

**WHEREFORE**, Plaintiffs demand the following relief jointly and severally, against all the defendants:

A. Compensatory damages in the amount of NINETY MILLION ($90,000,000.00) DOLLARS.

B. Punitive damages in the amount of ONE HUNDRED MILLION ($100,000,000.00) DOLLARS.

C. Attorneys' fees pursuant to 42 U.S.C. §1988.

D. Injunctive relief prohibiting the aforementioned conduct and an Order compelling defendant's to implement policy changes subject to the prior and subsequent review of this Court, to ensure compliance with local, state, and federal laws.

E. Such other and further relief as this Court may deem just and proper.

G. Plaintiff demands Trial by Jury.

ANTHONY M. GRANDINETTE (5913)
GRANDINETTE & SERIO, LLP
114 Old Country Road
Mineola, New York 11501
(516) 248-5317

PAUL CASTELEIRO, ESQ (0092)
86 Hudson Street
Hoboken, New Jersey 07030
(201) 656-1696

# EXHIBIT A

COPY RECEIVED THIS 17
DAY OF Mar                20 06
COUNTY ATTORNEY, NASSAU COUNTY
BY

----------------------------------------------------------x

In the matter of the Claim of

JOHN J. KOGUT

      -against-                                                NASSAU COUNTY CLAIM

NOTICE OF CLAIM

THE COUNTY OF NASSAU, NASSAU DISTRICTS              2006 MAR 17  AM 2 41
ATTORNEY'S OFFICE, POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVES JOSEPH VOLPE,
ROBERT DEMPSEY, ALBERT MARTINO, VICTOR GRUBER
MICHAEL CONNAUGHTON, WILLIAM DIEHL,
WAYNE BIRDSALL, CHARLES FRAAS, FRANK SIRIANI,
and JOHN DOES 1-5,

----------------------------------------------------------x

S I R S :

             PLEASE TAKE NOTICE, that claimant, JOHN J. KOGUT, hereby files

claim against the above captioned Defendants, for the following claims: battery,

harassment, false arrest, false imprisonment, malicious prosecution, denial of claimants

right to due process of law, libel, slander, intentional infliction of emotional duress,

excessive force, unlawful conviction, cruel and inhuman treatment, under 42 U.S.C. §1983

for false imprisonment, false arrest, malicious prosecution, conspiracy, denial of due

process of law, under New York Civil Rights Law §8 and Article 1, § 6, 11, and 12 of the

New York State Constitution, and other claims not yet known.

      Claimant further alleges a pattern of discrimination and constitutional violations

constituting a policy and/or practice carried out by the Nassau County Homicide Bureau,

with the knowledge and consent of its policy making officials, which intentionally denies

homicide suspects of their Federal fifth and sixth amendment rights and State constitution

rights under Article 1 §11 and 12 through force, trickery, threats, false promise,

intimidation, physical and verbal abuse and/or other methods aimed at soliciting

confessions in violation of individuals State and Federal constitution privileges and 42 USC

§1983.

Claimant further alleges that despite knowledge of the foregoing the Nassau Police Department has imposed no remedial measures to correct the unconstitutional practices of its homicide bureau warranting punitive damages and equitable relief.

The aforesaid occurrence took place on or about March 25-26, 1985. At approximately 6:00 p.m. , Claimant was taken into Police custody and subsequently imprisoned by Nassau County Police Department employees. While in their presence Claimant was threatened, shoved, pushed, slapped, forced, tricked and coerced into signing a fraudulent confession.

On May 8, 1985, Claimant was charged in a three count indictment alleging two counts of murder in the second degree and one count of rape in the first degree in connection with the death of Theresa Fusco.

By conduct under color of State law, the defendant's violated claimant's right to a fair trial and due process of law in that acting alone and or together did falsify documents purported to be, amongst other things, an admission against claimant's penal interest, as well as false statements created and utilized to provide false evidence against the claimant while knowing such evidence was false and to be relied upon by a Judge and Jury, at the Grand Jury, pre-trial hearing, and trial stages, all against the rights guaranteed claimant by the U.S. and New York State Constitution.

That as a direct result of defendants' presentation of false and misleading evidence, as to material issues of fact, on May 28, 1986, Claimant was convicted on all counts in the indictment. On June 27, 1986, Claimant was sentenced to an aggregate indeterminate term of imprisonment of 31.5 years to life.

After claimant's conviction, defendant's took no remedial measures to correct their civil rights violations.

On or about the same time frame, under a separate indictment, in a separate trial, John Restivo and Dennis Halstead were also convicted in connection with the murder and rape of Theresa Fusco. Similarly, the defendant's acting alone and or together did falsify, and thereafter present, false and misleading material evidence against Restivo and Halstead.

Beginning in 1993, and continuing into 2003, DNA tests were conducted on the vaginal smears of decedent which resulted in the conclusion that John Restivo, Dennis Halstead and Claimant were excluded as sources of the semen deposits recovered from Theresa Fusco's vagina shortly after her death. On June 11, 2003, the Nassau County District Attorneys Office stipulated to the entry of an Order vacating claimant's conviction (as well as the convictions of Restivo and Halstead) pursuant to N.Y. Crim. Proc Law §440.10(i)(g), 440.30(3). Upon the dismissal of the indictment, the original felony complaints were reinstated.

Thereafter, Claimant was released from prison on a $350,000.00 surety bond. This was the first time Claimant had been released from prison in the proceeding 18 years.

Notwithstanding the fact that scientific evidence existed excluding Restivo, Halstead and claimant, as perpetrators of this crime, and that undisputable evidence existed that claimant's confession was clearly the product of Police misconduct, on or about September 2003, The Nassau District Attorneys Office advised claimant's attorneys

that they intended to retry claimant for the rape and murder of Theresa Fusco.

Prior to claimant's retrial, the County defendants knew that Detectives Volpe and Dempsey had on prior occasions knowingly and maliciously solicited false and fabricated confessions from others, and as a result, were required to provide substantial monetary compensation to the prior victims of the defendants unconstitutional conduct.

On April 10, 2005, pre-trial hearings began.  On September 26, 2005, the retrial for the murder and rape of Theresa Fusco began before the Hon. Victor Ort.  On December 21, 2005, Claimant was acquitted of all charges.

Dated:    Mineola, New York
          March 10, 2006

                                        GRANDINETTE & SERIO, LLP

                                        By: Anthony M. Grandinette
                                        Attorneys for Claimant, John J. Kogut
                                        114 Old Country Road
                                        Suite 420
                                        Mineola, NY 11501
                                        (516) 248-5317

                                        PAUL CASTELEIRO, ESQ.
                                        86 Hudson Street
                                        Hoboken, New Jersey 07030
                                        (201) 656-1000

TO:    OFFICE OF THE COUNTY ATTORNEY
       Attorneys for Defendants
       One West Street
       Mineola, New York 11501

       NEW YORK ATTORNEY GENERALS OFFICE
       120 Broadway
       New York City, NY 10271-0332
       Attorney General Eliot L. Spitzer