# EXHIBIT C

SHORT FORM ORDER

COUNTY COURT – NASSAU COUNTY

_____ Term: Part _____

Present:
Hon. JOHN F. O'SHAUGHNESSY
County Judge

Motion Cal. # _____
Indictment #. 61029

PEOPLE OF THE STATE OF NEW YORK

—against—

JOHN KOGUT

Defendant

HON. DENIS DILLON
District Attorney
Nassau County
Mineola, New York

After hearing testimony at a combined Huntley/Wade hearing, this Court makes the following findings of fact:

On March 21, 1985, the defendant, John Kogut, was interviewed by Detective Joseph Volpe of the Nassau County Homicide Squad for the first time concerning the rape/murder of Theresa Fusco and the disappearance of Kelly Morrisey. He was brought to police headquarters voluntarily and was questioned for approximately two hours, then was allowed to leave.

The defendant stated that he had dated Kelly Morrisey one and one-half years before, but had no sexual relations with her. He also met and was employed by Dennis Halstead (a codefendant) at about the same time. The defendant told Det. Volpe that the first time he learned that Theresa Fusco was missing was from a friend's mother who told him that Fusco's body had been found. He further stated that he had last been at Dennis Halstead's apartment three months before. He said that he had also worked for John Restivo (another codefendant) at "Move Right Movers," most recently about three weeks before. Before leaving police headquarters the defendant agreed to return at a later date and

PEOPLE v. KOGUT                                                                  2.

submit to a polygraph test.

On March 25, 1985, at approximately 6:00 P.M., Detective Michael Connaughton picked up the defendant who agreed to go to police headquarters to take the polygraph test. Upon observing the defendant drinking a beer, and being asked by the defendant whether this would affect the test, Det. Connaughton called headquarters and was told that it would not.

They arrived at headquarters at approximately 6:30 P.M. and were met by Detective Gruber, the polygraphist. When asked about his physical condition, the defendant told Det. Gruber that he had gotten six hours sleep the previous night, smoked a marijuana "roach" in the morning, had eaten lunch, and consumed two beers in the afternoon. He also stated that he had neither used other drugs not been intoxicated recently.

Det. Gruber then explained the polygraph test and Consent Form to the defendant. The Consent Form contains <u>Miranda</u> warnings and states that although the defendant's statements may be used against him, the results of the test will not be used in Court. The defendant signed the Consent Form (People's Exhibit 1) and did not ask to speak with an attorney.

The polygraph test was administered by Det. Gruber and lasted approximately two hours. At no time during the test did the defendant ask to leave or to contact anyone. Det. Gruber analyzed the test results and concluded that the defendant had failed the test. His conclusion focused on the defendant's faulty responses to two questions:



PEOPLE v. KOGUT                                                      3.

Question: Did you murder Theresa Fusco?

Answer: No.

Question: Do you recall any of the questions?

Answer: If I had any part in it?

The second question and answer are significant because the defendant was not asked during the test whether "he had a part in it."

The defendant was informed that he had failed the test; he responded that he suspected Halstead because when Halstead drinks he is crazy enough to have murdered Theresa Fusco.

At approximately 8:55 P.M., Det. Volpe was notified that the defendant had failed the polygraph test. Volpe told the other officers to keep the defendant in Room 219, which they did. Det. Volpe arrived at headquarters at 10:00 P.M. and spoke with Det. Gruber concerning the results of the polygraph test. He also conversed with several other detectives who were involved in the investigation.

At 10:30 P.M., Det. Volpe, in the presence of Det. Robert Dempsey, read the <u>Miranda</u> rights to the defendant who indicated that he understood the rights and would speak to them without an attorney. The defendant signed a rights card in their presence. (People's Exhibit 2.)

Det. Volpe told the defendant that there were problems with the polygraph test and that he should tell the truth. The defendant then gave an oral statement concerning the crime. He said that he had been in a van with John Restivo when they saw Theresa Fusco walking. Both were high on alcohol and marijuana. Fusco got into the van with them and Restivo drove the defendant to a friend's

PEOPLE v. KOGUT                                                              4.

house. The defendant stated that he did not see Theresa Fusco again that night.

Det. Volpe again told the defendant that there were severe problems and that he had failed the polygraph. He told the defendant to tell the truth. The defendant's second oral statement again placed him in the van with Restivo and Theresa Fusco. This time he stated that he had fallen asleep while Restivo was driving and was awakened by screams. They were in a cemetery where he observed Restivo choke the partially-nude girl with a length of cloth. When Restivo asked for help in hiding the body, the defendant became scared and left.

After the second statement, Det. Volpe moved the defendant to another interview room and left to discuss the polygraph results with Det. Dempsey. Detectives Volpe and Dempsey returned to the defendant and reviewed the two statements he had given. They again urged him to tell the truth and not to be afraid. The defendant then told them a third version which was similar to the second statement until the defendant was awakened in the cemetery. He again stated that he had observed Restivo strangling the girl. He added that they went from the cemetery to an area known to local teenagers as the "fort" where they hid the body.

At approximately 1:20 A.M., the defendant was provided with coffee and cigarettes, and spoke with Det. Dempsey for awhile concerning subjects unrelated to the murder. After this break, the defendant provided a forth oral statement to the detectives. In this recounting, the defendant remembered that the incident had occurred a week or two before his birthday and that he might have done a moving job that day. He also placed Dennis Halstead in the van with John

PEOPLE v. KOGUT                                                    5.

Restivo and himself. He stated that Halstead forced the girl into the van. As Restivo was driving, both Halstead and the defendant had forcible sexual intercourse with her. When they arrived at the cemetery, Restivo also had sex with her. A mutual decision was made to kill her, and John Restivo strangled her in the van. The three of them then took the body to the location previously described by the defendant and hid it there.

The defendant was again told by the dectives that his story was at variance with the polygraph test results. A fifth oral statement was related in which the defendant and John Restivo were alone in the van with Theresa Fusco. The defendant hit her and had sexual intercourse with her as Restivo drove to the cemetery. There Restivo strangled her, and the two of them drove to the burial site.

The defendant stated that he then became scared and told "them" he was leaving. At that, the detectives asked who "them" were. The defendant began to cry and was asked if he would now tell the truth. He was given 10 to 15 minutes to compose himself.

At approximately 3:40 A.M., the defendant gave his last oral statement which was subsequently reduced to writing by Det. Volpe. He stated that Halstead had raped Theresa Fusco in the van as the defendant held her, and that Restivo had later raped her in the cemetery. Afterwards, they decided that she had to be killed, and the defendant himself strangled her. All three went to the burial location and participated in hiding the body.

At approximately 6:00 A.M., the written statement (People's Exhibit 4) was completed and given to the defendant to review. He read the statement aloud, including a portion containing the Miranda

rights, and initialed corrections. When asked, he again stated that he understood his rights and that the statement was the truth. The defendant signed the statement.

After breakfast, the defendant agreed to accompany several detectives to the locations which he had described in his statements. They left at 10:45 A.M., and the defendant directed them to the place where he had first seen Theresa Fusco, then to the cemetery, and finally to the area where the body was found. At each of the locations he described the events which had occurred there. His comments were consistent with the written statement he had signed earlier.

At 12:30 P.M. the defendant was transported to the Nassau County District Attorney's office where he gave a videotaped statement (People's Exhibit 10) to Assistant District Attorney George Peck. He told A.D.A. Peck that he had not been mistreated by the police and was once again willing to make a statement without consulting an attorney. The videotaped statement is essentially the same as the written one given to Det. Volpe.

As to the <u>Wade</u> portion of the hearing, the testimony showed that on May 1, 1985, the defendant was identified from a photopack by Steve and Lisa Kagan as a mover for "Move Right" who had done a job for them.

### Conclusions of Law

1. The defendant was not in police custody on March 21, 1985. He went to headquarters of his own volition and was free to leave at any time. His statements to Det. Volpe on that date were made voluntarily.

2. The statements made by the defendant during the polygraph test on March 25, 1985, were voluntary and not the result of custodial interrogation. Although transported to headquarters by police, the defendant went there willingly, and agreed to take the test after being informed of his rights. He was free to stop the test at any point and leave, yet he made no such request.

This finding does not, however, speak to the admissibility of the polygraph results at trial.

3. After the determination that the defendant had failed the polygraph test, probable cause existed and the defendant was in police custody. All subsequent statements by the defendant resulted from custodial interrogation.

4. The remaining statements given by the defendant at headquarters, at the crime scene, and at the District Attorney's office came after the defendant had been properly and adequately advised of his Miranda rights and had made a knowing and intelligent waiver thereof. The defendant appeared to understand his rights; he was not intoxicated, nor was he physically deprived in any manner which would affect his ability to understand the warnings. At no time did he ask to make a phone call or to speak with an attorney. There was no significant break in the questioning which would require repetition of the Miranda rights, even though they were given to the defendant again as part of his written statement (People v Ridgeway, 101 AD2d 555; People v Crosby, 91 AD2d 20).

5. All of the statements made by the defendant after being placed in custody were voluntary and not the product of police pressure or coercion. The test to be applied is the "totality of the circumstances" (Columbe v Connecticut, 367 US 568; People v Tarsia, 50 NY2d 1;

PEOPLE v KOGUT                                                        8.

People v Leonard, 59 AD2d 1; People v Anderson, 42 NY2d 35).

    6. The confrontation of the defendant with the negative results of the polygraph test was permissible and did not amount to psychological coercion of his statements. Rather, the statements were "the product of the permissible intimation that it was useless for [the defendnt] to conceal his culpability any longer" (People v Tarsia, supra; People v Knighton, 91 AD2d 1077). Unlike People v Leonard, supra, where the defendant was duped by police tactics into believing that the polygraph was omniscient and that the polygraphist would later testify as to defendant's "lies," here there were no misrepresentations about the infallibility of the machine or the use of its results against the defendant in court (see People v Tarsia, supra; People v Knighton, supra).

    7. The persistent questioning and exhortations to "tell the truth" did not render the defendant's statements involuntary. Faced with the inconsistencies between the defendant's statements and the polygraph results, the detectives had a legitimate interest in pursuing the matter. The defendant was not asked to repeat the same story over and over again; each time new and different facts were added which necessitated further questioning. There is no indication that the defendant was browbeaten or bullied into confessing (see People v Tarsia, supra). Experienced detectives investigating a crime as serious as murder should not be precluded from persistent, non-coercive interrogation where a suspect's answers are at variance with scientific evidence.

    8. The length of time which elapsed during interrogation did not cause defendant's statements to be involuntary. Altogether the

PEOPLE v KOGUT                                                          9.

questioning lasted some 14 and one-half hours from the time he was placed in custody until he gave the videotaped statement at the District Attorney's office. During that period, the defendant was advised of his <u>Miranda</u> rights more than once, was given breaks to relax and compose himself, and was provided with food, coffee and cigarettes. There is no evidence that he was physically or verbally abused, or that he was prevented from making a telephone call. There was no "relay questioning" by teams of detectives. (<u>People v Tarsia</u>, <u>supra</u>; <u>People v Carbonaro</u>, 21 NY2d 271; <u>People v Ridgeway</u>, <u>supra</u>.)

Although the defendant had not slept for a substantial period of time, in his videotaped statement made at the end of the 14 and one-half hour period he did not appear so tired as to render his statement involuntary. He confirmed that he had not been mistreated and that he was speaking voluntarily.

9. The defendant's actions in leading the detectives to the various crime scenes and the statements made there were voluntary. There is no evidence that the detectives prompted the defendant or that he was forced to direct them to the sites. The defendant merely reiterated the contents of his written statement.

10. Any technical difficulties occurring in the videotape of the defendant's final statement are insignificant and do not render the tape inadmissible due to visual or aural inadequacies.

11. Defense counsel's objection as to the lack of notice of the defendant's oral statements, while substantively persuasive, was remedied at the time of the hearing by granting the defendant the opportunity for a continuance.

PEOPLE v. BOGUT                                                      10.

12. The photopack identification was not suggestive, and an in-court identification will be permitted.

Based upon the foregoing, the defendant's motion to suppress his statements and the photopack identification is denied in its entirety.

The matter is set for trial on May 5, 1986.

SO ORDERED

GRANTED
Dated:
April 28, 1986

_____s/_____
                JOHN F. O'SHAUGHNESSY
                                          J.C.C.