# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOHN KOGUT,

                         Petitioner,

        -against-

CHRISTOPHER ARTUZ, Superintendent of
Green Haven Correctional Facility,

                         Respondent.

Civil Action No. 97-CV-2094

(Hurley, J.)
(Lindsay, M.J.)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION AND STAY OF PROCEEDINGS

WILMER, CUTLER & PICKERING
520 Madison Avenue
New York, New York 10022
(212) 230-8800

Attorneys for Petitioner John Kogut

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

I.   INTRODUCTION ....................................................................................................... 1

II.  THIS COURT SHOULD SET ASIDE ITS ORDER DISMISSING THE PETITION, AS THE COURT
     OVERLOOKED LEGAL AND FACTUAL ARGUMENTS BEFORE IT, AS POWERFUL NEW EVIDENCE
     WILL ESTABLISH PETITIONER'S ENTITLEMENT TO RELIEF, AND AS DOING SO WILL PREVENT
     MANIFEST INJUSTICE .................................................................................................. 2

III. THIS COURT SHOULD HOLD IN ABEYANCE THESE PROCEEDINGS SO THAT UNEXHAUSTED
     EVIDENTIARY CLAIMS MAY BE PRESENTED TO THE STATE COURT ......................................... 7

IV.  CONCLUSION ......................................................................................................... 11

# TABLE OF AUTHORITIES

**CASES**                                                                    Page(s)

Blazic v. Henderson, 900 F.2d 534 (2d Cir. 1990) .......................................................8

Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976)..........................7

Duncan v. Walker, 533 U.S. 167 (2001)........................................................8, 9, 10

General Reinsurance Corp. v. Ciba-Geigy Corp., 853 F.2d 78 (2d Cir. 1988) ...............................7

Harvey v. Horan, 285 F.3d 298, 2002 WL 471720 (4th Cir. Mar. 28, 2002)..........................2, 3, 6

Herrera v. Collins, 506 U.S. 390 (1993) .................................................................5

Herschaft v. New York City Campaign Fin. Bd., 139 F. Supp. 2d 282 (E.D.N.Y.),
    aff'd, 2001 WL 533590 (2d Cir. May 17, 2001) ..................................................2

Jimenez v. Walker, 166 F. Supp. 2d 765 (E.D.N.Y. 2001) ..............................................10

Miller v. Commissioner of Corr., 700 A.2d 1108 (Conn. 1997) .....................................10

O'Sullivan v. Boerckel, 526 U.S. 838 (1999)..............................................................8

Parajecki v. International Bus. Machs. Corp., 165 F.R.D. 20 (E.D.N.Y. 1996)..............................2

People v. Kogut, 176 A.D.2d 757, 575 N.Y.S.2d 96 (2d Dep't 1991) .............................6

Rose v. Lundy, 455 U.S. 509 (1982) .....................................................................8

Santana v. Artuz, No. 97 Civ. 3387, 2001 WL 823863 (S.D.N.Y. July 20, 2001)..........................10

Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,
    No. 96 Civ. 3231, 2000 WL 322794 (S.D.N.Y. Mar. 28, 2000) ...........................................7

Tower Int'l, Inc. v. Caledonian Airways, Ltd.,
    No. CV-93-1122, 1996 WL 518102 (E.D.N.Y. Aug. 28, 1996)..........................................2

United States v. Quinones, No. S300CR761, 2002 WL 724231 (S.D.N.Y. Apr. 25, 2002) ...........5

Vasquez v. Hillery, 474 U.S. 254 (1986)................................................................8

Warren v. Garvin, 219 F.3d 111 (2d Cir. 2000) ......................................................9

Zarvela v. Artuz, 254 F.3d 374 (2d Cir.), cert. denied, 122 S. Ct. 506 (2001) ..........................9, 10

ii

**STATUTES**                                                                    Page(s)

28 U.S.C. § 2254(b)(1)(A)...........................................................................................8

**MISCELLANEOUS**

Randy Hertz & James S. Liebman,
    Federal Habeas Corpus Practice and Procedure (4th ed. 2001)..........................................8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOHN KOGUT,

                       Petitioner,

       -against-

CHRISTOPHER ARTUZ, Superintendent of
Green Haven Correctional Facility,

                  Respondent.

Civil Action No. 97-CV-2094

(Hurley, J.)
(Lindsay, M.J.)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION AND STAY OF PROCEEDINGS

### I.    INTRODUCTION

Petitioner John Kogut respectfully asks this Court, pursuant to Federal Rule of Civil Procedure 59(e) and Rule 6.3 of the Local Rules of the Eastern and Southern Districts of New York, to reconsider and set aside its Order of April 15, 2002, dismissing his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Further, Petitioner Kogut asks that the Court exercise its inherent power to stay indefinitely all further proceedings on said petition, so that he may return to state court and obtain an evidentiary hearing and ruling on extraordinary, newly-discovered evidence of innocence, evidence that also highlights grave constitutional errors underlying his conviction. In the alternative, Petitioner asks that the Court simply stay consideration of the instant motion to set aside the Order, so that the same relief in state court may be sought.

This evidence has not yet been considered by any court, including the habeas court; comity points to the New York State courts as the proper forum for such consideration; and judicial economy requires that, should it be necessary subsequently to seek federal relief, the action should be revived in this Court so that its final disposition of the habeas petition may be made on a complete record.

II.    THIS COURT SHOULD SET ASIDE ITS ORDER DISMISSING THE PETITION, AS THE COURT OVERLOOKED LEGAL AND FACTUAL ARGUMENTS BEFORE IT, AS POWERFUL NEW EVIDENCE WILL ESTABLISH PETITIONER'S ENTITLEMENT TO RELIEF, AND AS DOING SO WILL PREVENT MANIFEST INJUSTICE.

A motion for reconsideration properly is granted where the movant demonstrates that the Court overlooked controlling decisions or factual matters that, if considered, might reasonably have altered the result; that new evidence bears on the matter; or that reconsideration is necessary to prevent manifest injustice. See, e.g., Herschaft v. New York City Campaign Fin. Bd., 139 F. Supp. 2d 282, 283-84 (E.D.N.Y.), aff'd, 2001 WL 533590 (2d Cir. May 17, 2001); Tower Int'l, Inc. v. Caledonian Airways, Ltd., No. CV-93-1122, 1996 WL 518102, at *1 (E.D.N.Y. Aug. 28, 1996); Parajecki v. International Bus. Machs. Corp., 165 F.R.D. 20, 22 (E.D.N.Y. 1996). In this case, each factor weighs in favor of setting aside the Order dismissing the movant's petition for a writ of habeas corpus.

As the Court is aware, the legal and factual landscape of this case changed dramatically in the months just prior to entry of the Order. Most crucially, a new round of highly sophisticated DNA testing was completed, the results of which (delayed by the events of September 11) recently were received. See Letter of Barry C. Scheck to Hon. Denis R. Hurley, dated April 11, 2002, and accompanying Exhibits A-E (attached collectively hereto as Exhibit 1) (reflecting communications with the Nassau County District Attorney over the last year). That DNA testing, performed under the new Short Tandem Repeat (STR) method, now considered the state of the art,[1] has conclusively excluded all three defendants as contributors to the semen

---

[1] "STR DNA and related techniques represent historic scientific developments, increasing exponentially the reliability of forensic identification over earlier techniques. There is now widespread agreement within the scientific community that this technology, which requires literally cellular-sized samples only, can distinguish between any two individuals on the planet . . . . In other words, STR DNA tests can, in certain circumstances, establish to a virtual certainty whether a given individual did or not commit a particular crime." Harvey v. Horan, 285 F.3d 298, 2002 WL 471720, at *7 (4th Cir. Mar. 28, 2002) (Luttig, J., concurring); see also id. at *7 n.1.

2

sample recovered from the victim. Perhaps more importantly, reflecting the tremendous sophistication of the STR method, the testing now has yielded a conclusive "profile" of the actual source of that semen.[2] Very recently that profile was submitted to a DNA databank, where it may well yield a "hit" as DNA profiles (culled from convicted felons and "rape kits") continue to be entered. These extraordinary developments were brought to the Court's attention just days before entry of the Order. However, despite this dramatic development, the Court did not consider the significance of the previously unavailable STR DNA evidence in entering its Order.

Movant is not asking the Court to consider such evidence at this time; as the District Attorney has repeatedly noted in its correspondence to the Court, such evidence—which may well obviate the need for any further proceedings in this matter—should first be considered by a New York State court.[3] Rather, movant is asking the Court to consider the current necessity for further factual exploration by the state courts as an important factor militating against dismissal of the petition.

---

[2] The significance of this evidence, while properly considered in the first instance by the state court, nonetheless plainly strikes at the heart of the matter: if an unknown person was the source of the forensic evidence of rape, then the crime could not have taken place in the manner the state has continuously asserted (that is, that Restivo and Halstead raped the victim), and Kogut's confessions (which he has consistently maintained to be the product of unconstitutional coercion) cannot be accurate.

[3] In addition to the comity concerns that point strongly to the state court as the proper forum for evaluating the significance of the STR DNA testing, movant does not believe the Court at this juncture *could* evaluate that evidence, certainly not without extensive evidentiary hearings. The fact that the STR DNA testing, unlike prior testing, was able to yield a definitive profile of the actual semen donor undercuts many of the factual conclusions made in the state-court decision by Justice Ain, heavily relied upon by both the Magistrate Judge and the Court in dismissing the petition. For example, the fact that the samples may have been degraded by improper storage or bodily decay (see Order of Hon. Stuart L. Ain dated Aug. 15, 1995, at 35-36; Order of Hon. Denis R. Hurley dated April 15, 2002, at 5) is shown to be unsound or, at a minimum, inapplicable to the STR testing; were either of those factors to have affected the evidence, the testing would have yielded no useful information, rather than a DNA profile of an existing, though presently unknown, male person. See, e.g., Harvey, 2002 WL 471720, at *7 n.1 ("Moreover, STR testing is capable of producing information even when samples are severely degraded."). The full impact of this evidence, including the extent to which it differs from prior DNA testing, can be realized only through a comprehensive hearing, properly conducted by the state court, and movant's habeas petition, in turn, cannot be properly decided without benefit of such a proceeding.

3

In that regard, it is also important to note that, prior to entry of the Order, the Innocence Project had brought to the Court's attention the very strong possibility that all three defendants would shortly make motions to stay the instant proceedings in order to bring the new evidence before a state court. See Exhibit 1, at 2 & n.2. The propriety of a request to hold the petition in abeyance was not considered by the Court before entry of its Order; and, as discussed in Part III, *infra*, the Court would have (in accordance with recent caselaw on point) granted such request had it been considered.

Further, before entry of its Order, Petitioner Kogut had just retained new counsel. By letter dated April 8, 2002, the Court was informed that new counsel, Wilmer, Cutler & Pickering, was working closely with the Innocence Project—signifying that the issues and possibilities previously raised by the Innocence Project with regard to its client, Restivo, were being similarly considered by Kogut—and was actively preparing to bring important factual and legal matters to the Court's attention as it became more familiar with both its client and the record. See Letter of Lewis J. Liman to Hon. Denis R. Hurley, dated April 8, 2002 (attached hereto as Exhibit 2).[4] The impact of this notice, including a determination as to whether prior counsel had been effectively discharged and whether petitioner had been either actually or effectively without the benefit of counsel as these important new issues were being raised and debated over the court of the prior year, was similarly not considered by the Court before entry of its Order.

Moreover, important developments in the law regarding claims of actual innocence by habeas petitioners were not considered by the Court. As courts are now beginning to recognize,

---

[4] In denying the applications for substitution of counsel and a temporary stay of decision made in that letter, the Court cited to Fed. Rule of Civ. P. 72(b); however, that Rule poses no barrier to those applications, for under that Rule the Court retains power to conduct a *de novo* review and entertain the import of new evidence. Further, the cite to 28 U.S.C. § 2266(b)(3)(B) is premature. It is too soon to know whether the petition eventually will require amendment; and in any event, the availability of the new STR DNA evidence satisfies the requirements of 28 U.S.C. § 2244(b), and, as discussed more fully in Part III, *infra*, after state court proceedings such amendment would be permitted.

the scientific revolution occasioned by advances in DNA testing—such as the extraordinary development of the STR technique—have called into question the assertion, relied upon by the Court in entry of its Order, that actual innocence cannot form the basis for a habeas claim. To give but one example, Judge Rakoff recently signaled his intention to invalidate the Federal Death Penalty Act on the ground that it too readily admits of the possibility of punishing innocent persons in violation of the United States Constitution. See United States v. Quinones, No. S300CR761, 2002 WL 724231 (S.D.N.Y. Apr. 25, 2002) (attached hereto as Exhibit 3). Judge Rakoff declared that the oft-quoted language from Herrera v. Collins, 506 U.S. 390 (1993)—"our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim"—id. at 404, "is plainly dictum," Quinones, 2002 WL 724231, at *3. Indeed, Herrera itself recognizes that a "truly persuasive" showing of actual innocence may establish a constitutional claim warranting habeas relief. 506 U.S. at 419-20 (O'Connor and Kennedy, J.J., concurring). DNA evidence, and particularly STR DNA evidence, is precisely the sort of evidence capable of making such a truly persuasive showing. Judge Rakoff pointed out that DNA testing is of "remarkably high reliability" and that "its use in re-evaluating prior convictions was only beginning at the time Herrera was decided in 1993," Quinones, 2002 WL 724231, at *1, and that Herrera therefore "was premised on a series of factual assumptions about the unlikelihood that proof of actual innocence would emerge long after conviction," assumptions "that no longer seem sustainable," id. at *3. The court stated:

> We now know, in a way almost unthinkable even a decade ago, that our system of criminal justice, for all its protections, is sufficiently fallible that innocent people are convicted of capital crimes with some frequency. Fortunately, as DNA testing illustrates, scientific developments and other innovative measures (including some not yet even known) may enable us not only to prevent future mistakes but also to rectify past ones by releasing wrongfully-convicted persons[.]

Id. at *3.

Similarly, Judge Luttig of the Fourth Circuit recently took note of the fundamental changes wrought by the increasing sophistication of STR DNA testing and the concomitant need for the law to progress accordingly:

> These scientific advances, which have rendered it literally possible to confirm guilt or innocence beyond any question whatsoever . . . are no ordinary developments, even for science. And neither can they be treated as ordinary developments for law . . . . the questions these significant developments beget must in turn be recognized for the serious constitutional questions that they are.

Harvey, 2002 WL 471720, at *7; see also Miller v. Commissioner of Corr., 700 A.2d 1108, 1134-40 (Conn. 1997) (holding that "clear and convincing evidence" of petitioner's "actual innocence" warrants grant of habeas relief).

Though Petitioner believes he can proffer clear evidence of actual innocence, it bears noting that he does not claim "only" actual innocence: as also previously signaled to the Court, he additionally has claims as to, for example, ineffective assistance of counsel and the involuntariness of his confessions. The lack of a "fit" between his confessions and the new STR DNA evidence strengthens the potency of the latter argument.[5] Nor does Petitioner plan to rely solely on the STR DNA evidence in showing the unconstitutional nature of his conviction and incarceration. We anticipate being in a position to present powerful new evidence, including testimonial evidence, to that effect. The timing of the Order prevented new counsel from clearly articulating these constitutional claims for the Court while the proceeding remained extant.

Viewing these factors cumulatively, it is evident that a dismissal of the movant's petition at this juncture would result in a manifest injustice. Only by setting aside the dismissal will the Court have the opportunity eventually to render its decision with benefit of a full record, thoroughly developed by competent counsel, and reliant on recent technological and legal

---

[5] The involuntariness claim was presented to the New York State courts on direct appeal, and therefore has been preserved. See People v. Kogut, 176 A.D.2d 757, 757-78, 575 N.Y.S.2d 96, 96 (2d Dep't 1991).

developments bearing directly on the question of whether the Constitution is violated by Petitioner's conviction and continued incarceration.

**III.    THIS COURT SHOULD HOLD IN ABEYANCE THESE PROCEEDINGS SO THAT UNEXHAUSTED EVIDENTIARY CLAIMS MAY BE PRESENTED TO THE STATE COURT.**

Once the Court has set aside its prior Order of dismissal in recognition of the weighty factual and legal issues not previously taken into account, the proper course of action is to then stay the proceedings so that Petitioner may exhaust those claims in state court.

It is well established that the District Court has inherent power to stay an action so that the parties may pursue related proceedings, including those in other jurisdictions. That power is most appropriately exercised where a stay will avoid "piecemeal litigation," where there is full identity between the parties in both actions, and where the state-court proceeding will adequately protect those parties' rights. General Reinsurance Corp. v. Ciba-Geigy Corp., 853 F.2d 78, 81-82 (2d Cir. 1988); see also Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 818 (1976); Silva Run Worldwide Ltd. v. Gaming Lottery Corp., No. 96 Civ. 3231, 2000 WL 322794, at *1 (S.D.N.Y. Mar. 28, 2000) ("the district courts have the inherent power, in the exercise of discretion, to issue a stay when the interests of justice require such action"). Such is clearly the case here; it is extremely likely that Petitioner will win a fully favorable result in state court, completely obviating the need for further federal proceedings. However, if Petitioner remains in need of federal relief, a stay will return the action from whence it came, saving judicial resources while also ensuring that the Court will be able to continue its consideration of this petition on the basis of a fully developed record.

In fact, this is the result mandated by the principle of comity. It is equally foundational that, before a state prisoner's claim can be considered by a federal court exercising its habeas jurisdiction, such claim must first have been presented to the state courts. See, e.g., 28 U.S.C. §

2254(b)(1)(A); Randy Hertz & James S. Liebman, <u>Federal Habeas Corpus Practice and Procedure</u> § 23.1 (4th ed. 2001); <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 844 (1999); <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257 (1986).   A claim has not been exhausted where it relies on new factual grounds never before presented to the state courts.  <u>See, e.g.</u>, <u>Vasquez</u>, 474 U.S. at 260; <u>Blazic v. Henderson</u>, 900 F.2d 534, 537 (2d Cir. 1990) (claim premised on "evidentiary theory not previously presented to the state courts" was not exhausted).   Thus, movant's petition is properly treated as a "mixed" one, that is, one that contains both exhausted and unexhausted claims.  The most obvious unexhausted claim is that stemming from the previously unavailable STR DNA testing, and its yield of a DNA profile of an unknown male person as the source of the forensic evidence of rape.

Historically, the district courts disposed of such mixed petitions by dismissing the petition in its entirety, without prejudice, in order to allow the petitioner to refile should he still believe himself to be entitled to federal relief once he has returned to state court and exhausted all his claims.[6]  <u>See, e.g.</u>, <u>Rose v. Lundy</u>, 455 U.S. 509, 520, 522 (1982); <u>Federal Habeas Corpus Practice and Procedure</u> § 23.5 n.3 & accompanying text.

However, this is no longer the appropriate course where such a dismissal, albeit ostensibly without prejudice, might, by virtue of the one-year time limit imposed by the Antiterrorism and Effective Death Penalty Act (AEDPA), cause the refiled petition to be treated as untimely.  <u>See</u> <u>Duncan v. Walker</u>, 533 U.S. 167 (2001) (holding that the filing of a federal habeas petition does not toll the one-year limitation imposed by AEDPA).   Instead, in the case of a habeas petition that is timely filed under AEDPA but which later proves to contain both exhausted and unexhausted claims, the district court should hold the petition in abeyance during

---

[6] It appears that the Order dismissing Petitioner's claim was, in fact, with prejudice; at a minimum, such dismissal should have been without prejudice for refiling.

the period of state court litigation of the unexhausted claims.  See Duncan, 533 U.S. at 183 (Stevens, J., concurring in part and concurring in the judgment, joined by Souter, J.) (recognizing that "there is every reason" for the federal courts to avoid "potential for injustice" by retaining jurisdiction and "stay[ing] further proceedings pending the complete exhaustion of state remedies . . . when the failure to retain jurisdiction would foreclose federal review of a meritorious claim because of the lapse of AEDPA's 1-year limitations period"); id. at 192 (Breyer, J., dissenting, joined by Ginsburg, J.) (joining "Justice Stevens' sound suggestion[] that district courts hold mixed petitions in abeyance").

Thus, following the holding in Duncan, the Second Circuit has explicitly held that in such a situation the "only appropriate course" is "to dismiss only unexhausted claims and stay proceedings as to the balance of the petition."  Zarvela v. Artuz, 254 F.3d 374, 380 (2d Cir.), cert. denied, 122 S. Ct. 506 (2001).  The stay properly is granted on the condition that the petitioner both initiate state court proceedings on the unexhausted claims within a reasonable period of time and return to federal court within a similarly reasonable period of time after exhaustion is completed.  See id. at 381.  The court further noted that such a stay will keep the petition extant, thus freeing the returning petitioner from the significant hurdles presented by AEDPA's successive-petition rules.  See id. at 378-79 (citing to Warren v. Garvin, 219 F.3d 111, 114 (2d Cir. 2000) (once petition is dismissed, even without prejudice, new claims on second round will not "relate back" to dismissed petition)).  With a stay, once petitioner has made his "round trip to and from the state court to accomplish exhaustion" he may amend his habeas petition to reflect the now-exhausted claims, and such amendments will relate back to the original date of the petition's filing. Zarvela, 254 F.3d at 382.

9

"In light of <u>Duncan</u> and <u>Zarvela</u>, several courts in this Circuit have dismissed the unexhausted portions of habeas petitions and stayed the proceedings with regard to the exhausted claims provided that the petitioner presents the unexhausted claims to the state court within certain time limits." <u>Jimenez v. Walker</u>, 166 F. Supp. 2d 765, 771 (E.D.N.Y. 2001); <u>see also</u> <u>Santana v. Artuz</u>, No. 97 Civ. 3387, 2001 WL 823863, at *2 (S.D.N.Y. July 20, 2001). Indeed, in light of the strong language of <u>Zarvela</u>, abeyance is certainly now evolving into the standard practice.

Thus, as Petitioner has now come forward with significant, previously unavailable new evidence strongly suggestive of both actual innocence and grave constitutional error underlying his conviction—for example, a coerced confession, the details of which have now been shown to be untrue—the only appropriate course of action is for the Court to stay consideration of the petition while these new claims are presented in the first instance to the New York State courts. Should it then become necessary to return, Petitioner will amend his petition to reflect those claims (which will then have been exhausted) and the Court may proceed to a final determination on the merits.

## IV.    CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court reconsider and set aside its Order of April 15, 2002, in which it dismissed with prejudice his petition for a writ of habeas corpus. Petitioner further requests that the Court hold his petition in abeyance pending pursuit of his unexhausted claims in state court. In the alternative, Petitioner respectfully requests that the Court make use of its inherent power to stay consideration of the instant motion while he seeks relief in the state courts.

Respectfully submitted,

Lewis J. Liman (LL 9166)
Terry A. Maroney (TM 8014)
WILMER, CUTLER & PICKERING
520 Madison Avenue
New York, New York 10022
(212) 230-8800
Attorneys for Petitioner John Kogut

Dated: April 29, 2002

# EXHIBIT 1

BENJAMIN N. CARDOZO SCHOOL OF LAW · YESHIVA UNIVERSITY

THE INNOCENCE PROJECT

Barry C. Scheck
Peter J. Neufeld
*Directors*
Jane Siegel Green
*Executive Director*
Huy Dao
*Assistant Director*
Vanessa Potkin
*Staff Attorney*
Alexandra Yates
*Fellow*

·212· 790·5334
FAX 212· 791·1284

April 11, 2002

*By Overnight Delivery*

The Honorable Denis R. Hurley
United States District Judge
Eastern District of New York
Long Island Courthouse, 100 Federal Plaza
Central Islip, New York 11722

      Re:  *Restivo v. Artuz* (V 96-4865) (DRH) (habeas corpus petition)

Dear Judge Hurley:

As the Court is aware, in the past the Innocence Project has provided "of counsel" advice concerning DNA testing issues for lawyers representing John Restivo, John Kogut, and Dennis Halstead, along with the Centurion Ministries, a non-profit organization that investigates wrongful conviction cases. The purpose of this letter is to inform the Court that the Innocence Project will henceforth be representing John Restivo for all purposes and that his previous counsel at trial, on appeal, and in all post-conviction proceedings to this point, Theodore Robinson, has been discharged.  In addition, we will be seeking some time to review the voluminous record in this case so that we can brief the significance of new, extraordinarily significant DNA testing results as well as ineffective assistance of counsel issues.

Your Honor should be in receipt of correspondence from Wilmer, Cutler & Pickering ("WCP") indicating that John Kogut has discharged his prior counsel and has retained WCP to represent him. WCP is also requesting that Mr. Kogut's petition be held in abeyance while the firm familiarizes itself with the record.

Similarly, by next week your Honor will receive correspondence from Professor Adele

Bernhard of the Pace University School of Law Post-Conviction Project ("Pace") indicating that prior counsel for Dennis Halstead has been discharged and that Mr. Halstead has retained Pace to represent him for all purposes.

The Innocence Project, WCP, and Pace are all proceeding on a *pro bono* basis and have rapidly commenced the arduous process of reviewing the record in this matter and obtaining outside expert assistance. It is imperative this effort be undertaken immediately because all three clients have, at the very least, serious ineffective assistance claims against their trial, appellate, and post-conviction counsel, as well as very substantial actual innocence claims, in light of new STR (Short Tandem Repeat) DNA testing results showing that all three men were excluded as donors of semen found inside the rape/murder victim, Teresa Fusco, post-mortem. *See* June 7, 2001 LabCorp STR DNA Supplemental Certificate of Analysis; and December 4, 2001 Laboratory Report from Dr. Robert Shaler, Office of the Chief Medical Examiner, New York City (annexed to this letter as Exhibits A and B, respectively).[1]

The significance of these DNA testing results, both factually and legally, have not yet been briefed or formally presented to this Court. Indeed, it is not yet clear to me whether these results should be submitted initially in the context of the current federal habeas proceedings or in a New York State Court.[2] I am certain, however, that this STR DNA testing conducted by Lab Corp, a laboratory the District Attorney's office chose, constitutes a breakthrough in this matter. These DNA results are much more informative and reliable than those reviewed previously and significantly undermine the prosecution's case.[3] The State's theory in all three prosecutions --

---

[1] Please note that the December 4, 2001 testing by the Medical Examiner's Office was not sent out to counsel in hard copy form until February 20, 2002 because of the overwhelming workload that Office has undertaken since September 11, 2001.

[2] Before the STR DNA testing was performed, the Nassau County District Attorney's office opined that "favorable" results should first be presented and "exhausted" in the state court. Now that favorable DNA results have been produced by the laboratory the District Attorney chose, new counsel are seriously considering this possibility. *See* Letter of Peter A. Weinstein dated March 12, 2001, at 2 (annexed hereto as Exhibit C). While new counsel are not yet prepared to make a final proposal to the Court, it is obvious that common sense and judicial economy compel a single, fully informed assessment by all three petitioners of both the new DNA evidence and the constitutional problems raised by inadequate representation of prior counsel.

[3] In a letter to the Court, the District Attorney claims that these STR test results are not exculpatory because of "petitioner's inability to show the procedures used in this case approximately 15 years ago to collect and preserve the evidence were inadequate to ensure the trustworthiness of the test results." *See* Exhibit D at 1. Both Dr. Shaler and I believe Mr. Weinstein is seriously misinformed and confused about the scientific facts of this matter, but there is no need to take our word for it. Rather, this issue should be developed through affidavits and/or testimony of scientists based on the data. Mr. Weinstein, it should be noted, further asserts that additional DNA testing I have proposed on other old, unsolved cases to see if there is
(continued...)

The Hon. Denis R. Hurley
April 11, 2002

built almost entirely on a confession by Mr. Kogut that he maintains was coerced, and the testimony of various "jailhouse snitches" -- was that these three men conspired with one another to kidnap and murder Teresa Fusco, and that Mr. Halstead and Mr. Restivo had sex with her before her death. Nowhere in this voluminous record to date is there any suggestion of a fourth, unindicted co-ejaculator or a prior consensual sex partner, making it impossible to reconcile the unidentified male DNA profile obtained from the recent LabCorp tests with the State's case. This fact alone could be the basis for post-conviction relief, but I believe, from just a preliminary review, there is even more new evidence of innocence to be presented to the Court, as well as other constitutional claims that have been neglected to date. That is why we have gone to great trouble and expense to find highly competent and dedicated *pro bono* co-counsel for each habeas petitioner. New counsel are now working diligently to determine the best course of action in this most serious matter, and we will need some time to make that determination.[4]

All new counsel, I am sure, would welcome an opportunity to have a status conference with the Court as soon as possible to explain why we have entered this case and what we hope to accomplish. We will contact chambers as soon as all notices of appearance are filed to see if and when Your Honor may hear us.

We again respectfully request your Honor hold the petitions of Mr. Restivo and Mr. Kogut in abeyance. Thank you for your consideration of this request. Should the court require any further information, I can be reached directly at (212) 790-0368 or (917) 796-1150.

Respectfully submitted,

Barry C. Scheck

---

[3](...continued)
a male DNA profile that matches the evidence collected by police in the Fusco murder would also be unavailing. *See* Exhibit D at 1-2. This position, as today's newspaper articles about the release of Ray Krone from Arizona's death row demonstrate, is plainly wrong. Indeed, Mr. Krone was exonerated by precisely the kind of databank "hit" we are seeking here, after a male DNA profile taken from the victim's body in that case was matched to that of another serial sex offender. *See* "DNA Frees Arizona Inmate After 10 Years in Prison," The Arizona Republic, April 9, 2002 (annexed as Exhibit E).

[4] I am acutely aware that prior post-conviction counsel for Dennis Halstead failed to seek an opportunity to brief the significance of the new STR DNA test results before your Honor ruled on a habeas petition by Mr. Halstead last week. Post-conviction counsel for Mr. Halstead should have alerted the court to these results and requested relief. I have no doubt Prof. Adele Bernhard, as soon as she receives the requisite paperwork from Mr. Halstead, will correct this situation expeditiously.

The Hon. Denis R. Hurley
April 11, 2002

Encl.

cc:     Denis Dillon, District Attorney, Nassau County
        John Restivo, Green Haven Correctional Facility

bcc:    Adele Bernhard, Pace University School of Law
        Lewis Liman, Wilmer, Cutler & Pickering

# EXHIBIT A



Laboratory Corporation of America® Holdings
P.O. Box 13973
1912 Alexander Drive
Research Triangle Park, North Carolina 27709

Telephone  800-533-0567
Fax.        919-361-7797

## SUPPLEMENTAL CERTIFICATE OF ANALYSIS

June 7, 2001

Nassau County District Attorney's Office
262 Old Country Rd.
Mineola, NY  11501
Attn.: Mr. Fred Klein

Agency #:     NCMEO #:  84-4854

FS Lab #:     FC1-3132

Victim(s):   Fusco, Teresa
Suspect(s):  Not listed.

Date Received:  5/15/01

Evidence Submitted:  via Federal Express
                     (# 819667155771)

Item 135-4     One sealed bag containing a tube with extracted DNA labeled "Teresa Fusco #94 1416-04" and listed as from oral swab taken from Teresa Fusco 12-6-84.

Item 135-5     One sealed envelope containing three paraffin blocks labeled, "844854" and listed as from Teresa Fusco.

## Results:

Extracted deoxyribonucleic acid (DNA) in the above listed evidence (Item 4) was characterized through the polymerase chain reaction (PCR) at the following genetic systems:

Page 1 of 3

F01-3132

Alleles Detected

| System | 5-02E2 | 135-4/T. Fusco |
|--------|--------|----------------|
| D3S1358 | 15*, 16 | 15, 16 |
| vWA | 18 | 18, 19 |
| FGA | 21, 24 | 20, 22 |
| D8S1179 | 12 | 13, 15 |
| D21S11 | 29, 31 | 28, 30.2 |
| D18S51 | NA | 16, 17 |
| D5S818 | 12 | 9, 13 |
| D13S317 | 11, 14 | 9, 14 |
| D7S820 | 8, 11* | 10, 11 |
| D16S539 | 12 | 11, 13 |
| THO1 | 7*, 9, 9.3 | 7, 9.3 |
| TPOX | 8 | 8, 11 |
| CSF | 10, 11* | 10 |
| Amelogenin | X Y | X |

NA= No activity detected.
*= Alleles designated with an asterisk are less intense than non-designated alleles.
1= See Certificate of Analysis dated March 20, 2001 for previously submitted evidence and previously reported results.

Based on the results listed above, the DNA profile obtained from 02E2-sperm fraction of the vaginal smear (Item 5) is consistent with a mixture of DNA from more than one individual. The major profile is consistent with a male contributor. Teresa Fusco (Item 135-4) cannot be excluded as a minor contributor of much of the weaker alleles, however, she cannot be the source of the CSF "11" allele. Statistical estimates can be calculated upon submission of a matching reference sample.

There was insufficient DNA recovered from Item 135-5 to yield reportable results through PCR analysis.

Disposition of Evidence:

Unless previous arrangements have been made, unused evidence will be returned to the submitting agency.

**Page 2 of 3**

F01-3132

The results have been reviewed independently by the undersigned and are correct as reported.

Sworn to and subscribed
before me this ___11___ day
of __June__, 20_01_
at Research Triangle Park, NC.

_Shawn M. Weiss_
Shawn M. Weiss, B.S.
Associate Technical Director, Forensic Identity Testing

_Irenette Holley_
Notary Public
State of North Carolina
My commission expires___8-3-04___

_Meghan E. Clement_
Meghan E. Clement, M.S.
Technical Director, Forensic Identity Testing

Page 3 of 3

# EXHIBIT B



# OFFICE OF CHIEF MEDICAL EXAMINER

Charles S. Hirsch, M.D., *Chief Medical Examiner*

520 First Avenue, New York, NY 10016
Tel: 212.447.2618 · Fax: 212.447.2630 · TTY: 212.447.2086 -http://nyc.gov

## DEPARTMENT OF FORENSIC BIOLOGY

Robert C. Shaler, Ph.D., *Director*

Howard J. Baum, Ph.D., *Deputy Director*
Marie Samples, M.S., M.Phil., *Assistant Director*
Mechthild Prinz, Ph.D., *Assistant Director*
Pasquale Buffolino, M.S., M.Phil., *Assistant Director*
Karen E. Dooling, M.S., *Assistant Director*



December 4, 2001

## LABORATORY REPORT

SUSPECT: John Restivo, Denis Halstead, John Kogut

LAB NO: FB01-S286

## SUMMARY OF RESULTS:

The suspects, John Restivo, Denis Halstead, and John Kogut, could not have contributed the DNA alleles seen in the sperm fraction of the vaginal smear "listed as from Teresa F  sco", and tested by Lab Corp under case number F01-3132.

The DNA alleles from the suspects do not match any previous New York City PCR (STR) DNA cases to date.

FB01-S286                                        John Restivo, Denis Halstead, John Kogut

EXAMINATIONS:

Blood and other physiological fluids and tissues contain polymorphic ("many forms") genetic markers which can differ from person to person. These genetic markers are inherited, that is, pass from generation to generation and can be used to compare biological samples from different sources. Genetic markers occur because of changes (mutations) that occur in a person's hereditary material, DNA (Deoxyribonucleic Acid).

Alternative forms of DNA are called alleles; they are found at the same location of the DNA (locus, plural loci) on homologous (matching) chromosomes. An individual can have a maximum of two different alleles at a particular locus, one on each homologous chromosome. A group of two alleles from the same locus constitutes a type.

Several different loci may be analyzed simultaneously using a technique known as the polymerase chain reaction (PCR). This technique allows small amounts of DNA to be amplified; after amplification, the alleles present in the sample are identified.

The loci tested may include the short tandem repeat (STR) loci [VWA, THO1, F13A1, FES/FPS, D3S1358, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, TPOX, CSF1PO, D16S539]. The STR loci exhibit length polymorphisms which are variations in the number of core repeats, which are 4 base pairs in length. STR alleles are named according to the number of core repeats present at the locus. Each locus has between 8 and 32 identifiable alleles.

The loci tested may also include the Amelogenin locus, which is located on the chromosomes X and Y, and can be used to determine the sex origin of an unknown sample.

| Locus | Chromosome | Alleles | Types |
|---|---|---|---|
| D3S1358 | 3 | 9, 10, 11, 12, 13, 14, 15, 15.2, 16, 17, 18, 19, 20 | 91 |
| VWA | 12 | 10, 11, 12, 13, 14, 15, 15.2, 16, 17, 18, 19, 20, 21, 22 | 105 |
| FGA | 4 | 16, 16.2, 17, 17.2, 18, 18.2, 19, 19.2, 20, 20.2, 21, 21.2, 22, 22.2, 23, 23.2, 24, 24.2, 25, 25.2, 26, 26.2, 27, 27.2, 28, 28.2, 29, 29.2, 30, 30.2, 31, 31.2 | 528 |
| D8S1179 | 8 | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 | 78 |
| D21S11 | 21 | 24.2, 25, 26, 27, 28, 28.2, 29, 29.2, 29.3, 30, 30.2, 31, 31.2 32, 32.2, 33, 33.1, 33.2, 34, 34.2, 35, 35.2, 36, 38 | 300 |
| D18S51 | 18 | 9, 10, 10.2, 11, 12, 13, 13.2, 14, 14.2, 15, 16, 17, 18, 19, 20 21, 22, 23, 24, 25, 26 | 231 |
| D5S818 | 5 | 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 | 55 |
| D13S317 | 13 | 5, 8, 9, 10, 11, 12, 13, 14, 15 | 45 |
| D7S820 | 7 | 6, 6.3, 7, 8, 9, 10, 11, 12, 13, 14, 15 | 66 |
| D16S539 | 16 | 5, 8, 9, 10, 11, 12, 13, 14, 15 | 45 |
| THO1 | 11 | 4, 5, 6, 7, 8, 8.3, 9, 9.3, 10, 11 | 55 |
| TPOX | 2 | 6, 7, 8, 9, 10, 11, 12, 13 | 36 |
| CSF1PO | 5 | 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 | 55 |

FB01-S286

John Restivo, Denis Halstead, John Kogut

Allelic typing was done with the following results:

| ITEM | D3S1358 | D16S539 | Amel | THO | TPOX | CSF1PO | D7S820 | VWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| John Restivo | 16 | 11 | XY | 6, 8 | 8 | 12 | 9, 11 | 15, 16 | 22, 23 | 14, 16 | 27, 28 | 14, 18 | 11, 12 | 12 |
| Denis Halstead | 15 | 11, 12 | XY | 6, 9.3 | 9, 11 | 11, 12 | 9, 10 | 15, 19 | 20, 29 | 11, 13 | 30, 32.2 | 12, 13 | 10, 12 | 8, 12 |
| John Kogut | 16 | 9, 12 | XY | 8, 9.3 | 8, 11 | 11, 12 | 9, 13 | 18, 19 | 19, 24 | 9, 12 | 29 | 16, 17 | 12, 13 | 13, 14 |

3

FB01-S286

John Restivo, Denis Halstead, John Kogut

## VIDENCE RECEIVED:

| TEM | VOUCHER | DATE REC'D | DESCRIPTION |
|-----|---------|-----------|-------------|
| | n/a | 07/24/01 | 6 buccal swabs from John Restivo |
| | n/a | | 6 buccal swabs from Denis Halstead |
| | n/a | | 6 buccal swabs from John Kogut |

## )ISPOSITION:

`he following items will be retained in the laboratory:

    -2 buccal swabs from each suspect
    - DNA extracts from samples and controls tested

`he packaging and additional swabs have been returned to Lifecodes.

Analyst: _____
          Bianca Nazzaruolo
          Criminalist II

Supervisor: _____
          Mechthild Prinz, Ph.D.
          Assistant Director

# EXHIBIT C

DENIS DILLON
DISTRICT ATTORNEY



COPY

## OFFICE OF THE DISTRICT ATTORNEY
## NASSAU COUNTY
262 OLD COUNTRY ROAD
MINEOLA, NEW YORK 11501 - 4251
TELEPHONE (516) 571-3800

March 12, 2001

Hon. Denis R. Hurley
United States District Court
Eastern District of New York
934 Federal Plaza
Central Islip, New York 11722-4438

    Re:  John Restivo v. Christopher Artuz
         97-CV-4865 (DRH)

Dear Judge Hurley:

    On behalf of respondent, I am writing in response to Mr. Scheck's letter, dated February 27, 2001, in which he proposes a settlement conference to "present a course of action that would satisfy all of the parties involved and serve the public interest." Although Mr. Scheck does not specify the nature of the proposal that he seeks to advance at such a conference, his letter suggests that he intends to urge that another round of DNA testing be performed and that the results of that testing be run against the state and federal DNA databank systems.

    At the outset, it is important to note that there is a serious question concerning Mr. Scheck's standing to intervene in this matter. To our knowledge, Mr. Scheck has never before represented petitioner in this proceeding and did not, at any time, represent petitioner in any of the earlier, related state proceedings. Moreover, in his letter to this Court, Mr. Scheck conspicuously fails to state that he is authorized to represent petitioner.

    In any event, no settlement conference is necessary. Prior to receiving Mr. Scheck's letter, this office had already decided on its own, and has already taken steps, to conduct the additional DNA testing that Mr. Scheck appears to contemplate and run the results of that testing when it is complete, which should be in approximately 4-6 weeks, against the state and federal DNA databanks. Indeed, the genetic material at issue has

Hon. Denis R. Hurley
Page 2
March 12, 2001

already been delivered to a private laboratory so that such testing can be conducted. Should the results of that testing serve to exculpate the petitioner in any way, we will, of course, share that information with petitioner's counsel.

In the interim, however, there is no good reason to delay final disposition of the habeas petition. Even if the results of this new round of testing were favorable to petitioner, they could not be considered by this Court in connection with the instant habeas petition. Rather, principles of exhaustion would require petitioner to present his new evidence to the state court, and only then, if the state court denied his claim, would petitioner be entitled to return to federal court and seek habeas relief on the basis of this new evidence.

Yours truly,

Peter A. Weinstein (PW 7745)
Chief, Appeals Bureau

cc.    Barry C. Scheck, Esq.
Co-Director, Innocence Project
Benjamin N. Cardozo School of Law

Theodore W. Robinson, Esq.
Counsel for Petitioner

Thomas T. McVann, Esq.
Counsel for Dennis Halstead

# EXHIBIT D



**DENIS DILLON**
DISTRICT ATTORNEY

262 Old Country Road
Mineola, New York 11501
Telephone (516) 571-3800

OFFICE OF THE DISTRICT ATTORNEY
Nassau County

September 28, 2001    *Allend J.S.*

Hon. Denis R. Hurley
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722-4438

     Re:   <u>John Restivo v. Christopher Artuz</u>
          97-CV-4865

Dear Judge Hurley:

     We take no position with regard to Mr. Scheck's request (which we assume has been made with the consent of petitioner and his counsel, Theodore Robinson) that you defer action on the petition until some unspecified time in the future. We feel constrained to note, however, that this proceeding has already been pending a very long time (the petition was filed on August 20, 1997), and that the results from the additional round of DNA testing that occurred earlier this year (as well as any results from the still-further testing that Mr. Scheck hopes can be conducted) should have absolutely no impact on the Court's analysis and decision of the legal issues presented by the petition.

     Obviously, to the extent that petitioner or his attorneys believe that the results from new rounds of DNA testing may have some legal significance, petitioner would first have to present such new facts to the state courts. Moreover, Mr. Scheck is simply wrong in stating that the results from the DNA testing that was conducted in March of this year are any more probative of petitioner's claimed innocence than the earlier rounds of DNA testing, which was the subject of his post-judgment motion to vacate his conviction. As found by the state court judge who denied that motion -- a finding that Magistrate Lindsay concluded was entirely reasonable and correct -- the insurmountable weakness of petitioner's DNA evidence is a product not of the testing itself but of petitioner's inability to show that the procedures used in this case approximately 15 years ago to collect and preserve the evidence were adequate to ensure the trustworthiness of the test results. No additional testing that Mr. Scheck may contemplate for that same evidence can obscure or overcome that inherent weakness in petitioner's newly discovered evidence claim, especially in light of the overwhelming evidence of his guilt. Indeed, all that the numerous additional rounds of testing has accomplished so far is to further consume whatever DNA

Hon. Denis R. Hurley
Page 2
September 28, 2001

remained; and, at this point, it is entirely doubtful that there is any genetic material left to test.  Finally, as we have previously argued in our papers and as set forth in Magistrate Lindsay's decision recommending denial of the petition, in light of the limited basis upon which federal habeas relief can be granted, petitioner's purportedly favorable DNA test results provide no legal basis for this Court to grant relief; the same holds true as to any further DNA testing that petitioner and his attorneys hope to conduct.

In conclusion, although we take no formal position with respect to Mr. Scheck's request, petitioner has provided no sound reason for the Court to defer decision upon his meritless petition.

Sincerely,

Peter A. Weinstein (PW 7745)
Chief, Appeals Bureau
(516) 571-3660

cc.    Barry Scheck, Esq.
       Co-Director, Innocence Project

       Theodore Robinson, Esq.
       Counsel for Petitioner

# EXHIBIT E

DNA frees Arizona inmate after 10 years in prison    Page 1 of 4

azcentral    HEALTH · ENTERTAINMENT · CALENDAR · GAMING · TRAVEL · JOBS · CARS · REAL ESTATE · PHONE BOOK

# THE ARIZONA REPUBLIC    online *Edition*

*Sections*    FRONT PAGE    VALLEY & STATE    SPORTS    BUSINESS    ARIZONA LIVING    OPINIONS    ONE

CLASSIFIEDS | ADVERTISE | SUBSCRIBE    ARCHIVES · TALK BACK | HELP | REPUBLIC STORE | ABOUT US

---

**Site Search**

[_____] GO

[Republic ▾]

SUNDAY SECTIONS
A&E
JOBS ARIZONA
TRAVEL
VIEWPOINTS

FEATURES SECTIONS
HOME
FOOD & DRINK
PREVIEW
WHEELS

LOCAL SECTIONS
AHWATUKEE
CHANDLER
TEMPE
MESA
GILBERT
NORTHEAST
SCOTTSDALE
NORTH SCOTTSDALE
SUN CITIES/SURPRISE
GLENDALE/PEORIA
NORTH PHOENIX
CENTRAL PHOENIX
SOUTHWEST VALLEY

ON AZCENTRAL.COM
THE REP
CALENDARS
TRAVEL & OUTDOORS
PHOENIXAZ.COM
COMMUNITY STORIES
GOLF
HOME & GARDEN
COMICS & GAMES
NEWS FROM HOME
OBITUARIES

7 DAY ARCHIVE
■ SUNDAY
■ MONDAY
■ TUESDAY
■ WEDNESDAY
■ THURSDAY
■ FRIDAY
■ SATURDAY

NEWS    SAVE THIS    EMAIL THIS    PRINT THIS    MOST POPULAR

# DNA frees Arizona inmate after 10 years in prison

10 years included time on death row

**By Dennis Wagner Beth DeFalco, and Patricia Biggs**
The Arizona Republic
April 09, 2002 12:00:00

Ray Krone walked out of Arizona State Prison at Yuma on Monday, freed by DNA evidence after serving 10 years and facing the death penalty for a murder he didn't commit.

During a phone call moments before he stepped into the Arizona sunshine, Krone's voice quavered with emotion. "There's tears in my eyes," he said. "Your heart's beating. You can't hardly talk."



Charles Whitehouse/The Associated Press

Freed inmate Ray Krone (right), shown with his attorney, Christopher Plourd, says he is looking forward to a good meal.

Freedom came just hours after Maricopa County Attorney Rick Romley held a news conference to acknowledge that Krone almost certainly did not sexually assault and kill cocktail waitress Kim Ancona at a Phoenix lounge in 1991.

Romley said new evidence not only vindicates Krone, but points directly at Kenneth Phillips, 36, who is serving time in Florence for an unrelated sex crime.

Prosecutors are considering investigating whether to charge Phillips, Romley said.

Romley and Phoenix Police Chief Harold Hurtt announced that they would ask for Krone's release pending a hearing next month to vacate the murder conviction. Both officials stressed that detectives and prosecutors who won Krone's conviction were operating with strong circumstantial evidence. However, they said, new DNA findings make it clear that they had the wrong man.

New azce
• Bre
• New
Hom
• AP

Ema
new
Sign
break
alerts
your i
when
happe

---

http://www.arizonarepublic.com/news/articles/0409krone09.html    4/10/2002

"He (Krone) deserves an apology from us, that's for sure," Romley said. "A mistake was made here. . . . What do you say to him? An injustice was done and we will try to do better. And we're sorry."

Krone refused to place blame for his decade behind bars.

"I'm not pointing fingers. . . . Maybe it was a mistake, maybe incompetence," he said. But he made it clear that he felt betrayed by the justice system.

Even after his first conviction, Krone said, he lived by a mantra: "I didn't do it, so how could there be unquestionable evidence that I did?"

Krone was sentenced to death, spending two years and eight months in Cellblock 6 in Florence, watching other condemned inmates taken away for execution.

Krone maintained hope when a second trial was granted but says he gave up when, in his mind, jurors ignored overwhelming evidence and testimony in his favor. When the life sentence came down, Krone said, "that pretty much ruled out all the faith I had in truth and justice."

Krone said he tried to focus on being strong for friends and family who supported him. He read from his Bible each night, and said a prayer "for the truth to come out and, Lord, change the hearts of my accusers."

## Bite marks convincing

Once labeled the "snaggletooth killer," Krone was convicted largely on circumstantial evidence, particularly expert testimony that bite marks found on the victim matched his teeth.

No DNA evidence was submitted in the first trial, and genetic tracing results provided for the second trial merely failed to preclude him as the perpetrator.

But all of that changed after defense attorney Alan Simpson obtained a court order, and Phoenix police produced new results.

On Monday, prosecutor William Culbertson told Maricopa County Superior Court Judge Alfred Fenzel that DNA found in saliva on the victim's tank top did not come from Krone. In fact, chances are 1.3 quadrillion to one that it came from Phillips, the Florence prison inmate.

Culbertson said that information was bolstered by two discoveries.

First, lab results show that Phillips has type O blood, the same as that found at the crime scene.

Second, a dental expert said he "cannot eliminate Phillips as the person who

left the bite mark" on Ancona's breast.

During a recent interview with Simpson at the Arizona Department of Corrections facility in Florence, Phillips purportedly admitted seeing Ancona in the men's room at the CBS Lounge the night she died. He said he needed to use the restroom, but she told him to leave because she was cleaning it. Ancona's body was found in the men's room the next morning, stabbed to death.

"Kim died a very violent death," Simpson noted after Monday's hearing. "In all the excitement for my client, we have to pause and remember that a young lady didn't deserve to die."

Meanwhile, Fenzel ruled that it would be an injustice to keep Krone in custody any longer.

After ordering his immediate release, he set a follow-up hearing for 10:30 this morning. Krone will not be allowed to leave the state and cannot have any contact with the victim's family or any potential witnesses until the evidentiary hearing April 29.

## Looking for a good meal

Around 5 p.m. Monday, Krone traded his orange prison jumpsuit for blue jeans and a T-shirt, then walked away from the Cheyenne Unit, a 30-man dorm in the Yuma prison.

He said he was desperate for a good meal after years of prison food, maybe seafood and a milkshake.

John Ontiveros, an assistant deputy warden who also knew Krone on death row, said Krone signed autographs for other inmates and then made a cellphone call to his mother before walking out the door.

He is the second Arizona convict to be exonerated by DNA evidence, and the first after facing execution.

Before the murder, he said, he viewed capital punishment as something for mass murderers and vicious criminals. Now?

"They would have executed *me*," he said. "Could I have any faith in it anymore? Absolutely not. I can't be the only one. . . . People need to address this issue."

Earlier, Romley and Hurtt defended the death penalty. "The system may not be perfect, but it's the best in the world," Hurtt argued.

## Parents celebrate

Krone's parents, Carolyn and Jim Leming of Pennsylvania, saved his 1970

Case 2:06-cv-06695-JS-SIL    Document 18-7    Filed 08/27/08    Page 41 of 50 PageID
#: 244
DNA frees Arizona inmate after 10 years in prison                                    Page 4 of 4

Corvette for him. As soon as they got word Monday, the couple started
packing for a long drive to Phoenix.

"We just have to thank God that this worked out finally, and have to thank
all of our friends and family who have stood behind Ray all these years,"
Carolyn said.

She questioned why her son was not released immediately after the DNA
specimens found on Ancona were traced to Phillips. But she gave credit to
Romley, calling him "an honest and fair person" because he was willing to
apologize.

Leming predicted that her son will get on with life immediately, adding,
"He won't let bitterness or anger or a woe-is-me attitude keep him from
living."



Republic Front Page | Valley & State | Sports
Arizona Living | Business | Opinions

Subscribe to The Republic

Terms of Service

Help Center | About us

Copyright 2002, The Arizona Republic. All rights reserved
Gannett Co. Inc.

# EXHIBIT 2

WILMER, CUTLER & PICKERING

520 MADISON AVENUE
NEW YORK, NY 10022-4213

TELEPHONE (212) 230-8800
FACSIMILE (212) 230-8888
WWW.WILMER.COM

2445 M STREET, N.W.
WASHINGTON, DC 20037-1420
TELEPHONE (202) 663-6000
FACSIMILE (202) 663-6363

100 LIGHT STREET
BALTIMORE, MD 21202-1036
TELEPHONE (410) 986-2800
FACSIMILE (410) 986-2828

1600 TYSONS BOULEVARD
10TH FLOOR
TYSONS CORNER, VA 22102-4859
TELEPHONE (703) 251-9700
FACSIMILE (703) 251-9797

4 CARLTON GARDENS
LONDON SW1Y5AA, ENGLAND
TELEPHONE 011 (44)(20) 7872-1000
FACSIMILE 011 (44)(20) 7839-3537

RUE DE LA LOI 15 WETSTRAAT
B-1040 BRUSSELS, BELGIUM
TELEPHONE 011 (32) (2) 285-4900
FACSIMILE 011 (32)(2) 285-4949

INTERNATIONAL TRADE CENTER
FRIEDRICHSTRASSE 95
D-10117 BERLIN, GERMANY
TELEPHONE 011 (49)(30) 2022-6400
FACSIMILE 011 (49)(30) 2022-6500

[S] J. LIMAN
(:) 230-8840
.N@WILMER.COM

April 8, 2002

RECEIVED

APR 10 2002

BY THE
JUDGE DENIS R. HURLEY

**VIA OVERNIGHT MAIL**
Honorable Denis R. Hurley
United States District Court Judge
Eastern District of New York
Long Island Courthouse, 100 Federal Plaza
Central Islip, New York 11722

Re:   *Kogut v. Artuz, 97-CV-2094 (DRH)*

Dear Judge Hurley:

John Kogut, the petitioner in the above-referenced petition for a writ of habeas corpus, last Friday afternoon retained myself and the law firm of Wilmer, Cutler & Pickering to represent him on a *pro bono* basis. Mr. Kogut was convicted in New York State court in 1986 along with two co-defendants, John Restivo and Dennis Halstead. The Court recently issued an opinion dismissing Mr. Halstead's habeas petition (Order dated March 19, 2002, 96-CV-4879), and the petitions of Mr. Restivo and Mr. Kogut are still pending.

I respectfully request that Mr. Kogut's petition be held in abeyance while we familiarize ourselves with both our client and the extensive (and still developing) record in this complex case. Your Honor should also be in receipt of correspondence from the Innocence Project of Cardozo School of Law, indicating that Wilmer, Cutler & Pickering has joined with them and with Pace University School of Law to undertake representation in this matter. After reviewing the entire record and consulting closely with the Innocence Project and Pace—and, most importantly, with Mr. Kogut—we will decide what procedural course is indicated at this stage.

Thank you for your consideration of this request. I can be reached at (212) 230-8840 should you have any comments or questions. Should you be unable to reach me, please feel free to call on my colleagues, Terry Maroney, (212) 230-8808, and Rebecca Roiphe, (212) 230-8852.

Respectfully submitted,

Lewis J. Liman

cc:   Denis Dillon, District Attorney, Nassau County
      John Kogut, Clinton Correctional Facility

Application denied. See Local Civil Rules 1.4, 7.2; see also Fed. R. Civ. P. 72 (b); 28 U.S.C. § 2266 (b)(3)(B). **SO ORDERED.**

Dated: April 10, 2002, at Central Islip, New York

United States District Judge

MOVANT'S COUNSEL IS DIRECTED TO SERVE A COPY
OF THIS ORDER ON ALL PARTIES UPON RECEIPT.

# EXHIBIT 3

2002 WL 724231                                          Page 1
--- F.Supp.2d ---
(Cite as: 2002 WL 724231 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

UNITED STATES of America,
v.
Alan QUINONES, et al., Defendants.

No. S3 00 CR. 761(JSR).

April 25, 2002.

Defendants charged with narcotics violations and murder moved to dismiss death penalty aspects of their case. The District Court, Rakoff, J., held that: (1) Federal Death Penalty Act violated due process, and (2) Government was entitled to opportunity to file additional brief before final order would issue.

Ordered accordingly.

[1] Constitutional Law ⬅ 42.1(3)

92k42.1(3)

Defendants, as presumptively innocent persons whose death the Government had committed to seek immediately upon their conviction of alleged capital offenses, had standing to challenge constitutionality of Federal Death Penalty Act. 18 U.S.C.A. §§ 3591-3598.

[2] Constitutional Law ⬅ 270(2)
92k270(2)

Federal Death Penalty Act, by cutting off a defendant's ability to establish his actual innocence, violated due process; scientific developments such as DNA testing established possibility that meaningful number of innocent persons have been executed. U.S.C.A. Const.Amend. 5; 18 U.S.C.A. §§3591-3598.

[2] Sentencing and Punishment ⬅ 1628
350Hk1628

Federal Death Penalty Act, by cutting off a defendant's ability to establish his actual innocence, violated due process; scientific developments such as DNA testing established possibility that meaningful number of innocent persons have been executed. U.S.C.A. Const.Amend. 5; 18 U.S.C.A. §§3591-3598.

[3] Sentencing and Punishment ⬅ 1780(1)
350Hk1780(1)

Government would be permitted to file additional brief before final order would issue in decision holding Federal Death Penalty Act unconstitutional; Government was entitled to additional opportunity to be heard after hearing court's views on the issue. 18 U.S.C.A. §§3591-3598.

West Codenotes
Validity Called into Doubt

18 U.S.C.A. § 3591, 18 U.S.C.A. § 3592, 18 U.S.C.A. § 3593, 18 U.S.C.A. § 3594, 18 U.S.C.A. § 3595, 18 U.S.C.A. § 3596, 18 U.S.C.A. § 3597, 18 U.S.C.A. § 3598.

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

*1 The Federal Death Penalty Act, 18 U.S.C. §§ 3591-3598, serves deterrent and retributive functions, or so Congress could reasonably have concluded when it passed the Act in 1994. But despite the important goals, and undoubted popularity, of this federal act and similar state statutes, legislatures and courts have always been queasy about the possibility that an innocent person, mistakenly convicted and sentenced to death under such a statute, might be executed before he could vindicate his innocence--an event difficult to square with basic constitutional guarantees, let alone simple justice. As Justice O'Connor, concurring along with Justice Kennedy in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), stated: "I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



2002 WL 724231
(Cite as: 2002 WL 724231, *1 (S.D.N.Y.))

Page 2

with the Constitution. Regardless of the verbal formula employed--'contrary to contemporary standards of decency,' 'shocking to the conscience,' or offensive to a 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental'--the execution of a legally and factually innocent person would be a constitutionally intolerable event." *Id.* at 870 (citations omitted).

To the majority in *Herrera,* however, as to most judges and legislators at the time (1993), the possibility that an innocent person might be executed pursuant to a death penalty statute seemed remote. Thus, Chief Justice Rehnquist, writing for the Court in *Herrera,* discounted as potentially unreliable a study that had concluded that 23 innocent persons were executed in the United States between 1900 and 1987. *See Herrera,* 506 U.S. at 868, n. 15. While recognizing that no system of justice is infallible, the majority in *Herrera* implicitly assumed that the high standard of proof and numerous procedural protections required in criminal cases, coupled with judicial review, post-conviction remedies, and, when all else failed, the possibility of executive clemency, rendered it highly unlikely that an executed person would subsequently be discovered to be innocent.

That assumption no longer seems tenable. In just the few years since *Herrera,* evidence has emerged that clearly indicates that, despite all the aforementioned safeguards, innocent people--mostly of color--are convicted of capital crimes they never committed, their convictions affirmed, and their collateral remedies denied, with a frequency far greater than previously supposed.

Most striking are the results obtained through the use of post-conviction testing with deoxyribonucleic acid ("DNA"). Although DNA testing is of remarkably high reliability, [FN1] its value as a forensic tool in criminal investigations was not demonstrated until 1985 [FN2] and its use in re- evaluating prior convictions was only beginning at the time *Herrera* was decided in 1993. [FN3] Yet in just the few years since then, DNA testing has

established the factual innocence of no fewer than 12 inmates on death row, some of whom came within days of being executed and all of whom have now been released. [FN4] This alone strongly suggests that more than a few people have been executed in recent decades whose innocence, otherwise unapparent to either the executive or judicial branches, would have been conclusively established by DNA testing if it had been available in their cases.

*2 The problem, however, goes well beyond the issue of the availability of DNA testing. Indeed, the success of DNA testing in uncovering the innocence of death row defendants has itself helped spark reinvestigation of numerous other capital cases as to which DNA testing is unavailable or irrelevant but as to which other techniques can be applied. Partly as a result, in just the past decade, at least 20 additional defendants who had been duly convicted of capital crimes and were facing execution have been exonerated and released. [FN5] Again, the inference is unmistakable that numerous innocent people have been executed whose innocence might otherwise have been similarly established, whether by newly developed scientific techniques, newly discovered evidence, or simply renewed attention to their cases.

Moreover, even the frequency of these recent exonerations resulting from DNA testing and from fresh attention to neglected cases hardly captures either the magnitude of the problem or how little it was recognized until recently. It was not until the year 2000, for example, that Professor James S. Liebman and his colleagues at Columbia Law School released the results of the first comprehensive study ever undertaken of modern American capital appeals (4,578 appeals between 1973 and 1995). That study, though based only on those errors judicially identified on appeal, concluded that "the overall rate of prejudicial error in the American capital punishment system" is a remarkable 68%. James S. Liebman, et al., *A Broken System: Error Rates in Capital Cases* (2000) at ii. No system so "persistently and systematically fraught with

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



2002 WL 724231
(Cite as: 2002 WL 724231, *2 (S.D.N.Y.))

error," *id.,* can warrant the kind of reliance that would justify removing the possibility of future exoneration by imposing death.

Just as there is typically no statute of limitations for first-degree murder-- for the obvious reason that it would be intolerable to let a cold-blooded murderer escape justice through the mere passage of time--so too one may ask whether it is tolerable to put a time limit on when someone wrongly convicted of murder must prove his innocence or face extinction. In constitutional terms, the issue is whether--now that we know the fallibility of our system in capital cases--capital punishment is unconstitutional because it creates an undue risk that a meaningful number of innocent persons, by being put to death before the emergence of the techniques or evidence that will establish their innocence, are thereby effectively deprived of the opportunity to prove their innocence-- and thus deprived of the process that is reasonably due them in these circumstances under the Fifth Amendment. [FN6]

[1] In the instant case, the Government has announced its unalterable intention to seek the death penalty with respect to defendants Alan Quinones and Diego Rodriguez, the only two of the eight defendants originally named in this narcotics/murder case who have not pled guilty to the underlying charges. Trial of those charges, and, if the defendants are convicted, of the Government's request for imposition of the death penalty, is scheduled to begin September 2, 2002. Meanwhile, the two death-eligible defendants have moved to have the death penalty aspects dismissed from the case, on the ground, *inter alia,* that the federal death penalty statute is, for the aforementioned reasons, unconstitutional. [FN7] The Government does not contest the defendants' standing to make this motion at this time, and, indeed, it could not, for as presumptively innocent persons whose death the Government has committed to seek immediately upon their conviction of the capital offenses here alleged, the defendants are already directly affected by the death-penalty potential in every aspect of their defense.

*3 [2] On the merits, the Government concedes that "research has not uncovered a case addressing the precise point" here raised, *i.e.,* "whether the death penalty violate[s] due process, and is therefore unconstitutional, because, by its very nature, it cuts off a defendant's ability to establish his actual innocence." Govt. letter brief dated March 29, 2002 at 1. [FN8] The Government asserts, however, that the thrust of defendants' argument is contrary to the positions taken by the Supreme Court in *Herrera, supra,* where the Court affirmed the denial of petitioner's second petition for habeas relief in which he alleged that his pending execution in the face of new evidence of his alleged innocence would violate the Eighth and Fourteenth Amendments.

This Court is not persuaded that *Herrera* provides the guidance necessary to resolve the instant issue. Unlike the presumptively innocent federal defendants bringing the present motion, *Herrera* involved a state-convicted defendant seeking a second habeas review whose proof of "actual innocence" was tenuous on its face--a factor that weighed heavily in the view of two of the justices (O'Connor and Kennedy) who made up the five-justice majority. *See Herrera,* 506 U.S. at 419 (O'Connor, joined by Kennedy, concurring)("Dispositive to this case, however, is an equally fundamental fact: Petitioner is not innocent, in any sense of the word.").

Moreover, while Chief Justice Rehnquist, writing for the Court, at one point states that "our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim," *id.* at 404, this is plainly dictum, for elsewhere he states that "[w]e may assume, for the sake of argument, in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional ...," *id.* at 417. As with the concurring justices, however, the Chief Justice found that Herrera's own "showing of innocence falls far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo,* to exist." *Id.* at

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Westlaw

418-19.

Ironically, it was only a year or so after *Herrera* was decided that the new availability of DNA testing began to supply the kind of "truly persuasive demonstration" of actual innocence to which Chief Justice Rehnquist had hypothetical alluded. Thus, not only did *Herrera* not reach the issue here presented, but also it was premised on a series of factual assumptions about the unlikelihood that proof of actual innocence would emerge long after conviction that no longer seem sustainable. More generally, as already discussed, it implicitly premised a degree of unlikelihood of wrongful capital convictions that no longer seems tenable. [FN9]

The issue--not addressed by *Herrera* or, so far as appears, anywhere else-- boils down to this. We now know, in a way almost unthinkable even a decade ago, that our system of criminal justice, for all its protections, is sufficiently fallible that innocent people are convicted of capital crimes with some frequency. Fortunately, as DNA testing illustrates, scientific developments and other innovative measures (including some not yet even known) may enable us not only to prevent future mistakes but also to rectify past ones by releasing wrongfully-convicted persons--but only if such persons are still alive to be released. If, instead, we sanction execution, with full recognition that the probable result will be the state-sponsored death of a meaningful number of innocent people, have we not thereby deprived these people of the process that is their due? Unless we accept--as seemingly a majority of the Supreme Court in *Herrera* was unwilling to accept--that considerations of deterrence and retribution can constitutionally justify the knowing execution of innocent persons, the answer must be that the federal death penalty statute is unconstitutional.

**\*4** [3] Consequently, if the Court were compelled to decide the issue today, it would, for the foregoing reasons, grant the defendants' motion to dismiss all death penalty aspects of this case on the ground that the federal death penalty statute is

unconstitutional. But prudence dictates that in a matter of such importance, the Court should give the Government--which only now has the benefit of the Court's views on this issue--one last opportunity to be heard before a final determination is reached. Accordingly, the Government, if it chooses, may submit an additional brief on the aforementioned issue by no later than May 15, to which defendants may respond by no later than May 31, following which the Court will render a final determination. Alternatively, if the Government prefers to treat this as a final order granting defendants' motion and proceed directly to appeal (assuming such is available), it should so notify the Court, in writing, by no later than May 1, so that a final order may be entered.

SO ORDERED.

FN1. *See, e.g.,* National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, *The Future of Forensic DNA Testing* (2000) at 6.

FN2. *See id.* at 1, 13.

FN3. *See Development in the Law-Confronting the New Challenges of Scientific Evidence,* 108 Harv. L.Rev. 1557, 1573-78 (1995); *see also* the proposed bipartisan Innocence Protection Act of 2001, S.486, 107th Congress, § 101(a)(3)(2001); H.R. 912, 107th Congress, § 101(a)(3)(2001)(Findings).

FN4. Defendants' statistics and summaries of such releases, derived from data kept and continuously updated by the Death Penalty Information Center at its website, *http://www.deathpenaltyinfo.org/innoccases,* have not been disputed by the Government on this motion. *See also* Ex. A to Defendants' letter brief dated April 11, 2002, Press Release from the Death Penalty Information Center dated April 9, 2002. *Cf.* S.486, at § 101(a)(5)(more than 80 defendants, including 10 who had been sentenced to death, exonerated by DNA testing between 1994 and 2001). *See generally* National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial* (1996).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



FN5. Defendants claim that the figures are even higher, but a review of the underlying data on the website of the Death Penalty Information Center, *supra,* shows that the defendants' figures include cases in which the basis of the exoneration is not clearly discernible. On any fair analysis of the website data, however, at least 20 of the 51 death-sentenced defendants who have been released from prison since 1991 were released on grounds indicating factual innocence derived from evidence other than DNA testing.

FN6. "No person shall ... be deprived of life, liberty, or property without due process of law...." While this language--drafted when capital punishment for such offenses as burglary, arson, counterfeiting and theft, was common, *see* Stuart Banner, *The Death Penalty: An American History* (2002) at 5--clearly implies that some capital punishment is compatible with due process, due process is, virtually by definition, an evolving concept that takes account of current conditions and new discoveries, as well as heightened moral awareness. In *Herrera,* the concurring and dissenting justices (a majority of the Court), in describing the execution of the innocent as a constitutionally intolerable event, used terms like "shock the conscience," suggesting that they view it as a denial of substantive due process.

FN7. Defendants also assert numerous other grounds, such as under the Sixth and Eighth Amendments, for holding the death penalty statute unconstitutional and/or for not applying it to the remaining defendants in this case. This Opinion And Order does not reach any of these other grounds.

FN8. This additional letter briefing was requested by the Court after the Government, in its original brief, similarly failed to unearth any prior precedent directly addressing the aforementioned issue.

FN9. As the Government notes, Chief Justice Rehnquist's opinion for the Court, while acknowledging the fallibility of any fact-finding system, takes solace not only in the putative unlikelihood of frequent mistakes but also in the availability of executive clemency when all legal remedies are exhausted. In the Chief Justice's view, "Clemency ... is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." *Herrera,* 506 at 411-12. But subsequent studies show that there has been a precipitous decline in the number of clemencies granted in recent years. As summarized by Professor Banner: "The most noticeable [change in recent years] was the sudden decline of clemency. For centuries governors commuted death sentences in significant numbers. That pattern continued for the first two-thirds of the twentieth century ... [but] dropped close to zero under the new sentencing schemes [enacted after 1972]." Banner, *supra,* at 291. This is hardly surprising in an age when "law and order" is a political issue, for the executive branch, far more than the judiciary, is inherently sensitive to political pressure. In any event, clemency has no real relevance to the issue now before this Court, for it would be unusual for an executive to stay an execution simply because proof of innocence might *thereafter* develop; yet it is this very real possibility, as demonstrated by the emergence of DNA testing, that creates the constitutional problem here addressed.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOHN KOGUT,

                Petitioner,

    -against-

CHRISTOPHER ARTUZ, Superintendent of
Green Haven Correctional Facility,

                Respondent.

Civil Action No. 97-CV-2094

(Hurley, J.)
(Lindsay, M.J.)

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK     )
                        :ss.:
COUNTY OF NEW YORK   )

        Joseph Ciraco, being duly sworn, deposes and says:

        1.     I am over 18 years of age and am employed by Wilmer, Cutler & Pickering and am not a party to this action.

        3.  On April 29, 2002, I caused a true and correct copy of the attached **MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION AND STAY OF PROCEEDINGS** to be served by FedEx, next business day delivery, on:

                Denis Dillon
                Nassau County District Attorney
                262 Old Country Road
                Mineola, New York 11501

                                _Joseph Ciraco_
                                  Joseph Ciraco

Sworn to before me this
29th day of April 2002

      Notary Public

VANESSA ROSE-MUSSENDEN
Notary Public, State Of New York
No. 01RO5000202
Qualified In Suffolk County
Certificate Filed In New York County
Commission Expires August 10, 20 22