# EXHIBIT G

COUNTY COURT  :  NASSAU COUNTY

– – – – – – – – – – – – – – – – – – – – – – x

THE PEOPLE OF THE STATE OF NEW YORK,       :

                                           :

                  -against-                :

                                           :          Ind. #61029

JOHN KOGUT,                                :

                    Defendant.             :

– – – – – – – – – – – – – – – – – – – – – – x

                         262 Old Country Road
                         Mineola, New York
                         May 13, 1986

B E F O R E :

              HON. JOHN F. O'SHAUGHNESSY,

                                     County Court Judge.

A P P E A R A N C E S :

         HON. DENIS DILLON
         Nassau County District Attorney
         BY:  FRED KLEIN, ESQ., of Counsel
              Assistant District Attorney,

                                     for the People.


         F. JAMES WOODS, ESQ.,

                                     for the Defendant.




                    -JURY TRIAL-




                         JERRI KREVOFF, CSR, RPR
                         Official Court Reporter

Waltman - People - Cross                    622

that you all stopped and looked at the area where Theresa

Fusco was allegedly found?

    A    That's where Mr. Kogut told us to stop.  Yes, sir.

    Q    Is that where you stopped, right by the wood?

    A    Yes, sir.

        MR. WOODS:  I have no further questions.

        MR. KLEIN:  No redirect.

        THE COURT:  Thank you, detective.

        Call your next witness.

        MR. KLEIN:  The People call Police Officer

Wayne Birdsall.

P O L I C E    O F F I C E R    W A Y N E

B I R D S A L L,  Shield #603, assigned to the Scientific

    Investigation Bueau of the Nassau County Police

    Department, called as a witness on behalf of the

    People, having been first duly sworn by the Clerk of

    the Court, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. KLEIN:

    Q    Police Officer Birdsall, how long have you been

a member of the Nassau County Police Department?

    A    Thirteen years, this June.

    Q    You mentioned that you're assigned to the

Scientific Investigation Bureau.  How long have you been

2  assigned there?

3      A    Eight and-a-half years.

4      Q    Can you describe what your duties are with the

5  Scientific Investigation Bureau?

6      A    I'm assigned to the serology section of the

7  laboratory.

8      Q    What is that, in laymen's terms?

9      A    We analyze body fluids, identify hairs, as

10  related to crimes in Nassau County.

11      Q    Now, were you working with the Scientific

12  Investigation Bureau on December 6, 1984?

13      A    Yes, sir; I was.

14      Q    Did you have an occasion, during that day, to meet

15  Detective Harry Waltman from the Homicide Bureau?

16      A    Yes, I did.

17      Q    What if anything did Detective Waltman give you

18  on that day?

19      A    He brought me a white envelope, and blood of the

20  deceased.

21      Q    Let me show you what's marked for identification

22  as People's Exhibit 34.  Do you recognize that, Officer

23  Birdsall?

24      A    Yes; I do.

25      Q    What do you recognize that to be?

A     This is the white envelope that Detective Waltman gave to me, containing the hair samples of the deceased.

Q     Who did you give that to?

A     I turned them over to Detective Fraas of the Scientific Investigation Bureau.

Q     That's Charles Fraas?

A     Yes, sir.

Q     When you received that from Detective Waltman, was the envelope sealed?

A     Yes, sir; it was.

Q     What condition was it in when you gave it to Detective Fraas?

A     I had opened up this envelope, and looked inside, and saw four small white envelopes, containing hair samples.

Q     Was that the condition it was in when you gave it to Detective Fraas?

A     Yes, it was.

Q     Now, let me direct your attention to March 26, 1985.  Did you have an occasion to search or examine a blue van on that day?

A     Yes, I did.

Q     Where did you conduct that examination?

A     In the Emergency Services Bureau, in police headquarters.

Q     Is that also known as the E building?

Birdsall - People - Direct                    625

1

2       A       Yes, it is.

3       Q       The van was in there when you examined it?

4       A       That is correct.

5       Q       Did you remove some hairs from the interior of that

6    van?

7       A       Yes, I did.

8       Q       Could you describe what you did, or how you did it.

9       A       We were assigned to look at the truck for any types

10   of physical evidence that we could find.  I did look

11   through the van and removed numerous hairs with tweezers

12   that were found scattered throughout the truck.

13      Q       What did you do with the hairs, after you removed

14   them from the truck?

15      A       I put them in white envelopes and labeled the

16   envelopes.

17      Q       How did you label the envelopes?

18      A       I put the location of the van, and my initials.

19      Q       The location of the van, meaning what?

20      A       Where the hair was found.

21      Q       You mean that you put in that envelope?

22      A       That is correct.

23      Q       I see.  And after you had placed the hair in the

24   various envelopes, what did you do with the envelopes?

25      A       I -- after going back to the laboratory, I turned

Birdsall - People - Direct                    626

them over to Detective Fraas.

Q    The same detective that you had turned that other envelope over to?

A    Yes, sir.

Q    And were the envelopes that you turned over to him, were they all labeled with the area in the van that the hair had come from?

A    Yes.

MR. KLEIN:  May I have this marked for identification?

(Whereupon People's Exhibit 35 was marked for Identification, only.)

Q    Detective, or Officer Birdsall, do you recognize that exhibit?

A    Yes, I do.

Q    What do you recognize that to be?

A    This is the envelope that I placed the hairs that I removed from the van.  In this envelope, I placed them in here.

Q    Did you label the envelope with the area of the van the hairs had been removed from?

A    Yes, sir.

Q    What area was that?

A    It was the right front seat floor.

Birdsall - People - Direct                     627

1

2    Q    And you turned that envelope over to Detective

3  Fraas?

4    A    Yes, I did.

5    Q    Let me show you what's been marked as People's

6  Exhibit 25.  Do you recognize what's shown in that

7  photograph?

8    A    Yes, I do.

9    Q    What do you recognize that to be?

10   A    This is the van that we had inspected that

11  evening.

12   Q    Is that the location it was in when you inspected

13  it?

14   A    Yes, it is.

15        MR. KLEIN:  May I have this marked for

16  identification?

17        THE COURT:  Yes.

18        (Whereupon People's Exhibit 36 was marked

19  for Identification, only.)

20        MR. KLEIN:  Show that to Officer Birdsall,

21  please.

22   Q    Do you recognize that exhibit, Officer Birdsall?

23   A    Yes, I do.

24   Q    What do you recognize that to be?

25   A    This is the interior of the van that we had

1          Birdsall - People - Cross                    628

2    searched.

3        Q    Is that a fair and accurate representation of the

4    way it looked on the day you searched it?

5        A    Yes, it is.

6              MR. KLEIN:  I would offer the two

7          photographs of the van into evidence, your Honor.

8              MR. WOODS:  No objection.

9              THE COURT:  In evidence.

10             (Whereupon People's Exhibit 35 and 36 were

11         now received and marked in Evidence.)

12       Q    The photograph of the interior of the van, is that

13   the way it looked before or after you searched it?

14       A    This is after we searched it.

15       Q    There were items that you had removed?

16       A    Yes.

17             MR. KLEIN:  I have no further questions.

18   CROSS-EXAMINATION
19   BY MR. WOODS:

20       Q    As I understand it, you were assigned to the

21   serology branch of the Scientific Investigation Bureau.

22   Is that correct?

23       A    That is correct.

24       Q    You, in fact, do the serology testing -- did you

25   do any serology testing for hair comparisons?

A    I do not do hair comparisons.  I do serology testing.

Q    Now, on December 6, 1984, there came a time when you met with Detective Waltman; is that right?

A    Yeah.  He came to the laboratory.

Q    About six p.m. on that day?

A    Six p.m.?  I don't recall the exact time, but he was in the lab that day.

Q    Was it late evening?

A    I think it was before six p.m.

Q    Do you recall what tour you were working that day?

A    I was assigned to the eight to four tour of duty.

Q    You didn't work overtime that day?

A    I do work a lot of overtime.  That day, I don't recall if I did or didn't.

Q    Do you have any independent recollection as to what time he was there?

A    I think it was sometime in the afternoon.

Q    Now, was Detective Volpe present at that time?

A    In the laboratory?  No; he was not.

Q    Was there a form 106 prepared, proceeding that envelope?

A    In invoice form?  Yes, there was.

Q    Do you know who signed that invoice form?

```
 1                Birdsall - People - Cross              630

 2        A    No, I don't.   I'd have to look at it, to see who

 3   signed it.

 4        Q    If you have it with you to refresh your recollection.

 5        A    No, I don't have the 106.

 6             MR. WOODS:  I would ask that these four

 7        pages be marked.

 8             (Whereupon Defendant's Exhibit D was marked

 9        for Identification, only.)

10        Q    Take a look at Defendant's Exhibit D for

11   Identification.  I would ask you if any of these sheets

12   refresh your recollection as to who signed the receipt?

13        A    The 106 are you referring to?

14        Q    Yes.

15        A    The 106 is signed by --

16        Q    (Interposing)  I'm not asking you who signed it.

17   I'm asking you if that refreshes your recollection as to who

18   signed it.

19        A    Well, looking at it, I see the signature.  Yes.

20        Q    Was that 106 prepared in your presence?

21        A    No.

22        Q    So in other words, as I understand it, then,

23   Detective Waltman gave you something, but all the receipting

24   of it was done outside of your presence.  Is that right?

25        A    All the processing?
```

2  Q    The paper processing of receipts, and that, you
3  had nothing to do with?

4  A _ Homicide doesn't do any of their paper work in the
5  laboratory.

6  Q.   So whatever receipts were done up in Homicide, the
7  laboratory did its thing downstairs; and you really had
8  nothing to do with each other.   Right?

9  A    We're on the same floor as they are.

10  Q    Did you have any discussions with Detective Volpe
11  about anything that you received on that day?   I'm talking
12  about on the sixth.

13  A    That day?  I don't recall.  I don't remember seeing
14  Joseph that day.

15  Q    You don't even know if you worked that day; do you?

16  A    If Joseph did?  I have no independent recollection
17  of that.  No.

18  Q    Now, on the twenty-sixth of March, you received
19  an assignment to go to the E building, and go through a van.
20  Is that right?

21  A    That is correct.

22  Q    And in your direct testimony, you said, we looked.
23  Was it you alone, or was there anyone  else in that van?

24  A    There were other members from the laboratory therefore
25  yes.

Birdsall - People - Cross                    632

1

2      Q    Do you recall who they were?

3      A    I believe Detective Fraas was there, and Police

4   Officer King.

5      Q    Police Officer King?

6      A    Yes.

7      Q    Do you know Police Officer King's first name?

8      A    John.

9      Q    And approximately what time did you arrive at that

10  van?

11     A    It was late afternoon.

12     Q    When you say, late afternoon, you mean after

13  three o'clock?

14     A    Yes.

15     Q    Would it be after four, also?

16     A    Yes.  I believe it was after four.

17     Q    Is it fair to say that you, Detective Fraas and

18  Police Officer King completed your search and inventory

19  of that van, about six p.m. that night?

20     A    I would think that we were near completion.  I

21  don't recall if we were completely done.

22     Q    Now, as you went through the van, I presume you

23  found some hairs; Police Officer King found some hairs;

24  Detective Fraas found some hairs.  Is that a fair statement?

25     A    Well, I processed all the hairs.  I put all the

Birdsall - People - Cross                    633

1
2    hairs in the envelopes.

3        Q      You put them in the envelopes and marked the

4    envelopes?

5        A      That is correct.

6        Q      Did you secure each one in the van, pick it up?

7        A      And put it in the envelope; yeah.

8        Q      And you located each one?

9        A      I didn't locate each one.  Perhaps someone --

10       Q      (Interposing)  I'm sorry.  Strike my question,

11   please.  When I say you located each one, when you placed it

12   in the envelope, you placed the location as to where it was

13   found?

14       A      On the envelope; correct.

15       Q      And that location is really where you first

16   observed it?

17       A      That is correct.

18       Q      Someone else may have drawn your attention to it

19   and said, there's one, pick it up.  There's one, pick it

20   up.

21       A      That is correct.

22       Q      Police Officer King is actually with the Crime

23   Scene Search Unit; isn't he?

24       A      No.

1

2      Q      He's in the Scientific-Investigation Bureau with

3    you?

4      A      Yes, sir.

5      Q      And as you were going through this vehicle, do

6    you know whether anyone else had been in that vehicle,

7    on that day; other than the three of you?

8      A      Before the three of us?

9      Q      Yeah.

10      A      No, I don't.

11      Q      Did you have any record of how that vehicle was

12    transported to the E building; or any knowledge of how it

13    was transported to the E building?

14      A      That particular vehicle, I have no idea how it

15    got there -- to the E building.

16      Q      Is it fair to say that somebody told you there is

17    a van in the E building, go through it.  Get all the hair

18    out of it, or whatever else you were told?

19      A      Well, they said to look at it for any type of

20    serological or hair evidence that we might be able to retrieve;

21    yes.

22      Q      Now, while the three of you were examining the

23    vehicle, were there any other members of the department

24    examining the vehicle for any other purposes?

25      A      Well, it was the three of us looking at it.  I

Birdsall - People - Cross                        635

1
2    don't recall if anybody else was there for any other
3    reason.
4         Q    Now, by the time you had finished your investigation,
5    or your going through the vehicle, is it fair to say you
6    picked up approximately twenty-one, twenty-two individual
7    hairs?
8         A    I did not count them.
9         Q    Do you have anything that would refresh your
10   recollection as to how many hairs you picked up?
11        A    It was numerous hairs.  I don't count individual
12   hairs.
13        Q    But you marked each one?
14        A    I didn't -- I marked the location where hairs
15   were removed.  It might have been multiple hairs.  I didn't
16   put each individual hair in individual envelopes.
17        Q    Did you mark how many hairs were picked up at each
18   time?
19        A    No, I did not.
20        Q    So do you have any records that would indicate
21   exactly how many individual packets of hair you prepared,
22   on March 26, 1985?
23        A    No, I do not.
24        Q    Did you retain the packets of those hairs?
25        A    I turned them over to Detective Fraas.

2   Q    But you don't know how many you turned over to

3   him?

4   A    I don't recall; no.

5   Q    And any notations you took, were right on those

6   individual envelopes?

7   A    As to location.

8   Q    As to location.

9   A    That is correct.

10   Q    Were there any other notations you took during

11   that search of the van?

12   A    Yes.

13   Q    Do you have those with you today?

14   A    Yes, I do.

15        MR. WOODS:  May I see them.

16   Q    Officer Birdsall, you've shown me certain notes.

17   These were prepared after you finished your work in the van;

18   is that correct?

19   A    What I showed you --

20   Q    (Interposing)  What you showed me in the

21   typewritten notes.

22   A    Well, those notes are taken while you're doing the

23   examination.  Before you do the examination, you make

24   notations as to what you're examining.

25   Q    You mean while you were -- I'm sorry.

Birdsall - People - Cross                    637

1

2      Do you mean before you went to the van, you took

3   the notes?

4      A    No.

5      Q    While you were at the van, you --

6      A    (Interposing)  While I was at the van --

7      Q    (Interposing)  You have a typewriter with you in

8   the van?

9      A    No.  I jotted it down.  The typewritten is my

10  final compilation of all my notes.

11     Q    Oh, okay.  In other words, while you were at the

12  van, you had a piece of paper of some sort, that you were

13  writing, with your hand?

14     A    Oh, I don't carry a typewriter with me, counsel.

15     Q    That's what I'm asking you.

16     A    No.

17     Q    While you were there, you took handwritten notes;

18  is that right?

19     A    That's correct.

20     Q    Later in your office, you typed them up into

21  a formal report.  And that's what you have with you today?

22     A    That's my formal report; yes.

23     Q    Do you have the copies of the actual notes while

24  you were in the van?  That's what I'm asking you.

25     A    Well, my notes are on the envelopes; the locations

Birdsall – People – Cross                638

2    where I took it.  That's the actual --

3         Q    (Interposing)  That constitutes the notes that you

4    took while you were in the van?

5         A    That constitutes the actual evidence that I took;

6    yes.

7         Q    But I'm saying, while you were in the van, you

8    made certain notations on each envelope, as you put

9    something in it.

10        A    I write on the envelope, as I was doing it.  Yes.

11        Q    Did you take any other notes as to what you were

12   doing?  Did you have a pad with you?

13        A    I wrote on a pad, what I was examining; yes.

14             THE COURT:  When and where did you do that?

15             THE WITNESS:  Well, before I took -- retrieved

16        any evidence from the van, I wrote down what it was,

17        the vehicle it was, the mileage, the vehicle

18        identification number.

19             THE COURT:  This is on a pad?

20             THE WITNESS:  That's on a pad.

21             THE COURT:  That's what he's asking you about.

22        In the van.

23        Q    Right at the van.  You were going through the

24   van.  You looked at the vin number and wrote it down?

25        A    Right.

1

2       Q    This would be during that several hours you were

3   in the van?

4       A    That is correct.

5       Q    That's what I'm asking.  That paper, do you have

6   that paper?

7       A    No, sir.

8       Q    Do you know what you did with that paper?

9       A    After I did my final report, I threw it away.

10      Q    Were you directed by anyone to throw it away?

11      A    I don't keep all my notes.  If I kept all my

12  notes--

13      Q    (Interposing)  I'm asking you, were you directed

14  by anyone to throw it away.  Did anyone tell you, throw it

15  away, don't put it in the case file?

16      A    No.  No one told me.

17      Q    You did that on your own?

18      A    Correct.

19      Q    Did any supervisor ask to review the notes that

20  you had taken, while you were at the van?

21      A    They didn't look at my notes.  They looked at my

22  final report.

23      Q    I show you  People's Exhibit 35 for Identification.

24  That's one of the envelopes you prepared notes on, while you

25  were searching this van.  Is that right?

Birdsall - People - Cross                    640

2    A    That is correct.

3    Q    As I understand it, you did maybe twenty,

4    twenty-five, thirty of those, while you were at the van.

5    Is that right?

6    A    I don't recall how many envelopes I made; no.

7    I don't recall.

8    Q    Do you have those envelopes?

9    A    Detective Fraas has all of them.

10    Q    Are they present here today?

11    A    I, myself, do not have them in my possession.

12    Because I turned them over for comparison, to Detective

13    Fraas.

14    Q    When you turned them over for comparison to

15    Detective Fraas, did you just refer to them as numerous; or

16    did you know how many envelopes you were turning over to

17    Detective Fraas?

18    A    On each envelope, I labeled where I retrieved

19    the evidence from.

20    Q    On the envelope, itself?

21    A    On the envelope, itself.

22    Q    As I understand it now, you're walking into

23    Detective Fraas, and you've got a packet of envelopes?

24    A    That are labeled.

25    Q    You don't know how many envelopes you had?

Birdsall - People - Cross                    641

1

2    A    I didn't count them.

3    Q    You don't know what they said on them -- at this

4  point?  You know you put something on them at the time.

5    A    The numerous locations; yes.

6    Q    Then those envelopes were just given to Detective

7  Fraas?

8    A    Correct.

9    Q    By you?

10    A    Correct.

11    Q    You didn't anywhere write down the number of

12  envelopes you gave him? You don't know, to this day, how

13  many envelopes you did?

14    A    The exact -- no.

15    Q    So if Detective Fraas came in with twenty-five

16  envelopes today, you'd say, I did twenty-five?

17              MR. KLEIN:  Objection.

18              THE COURT:  Sustained.

19    Q    If Detective Fraas came in with twenty-five

20  envelopes today, would you know whether you did twenty-five,

21  more, less?

22    A    I'd look at them, and see if my initials were on

23  each one.

24    Q    So if he came in with twenty-five envelopes with

25  your initials on them, would you know whether you did

thirty that day?

    A     I would say I did twenty-five.

    Q     Because that's what Detective Fraas showed you?
Or for some other reason?

    A     Well, if he said this is all the hair that you
took that day, and there were twenty-five envelopes, I would
say I took twenty-five envelopes.

    Q     But if he had lost one, you wouldn't know.  Would
you?

    A     We don't lose evidence, counselor.

    Q     You say, we don't. You've never lost an
envelope in your life?

    A     Not with evidence in it.

    Q     You didn't catalog it anywhere; did you?

    A     I cataloged it right on the envelope.

    Q     But anywhere else --

          MR. KLEIN:  I object, at this point.

          THE COURT:  I'll permit an answer to that
question.

          Read it back.

          (Whereupon the Court reporter complied with
the request.)

          THE WITNESS:  No, I didn't.

    Q     Now, those envelopes, did you take them from the

2    van into the Scientific Investigation Bureau? Or did you

3    turn them over to Detective Fraas, right at the van?

4        A    I believe we waited until we got to the lab.

5    Then I turned the evidence over to him.

6        Q    Aside from these envelopes that you put hair in,

7    did you take anything else out of the van on that day?

8        A    Yes, I did.

9        Q    And was that a pillowcase, a T-shirt and blankets?

10       A    That is correct.

11       Q    How many blankets did you take

12       A    I don't recall the exact number.

13       Q    Do you have something that might refresh your

14   recollection?

15       A    Yes.  I don't have the exact number of blankets

16   that we removed; no.

17       Q    Was there any way you distinguished one blanket

18   from another, that was in the van?

19       A    After we got to the laboratory, we labeled them.

20   We put numbers on them.

21       Q    How did you label them?

22       A    We put numbers on them.

23       Q    Do you recall -- strike that.

24            There were more than one blanket; weren't there?

25       A    Yes; that's correct.

Birdsall - People - Cross                644

Q    Do you recall the colors of any of the blankets?

A    They were numerous colors.

Q    Did you do anything with relation to those blankets?

A    Yes, I did.

Q    What did you do?

A    I performed morphological examination on them.

Q    Morphological.  That's the shape?

A    Shape, texture, size, and for any physical evidence.

Q    Did you make a record of that examination that you performed on those blankets?

A    Well, we did take the hairs off them; Detective Fraas and I.  He has the hair, as well.

Q    You say, Detective Fraas and I.  You were both there, while this morphological examination was going on?

A    We were both in the laboratory at the same time, reviewing the blankets.

Q    Once again, were you the person who actually picked each hair and placed it in an envelope?

A    Not each hair, with regard to the blanket; no.

Q    You both were doing it simultaneously; or did Detective Fraas do it?

A    He retrieved all the hairs.  He had them in his possession.

Q    As you did this morphological examination, did you

Birdsall - People - Cross                    645

take any notes as to what you found in your examination?

A    Again, they're on the envelopes; as to the blanket

number and if there were hairs removed.

Q    Was the sole purpose of the morphological

examination, to remove hairs?

A    No.

Q    Did you do other things with respect to the blankets,

in the form of testing?

A    Yes, sir.

Q    You did those tests yourself; is that right?

A    We both viewed it; yes.

Q    As you did that test, though, did you record your

findings; other than hairs that were taken?

A    Well, there was negative results.

Q    Okay.  There was negative results.  Do you just

say, negative results?  Or do you say this test is negative,

this test is negative?

A    We don't record every negative result we get.  It's

a physical impossibility.

Q    Well, do you put a general negative -- in other

words, do you say, blue blanket number one, negative.  Red

blanket number two, negative?

A    No, no.

Q    So there would be no way today, to ascertain how

1
2   many blankets you examined on that day; is that right?
3   There's no record?
4       A    If we went back to the laboratory and counted them,
5   we could ascertain how many we took.
6       Q    You could today count whatever blankets are in the
7   laboratory?
8       A    Sure.
9       Q    But there is no individual record of a negative
10  finding, or any positive finding, that you wrote down on
11  that day?
12      A    If there was a positive finding, I would have one.
13      Q    Did you consider finding a hair, a positive finding?
14      A    It's evidence that has to be secured.
15      Q    So would some record of that be made?
16      A    That was made on the envelope.
17      Q    On the envelopes?
18      A    Correct.
19      Q    And that envelope would indicate from blanket
20  so and so?
21      A    Correct.
22      Q    Now, aside from whatever hairs you took from those
23  blankets, did you put anything else in an envelope?
24      A    With regard to the blankets?
25      Q    With regard to the blankets.

Birdsall - People - Cross                    647

A     I believe the hair was the only evidence we removed from the blanket.

Q     I'm sorry?

A     The hair was the only evidence we removed from the blankets.

Q     They were negative for everything else?

A     That is correct.  Any serological evidence.

Q     Once you had completed the examination for serological evidence on those blankets, was anyone else from the Scientific Investigation Bureau given those blankets for any other testing?

A     No.

Q     And the serological evidence would be blood, hair, semen.  Anything else that you would call serological evidence?

A     Saliva, sweat, urine.

Q     Now, you took other items besides the blankets. Is that right?

A     Correct.

Q     Did you perform similar testing to them, that morphological testing?

A     Yes.

Q     Aside from hair, were they all negative?

A     That is correct.

Birdsall - People - Cross                        648

Q    Once again, the hair that would have been taken from them, would have been placed in an envelope?

A    Correct.

Q    And given to Detective Fraas?

A    Correct.

Q    And you made no records of that, either; did you? Other than what was written on the envelope?

A    No.

        MR. WOODS:  I have no further questions. Thank you.

        MR. KLEIN:  No redirect.

        THE COURT:  Thank you, officer.

        (Continued on next page.)

186

MR. KLEIN:   The People call Detective Charles Fraas.

D E T.   C H A R L E S   A.   F R A A S,   Shield #446, from the Scientific Investigation Bureau of the Nassau County Police Department, called as a witness on behalf of the People, having first been duly sworn by the Clerk of the Court, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. KLEIN:

Q     Detective Fraas, how long have you been with the Nassau County Police Department?

A     Sixteen years.

Q     How long have you been assigned to the Scientific Investigation Bureau?

A     A little over fifteen years.

Q     Could you describe what your present duties are with the Scientific Investigation Bureau.

A     Yes, sir.  My current duties include the examination and analysis of physical evidence, for the presence of blood, hair, semen, and other body fluids.

Q     Can you describe for the jury what your training and experience is, with respect to those duties.

A     Yes.  I have a Bachelor's Degree in biology, from Hofstra University.  In addition to that, I have six months

187

of training under my immediate supervisors on basic serological and hair examination techniques.

In addition to that, I have two weeks of training at the New York City Medical Examiner's Office, on advanced bio-chemical methods of analysis of blood and hair. I have a week training at the FBI Academy, on forensic microscopy of hair; a week of training at the University of Connecticut, on the forensic microscopy of hair and fibers; two weeks of training at the FBI Academy, on bio-chemical methods of analysis of blood, hair and body fluids.

In addition to that, I attended numerous seminars and other schools, sponsored by the American Academy of Forensic Science, Northeastern Association of Forensic Science, and various other organizations in the area.

Q    Are you a member of any professional organizations in your field?

A    Yes, sir.

Q    What are those?

A    The Northeastern Association of Forensic Science, and American Academy of Forensic Science.

Q    Have you had occasion, previously, to testify in criminal cases, concerning hair analysis?

A    Yes, sir.

Q    Approximately how many times have you done that?

188

A    I would say in excess of fifty times.

Q    Have you testified for the defense, as well as the prosecution?

A    Oh, yes, sir.

Q    Now, could you describe for the jury what hair comparisons, or hair analysis, consists of.

A    Yes, sir.  Hair comparison is basically a microscopical examination.  And the very nature of hair comparison is that you are examining two samples, side by side, a known sample that is removed from someone's scalp or pubic area; and at the same time, a questioned sample or sample removed from a scene, or an item of evidence.

Each sample is mounted on a microscope, two microscopes, side by side, for the two samples, and viewed simultaneously in the same viewing field.

Q    Can you describe for the jury what the separate components of human hair are.

A    A hair has three basic overall anatomical regions. The outermost portion is called the cuticle.  The central portion is called the medulla.  And the material that fills in the medulla to the cuticle, is called the cortex.

Q    What types of characteristics do you look for, when making this microscopic examination?

A    I look for any number of characteristics, including

189

the presence of the cuticles, the clarity, the appearance of

it.  Is the inner margin defined; are the scales protruding.

How long are the scales.

As I progress into the innermost portions, I

examine the pigment granules, for various characteristics,

and overall appearance of it.  The presence or absence of the

medulla and how that appears; whether it's translucent or

opaque, and a number of other characteristics.

Q     Detective Fraas, I show you what's been marked for

identification as People's Exhibit 34.  Do you recognize that

exhibit?

A     Yes, sir; I do.

Q     What do you recognize that to be?

A     This is the envelope containing the scalpular

samples removed from Theresa Fusco.

Q     Who did you receive that from?

A     If I can check with my report.  That was received

from Officer Birdsall, at SIB, back on December 11, 1984, at

four o'clock in the afternoon.

Q     The marking -- are there any markings on that, that

you made?

A     Yes, sir.  My SIB number, initials, and my

notations of "Sample K-1."

Q     You put K-1 on that particular envelope, to denote

190

that particular envelope?

    A    Yes, sir.

    Q    I ask you to look at People's Exhibit 35 for Identification.  Do you recognize that?

    A    Yes, sir.

    Q    What do you recognize that to be?

    A    A questioned sample number 8, associated with this Homicide investigation.  The envelope contained hair samples that were removed from the front seat floor area of the van.

    Q    And where did you receive that envelope from?

    A    Again, this was received from Officer Birdsall, on March 26, 1985, six o'clock in the evening, at SIB.

    Q    And did you make any markings on that?

    A    Yes, sir.  SIB number is placed on here, and the notation, Q-8.  Questioned sample number 8.

    Q    I take it you received a number of envelopes on the 26th of March, from Officer Birdsall?

    A    Yes, sir.

    Q    Did you place a K with a number on each one of the envelopes?

    A    Yes, sir; I did.

    Q    Now, did you have an occasion to examine the hairs contained in envelope K-1, which is People's Exhibit 34, with the hair contained in Q-8, envelope Q-8, which is People's

654

791

Exhibit 35?

A    Yes, sir.

Q    Did you do that hair analysis that you've described, using the microscope?

A    Yes, sir.

Q    Can you describe what if anything your findings were with respect to that examination.

MR. WOODS:  I would object.

THE COURT:  Read back the question.

(Whereupon the pending question was read back by the court reporter)

THE COURT:  Sustained.

Q    Where did you perform the examination?

A    In the Scientific Investigation Bureau.

Q    That's at police headquarters?

A    Yes, sir.

Q    Did you examine hairs from both of those envelopes?

A    Yes, sir.

MR. KLEIN:  I offer those into evidence, those envelopes.

MR. WOODS:  I have no objection to the envelopes.

THE COURT:  34 and 35.

(Whereupon People's Exhibits 34 and 35,

192

2   previously marked for Identification, only, were

3   now received and marked in Evidence)

4   Q    Now, Detective Fraas, based upon your training in

5   the area, together with your examination of the hairs on

6   those two envelopes, do you have an opinion with respect to

7   that examination?

8            MR. WOODS:   Objection.

9            THE COURT:   Overruled.

10  A    Yes, sir; I do.

11  Q    What is that opinion?

12  A    My opinion is that the questioned hair sample

13  removed from the van, could have originated from the scalp of

14  Theresa Fusco.

15  Q    That's based upon a comparison of the hairs from

16  K-1 to Q-8?

17  A    Yes, sir.

18  Q    Could you describe for the jury what if any

19  physical characteristics you saw, that led you to that

20  opinion.

21  A    Yes, sir.  Included in the characteristics that led

22  me to my conclusion, are the fact that both hairs are

23  Caucasian.  They're both scalp hairs, and brown.  The

24  questioned sample certainly fits within the range,

25  length-wise, from the known sample.  The tips on both the

193

2  questioned sample and the known sample, are both cut --

3      Q    (Interposing) What do you mean by that, the tips

4  cut?

5      A    The tips of the hair aren't shredded, split or

6  braided.  They're somewhat freshly cut.  The root, in both

7  hair samples, are somewhat stretched with follicular tags

8  attached.  That's some sort of dermis or cellular material

9  attached to the root portion.

10     Q    From the scalp, you mean?

11     A    Yes, sir.  The diameter of the questioned sample is

12 approximately sixty microns.  And the range of diameters in

13 the known samples, are between fifty-six and ninety-six

14 microns.  The individual hairs taken singularly, in the known

15 sample, exhibit very little diameter variations from the root

16 to the shaft.  And that also is consistent in the questioned

17 sample.  The cuticle appearance in both the questioned and

18 known samples, show some variation, and thickness in the

19 individual hairs.  And the inner margin of the cuticle,

20 microscopically, is not consistently defined in all the hairs.

21 And not consistently defined along the entire shaft in each

22 hair.

23     Q    Is that true with respect to the questioned hairs

24 and the known hairs?

25     A    Yes, sir.

194

Q    Go ahead.

A    The cuticle does give an overall clear appearance. And the scales which are comprised in the cuticle, are somewhat serrated in appearance; especially in the areas that exhibit some artificial treatment.  In both the questioned sample and the known sample, there seems to be some sort of artificial treatment that was applied to the hair.  I wouldn't call it a strong dye, or a heavy bleaching.  But something along the lines of perhaps a residue of a perm.

Q    Now, with respect to that, did you find -- where did you find the presence of the artificial treamtment on the questioned hair and the known hair?

A    In the distal portions of the hair, or the areas most distant from the root portion.

Q    What about the pigment of the hairs?

A    The pigment granules are defined as coarse in appearance.  Medium density, oblong to round shape.  And the pigment granules are distributed evenly and along and across the shaft.  Distributed evenly in that regard, with some striking of the pigment granules.  The medulla is classified as fragmented, meaning that the medulla is -- it occupies less space than a continuous medulla; sometimes opaque, and sometimes translucent in appearance.

Q    Is this in both the questioned and the known hairs?

686

195

A    Yes, sir.  The corticle cells are obscured; the cells that are present in the cortex portion of the hair. The overall appearance of the hair is rather straight.

Q    This is -- these are all present in both the known sample and the questioned sample?

A    Yes.  Those characteristics apply to both.

Q    Did you find anything with your microscopic examination, that showed that the questioned hair was inconsistent with the known sample?

MR. WOODS:  Objection.

THE COURT:  No.  I'll permit it.  Overruled.

A    No, sir.  The range of characteristics that are exhibited in the known sample, are exhibited also in the questioned sample.

MR. KLEIN:  I have no further questions.

THE COURT:  All right.  I'm going to recess for lunch.

Do not discuss the case among yourselves.  Do not discuss it with anyone else.

Do not permit anyone else to discuss it with you.

We'll see you at two o'clock.

(Whereupon there was a luncheon recess).

*                    *                    *

655

196

A F T E R N O O N    S E S S I O N

THE CLERK:  People vs. John Kogut.

Are the People ready?

MR. KLEIN:  The People are ready.

THE CLERK:  Is the defendant ready?

MR. WOODS:  The defendant is ready.

THE CLERK:  The jury is present.

Detective Charles Fraas, you're reminded,

you're still under oath.

CROSS-EXAMINATION
BY MR. WOODS:

Q    Good afternoon, Detective Fraas.

A    Good afternoon, sir.

Q    Now, as I understand it, the first hair samples
that you received, you received some time in December of
1984; is that right?

A    Yes, sir.

Q    And you received them from Officer Birdsall?

A    That's correct.

Q    What if anything did you do with those samples,
when you received them?

A    Those samples were maintained in SIB.

Q    In other words, you just filed them somewhere?

A    Initially, I don't believe I conducted any

197

examinations; no, sir.

Q    And you retained them through March; is that right?

A    Yes, sir.

Q    And during that time, you know you didn't conduct any examinations on them; is that right?

A    I don't believe I did, sir.  No.

Q    When you say you don't believe, are you sure that you didn't; or you're really not sure?

A    I may have visually examined them.  But I don't believe I conducted any microscopic comparisons at that time.

Q    A visual examination would just be a gross looking at them; not through any glass, or even a magnifying glass. Is that right?

A    Yes, sir.

Q    In any event, you took no notes on anything you did prior to March of 1985.  Is that right?

A    No, sir.

Q    That's not right?

A    I don't believe I took any notes.

Q    Then in March of '85, on the 26th, you accompanied Police Officer Birdsall and another police officer to the E building in the police department, and went through a van. Did you not?

A    Yes, sir.

66

198 1

2      Q     While you were at that van, did you personally

3  secure anything that you thought might be evidence?

4      A     I assisted Officer Birdsall in the search of the

5  vehicle.

6      Q     What if -- did you pick up any hairs?

7      A     No.  As I recall, Officer Birdsall picked up hairs,

8  and placed them in envelopes, that he had marked.

9      Q     Well, did you locate hairs in the vehicle, and

10  point them out to Officer Birdsall?

11      A     I assisted him in his examination.  Yes, sir.

12      Q     I'm trying to get -- what do you mean when you say,

13  "I assisted him"?  What did you do?  Physically, what did you

14  do?  Did you look through the van?

15      A     I accompanied him in his investigation.  If there

16  was an area to be examined, I might point out, examine this

17  area.  Or I may hold the envelope for him when he placed it

18  in.  I don't recall all of my actions.  But Officer Birdsall

19  was the principal investigator.

20      Q     In any event, eventually, you left that van and

21  received envelopes from Officer Birdsall; did you not?

22      A     Yes, sir.

23      Q     Do you recall how many envelopes you received from

24  Officer Birdsall?

25      A     I don't recall.  But if I refer to my report --

662

199

2    Q    (Interposing) If you have something, you mau refer

3    to it.

4    A    Yes, sir.  I have enumerated at least twenty-one

5    questioned samples on that occasion.  And each of which were

6    submitted separately, in envelopes.

7    Q    Now, those twenty-one questioned samples, is each

8    sample a single hair; or is some a grouping of hair?

9    A    They are more than likely more than one hair, in

10   many of those envelopes.  Each number or questioned numbered

11   sample, just refers to a particular area; not one particular

12   hair.

13   Q    So then, whatever hair was taken from the left side

14   of the bench seat, would be grouped in one and called an

15   envelope.  Is that right?

16   A    Yes, sir.

17   Q    Did you check each of those envelopes, and make any

18   determination as to whether the hairs in each envelope were

19   similar or not, to each other?

20   A    Did I compare one questioned sample to another?

21   Q    Yes.

22   A    No, sir.

23   Q    Now, when you took a questioned sample -- that

24   would be an envelope; is that right?

25   A    Yes, sir.

665

200 1

2        Q      Did there come a time that you examined each

3     questioned sample?

4        A      Yes, sir.

5        Q      Each of the twenty-one questioned samples?

6        A      Yes, sir.

7        Q      Did you first examine them by gross examination, of

8     looking at them?

9        A      Yes, sir.

10       Q      As a result of that non-microscopic, or

11    non-magnified examination, did you eliminate any of those

12    hairs outright?

13       A      At this particular juncture in the investigation, I

14    was focusing on comparing those hairs from the van, with the

15    known samples of Theresa Fusco; knowing that the deceased's

16    hair was brown, medium length.  I, of course, would, on the

17    gross examination, eliminate a long blonde hair; or if there

18    were -- I don't recall any.  But certainly, if there was a

19    negroid hair sample, things of that nature, would be

20    eliminated upon gross examination.

21       Q      Detective Fraas, can you, with a reasonable degree

22    of scientific certainty, distinguish Caucasian hair from

23    negroid hair?

24       A      Yes.

25       Q      Can you also distinguish male hair from female

201

hair?

A In most instances, no.

Q Now, as I understand it, you had a known sample. Is that correct?

A Yes, sir.

Q Known, because somebody had identified it to you, and said what it was?

A Known, because it was removed from the scalp of the deceased, by the morgue or the morgue attendants, and --

Q (Interposing) This is what you were informed?

A Yes, sir.

Q Now, that sample, as I understand it, was clinically taken. So it would have root and everything else. Is that right?

A They have been instructed to pull hairs from a scalp; not cut them. Yes, sir.

Q And was the known sample that you viewed correctly taken, to your scientific satisfaction?

A Yes. It was root to tip.

Q Did you ascertain from what portion of the head that sample had been taken?

A There, to my recollection, were four samples removed from the scalp of the deceased, from four different areas. Usually, the left, right, front and rear.

660

202

Q    Were they identified to you, as to which areas they were removed from?

A    I believe they were, on the four individual envelopes, marked such:  left, right, rear, front; something to that nature.

Q    Now, as I understand it, when you did your actual investigation, you only took one of those hairs; is that correct?

A    No, sir -- are we referring to the known sample of --

COURT:  What do you

Q    (Interposing) The known sample.

A    No, sir.  That's not a correct statement.

Q    You took all four of those hairs?

A    I took a number of hairs from each of four different areas.

Q    Maybe I don't understand.  The samples that were originally given to you, were they one strand of hair, or several strands?

A    There were a number of hairs in each of the four envelopes, which corresponded to four areas of the scalp.  I would say probably somewhere in the area of fifty or more hairs in each envelope.

Q    Now, then, you had some twenty-one unknown hairs; is that right?

660

203

2      A    Questioned samples.  Yes, sir.

3      Q    Questioned samples.  Each of those questioned

4   samples, were they in that same range of fifty hairs, or

5   forty hairs?

6      A    No, sir.  The questioned samples that were removed

7   from the blanket, as I testified to earlier, maybe one

8   questioned area may have only one or two hairs.  And another

9   area may have had more than that.  I don't really recall the

10  figures.

11          THE COURT:  What do you mean by questioned

12      areas, Detective?

13          THE WITNESS:  The questioned hairs --

14          THE COURT:  Oh, questioned hairs; not area?

15          THE WITNESS:  Yes, sir.

16     Q    Did there come a time that you actually examined

17  the questioned samples from the right front seat, in

18  comparison to what you were told was a hair from Theresa

19  Fusco?

20     A    Yes, sir.

21     Q    And did you call that sample Q-8?

22     A    Yes, sir; I did.

23     Q    And that sample, do you recall how many hairs that

24  had?

25     A    I believe there were four hairs, individual hairs

66'

204

in that particular sampling.

Q    And in taking those hairs, the first thing, as I understand it, you did, was you observed it, and you determined, well, the color, the length are close enough to look at.  Is that correct?

A    Yes.

Q    And did that, in and of itself, make it worthwhile to do this comparison microscopy?

A    Yes.  That would be a preliminary step.

Q    Were there any other preliminary steps that you performed; other than visualizing and looking at them?

A    None that I can recall; no, sir.

Q    After that, did you take one of those hairs, or all four of those hairs, and put them on that slide that you described?

A    The hairs were individually mounted on separate microscopic slides.

Q    Now, at this point, is it fair to say you didn't know the similarities of those four hairs; other than the gross examination you had made?

A    That's correct.

Q    Did you then examine those four hairs against each other, to determine any similarities or difference?

A    No, sir.  I don't conduct comparisons, questioned

660

2 05

sample against questioned sample.  That's not a viable method of doing a comparison.

Q    Did you actually measure the samples, in terms of their length?

A    I approximated their length with a ruler; yes, sir.

Q    And did you record the length of those four strands in that questioned sample of eight?

A    I recorded the length of some of the questioned samples, in my notes; yes, sir.

Q    And how long was each of those four hairs in that questioned sample eight?

A    As I reported earlier, under direct testimony, the length of the hairs were approximately in the four to five inch range.

Q    You mean all four were more than four, but less than five inches long?

A    The two hairs that I focused on, which I found to be microscopically alike with Theresa's, were in the four to five inch range.

Q    There were two other hairs in that same sample.

A    That's correct.

Q    And those hairs, you did not find to be microscopically alike.  Is that correct?

A    Yes, sir.

665

206

2    Q    So you discounted them from your test, once you
3    found that dissimilarity?

4    A    At that point; yes, sir.

5    Q    Now, you had the known sample as well.  Is that
6    correct?

7    A    Yes, sir; I did.

8    Q    Did you have one or more than one known sample
9    mounted on a slide?

10    A    I have, as I recall, one hair per slide.  And a
11    number of slides.

12    Q    In your report, did you indicate the number of
13    slides that you made?

14    A    No, sir.

15    Q    Did you label each of those slides the same thing;
16    K-1?

17    A    Yes, I did.

18    Q    And on the other, you labeled each of those slides
19    K-8; is that right?

20    A    Q-8.

21    Q    Q-8.  I'm sorry.  There were some Q-8's you threw
22    away.

23    A    No.  I didn't throw them away.

24    Q    I mean, there were some that you discounted from
25    further investigation, on finding there was absolutely no

6.0

207

similarity.

A     That's correct.

Q     But there were others that you kept, under that same number of Q-8?

A     I kept all the slides that I mounted --

Q     (Interposing) Kept working on.

A     Yes, sir; I'm sorry.

Q     As I understand, the other two, you put in some other place, because they were no longer relevant to the study you were doing.  Is that a fair statement?

A     Yes, sir.

Q     The two you had left, were still marked the same, K-8?

A     Yes, sir; they were.

Q     The whatever number of hairs from the known sample, were still K-1?

A     Yes, sir.

Q     Now, the K-1 samples, were as long as nine inches; weren't they?

A     Yes, they were.

Q     And is it fair to say that in your microscopic examination of each of the questioned samples, it was your determination that that hair had been from root to tip, a complete root to tip hair?

671

208

2    A    Yes, sir.

3    Q    It wasn't a broken hair, in any way?

4    A    It wasn't fragmented.  No, sir.

5    Q    And as I understand, you described something at the

6    end of the hair, that indicated to you the cut.  Is that

7    right?

8    A    Yes.  The distal portion of the hair, or the

9    portion of the hair furthest from the root, exhibited a

10   somewhat fresh appearance, in term of being cut.  When I say

11   fresh, I can't determine anything more than, let's say, a

12   week, or something along that line.  Certainly, it didn't

13   appear to be a month or two months; or something that had

14   been of that duration.

15   Q    Now, you described this hair, grossly looking, as I

16   understand, there's a root, a tip, and a shaft.  I'm talking

17   about from viewing it, looking at it.

18   A    Yes, sir.

19   Q    With the naked eye.  Then, under a microscope,

20   there are three basic areas:  the cuticle, the medulla, and

21   the cortex.  Is that right?

22   A    That's correct.

23   Q    Now, are you familiar with hair and its ability to

24   grow, after death?

25   A    No, sir; I'm not.

209

Q    At death, does hair cease growing?

A    I believe so; yes, sir.

Q    Do you know, with any degree of scientific certainty, whether it does or does not?

A    I would say -- I would be fairly confident in saying that it does not grow. And in some instances, it does give the appearance of growing, because the facial muscles, or other muscles, will contract and, possibly, the skin will retract from the hair shaft, and possibly expose more of the hair to the eye, and give the appearance that it has grown. Particularly, in beard hairs, that's very noticeable. But as far as anything growing in the body after it's died, I'm reasonably certain that that does not occur. If it did, it certainly wouldn't be noticeable.

Q    Hair actually grows from the root; doesn't it? It doesn't grow on the end?

A    That's correct.

Q    So during its growth status, the end would not change, except to move further away from the head?

A    That's correct.

Q    Now, in addition to the length of hair, do you measure the diameter of the hair?

A    Yes, I do.

Q    What do you measure that with?

210

1

2     A    I measure it with a micrometer-type slide; that's

3 mounted on the microscope.

4     Q    This is done while it's under a microscope; is that

5 right?

6     A    That's correct.

7     Q    And it's done by comparison with a slide that

8 has --

9     A    (Interposing) It has a grid on it, with calibrated

10 numbers on it.

11     Q    And did you measure the diameter of the two

12 questioned samples?

13     A    Yes, sir.

14     Q    Did you record those measurements?

15     A    Yes, sir.  As I testified earlier this morning, I

16 -- they were in approximately sixty microns.

17     Q    And you also measured the known sample; is that

18 correct?

19     A    Yes, I did.

20     Q    And the known sample, some were fifty-six and some

21 were ninety-six microns; is that correct?

22     A    Yes.  There was a forty micron range in diameters.

23     Q    Is that range within an individual hair; or is it

24 on several different hairs?

25     A    That range is not on an individual hair.  In other

words, a hair did not go from fifty-six to ninety-six microns. That would be from hair to hair.  Some were extremely wide, some were much narrower.

Q    Is an individual hair consistent in its diameter, at all times; or can it have a different diameter at different points along the shaft?

A    It very definitely can have different diameters.

Q    What can that range be?  Is there a specific range?

A    No.  There isn't a specific range for any particular hair.  It's just a statistical bit of information, that a hair examiner would record.  And that profile of diameter, or diameter variations, would be a characteristic you may assign to a hair or a hair sample.

Q    It would be one of the ways to show a similarity, that we have this same variation?

A    Absolutely; yes, sir.

Q    But in this case, clearly, there was no variation in the questioned sample?  They were consistently sixty microns?

A    Well, sixty microns, give or take a little bit.  As I testified to earlier, there was minimal variation within sample.  That, I would take to mean a few microns, three or four or five microns; something along that line.  But not an alarming degree of variation within each individual hair.

212 1

2          Q    Nothing coming near that ninety-six?

3          A    That's correct, sir.

4          Q    Now, were you informed at some time earlier in the

5     day, on March 26, 1985, that van that you examined with

6     Officer Birdsall, had been occupied by a woman?

7                    MR. KLEIN:  Objection to what he was informed.

8                    THE COURT:  No.  I'll permit it.

9          A    Was occupied by a woman?

10                   THE COURT:  He's asking you if you were told
that.

12         Q    Were you told that?

13         A    I believe I was told that the van was to be

14    examined for the presence of hair.  And that possibly, the

15    deceased, being a woman, had been in the van.  That, I was

16    told.  Yes, sir.

17         Q    No.  What I'm asking you, were you told that when

18    that van was taken into custody, there was a woman operating

19    it?

20         A    Well, was a woman operating the van?  No, sir.

21         Q    In conducting your tests, would it have been, in

22    any way relevant, for you to get a sample from a woman who

23    had recently been in that van, and been in the front seat of

24    that van?

25                   MR. KLEIN:  Objection.

670

213

THE COURT:  No.  I'll permit it.

A    You're asking me, as a hair examiner, if I would be more comfortable being supplied with samples from people that were known to be in that van?

Q    Yes.

A    I'm always a little bit more comfortable having as much information as I can, with any case.  So the answer to your question is yes.

Q    As I understand the hair examination, you're attempting to find whatever similarity you can find, or difference you can find, that you can describe; and you use that to say, could be, could not be.  Is that a fair statement to what you do?

A    Pardon me for not being able to answer your question very simply.  I'm not comfortable with that.  I have three possibilities when I do a hair examination:  an inconclusive.  For some reason, I can't make a determination.

The second possibility being that these two hairs could have common origin.

Or the third, that they could not have common origin.

Q    Is it fair to say you're dealing in probabilities, rather than positives and negatives?

A    I'm not comfortable with probabilities.  But

214

2  absolutes are very difficult, as far as assigning whether a

3  hair absolutely came from a person.

4      Q   As I understand your testimony, you're not giving

5  any absolutes in your testimony.  You're saying, could be?

6      A   I'm saying that in this particular instance, that

7  the questioned hair could have originated from the scalp of

8  Theresa Fusco, with a high degree of probability.

9      Q   Now, if you had a hair known, and known to be in

10  that -- from a person who had been in that vehicle on the

11  very day that you did the examination, would it be relevant

12  to your investigation, to see if that hair matches any closer

13  Q-8 than Theresa Fusco's hair?

14      A   If there was another individual that was in that

15  hair -- excuse me -- in that van, and their hair was very

16  similar to Theresa Fusco's, or similar to the point where I

17  couldn't distinguish her hair from the scalp of Theresa

18  Fusco, that would be a very relevant bit of information.

19  Yes, sir.

20      Q   And in any event, her hair was, in fact, closer to

21  the ninety -- closer to the sixty micron consistency in

22  diameter, would that be relevant in your investigation?

23      A   You're asking me if factors are added that make

24  it more and more alike with Theresa Fusco's, would it be

25  relevant?

670

215

Q    Or would it be more and more like Q-8 than Theresa Fusco's was?

A    That would be relevant information.  Yes, sir.

Q    What I'm, in effect, asking you is, if you had a known sample, that more closely matched Q-8 than that K-1 sample that you matched it to, would that be relevant in eliminating the possibility of Theresa Fusco?

A    I don't know -- could that question be read back?

THE COURT:  Surely.

(Whereupon the pending question was read back by the court reporter)

THE COURT:  I think, re-ask it.

THE WITNESS:  The two samples that I examined here, Q-8 and K-1, are microscopically alike.

You're asking me if another sample came along that looked more alike than that?  I don't think that's really possible.  So the answer to your question, I guess, would be no.

Q    When you say it's not possible, what I said was if that known sample was, in fact, the ninety-six and fifty-six microns, rather than the consistent sixty microns?

A    No.  There's a misunderstanding here.  Those numbers, fifty-six to ninety-six microns represent a range of diameters in the known sample.  There were some hairs in

216

there, that were sixty microns, or about sixty microns, and they happened to be two of the hairs, in that known sample, that I matched up with the questioned hair, were identical, in terms of diameter and diameter variations.  So there wouldn't be another hair that would fit this scenario any better than the questioned sample removed from the van.

Q    Are you saying that you had some known, one of your K-1's was, in fact, sixty microns?

A    Was, in fact, very close in diameter to my questioned sample.  Yes, sir.

Q    And that was consistent throughout that hair?

A    Well, were microscopically alike.  Yes, sir.

Q    You compared that hair with the K-8 hairs; not the ninety-six?

A    That's correct, sir.

Q    Now, when you compared the cuticle -- you compared them by thickness, too; don't you?

A    Among other factors.  Thickness is a consideration; yes, sir.

Q    Do you measure the thickness the same way:  by microns?

A    I actually don't measure it.  I do a comparison, a visual examination through the scope.  I don't assign specific numbers to the thickness of the cuticle.

217

2    Q    You don't leave that graphic grid under there, when

3    you're doing this examination?

4    A    No, sir.

5    Q    So it's your eye and your comparison, and the

6    microscope.  Is that correct?

7    A    Yes, sir.

8    Q    This microscope, as I understand it, it's actually

9    side by side.  You can look at both samples at once?

10   A    Yeah.  There are two scopes, side by side; bridged

11   by a series of mirrors, and one viewing field.  You can

12   manipulate both stages of both samples at the same time, when

13   you're viewing them.

14   Q    When you examine them, you change your known and

15   your -- knowing which side is which.  But you measure each of

16   your knowns against your unknowns.  Is that right?

17   A    Yes, sir.

18   Q    And did you record the number of different

19   comparisons you made?

20   A    No, sir.

21   Q    So is it fair to say, as you sit here now, you

22   don't know how many different hairs you compared that day?

23   A    I only know that I spent a great deal of time, and

24   looked at a great number of hairs.

25   Q    Do you have anything that would refresh your

218   1

2    recollection as to how many slides you made?

3         A    I don't have notes with me.  I physically have the

4    slides at my office.  They are -- there are in excess of one

5    hundred or more slides.

6         Q    And as I understand it, then, the comparison that

7    you're talking about, though, is when you finally found the

8    same lengths, same diameter, out of all those samples.  Is

9    that right?

10        A    Those are just two of the grosser characteristics.

11   You're oversimplifying it, a little bit.

12        Q    Okay.  Are you saying that you had to examine many

13   different hairs to get the more refined characteristics?

14        A    What I'm saying is, that initially, upon examining

15   a hair, I, of course, will focus on the gross

16   characteristics, even microscopically.  Then build up a

17   profile of the range of characteristics in my known sample.

18        After building that profile up, either on a piece

19   of paper, or in my mind, or on some notes, then conduct a

20   comparison with my questioned samples against that.

21        I have to build some information up, within myself,

22   before I'll just dive into a comparison.

23        Q    Is it important, in preparing this, to compare your

24   knowns with each other, and see the various ranges in those

25   knowns?

682

2-19

1

2    A    I don't compare them to each other.  I just put one

3    slide after another on there.

4    Q    Now, back in December of '84, in addition to the

5    known hairs that were forwarded to you, did you, under a

6    separate cover, receive from Police Officer Birdsall, other

7    hairs from blankets?

8    A    Yes, sir.  I received several samples from

9    Birdsall, back in December of '84.

10    Q    And did you conduct any tests on those hairs?

11    A    Yes, sir; I believe I did.

12    Q    And do you have those records with you?

13    A    I think we're referring to samples Q-1A through

14    Q-6A, I believe.  And the results of that examination are in

15    my report.

16    Q    So when you first tested those hairs that you got

17    on December 6th, are you saying that -- you got on March

18    26th, or thereafter?

19    A    I think we're talking about the hairs that I

20    received with the hairs from Theresa Fusco, back on December

21    11th of 1984.

22    Q    I'm talking about Q-5A and Q-6A.

23    A    Yes, sir.

24    Q    So is the first time you ran any tests on those,

25    some time after March 26, 1985?

A    No.  I'm not quite so certain of that.  I may have initially looked at those, right after they came into the lab; which would be a matter of routine in a Homicide investigation.  I wouldn't set something aside without at least giving it some sort of preliminary look.

Q    And when you reviewed those, did you make any notes as to a reason for not going any further at that time?

A    No, sir.  I don't have those notes, or recall making those notes.  I can only tell you that if there was anything for further investigation, I most certainly would have done it.  Apparently, there were gross differences in those samples from the scalp hairs -- compared to the scalp hairs of Theresa Fusco.  At that particular juncture, they weren't too important to me.

Q    It may be oversimplifying, but they were maybe a different color, a blonde color, or something?

A    Something of that nature.

Q    That would stop and take you no further, and there would be no further reason.  Is that right?

A    Yes, sir.

Q    Now, can hair further be analyzed by neutron activation analysis?

A    Studies have been done involving that area of investigation.  And Scientific Investigation Bureau doesn't

think that they are particularly good for us; nor do I.  So we do not use that; no, sir.

Q   You do have the availability to send it to the FBI lab and have it done; do you not?

A   If there was a particular reason for a case, and we don't have the facilities, it's not uncommon for us to send evidence out to another laboratory.

Q   And in cases, the Scientific has sent cases to the Scientific Investigation Bureau for neutron activation analysis?

A   Not to my understanding, no hair samples.  They have sent swabs conducted with firearms examinations.

Q   In any event, this hair was not analyzed by neutron activation analysis; was it?

A   No, sir.

Q   And as I understand it, the SIB of the Nassau County Police Department is not equipped to do neutron activation analysis.  Is that right?

A   That's correct.

Q   And you mentioned, in your direct testimony, something about the hair being treated.  Is that right?

A   Yes, sir; I did.

Q   And when you say it's treated, does that do something to the hair that you saw?  Or do you see something

222

on the hair?

A     It physically changes the appearance of the hair

somewhat, microscopically.

Q     Is there a way to determine what the hair has been

treated with, by this change?

A     Sometimes it is.  If the hair has been treated with

a very strong bleaching agent, it will remove the

pigmentation from the interior of the hair, and the pigment

granules would not be visible, or will have been bleached

colorless.  If the hair has been dyed, and the dye finds its

way inside the hair, you will notice that the cortex and some

of the granules will take on the color the dye.  In this

instance, I suspect that the hair may have been treated to a

perm, or some sort of light dying agent.  There was some

remnants of that condition on the distal portions of the

hairs, in both the questioned sample and the known.  Nothing

severe, that you would notice microscopically.  But a subtle

reddening in -- microscopically.

Q     Could you compare the reddening in the known and

the unknown samples?

A     Well, the same condition existed in both samples,

sir.

Q     Your best estimate is that it was a light perm; is

that correct?

680

23  1

2       A     I'm supposing that it was either a perm, or some

3    sort of light dying condition.  I'm not quite sure.  I just

4    can't pinpoint it.

5       Q     Could it have been an extensive use of a hair

6    conditioner, as well?  Regular use of hair conditioner?

7       A     I'm not sure.

8       Q     Is there anything in seeing this sensitization --

9    what would you call this thing you saw at the end of the

10   hair?

11      A     I would just call it the presence of artificial

12   treatment.

13      Q     But you have no further way to identify that, the

14   artificial treatment that caused that?

15      A     That's correct.

16      Q     It could be consistent with several different

17   artificial treatments?

18      A     Yes, sir.

19      Q     As I understand it, then, at the conclusion of your

20   entire investigation, you found that by microscopic

21   examination, twenty of the samples you viewed, could not have

22   originated from Theresa Fusco's scalp.  Is that correct?

23      A     That's a true statement.  Yes, sir.

24      Q     You found that one of the samples could have

25   originated from Theresa Fusco's scalp.  Is that right?

Fraas - People - Cross                    686-A

A    That's correct.

Q    And --      ... you'...

       MR. WOODS:  I have no further questions.

       MR. KLEIN:  No redirect.

       THE COURT:  Thank you.  Call your next

witness.

       MR. KLEIN:  The People's next witness is

Mr. George Peck.

       THE COURT:  Come up to the Bench for a minute.

       (Whereupon there was a discussion off the

record.)

       THE COURT:  All right.  I'm going to take a

short recess at this time, ladies and gentlemen.

       Remember not to discuss the case among

yourselves, or with anyone else; or permit anyone

else to discuss the case with you.

       Please keep an open mind.

       (Whereupon there was a recess.)

       THE CLERK:  People vs. John Kogut.  Trial

continued.

       Are the People ready?

       MR. KLEIN:  The People are ready.

       THE CLERK:  Is the defendant ready?

       MR. WOODS:  The defendant is ready.