Judge Edward W. McCarty, III December 20, 2010
1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------

JOHN KOGUT, et al,

Plaintiffs,

-against-

Index No. 06-CV6695 06-CV6720

THE COUNTY OF NASSAU, et al,

Defendants.

---------------------------------------

DEPOSITION OF JUDGE EDWARD W. MCCARTY, III, a non-party witness herein, taken by all parties, pursuant to subpoena, at the offices of Nassau County Supreme Court, 100 Supreme Court Drive, Mineola, New York, on Monday, December 20, 2010 at 10:00 a.m. before Marie DiMarco, a Shorthand Reporter and notary public, within and for the State of New York.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
2

A P P E A R A N C E S :

NEUFELD SCHECK & BRUSTIN, LLP
Attorneys for Plaintiff Restivo
99 Hudson Street
New York, NY 10013

BY: BARRY SCHECK, ESQ.
ANNA BENVENUTTI HOFFMAN, ESQ.

GRANDINETTE & SERIO LLP
Attorneys for Plf John Kogut
114 Old Country Road Suite 420
Mineola, New York 11501

BY: ANTHONY M. GRANDINETTE, ESQ.

FREEMAN NOOTTER & GINSBERG, ESQS.
Attorneys for Defendant Nassau County
30 Vesey Street Suite 100
New York, NY 10007

BY: LOUIS FREEMAN, ESQ.

NASSAU COUNTY OFFICE OF COUNTY ATTORNEY
Attorneys for Nassau County
One West Street
Mineola, New York 11501

BY: MICHAEL J. FERGUSON, Deputy Attorney

PAUL CASTELEIRO, ESQ.
Attorney for Plaintiff Kogut
200 Washington Street Suite 500
Hoboken, New Jersey 07030

* * *

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com



Judge Edward W. McCarty, III December 20, 2010
3

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that the filing, sealing and certification be, and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the questions, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be subscribed and sworn to before any notary public with the same force and effect as though subscribed and sworn to before this court.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

4

INDEX

| WITNESS | EXAMINED BY | PAGE |
| --- | --- | --- |
| E. McCarty | Scheck | 5, 108 |
| | Ferguson | 88, 113 |

| EXHIBITS | DESCRIPTION | PAGE |
| --- | --- | --- |
| 236 | Document (2pgs) | 38 |
| 237 | Document | 42 |
| 238 | Decision | 58 |

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
5

Edward W. McCarty, III

Whereupon,

JUDGE EDWARD W. MCCARTY, III

after having been first duly sworn, was examined and testified as follows:

EXAMINTION BY MR. SCHECK:

Q. Judge, thank you very much for making time to do this. If you don't mind I have a copy of your curriculum vitae and I would like to review it a little bit.

A. Sure.

Q. It is quite extraordinary. So you had, I guess, are you from the metropolitan area?

A. Born in Brooklyn; raised in Nassau County.

Q. Where in Brooklyn?

A. Park Slope.

Q. I see you graduated Sienna College?

A. Yes, in 1967.

Q. Then you went on for a law degree at Saint John's?

A. Yes.

Q. Then you got a diploma from the Foreign Service Institute. Can you tell us what that is?

A. The Foreign Service Institute is a teaching arm of the State Department. It is a part of the Army

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

Reserve Unit and it prepares you for -- with emphasis on three or four countries of the world and it is an intensive program to learn the customs culture and language of these countries.

Q. Where were you sent?

A. I was never sent but always have been available in case countries need immediate support.

Q. Which country were you being prepared for?

A. That was Tunisia, Algeria, Morocco and Libya.

Q. Then from, I take it, from 1971 and 1972 you were working the Judicial Inquiry of Professional Conduct?

A. That was a predecessor of the Stern Commission which was involved with removing judges and lawyers from the profession for malfeasance and misconduct. It was eventually formed into the Stern Commission which removes judges from the bench and the different professional committees to remove lawyers for misconduct.

Q. As a young lawyer how did you wind up doing that as your first or second job out of law school?

A. You have a perception for good questions. I interviewed for the job at the Appellate Division, with



Edward W. McCarty, III

a man by the name of Pelzer, for a clerk job at the Appellate Division. Pelzer got the job, and I impressed the Chief Judge who said we have the opening in the special prosecution office and how would you like to take it. Pelzer just retired as chief clerk of the Appellate Division, Second Department and it is interesting in an intervening way how some professional people part at the road but intersect with us, so to speak.

Q. You were there for a year?

A. One year. I knew it was a terrible mistake when I first got there; everything was highly confidential. If you were a person of ability no one would ever no. That is part of the merchantability of a lawyer. So I applied for the job at the DA's office and was hired.

Q. That was 1972?

A. That's right.

Q. Can you tell us about your progress or work in the DA office?

A. I joined the Nassau County DA's office in 1972 and had the normal progression. I found myself as Chief Assistant in 1975 to manage the supervision and prosecution of a major kidnaping case with coordination

Edward W. McCarty, III

between the FBI in New York and California.

I worked that case for a while prior to trial. I was transferred to the Homicide Bureau which was considered an elite bureau of the office at that time.

Q. I see here you had a certificate from NYU Medical School in 1982. Can you tell us about that?

A. I was mentored as soon as I got to homicide in 1976. I saw an opportunity to really open up an area of expertise for myself. So I am proud to say I was mentored by Leslie Lucatch (ph), Medical Examiner of Nassau County. She would have me come over when the pathologist would do rounds. I must have been through 1,000 autopsies, they would call and say I thought you might want to come over and see this one; that is where I started to wear bow ties. If you look too close, the tip of your tie would go into the body cavity during an autopsy at the pre-aids procedure.

I did two years, only put one down, medical school but they used to bring a bunch of pathologists and teach DA's and pathologist the latest science and medicine in that field.

Q. Would any homicide detectives also participate?



Edward W. McCarty, III

A. No, that was just ADAs. I was the only one who took advantage of it.

Q. I also see in 1982 you were involved in the National Institute for Trial Advocacy faculty?

A. Yes. That is a national program where they teach graduate lawyers how to be trial lawyers.

When it first opened in Nassau County I was at Hofstra Law School teaching on a summer basis, trial skills since 1979, and they asked me to join the faculty. I used to teach. Very great program for young lawyer who wish to take advantage.

Q. Ordover, (ph) that is Professor Ordover?

A. Yes.

Q. I am trying to recall where I might have encountered you before I think it could have started right there. Have we ever met before?

A. I don't believe so.

Q. Not in that program --

A. Yes.

Q. Mr. Freeman teaches some of the programs as well.

A. Ordover is not there. He went to Emory; he is no longer there.

Q. Judge, could you tell us a little bit about

Judge Edward W. McCarty, III December 20, 2010
10

Edward W. McCarty, III

your military experience when you first got involved?

A. I was commissioned in 1970 to go to Vietnam. Shortly after I received my orders to go to Vietnam I received a letter from the Department of Defense that asked me if I would rather do six years in the Army Reserves. Unless you are a fatalist, I said yes. I went into the Army Rreserve with the J A Corp which is an interesting program.

I was here living in New York. They would send me all over the world to lecture because I was an anomaly, a civilian judge and military officer. Many countries didn't have that concept so I lectured. I stayed in the Army Reserve for many years and miss it terribly.

Q. Did you indicated that at some point in time you began doing homicide cases in the Nassau County?

A. 1976, it was considered an elite bureau at the time.

Q. Did you know Detective Volpe?

A. I did not know Volpe until the end of my career 1984, 85. He was not a member of the squad.

Q. What about Lieutenant Spillane?

A. Knew of him only when he took command of

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
11

Edward W. McCarty, III

the Homicide Squad; I knew of only two commanders with my work there.

Q. I take it in the work of the Homicide Bureau in the 80's, and the Homicide Unit there was a separate Homicide Unit?

A. What happened 1980, about there, there were two separate units, the Major Offense Bureau and Homicide Bureau. Through intervening office politics they merged the two units. Therefore it took a way, quite, frankly, I saw some of the more beneficial aspects of the Homicide Bureau.

Back then we only had a bureau chief and three assistants so you would get two murders per month and they had eight or nine more so you were catching a murder once every two or three, and not developing the expertise you did earlier that was the trade off.

Q. In the police force there was a Homicide Unit?

A. That always remained. Feeding in that major -- into the major office bureau was a case from the robbery squad, major burglaries and, of course, murder cases.

Q. In the 80's among homicide detectives, was microscopic care comparisons a forensic discipline

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
12
Edward W. McCarty, III

employed in cases?

A. It was employed in my major kidnap case only for similarity as opposed to a match.

Q. Would it be fair to say in the 80's among homicide detectives now, that it was understood that for microscopic care comparison, this only required a limited understanding, that what one could obtain as a result after looking at hairs under a microscopic determination, that a hair from a crime seen was similar to a known hair or quote consistent with a known hair, or there could be an exclusion?

A. From at least 1977 hair analysis we used the Richard Warren Williams case, we used. It was known by the better comparison, you make hair comparison. If I was being a judge I would sustained your question; but I can't say every detective used the benefit of the hair analysis but it was known.

Q. And the term would be hair is consistent?

A. That is right.

Q. That would be something that a detective would say, let's say in an affidavit after there was microscopic comparison you wouldn't just say I see some hairs here and these hairs, just eyeballing, without looking under a microscopic are consistent with a known

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

                    Edward W. McCarty, III

person, would you?

A. Well, at the scene, you may see hairs. You hold a hair up in your hands and say, look down, that's a blonde hair, the person we're looking is blonde, the person is red hair, I can't speak for every detective but I am sure detectives knew there was not conclusive comparison among hairs.

Q. Consistent was the term used?

A. There was a phrase used to show the inability to make a complete identification between hairs.

Q. It would be the term used after microscopic comparison you would say this hair is consistent?

A. Yes.

Q. Now, could you tell us, do you remember this particular case?

A. Oh, yes, sure I do.

Q. Tell us what you remember about this case.

A. I remember being home at about 5:30 when the body was discovered. I would have -- the reason why I know, I would have gotten a call from the Homicide Squad, I was the DA on call and had my detective car with me at home.

I remember driving from my home, getting

Judge Edward W. McCarty, III December 20, 2010
14

Edward W. McCarty, III

stopped down at the railroad crossing, at the West Hempstead Railroad and went around, and as soon as it opened I continued on because the scene was about a mile away. I remember sitting there in a car, I forget the scene. I can't tell you where I parked but thinking about this I remember walking up the hill where Ms. Fusco's body was located and remember checking in with all the detectives and saying hello. I couldn't tell you who was there, I remember looking up, watching the train speed by, lighting flashing, and I remember kneeling over her body. We were right there on the side of the hill and there was the body.

I could not tell you anything independently about the body right now. I couldn't tell you if it was face up or face down. I couldn't tell you if she was dressed or undressed but I also do remember what we'll call a military loading pallet, a piece of wood in the immediate area there.

I remember being there, it was a chilly December night as I recall, early in December, I was there for the necessary time. When I say necessary time we usually would compare notes with the seasoned homicide detective and with the medical examiner in Nassau County, the medical examiner, not a PA or someone

ESQUIRE an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com



Edward W. McCarty, III

else would respond to every case.

I remember, I believe then I left and went home. I believe I was on trial. The reason I believe I was on trial was because, quite frankly, I really enjoyed the medicine; I would have gone to the autopsy had I been available.

I don't recall going to the autopsy the next morning. It would be on your sheet who appeared at the autopsy. I don't believe I was there. I may have been on trial or preparing a trial or working on a case at that time and it was my case and I wouldn't have communication with them until the case started to ripen, so to speak. I can't go over months or the things I did -- there are documents --

Q. Sure. Tell us, there are only limited number of documents to refresh your recollection but perhaps it might be better if you tell us everything you remember about this case before we go into any documents. I am with you up to the side of the hill.

A. I either remember being on trial after that or nothing productive was coming out of the investigation. You know, the way the homicide DA office involvement was we were always there to provide technical support about serious questions about what was

Edward W. McCarty, III

going on.

Hey, I might go down with coffee to the mobile van and see what was going on. The person who is in charge, the lead, that was Barry Grennan, Bureau Chief of the Major Offense Bureau and the Homicide Bureau -- Barry passed on four or fives month ago. But Barry was the bureau chief and had his own office and where we were on trial work, working other cases, cases for the grand jury and he was liaison between the Homicide Squad and all cases pending. He would go and say what is going on, I was talking about Fusco and the case, what's new. That would alleviate 10 assistants calling up, 10 people at the squad to find out what was going on. The case was largely unproductive for a large period of time.

They were not -- then there was that eureka moment where we think we have the guy, and were concerned about the relationship and Kelly Morrissey (ph), who was missing and it was disturbing.

Q. Can you tell us about your knowledge of the Kelly Morrissey disappearance, any recollection you have of that?

A. Driving down to the murder scene-- my first question to the detective that called me is this Kelly



Edward W. McCarty, III

Morrissey, he said no. I got in my car and drove down.

Q. Before you tell us that, tell us what, if any knowledge or --

A. No more than anybody else in Nassau County other than looking at the papers, maybe seeing a friend from the detective squad or anything and asking about what is going on.

Q. Kelly Morrissey was the known teenage girl missing?

A. Yes, she was a 14 year old blond and attractive girl missing and the newspapers were extensively covering; it was in the newspapers all over the place.

Q. This was a matter of concern?

A. It was a matter of public record and I knew this case like anybody else in the public; no more no less. Of course after Fusco, it became more worrisome, so to speak.

Q. By worrisome, you had some concern there was a serial offender out there?

A. There was concern there that there was a relationship between the crimes. When you -- that was homicide, when you work homicide, a professional person, you try to read as much as you can about it when you

Edward W. McCarty, III

have two teenagers missing in the same town, one shows up murdered, there is something you have to be concerned about there. You didn't have to read too many books on repeat murders and serial killers to sensitize yourself to that fact.

Q. You were telling us Barry Grennan, he was a liaison?

A. He was bureau chief of the Major Offense Bureau and that was a big supervisory job. He would kind of manage your case and the other cases with you, so to speak. I think Barry made every murder that there was, he would invariably go to the crime scenes himself.

Q. In terms of, ordinarily as a homicide investigation progressed, you said if I heard you correctly, that the Homicide Unit would ask district attorneys for technical support?

A. Yes. If there was need for search warrants any ancillary work they would give us a call. Generally we would be with them and have knowledge how the case was going; anything on the murder, if we have potential suspects, we would work together.

One thing was effective from the Nassau County point of view of case management that you had, when there where only four of us in the Homicide Bureau



Judge Edward W. McCarty, III December 20, 2010
19

Edward W. McCarty, III

you had four ADAs and 26 or 27 detectives. It was quickly done to get the expertise of the four DA's and exercise the experience of the homicide detective. There was always interesting interplay of ideas and concepts with the squad. Everybody was receptive to it.

Q. How would, would this be written reports?

A. Oh, no, as to updates? No, not done surreptitious, just that Detective Jones was working on it and if you need to, give me a call, let me know. It was nothing formal.

Q. In this particular case, you weren't reviewing each individual lead sheet as the homicide detectives were solving --

A. I knew of the existence of lead sheets, lead sheets could be the work production of the little van parked outside of the murder scene, people come out of the woodwork, people from Mars, when it involved a murder like this, where people could say this or that, that was not the micro management that was done. We let them do their lead sheets.

Q. They had their lead sheets, these would not, would the lead sheets automatically all be sent to be part of the prosecutor's file?

A. Never.

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
20

Edward W. McCarty, III

Q. You said never?

A. I never saw a lead sheet trying murder cases for 10 years; never saw a lead sheet make it in the jacket; never looked at it. I understood when you monitor the murder you'll have people coming out of the woodwork and there is a lot of meaningless information and I wasn't prepared to waste my time in reviewing them.

Q. Would it be fair to say homicide prosecutors at this time would rely on the police to communicate if they had a promising lead?

A. Sure.

Q. If there were a promising lead in a homicide case, that got screwed up, would that be something that you would want to know?

A. Of course.

Q. So, well, before we go back to that, I loss track of, you were telling us all you remember about this case.

A. Well, getting back to what I remember, in general fashion, I remember then in early, late winter, actually early spring, I believe, that there was someone of concern, three members of the Lynbrook community, the three defendants, later on the three defendants, and we

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com



Judge Edward W. McCarty, III December 20, 2010
21

Edward W. McCarty, III

explored the need and potential requirement for doing eaves drop, tapping on their premises. I was the fellow who drafted them. And I was there when they first introduced them.

It is not required by law, but it was required by good case management, went over to see who was being monitored. This was an unusual one because in the past when we were younger when they would be doing eaves dropping they would have to have somebody in the area of the apartment, in the basement; now it's all done in one central location in police headquarters. They were watching them to make sure any conversations were being observed; all the other requirements of a solid eaves dropping execution.

Q. This was comparatively unusual to having State eaves dropping warrants?

A. Yes, Nassau County was unaccustomed to it as most major prosecution offices, it is unusual to have that.

Q. There was concern for each extension of the eaves dropping warrants that proper procedures were followed?

A. Sure.

Q. So any application for an extension of the

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
22

Edward W. McCarty, III

eaves dropping warrants ordinarily had a supporting affidavit?

A. I know where you are leading, yes, because supporting affidavits to extend the eaves dropping warrants, to the best of our ability, to the best of what we were doing with these warrants, there's -- and there can be shortcomings in the warrants and if there are shortcomings in the warrants, quite frankly, it is because of lack of having done these. I believe there may have been some kind of technical reporting requirements that it may be a day late on it, nothing ever significant.

Q. What I mean to say, I wasn't leading you in that direction --

A. As I sit here that's my only concern about the warrants that all the affidavits we used for supporting of these warrants were factual part of the investigative process.

Q. And carefully reviewed --

A. Yes. I would never have requested the extension or the granting of a warrants unless there was something that would justify the extension of its granting.

Q. The factual details proffered to the judge

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
23

Edward W. McCarty, III

for extension of the eaves dropping warrants should be accurate?

A. Sure.

Q. They should not be misleading?

A. Absolutely.

Q. Now, Lawrence Leff --

A. He was the Chief Assistant DA at the time.

Q. Who was he is relation to you?

A. Supervisor Barry Grennan, he was Chief Assistant DA supervising Barry Grennan. Watch how good I'll be with this. Did Lawrence Leff execute part of the warrants? Did he file an affidavit in support of it?

Q. Yes.

A. I had absolutely no recollection of that occurring until now. Let me ask you this question, is the Lawrence application of warrants after May 15th?

Q. No, I'll show you all of them.

A. If you can tell me right now because was it's important.

Q. 29th of March 1985.

A. I left the office and I left May 15th and I went to Cape Cod to be the judge advocate of Cape Cod for two months. The case was handed over to Freddy

Q. Let me be more disciplined and ask you your

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
24
Edward W. McCarty, III

recollection of this case. So, you recall the wire tap applications?

A. Yes.

Q. What else do you remember?

A. I remember not being pleased about something.

Q. What was that?

A. Right after the trap was installed on one of their homes, the first thing he said on the telephone when he got home I think someone has been in here and I think there is an eaves dropping device there. After all the work we did trying to put the warrants that was not what I wanted to hear as the first statement on the wire.

Q. What else do you remember?

A. I remember the wires not being particularly productive. We didn't get the smoking gun as many as wires went on; we did whatever had to be done to manage the wire. See if it was properly minimized.

Q. What else do you remember? Try to take it chronologically.

A. We are into the warrants. Getting unproductive warrants. Then we had a third body missing, a woman. It was in Lynbrook, a 17 years old walking to

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

work, taken off the street in broad daylight and found at a golf course in the five towns area.

Now, if you are a student of homicide this is indeed an extraordinary event. You would have practical knowledge of homicide or have much more defined knowledge of, what, you have now because if you are having knowledge of what, you have three teenagers in the three-mile radius missing or killed during an extremely short period of time.

This was real really disturbing and, frankly, whether you had more sensitized view of homicide or more superficial assistant DAs who have tried one, the wire was running down. We thought if we publicized this and maybe this may be a case that there may be group of people or individuals engaged in felonious acts against women, this was in the Lynbrook, general, Oceanside area, there was the hope that it would heat up but it didn't.

Q. Heating up, the wire, you mean?

A. Getting more statements concerning the missing woman on the wire.

Q. In other words the suspect, it was anticipated, would be talking on the wire tap, maybe would be induced to talk about things because there was

Edward W. McCarty, III

publicity about the missing? Do I have that right?

A. Sure. That is more acceptable stratagem to get out of wires.

Q. The logic of that would be that either the people that were suspects may have had nothing to do with this, and that's why they were not talking about it or they knew overhearing was going on?

A. Of course. And from what I understand we received on that, something on that wire of someone talking to sister or relative, don't talk about the cases now, there was the evasiveness, not the kind of innocent conversations you would have with regard to this events on some of those taps; I am told later used as part of the prosecution. So, yeah, we were always concerned with the evasiveness of the conversations and trying to overcome the evasiveness.

Q. Were you aware whether or not any of the suspects were -- whether it was known to them they were under suspension or surveillance?

A. Under suspicion, yes.

Q. Or surveillance that they knew?

A. Except for the fact that the first statement out of someone's mouth on the telephone when they walked in, they said they knew someone had been

Edward W. McCarty, III

here. They knew something was going on.

Q. What else do you remember?

A. Being on Cap Cod listening to WCBS radio for the developments of the case; before leaving for Cape Cod that someone was arrested.

Q. John Kogut?

A. John Kogut was arrested. When shown the confession I was really impressed by the confession. The confession had what I would like to call an essence of homicide corroboration. It had a lot of material in that confession that showed me interaction between events and times that we knew something was going on in between specs and times.

Q. Tell me what else you remember?

A. There were little things that would crop up. I remember one of the suspects we were interested in had told a friend about the time when she was killed, when the girl we thought was killed, and had told a friend that listen, you dropped me off 9:30 that night, not 6:30. The friend came back with 6:30, not 9:30. The friend got so upset he actually came forward on it, he thought he was being involved in a false confession. Let me tell you that was disturbing.

Q. Anything else you remember?

Edward W. McCarty, III

A. I am sure you'll refresh my recollection as we go along. Nothing really that is outstanding right now.

Q. You remembered that, do you recall presenting the case against John Kogut with the confession to the grand jury?

A. No. I don't recall anything specific about it but if I did present that case to the grand jury it's one of the thousand of cases I presented to the grand jury and it was not a particularly challenging case to get an indictment because of the confession.

Q. You said you recall handing the case over to Fred Klein?

A. I don't really recall. I was going to Cape Cod for two months and Barry said to me, let Fred and I manage it until you get back. Then, well, something gratuitous happened and I was asked to run for re-judgeship and when I said yes to that I had to leave the office. I was now a candidate so Fred Klein took over the case on a full-time basis.

Q. What else do you remember about the case?

A. That's about all.

Q. Prior to being deposed in the case have you spoken to anybody about it?

Edward W. McCarty, III

A. Monday night I saw Sean Spillane at a police Christmas party and I said hey, they are calling me in on the case; don't tell me anything you said. He walked away. The other day someone comes in, I am Mr. Popular right now because elected to Surrogates, Jack Sharkey, associated with the case, I think you deposed Jack also, but I said don't talk to me about the case I don't want to learn anything about this, that is about it.

Q. Do you have any recollection of hearing about the eventual arrest of a suspect in this matter?

A. I read the newspaper, sure. Matter of fact that's what I heard driving to work 6:30 in the morning on Cape Cod, I picked up WCBS radio, in June or so that the other two fellows were arrested --

Q. Yes --

A. -- and I remember hearing that on the radio.

Q. Do you remember anything about the eventually trial?

A. Just what I read in the paper.

Q. What do you remember about that?

A. They were found guilty; evidence was presented to convict them.

Edward W. McCarty, III

Q. Do you remember anything about, did you read or hear anybody ever speak to you about any post conviction applications being made in this case?

A. I knew it was appealed. I knew it refers to all of them. I don't know if the case was reversed. I don't know what procedurally happened. Judge Ort did something on one last act as judge.

Q. Do you recall ever reading that there was post conviction DNA testing?

A. Sure. What I know about that, I read, post DNA testing on here disclosed that there was semen spermatozoa in her which was not attributable to the three.

Q. Do you know anything about Arlene Callone (ph)?

A. No.

Q. Did anybody ever tell you or did you hear about the fact that substantial amount of spermatozoa were observed in the vaginal swabs and slides taken from the victim here that led to the DNA --

A. First time I heard the term substantial amount.

Q. You are familiar with the process one can look at a slide and see?



Judge Edward W. McCarty, III December 20, 2010
31

Edward W. McCarty, III

A. I am knowledgeable and have been to a thousand autopsies as to what are trace evidence. I didn't know there was substantial amount of spermatozoa in her vagina until just this moment.

MR. FERGUSON: So now you know there is --

A. I knew there was, but substantial? It was in the paper or applications concerning the reversal or bid for freedom. I didn't know there was substantial amount.

Q. That's the kind of thing that can be observed on the slides to your knowledge, you can take a look at the slides in the difference fields even back in the 80's and people could look at a slide and see a substantial number of spermatozoa on the slide?

A. Believe it or not I don't know. The only test we were doing that was reliable back then was a person, I won't go into detail, but if a person was a secreter you were looking to see whether the swimmers had the attributes of a secreter; more than that I don't believe the science had evolved.

Q. Let's talk scientific matter now. If observations being made at the time, looking under a microscope, you saw substantial number of spermatozoa on the slides, then DNA test is performed, that can be

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

significant in terms of the inferences one can drawn?

A. Absolutely, but I must tell you at autopsy, I didn't make this autopsy but normal procedures is you would take a long swab inside, into the vagina, take the swab. I don't know if there was copious amount, substantial amounts or trace amounts; I had no idea.

Q. Even back at that time after making a swab at the time of autopsy and putting it on to the slide for analysis and contemporaneously having the slides for analysis, if they saw a lot of spermatozoa on the slides that would be a significant and reliable finding for the time?

A. Yes. The shooter had a lot of sperm.

Q. Now, you mentioned something here about Judge Ort. Do you recall after the post conviction testing was done, some significant time later, that the convictions were vacated and indictments against all three were dismissed; do recall that?

A. Yes.

Q. Then there was a retrial of one of the defendants, Kogut?

A. I did not realize that. I thought it was complete washing them out.

Q. There was retrial.

Judge Edward W. McCarty, III December 20, 2010
33

Edward W. McCarty, III

A. Was that non jury?

Q. Non jury, in front of Judge Ort?

A. Yes.

Q. Kogut was the confessor, Kogut confessioned, as you recalled?

A. That's right.

Q. Now, do you have a personal or professional relationship with Judge Ort?

A. I know him professionally and personal. He was a legal colleague, found to be an agreeable fellow.

Q. Do You have respect for him as a professional?

A. I don't have any disrespect for him. He was just another judge.

Q. I understand.

A. I am sure as do my friends.

Q. Let's talk a little bit about, you mentioned you have seen Sean Spillane at an event?

A. Yes.

Q. Is this an individual you had a professional and personal relation with?

A. No personal. Sean was just a lieutenant in charge of homicide.

Q. So you had extensive -- how would you

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
34

Edward W. McCarty, III

describe it?

A. Every time you go to a scene generally speaking, the commander may be there. I got to know him pretty well. His kid went to the same college I went to so he was always proud of that give and would give me updates on the kids and how he was going. I have never been to his house. I do know what his kids are doing today, one became a cop. I was never close with Sean.

Q. What about Fred Klein, could you describe your relationship with Mr. Klein?

A. Took him to his first murder scene. Mentored him. Thought he was going to be a stand out prosecutor. It was my pleasure, quite frankly, to bring him along.

Q. Do you maintain a personal, professional relationship?

A. We both teach at Hofstra Law School; we talk, how is everything going.

Q. Have you spoken to him at all about this case?

A. I may have said to him like something like are they suing? What is going on in the Kogut case? He may have said yeah. I haven't seen Fred in a year's time now; nothing of any substance.

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com



Edward W. McCarty, III

Q. Police Officer Connaughton ring any bells?

A. No.

Q. How about Sirianni?

A. No. There was Jean Connaughton, he was 70 years old in 1975.

Q. No, I am not talking about him. Detective Dempsey?

A. Yes, I knew him very well. Just lost his son. His son was involved in an automobile accident and doctors overlooked something and he died the next morning. Very sad.

Q. Did you work cases with him?

A. I worked cases with him.

Q. Any cases involving interrogations, by the way?

A. Not with me.

Q. You mentioned something before about being impressed by the confession because there was a lot of corroborating detail?

A. I can't tell you what it is now but it was back then. There were portions. When you say, for example, you are cooperating with the deposition, you don't go beyond the question. But I will. The murder taking place in the cemetery, he knew where the cemetery

Judge Edward W. McCarty, III December 20, 2010
36

Edward W. McCarty, III

was, it was little things that were impressive in regard to the confession.

Q. Have you been keeping abreast of any of the scholarship in the area of confessions and false confessions?

MR. FERGUSON: What's the word you used?

Q. Scholarship

A. I Did a lot of research on it.

Q. Are you familiar with some of the research that came out since the advent of post conviction DNA exoneration?

A. I am a medical malpractice judge right now going into the Surrogate's Court but the science of this has always intrigued me. I have read as much as I can on false confessions and the like.

Q. Ordinarily in a confession would it be fair to say one is looking to see if the person giving the confession can provide details that only the perpetrator would know?

A. Deduces of truth.

Q. The person giving the confession can make statements that would lead to other evidence the investigators go by?

A. Corroborative aspects of the confessions;

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
37

Edward W. McCarty, III

few matters contained in the confession, that is important stuff.

Q. If suggestions are made to the person being interrogated, or even leading questions are asked about some of these details only a perpetrator could know, and they showed up in the confession, that is one way false confessions can occur?

A. Leading questions are dangerous. A good interrogator must not let the person know certain things not known before. Not that I ever had to teach it; but one of the best aspects of taking confession from a person is to learn something new from it. If you don't learn something new from the confession then you have to be some what nervous about the confession.

Q. Well --

MR. FERGUSON: Could we take a short break.

MR. SCHECK: Off the record.

(Discussion held off the record.)

Q. We're starting with Exhibit 157 which was previously marked. I am showing you, showing you 157 which is an application for an extension of the eaves dropping warrants that, as you can see, is filled out by Lawrence Leff and supported by an affidavit from Detective Volpe. I wanted to ask you a question about

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

that. But before I do --

A. Let me find that before you ask.

Q. But before I do, would it assist you, would you feel more comfortable if I showed you a series of other applications?

A. I won't remember, quite frankly.

Q. They are yours initially seeking the wire tape.

A. I remember doing them but I don't remember anything substantive; it's been 25 years.

Q. I understand that. If you looked through those generally --

A. This is eaves dropping warrants for the telephone.

Q. Right. Just, I think, this one -- I have shown you Exhibit 157 is the initial one and here are, I guess, we should mark, well, deem this marked. What number are we up to?

MS. HOFFMAN: 236. We have marked through 235. The next Exhibit would be 236.

(Exhibit No. 236 was so marked for identification.)

Q. We have been having problems with production of document and Bates stamp numbers. This

Edward W. McCarty, III

Exhibit 236 has two pages. The first page is Bates stamped B05083. And this is a progress report on the eaves dropping warrants signed by Judge McCarty.

A. Signed by Edward McCarty, Assistant District Attorney at the time.

Q. Thank you. The second page of this Document 236 is an affirmation, sorry, just that one page is 236. Looking at 157 and Exhibit 236, 157 is the application for the eaves dropping warrants that I think you described to us previously?

A. No, this is more of a wire tap. I thought we initially went in with an eaves dropping warrant, a bug, so to speak.

Q. Well, this says eaves dropping warrant authorizing interception of certain telephonic communication?

A. I thought our first application was for a bug as opposed to a wire tap. It's been 25 years; I do not know.

Q. Let me rephrase that. You read 157 as the application for a bug?

A. This is for a wire tap.

Q. That's correct. You thought the initial application with you was for a bug?

Edward W. McCarty, III

A. My recollection was that maybe we did -- I don't recall, if I sat here and said what was our initial application I would have thought it was for a bug, as commonly called an interception device not related to the telephone.

Q. This is a phrase one wants to call it a bug or actual wire tape, both are electronic surveillance?

A. Yes, they are electronic surveillance from what I remember it required a higher degree of need to come into somebody's apartment, break into the apartment and put in an information gathering device.

Q. Right. 236 appears to be application for an extension for eaves dropping warrant, that is under 157, right?

MR. FERGUSON: 157, you said?

Q. 157.

A. Yes, it seems to be.

Q. Now, would you have been, in the ordinary course of your activities as the prosecutor that was working on this homicide case, at the time that the application was filed on the 29th of March 1985 by Mr. Leff, for the eaves dropping warrant, would that have been something in the ordinary course of things you would have been aware?

Edward W. McCarty, III

A. Yes.

Q. We had some conversation at the beginning of this deposition about these kind of eaves dropping warrants at this period of time were comparatively rare in Nassau County?

A. This wire tap was not at all. The one on 3/29 was not rare at all; it seems to be application for a wire tap, that wasn't rare at all, we often did that.

Q. But this is the same comment that you made with respect to wanting to be sure that the factual allegations that were being put forth by the detective in the application for the wire taping being accurate and not misleading; those would apply to this as well?

A. By every application made.

MR. SCHECK: Why don't we mark all of these; there seems to be some confusion here. Why don't we mark as Exhibit 237, that would be the following Bates stamp numbers. B0518 which appears to be an application about a progress report of -- let me do these in the right order. My apologies, your Honor.

A. That's all right.

MR. SCHECK: Let's mark as 237 bates stamp B 05081, B01582 and B 05079 and B 05080. Please mark those.

Judge Edward W. McCarty, III December 20, 2010
42

Edward W. McCarty, III

( Exhibit No. 237 was so marked for identification.)

MR. FERGUSON: Since there are multiple documents in the exhibit that are similar except for a few words, can you see which ones you are referring to so I can read along?

Q. Sure. These are progress reports signed by you with respect to the ease dropping warrants that might refer to the bug that you recall, is that right?

A. Yes.

Q. So, consistent with your recollection there appears to be have been an application for a bug?

A. Eaves dropping device as opposed to a telephone devise.

Q. The eaves dropping device was comparatively rare?

A. Yes.

Q. But the actual wire tap of the telephone that is something that happened?

A. Far more common.

Q. Both of these appear to be going on during the same period of time?

A. I forgot about the wire tap but as for the eaves dropping warrant I was concerned about it because

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
43
Edward W. McCarty, III

of the rarity of it.

Q. Now, I call your attention to pages four and five of Exhibit 157 which is the Volpe affidavit in support of the wire tap application.

Just looking at page four, you see starting paragraph nine, Detective Volpe recounts how John Kogut gave a confession and a seven page written statement to detectives bidding in great detail his participation in the rape/murder of Theresa Fusco.

A. I read that, yes.

Q. Then moving to page five, paragraph 10, right, Detective Volpe says the following, I'll read it, "that on March 27, 1985, Nassau County Court Judge Lawrence signed an order authorizing the seizure of the above described van to wit, a 1977 Ford Van, blue in color, New York registration 32525 BCG operated by John Restivo during the murder of Theresa Fusco. A search of that van has produced hair consistent with Theresa Fusco and possible human blood." Do you see that?

A. I do.

Q. Just to be clear, this affidavit, Exhibit 157 is written on, go to very end which is page 11, the 29th of March 1985, there's a stamp at the bottom of the page that maybe can you inform me as to a time?

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

A. That was Susan Warren, at the bottom I have no idea what that represents.

Q. By the way, what was the, do you recall this particular extension specifically?

A. No.

Q. But in the ordinary, and there's a 0157 before the application, before the Volpe affidavit, there is a Lawrence Leff makes an affirmation?

A. Yes, I saw that.

Q. So what was the ordinary course of business as to how an affidavit like Detective Volpe's would come to past in this kind of case?

A. If we needed a special written -- such as search warrant or an eaves dropping device which is rare as I said -- we would bring the detective over, question the detective under the requirements of the law and determine whether we meet the criteria. We would then execute the warrants and have the detective swear a supporting affidavit.

Frankly, I am not sure whether we would have the district attorney execute that; if that was the requirement of the CPLR, we would have the district attorney sign the actual warrant.

Q. Paragraph 10, at page five of Detective

Judge Edward W. McCarty, III December 20, 2010
45

Edward W. McCarty, III

Volpe's affidavit, when we say a search of the van has produced hair consistent with Theresa Fusco and possible human blood?

A. Page 10?

Q. Page 5, paragraph 10, I am sorry.

A. Yes, I see it.

Q. Pursuant to some conversation we had at the beginning of this deposition, and based upon your understanding of this at the time, this would be understood as a statement that a hair had been recovered from Theresa Fusco and under microscopic analysis and was determined that a hair had been recovered from John Restivo's van and under microscopic hair analysis was determined it was consistent with Theresa Fusco?

A. You are going way to far.

MR. FERGUSON: Note my objection.

A. The search of the van produced hair consistent with Theresa Fusco and possible human blood. That is all there is. I don't know if Volpe held up two strands of hair, whether the hair they found in the van was brunette or dark hair therefore the hair comparison produced hair consistent with Theresa Fusco. I would say that is consistent.

Q. What about possible human blood? There

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

46

Edward W. McCarty, III

were presumptive tests done for blood, right?

A. I don't know why. I don't know why they say possible human blood. The problem was a presumptive test. The test would destroy the sample. I don't know whether it was a presumptive test or they took the sample for more testing; I don't know. That could explain the reason for possible human blood as to presumptive test, as to we know it was human blood.

Q. Do you know somebody named Birdsall?

A. Wayne Birdsall now lieutenant or sergeant. He was from the crime lab; maybe would have done one of the tests.

Q. Was he a person from this period of time who was an individual that would be processing items from a crime scene for the possible processing of blood?

A. The person processing at the crime scene itself was a crime scene search unit. He was not a part of the search unit at the time. He worked in the lab. If they took the van, brought it in, they may have called people down from the lab to take extraordinary expertise in the search of the van. I don't know if that is the case or not.

Q. Assume for the sake, I represent to you that Mr. Birdsall has testified in a deposition in this

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
47

Edward W. McCarty, III

case that he did the analysis of the van when it was brought in and determined that.

A. I think that is called corroboration for what I just said.

Q. That's right. Based on your understanding at the time, if Birdsall had processed the van and testified that he found no human blood, right?

A. Don't know.

Q. I am asking you if he said that?

A. Are you asking me to respond; I don't know.

Q. If he said that and that was in fact the case, that would be inconsistent with this representation in paragraph 10 --

MR. FERGUSON: Note my objection.

A. No, that would not be inconsistent. Because it says possible human blood. I don't know if when they took it up to the lab and first saw it it was possible human blood, I don't know if Birdsall ruled out it being human blood.

Q. Birdsall said when he processed the van he found no stains that were even possible human blood --

MR. FERGUSON: Stop there. Note my objection to mis-charactering the testimony in the case then asking a question based on that. That is totally

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
48

Edward W. McCarty, III

improper. Objection.

MR. SCHECK: Fine.

Q. Ordinarily at this time when detectives such as Volpe is filling out this kind of affidavit, what would be the source of his information?

A. The investigation.

Q. I mean when he is filling out an application with respect to the trace evidence recovered from an item such as a van, right, would that either be in the ordinary course of business, something that he would have learned from the people at the laboratory that inspected the van, would that be in the ordinary course?

A. There's is no ordinary course here. Every review of the van of this type or piece of evidence is somewhat different.

Q. Let's assume that the van was seized and brought to the lab, right. Then being processed by Detective Fraas --

A. Fraas was at that time at the lab.

Q. He was the fellow that did the microscopic comparison?

A. Don't know.

Q. And you remember Birdsall?

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
49

Edward W. McCarty, III

A. Yes.

Q. If Fraas and Birdsall were tasked with the search and evaluation of trace evidence of the van, right --

A. Yes.

Q. -- would it not have been in the ordinary course those individuals that would have been the sources of information for Volpe to make a representation to a judge about what had been recovered?

A. I don't know how far Volpe went to get his verification information. He could have looked in the van, saw red paint and said I think it looks like blood and that could be the basis that formed his statement.

Q. Could have?

A. Yes.

Q. But in the --

A. Aristotle said in the area of possibility all truth lies; in essence, anything is possible that means. You are asking me to guess what came first.

Q. I prefer to ask you about what in the ordinary course of investigative methods in Nassau County would have been the appropriate procedure?

A. Don't know. Don't know here. There was no ordinary course for looking at a van and bringing it in.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
50

Edward W. McCarty, III

The expert might not be available for three days so the van sits there for three days until someone can come in. There is no usual procedure here.

Q. But let me -- if, in fact, in terms of whether what was ordinary and appropriate procedure, the van was seized and brought into the lab, and then Fraas and Birdsall were tasked with processing the van for trace evidence, would it not have been the appropriate course, if not appropriate course of conduct, before filling out an application for an extension of the search warrants and reporting on what was found in the van, that the detective would have based the representations on what the people tasked with processing the van had found?

A. I really can't answer that question in that fashion. Reality is if the detective was coming on a particular day, if the only thing he knew was that the van had -- there was possible blood in the van, that would be sufficient for me to get the warrant.

Later on if that information proved not to be the case I would like to hope we would include it in follow up documentation. I am not going to fault a detective for coming in on day one and the van wasn't processed until day three. If he seized it there is

ESQUIRE an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

something there.

Q. If the van was taken and processed --

A. Of course that would be the better process.

Q. That's all I am asking you?

A. Yes.

Q. If the van was seized and Detective Volpe was present when the van was brought in Detective Volpe was aware Fraas and Birdsall were processing for evidence?

A. Sure.

Q. And it would be appropriate and ordinary procedure that he would then have reported back to the District attorney and Judge seeking extension of the search warrants on what Fraas and Birdsall told him about what they found in the van?

A. Well, your question is good except when you add the word appropriate. Because there is nothing appropriate here. Yes, I would like the detective to wait for the eureka moment when testing for blood, eureka, then there is blood there; it might strengthen our warrants. He didn't wait why he didn't, I do not know.

MR. FERGUSON: I would like to pose an objection, this is calling for speculation; the Judge

Judge Edward W. McCarty, III December 20, 2010

52

Edward W. McCarty, III

really has told you six or seven times he had no particular knowledge of this and there was no usual customary procedure.

MR. SCHECK: I don't think he said that.

A. If I didn't say it I meant it.

Q. When you say, I appreciate that you are saying things can happen in different ways.

A. Right.

Q. My question is a different one. That is assuming a certain chain of events, what would have been the appropriate procedure? That's my question for you.

A. My answer to that is there is no appropriate procedure here. No standard operating procedure to do this. It has variability with particular experts or if a material can be maintained and is not affected by the weather and elements, there is host of different questions here.

Q. In the ordinary course who would have drafted the affidavit for Volpe?

A. I would have drafted this. It's my work product.

Q. But when you draft an affidavit from a detective such as Volpe, ordinarily wouldn't the information in the affidavit that he is signing, right,

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
53

Edward W. McCarty, III

have come from him?

A. Sure. It's the work of the yellow pad, he comes in and sits down and tells me the status, what we're looking for and I am trying to determine whether we could fit the status of the case into the four corners of a warrant.

Q. If a detective comes in and tells you we seized the van, brought it down to the lab, the appropriate people in the lab have processed it for trace evidence which would include hair, and the presence of blood, right, would you as district attorney in the ordinary course of things say to him what did they find?

A. I don't recall. It leads me to suspect what you may have uncovered, of course, possible human blood, if I knew it was human blood or not human blood I would have put that into the affidavit. I probably wouldn't even put in there there was no human blood I would have put in search of that van has produced hair consistent with Theresa Fusco. At that point it was up in the air whether that substance was human blood. I would never put that in if I knew one way or the other.

Q. Why don't we turn to 184 and 185. 184 is the letter. 185 is a typed up version of the same thing.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
54

Edward W. McCarty, III

These are two different exhibits, however, two different as 184 was the original letter produced to us and because it was difficult to read we typed up a transcript of it.

MR. FERGUSON: So it's the same thing.

MS. HOFFMAN: However, we produced it and we created it, marked in it the prior depositions so it was easier to follow along with the original.

MR. FERGUSON: Okay.

Q. Looking at paragraph four of this correspondence, recommendation of the medal of commendation for Detective Volpe and Michael Connaughton and Police Officer William Diehl by Spillane, the end of paragraph four, the last line I believe, getting up there, the last few lines, "as a result of the Kogut statement a search warrant was secured to John Restivo's van, the van in which the girl was abducted and murdered and search of the van by the Scientific Investigation Bureau revealed that there was hair from the deceased person present in the van."

A. Are we on paragraph four. Yes, "search of the van by the Scientific Investigation Bureau revealed hair from the deceased person present in the van. Is that what you just read?

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com



Edward W. McCarty, III

Q. Yes.

A. Agreed.

Q. In terms of at least this summary, Spillane is saying in the chronology of things that the van was searched by the Scientific Investigations Bureau.

A. Yes.

Q. They determined that a hair from the deceased was present in the van?

A. Yes.

Q. Do you recall anything in the course of all you have heard about this case about the existence of this van and hair in the van?

A. My thought was going to hair in the van. Supposedly according to one of these confessions the girl was in the van. If being transported in the van she left a hair behind; it was a piece of important evidence.

Q. It would be important evidence for continuation of the search warrants?

A. And for eventual trial, sure.

Q. This search warrant, after all, for the van, was being undertaken weeks after Theresa Fusco had disappeared, correct?

A. That's correct.

Edward W. McCarty, III

Q. So in a sense wouldn't you agree that assuming that someone had been involved in abducting Theresa Fusco, raping and/or murdering her in a van and dumping her body in a cemetery, then with word out of that I think you indicated it was purposely put out by homicide and the district attorney's office that a search was going on, that is what was going on here, right?

A. Yes.

Q. Kind of a long shot, wouldn't it be, that you would find something in the van all these weeks later assuming the person committed the crime, you know, and he knew he had committed the crime in the van?

A. Absolutely not. Absolutely not. In my kidnapping case we had a man kidnaped in 1974 in November he was held in a trunk of a Ford Mustang and three years later we found the car in a lot in New London, Connecticut and they sent a team of detectives and hooked it up, brought it back and there were hairs in the trunk of the car.

Q. Could happen, that is why you do it?

A. Frankly, that's why I am not surprised there were hairs there. In the nicks and crawls and crannies, it may not be cleaned out.

Judge Edward W. McCarty, III December 20, 2010
57

Edward W. McCarty, III

Q. That is why you go back and do it because there is always that possibility?

A. Yes.

Q. On the other hand there is always concern that after all this time and after putting out the word that people are being suspected, perhaps, of committing this crime, there is concern that criminals will try to clean whatever car they were using?

A. One of the best parts we're dealing with when dealing with criminals is you are not always dealing with nuclear scientists, and generally they may overlook a hair.

Q. Are you familiar with any of the things going on with the litigation of this case concerning this hair?

A. The only thing I know, it might not match hairs. That is all I heard some place in the media or something like that.

Q. Do you know that, are you aware that Judge Ort made a finding in his decision in this case, I'll show it to you, that the hair didn't come from the van?

A. I didn't know that.

Q. Show him that.

MR. SCHECK: Please mark this 238.

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
58

Edward W. McCarty, III

(Exhibit No. 238 was so marked for identification.)

Q. This is the transcript of the proceedings on December 25, 2005 where Judge Ort issued his decision in the retrial of John Kogut. Mr. Castelerio was present there. I am looking at the bottom of the page where the Judge says in analyzing the case I felt the best way to deal with it would be from the bottom up, so to speak. In reaching my decision first with respect to count three, and it is the finding of this Court that I do not believe that the in question hairs were left in the van on or about November 10, 1984 and in absence of those hairs there is no corroboration whatsoever for the defendant's confession concerning the count of rape. Do you see that?

A. Yes.

Q. You had no awareness this was a contested issue, the hair?

A. I know the hair was a contested issue.

Q. Are you aware there is a contention, that there's no dispute in this case, that the hair from the dead body is not that of the dead body of Theresa Fusco?

A. I am going to say no, I don't know that that is totally -- that everybody agrees on that.

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
59

Edward W. McCarty, III

Q. Because I deduced from your comments you were under the impression what happened here there is some DNA test showing the hair from the van was not from the deceased?

A. I wasn't absolutely sure of the definition of the hair in the van. In producing me -- I think I knew the hair in the van was Theresa Fusco's hair whether post mortem or whether it could be determined it was long after the body had been found or pre mortem, its disputed as to the length of time.

Q. Are you familiar with the phenomenon of hair banding?

A. Yes, I used it myself in the another case. I remember a term of hair banding. I know there is such a thing as hair banding.

Q. When you say another case, what you are you referring to?

A. The Williams case, the case from '77, the hairs found in the back of his car after a number of years.

Q. Hair banding is the hair came from the body of the dead person?

A. The victim in this case lived. And there were certain characteristics of hair that have

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
60

Edward W. McCarty, III

striations through them, certain colors in them to say whether the hair is consistent or inconsistent.

MR. FERGUSON: You mean the banding on the a live person?

A. Yes.

Q. We're talking about a different person?

A. You can't band on a live person.

MR. FERGUSON: He's not an expert on this.

A. I remember the term banding back then. I know my victim was alive and fortunately a recovered victim.

Q. I guess what I am really trying to ask you about, are you familiar with the issue in dispute here as to whether or not the hair in the van that is agreed upon came from dead body of Theresa Fusco was planted there?

A. I am sorry?

Q. Planted.

A. Your question is what?

Q. Are you aware that is the issue?

A. I know this is always out there. I am aware of it.

Q. Were you aware of that before we came in here for the deposition?

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

A. Yes, I think that is public knowledge. I think that is where I picked it up. I don't know if that was something at a police smoker years ago but I think that is public knowledge.

Q. Let me bring you back to the Spillane commendation letter, paragraph four. Spillane says, "a short time after the Kogut arrest, the police department was notified by an attorney that he represented the suspects Halstead and Restivo and we were not to talk to them." Do you remember that?

A. They were represented by Ted Robinson (ph).

Q. What do you remember about that?

A. Ted Robinson notified someone that he represented the two of them and that we should discontinue further, any further interrogation of them.

Q. Continuing to read, "with Kogut arrested the only thing we were left with was a statement of a co-defendant which would not be admissible against the other two defendants. Unable to speak to them because of the Miranda warnings by the attorney we were left with a very weak, if non existent case, against the two other individuals. Detective Volpe and Police Officers Connaughton and Diehl conducted exhaustive investigation against the two defendants. All friends, co-workers,

Judge Edward W. McCarty, III December 20, 2010
62

Edward W. McCarty, III

family members, who would cooperate, anybody who had contact with the two suspects were interviewed. Police officers Connaughton and Diehll and Detective Volpe interviewed approximately 150 people who had contact with these two individuals. As result of these interviews enough information was gleaned so Detective Volpe applied for a court order wire tap for the defendants at the residence of Mr. Restivo and Mr. Halstead as a result (inaudible) the Kogut statement. A search warrant was secured for John Restivo's van."

Does that refresh your recollection of the events as you remember them?

A. I don't recall Connaughton, I don't recall Diehl. I don't know all of that exhaustive detective work resulted from the wire tap or the wire happened and eventually that led to their arrest.

Q. Was it your impression that, he says, Spillane, was unable to speak to them, meaning, I guess, Halstead and Restivo because of the Miranda warrants by the attorneys left them with a weak or non existence case against the two other individuals here. That would be Restivo and Halstead?

A. Yes.

Q. Is that your impression of the state of

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
63

Edward W. McCarty, III

things?

A. The status of the case once lawyers came in and it shut down; that was my impression.

Q. It was the police department that engaged in all the interviews?

A. Yes.

Q. As you have told us it was not representatives of the prosecuting office, and you were not informed of each and every interview they were conducting when we started a little while ago, that was the Barry Grennan that was keeping up with the case and you didn't want to over manage.

When you say "over manage", they had considerable autonomy and would come to you with significant leads?

A. Yes, that's how the system works. We advise and try to get into the investigation but not at a cost of the investigation itself.

Q. You said the investigators were?

A. The investigators were the investigators, the people out on the street gathering evidence, gathering testimony, interviewing witnesses; the prosecutors don't do that; we see eventually what they would harvest, so to speak.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
64

Edward W. McCarty, III

Q. But you would expect them to provide you with any significant lead that developed?

A. Sure. Word being "significant".

Q. Even if something had gotten screwed up?

A. Absolutely.

MR. SCHECK: We will take a short break.

(Break).

Q. Going back to Spillane' commendation letter, just in terms of going down to paragraph 7, it starts, I am reading out loud, " I am recommending that Detective Volpe, Police Officer Connaughton and Police Officer Diehl be awarded the medal of commendation for diligently and exhaustive investigation or the murder of Theresa Fusco. This was not an ordinary homicide. The discovery of the body, the second missing person from Lynbrook aroused the entire South Shore community of Nassau County. This one had to be solved."

A. I disagree with the language. Every murder has to be solved.

Q. To the extent that this is indicating, I think, correct me if I am wrong, that consistent with what you said, this particular homicide, given the disappearance of Kelly Morrissey, I think you indicated another disappearance of a woman in Lynbrook, this was a

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

matter of great concern in the community?

A. Sure it was a matter of great concern I quarrel with the language this one had to be solved. There is no prioritizing in regard to murder cases.

Q. Your concern with the language here, "this one had to be solved," you mean that all have to be solved??

A. It's offensive to me; they all have to be solved.

Q. On the other hand would you not agree that this language reflects at least a view that was shared in police community that this case had particular importance, fair enough?

A. Fair enough.

Q. Looking at paragraph 8, Spillane indicates, quote "Detective Volpe worked five to seven days a week, put off his vacation as did Detective Connaughton and Diehl and as result of the combined team working their case it was brought to a successful conclusion. Each day every little bit of information was discussed between the police officers and Detective Volpe. A critique was held bi weekly and all information was passed on not only to Detective Volpe, Police Office Connaughton and Diehl but the supervisors and members of

the Homicide Squad." Do you see that?

A. Yes.

Q. To be clear, do you agree that is the way the process worked in cases of this nature?

A. That is rhetoric you need to say to make sure someone gets a medal.

Q. You are not sure they worked this hard and did the case this way?

A. In the Army I wrote up people for medals and you always know you what you have to write to make the metals work; this seems be the gratuitous language for that. Would they always be talking, updating, doing all those fine things police officers do, I have no idea that took place. If the language didn't appear there, the medals might not have been awarded.

Q. My inquiry of you is, I think you indicated already, is that generally speaking, is the way that the Homicide Unit would proceed is that they would conduct intensive investigation and talk among themselves and then if they had significant leads or needed a warrant or technical assistance they would pass that on to prosecutors, is that right?

A. The Harvard Business School has some excellent criteria for group discussion and group

Judge Edward W. McCarty, III December 20, 2010
67

Edward W. McCarty, III

dynamics. I learned at the Army War College you bring people in, discuss matters and you cull everybody's expertise to have something done better. I follow that procedure in every aspect of my professional life since I learned about it.

I would like to think that that form of management is executed by the police department. I can't tell you that it has been. I do not know.

I know, for example, if a detective supervisor is about to go off duty at 5:00 and a whole new shift is coming on he should bring those detectives on board and discuss the merits of certain investigations being done. That is outstanding management. I don't know if they do it over there.

Q. Now, putting aside what the police might have been doing among themselves, the thrust of my question really is, am I fairly describing, I take it if your answer is going to be what would generally happen in a homicide investigation during this period of time in Nassau, in other words the police would move it forward, interview various witnesses, and then if they would report significant leads they would ask prosecutors for technical assistance in getting a warrant.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
68

Edward W. McCarty, III

A. That's right.

Q. That's generally. Is that fair?

A. That's fair.

Q. Let me first show you, do we have the big chart with the map?

MR. GRANDINETTE: No, we don't have the large maps here.

Q. Let me show you Exhibit 170. This is Exhibit 170. This is a map that we have been using during the course of the depositions in this case.

A. Yes.

Q. Let me first start by pointing you to number one, Hot Skates.

A. I remember the location, you can't pass it now without thinking of this case.

Q. This is the place where Theresa Fusco was working. She left prior to, that's where she went missing; last place she was seen?

A. That's right.

Q. Two, that is labeled the location of Theresa Fusco's body found on December 5, 1984.

A. That's right.

Q. Looking at this map does that orient you?

A. Sure.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
69

Edward W. McCarty, III

Q. Now, do you recall ever being informed after the body was found, that police had gotten a, had learned, that on the night of the incidents --

A. I am not sure of the date, the night she went missing.

Q. November 10, 1984, there was a report of the car being stolen; November 10, 1984, and another witness had come forward saying that she had seen a car, which she subsequently identified as having been located at the area. See number four, here?

A. I see it. Was she headed eastbound or westbound, do you know?

Q. I have to orient myself which is eastbound.

A. Eastbound is to the right of the map.

Q. Why do you ask me that question?

A. Because it would put her 60 feet closer or further away from two.

Q. First of all, I am just going to show you the police reports concerning this. But just as a general matter, do you remember ever hearing of a car that was stolen the night of the incident, that another witness had reported seeing?

A. I will be the Judge breaking up the question; first question no. I do not remember being

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

70

Edward W. McCarty, III

told about a stolen car.

Q. Second question, do you remember being told of a witness who had identified seeing the stolen car near the scene of the incident and hearing a scream at or around the time that evening?

MR. FERGUSON: Note my objection to the form of the question.

A. Absolutely not.

Q. Do you recall hearing that this car that had been reported stolen, when it was eventually recovered -- withdrawn. Flip to Exhibit 168, your Honor. Just keep the map. Do you remember 168, is this the missing poster for Theresa Fusco; do you see that?

A. I see it.

Q. Do you recall that there was such a poster? Do you recall this poster?

A. I don't recall whether I saw this before or after we found her.

Q. But you do recall seeing it?

A. Yes.

Q. You see here that among the items that she was described as having been wearing when she was last seen were stripped blue jeans?

A. I see that.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

71

Edward W. McCarty, III

Q. Do you recall any reports from detectives that they had learned that stripped blue jeans turned inside out were found under the front seat of a car that had been reported stolen on November 10, 1984 prior to the homicide?

A. Never knew that.

Q. Now, so non of this rings a bell?

A. No, I never knew this. Can I ask one question of you then? Number 3 on your map, I know this area, this is like a swampy area. Was the car stolen from that? It's not parked on a street.

MS. HOFFMAN: I think it might be the wrong side.

MR. SCHECK: Wrong side of what?

MS. HOFFMAN: I think three should be on the other side.

A. Of Ocean Avenue.

MR. FERGUSON: You really do know that area.

A. No place to mark this.

Q. What I am trying to establish, none of this rings a bell for you?

A. No, none at all.

Q. Would you agree that very often in criminal investigations -- withdrawn. Let me put it to you this

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

72

Edward W. McCarty, III

way, statistically at least, ordinarily investigators say more crimes are solved by leads that come in early in the investigation as opposed to late?

A. Don't know.

Q. Please turn to 166. Are you familiar with these kind of reports from the police department concerning reports of stolen vehicles?

A. Completely unfamiliar.

Q. I am simply going to ask you if you have any recollection of seeing this document before?

A. No.

Q. Let me review the highlight for you, Exhibit 166 indicates an individual by the name of John French certifies that at 21:30, which would be what military time?

A. 21:30 is 9:30.

Q. 9:30 on November 10, 1984, that he reports that his vehicle, well, between 9:30 and what would that be 23:05 --

A. 23:05 would be 11:05.

Q. 9:30 and 11:05, he says his vehicle was stolen from the south side of Lakeview Avenue 200 feet west of Ocean Avenue in Lynbrook, New York.

A. Yes.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

Q. Taking a look at number 3 in our map again --

A. Number 3 should be probably across Lakeview where the "V" is.

Q. That area is where you can see this report of the car being stolen, correct?

A. Yes.

Q. Looking at the description of the vehicle here, it's indicating an Oldsmobile Delta Eight Eight, four door sedan, gold, blacktop, you do you see that?

A. Yes.

Q. That's the description.

A. Hunting knife above passenger door.

Q. Why don't you take a look at Exhibit 158. You see this homicide lead sheet?

A. Funny, first time I have seen a lead sheet for homicide. I don't recognize this form or anything else.

Q. How many years were you a homicide prosecutor?

A. Over 10.

Q. During this period of time?

A. Yes.

Q. You never before had seen a lead sheet?

ESQUIRE
an Alexander Gallo Company

Edward W. McCarty, III

A. No.

Q. In terms of the documentation of what went on in an investigation, would you ever receive a written report from the homicide investigators of what happened?

A. Like and update? No. There was no formal written documentation; we would just talk on the phone.

Q. No regular way, for example, when that case was processed, no standardized forms that would indicate when an witness interviewed, when the report was prepared to summarize statements?

A. Not given to us. I could probably go over every lead sheet but we never did.

Q. You depended on the police to provide those to you?

A. Yes.

Q. Let's go over this lead sheet. This was received on December 9, 1984 at 4:25. So, this would have been the body that was found on, I think, the body was found on December 5th, right?

A. Yeah, around that. I can't tell you exactly. Let me tell you something interesting from the homicide investigation. What time did she leave the skating --

MR. CASTELERIO: 9:40.

Judge Edward W. McCarty, III December 20, 2010
75

Edward W. McCarty, III

Q. Right here on this lead sheet, I see you are now checking.

A. Yes.

Q. Called and stated that she was driving over Sunrise at Rockland, right, and heard a scream.

A. She says between 21:00 and 0100 hours, that is between 9 o'clock and one o'clock at night.

Q. She said when said got to the railroad tracks on Rockland there was a car parked with no one in it, auto possibly tan, four door, older vehicle, large window, had tools and dark colored blanket in auto.

Then it indicates that on 12/9 Policeman Smith was responding to homicide to view the auto in Lynbrook on November 10, 1984 -- I am sorry, I mis-read it, read it too quickly. The next thing on the lead sheet 12/9 Policeman Smith responding to homicide to view auto stolen in Lynbrook 11/10/84. Do you see that?

A. Surely.

Q. Below that it indicates Pierce and Lane present at ESB.

A. Employee Emergency Service Building.

Q. What would that be?

A. Over here by headquarters.

Q. With above Debra. Viewed car. After

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

76

Edward W. McCarty, III

viewing stated she remembers the broken windshield, the parking sticker in the windshield and the Silver AAA sticker on the rear bumper. Stated she would only give us 90 percent, because when she looked inside the car there was a lot of garbage in the rear seat. Remembers a blanket and tools and rope. She said she viewed the car between 11 a.m. at night until 1:00 a.m. because remembers no traffic on Sunrise Highway. No trains or railroad overpass. Then on the next page, this is labeled Detective Volpe parentheses says 22, 28 years I am sorry, on 422-dash Debbie Smith reports a few weeks ago she was at Sunrise slash Rockland northbound. She heard a girl scream. When the light changed she observed a vehicle parked on the east slash B -- I don't know what that says -- eastbound, I would imagine, of Rockland and Long Island railroad overpass. No occupants.

Vehicle description 1970 to 75 gray or beige with large windows in it. Time approximately 21:00 to 0 100 hours. Okay. Then, here, if you look at Exhibit 159, turn to that, there is this statement of Debra L. Smith, it says "my name is Debra L. Smith. I am 28 years old. I was born" and there's a blank. "I live at," that is also blank. "My home phone number is"

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
77
Edward W. McCarty, III

blanked out. "I worked at American Technical Service service (inaudible) at 15 Stevens Place, Huntington Station, New York." Gives a phone number. Is a computer program analysis. "I live at home with my parents, brother and sister. I have been told by the detective writing the statement any false statements I make here in are punishable as a Class A misdemeanor pursuant to Section 2, 1045 of the Penal Law the State of New York."

Let me just stop there for a second. Was it your understanding, ordinarily if a detective went to the trouble of actually getting a statement that was being made from a witness under penalty of perjury it was considered, at least, a comparatively significant thing so they wanted to have it sworn?

A. No, this seems to be standard procedure for the Nassau County Police Department. You get the two 1045s, that is in almost every statement they take.

Q. This is how the Nassau County Police Department does it as opposed to whom?

A. I don't know. This is how Nassau does it.

Q. That's why I am asking you, because you know how Nassau County does it. Would Nassau do this for every witness?

A. Yes. Anybody, a victim of a crime they put

Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
78

Edward W. McCarty, III

the two 1045 statement in their, that is always.

Q. But the effect of this, I take it -- withdrawn. Would one of the reasons, to your knowledge that the Nassau County Police Department would have people when they signed a statement tell them it was under penalty of perjury was so they take it seriously?

A. It made the solemnity of it.

Q. "I wish to state last month between November 17th and the 21st I had gone to my friends James Pierson's house and planning (ph) for the evening; we had an argument. I left his home to go to Central Avenue. As I got to the corner I saw the railroad gates were down for a train going towards Long Beach. I decided to take Rockland Avenue up to Merrick Road and Ocean Avenue where I go to Peninsula Boulevard and home. I drove north on Rockland Avenue to Sunrise Highway. The traffic light was red and I stopped for the light. I had my window partly opened because I was smoking.

While I was sitting at the light I heard a woman scream. I rolled my window down and listened but did not hear anything else. The scream came from the left, like, it was up high. I looked at the elevated railroad because that seemed to be the direction that the scream came from. The traffic light changed and I

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com



Edward W. McCarty, III

drove across Sunrise Highway and over the railroad overpass.

I saw a large light to medium tan, Olds, four door sedan, early 70's that had large windows. I looked inside and saw a lot of stuff in the back seat, tools, blankets and other stuff in the back seat. During this time I got out of my car and I looked around toward the railroad trestle. I looked at the license plate. I remember there were four numbers and three letters and a shiny sticker on the left side of the rear bumper. I also remember the car had a broken windshield and the ticket in the left front window of the dashboard.

Today I received a phone call from Detective Joseph Volpe who asked me to come to the police headquarters and view a car that they had there.

I met with police officers Lane and Pierce who showed me a 1971 Oldsmobile Delta Eighty Eight. I have looked at the car and feel this is the car that I saw that night. The only reservation I have is the interior of the car does not have all of the stuff in it that the car had when I stopped at the railroad crossing. I have given this statement to the detectives and it is the truth." I see you writing things down.

A. It had a parking ticket on the window.

Edward W. McCarty, III

That's the first I ever heard of such a thing.

Q. Well, my question to you is, does any of this ring a bell?

A. No.

Q. Take a look at Exhibit 160. You see this says, incidentally, is this this kind of a sheet, did you ever see a sheet like this before?

A. Don't know what it is, no.

Q. It's not a form familiar to you?

A. No.

Q. 12-11 8415030, "Detective Mitchell, Debbie Smith called to command bus states she is not sure if she saw the automobile between 11:17 and 11:21 or between 1:10 and 11:14. She will attempt to put her dates and activities in order and will call us back."

A. Yes.

Q. So in other words she's calling back and saying the time when I might have seen this car was between, was actually on November 10th as opposed November 17th?

A. That's right.

Q. Remember she was initially calling in on December 9th, correct?

A. Don't know.

Judge Edward W. McCarty, III December 20, 2010
81

Edward W. McCarty, III

Q. The first document.

A. The first document shows that. I don't know whether that was accurate; I presume it is.

Q. So the body is found on December 5th, right?

A. Yes.

Q. Then, it's not uncommon in the course of investigations that after a body is found like this in a homicide and there's some publicity, that witnesses might call in with respect to their recollections of what they might have seen or heard in the area at the time where a body was found?

A. That's one thing why we put a huge van crime post so people feel encouraged in the area; they feel more secure.

Q. In your experience is it often true people are better at remembering the order of events then remembering specific dates?

A. That's probably true.

Q. Now, in terms of just this location where Debra Smith reports seeing the car, okay?

A. Yes. Yes, I see.

Q. Now, are you familiar with this intersection?

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

82

Edward W. McCarty, III

A. No.

Q. Of Sunrise Highway and Rockland Avenue?

A. No, I was not. I thought she had been traveling on Sunrise; she was traveling northbound on Rockland. So the four, that is where I was trying to put the four before at that intersection there.

Q. Okay. In your experience would a car with a smashed in front window, on the side of the road, at that intersection, right, is that something that could be there for weeks with nobody noticing?

A. I don't know. It was always my interpretation in the areas of Hot Skates, down to Sunrise Highway there was a light industrial area. I don't know how long a car would be left there.

Q. Would you agree that if Debbie Smith is correct in her recollection, that she could have been at that intersection, right, and heard a scream on the evening of November 10th, right, and observed a car by the side of the road with a broken windshield, right?

A. If we go into all the ifs, if she was there at the right time.

Q. If she is reported there --

MR. FERGUSON: If she reported she was there on November 10th; question is improper.

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

A. She said an awful lot. I am not trying to be argumentative, but if she was there when that took place, to hear the screams, they would have been there at about the time, if Theresa Fusco was murdered at that location, and if she screamed then she may have heard the screams.

Q. Right. Most importantly the car?

A. If that car was involved in the murder, she stopped to see the car, then she possibly saw the car that was involved in the murder.

Q. That's the kind of lead you would expect to be followed up, yes?

A. That I would leave to the discretion of the detectives when they took to the complainant or witness. I would not be turned unto that as a homicide guy in understanding the science of murder cases; that is not something that would peak my interest, frankly.

Q. Wouldn't peak your interest? I am sorry?

A. Because the time she may have been there, the probability that on a November night that she actually heard someone scream, the potential that this girl screamed on that night, the potential this man left the car, the potential that she saw, drove by the car and saw tools and other stuff in the back of the seats,

Judge Edward W. McCarty, III December 20, 2010

84

Edward W. McCarty, III

stopped the car, she got out of the car, did her own investigation, highly unlikely.

Q. That she did all those things?

A. Highly unlikely. Every good trial lawyer does, I know you do, Mr. Scheck, you review people's execution of events on a natural and affordable consequence of life. What people really do and hear and interact with. That's really off the charts.

Q. Let me ask you this. You never heard about this?

A. Never heard about it.

Q. Did you ever hear about anyone saying that stripped jeans consistent with the description of the jeans Theresa Fusco wore, were found in this car?

A. Never heard that. Until recently, until six months ago, I don't know what recently came up, this is some time ago within the passed two years or so when this matter came up, but I never heard this back when I was assistant district attorney.

Q. Heard what?

A. The jeans in the back of the car.

Q. When did you first hear about the jeans in the back of the car?

A. I can't telling you; I do not know.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
85

Edward W. McCarty, III

Q. Recently?

A. May have been back when Mr. Klein was trying the case; I do not know. I have no independent recollection of the jeans in the back of the car.

Q. If it helps you Mr. Klein has testified he had no recollection of any of this?

A. Same thing. Consistent with mine. It didn't come from Fred. I can tell you I am a science homicide guy I would reviewed this as something significant.

Q. Would you agree that in this particular car jeans consistent with the description of the jeans worn by Theresa Fusco were found inside out stuff under the front seat of the car, that would be significant wouldn't it?

A. Jeans would have been significant if they were consistent with stripes.

Q. Finding jeans insides out stuffed in the front seat of the car would be consistent?

A. Further peak my interests that it is natural and inevitable consequence of a crime.

Q. Finding and locating jeans from the victim in a car that was stolen on the night that she disappeared, right, and at least one witness observed in the area where the body was found, putting all that

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
86

Edward W. McCarty, III

together, that could be pretty significant evidence to pursue?

MR. FERGUSON: Objection.

A. Evidence significant to be pursued.

MR. FERGUSON: Note my objection.

Q. Certainly, you would, as prosecutor on a homicide case, you would have wanted to process the jeans found in such a car that were underneath the front seat turned inside out for trace evidence?

A. Retrospective or prospective analysis.

Q. Even back then you would want to process those?

A. I would say potentially, yes. Up until then we didn't know the jeans were missing.

Q. You knew the girl was missing?

A. That's all we had.

Q. So if you locate soon after the body is found, in early December of 1984, a car was stolen and/or around the time of the incident and jeans in that car were turned inside out under the front seat those were jeans you would want to process to see whether or not you could connect it to the victim?

A. Absolutely.

Q. Given what you know about this case, if

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

this car, John French's car was stolen on the night of the evening -- withdrawn.

If this car, John French's car, the one reported stolen November 10th, were the car where clothing from the victim was recovered, that would be completely inconsistent with the theory of the case later developed that the three individuals John Restivo, Dennis Halstead and John Kogut had abducted the victim in Restivo's car?

A. Restivo's van.

MR. FERGUSON: Note my objection.

A. I would take it it be would inconsistent. We had a confession now and I would say what we later learned and developed when we had confession --

Q. But the confession occurred after this, didn't it?

A. Yes, it did. You asked me would it have been inconsistent later this would be inconsistent later.

Q. Right.

MR. SCHECK: Could we have a minute?

(Discussion held off the record.)

Q. Had you ever worked any homicide cases with Detective Volpe prior to this one?

Edward W. McCarty, III

A. No.

Q. What, if any, involvement had you had with him in any cases ever?

A. He was new to the squad; this may have been his first major, and I had no other contact him, I don't know where he came from before, maybe he came from the third squad, I don't know. He had a distinctive look about him with the black moustache; I had seen him around but I didn't know him.

MR. SCHECK: I think that is actually it.

MR. FERGUSON: I have a few questions. Could we take a few minutes?

MR. GRANDINETTE: Is it okay if we make that five minutes so I can shoot downstairs; would that work?

MR. FERGUSON: Do you want more than five minutes?

MR. GRANDINETTE: Just to go get -- off the record.

(Discussion held off the record.)

(Pause).

EXAMINATION BY MR. FERGUSON:

Q. Good afternoon, your Honor.

A. Good afternoon.

Judge Edward W. McCarty, III December 20, 2010
89

Edward W. McCarty, III

Q. Your Honor, I think you already indicated that you started at the DA's office around '72?

A. '72 after a year as a prosecutor for the Appellate Division, Second Department.

Q. In the Homicide Unit, and it was considered an elite unit?

A. Both are the DA's office and the police department.

Q. Based on your experience would you say that the Homicide Unit was also considered an elite unit?

A. Yes, it was.

Q. Detectives in that unit were the most experienced and seasoned detectives in the Nassau County Police Department?

A. For the most part.

Q. Is it fair to say from your knowledge -- withdrawn. Before you were in the Homicide Bureau, in the District attorney's office, I take it you did other jobs?

A. I worked for all the bureaus, the Rape Bureau, and worked through county court trials, the Grand Jury Bureau; every bureau as assistant.

Q. You worked your way up?

A. Yes.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
90
Edward W. McCarty, III

Q. In the course of doing that you worked with many detectives for many units of the Nassau County Police Department --

A. Yes --

Q. -- from the detectives in the robbery unit, missing person squad, a lot of different units, correct?

A. Yes.

Q. Over that period of time you got to know a lot of detectives in the Nassau County Police Department?

A. Correct.

Q. In general would it be fair to say amongst all those different units, as detectives became more experienced and more knowledgeable, they themselves would also get promoted?

A. They would.

Q. Is it fair to say that in Nassau County, in general those detectives in the Homicide Unit were the best under or most elite of the police department?

A. So considered, yes.

Q. You already mentioned, when you were asked about Detective Volpe, that he was new on the Homicide Bureau, he was new to the Homicide Squad when you were in the Homicide Bureau?

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

A. Yes.

Q. You mentioned you knew Detective Dempsey?

A. Very well.

Q. What was your opinion of Detective Dempsey?

A. When I knew Dempsey was in charge I was confident.

Q. You had cases working with him in homicides?

A. Many.

Q. Did you go to trial on those homicides where Detective Dempsey was in charge of the case?

A. Yes.

Q. Were any of those considered to be major homicide cases?

A. Yes.

Q. What did you feel about the work Detective Dempsey did on those homicides cases that went to trial?

A. Exemplary.

Q. How long would you say you knew Detective Dempsey at the time of this case?

A. Since 1976.

Q. You also knew Jack Sharkey?

A. Yes. Sharkey was another one of those detectives that if you pulled up to the scene and saw he

Judge Edward W. McCarty, III December 20, 2010
92

Edward W. McCarty, III

was there you were confident everything was going to be you done with your case.

Q. He was that good?

A. Yes.

Q. Do you know if Detective Sharkey interviewed John Restivo, one of the suspects in this homicide?

A. I don't know but Sharkey has the type of participation in the case that when I saw him the other day I knew he had participation and reviewed the investigation and we are in the discovery process and did not want to talk about it. I told him not to talk to me about it.

Q. There was a chain of command in the police department?

A. Yes.

Q. Chain of command in the DA's office?

A. Yes.

Q. You told us Barry Grennan was someone you reported to?

A. Yes.

Q. Was he --

A. Chief of the Homicide Bureau.

Q. Did Barry Grennan have to report up the

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

line to his superior?

A. No. It wasn't as good as you would find from the Harvard Business School recommendations; yes there were times when Barry had to report to up the chain of command; many DA's offices back then really had no, some but management control was really wanting.

Q. Obviously, it was Mr. Dillon who was District attorney?

A. That's right.

Q. Did Mr. Dillon have a staff below him above the bureau chief level?

A. Yes.

Q. Was Lawrence Leff --

A. Chief assistant but wanting in the line of command sometimes if you saw Dennis Dillon you would tell him what is going on in the press relations room, Leff may be out of the chain of information in passing.

Q. If there was a major case under investigation, and it was necessary for the District Attorney, Mr. Dillon, to be kept advised would it be Mr. Grennan who would interface with Mr. Dillon rather than the assistant?

A. You would walk down the hall and go right to Dillon's office.

Judge Edward W. McCarty, III December 20, 2010
94

Edward W. McCarty, III

Q. At the time of this homicide Mr. Grennan was the bureau chief?

A. Yes.

Q. Would it be fair to say Mr. Grennan, more so then yourself, would be the one who would be actually dealing with the police command at the time of this investigation?

A. Very true. I tried a major school teacher murder case during this time, in the spring, early fall, late winter of '85, so when you are on trial Mr. Grennan took over all control. It would be Mr. Grennan who would be speaking to Lieutenant Spillane or the detectives on the case. Mr. Grennan is deceased. He died about four months ago.

Q. I think you mentioned earlier about the fact, I know you said one time there were 26 detectives and four DA's in the interchange and interplay of cases?

A. Correct.

Q. You were talking about the four DA's in the Homicide Bureau?

A. Yes.

Q. 26 detectives --

A. In the Homicide Squad.

Q. They would have interplay or exchange of

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
95

Edward W. McCarty, III

information?

A. Good math. We had about, back then, we had about 40 murders a year. So, assistants would probably catch more murders then a homicide detective would catch. If an assistant wanted to he could expand his knowledge; the world was his oyster.

Q. Assistants could learn from the homicide detectives?

A. Yes.

Q. Homicides detectives could learn from assistants?

A. Yes, go over to the medical examiner at that time; it was a wonderful experience.

Q. The way this was worked out, was there any restriction to the ability of homicide detectives and assistant DA's to go back and forth?

A. Never.

Q. It was frequently common they would talk on the phone and say what was going on in investigations?

A. Yes.

Q. There wouldn't necessarily be any formal reports made of these conversations; is that correct?

A. Yes, typical conversations were what do you have on the blank case? What do you have going on the

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
96
Edward W. McCarty, III

blank case?

Q. Now, early on you mentioned something about homicide detectives would have a jacket or something like that, do you recall saying that?

A. Yes.

Q. What were you referring to?

A. Brown colored jacket like you see a manilla folder envelope. It would be photographs and statements and all of the indices that the detective had for trying to prove his case.

Q. Detectives would bring the homicide file over to the DA's office?

A. That is right.

Q. If you wanted to you had free opportunity to purview the file?

A. Yes.

Q. I take it you would want to familiarize yourself with the police record, crime scenes, fingerprints analysis?

A. Anything that was done. Like anybody in the room prepares a case, you take from the detectives jacket, write what you are going to include as Exhibit A, Exhibit B, structure your case.

Q. One of the things in a given major homicide

ESQUIRE an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

investigation, at least one of the things a competent assistant DA wants to know is to make sure they are familiar with all the crime scene photographs and reports?

A. Absolutely.

Q. That doesn't mean every photograph would be important, correct?

A. That's exactly right. You used your experience and your knowledge to say what was important, not the detectives.

Q. Earlier you mentioned something about in a major case sometimes there might be a police command bus at the scene, things of that nature?

A. Right.

Q. There might be people that come forward in a homicide case and say, perhaps, they have information or thought they had information? Are you familiar with that?

A. Yes.

Q. This might generate something in writing called a lead?

A. Lead sheet.

Q. Detectives might not know when the person is coming through the door whether there is validity,

Judge Edward W. McCarty, III December 20, 2010
98

Edward W. McCarty, III

invalidity, correct?

A. Yes.

Q. You left it up to the detectives to do their work?

A. This is the First time I saw a lead sheet. I thought it was a small piece of paper -- first time today.

Q. You were familiar before today there were lead sheets?

A. Yes.

Q. They were part of the homicide jacket?

A. Part of the homicide, I don't know what they did with them; I didn't review lead sheets when preparing for a case for grand jury or trial.

Q. When people might come forward or come to a command bus they might have all sorts of information, am I right?

A. Absolutely true.

Q. Earlier you mentioned something about people coming in from Mars, I think were your words?

A. Hyperbole, interesting theories from people coming in to the van in the neighborhood. The command post was for two purposes, reassure the neighborhood because everybody was upset a murder had taken place in

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
99

Edward W. McCarty, III

their community; number two to have people come in and talk to us.

Q. Was it your knowledge --- you talked a lot about the science of homicides and investigation, was it your knowledge also there are people out there who on newsworthy cases for whatever psychological reasons need to put themselves into the case in some fashion?

A. I never experience that but I am sure that is the case.

Q. Do you happen to know if this woman here referred to on that lead sheet December 9, 1984, do you happen to know if she may have even recently been in a locked unit of Pilgrim State?

A. I know nothing about it.

Q. Do you know if that woman may have a psychological history?

A. Nothing about it except things told to me by lawyers and people involved in case.

Q. I think you did tell us earlier that often there is a lot of meaningless information on lead sheets?

A. I am not too familiar with leads sheet but a lot of meaningless information is conveyed right after homicide.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
100

Edward W. McCarty, III

Q. You were asked about the Volpe affidavit, I think earlier marked here today in connection with the first, I think, it was eaves dropping warrant on March 29th. It happens to be right here. Paragraph 10, I believe. A search of that van has produced hair consistent with Theresa Fusco. Anything in there that says anything about that hair that was consistent being under microscopic analysis?

A. Nothing. I would say as a judge it speaks for itself.

Q. Had you been assisting in the drafting of that?

A. I am sure.

Q. Had you been doing with that detective work and you had known there were microscopic constraints would you have put that in there?

A. Yes.

Q. You put your best foot forward in trying to get that affidavit, correct?

A. Yes. There's one philosophy, leave it bare-bones, defense lawyers will get a crack at the affidavits; I was not of that opinion; I put everything I can into my affidavit.

Q. Do you recall a Detective Sergeant

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
101

Edward W. McCarty, III

Campbell?

A. Very well.

Q. Did you have any occasion to deal with Detective Campbell?

A. He supervised, a lieutenant runs the unit, three or four sergeant's work under him then the regular line detectives. That's the chain of the command. Campbell was a good guy. Known to be an excellent detective.

Q. Do you know if Campbell worked on this case?

A. I don't remember.

Q. Do you remember Sergeant Campbell being at the crime scene after you arrived there December 5, 1984?

A. I can't remember. Interesting factor but I tell you what the body looked like. You blank things out. I remember looking up, seeing where, detectives being there, one of the medical examiners being there, Dr. Iracki (ph) I believe I saw a Dr. Iracki. I don't remember Campbell being there or anyone else.

Q. Just for, I don't have Exhibit stickers, don't have this marked, I know everybody is familiar the crime scene and --

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
102

Edward W. McCarty, III

MR. CASTELERIO: Let's identify it.

MR. GRANDINETTE: Yes, let's identify it.

MR. SCHECK: Does it have a bates stamp?

MR. FERGUSON: That doesn't, others do. Here's a copy.

MR. SCHECK: That's not the issue.

MR. FERGUSON: I am just -- what I want to know -- you can object if you want to object.

MS. HOFFMAN: Exhibit 29, it might be in already.

A. What's the question? I have the thing right here.

MR. SCHECK: We had three different productions --

MS. HOFFMAN: This is this document.

MR. FERGUSON: Yes, Exhibit 29. We are in agreement it's Exhibit 29.

Q. Does that document there, if you note there was a time, 18:21, 621 ADA McCarty --

A. Yes.

Q. The earlier -- up, at the top close to the top you see 17, 15 Detective Campbell?

A. Yes.

Q. Underneath that Detective Lieutenant

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
103

Edward W. McCarty, III

Spillane?

A. Yes.

Q. Further on down the line you see Dr. Green, M.E. and later on Dr. Taft and Dr. McCarthy (ph).

A. That would be the medical examiner.

Q. Looking at this document does that reflect your recollection as to some of the persons who were present at the crime scene?

A. I wish I could say it did but I don't remember.

Q. Do you have any recollection at all after this date of speaking to Detective Sergeant Campbell about this case?

A. I don't. Seems to me he would have been immediate supervisor of the homicide detectives. The lead supervisor or another supervisor there, that would Detective Spillane. He came five minutes later.

Q. Now, it was asked of you, Judge, you had presented their case, I mean the Kogut case to the grand jury, correct?

A. That's correct.

Q. That was in early May of 1985; am I right?

A. That's right.

Q. Do you happen to recall what witnesses you

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
104

Edward W. McCarty, III

called for the presentation to the grand jury?

A. No recollection of it.

Q. Do you happen to recall using photographs, marking photographs as exhibits in that grand jury case?

A. No recollection of anything taking place at the grand jury.

Q. Now, if you did mark photographs taken by the crime scene unit from the scene of where the body was found, that would certainly indicate that you had access to the crime scene photographs, correct?

A. Yes, photographs to the grand jury, they are marked; one of the designated support staff in the grand jury marks it as an exhibit.

Q. Do you recall introducing the videotape confession of Mr. Kogut at that time?

A. I don't know.

Q. Do you recall if you had reviewed the video taped confession of Mr. Kogut with ADA Peck at that time?

A. I remember seeing it and liking it, remember saying it was an excellent confession.

Q. Do you remember being present in the district attorney's office on the day Mr. Kogut was video taped with ADA Peck?

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
105

Edward W. McCarty, III

A. I was in that day. The video tape confession came early that morning; I don't know what time but I think it was in the early mornings hours. I saw the tape that morning, an hour later.

Q. It was shortly after that that you told us you left to go to military service on Cape Cod, right?

A. Yes.

Q. That was Camp Edwards?

A. Yes.

Q. As of the time you left for military service was it your understanding you were going to return to continue the prosecution of this case?

A. It was.

Q. Then something changed, is that right?

A. Four days into my tour, approximately May 20th, I received a telephone call from Chairman Joseph Mondello (ph) of the Republican Party who asked me if I would like to run for judge.

Q. You said yes?

A. I was at a crossroads, some people take different paths, I was ready to start my career as a medical malpractice lawyer and I had to make a choice. I knew if I said no it would never be offered to me again, so I told the Chairman, yes, I would like to run.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
106

Edward W. McCarty, III

Q. When you returned from Cap Code?

A. I came back almost that same day and there was a convention. I had to accept the nomination. I returned to Cape Cod as the designee of the Republican Party in that position. When Dennis Dillon learned of it he informed me I was terminated from the office because we had a non participation policy with politics.

Q. Is it fair to say you did no further work on this case?

A. Yes.

Q. And you spoke to no one about it?

A. That is true.

Q. Before you left though it was your understanding you were going to return and work it out?

A. Yes.

Q. And that would continued to be your case and there was no reason for you to give someone else a lot of information or detailed information about the case?

A. That is true.

Q. Would it be fair to say you had very little discussion with Fred Klein about this case before you left?

A. Very little.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

Q. And very little after it became his case and that is one of the things when you hand over a case, it's their responsibility?

A. Yes.

Q. Whatever information you had gotten back in '85 from the detectives working on the case from Campbell or anyone else who was working on the case, that information you would not have imparted to Fred Klein?

A. I would presume he knew.

Q. I am asking you about your conversations between December 5th at the crime scene and mid-May, during that time this was your case, right?

A. Yes.

Q. You would have spoken to Barry Grennan about it, your supervisor?

A. Correct.

Q. You would not have been speaking to Fred Klein?

A. No.

Q. Your recollection is before you left for Cape Cod code you didn't speak to Fred Klein to bring him up to speed on what you were doing for the five months?

Edward W. McCarty, III

A. Right.

Q. When you came back you had nothing to do it?

A. I would have said something but I knew Fred was in control; I heard on Cape Cod there were indictments.

Q. Fred didn't call you on Cape Cod?

A. No; once out of the loop you were out.

MR. FERGUSON: Thank you, Judge, no other questions.

EXAMINATION BY MR. SCHECK:

Q. Mr. Ferguson asked you some questions about various different police officers and your opinion of them; do you recall that? You were saying that you had confidence in this officer when you arrived at the crime scene?

A. That is right.

Q. He was an excellent officer or detective, is that right?

A. Yes.

Q. Have you ever had that view of someone then it turned out that that individual had engaged in acts of mis-conduct?

A. Engaged in acts of mis-conduct? No.

Judge Edward W. McCarty, III December 20, 2010
109

Edward W. McCarty, III

Q. There were never police officers you ever encountered, who you had a high opinion of -- you never subsequently learned engaged in acts of mis-conduct?

A. That's right.

Q. I am not talking about these individuals in particular, but in general?

A. In general, yes.

Q. That has happened in your experience?

A. Yes. From what I understand since I have left, employed at the DA's office, there has been a civil suit for Detective Dempsey when he was a target and Detective Dempsey because of his activities they had to pay money on the case. Nothing more except the facts of what I just told you.

Q. I am asking as a general matter, that can happen that as a prosecutor or a judge you can have a favorable impression of the particular officer in context of your working with them and it turns out, perhaps, in an another matter they broke the rules?

A. If you want to be a successful prosecutor -- show me. If a detective brings you a file you should ask them in detail how it happened.

Q. You also said the confession that you saw the videotape you saw quote, unquote "excellent"

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

confession --

A. I was impressed by it. To this day I would still be impressed by it.

Q. Because of the details?

A. The details, the demeanor of the person confessing and the spirit of the room where the confession was being made. I didn't pick up any whatsoever, any coercion against him.

Q. You had no knowledge of what happened preceding the time of that video tape?

A. Absolutely not.

Q. Were you aware of measures, reform measures proposed and implemented for videotaping interrogation from the time Miranda's were given?

A. How you can be exposed?

Q. In cases where there is controversy whether the confession was the produced by coercion or more importantly that details were provided either deliberately or inadvertently only the perpetrator could know, that kind of thing, could be at least ameliorated by videotaping?

A. They could be ameliorated I am sure somebody graduating from law school is going to come up with an interesting theory of attacking confession on

Edward W. McCarty, III

video tape also.

Q. Certainly the idea of videotaping from Miranda warnings forward would be to -- it would be a protection against situations where there was coercion and feeding of information deliberately or inadvertent to the suspect?

A. Absolutely.

Q. Would you not agree that in terms evaluating the reliability of a conviction, that places most critical, objective evidence that either corroborates or refutes the confession?

A. Sure.

Q. Jurors are prone to accept videotaping if there is some question about misconduct?

A. It is a wonderful opportunity.

Q. Did you ever have any cases which dealt with what is known as jail house snitches?

A. Often.

Q. Was that the kind of witness that you like to use?

A. Always. I can give you the best example in the world. I had a man once, we had him up on murder charges for murdering his second wife, and his first wife was missing when he married the second wife.

Judge Edward W. McCarty, III December 20, 2010
112

Edward W. McCarty, III

He was an elevator repairman and installer. He was bunched with a 19-year old drug user from Hicksville in Nassau County Jail.

The drug user gave us a call to come over. The guy told me how he disposed of his first wife's body which we never found. He took her out in -- she was bound in a sack and loaded her down with elevator weights and dropped the body over the side. He said I should have done that with the second wife. We used that as a statement against him. Of course the confession was caused into question by excellent defense lawyers. I got up to sum, and said has anybody in this room ever used the word elevator weights in their lives? If you think a 19-year old Heroin abuser from Hicksville barely graduated from elementary school would compose the word elevator weights -- guess what, the jury didn't, they didn't accept it. They used other evidence to convict. They are extraordinarily difficult to convince jurors of the reliability.

Q. What about your accessibility?

A. I think he was telling the truth.

Q. Generally have you ever encountered where house snitches give you false information?

A. I came remember any jail house snitch who

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Edward W. McCarty, III

gave me something wrong or bad; I think I had four or five of them but I can't remember any jail house snitches that gave me anything bad.

EXAMINATION BY MR. FERGUSON:

Q. I have two or three questions. You mentioned a couple of times a kidnapping and indicated it involved where, I think you said, the hair was found from the victim three years after the crime?

A. About that.

Q. That hair was found in the trunk of the car where the victim was in the trunk of the car?

A. That is right.

Q. What is the name of the case?

A. The people versus Richard Warren Williams.

Q. What year was that?

A. Conviction was 1977 or '78.

Q. Obviously, we're going back a long time -- there was something about hair banding involved with that hair?

A. I think the term was hair banding; I don't know if it was in this case, something about colorations in a particular hair, I am only speculating. It's been 30 years ago.

Q. Do you remember in that case if there was

Judge Edward W. McCarty, III December 20, 2010
114
Edward W. McCarty, III

hair evidence?

A. That case?

Q. Yes.

A. Sure.

Q. Forensic hair evidence?

A. They were surprised when they found the car all the way in junk yard in New Haven, Connecticut and found hair in the trunk of the car where this fellow had been.

MR. FERGUSON: Thank you.

MR. SCHECK: Thank you, Judge.

(Time noted: 1:50 p.m.)

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
115

DEPOSITION ERRATA SHEET

C E R T I F I C A T I O N

I, Marie DiMarco, a Shorthand Reporter and notary public, within and for the State of New York, do hereby certify:

That EDWARD W. MCCARTY, III, the witness whose examination is hereinbefore set forth, was first duly sworn by me, and that transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of January, 2010.

Marie DiMarco
Marie DiMarco

ESQUIRE
an Alexander Gallo Company
Toll Free: 800.944.9454
Facsimile: 212.557.5972
Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
116

DEPOSITION ERRATA SHEET

Our Assignment No.: 316238

Case Caption: RESTIVO VS NASSAU COUNTY

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

____________________________

EDWARD W. MCCARTY, III

Subscribed and sworn to on the ____ day of ____________,
20 ____ before me.

__________________________________

Notary Public,

in and for the State of ____________________________.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010
117

DEPOSITION ERRATA SHEET

Page No.____Line No.____Change to:______________

__________________________________________________

Reason for change:______________________________

Page No.____Line No.____Change to:______________

__________________________________________________

Reason for change:______________________________

Page No.____Line No.____Change to:______________

__________________________________________________

Reason for change:______________________________

Page No.____Line No.____Change to:______________

__________________________________________________

Reason for change:______________________________

Page No.____Line No.____Change to:______________

__________________________________________________

Reason for change:______________________________

Page No.____Line No.____Change to:______________

__________________________________________________

Reason for change:______________________________

Page No.____Line No.____Change to:______________

__________________________________________________

Reason for change:______________________________

SIGNATURE:________________________DATE:____________

EDWARD W. MCCARTY, III

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Judge Edward W. McCarty, III December 20, 2010

118

DEPOSITION ERRATA SHEET

Page No.____Line No.____Change to:____________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:____________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:____________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:____________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:____________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:____________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:____________

______________________________________________

Reason for change:____________________________

SIGNATURE:_______________________DATE:__________

EDWARD W. MCCARTY, III

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

**A**

**AAA** 76:3
**abducted** 54:18 87:9
**abducting** 56:3
**ability** 7:14 22:6 95:16
**abreast** 36:4
**absence** 58:13
**Absolutely** 23:6,15 32:3 56:15 59:6 64:6 70:9 86:24 97:6 98:19 110:12 111:8
**abuser** 112:15
**accept** 106:4 111:14 112:18
**acceptable** 26:3
**access** 104:11
**accessibility** 112:21
**accident** 35:10
**accurate** 23:3 41:13 81:4 116:11
**act** 30:8
**action** 115:13
**activities** 40:20 80:16 109:13
**acts** 25:17 108:23,25 109:4
**actual** 40:8 42:19 44:24
**ADA** 102:20 104:19,25
**ADAs** 9:2 19:2
**add** 51:18
**admissible** 61:19
**advantage** 9:3,12
**advent** 36:11
**advise** 63:18
**advised** 93:21
**Advocacy** 9:5
**advocate** 23:23
**affidavit** 12:22 22:3 23:13 37:24 43:4,22 44:8,12,20 45:2 48:5 52:20,23,25 53:18 100:2,20,24
**affidavits** 22:5,17 100:23
**affirmation** 39:8 44:9
**affordable** 84:7
**afternoon** 88:24,25
**ago** 16:7 61:4 63:11 76:13 84:17,18 94:15 113:24
**agree** 56:2 65:11 66:4 71:24 82:16 85:11 111:9
**agreeable** 33:11
**AGREED** 3:1,6,10 55:3 60:15
**agreement** 102:18
**agrees** 58:25
**air** 53:21
**al** 1:4,7
**Algeria** 6:10
**alive** 60:11
**allegations** 41:12
**alleviate** 16:13
**along** 28:3 34:15 42:7 54:9
**already** 66:18 89:2 90:22 102:11
**also** 8:24 9:4 14:17 29:8 76:25 79:12 89:11 90:16 91:23 99:6 109:24 111:2
**always** 6:7 11:20 15:24 19:5 26:15 34:6 36:15 57:3,5,11 60:22 66:11,13 78:2 82:12 111:22
**ameliorated** 110:21,23
**American** 77:2
**among** 11:24 12:5 13:8 66:20 67:17 70:22
**amongst** 90:13
**amount** 30:19,23 31:4,10 32:6
**amounts** 32:7
**analysis** 12:13,18 32:10,11 45:12,14 47:2 77:5 86:11 96:20 100:9
**analyzing** 58:8
**ancillary** 18:19
**and/or** 56:4 86:20 116:12
**ANNA** 2:5
**anomaly** 10:12
**another** 33:15 59:14,17 64:25 69:8,22 91:24 103:17 109:20
**answer** 50:16 52:13 67:19
**ANTHONY** 2:9
**anticipated** 25:24
**anybody** 17:5,17 28:25 30:3,18 62:2 77:25 96:21 112:13
**apartment** 21:11 40:11
**apologies** 41:21
**appealed** 30:5
**appear** 42:22 66:15
**appeared** 15:9
**appears** 40:13 41:19 42:13
**Appellate** 6:25 7:3,7

89:5
application 21:25 23:17 37:22 39:10, 18,22,25 40:4,13,22 41:8,13,15, 19 42:13 43:5 44:8 48:9 50:11
applications 24:3 30:4 31:8 38:6
applied 7:16 62:8
apply 41:14
appreciate 52:7
appropriate 49:23 50:6,9, 10 51:12,18, 19 52:12,14 53:10
approximately 62:5 76:20 105:16
area 5:13 8:10 14:19 21:11 25:3,18 36:5 49:18 69:11 71:11,19 73:6 81:12,15 82:14 85:25
areas 82:13
argument 78:12
argumentative

83:3
Aristotle 49:18
Arlene 30:15
arm 5:25
Army 5:25 10:7,8, 14 66:10 67:2
around 14:3 70:6 74:21 79:8 86:20 88:10 89:3
aroused 64:17
arrest 29:12 61:8 62:17
arrested 27:6,8 29:16 61:17
arrived 101:15 108:16
aside 67:16
asked 9:10 10:6 28:18 37:5 79:15 87:18 90:22 100:2 103:19 105:18 108:13
asking 17:7 47:10, 11,25 49:20 51:5 77:22 107:12 109:16
aspect 67:5
aspects

11:12 36:25 37:12
Assignment 116:3
assist 38:4
assistance 66:22 67:24
Assistant 7:24 23:8,11 25:13 39:5 84:20 89:23 93:15,23 95:6,17 97:3
assistants 11:14 16:13 95:4,8,12
assisting 100:12
associated 29:7
Assume 46:24 48:18
assuming 52:11 56:3,13
attacking 110:25
attempt 80:15
attention 43:3
ATTORNEY 2:13,16,17 39:6 44:22,24 51:14 53:12 61:9,21 84:20 93:9,21
Attorneys 2:2,7,10,14 3:2 18:17 62:21
attorney's

56:7 89:19 104:24
attractive 17:12
attributable 30:13
attributes 31:20
authorizing 39:16 43:15
auto 75:11,12,14, 18
automatically 19:23
automobile 35:10 80:14
autonomy 63:15
autopsies 8:15 31:3
autopsy 8:19 15:6,8, 10 32:3,4,9
available 6:8 15:7 50:2
Avenue 71:18 72:23, 24 78:13,15, 16,17 82:3
awarded 64:13 66:16
aware 26:18 40:25 51:9 57:20 58:21 60:21, 22,24 110:13
awareness 58:18
awful

83:2

B

B 41:23,24 76:15 96:24
B01582 41:24
B05083 39:3
B0518 41:19
Back 11:13 20:18, 21 27:21 28:17 31:13, 17 32:8 35:22 51:13 56:20 57:2 59:20 60:10 61:6 64:9 79:6,7 80:16,18 83:25 84:19, 22,24 85:3,5 86:12 93:6 95:3,17 106:3 107:6 108:3 113:18
bad 113:2,4
band 60:8
banding 59:13,15,16, 22 60:4,10 113:19,21
bare-bones 100:22
barely 112:16
BARRY 2:4 16:5,7,8 18:7,12

23:10,11 28:16 63:12 92:20,25 93:5 107:16
**based** 45:9 47:6,25 50:13 89:10
**basement** 21:11
**basis** 9:9 28:21 49:14
**Bates** 38:25 39:2 41:18,23 102:4
**BCG** 43:17
**Beach** 78:14
**began** 10:17
**beginning** 41:3 45:9
**beige** 76:20
**being** 6:9 12:16 13:20 14:20 15:21 21:8,14 24:6,17 27:4, 23 28:24 30:4 31:23 35:18 37:4 41:12,13 47:19 48:19 55:16,23 57:7 64:4 67:14 69:2,8,25 70:3 73:7 77:13 100:8 101:14,20,22 104:23 110:8
**believe** 9:18 15:3,4, 10 20:23 22:10 31:16, 21 54:15 58:12 100:6 101:21
**bell** 71:8,22 80:4
**bells** 35:2
**bench** 6:19
**beneficial** 11:11
**benefit** 12:17
**BENVENUTTI** 2:5
**best** 22:6 37:12 57:10 58:8 90:20 100:19 111:22
**better** 12:15 15:18 51:4 67:4 81:18
**between** 3:2 8:2 13:11 16:10 17:23 27:12,14 65:22 72:19 75:7,8 76:8 78:9 80:14, 15,20 107:13
**beyond** 35:24
**bi** 65:23
**bid** 31:9
**bidding** 43:9
**big** 18:10 68:5
**Birdsall** 46:10,11,25 47:7,19,21 48:25 49:3 50:8 51:9,15
**bit** 5:10 9:25 33:18 65:21
**black** 88:9
**blacktop** 73:11
**blank** 76:24,25 95:25 96:2 101:18
**blanked** 77:2
**blanket** 75:12 76:7
**blankets** 79:7
**blond** 17:11
**blonde** 13:5
**blood** 43:20 45:4, 19,25 46:2,4, 8,9,16 47:8, 17,19,20,22 49:13 50:19 51:20,21 53:12,16,17, 19,22 115:13
**blue** 43:16 70:24 71:3
**board** 67:13
**body** 8:18 13:21 14:8,12,13, 15 24:24 56:5 58:23 59:10, 22 60:16 64:16 68:22 69:3 74:19 81:5,9,13 85:25 86:18 101:18 104:9 112:6,9
**books** 18:4
**Born** 5:14 76:24
**both** 34:18 40:8 42:22 89:8
**bottom** 43:24 44:2 58:7,9
**Boulevard** 78:16
**bound** 112:8
**bow** 8:17
**break** 37:17 40:11 64:7,8
**breaking** 69:24
**bring** 8:21 34:14 44:16 61:6 67:2,12 96:12 107:23
**bringing** 49:25
**brings** 109:22
**broad** 25:2
**broke** 109:20
**broken** 76:2 79:12 82:20
**Brooklyn** 5:14,15
**brother** 77:6
**brought** 46:20 47:3 48:19 50:7 51:8 53:9 56:20 65:20
**Brown** 96:8
**brunette** 45:22
**BRUSTIN** 2:2
**bug** 39:14,19,22, 25 40:5,7 42:10,13
**Building** 75:22
**bumper** 76:4 79:11
**bunch** 8:21
**bunched** 112:3
**Bureau** 8:4,5 10:19 11:5,8,9,12, 13,21 16:5,6, 7,8 18:9,10, 25 54:20,23 55:6 89:18,

22,23 90:24, 25 92:24 93:12 94:3,21
bureaus 89:21
burglaries 11:22
bus 80:13 97:13 98:17
business 44:11 48:11 66:24 93:4

C

C 2:1 115:3
California 8:2
call 8:15 13:22,23 14:18 18:19 19:10 27:10 40:7 43:3 79:14 80:16 81:11 105:17 108:8 112:5
called 16:25 40:5 46:20 47:4 75:5 80:13 97:22 104:2
calling 16:14 29:3 51:25 80:18, 23
Callone 30:15
came 27:21,22 36:11 49:20 59:22 60:16, 24 63:3 78:22,25 84:17,19 88:7 103:18 105:3 106:3 108:3 112:25
Camp 105:9
Campbell 101:2,5,9, 11,14,22 102:23 103:13 107:8
candidate 28:20
Cap 27:4 106:2
Cape 23:23 27:6 28:15 29:15 105:7 106:5 107:23 108:6, 8
Caption 116:4
captioned 116:10
car 13:23 14:5 17:2 56:18,21 57:9 59:20 69:8,9,21 70:2,4,10 71:4,11 73:7 75:10,25 76:5,7 79:8, 12,16,19,21, 22 80:19 81:22 82:8, 15,19 83:8,9, 10,24 84:2, 15,22,24 85:5,11,14, 19,23 86:9, 19,21 87:2,4, 5,10 113:11, 12 114:7,9
care 11:25 12:7
career 10:23 105:22
carefully 22:20
case 6:8 7:25 8:3 11:21 12:3,14 13:17,19 15:2,11,12, 13,19 16:13, 15 17:17 18:11,20,24 19:12 20:15, 20 21:7 23:24 24:2 25:15 27:5 28:6,9, 11,13,21,22, 24 29:4,7,8 30:4,6 34:21, 23 40:21 44:13 46:23 47:2,13,24 50:22 53:6 55:12 56:16 57:15,21 58:8,22 59:14,17,19, 24 61:22 62:22 63:3,12 65:13,20 66:9 68:11,16 74:8 85:4 86:8,25 87:7 91:12,21 92:3,10 93:19 94:10,14 95:25 96:2, 11,22,24 97:13,17 98:15 99:8, 10,19 101:12 103:14,20 104:5 105:13 106:10,17, 20,23 107:2, 3,7,8,14 109:14 113:14,22,25 114:3 116:4
cases 10:17 11:23 12:2 16:9,11 18:11 20:4 26:12 28:10 35:13,14,15 65:5 66:5 83:17 87:24 88:4 91:8,15, 18 94:18 99:7 110:17 111:17
CASTELEIRO 2:17
Castelerio 58:6 74:25 102:2
catch 95:5,6
catching 11:15
caused 112:12
cavity 8:18
cemetery 35:25 56:5
central 21:12 78:12
certain 37:10 39:16 52:11 59:25 60:2 67:13
Certainly 86:7 104:10 111:3
certificate 8:7
certification 3:3
certifies 72:15
certify 115:7,12
chain 52:11 92:15, 18 93:6,18 101:8
Chairman 105:17,25
challenging 28:11
change 117:4,7,10, 13,16,19,22 118:4,7,10, 13,16,19,22
changed 76:14 78:25 105:15
changes 116:12,14
characteristics 59:25
charge 16:5 33:24 91:6,12
charges 111:24
chart 68:6
charts 84:9
checking



14:8 75:3
**Chief** 7:4,6,24 11:13 16:6,8 18:9 23:8,10 92:24 93:12, 15 94:3
**chilly** 14:20
**choice** 105:23
**Christmas** 29:3
**chronologically** 24:22
**chronology** 55:5
**civil** 109:12
**civilian** 10:12
**Class** 77:8
**clean** 57:9
**cleaned** 56:25
**clear** 43:22 66:4
**clerk** 7:2,6
**close** 8:17 34:9 102:22
**closer** 69:17
**clothing** 87:6
**Cod** 23:23 27:4,6 28:16 29:15 105:7 106:5 107:23 108:6, 8
**Code** 106:2 107:23
**co-defendant** 61:19
**coercion** 110:9,18 111:5
**coffee** 16:3
**colleague** 33:11
**College** 5:17 34:5 67:2
**color** 43:17
**colorations** 113:22
**colored** 75:12 96:8
**colors** 60:2
**combined** 65:19
**come** 8:13,16 19:17 40:11 44:12 50:3 53:2 57:22 63:15 69:9 72:3 79:15 85:9 97:16 98:16 99:2 110:24 112:5
**comes** 29:5 53:4,8
**comfortable** 38:5
**coming** 15:22 20:6 50:17,24 67:12 97:25 98:21,23
**command** 10:25 80:13 92:15,18 93:6,16 94:7 97:13 98:17, 23 101:8
**commander** 34:4
**commanders** 11:2
**commendation** 54:13 61:7 64:9,13
**comment** 41:10
**comments** 59:2
**Commission** 6:16,19
**commissioned** 10:3
**committed** 56:13,14
**committees** 6:20
**committing** 57:7
**common** 42:21 95:19
**commonly** 40:5
**communicate** 20:12
**communication** 15:13 39:17
**community** 20:24 64:17 65:2,13 99:2
**comparatively** 21:16 41:5 42:16 77:14
**compare** 14:23
**comparison** 12:7,15,23 13:8,14 45:22 48:23
**comparisons** 11:25
**competent** 97:2
**complainant** 83:15
**complete** 13:11 32:24
**Completely** 72:9 87:7
**compose** 112:16
**computer** 77:4
**concept** 10:13
**concepts** 19:5
**concern** 17:15,20,22 20:24 21:21 22:16 57:5,8 65:2,3,6
**concerned** 16:19 18:3 26:16 42:25
**concerning** 25:21 31:8
57:15 58:15 69:20 72:8
**conclusion** 65:21
**conclusive** 13:7
**Conduct** 6:14 50:10 66:19
**conducted** 61:24
**conducting** 63:11
**confessing** 110:7
**confession** 27:9,10,12, 23 28:7,12 35:19 36:3, 17,19,22 37:2,7,12, 14,15 43:8 58:15 87:14, 15,16 104:16, 19,22 105:3 109:24 110:2, 8,18,25 111:12 112:12
**confessioned** 33:6
**confessions** 36:5,6,16,25 37:8 55:15
**confessor** 33:5
**confidence** 108:16
**confident** 91:7 92:2
**confidential** 7:14
**confusion**

41:17
Connaughton
35:2,5 54:13
61:24 62:4,14
64:12 65:19,
25
connect
86:23
Connecticut
56:19 114:8
connection
100:3
consequence
84:8 85:21
considerable
63:15
considered
8:5 10:19
77:14 89:6,11
90:21 91:14
consistent
12:11,19,25
13:9,14 42:12
43:19 45:3,
15,19,23,24
53:20 60:3
64:22 84:14
85:8,12,17,
19 100:7,8
constraints
100:16
contact
62:3,5 88:6
contained
37:2
contemporane
ously
32:10
contention
58:21
contested
58:18,20
context
109:19
continuation
55:20
continue
105:13
continued
14:4 106:17
Continuing
61:17
control
93:7 94:12
108:6
controversy
110:17
convention
106:4
conversation
41:3 45:8
conversation
s
21:13 26:13,
16 95:23,24
107:12
conveyed
99:24
convict
29:25 112:19
conviction
30:4,10 32:16
36:11 111:10
113:17
convictions
32:18
convince
112:20
cooperate
62:2
cooperating
35:23
coordination
7:25
cop
34:9
copious
32:6
copy
5:8 102:6
corner
78:13
corners
53:7
Corp
10:8
correct
39:24 55:24,
25 64:22 73:7
80:24 82:17
90:7,12 94:19
95:23 97:8
98:2 100:20
103:21,22
104:11 107:18
corrections
116:12
correctly
18:16
corresponden
ce
54:12
corroborates
111:12
corroboratin
g
35:20
corroboratio
n
27:11 47:4
58:14
Corroborativ
e
36:25
cost
63:19
couldn't
14:9,15,16
count
58:10,15
countries
6:3,5,8 10:13
Country
2:7 6:9
COUNTY
1:7,13 2:10,
13,14 5:14
7:22 8:13 9:8
10:18 14:25
17:5 18:24
21:18 41:6
43:14 49:23
64:18 77:17,
19,23 78:5
89:14,22
90:3,10,18
112:4 116:4
couple
113:7
course
11:22 17:18
20:17 25:3
26:9 40:20,24
44:11 48:11,
14,15 49:8,
22,25 50:10
51:4 52:19
53:13,16
55:11 68:11
81:8 90:2
112:11
COURT
1:1,14 3:13
36:14 43:14
58:11 62:8
89:22
covering
17:13
co-workers
61:25
CPLR
44:23
crack
100:22
crannies
56:25
crawls
56:24
created
54:8
crime
12:10 18:13
46:12,16,17,
18 56:13,14
57:8 77:25
81:15 85:21
96:19 97:4
101:15,25
103:9 104:9,
11 107:13
108:16 113:9
crimes
17:23 72:3
criminal
71:24
criminals
57:8,11
criteria
44:18 66:25
critical
111:11
critique
65:23
crop
27:16
crossing

ESQUIRE
an Alexander Gallo Company



14:2 79:23
**crossroads** 105:21
**cull** 67:3
**culture** 6:4
**curriculum** 5:9
**customary** 52:4
**customs** 6:4

**D**

**D** 4:1
**DA** 7:21 13:23 15:23 23:8,11 97:3
**dangerous** 37:9
**dark** 45:22 75:12
**DAs** 25:13
**DA's** 7:16,22 8:22 19:3 89:3,8 92:18 93:6 94:18,20 95:17 96:13 109:11
**dashboard** 79:13
**date** 69:5 103:13
**dates** 80:16 81:19
**day** 22:12 29:5 50:18,24,25 65:21 92:11 104:24 105:2 106:3 110:3 115:18 116:18
**daylight** 25:2
**days** 50:2,3 65:18 105:16
**dead** 58:23 59:23 60:16
**deal** 58:9 101:4
**dealing** 57:10,11,12 94:7
**dealt** 111:17
**Debbie** 76:12 80:12 82:16
**Debra** 75:25 76:23 81:22
**deceased** 54:20,24 55:9 59:5 94:14
**December** 1:15 14:21 58:5 68:22 74:18,20 80:24 81:5 86:19 99:12 101:15 107:13
**decided** 78:15
**Decision** 4:11 57:21 58:5,10
**DECLARATION** 116:6
**declare** 116:8
**deduced** 59:2
**Deduces** 36:21
**deem** 38:18
**Defendant** 2:10
**Defendants** 1:8 20:25 32:22 61:20,25 62:9
**defendant's** 58:15
**Defense** 10:6 100:22 112:12
**defined** 25:7
**definition** 59:6
**degree** 5:19 40:10
**deliberately** 110:20 111:6
**Delta** 73:10 79:18
**demeanor** 110:6
**Dempsey** 35:8 91:3,5,6,12,18,21 109:12,13
**Dennis** 87:9 93:16 106:6
**Department** 5:25 7:7 10:5 61:8 63:5 67:8 72:7 77:17,20 78:5 89:5,9,15 90:4,11,20 92:16
**depended** 74:14
**deposed** 28:24 29:7
**DEPOSITION** 1:11 35:23 41:4 45:9 46:25 60:25 115:1 116:1,9,13 117:1 118:1
**depositions** 54:8 68:11
**Deputy** 2:16
**describe** 34:2,10
**described** 39:11 43:16 70:23
**describing** 67:18
**DESCRIPTION** 4:8 73:9,13 76:19 84:14 85:12
**designated** 104:13
**designee** 106:5
**destroy** 46:5
**detail** 31:18 35:20 43:9 109:23
**detailed** 106:19
**details** 22:25 36:19 37:6 110:5,6,19
**Detective** 10:21 12:17,21 13:6,23 14:24 16:25 17:7 19:4,9 35:7 37:25 41:12 43:7,13 44:12,16,17,19,25 48:20 50:13,17,24 51:7,8,19 52:24 53:8 54:13 61:23 62:4,7,15 64:12 65:17,18,22,24 67:10 76:11 77:6,11 79:15 80:12 87:25 90:23 91:3,5,12,17,20 92:6 95:5 96:10 100:15,25 101:5,10 102:23,25 103:13,18 108:19 109:12,13,22
**detectives** 8:24 11:24 12:6 13:7 14:9 19:2,14 43:9 48:4 56:19 67:12 71:2 79:23 83:15 89:13,14 90:3,6,10,14,19 91:25 94:13,17,23 95:9,11,16

ESQUIRE
an Alexander Gallo Company

Case 2:06-cv-06695-JS-SIL Document 224-14 Filed 06/02/12 Page 126 of 152 PageID #: 4954

96:4,12,22 97:11,24 98:4 101:8,19 103:16 107:7
determination 12:10
determine 44:18 53:5
determined 45:13,15 47:3 55:8 59:9
developed 64:3 87:8,15
developing 11:16
developments 27:5
device 24:12 40:5,12 42:14,16 44:15
devise 42:15
didn't 10:13 18:4 24:18 25:19 31:4,9 32:4 51:22 52:6 57:22,23 63:13 66:15 85:8 86:15 87:17 88:10 98:14 107:23 108:8 110:8 112:18
died 35:11 94:14
Diehl 54:14 61:24 62:15 64:13 65:19,25
Diehll 62:4
difference 31:13
different 6:20 48:17 52:8,10,18 54:2 60:7 90:7,14 102:14 105:22 108:14
difficult 54:4 112:19
diligently 64:14
Dillon 93:8,11,16, 21,22 106:6
Dillon's 93:25
DiMarco 1:16 115:5,21
diploma 5:22
direction 22:15 78:24
disagree 64:19
disappearance 16:22 64:24, 25
disappeared 55:24 85:24
discipline 11:25
disciplined 23:25
disclosed 30:12
discontinue 61:16
discovered 13:21
discovery 64:16 92:12
discretion 83:14
discuss 67:3,13
discussed 65:22
Discussion 37:19 66:25 87:23 88:21 106:23
dismissed 32:19
disposed 112:6
dispute 58:22 60:14
disputed 59:11
disrespect 33:14
distinctive 88:8
DISTRICT 1:1,2 18:16 39:6 44:22,23 51:14 53:12 56:7 84:20 89:19 93:9,20 104:24
disturbing 16:20 25:11 27:24
Division 6:25 7:3,7 89:5
DNA 30:10,12,21 31:25 36:11 59:4
doctors 35:11
Document 4:9,10 38:25 39:8 72:11 81:2,3 102:16,19 103:7
documentation 50:23 74:3,7
documents 15:15,17,20 42:5
doesn't 97:7 102:5
doing 6:22 10:17 21:2,9 22:7 31:17 34:8 38:10 66:13 67:17 90:2 100:15 107:24
door 73:11,14 75:11 79:5 97:25
down 8:20 13:4 14:2,16 16:3, 24 17:2 25:14 46:21 53:4,9 63:4 64:10 78:14,21 79:24 82:13 93:24 103:4 112:8
downstairs 88:15
Dr 101:21 103:4, 5
draft 52:23
drafted 21:4 52:20,21
drafting 100:12
drawn 32:2
dressed 14:17
Drive 1:14
driving 13:25 16:24 29:14 75:5
drop 21:3
dropped 27:20 112:9
dropping 21:10,15,17, 22 22:2,5 23:2 24:12 37:23 38:14 39:4,10,13, 15 40:14,23 41:4 42:9,14, 16,25 44:15 100:4
drove 17:2 78:17 79:2 83:24
drug 112:3,5
duly 5:4 115:10
dumping 56:5
during 8:18 25:9



42:22 43:18
67:20 68:11
73:23 79:7
94:10 107:14

**duty**
67:11

**dynamics**
67:2

**E**

**E**
2:1 4:1,4
115:3

**each**
19:13 21:21
63:10 65:21

**earlier**
11:17 94:16
97:12 98:20
99:20 100:3
102:22

**early**
14:21 20:22,
23 72:3 79:5
86:19 94:10
96:3 103:23
105:3,4

**ease**
42:9

**easier**
54:9

**east**
76:15

**eastbound**
69:12,14,15
76:16

**EASTERN**
1:2

**eaves**
21:3,10,15,
17,22 22:2,5
23:2 24:12
37:22 38:14
39:4,10,13,
15 40:14,23
41:4 42:14,
16,25 44:15
100:4

**EDWARD**
1:11 5:1,3
6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1,5
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:8
116:17 117:25
118:25

**Edwards**
105:9

**effect**
3:12 78:3

**effective**
18:23

**eight**
11:15 73:10
79:18

**Eighty**
79:18

**either**
15:21 26:5
48:10 110:19
111:11

**elected**
29:6

**electronic**
40:8,9

**elementary**
112:16

**elements**
52:17

**elevated**
78:23

**elevator**
112:2,8,14,
17

**elite**
8:5 10:19
89:7,11 90:20

**Emergency**
75:22

**Emory**
9:23

**emphasis**
6:2

**employed**
12:2,3 109:11

**Employee**
75:22

**encountered**
9:16 109:3
112:23

**encouraged**
81:15

**end**
10:22 43:23
54:14

**engaged**
25:16 63:5
108:23,25
109:4

**enjoyed**
15:6

**enough**
62:7 65:14,15

**entire**
64:17 116:9

**envelope**
96:9

**ERRATA**
115:1 116:1,
13 117:1
118:1

**ESB**
75:21

**ESQ**
2:4,5,9,12,
17

**ESQS**
2:10

**essence**
27:10 49:19

**establish**
71:21

**et**
1:4,7

**eureka**
16:17 51:20,
21

**evaluating**
111:10

**evaluation**
49:4

**evasiveness**
26:12,16,17

**evening**
70:6 78:11
82:19 87:3

**event**
25:5 33:19

**events**
26:14 27:13
52:11 62:13
81:18 84:7

**eventual**
29:12 55:21

**eventually**
6:18 29:21
62:17 63:24
70:11

**Everybody**
19:6 58:25
98:25 101:24

**everybody's**
67:3

evidence 29:24 31:3 36:23 48:9,16 49:4 50:9 51:10 53:11 55:18,19 63:22 86:2,5, 10 111:11 112:18 114:2, 6
evolved 31:21
exactly 74:22 97:9
examination 3:11 88:23 108:12 113:5 115:9
EXAMINED 4:3 5:4
Examiner 8:12 14:24,25 95:13 103:6
examiners 101:20
EXAMINTION 5:6
example 35:23 67:10 74:8 111:22
excellent 66:25 101:9 104:22 108:19 109:25 112:12
exchange 94:25
exclusion 12:12
execute 23:12 44:19, 22
executed 67:8
execution 21:15 84:7
Exemplary 91:19
exercise 19:4
exhaustive 61:24 62:15 64:14
Exhibit 37:20 38:17, 21,22 39:2,9 41:18 42:2,5 43:4,22 58:2 68:9,10 70:12 72:14 73:15 76:22 80:6 96:23,24 101:23 102:10,17,18 104:14
EXHIBITS 4:8 54:2 104:5
existence 19:15 55:12 62:21
existent 61:22
exoneration 36:12
expand 95:6
expect 64:2 83:12
experience 10:2 19:4 81:17 82:8 89:10 95:14 97:10 99:9 109:9
experienced 89:14 90:15
expert 50:2 60:9
expertise 8:11 11:17 19:3 46:21 67:4
experts 52:16
explain 46:8
explored 21:2
exposed 110:16
extend 22:5
extension 21:21,25 22:22,23 23:2 37:22 40:14 44:5 50:11 51:14
extensive 33:25
extensively 17:13
extent 64:21
extraordinarily 112:19
extraordinary 5:12 25:5 46:21
extremely 25:10
eyeballing 12:24

F

F 115:3
face 14:16
fact 18:6 26:23 29:13 30:19 47:12 50:5 94:17
factor 101:17
facts 109:14
factual 22:18,25 41:11
faculty 9:5,11
fair 12:5 20:10 36:17 65:14, 15 68:3,4 89:17 90:13, 18 94:5 106:9,22
fairly 67:18
fall 94:10
false 27:23 36:5,16 37:7 77:7 112:24
familiar 30:24 36:10 57:14 59:12 60:14 72:6 80:10 81:24 97:4,18 98:9 99:23 101:24
familiarize 96:18
family 62:2
Far 42:21 45:16 49:11
fashion 20:22 50:17 99:8
fatalist 10:7
fault 50:23
favorable 109:18
FBI 8:2
Feeding 11:20 111:6
feel 38:5 79:19 81:15,16 91:17
feet 69:17 72:23
fellow 21:3 33:11 48:22 114:9
fellows 29:16
felonious 25:17
felt 58:8
FERGUSON 2:16 4:5 31:6 36:7 37:17 40:16 42:4 45:17 47:15, 23 51:24 54:6,10 60:4, 9 70:7 71:19



82:24 86:4,6 87:12 88:12, 17,23 102:5, 8,17 108:10, 13 113:5 114:11

**field** 8:23

**fields** 31:13

**file** 19:24 23:13 96:12,16 109:22

**filed** 40:22

**filing** 3:3

**filled** 37:23

**filling** 48:5,8 50:11

**find** 16:14 38:3 53:14 56:12 93:3

**finding** 32:12 57:21 58:11 85:18, 22

**Fine** 48:3 66:14

**fingerprints** 96:20

**first** 5:4 6:23 7:13 9:8 10:2 16:24 21:4 24:10,14 26:23 30:22 34:12 39:2,18 47:18 49:20

58:10 68:5,13 69:19,25 73:17 80:2 81:2,3 84:23 88:6 98:6,7 100:4 111:24 112:6 115:9

**fit** 53:6

**five** 25:3 43:4,12 44:25 65:17 88:15,18 103:18 107:25 113:3

**fives** 16:7

**flashing** 14:11

**Flip** 70:12

**folder** 96:9

**follow** 50:23 54:9 67:4

**followed** 21:23 83:13

**following** 41:18 43:13

**follows** 5:5

**foot** 100:19

**force** 3:12 11:18

**Ford** 43:16 56:17

**Foreign** 5:22,24

**forensic** 11:25 114:6

**forget** 14:5

**forgot** 42:24

**form** 3:7 67:7 70:8 73:18 80:10

**formal** 19:11 74:6 95:22

**formed** 6:18 49:14

**forms** 74:9

**forth** 41:12 95:17 115:9

**fortunately** 60:11

**forward** 27:22 67:22 69:9 97:16 98:16 100:19 111:4

**found** 7:23 25:2 29:24 33:11 45:21 47:8,22 50:12,15 51:16 56:18 59:10,20 68:22 69:3 70:19 71:4 74:19,20 81:5,9,13 84:15 85:13, 25 86:9,19 104:10 112:7 113:8,11 114:7,9

**four** 6:3 16:7 18:25 19:2,3

43:3,6 53:6 54:11,15,22 61:7 69:11 73:11 75:11 79:5,10 82:6, 7 94:14,18,20 101:7 105:16 113:2

**Fraas** 48:20,21 49:3 50:7 51:9,15

**frankly** 11:11 15:5 22:9 25:12 34:14 38:7 44:21 56:23 83:18

**Fred** 28:14,16,20 34:10,24 85:9 106:23 107:9, 19,23 108:5,8

**Freddy** 23:24

**free** 96:15

**freedom** 31:9

**FREEMAN** 2:10,12 9:21

**French** 72:15

**French's** 87:2,4

**frequently** 95:19

**friend** 17:6 27:18, 20,21,22

**friends** 33:17 61:25 78:10

**front** 33:3 71:4 79:13 82:9 85:14,19 86:9,21

**full-time** 28:21

**Funny** 73:17

**FURTHER** 3:6,10 61:16 69:18 85:20 103:4 106:9 115:12

**Fusco** 16:12 17:18 43:10,18,19 45:3,12,15, 19,23 53:21 55:23 56:4 58:23 60:16 64:15 68:17 70:14 83:5 84:15 85:13 100:7

**Fusco's** 14:8 59:8 68:22

G

**garbage** 76:6

**gates** 78:13

**gathering** 40:12 63:22, 23

**gave** 43:8 112:5 113:2,4

**general** 20:22 25:18 69:21 90:13,

19 109:7,8,16
**Generally** 18:19 34:3 38:13 57:12 66:18 67:19 68:3 112:23
**generate** 97:21
**getting** 13:25 20:21 24:23 25:21 54:15 67:24 77:12
**GINSBERG** 2:10
**girl** 17:9,12 27:19 54:18 55:16 76:14 83:23 86:16
**give** 18:19 19:10 34:6 76:4 106:18 111:22 112:24
**given** 64:23 74:12 79:23 86:25 96:25 110:15 115:11
**Gives** 77:4
**giving** 36:18,22
**gleaned** 62:7
**go** 8:18 10:3,4 15:14,19 16:3,11 18:13 20:18 28:3 31:18 34:3 35:24 36:24 43:23 57:2 67:11 74:12, 17 78:12,16 82:21 88:19 91:11 93:24 95:13,17 105:7
**going** 15:8 16:2,4, 12,15 17:8 18:21 26:8 27:2,13 28:15 34:7,13,19, 23 36:14 42:22 45:16 50:23 55:14 56:8 57:15 58:24 64:9,10 67:19 69:19 72:10 78:14 92:2 93:17 95:20,25 96:23 105:12 106:15 110:24 113:18
**gold** 73:11
**golf** 25:3
**gone** 15:6 78:10
**good** 6:24 21:7 23:11 37:9 51:17 84:5 88:24,25 92:4 93:3 95:3 101:9
**gotten** 13:22 64:5 69:3 107:6
**graduate** 9:7
**graduated** 5:17 112:16
**graduating** 110:24
**grand** 16:10 28:7,9, 10 89:23 98:15 103:20 104:2,5,7, 12,14
**GRANDINETTE** 2:6,9 68:7 88:14,19 102:3
**granting** 22:22,24
**gratuitous** 28:18 66:12
**gray** 76:19
**great** 9:11 43:9 65:2,3
**Green** 103:4
**Grennan** 16:5 18:7 23:10,11 63:12 92:20, 25 93:22 94:2,5,11, 12,14 107:16
**group** 25:16 66:25
**guess** 5:13 38:18 49:20 60:13 62:19 112:17
**guilty** 29:24
**gun** 24:18
**guy** 16:18 83:16 85:10 101:9 112:6

**H**

**hair** 12:10,11,13, 15,17,19 13:4,5,6,14 43:19 45:3, 11,13,14,18, 21,22,23 53:11,20 54:20,24 55:8,13,14, 17 57:13,16, 22 58:19,20, 22 59:4,7,8, 13,15,16,22, 25 60:3,15 100:6,8 113:8,11,19, 20,21,23 114:2,6,9
**hairs** 12:9,24 13:3, 8,12 56:20,24 57:18 58:12, 14 59:20
**hall** 93:24
**Halstead** 61:10 62:10, 20,23 87:9
**hand** 57:5 65:11 107:3 115:18
**handed** 23:24
**handing** 28:13
**hands** 13:4
**happen** 52:8 56:22 67:19 99:11, 13 103:25 104:4 109:17
**happened** 11:7 28:18 30:7 42:20 59:3 62:16 74:5 109:9,23 110:10
**happens** 100:5
**hard** 66:8
**Harvard** 66:24 93:4
**harvest** 63:25
**Haven** 114:8
**haven't** 34:24
**headed** 69:12
**headquarters** 21:12 75:24 79:16
**hear** 24:14 30:3,18 78:22 83:4 84:8,13,23
**heard** 18:15 29:14 30:22 55:12 57:18 75:6 76:14 78:20 80:2 81:12 82:18 83:6,22 84:10,12,16, 19,21 108:6
**hearing**

ESQUIRE
an Alexander Gallo Company

29:11,18 69:21 70:5,10
**heat** 25:19
**Heating** 25:20
**held** 37:19 45:20 56:17 65:23 87:23 88:21
**hello** 14:9
**helps** 85:6
**Hempstead** 14:3
**her** 14:12 30:13 31:5 56:4,5 69:17 70:19 80:15 82:17 84:2 112:7,8
**HEREBY** 3:1,4 115:7
**herein** 1:12
**hereinbefore** 115:9
**hereof** 116:13
**hereto** 3:2
**hereunto** 115:17
**Heroin** 112:15
**Hey** 16:3 29:3
**Hicksville** 112:4,15
**high** 78:23 109:3
**higher** 40:10
**highlight** 72:13
**highly** 7:13 84:3,5
**Highway** 76:9 78:17 79:2 82:3,14
**hill** 14:7,13 15:20
**hired** 7:17
**history** 99:17
**Hoboken** 2:18
**HOFFMAN** 2:5 38:20 54:7 71:13,16 102:10,16
**Hofstra** 9:9 34:18
**hold** 13:4
**home** 13:20,24,25 15:4 24:11 76:25 77:5 78:12,16
**homes** 24:10
**Homicide** 8:4,9,24 10:17 11:2,4, 5,6,9,12,18, 24 12:6 13:22 14:24 15:23 16:6,11 17:24 18:14,16,25 19:4,13 20:10,15 25:4,6,13 27:11 33:24 40:21 56:7 64:15,23 66:2,19 67:20 71:6 73:16, 18,20 74:5,23 75:14,17 81:10 83:16 85:9 86:8 87:24 89:6, 11,18 90:19, 23,24,25 91:15 92:8,24 94:2,21,24 95:5,8,16 96:4,12,25 97:17 98:12, 13 99:25 103:16
**homicides** 91:9,11,18 95:11 99:5
**Honor** 41:21 70:12 88:24 89:2
**hooked** 56:20
**hope** 25:18 50:22
**host** 52:17
**Hot** 68:14 82:13
**hour** 105:5
**hours** 75:7 76:21 105:4
**house** 34:8 78:11 111:18 112:24,25 113:3
**Hudson** 2:3
**huge** 81:14
**human** 43:20 45:4, 19,25 46:4,8, 9 47:8,17,19, 20,22 53:16, 17,19,22
**Hunting** 73:14
**Huntington** 77:3
**Hyperbole** 98:22

**I**

**idea** 32:7 44:3 66:14 111:3
**ideas** 19:5
**identification** 13:11 38:23 42:3 58:3
**identified** 69:10 70:4
**identify** 102:2,3
**ifs** 82:21
**III** 1:11 5:1,3 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1

110:1 111:1 112:1 113:1 114:1 115:8 116:17 117:25 118:25
**imagine** 76:16
**immediate** 6:8 14:19 103:16
**imparted** 107:9
**implemented** 110:14
**importance** 65:14
**important** 23:20 37:3 55:17,19 97:8,10
**importantly** 83:8 110:19
**impressed** 7:3 27:9 35:19 110:3,4
**impression** 59:3 62:18,25 63:4 109:18
**impressive** 36:2
**improper** 48:2 82:25
**inability** 13:11
**inadvertent** 111:6
**inadvertently** 110:20
**inaudible** 62:10 77:3
**incident** 69:22 70:5 86:20
**incidentally** 80:7
**incidents** 69:4
**include** 50:22 53:11 96:23
**inconsistent** 47:13,16 60:3 87:7,13,19
**indeed** 25:5
**independent** 85:4
**independently** 14:14
**Index** 1:5
**indicate** 74:9 104:10
**indicated** 10:16 56:6 64:24 66:17 89:2 113:7 116:12
**indicates** 65:17 72:14 75:13,20
**indicating** 64:21 73:10
**indices** 96:10
**indictment** 28:12
**indictments** 32:18 108:7
**individual** 19:13 33:21 46:15 72:14 108:23
**individuals** 25:16 49:8 61:23 62:6,22 87:8 109:6
**induced** 25:25
**industrial** 82:14
**inevitable** 85:21
**inferences** 32:2
**inform** 43:25
**information** 20:7 40:12 48:6 49:9,12 50:21 52:25 62:7 65:21,23 93:18 95:2 97:17,18 98:17 99:21, 24 106:19 107:6,9 111:6 112:24
**informed** 63:10 69:2 106:7
**initial** 38:17 39:24 40:4
**initially** 38:8 39:13 80:23
**innocent** 26:13
**Inquiry** 6:13 66:17
**inside** 32:5 71:4 76:5 79:6 85:13 86:10, 21
**insides** 85:18
**inspected** 48:13
**installed** 24:9
**installer** 112:2
**Institute** 5:23,24 9:5
**intensive** 6:4 66:20
**interact** 84:9
**interaction** 27:12
**interception** 39:16 40:5
**interchange** 94:18
**interest** 83:18,19
**interested** 27:17 115:14
**interesting** 7:8 10:9 19:5 74:22 98:22 101:17 110:25
**interests** 85:20
**interface** 93:22
**interior** 79:21
**interplay** 19:5 94:18,25
**interpretation** 82:13
**interrogated** 37:5
**interrogation** 61:16 110:14
**interrogations** 35:15
**interrogator** 37:10
**intersect** 7:9
**intersection** 81:25 82:7, 10,18
**intervening** 7:8 11:9
**interview** 63:10 67:22
**interviewed** 6:25 62:3,5 74:10 92:7
**interviewing** 63:23
**interviews** 62:7 63:6
**intrigued** 36:15
**introduced** 21:5
**introducing** 104:15
**invalidity** 98:2
**invariably** 18:13
**investigation**

15:23 18:15 48:7 54:19,23 61:24 63:18, 19 64:14 66:20 67:20 72:4 74:4,23 84:3 92:12 93:20 94:8 97:2 99:5
**Investigations**
55:6 67:14 71:25 81:9 95:20
**investigative**
22:19 49:22
**investigators**
36:24 63:20, 21 72:2 74:5
**involved**
6:16 9:4 10:2 19:18 27:23 35:10 56:3 83:9,11 99:19 113:8,19
**involvement**
15:24 88:3
**involving**
35:15
**Iracki**
101:21
**Island**
76:17
**issue**
58:19,20 60:14,21 102:7
**issued**
58:5
**item**
48:10
**items**
46:15 70:22

J

**J**
2:16 10:8
**Jack**
29:6,8 91:23
**jacket**
20:5 96:4,8, 23 98:12
**jail**
111:18 112:4, 25 113:3
**James**
78:11
**Jean**
35:5
**jeans**
70:24 71:3 84:14,15,22, 23 85:5,12, 16,18,22 86:9,15,20, 22
**Jersey**
2:18
**job**
6:23,25 7:2, 3,16 18:10
**jobs**
89:20
**JOHN**
1:4 2:7 27:7, 8 28:6 43:7, 17 45:13 54:17 58:6 62:11 72:14 87:2,4,8,9 92:7
**John's**
5:20
**join**
9:10
**joined**
7:22
**Jones**
19:9
**Joseph**
79:15 105:17
**JUDGE**
1:11 5:3,7 7:4 9:25 10:12 12:16 22:25 23:23 30:7,8 32:16 33:3,9,15 36:13 39:4 43:14 49:10 51:14,25 57:20 58:5,8 69:24 100:10 103:19 105:19 108:10 109:17 114:12
**judges**
6:16,19
**Judicial**
6:13
**June**
29:15
**junk**
114:8
**Jurors**
111:14 112:20
**jury**
16:10 28:7,9, 11 33:2,3 89:23 98:15 103:21 104:2, 5,7,12,14 112:17
**just**
7:6 9:2 12:23,24 19:9 29:22 31:5 33:15,23 35:9 38:16 39:8 43:6,22 47:5 54:25 64:10 69:19,20 70:13 74:7 77:10 81:21 88:19 101:23 102:8 109:15
**justify**
22:23

K

**keep**
70:13
**keeping**
36:4 63:12
**Kelly**
16:19,22,25 17:9 64:24
**kept**
93:21
**kid**
34:5
**kidnap**
12:3
**kidnaped**
56:16
**kidnaping**
7:25
**kidnapping**
56:16 113:7
**kids**
34:7,8
**killed**
25:9 27:18,19
**killers**
18:5
**kind**
18:10 22:11 26:12 31:11 41:4 44:13 48:5 56:11 72:7 80:7 83:12 110:21 111:20
**Klein**
28:14,20 34:10,11 85:3,6 106:23 107:10,20,23
**kneeling**
14:12
**knew**
7:12 10:25 11:2 13:7 17:16 19:15 26:8,22,25 27:2,13 30:5 31:7 35:9,25 50:18 53:17, 23 56:14 59:8 71:7,9 86:16 91:3,6,20,23 92:11 105:24 107:11 108:5
**knife**
73:14
**know**
10:21,22 13:22 15:23 19:10 20:16 22:4 30:6,7, 11,15 31:4,6, 9,16 32:6 33:10 34:4,8 36:20 37:6,10 39:20 45:20 46:3,5,7,9, 10,22 47:9, 11,17,19 48:24 49:11, 24 51:23 56:13 57:17,

20,23 58:20, 24 59:15 60:11,22 61:3 62:15 66:11 67:9,10,15 69:13 71:10, 19 72:5 76:15 77:21,23 80:9,25 81:3 82:12,15 84:6,17,25 85:4 86:15,25 88:7,8,10 90:9 92:6,9 94:17 97:3,24 98:13 99:11, 13,15,16 101:11,24 102:9 104:17 105:3 110:21 113:22

**knowledge** 16:21 17:4 18:20 25:6,7, 8 31:12 52:3 61:2,5 78:4 89:17 95:7 97:10 99:4,6 110:10

**knowledgeabl e** 31:2 90:15

**known** 12:11,14,18, 25 17:9 26:19 37:11 100:16 101:9 111:18

**KOGUT** 1:4 2:7,17 27:7,8 28:6 32:22 33:5 34:23 43:7 54:16 58:6 61:8,17 62:10 87:9 103:20 104:16,19,24

**L**

**L** 76:23

**lab** 46:12,19,21 47:18 48:19, 21 50:7 53:9, 10

**labeled** 68:21 76:11

**laboratory** 48:12

**lack** 22:10

**Lakeview** 72:23 73:4

**Lane** 75:20 79:17

**language** 6:5 64:19 65:4,6,12 66:12,15

**large** 16:15 68:8 75:11 76:20 79:4,5

**largely** 16:15

**last** 30:8 54:15,16 68:19 70:23 78:9

**late** 20:22 22:12 72:4 94:11

**later** 20:25 26:14 32:17 50:21 56:13,18 87:8,14,19, 20 103:5,18 105:5

**latest** 8:22

**law** 5:19 6:23 9:9 21:6 34:18 44:17 77:9 110:24

**Lawrence** 23:7,12,17 37:24 43:15 44:9 93:14

**lawyer** 6:22 7:16 9:12 84:5 105:23

**lawyers** 6:17,20 9:7 63:3 99:19 100:22 112:13

**lead** 16:5 19:13, 15,16,21,22, 23 20:3,4,12, 14 36:23 64:3 73:16,17,25 74:13,17 75:2,16 83:12 97:22,23 98:6,10,14 99:12,21 103:17

**leading** 22:4,14 37:5, 9

**leads** 53:15 63:16 66:21 67:23 72:3 99:23

**learn** 6:4 29:9 37:13,14 95:8,11

**learned** 48:12 67:2,6 69:4 71:3 87:15 106:6 109:4

**least** 12:13 55:4 65:12 72:2 77:14 85:24 97:2 110:21

**leave** 28:19 74:23 83:14 100:21

**leaving** 27:5

**lecture** 10:11

**lectured** 10:13

**led** 30:21 62:17

**Leff** 23:7,12 37:24 40:23 44:9 93:14,18

**left** 15:3 23:22 55:17 58:12 61:18,21 62:21 68:18 78:12,23 79:11,13 82:15 83:23 98:4 105:7,11 106:14,24 107:22 109:11

**legal** 33:11

**length** 59:11

**Leslie** 8:12

**less** 17:18

**let's** 12:22 31:22 33:18 41:23 48:18 74:17 102:2,3

**letter** 10:5 53:25 54:3 61:7 64:10

**letters** 79:10

**level** 93:12

**liaison** 16:10 18:8

**Libya** 6:11

**license** 79:9

**lies** 49:19

**Lieutenant** 10:24 33:23 46:11 94:13 101:6 102:25

**life** 67:5 84:8

**light** 76:14 78:18, 20,25 79:4 82:14

**lighting** 14:11

**liking** 104:21

**limited** 12:8 15:16

**line**




54:15 93:2,15 101:8 103:4
**lines** 54:16
**listen** 27:20
**listened** 78:21
**listening** 27:4
**litigation** 57:15
**little** 5:9 9:25 19:16 27:16 33:18 36:2 63:11 65:21 106:22,25 107:2
**live** 60:5,8 76:24 77:5
**lived** 59:24
**lives** 112:14
**living** 10:10
**LLP** 2:2,6
**loaded** 112:8
**loading** 14:18
**locate** 86:18
**located** 14:8 69:10
**locating** 85:22
**location** 21:12 68:15, 21 81:21 83:6
**locked** 99:14
**logic** 26:5
**London** 56:19
**long** 32:5 56:11 59:10 76:17 78:14 82:15 91:20 113:18
**longer** 9:24
**look** 8:17 13:4 30:25 31:13, 14 73:2,15 76:21 80:6 88:8
**looked** 20:5 38:12 49:12 76:5 78:23 79:6,8, 9,19 101:18
**looking** 12:9,25 13:5 14:10 17:6 31:19,23 36:18 39:9 43:6 49:25 53:5 54:11 58:7 65:16 68:24 73:9 101:19 103:7
**looks** 49:13
**loop** 108:9
**loss** 20:18
**lost** 35:9
**lot** 20:7 27:11 32:11,14 35:19 36:9 56:18 76:6 79:6 83:2 90:7,10 99:4, 21,24 106:19
**loud** 64:11
**LOUIS** 2:12
**Lucatch** 8:12
**Lynbrook** 20:24 24:25 25:17 64:17, 25 72:24 75:15,18

**M**

**M** 2:9
**M.E** 103:5
**maintain** 34:16
**maintained** 52:16
**major** 7:25 11:8,20, 21,22 12:3 16:6 18:9 21:19 88:6 91:14 93:19 94:9 96:25 97:13
**making** 5:7 32:8
**malfeasance** 6:17
**malpractice** 36:13 105:23
**man** 7:2 56:16 83:23 111:23
**manage** 7:24 18:11 24:19 28:17 63:13,14
**management** 18:24 19:20 21:7 67:8,15 93:7
**manilla** 96:8
**map** 68:6,10,24 69:15 70:13 71:10 73:2
**maps** 68:8
**March** 23:21 40:22 43:14,24 100:5
**Marie** 1:15 115:5,21
**mark** 38:18 41:16, 17,23,24 57:25 71:20 104:8
**marked** 37:21 38:18, 20,22 42:2 54:8 58:2 100:3 101:24 104:13
**marking** 104:5
**marks** 104:14
**marriage** 115:13
**married** 111:25
**Mars** 19:18 98:21
**match** 12:4 57:17
**material** 27:11 52:16
**math** 95:3
**matter** 17:15,16 29:12,13 31:22 65:2,3 69:21 84:19 109:16,20 115:15 116:10
**matters** 37:2 67:3
**McCarthy** 103:5
**MCCARTY** 1:11 4:4 5:1, 3 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1,4,5 40:1 41:1 42:1 43:1

44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1,20
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:8 116:17
117:25 118:25

**mean**
22:14 25:20
48:8 60:4
65:7 97:7
103:20

**meaning**
62:19

**meaningless**
20:7 99:21,24

**means**
49:20

**meant**
52:6

**measures**
110:13

**medal**
54:12 64:13
66:7

**medals**
66:10,16

**media**
57:18

**Medical**
8:8,12,21
14:24,25
36:13 95:13
101:20 103:6
105:23

**medicine**
8:23 15:6

**medium**
79:4

**meet**
44:18

**member**
10:23

**members**
20:24 62:2
65:25

**mentioned**
32:15 33:19
35:18 90:22
91:3 94:16
96:3 97:12
98:20 113:7

**mentored**
8:9,12 34:13

**merchantabil**
**ity**
7:15

**merged**
11:10

**merits**
67:13

**Merrick**
78:15

**met**
9:17 79:17

**metals**
66:12

**methods**
49:22

**metropolitan**
5:13

**MICHAEL**
2:16 54:13

**micro**
19:20

**microscope**
31:24

**microscopic**
11:25 12:7,9,
23,25 13:13
45:12,14
48:22 100:9,
16

**mid-May**
107:13

**mile**
14:4

**military**
10:2,12 14:18
72:16 105:7,
11

**mind**
5:8

**mine**
85:8

**Mineola**
1:14 2:8,15

**minimized**
24:20

**minute**
87:22

**minutes**
88:13,15,18
103:18

**Miranda**
61:21 62:20
111:4

**Miranda's**
110:15

**m i s -**
**charactering**
47:24

**misconduct**
6:18,21
111:15

**mis-conduct**
108:24,25
109:4

**misdemeanor**
77:8

**misleading**
23:5 41:14

**mis-read**
75:15

**miss**
10:14

**missing**
16:20 17:10,
12 18:2 24:24
25:9,22 26:2
64:16 68:19
69:6 70:14
86:15,16 90:7
111:25

**mistake**
7:12

**Mitchell**
80:12

**mobile**
16:4

**moment**
16:18 31:5
51:20

**Monday**
1:15 29:2

**Mondello**
105:18

**money**
109:14

**monitor**
20:6

**monitored**
21:8

**month**
11:14 16:7
78:9

**months**
15:14 23:24
28:16 84:17
94:15 107:25

**morning**
15:9 29:14
35:12 105:3,5

**mornings**
105:4

**Morocco**
6:10

**Morrissey**
16:19,22
17:2,9 64:24

**mortem**
59:9,10

**most**
21:19 83:8
89:13,16
90:20 111:11

**moustache**
88:9

**mouth**
26:24
**move**
67:21
**moving**
43:12
**multiple**
42:4
**murder**
11:16,22 16:24 18:12, 21 19:17,19 20:3,6 34:12 35:24 43:18 64:14,19 65:5 83:9,11,17 94:10 98:25 111:23
**murdered**
18:3 54:18 83:5
**murdering**
56:4 111:24
**murders**
11:14 18:5 95:4,5
**must**
8:14 32:3 37:10
**Mustang**
56:17
**myself**
7:23 8:11 59:14 69:14

N

**N**
2:1 4:1 115:3
**name**
7:2 72:14 76:23 113:14
**named**
46:10
**NASSAU**
1:7,13 2:10, 13,14 5:14 7:22 8:13 9:8 10:17 14:25 17:5 18:23 21:18 41:6 43:14 49:22 64:18 67:21 77:17,19,21, 23 78:5 89:14 90:3,10,18 112:4 116:4
**National**
9:5,6
**natural**
84:7 85:21
**nature**
66:5 97:14
**near**
70:5
**necessarily**
95:22
**necessary**
14:22 93:20
**need**
6:8 18:18 19:10 21:2 40:10 66:6 99:7
**needed**
44:14 66:21
**neighborhood**
98:23,24
**nervous**
37:15
**NEUFELD**
2:2
**never**
6:7 19:25 20:2,3,4,5 22:21 34:7,9 53:22 71:7,9 73:25 74:13 84:10,12,16, 19 95:18 99:9 105:24 109:2, 3 112:7
**NEW**
1:2,14,17 2:3,8,11,15, 18 8:2 10:10 16:13 37:13, 14 43:17 56:18 67:12 72:24 77:4,9 88:5 90:23,24 114:8 115:6
**newspaper**
29:13
**newspapers**
17:12,13
**newsworthy**
99:7
**nicks**
56:24
**night**
14:21 27:20 29:2 69:4,5, 22 75:8 76:8 79:20 83:21, 23 85:23 87:2
**nine**
11:15 43:7
**No.Change**
117:2,5,8, 11,14,17,20 118:2,5,8, 11,14,17,20
**No.Line**
117:2,5,8, 11,14,17,20 118:2,5,8, 11,14,17,20
**nobody**
82:11
**nomination**
106:4
**non**
33:2,3 61:22 62:21 71:8 106:8
**non-party**
1:12
**NOOTTER**
2:10
**normal**
7:23 32:4
**north**
78:17
**northbound**
76:13 82:5
**notary**
1:16 3:12 115:6 116:21
**Note**
45:17 47:15, 23 70:7 86:6 87:12 102:19
**noted**
114:13
**notes**
14:23
**nothing**
15:22 19:11 22:12 26:6 28:3 34:25 51:18 99:15, 18 100:10 108:3 109:14
**noticing**
82:11
**notified**
61:9,14
**November**
56:17 58:13 69:7,8 71:5 72:18 75:15 78:10 80:20, 21 82:19,25 83:21 87:5
**nuclear**
57:12
**number**
15:17 31:15, 24 38:19 59:20 68:14 69:11 71:10 73:2,4 76:25 77:4 99:2
**numbers**
38:25 41:19 79:10
**NY**
2:3,11
**NYU**
8:7

O

**O**
115:3
**oath**
116:15
**object**
102:9
**objection**
45:17 47:15, 23 48:2 51:25 70:7 86:4,6 87:12
**objections**
3:7
**objective**
111:11
**observations**
31:23
**observed**
21:14 30:20

31:12 76:14 82:19 85:24
obtain 12:8
Obviously 93:8 113:18
occasion 101:4
occupants 76:18
occur 37:8
occurred 87:16
occurring 23:16
Ocean 71:18 72:24 78:16
Oceanside 25:18
o'clock 75:8
offender 17:21
Offense 11:8 16:6 18:9
offensive 65:9
offer 116:14
offered 105:24
OFFICE 2:13 7:5,16, 21,22 8:5 11:9,21 15:23 16:8 23:22 28:20 56:7 63:9 65:24 89:3,8,19 92:18 93:25 96:13 104:24 106:7 109:11
officer 10:12 35:2 54:14 64:12, 13 108:16,19 109:18
Officers 61:23 62:4 65:22 66:14 79:17 108:14 109:2
offices 1:13 21:19 93:6
Oh 13:18 19:8
Okay 54:10 76:21 81:22 82:8 88:14
Old 2:7 17:11 24:25 35:6 76:24 112:3, 15
older 75:11
Olds 79:4
Oldsmobile 73:10 79:18
once 11:16 63:3 108:9 111:23
ones 42:6
open 8:10
opened 9:8 14:4 78:19
opening 7:4
operated 43:17
operating 52:14
opinion 91:5 100:23 108:14 109:3
opportunity 8:10 96:15 111:16
opposed 12:4 39:19 42:14 72:4 77:20 80:20
order 41:21 43:15 62:8 80:16 81:18
orders 10:4
ordinarily 18:14 22:2 36:17 48:4 52:24 72:2 77:11
ordinary 40:19,24 44:7,11 48:11,13,15 49:7,22,25 50:6 51:12 52:19 53:13 64:15
Ordover 9:13,23
orient 68:24 69:14
original 54:3,9
Ort 30:7 32:16 33:3,9 57:21 58:5
outcome 115:14
outside 19:17
outstanding 28:3 67:14
over 8:13,16 10:11 14:12 15:14 17:13 21:7 23:24 28:13, 21 44:16 63:13,14 67:15 73:22 74:12,17 75:5,24 79:2 90:9 94:12 95:13 96:13 107:3 112:5,9
overcome 26:17
overhearing 26:8
overlook 57:13
overlooked 35:11
overpass 76:10,17 79:3
oyster 95:7

P

P 2:1
p.m 114:13
PA 14:25
pad 53:3
PAGE 4:3,8 39:2,7, 9 43:6,8,12, 23,25 44:25 45:5,6 58:7 76:10 117:2, 5,8,11,14, 17,20 118:2, 5,8,11,14, 17,20
pages 39:2 43:3
paint 49:13
pallet 14:18
paper 29:22 31:8 98:7
papers 17:6
paragraph 43:7,12 44:25 45:6 47:14 54:11,15,22 61:7 64:10 65:16 100:5
parentheses 76:11
parents 77:5
Park 5:16
parked 14:6 19:17 71:12 75:10 76:15
parking

76:3 79:25
**part**
5:25 7:9,15 19:24 22:18 23:12 26:15 46:18 89:16 98:12,13
**participate**
8:25
**participation**
43:9 92:10,11 106:8
**particular**
13:17 19:12 44:5 50:18 52:3,15 64:23 65:13 85:11 109:7,18 113:23
**particularly**
24:17 28:11
**parties**
1:12 3:2 115:13
**partly**
78:19
**parts**
57:10
**party**
29:3 105:18 106:6
**pass**
66:22 68:15
**passed**
16:7 65:24 84:18
**passenger**
73:14
**passing**
93:18
**pathologist**
8:14,22
**pathologists**
8:22
**paths**
105:22
**PAUL**
2:17
**Pause**
88:22
**pay**
109:14
**peak**
83:18,19 85:20
**Peck**
104:19,25
**Pelzer**
7:2,3,6
**Penal**
77:9
**penalty**
77:13 78:7 116:6,8
**pending**
16:11
**Peninsula**
78:16
**people**
7:9 16:14 19:17,18,19 20:6 25:16 26:6 31:14 46:21 48:12 50:14 53:10 57:7 62:5 63:22 66:10 67:3 78:6 81:15,17 84:8 97:16 98:16, 21,22 99:2,6, 19 105:21 113:15
**people's**
84:6
**percent**
76:5
**perception**
6:24
**performed**
31:25
**period**
16:16 25:10 41:5 42:23 46:14 67:20 73:23 90:9
**perjury**
77:13 78:7 116:6,8
**perpetrator**
36:19 37:6 110:20
**person**
7:14 13:2,5,6 16:4 17:24 31:18 36:18, 22 37:4,10,13 46:14,17 54:21,24 56:13 59:23 60:5,7,8 64:16 90:7 97:24 110:6
**personal**
33:8,10,22, 23 34:16
**persons**
103:8
**ph**
8:12 9:13 16:20 30:16 61:12 78:11 101:21 103:5 105:18
**phenomenon**
59:12
**philosophy**
100:21
**phone**
74:7 76:25 77:4 79:14 95:20
**photograph**
97:7
**photographs**
96:9 97:4 104:4,5,8, 11,12
**phrase**
13:10 40:7
**pick**
110:8
**picked**
29:15 61:3
**piece**
14:18 48:16 55:17 98:7
**Pierce**
75:20 79:17
**Pierson's**
78:11
**Pilgrim**
99:14
**place**
17:14 35:25 57:18 66:15 68:17,19 71:20 77:3 83:4 98:25 104:6
**places**
111:10
**Plaintiff**
2:2,17
**Plaintiffs**
1:5
**planning**
78:11
**planted**
60:16,19
**plate**
79:9
**Please**
41:24 57:25 72:6
**pleased**
24:6
**pleasure**
34:14
**Plf**
2:7
**point**
10:16 18:24 53:21
**pointing**
68:13
**police**
11:18 20:11 21:12 29:3 35:2 54:14 61:4,8,23 62:3 63:5 64:12 65:13, 22,24 66:14 67:8,16,21 69:3,20 72:7 74:14 77:17, 19 78:5 79:16,17 89:8,15 90:4, 10,20 92:15 94:7 96:19 97:13 108:14 109:2
**Policeman**
75:13,17
**policy**
106:8

ESQUIRE
an Alexander Gallo Company

politics
11:9 106:8
Popular
29:6
portions
35:22
pose
51:24
position
106:6
possibility
49:18 57:3
possible
43:20 45:3, 19,25 46:4,8, 16 47:17,18, 22 49:19 50:19 53:16
possibly
75:11 83:10
post
30:3,10,11 32:16 36:11 59:9 81:15 98:24
poster
70:14,16,17
potential
18:21 21:2 83:22,23,24
potentially
86:14
practical
25:6
pre
59:10
pre-aids
8:19
preceding
110:11
predecessor
6:15
prefer
49:21
premises
21:3
prepared
6:9 20:8 74:11
prepares
6:2 96:22
preparing
15:11 98:15
presence
53:12
present
28:9 51:8 54:21,24 55:9 58:6 75:21 103:9 104:23
presentation
104:2
presented
28:10 29:25 103:20
presenting
28:6
press
93:17
presume
81:4 107:11
presumptive
46:2,4,6,9
pretty
34:5 86:2
previously
37:21 39:11
prior
8:3 28:24 54:8 68:18 71:5 87:25
prioritizing
65:5
probability
83:21
probably
53:18 73:4 74:12 81:20 95:4
problem
46:4
problems
38:24
procedurally
30:7
procedure
8:19 49:23 50:4,6 51:13 52:4,12,14, 15 67:5 77:16
procedures
21:22 32:4
proceed
66:19
proceedings
58:4
process
22:19 30:24 51:4 66:5 86:8,12,22 92:12
processed
47:7,21 48:19 50:25 51:3 53:10 74:9
processing
46:15,16,17 50:8,15 51:9
produced
43:19 45:3, 18,23 53:20 54:3,7 100:6 110:18
producing
59:7
product
52:22
production
19:16 38:25
productions
102:15
productive
15:22 24:18
profession
6:17
Professional
6:13,20 7:8 17:24 33:8, 13,22 34:16 67:5
professionally
33:10
Professor
9:13
proffered
22:25
program
6:4 9:6,11,19 10:9 77:5
programs
9:21
progress
7:20 39:3 41:20 42:8
progressed
18:15
progression
7:23
promising
20:12,14
promoted
90:16
prone
111:14
proper
21:22
properly
24:20
proposed
110:14
prosecuting
63:9
prosecution
7:5,25 21:19 26:15 105:13
prosecutor
34:14 40:20 73:21 86:7 89:4 109:17, 21
prosecutors
20:11 63:24 66:23 67:24
prosecutor's
19:24
prospective
86:11
protection
111:5
proud
8:11 34:6
prove
96:11
proved
50:21
provide
15:24 36:19 64:2 74:14
provided
110:19
psychological
99:7,17
public
1:16 3:12



17:16,17 61:2,5 115:6 116:21
**publicity** 26:2 81:10
**publicized** 25:15
**pulled** 91:25
**punishable** 77:8
**purposely** 56:6
**purposes** 98:24
**pursuant** 1:12 45:8 77:8
**pursue** 86:3
**pursued** 86:5
**purview** 96:16
**put** 8:20 24:13 40:12 41:12 53:18,19,20, 23 56:6 65:18 69:17 71:25 77:25 80:15 81:14 82:6 99:8 100:17, 19,23
**putting** 32:9 57:6 67:16 85:25

**Q**

**quarrel** 65:4
**question** 12:16 16:25 23:16 35:24 37:25 44:16 47:25 50:16 51:17 52:10, 12 58:12 60:20 67:18 69:16,25 70:3,8 71:10 80:3 82:25 102:12 111:15 112:12
**questions** 3:7 6:24 15:25 37:5,9 52:18 88:12 108:11,13 113:6
**quickly** 19:3 75:16
**quite** 5:12 11:11 15:5 22:9 34:14 38:7
**quote** 12:11 65:17 109:25

**R**

**R** 2:1 115:3
**radio** 27:4 29:15,19
**radius** 25:9
**railroad** 14:2,3 75:9 76:10,17 78:13,24 79:2,9,22
**raised** 5:14
**rape** 58:15 89:21
**rape/murder** 43:10
**raping** 56:4
**rare** 41:5,8,9 42:17 44:15
**rarity** 43:2
**reaching** 58:10
**read** 17:25 18:4 29:13,22 30:3,11 36:15 39:21 42:7 43:11,13 54:4,25 61:17 75:16 116:9, 10
**reading** 30:9 64:11
**ready** 105:22
**real** 25:11
**Reality** 50:17
**realize** 32:23
**really** 8:10 15:5 25:11 27:9 28:3,15 50:16 52:2 60:13 67:18 71:19 84:8,9 93:6,7
**rear** 76:4,6 79:11
**reason** 13:21 15:4 46:8 106:18 117:4,7,10, 13,16,19,22 118:4,7,10, 13,16,19,22
**reasons** 78:4 99:7
**reassure** 98:24
**recall** 9:15 14:21 15:8 24:2 28:5,8,13,15 30:9 32:16,19 40:3 42:10 44:4 53:15 55:11 62:14 69:2 70:10, 16,17,18,20 71:2 96:5 100:25 103:25 104:4,15,18 108:15
**recalled** 33:6
**receive** 74:4
**received** 10:4,5 26:10 74:18 79:14 105:17
**receptive** 19:6
**recognize** 73:18
**recollection** 15:17 16:22 23:15 24:2 28:2 29:11 40:2 42:12 62:12 72:11 82:17 85:5,7 103:8,12 104:3,6 107:22
**recollections** 81:11
**recommendation** 54:12
**recommendations** 93:4
**recommending** 64:11
**record** 17:16 37:18, 19 87:23 88:20,21 96:19 115:11
**recounts** 43:7
**recovered** 45:11,13 48:9 49:10 60:11 70:12 87:6
**red** 13:6 49:13 78:18
**refer** 42:10
**referred** 99:12
**referring** 42:6 59:18 96:7
**refers** 30:5
**reflect** 103:7
**reflects** 65:12
**reform**

110:13
**refresh** 15:17 28:2 62:12
**refutes** 111:12
**regard** 26:13 36:2 65:5
**registration** 43:17
**regular** 74:8 101:7
**re-judgeship** 28:19
**related** 40:6 115:12
**relation** 23:9 33:22
**relations** 93:17
**relationship** 16:19 17:23 33:9 34:11,17
**relative** 26:11
**reliability** 111:10 112:20
**reliable** 31:17 32:12
**rely** 20:11
**remained** 11:20
**remember** 13:16,19,20, 25 14:5,7,8, 10,11,17,20 15:3,19,21 20:19,21,22 24:5,6,16, 17,21 27:3, 15,17,25 28:22 29:18, 20,23 30:2 38:7,10 40:10 48:25 59:15 60:10 61:11, 13 62:13 68:15 69:21, 25 70:3,13 79:10,12 80:23 101:13, 14,17,19,22 103:11 104:21,22,23 112:25 113:3, 25
**remembered** 28:5
**remembering** 81:18,19
**remembers** 76:2,6,9
**remove** 6:20
**removes** 6:19
**removing** 6:16
**repairman** 112:2
**repeat** 18:5
**rephrase** 39:21
**report** 39:3 41:20 67:23 69:7 73:6 74:5,10 92:25 93:5
**reported** 51:13 69:23 70:11 71:5 82:23,24 87:5 92:21
**Reporter** 1:16 115:5
**reporting** 22:11 50:12
**reports** 19:7 42:8 69:20 71:2 72:7,8,18 76:12 81:22 95:23 97:5
**represent** 46:24
**representation** 47:14 49:10
**representations** 50:14
**representatives** 63:9
**represented** 61:9,12,15
**represents** 44:3
**Republican** 105:18 106:5
**requested** 22:21
**required** 12:7 21:6,7 40:10
**requirement** 21:2 44:23
**requirements** 21:14 22:12 44:17
**research** 36:9,10
**reservation** 79:20
**Reserve** 6:2 10:14
**reserved** 3:8
**Reserves** 10:7
**residence** 62:9
**respect** 33:12 41:11 42:9 48:9 58:10 81:11
**respective** 3:2
**respond** 15:2 47:11
**responding** 75:14,17
**responsibility** 107:4
**Restivo** 2:2 43:18 61:10 62:9, 20,23 87:8 92:7 116:4
**Restivo's** 45:14 54:17 62:11 87:10, 11
**restriction** 95:16
**result** 12:9 54:16 62:6,10 65:19
**resulted** 62:16
**retired** 7:6
**retrial** 32:21,25 58:6
**Retrospective** 86:11
**return** 105:13 106:15
**returned** 106:2,5
**revealed** 54:20,23
**reversal** 31:8
**reversed** 30:6
**review** 5:9 48:16 72:13 84:6 98:14
**reviewed** 22:20 85:10 92:11 104:18
**reviewing** 19:13 20:8
**rhetoric** 66:6
**Richard** 12:14 113:15
**right** 7:19 9:17 12:20 14:12, 15 23:19 24:9 26:2 28:3 29:6 33:7 36:13 38:16 40:13,15 41:20,22 42:10 43:13 46:2 47:6,8 48:10,19 49:5 52:9,25 53:12 56:9 66:23

68:2,20,23 69:15 74:20 75:2,6 80:22 81:6 82:10, 18,19,20,22 83:8 85:24 87:21 93:10, 24 96:14 97:9,15 98:18 99:24 100:5 102:13 103:23,24 105:7,15 107:14 108:2, 18,20 109:5 113:13

**ring**
35:2 80:4

**rings**
71:8,22

**ripen**
15:13

**Road**
2:7 7:9 78:15 82:9,20

**robbery**
11:22 90:6

**Robinson**
61:12,14

**Rockland**
75:6,10 76:13,17 78:15,17 82:3,6

**rolled**
78:21

**room**
93:17 96:22 110:7 112:14

**rope**
76:7

**rounds**
8:14

**Rreserve**
10:8

**ruled**
47:19

**rules**
109:20

**run**
28:18 105:19, 25

**running**
25:14

**runs**
101:6

S

**S**
2:1

**sack**
112:8

**sad**
35:12

**Saint**
5:19

**sake**
46:24

**sample**
46:5,7

**sat**
40:3

**save**
116:11

**saw**
8:10 11:11 20:3,4 29:2 31:24 32:11 44:10 47:18 49:13 70:18 78:13 79:4,6, 20 80:14 83:10,24,25 91:25 92:10 93:16 98:6

101:21 105:5 109:24,25

**saying**
14:9 52:8 55:5 69:9 80:19 84:13 96:5 104:22 108:15

**says**
39:15 43:13 47:17 58:8 61:7 62:18 72:22 75:7 76:11,16,23 80:7 100:8

**scene**
13:3 14:4,6 19:17 34:3,12 46:16,17,18 70:5 91:25 97:4,14 101:15,25 103:9 104:9, 11 107:13 108:17

**scene--**
16:24

**scenes**
18:13 96:19

**SCHECK**
2:2,4 4:4 5:6 37:18 41:16, 23 48:3 52:5 57:25 64:7 71:15 84:6 87:22 88:11 102:4,7,14 108:12 114:12

**scholarship**
36:5,8

**school**
6:23 8:8,21 9:9 34:18

66:24 93:4 94:9 110:24 112:16

**science**
8:23 31:21 36:14 83:17 85:9 99:5

**scientific**
31:22 54:19, 23 55:6

**scientists**
57:12

**scream**
70:5 75:6 76:14 78:21, 22,25 82:18 83:22

**screamed**
83:6,23

**screams**
83:4,7

**screwed**
20:15 64:5

**sealing**
3:3

**Sean**
29:2 33:19,23 34:9

**search**
18:18 43:18 44:15 45:2,18 46:18,19,22 49:4 50:12 51:15 53:20 54:17,19,22 55:20,22 56:8 62:11 100:6

**searched**
55:6

**seasoned**
14:23 89:14

**seat**
71:4 76:6 79:6,7 85:14, 19 86:10,21

**seats**
83:25

**second**
6:23 7:7 39:7 64:16 70:3 77:10 89:5 111:24,25 112:10

**secreter**
31:19,20

**Section**
77:9

**secure**
81:16

**secured**
54:17 62:11

**sedan**
73:11 79:5

**see**
5:17 8:7,16 9:4 12:23 13:3 16:4 21:7 24:20 30:25 31:14, 19 36:18 37:23 42:6 43:6,20 45:7 58:16 63:24 66:2 69:11,12 70:14,15,22, 25 73:6,11,16 75:2,18 79:24 80:6,8 81:23 83:10 86:22 96:8 102:23 103:4

**seeing**
17:6 69:23 70:4,20 72:11 81:22 101:19

104:21
seeking
38:8 51:14
seen
12:10 33:19 34:24 68:19 69:9 70:24 73:17,25 80:19 81:12 88:9
seized
48:18 50:7,25 51:7 53:9
seizure
43:15
semen
30:12
send
10:11
sense
56:2
sensitize
18:5
sensitized
25:12
sent
6:6,7 19:23 56:19
separate
11:6,8
sergeant
46:11 100:25 101:14 103:13
sergeant's
101:7
serial
17:21 18:5
series
38:5
SERIO
2:6
serious
15:25
seriously
78:7
Service
5:23,24 75:22 77:2,3 105:7, 12
set
115:9,17
seven
43:8 52:2 65:17
shall
3:8
shared
65:12
Sharkey
29:7 91:23,24 92:6,9
sheet
15:9 19:13 20:3,4 73:16, 17,25 74:13, 17 75:2,17 80:7,8 97:23 98:6 99:12,23 115:1 116:1, 13 117:1 118:1
sheets
19:15,16,21, 22,23 98:10, 14 99:22
shift
67:12
shiny
79:11
shoot
88:15
shooter
32:14
Shore
64:17
short
25:10 37:17 61:8 64:7
shortcomings
22:8,9
Shorthand
1:16 115:5
Shortly
10:4 105:6
shot
56:11
show
13:10 23:18 57:22,24 68:5,9 69:19 109:22
showed
27:12 37:7 38:5 79:18
showing
37:21 59:4
shown
27:8 38:17
shows
18:2 81:3
shut
63:4
side
14:12 15:20 71:14,15,17 72:23 79:11 82:9,20 112:9
Sienna
5:17
sign
44:24
SIGNATUREDAT E
117:24 118:24
signed
39:4,5 42:8 43:15 78:6
significant
22:13 32:2, 12,17 63:16 64:3,4 66:21 67:23 77:14 85:10,14,16 86:2,5
signing
52:25
Silver
76:3
similar
12:10 42:5
similarity
12:4
simply
72:10
Sirianni
35:4
sister
26:11 77:6
sit
22:16
sits
50:3 53:4
sitting
14:5 78:20
situations
111:5
six
10:6 52:2 84:17
Skates
68:14 82:13
skating
74:24
skills
9:10
slash
76:13,15
slide
30:25 31:14, 15 32:9
slides
30:20 31:12, 13,25 32:10, 11
Slope
5:16
small
98:7
smashed
82:9
Smith
75:14,17 76:12,23 80:13 81:22 82:16
smoker
61:4
smoking
24:18 78:19
snitch
112:25
snitches
111:18 112:24 113:4
solemnity
78:8
solid
21:15
solved
64:18,20 65:4,7,8,10 72:3
solving
19:14
somebody
21:10 46:10


110:24
somebody's 40:11
someone's 26:24
somewhat 48:17
son 35:10
soon 8:9 14:3 86:18
sorry 39:8 45:6 60:18 75:15 76:12 83:19
sorts 98:17
source 48:6
sources 49:9
South 64:17 72:23
speak 7:10 13:6 15:14 17:19 18:12 30:3 39:14 58:9 61:20 62:19 63:25 107:23
speaking 34:4 66:18 94:13 103:13 107:19
speaks 100:10
special 7:5 44:14
specific 28:8 81:19
specifically 44:5
specs 27:14
speculating 113:23
speculation 51:25
speed 14:11 107:24
sperm 32:14
spermatozoa 30:13,19 31:4,15,24 32:11
Spillane 10:24 29:2 33:19 54:14 55:4 61:6,7 62:19 65:16 94:13 103:2, 18
Spillane' 64:9
spirit 110:7
spoke 106:12
spoken 28:25 34:20 107:16
spring 20:23 94:10
squad 10:23 11:2,22 13:23 16:11, 14 17:7 19:6 66:2 88:5,8 90:7,24 94:24
staff 93:11 104:13
stains 47:22
stamp 38:25 41:18, 23 43:24 102:4
stamped 39:3
stand 34:13
standard 52:14 77:16
standardized 74:9
start 68:13 105:22
started 8:17 9:16 15:13 63:11 89:3
starting 37:20 43:6
starts 64:11
State 1:17 5:25 21:17 62:25 77:9 78:9 99:14 115:6 116:22
stated 75:5 76:2,4
statement 24:14 26:24 43:8 45:11 49:14 54:17 61:18 62:10 76:22 77:7, 12,18 78:2,6 79:23 112:11
statements 25:21 36:23
74:11 77:7 96:9
STATES 1:1 80:13
Station 77:4
statisticall y 72:2
status 53:4,6 63:3
stayed 10:14
Stern 6:15,18
Stevens 77:3
sticker 76:3,4 79:11
stickers 101:23
STIPULATED 3:1,6,10
stolen 69:8,22 70:2, 4,11 71:5,11 72:8,23 73:7 75:18 85:23 86:19 87:2,5
Stop 47:23 77:10
stopped 14:2 78:18 79:22 83:10 84:2
strands 45:21
stratagem 26:3
Street 2:3,11,14,18
25:2 63:22 71:12
strengthen 51:21
striations 60:2
stripes 85:17
stripped 70:24 71:3 84:14
structure 96:24
student 25:4
stuff 37:3 79:6,7, 21 83:25 85:13
stuffed 85:18
subpoena 1:13
subscribed 3:11,13 116:18
subsequently 69:10 109:4
substance 34:25 53:22
substantial 30:19,22 31:4,7,9,15, 24 32:7
substantive 38:11
successful 65:20 109:21
sufficient 50:20
suggestions

37:4
**suing**
34:23
**suit**
109:12
**Suite**
2:7,11,18
**sum**
112:13
**summarize**
74:11
**summary**
55:4
**summer**
9:9
**Sunrise**
75:6 76:9,13 78:17 79:2 82:3,5,14
**superficial**
25:13
**superior**
93:2
**supervised**
101:6
**supervising**
23:11
**supervision**
7:24
**Supervisor**
23:10 67:11 103:16,17 107:17
**supervisors**
65:25
**supervisory**
18:10
**support**
6:8 15:25 18:17 23:13 43:5 104:13
**supported**
37:24
**supporting**
22:2,5,18 44:20
**Supposedly**
55:15
**Supreme**
1:13,14
**Sure**
5:11 13:7,18 15:16 20:13 21:13,24 23:4 26:3 28:2 29:13 30:11 33:17 41:11 42:8 44:21 51:11 53:3 55:21 59:6 64:4 65:3 66:7,8 68:25 69:5 80:13 97:3 99:9 100:14 110:23 111:13 114:5
**Surely**
75:19
**surprised**
56:23 114:7
**surreptitious**
19:9
**Surrogates**
29:6
**Surrogate's**
36:14
**surveillance**
26:20,22 40:8,9
**Susan**
44:2
**suspect**
25:23 29:12 53:15 111:7
**suspected**
57:7
**suspects**
18:22 26:6,19 27:17 61:10 62:3 92:7
**suspension**
26:20
**suspicion**
26:21
**sustained**
12:16
**swab**
32:5,6,8
**swabs**
30:20
**swampy**
71:11
**swear**
44:19
**swimmers**
31:19
**sworn**
3:11,13 5:4 77:15 115:10 116:18
**system**
63:17

**T**

**T**
115:3
**Taft**
103:5
**take**
6:12 7:6 9:12 11:4 24:21 31:12 32:5 37:17 46:21 64:7 67:18 73:15 77:18 78:3,7,15 80:6 87:13 88:13 89:19 96:18,22 105:21
**taken**
1:12 25:2 30:20 51:3 98:25 104:8 116:9
**taking**
35:25 37:12 73:2 104:6
**talk**
25:25 26:11 29:8 31:22 33:18 34:19 61:10 66:20 74:7 92:13 95:19 99:3
**talked**
99:4
**talking**
16:12 25:24 26:7,11 35:7 60:7 66:13 94:20 109:6
**tan**
75:11 79:4
**tap**
24:2 25:24 39:12,19,23 41:7,9 42:19,24 43:5 62:8,16
**tape**
38:9 40:8 105:2,5 110:11 111:2
**taped**
104:19,25
**taping**
41:13
**tapping**
21:3
**taps**
26:14
**target**
109:12
**tasked**
49:3 50:8,14
**teach**
8:22 9:7,11 34:18 37:11
**teacher**
94:9
**teaches**
9:21
**teaching**
5:24 9:9
**team**
56:19 65:19
**technical**
15:25 18:17 22:11 66:22 67:24 77:2
**Ted**
61:12,14
**teenage**
17:9
**teenagers**
18:2 25:8
**telephone**
24:10 26:24 38:15 40:6 42:15,19 105:17
**telephonic**
39:16
**tell**
5:23 7:20 8:8 9:25 13:16,19 14:6,9,14,



15,16 15:16, 18 16:21 17:3 23:19 27:15, 24 29:4 30:18 32:3 35:21 67:9 74:21,22 78:6 85:9 93:17 99:20 101:18
**telling** 18:7 20:19 84:25 112:22
**tells** 53:4,8
**term** 12:19 13:9,13 30:22 59:15 60:10 113:21
**terminated** 106:7
**terms** 18:14 32:2 50:5 55:4 64:10 74:3 81:21 111:9
**terrible** 7:12
**terribly** 10:15
**test** 31:17,25 46:5,6,9 59:4
**testified** 5:5 46:25 47:8 85:6
**testimony** 47:24 63:23 115:10,11
**testing** 30:10,12 32:17 46:7 51:20
**tests** 46:2,13
**thank** 5:7 39:7 108:10 114:11,12
**themselves** 66:20 67:17 90:15 99:8
**theories** 98:22
**theory** 87:7 110:25
**Therefore** 11:10 45:22
**Theresa** 43:10,18,19 45:3,12,15, 19,23 53:21 55:23 56:4 58:23 59:8 60:16 64:15 68:17,22 70:14 83:5 84:15 85:13 100:7
**thing** 18:23 24:10 31:11 50:18 53:25 54:6 57:17 59:16 61:18 75:16 77:15 80:2 81:14 85:8 102:12 110:21
**things** 15:14 25:25 27:16 36:2 37:10 40:24 52:8 53:13 55:5 57:14 63:2 66:14 79:24 84:4
96:25 97:2,14 99:18 101:18 107:3
**think** 9:16 16:18 18:12 24:11, 12 29:7 38:16 39:10 47:4 49:13 52:5 56:6 59:7 61:2,3,4 64:22,24 66:17 67:7 71:13,16 74:19 88:11 89:2 94:16 98:21 99:20 100:3,4 105:4 112:15,22 113:2,8,21
**thinking** 14:6 68:16
**third** 24:24 88:8
**thought** 8:15 25:14 27:19,23 32:23 34:13 39:12,18,24 40:4 55:14 82:4 97:18 98:7
**thousand** 28:10 31:3
**three** 6:3 11:14,16 20:24,25 25:8 30:14 32:19 50:2,3,25 56:18 58:11 71:16 79:10 87:8 101:7 102:14 113:6, 9
**three-mile** 25:9
**thrust** 67:17
**ticket** 79:13,25
**tie** 8:18
**ties** 8:17
**time** 3:8 5:7 8:6 10:17,20 14:22 15:12 16:16 20:8,11 23:8 25:10 27:18 30:22 31:23 32:8,9, 13,17 34:3,24 39:6 40:21 41:5 42:23 43:25 45:10 46:14,19 47:7 48:4,21 57:6 59:11 61:8 67:20 70:6 72:16 73:17, 23 74:23 76:20 79:8 80:19 81:13 82:22 83:5,20 84:18 86:20 90:9 91:21 94:2,7,10,17 95:14 98:6,7 102:20 104:16,20 105:4,11 107:14 110:11,15 113:18 114:13
**times** 27:13,14 52:2 93:5 113:7
**tip** 8:18
**today** 34:9 79:14 98:8,9 100:3
**together** 18:22 86:2
**told** 26:14 27:18, 19 51:15 52:2 63:8 70:2,3 77:6 92:13,20 99:18 105:6, 25 109:15 112:6
**tools** 75:12 76:7 79:7 83:25
**top** 102:22,23
**totally** 47:25 58:25
**tour** 105:16
**toward** 79:8
**towards** 78:14
**town** 18:2
**towns** 25:3
**trace** 31:3 32:7 48:9 49:4 50:9 53:11 86:10
**track** 20:19
**tracks** 75:10

**trade** 11:17
**traffic** 76:9 78:18,25
**train** 14:11 78:14
**trains** 76:9
**transcript** 54:5 58:4 115:10 116:9
**transferred** 8:4
**transported** 55:16
**trap** 24:9
**traveling** 82:5
**trestle** 79:9
**trial** 3:8 8:4 9:5, 7,9 15:4,5, 11,21 16:9 29:21 55:21 84:5 91:11,18 94:11 98:15
**trials** 89:22
**tried** 25:14 94:9
**trouble** 77:12
**true** 81:17,20 94:9 98:19 106:13, 21 115:11 116:11
**trunk** 56:17,21
113:11,12 114:9
**truth** 36:21 49:19 79:24 112:22
**try** 17:25 24:21 57:8 63:18
**trying** 9:15 20:3 24:13 26:17 53:5 60:13 71:21 82:6 83:2 85:4 96:10 100:19
**Tunisia** 6:10
**turn** 53:24 72:6 76:22
**turned** 71:3 83:16 86:10,21 108:23
**turns** 109:19
**two** 8:20 11:2,8, 10,14,16 18:2 23:24 28:16 29:16 39:2 45:20 54:2 61:15,20,22, 25 62:3,6,22 68:21 69:18 77:17 78:2 84:18 98:24 99:2 113:6
**type** 48:16 92:9
**typed** 53:25 54:4
**typical**
95:24

**U**

**Unable** 61:20 62:19
**unaccustomed** 21:18
**uncommon** 81:8
**uncovered** 53:16
**under** 12:9,25 26:20,21 31:23 40:14 44:17 45:12, 14 59:3 71:4 77:13 78:7 85:13 86:21 90:20 93:19 100:9 101:7 116:6,8,15
**underneath** 86:9 102:25
**understand** 26:9 33:16 38:12 109:10
**understanding** 12:8 45:10 47:6 77:11 83:17 105:12 106:15 116:14
**understood** 12:6 20:5 45:11
**undertaken** 55:23
**undressed** 14:17
**unfamiliar** 72:9
**Unit** 6:2 11:5,6,19 18:16 46:18, 19 66:19 89:6,7,11,13 90:6,19 99:14 101:6 104:9
**UNITED** 1:1
**units** 11:8,10 90:3, 7,14
**Unless** 10:7 22:22
**unlikely** 84:3,5
**unproductive** 16:15 24:24
**unquote** 109:25
**unusual** 21:8,16,19
**update** 74:6
**updates** 19:8 34:7
**updating** 66:13
**upset** 27:22 98:25
**use** 111:21
**user** 112:3,5
**usual** 50:4 52:3
**usually** 14:23

**V**

**V** 73:5
**vacated** 32:18
**vacation** 65:18
**vagina** 31:5 32:5
**vaginal** 30:20
**validity** 97:25
**van** 16:4 19:17 43:16,19 45:2,14,18, 21 46:20,22 47:2,7,21 48:10,13,16, 18 49:4,13,25 50:3,7,8,13, 15,19,24 51:3,7,8,16 53:9,20 54:18,19,21, 23,24 55:5,9, 13,14,16,23 56:4,12,14 57:22 58:12 59:4,7,8 60:15 62:11 81:14 87:11 98:23 100:6
**variability** 52:15
**various** 67:22 108:14
**vehicle** 72:19,22 73:9 75:11 76:15, 19
**vehicles** 72:8
**verification** 49:12

**version** 53:25
**versus** 113:15
**Vesey** 2:11
**victim** 30:21 59:24 60:11,12 77:25 85:22 86:23 87:6,9 113:9,12
**video** 104:18,25 105:2 110:11 111:2
**videotape** 104:15 109:25
**videotaping** 110:14,22 111:3,14
**Vietnam** 10:4,5
**view** 18:24 25:12 65:12 75:14, 18 79:16 108:22
**Viewed** 75:25 76:7
**viewing** 76:2
**vitae** 5:9
**Volpe** 10:21,22 37:25 43:4,7, 13 44:8 45:20 48:5 49:9,11 51:7,8 52:20, 24 54:13 61:23 62:4,8 64:12 65:17, 23,24 76:11 79:15 87:25 90:23 100:2
**Volpe's** 44:12 45:2
**VS** 116:4

**W**

**W** 1:11 5:1,3 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:8 116:17 117:25 118:25
**wait** 51:20,22
**waived** 3:4
**walk** 93:24
**walked** 26:25 29:5
**walking** 14:7 24:25
**want** 8:16 20:16 29:9 63:13 86:12,22 88:17 92:13 96:18 102:8,9 109:21
**wanted** 24:14 37:25 77:15 86:8 95:6 96:15
**wanting** 41:11 93:7,15
**wants** 40:7 97:3
**War** 67:2
**warnings** 61:21 111:4
**warrant** 39:13,15 40:14,23 42:25 44:15, 24 50:20 53:7 54:17 55:22 62:11 66:21 67:25 100:4
**warrants** 18:18 21:17, 22 22:2,6,7, 8,9,17,18,22 23:2,13,17 24:13,23,24 37:23 38:14 39:4,10 41:5 42:9 44:19 50:12 51:15, 22 55:20 62:20
**Warren** 12:14 44:2 113:15
**washing** 32:24
**Washington** 2:18
**wasn't** 20:8 22:14 41:9 50:24 59:6 93:3
**waste** 20:8
**Watch** 23:11
**watching** 14:10 21:13
**way** 7:8 11:10 15:23 35:16 37:7 44:4 45:16 53:23 58:8 66:4,9, 18 72:2 74:8 89:24 95:15 114:8 115:14
**Wayne** 46:11
**ways** 52:8
**WCBS** 27:4 29:15
**weak** 61:22 62:21
**wear** 8:17
**wearing** 70:23
**weather** 52:17
**week** 65:18
**weekly** 65:23
**weeks** 55:23 56:12 76:12 82:11
**weights** 112:9,14,17
**we'll** 14:17
**went** 5:19 9:23 10:8 14:3 15:3 21:7 23:23 24:19

34:5 39:13 49:11 68:18 69:6 74:3 77:11 91:18
**we're** 13:5 37:20 53:5 57:10 60:7 113:18
**weren't** 19:12
**West** 2:14 14:2 72:24
**westbound** 69:13
**whatever** 24:19 57:9 99:7 107:6
**whatsoever** 58:14 110:9
**WHEREOF** 115:17
**Whereupon** 5:2
**whether** 25:12 26:18, 19 31:19 44:18,21 45:21 46:6 50:6 53:5,22 59:9 60:3,15 70:18 81:4 86:22 97:25 110:17
**whole** 67:11
**wife** 111:24,25 112:10
**wife's** 112:6
**William** 54:14
**Williams** 12:14 59:19 113:15
**wind** 6:22
**window** 75:12 78:19, 21 79:13,25 82:9
**windows** 76:20 79:5
**windshield** 76:2,3 79:12 82:20
**winter** 20:22 94:11
**wire** 24:2,15,20 25:14,20,22, 24 26:10 38:8 39:12,19,23 40:8 41:7,9, 13 42:19,24 43:5 62:8,16
**wires** 24:17,19 26:4
**wish** 9:12 78:9 103:10
**wit** 43:16
**withdrawn** 70:12 71:25 78:4 87:3 89:18
**within** 1:16 3:11 84:18 115:6
**witness** 1:12 4:3 69:9,23 70:4 74:10 77:13, 24 83:15 85:24 111:20 115:8,11,17
**witnesses** 63:23 67:22 81:10 103:25
**woman** 24:25 25:22 64:25 78:21 99:11,16
**women** 25:17
**wonderful** 95:14 111:16
**wood** 14:18
**woodwork** 19:18 20:7
**word** 36:7 51:18 56:5 57:6 64:4 112:14, 17
**words** 25:23 42:6 67:21 80:18 98:21
**wore** 84:15
**work** 7:20 11:3,4 16:9 17:24 18:19,22 19:16 24:13 25:2 29:14 35:13 52:21 53:3 62:16 66:12 88:16 91:17 98:5 100:15 101:7 106:9,15
**worked** 8:3 35:14 46:19 65:17 66:5,8 77:2 87:24 89:21, 22,24 90:2 95:15 101:11
**working** 6:13 15:11 16:9 19:9 40:21 65:20 68:18 91:8 107:7,8 109:19
**works** 63:17
**world** 6:3 10:11 95:7 111:23
**worn** 85:12
**worrisome** 17:18,20
**wouldn't** 12:23 15:12 52:24 53:18 56:2,11 83:19 85:15 95:22
**write** 66:11 96:23
**writing** 77:7 79:24 97:21
**written** 19:7 43:8,23 44:14 74:4,7
**wrong** 64:22 71:13, 15 113:2
**wrote** 66:10

**X**

**x** 4:1

**Y**

**yard** 114:8
**yeah** 26:15 34:24 74:21
**year** 7:11,12 17:11 89:4 95:4 113:16
**years** 8:20 10:6,14 20:4 24:25 35:6 38:11 39:19 56:18 59:21 61:4 73:20 76:11, 24 84:18 113:9,24
**year's** 34:24
**yellow** 53:3
**YORK** 1:2,14,17 2:3,8,11,15 8:2 10:10 43:17 72:24 77:4,9 115:6
**young** 6:22 9:11
**younger** 21:9
**yourself** 18:5 94:6 96:19

**0**

**0** 76:21
**0100**

ESQUIRE
an Alexander Gallo Company



75:7
**0157** 44:7
**05079** 41:24
**05080** 41:24
**05081** 41:24
**06-CV6695** 1:6
**06-CV6720** 1:6
**07030** 2:18

1

**10** 16:13,14 20:4 43:12 44:25 45:5,6 47:14 58:13 69:7,8 71:5 72:18 73:22 75:15 100:5
**100** 1:14 2:11 76:8,21
**1000** 1:15 8:15
**10007** 2:11
**10013** 2:3
**1045** 77:9 78:2
**1045s** 77:18
**108** 4:4
**10th** 80:20 82:19, 25 87:5
**11** 43:23 76:8
**11/10/84** 75:18
**110** 80:15
**1105** 72:21,22
**1114** 80:15
**1117** 80:14
**1121** 80:14
**113** 4:5
**114** 2:7
**11501** 2:8,15
**12/9** 75:13,17
**12-11** 80:12
**14** 17:11
**15** 77:3 102:23
**150** 62:5 114:13
**157** 37:20,21 38:17 39:9,21 40:14,16,17 43:4,23
**158** 73:15
**159** 76:22
**15th** 23:17,22
**160** 80:6
**166** 72:6,14
**168** 70:12,13
**17** 24:25 102:23
**170** 68:9,10
**17th** 78:10 80:21
**1821** 102:20
**184** 53:24 54:3
**185** 53:24,25
**1967** 5:18
**1970** 10:3 76:19
**1971** 6:12 79:18
**1972** 6:12 7:18,23
**1974** 56:16
**1975** 7:24 35:6
**1976** 8:10 10:19 91:22
**1977** 12:13 43:16 113:17
**1979** 9:10
**1980** 11:7
**1982** 8:8 9:4
**1984** 10:23 58:13 68:22 69:7,8 71:5 72:18 74:18 75:15 86:19 99:12 101:16
**1985** 23:21 40:22 43:14,24 103:23
**19-year** 112:3,15

2

**2** 77:9
**20** 1:15 116:19
**200** 2:18 72:23
**2005** 58:5
**2010** 1:15 115:18
**20th** 105:17
**2100** 75:7 76:21
**2130** 72:15,17
**21st** 78:10
**22** 76:11
**2305** 72:20,21
**235** 38:21
**236** 4:9 38:20,21, 22 39:2,8,9 40:13
**237** 4:10 41:18,23 42:2
**238** 4:11 57:25 58:2
**25** 38:11 39:19 58:5
**26** 19:2 94:17,23
**27** 19:2 43:14
**28** 76:11,24
**29** 102:10,17,18
**29th** 23:21 40:22 43:24 100:5
**2pgs** 4:9

3

**3** 71:10 73:2,4
**3/29** 41:8
**30** 2:11 113:24
**316238** 116:3
**32525** 43:17
**38** 4:9

ESQUIRE
an Alexander Gallo Company

4

**40**
95:4

**42**
4:10

**420**
2:7

**422-dash**
76:12

**425**
74:18

5

**5**
4:4 45:6
68:22 101:15

**500**
2:18 67:11

**530**
13:20

**58**
4:11

**5th**
74:20 81:5
107:13

6

**60**
69:17

**621**
102:20

**630**
27:21 29:14

7

**7**
64:10

**70**
35:5

**70's**
79:5

'

**'72**
89:3,4

7

**75**
76:19

'

**'77**
59:19

**'78**
113:17

8

**8**
65:16

**80's**
11:5,24 12:5
31:14

**8415030**
80:12

**85**
10:23

'

**'85**
94:11 107:7

8

**88**
4:5

9

**9**
74:18 75:8
99:12

**90**
76:5

**930**
27:20,21
72:17,18,19,
22

**940**
74:25

**99**
2:3

**9th**
80:24

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com