Page 387

1                UNITED STATES DISTRICT COURT

                 EASTERN DISTRICT OF NEW YORK

2

                 Docket # 06-CV-6695 (JS) (WDW)

3                          06-CV-6695 (JS) (WDW)

4

  KOGUT,

5

          Plaintiff,

6

  vs.

7

  THE COUNTY OF NASSAU, et al.,

8

          Defendants.

9  _____/

10                     Wednesday, December 14, 2011

                       1601 Belvedere Road

11                     West Palm Beach, Florida

                       10:14 a.m. to 12:42 p.m.

12

13                     VOLUME 3

14               CONTINUED VIDEOTAPED

15               DEPOSITION OF FRANK SIRIANNI

16

17

18        Reported before Tracey S. LoCastro, Registered

19  Professional Reporter, Notary Public in and for the

20  State of Florida at Large, pursuant to Notice of Taking

21  Deposition filed by the Defendants in the above cause.

22

23

24

25

Frank Sirianni

Page 388

1    APPEARANCES:
2

     NEUFELD, SCHECK & BRUSTIN, LLP
3    99 Hudson Street
     New York, New York 10013
4    Phone:  212.965.9081
     E-mail:  debi@nsbcivilrights.com
5    By:  DEBI CORNWALL, ESQ.
     Counsel for Plaintiffs Restivo and Halstead
6
7

     GRANDINETTE & SERIO, LLP
8    114 Old Country Road
     Suite 420
9    Mineola, New York 11501
     Phone:  516.248.5317
10   By:  PAUL CASTELEIRO, ESQ.
     Counsel for Plaintiff Kogut
11
12

     FREEMAN, NOOTER & GINSBERG
13   30 Vesey Street
     Suite 100
14   New York, New York 10007
     Phone:  212.608.0808
15   By:  LOUIS M. FREEMAN, ESQ.
          NADJIA LIMANI, ESQ.
16   Counsel for Defendant Nassau County
17
18
19
20
21
22
23
24
25

Frank Sirianni

Page 389

1                    I N D E X

                                              PAGE
2

   CROSS EXAMINATION                           390
3   BY MS. CORNWALL:
   CROSS EXAMINATION                           443
4   BY MR. CASTELEIRO:
   REDIRECT EXAMINATION                        476
5   BY MR. FREEMAN:
6
7
8                    EXHIBITS

                                              PAGE
9

   Plaintiff's Exhibit 272                     460
10   Plaintiff's Exhibit 273                    462
   Plaintiff's Exhibit 274                     465
11   (All exhibits retained by counsel)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Frank Sirianni

Page 390

1                    P R O C E E D I N G S

2                         -  -  -

3          VIDEOGRAPHER:  We're now on the video

4       record.  This is the continuation of frank

5       Sirianni's deposition.  We are taking place on    10:11:54

6       December 14th, 2011 and the time on the record

7       is 10:14 a.m. thank you.

8    THEREUPON,

9                    FRANK SIRIANNI,

10   having been first duly sworn, was examined and

11   testified as follows:

12          THE WITNESS:  I do.

13                 CROSS EXAMINATION

14   BY MS. CORNWALL:

15       Q.    Good morning, Mr. Sirianni.                 10:12:14

16       A.    Good morning.

17       Q.    I'm Debbie Cornwall.  I represent John

18   Restivo and Dennis Halstead.

19          We've met before, right?

20       A.    Yes, we have.                               10:12:22

21       Q.    I'm going to ask you some more questions

22   this morning.

23       A.    All right.

24       Q.    Mr. Sirianni, did you have an opportunity to

25   prepare for yesterday's testimony with your attorneys  10:12:30

Frank Sirianni

Page 391

1    beforehand?

2        A.    Yes.

3        Q.    Did you speak to them over the phone?

4        A.    No.

5        Q.    Did you meet with them in person?          10:12:38

6        A.    Yes.

7        Q.    How many times?

8        A.    Yesterday?

9        Q.    How many times in total did you meet with

10   your lawyers, Mr. Freeman, Ms. Limani, Mr. Ferguson or  10:12:48

11   anyone else to prepare for yesterday's testimony?

12       A.    About six weeks ago -- six weeks ago I met

13   with Ms. Nadjia, yesterday with Lou and Monday with

14   Nadjia and Lou.

15       Q.    When you met with Nadjia Limani six weeks    10:13:14

16   ago, where was that meeting?

17       A.    At my home.

18       Q.    In Florida down here?

19       A.    Yes.

20       Q.    How long was the meeting?               10:13:24

21       A.    I would say about hour and a half, two

22   hours.

23       Q.    When did she -- when was the appointment

24   for?

25       A.    I don't remember the date.             10:13:34

Frank Sirianni

Page 392

1    Q.    What time of day did she come to your house?

2    A.    It was in the late afternoon.

3    Q.    And when did she leave?

4    A.    Couple hours after that.

5    Q.    Did you look at documents during that         10:13:48

6  meeting?

7    A.    No.

8    Q.    You mentioned you also met with Mr. Freeman

9  and Ms. Limani on Monday --

10   A.    That's correct.                               10:14:00

11   Q.    -- the day before they questioned you.

12   A.    Yes.

13   Q.    Where was that meeting?

14   A.    Right here.

15   Q.    What time did you meet?                       10:14:10

16   A.    About 9:15, 9:30.

17   Q.    When did you break?

18   A.    When we came upstairs here, 10:00.

19   Q.    So you're referring to yesterday, the day

20  that you gave testimony.                            10:14:22

21   A.    And the day before.

22   Q.    Okay.  So I'm referring to Monday, the day

23  before you testified.

24   A.    Right.

25   Q.    You mentioned you had a meeting with         10:14:28

Frank Sirianni

Page 393

1    Mr. Freeman and Ms. Limani.

2         A.    Yes.

3         Q.    And that was a day when you did not testify?

4         A.    That's correct.

5         Q.    What time did you meet with them that          10:14:36

6    morning?

7         A.    Probably about 10:00.

8         Q.    And how long did that meeting go?

9         A.    I don't recall how long it went.  I wasn't

10   looking at a watch, so I don't know.                      10:14:48

11        Q.    Well, did it go through lunchtime?

12        A.    It might have.  I really can't be sure.

13        Q.    It's hard to remember how long your meeting

14   was two days ago?

15        A.    Yes.                                           10:14:58

16        Q.    Did you look at any documents on Monday?

17        A.    Not that I can recall, no.

18        Q.    You can't remember looking at any documents

19   on Monday?

20        A.    No, I didn't, can't recall.                    10:15:08

21        Q.    Did you have lunch with your lawyers on

22   Monday?

23        A.    No.  Wait a minute now.  Let me take that

24   back.  Let me think.  Yes.

25        Q.    And where did you eat?                         10:15:22

Frank Sirianni

Page 394

1      A.     Where did we eat?  We ate downstairs in the

2    hotel.

3      Q.     In the hotel restaurant?

4      A.     Yeah.

5      Q.     Did you continue meeting together after you    10:15:40

6    ate downstairs?

7      A.     We met and then had lunch and then a short

8    while later, a few minutes after then I left.

9      Q.     And did you have any conversations with your

10   attorneys after you left on Monday and before you     10:15:58

11   testified Tuesday morning?

12     A.     I left, I left.

13     Q.     Did you speak with your lawyers over the

14   phone after you left?

15     A.     No, I did not.                               10:16:10

16     Q.     You also mentioned that you met with

17   Mr. Freeman yesterday morning.

18     A.     Yes.

19     Q.     For how long before you started testifying?

20     A.     Forty minutes.                               10:16:18

21     Q.     Did you look at any documents during that

22   meeting?

23     A.     None that I can recall, no.

24     Q.     Other than the meeting six weeks ago with

25   Ms. Limani at your home, Monday's meeting from about 10 10:16:32

Page 395

1    a.m. till just after lunch and yesterday's 40 minutes

2    or so, have you done anything else to prepare for your

3    deposition?

4        A.    I might have looked at a statement.

5        Q.    Which statement might you have looked at?    10:16:50

6        A.    Harry Smyle's statement.

7        Q.    Was it a Harry Smyle statement that you

8    took?

9        A.    I believe so.

10       Q.    Which one?                                  10:17:00

11       A.    The first statement, I think.

12       Q.    The March 7th signed statement?

13       A.    I believe so.

14       Q.    Was it the typed version or the handwritten?

15       A.    My handwriting.                             10:17:14

16       Q.    Your handwritten statement that you wrote

17   out for Harry Smyle to sign on March 7th of 1985?

18       A.    Yes.

19       Q.    Other than that statement, did you look at

20   any other documents to prepare for your deposition?   10:17:28

21       A.    No.

22       Q.    You testified yesterday, I believe, that you

23   were a detective for Nassau County for 21 years; is

24   that right?

25       A.    That's right.                               10:17:46

Frank Sirianni

Page 396

1      Q.    During that time you were assigned to the

2    robbery squad.

3      A.    Yes.

4      Q.    And also to major cases.

5      A.    Yes.                                          10:17:52

6      Q.    And you had temporary assignments as well to

7    the homicide squad.

8      A.    Yes.

9      Q.    Had you worked on homicide cases prior to

10   your temporary assignment on the Fusco case?          10:18:00

11     A.    Yes.

12     Q.    Over how many years before December of 1984

13   had you had those temporary assignments to homicide?

14     A.    I'd say maybe 12.

15     Q.    And that was on an as-needed basis?            10:18:20

16     A.    Yes.

17     Q.    Fair to say that you worked many, many

18   homicide cases before the Fusco case?

19     A.    Yes.

20     Q.    Can you estimate for me how many you worked    10:18:30

21   on before the Fusco case?

22     A.    That would be just a guess.

23     Q.    I don't want you to guess.

24           Was it more than 10?

25     A.    Yes.                                           10:18:40

Frank Sirianni

Page 397

1      Q.    Was it more than 20?

2      A.    It could have been.

3      Q.    All right.  In your experience in homicide,

4  did you become aware that homicide investigations often

5  involved the collection and testing of various kind of   10:18:58

6  forensic evidence?

7      A.    Yes.

8      Q.    And was there a particular unit or units in

9  the Nassau County Police Department that was

10 responsible for that part of the work?                    10:19:12

11     A.    Yes.

12     Q.    What department was that?

13     A.    Crime scene.

14     Q.    The crime scene unit.  And what did the

15 crime screen unit do?                                     10:19:20

16     A.    They collected the evidence, they

17 photographed the scene.

18     Q.    Did they document the photographs as well on

19 logs or lists?

20     A.    Yes, they documented.                           10:19:28

21     Q.    Was there also a department responsible for

22 collecting and testing trace evidence?

23     A.    That was the Scientific Investigation

24 Bureau.

25     Q.    The SIB?                                        10:19:42

Frank Sirianni

Page 398

1      A.    Yes.

2      Q.    And trace evidence was what?

3      A.    Hair, blood.

4      Q.    So serology as well, bodily fluids?

5      A.    Yes.                                          10:19:54

6      Q.    The SIB would be responsible for collecting

7   and testing that evidence?

8      A.    Yes.

9      Q.    And you were very familiar with the

10  protocols of the SIB and the crime scene unit over the  10:20:00

11  years that you worked on homicide cases, weren't you?

12     A.    I knew it was their responsibility, yes.

13     Q.    You spoke yesterday about the case files and

14  the case jackets in homicide; do you recall that?

15     A.    Yes.                                          10:20:18

16     Q.    Is it fair to say that while homicide had

17  its own case files or case jacket for any given

18  homicide investigation, the SIB or units doing testing

19  on evidence in a given homicide would also keep their

20  own case files as well?                                10:20:34

21     A.    Yes, I would assume so.

22     Q.    And that would include the crime scene unit

23  would have its own case file going.

24     A.    They probably would.

25     Q.    And the SIB would have its own case file     10:20:46

Page 399

1    going if they were doing any work.

2        A.    Yes, they would.

3        Q.    And one of the other things we've discussed

4    previously is the responsibility to disclose helpful

5    information -- withdrawn.                              10:21:04

6             Do you recall when you testified about a

7    year and a half ago we talked about criminal

8    defendants' right of access to helpful evidence, Brady

9    material.

10       A.    I can't recall.                              10:21:26

11       Q.    You don't remember that?

12       A.    No.

13       Q.    Well, let me show you your testimony and see

14   if that helps, how's that?

15       A.    Fine.  That would be great.                  10:21:34

16       Q.    Please take a look at your transcript of

17   your deposition from June 15th, 2010.  You testified on

18   that date, right?

19       A.    Yes.

20       Q.    I'm calling your attention to page 30 of     10:21:48

21   your transcript.  And I'm going to start at line 18

22   where the little arrow is.

23            Do you see that?

24       A.    Yes.

25       Q.    And I asked you, "Did you understand that in 10:21:56

Frank Sirianni

Page 400

1    1984 and '85 criminal defendants had a right of access

2    to any information known to police that would tend to

3    show their innocence?"

4              And your answer was, "Yes."

5              Do you see that?                          10:22:12

6        A.    Yes, I do.

7        Q.    And that's consistent with your

8    understanding today, right?

9        A.    Yes, it is.

10       Q.    Then I asked you, "Question:  Did you     10:22:18

11   understand that you had a duty to provide any such

12   information to the prosecution?"

13             And your answer was, "Yes."

14             Do you see that?

15       A.    Yes, I do.                                10:22:28

16       Q.    And that's consistent with your

17   understanding today, isn't it?

18       A.    Yes.

19       Q.    All right.  Then I asked you, "Did you also

20   understand in 1984 and 1985 that criminal defendants  10:22:34

21   also had a right of access to information about

22   prosecution witnesses that could undermine their

23   credibility?"

24             And your answer was, "Yes."

25             Right?                                    10:22:46

Frank Sirianni

Page 401

1    A.    Yes, it was.

2    Q.    And that's consistent with your

3    understanding today?

4    A.    Yes.

5    Q.    And then I asked you, "And did you also        10:22:52

6    understand that you as a police officer had a duty to

7    share any such information with the prosecutor?"

8         Mr. Ferguson objected.

9         And you answered, "Yes."

10        Right?                                          10:23:04

11   A.    Yes, I did.

12   Q.    And is that consistent with your

13   understanding today?

14   A.    Yes.

15   Q.    So generally speaking, was it your            10:23:10

16   understanding in 1984 and 1985 that criminal defendants

17   had a right of access to information that might be

18   helpful to them in presenting their defense?

19   A.    Yes.

20   Q.    And that there was a corresponding duty on    10:23:26

21   the part of detectives to make sure prosecutors had

22   that information so they could turn it over to the

23   defendants?

24   A.    Yes.

25   Q.    And that kind of helpful information would    10:23:34

Page 402

1    include prior inconsistent statements by a prosecution

2    witness, right?

3              MR. FREEMAN:  Objection.

4    BY MS. CORNWALL:

5        Q.    You may answer.                          10:23:48

6        A.    You want to say that again.

7        Q.    One kind of information that criminal

8    defendants had a right of access to because it would be

9    helpful to their defense is information that a

10   prosecution witness had given a prior inconsistent     10:24:04

11   statement, right?

12             MR. FREEMAN:  I'm objecting.  I believe this

13       is beyond the scope of knowledge of this

14       witness.  There might be certain instances where

15       a prior inconsistent statement is Brady and       10:24:16

16       certain situations where it's not.

17   BY MS. CORNWALL:

18       Q.    You may answer.

19       A.    I really can't answer that.  I don't know.

20       Q.    Is one of the areas that you understood      10:24:30

21   would be helpful to a criminal defendant and therefore

22   needed to be turned over to the prosecutor leads

23   pointing in the direction of another suspect?

24             MR. FREEMAN:  Objection.  Same objection.

25   BY MS. CORNWALL:                                       10:24:46

Frank Sirianni

Page 403

1      Q.     You may answer.

2      A.     Not necessarily so.

3      Q.     Well, a criminal defendant -- withdrawn.

4             From time to time did you observe any of the

5      trials that you worked on?                           10:24:56

6      A.     After I testified, yes.

7      Q.     And you're aware, are you not, that one

8      legal defense strategy by criminal defendants is to

9      argue someone else did it, it wasn't me?

10     A.     That's what they say, yes.                     10:25:12

11     Q.     And evidence known to the police that would

12     support that defense theory is information that had to

13     be turned over to the prosecutor, right?

14             MR. FREEMAN:  Objection, same.

15             THE WITNESS:  I don't know how to answer      10:25:28

16        that.

17     BY MS. CORNWALL:

18     Q.     Why not?

19     A.     Because I don't.  I just don't know how to

20     answer it.  I've been out of the game a long time.    10:25:34

21     Q.     Are you saying that you don't remember?

22     A.     I don't.

23     Q.     Okay.  Would you agree, sir, that

24     information pointing to a different suspect can be used

25     to show the defendant's innocence?                    10:25:54

Page 404

1      A.    Yes.

2      Q.    And as you testified earlier and we just

3   looked at, defendants had a right of access to any

4   information known to the police that would tend to show

5   their innocence.                              10:26:10

6      A.    Yes.

7      Q.    All right.  You also have testified

8   previously that Detective Volpe is the one who provided

9   information to the prosecutors in the Fusco case,

10  right?                                          10:26:28

11     A.    Yes.

12     Q.    You didn't do that directly.

13     A.    No.   He was the lead detective on that.

14     Q.    And as the lead detective he collected your

15  notes?                                          10:26:38

16     A.    Everybody's notes.

17     Q.    Everybody's notes.

18           And he took responsibility for disclosing

19  information to the prosecutor.

20     A.    Yes.                                    10:26:46

21     Q.    And likewise, those separate case files that

22  were created in the SIB or the crime scene unit, they

23  would take responsibility for directly disclosing their

24  information to the prosecutors, right?

25     A.    Yes.                                    10:27:06

Page 405

1      Q.    Now, you've testified, Mr. Sirianni, that

2   there were biweekly meetings held on this case.

3      A.    Yes.

4      Q.    And those meetings were attended by the CO

5   Shaun Spillane.                                          10:27:30

6      A.    Yes.

7      Q.    Your sergeant Soupy Campbell.

8      A.    Yes.

9      Q.    Lead detective Joe Volpe.

10     A.    Yes.                                             10:27:38

11     Q.    Yourself.

12     A.    Yes.

13     Q.    Detective Perrino.

14     A.    Yes.

15     Q.    Who else?                                        10:27:42

16     A.    Anybody else that was assigned to that case.

17     Q.    Would that include Detective Allen?

18     A.    If he was there, yes.

19     Q.    Would that include police officers

20   Connaughton and Diehl?                                  10:27:54

21     A.    Yes.

22     Q.    How about Detective Dempsey?

23     A.    I'm sure.  I'm sure he was.

24     Q.    And --

25          MR. FREEMAN:  Excuse me for a second.  Could  10:28:08

Frank Sirianni

Page 406

1          I have a question read back.  I think I missed a

2          question.

3               MS. CORNWALL:  Sure.

4               (A discussion was held off the record.)

5               (A portion of the record was read by the

6      reporter.)

7               MR. FREEMAN:  I object.  Could we have a

8          clarification.  Did you mean Brady or just turn

9          the information over to Volpe?

10              MS. CORNWALL:  The question, I believe, was    10:29:14

11          clear.

12              MR. FREEMAN:  Could you read the one before

13          that, please.

14              (A portion of the record was read by the

15      reporter.)

16              MR. FREEMAN:  I object and I think the

17          question is vague and I'm not sure that my

18          client's answer was responsive, so we'll just

19          leave it at that for now.

20              MS. CORNWALL:  Fine.                           10:30:24

21      BY MS. CORNWALL:

22          Q.   Mr. Sirianni, in addition to the biweekly

23      meetings, you were familiar with the case file in the

24      Fusco case.

25          A.   I was familiar with the file.                10:30:40

Frank Sirianni

Page 407

1       Q.    You were familiar with the leads that had

2  come in?

3       A.    We would read the leads that come in.

4       Q.    And you were familiar with the leads that

5  had been investigated.                              10:30:52

6       A.    Yes.

7       Q.    Fair to say there was daily discussion

8  between you and other members of the team about the

9  status of the investigation?

10      A.    We talked about different things, yes.    10:31:02

11      Q.    So when Mr. Freeman asked you a line of

12 questions yesterday about whether information Mr. Smyle

13 was giving you had ever been known to the police

14 department before, you were able to answer those

15 questions because you knew what was in that homicide   10:31:18

16 file.

17      A.    No, I knew I took the statement from Harry

18 Smyle.

19      Q.    And in order to be able to know whether

20 Harry Smyle is offering new information to the        10:31:32

21 investigation, you have to be familiar with what's been

22 done before.

23      A.    What we discussed before.

24      Q.    Right.  So you were up to speed on what had

25 been done in the investigation.                       10:31:48

Frank Sirianni

Page 408

1      A.     At that time.

2      Q.     And during the course of your involvement in

3  this investigation, right?

4      A.     At that time.

5      Q.     That time being?                          10:32:00

6      A.     During the course of the investigation.

7      Q.     All right.  Please take a look at what has

8  previously been marked as Exhibit 163.

9             Do you recognize this document?

10     A.     Yes, I do.                                 10:32:28

11     Q.     What is it?

12     A.     Statement of John T. French.

13     Q.     And whose handwriting is it in?

14     A.     Mine.

15     Q.     When did you take this statement from John   10:32:32

16  T. French?

17     A.     December 7th, 1984.

18     Q.     Given that you were familiar with the status

19  of the investigation, you would, as of the time you

20  took this statement on January 7th of 1984, have been   10:32:58

21  familiar with who John French was, right?

22     A.     At the time I took it.

23     Q.     All right.  And specifically, you would have

24  been familiar with the information in Exhibit 161,

25  notes of an interview with John French from the day     10:33:16

Page 409

1   before.

2        A.    No, I never seen this statement.

3        Q.    You've never seen it?

4        A.    No.

5        Q.    Well, let's go through it together.          10:33:24

6              Why don't you read it into the record if you

7   would?

8        A.    "December 6th, 1984, 1840 hours.  Present at

9   58," I don't know the name of the street, "Malvern, New

10  York, home of John T. French.  He stated that on          10:33:46

11  11-10-84 his 1971 Oldsmobile sedan registration

12  5233-BJN New York, his car was parked on the southwest

13  corner of Lakeview Avenue and Ocean Avenue.  It was

14  stolen some time between 2130 to 2305 hours that date.

15  On 11-18-84 Mr. French went out looking around for his   10:34:18

16  car.  He entered Lakeview and he found it parked on

17  Woodfield Road near the railroad tracks.  He then got

18  his keys and drove the car to Lynbrook PD.  Prior to

19  going to the PD his sister, Lori, found a pair of

20  ladies' blue jeans with stripes.  Blue jeans were        10:34:46

21  inside out.  Jeans were found on right rear floorboard

22  halfway under right passenger seat."

23       Q.    Thank you.

24             So whether or not you had seen Plaintiff's

25  161 before or not, fair to say by the time you went out 10:35:04

Frank Sirianni

Page 410

1    to take this statement from John French on December 7th

2    you were familiar with the information in it.

3        A.    On this statement here?

4        Q.    Yes.

5        A.    I never seen this before.                    10:35:22

6        Q.    Right.

7        A.    I just got this off a lead sheet.  It was a

8    lead sheet with his name on it.  We went out to

9    interview him.

10       Q.    And who is "we"?                              10:35:30

11       A.    Had to be either Perrino or -- I don't

12   really recall if it was Perrino or Connaughton or

13   Diehl.  I don't remember who.

14       Q.    And you went out to see him because he

15   called the police concerned that his car had been     10:35:48

16   stolen the same night that Theresa Fusco had gone

17   missing and it had just been reported that her dead

18   body had been found and he was afraid there might be a

19   connection between the two, right?

20            MR. FREEMAN:  Objection.                      10:36:08

21   BY MS. CORNWALL:

22       Q.    That's why he called the police, right?

23            MR. FREEMAN:  How can this witness say why

24       the other person called the police?

25            THE WITNESS:  I can't answer for him.         10:36:16

Page 411

1    BY MS. CORNWALL:

2        Q.    Sir, you interviewed Mr. French, right?

3        A.    Yes.  But I can't answer why he called the

4    police.

5        Q.    Why did you go out to interview Mr. French?   10:36:24

6        A.    His name was on a lead sheet.

7        Q.    And what did the lead sheet say about him?

8        A.    That the car was -- his car was stolen and

9    it was found at the railroad station and he drove it

10   back to his home.                                     10:36:40

11       Q.    And what did that have to do, if anything,

12   with the Fusco case?

13       A.    The gas station where this car was stolen

14   from was in close proximity to where her body was

15   found.                                                10:36:54

16       Q.    So you went out to take a statement from

17   Mr. French on December 7th of 1984?

18       A.    Yes.

19       Q.    Why don't you read the statement that you

20   took from him into the record, please, it's Exhibit   10:37:04

21   163.

22       A.    "Statement from John T. French taken

23   12-7-84.  My name is John T. French.  I am 21 years

24   old, born on 7-31-63.  I live at 58 Broadway Malvern,

25   New York, with my mother and two sisters.  My home    10:37:26

Frank Sirianni

Page 412

1    phone number is 599-3227.  Today Detective Sirianni of

2    the homicide squad was present at my home where he

3    showed me a length of rope and a brown felt pouch.  I

4    have positively identified the rope and the pouch as

5    mine.  I had the length of rope in the back seat of my    10:37:50

6    car because I used it to tie down a bed that I had

7    transported for my friend.  The felt pouch I used to

8    keep change in.  I'm telling my story to Detective

9    Sirianni of the homicide squad.  I've read it, signed

10   it and it is the truth."                                 10:38:12

11       Q.    All right.  So you had some items that you

12   showed Mr. French on December 7th.

13       A.    Yes.

14       Q.    Where did you get those items to show him?

15       A.    They were taken from the car.               10:38:22

16       Q.    The car that was recovered?

17       A.    Yes.

18       Q.    Well, if you would please take a look at

19   169, previously marked.  It's a collection of

20   photographs.  That's the car you're referring to,      10:38:34

21   right?

22       A.    I believe it is.

23       Q.    All right.  And if you page forward to the

24   second to last page, there's a photograph of a length

25   of rope on the ground.                                 10:39:02

Frank Sirianni

Page 413

1        A.     Yes.

2        Q.     Is that the length of rope that you showed

3    Mr. French and that he identified?

4        A.     It could be.

5        Q.     Did you go out to the scene where these        10:39:16

6    photographs were taken?

7        A.     Yes.

8        Q.     You did.

9               And what was the importance of these -- what

10   appears to be a parking area by the side of a road near  10:39:26

11   railroad tracks?

12       A.     At the time I knew why I went out there, but

13   right now I can't recall why.

14       Q.     Is this the area where Mr. French reported

15   finding his car?                                          10:39:42

16       A.     Yes.

17       Q.     And that was about a week after it had gone

18   missing.

19       A.     Yes.

20       Q.     And so there was a length of rope out there    10:39:54

21   on the ground as reflected in the second to last

22   photograph of Exhibit 169.

23       A.     Yes.

24       Q.     And you showed that to Mr. French and he

25   said, yes, that's the rope that had been in my car.       10:40:12

Page 414

1     A.    Yes, he did.

2     Q.    All right.  Now, what else did you talk to

3  Mr. French about that day?

4     A.    I don't recall.

5     Q.    You became aware, did you not, that a pair    10:40:38

6  of ladies' blue jeans with stripes were found

7  inside-out in his car.

8     A.    Yes.

9     Q.    And the fact that the car had gone missing

10  from an area near where the body was later found, the    10:41:00

11  fact that the timing of when the car went missing was

12  around the same time the victim went missing and the

13  fact that ladies' striped blue jeans were found

14  inside-out in the car all raised a question about

15  whether there was a link between the disappearance of    10:41:20

16  the car and the abduction of Theresa Fusco, right?

17     A.    I would say so.

18     Q.    And that was a lead that was explored by the

19  Nassau County Police Department when Mr. French called

20  in, right?                                              10:41:36

21     A.    Yes.

22     Q.    And you were part of that investigation.

23     A.    As far as taking a statement from him, yes.

24     Q.    Yes.  Fair to say -- withdrawn.

25        The body was found on December 5th of 1984?    10:41:48

Frank Sirianni

Page 415

```
1       A.      Yes.

2       Q.      And he spoke to you two days later?

3       A.      Yes.

4       Q.      Are you aware --

5               MR. FREEMAN:  "He" meaning French?        10:41:58

6               MS. CORNWALL:  Yes.

7    BY MS. CORNWALL:

8       Q.      And are you aware that the Nassau County

9    Police Department took in the vehicle for processing?

10      A.      Yes.                                       10:42:12

11      Q.      In fact, Exhibit 169 shows the vehicle in

12   one of the Nassau County Police Department impound

13   garages, does it not?

14      A.      It's an emergency building.

15      Q.      The emergency services building?          10:42:30

16      A.      Yes.

17      Q.      And the reason why the Nassau County Police

18   Department brought in the car for processing was to see

19   if they could identify forensic evidence in the vehicle

20   linking it to Theresa Fusco.                         10:42:46

21              MR. FREEMAN:  Objection.

22   BY MS. CORNWALL:

23      Q.      Right?

24              MR. FREEMAN:  You're calling for his

25          understanding of what other people did.       10:42:52
```

Frank Sirianni

Page 416

1          MS. CORNWALL:  Yes, I am.

2          THE WITNESS:  The crime scene fellows would

3       take over that, they would check the car.

4    BY MS. CORNWALL:

5       Q.    And wouldn't it be important for a thorough    10:43:06

6    investigation to conduct forensic testing of a vehicle

7    to see if there could -- if there was forensic evidence

8    corroborating the theory that Theresa Fusco had been in

9    the vehicle?

10      A.    I would think so, yes.                          10:43:26

11      Q.    And, in fact, you spoke to Mr. French -- I'm

12   showing you Exhibit 164 -- about the people who had

13   been in his car, right?

14      A.    Yes.

15      Q.    This is another document in your              10:43:44

16   handwriting.

17      A.    Yes, it is.

18      Q.    Reflecting notes of a conversation you had

19   with John French.

20      A.    Yes.                                          10:43:52

21      Q.    By the way, there's no date on this

22   document, is there?

23      A.    None that I see, no.

24      Q.    On the third page of the document what does

25   it say?                                                10:44:06

Frank Sirianni

Page 417

1    A.    Hair sample submitted 12-27-84.

2    Q.    Fair to say that you were asking John French

3  to identify people who had been in his car?

4    A.    Yes.

5    Q.    And you wrote down the answers?          10:44:22

6    A.    Yes, I did.

7    Q.    And you wrote down what color hair each of

8  them had, didn't you?

9    A.    Yes.

10   Q.    Why did you do that?                      10:44:38

11   A.    I wanted to know what color hair they had,

12  that's all.

13   Q.    Well, you didn't ask for a description of

14  those people, did you?

15   A.    No, I did not.                            10:44:46

16   Q.    You just asked for their hair color.

17   A.    Yes.

18   Q.    Because you knew that the Scientific

19  Investigation Bureau was going to be combing that car

20  for hair samples.                               10:44:56

21   A.    Combing it for any type of forensic

22  evidence.

23   Q.    Including hair, right?

24   A.    Hair, blood, semen, anything.

25   Q.    Anything.  And it was important to know who  10:45:04

Page 418

1    had been in the vehicle before so that you could either

2    rule out their hair if hair is found in the car or

3    identify a suspect or the victim, right?

4        A.    Yes.

5        Q.    That's why you were asking who had been in    10:45:26

6    the car and what color hair they had.

7        A.    Yes.

8        Q.    Fair to say -- withdrawn.

9              You were aware, of course, that when Theresa

10   Fusco went missing she'd been last scene wearing    10:45:44

11   striped blue jeans.

12       A.    Yes, it was on the missing poster.

13       Q.    Is Exhibit 168, which I'm showing you, the

14   missing poster that you're referring to?

15       A.    Uh-huh.    10:45:58

16       Q.    And it indicates that she'd been wearing

17   striped blue jeans.

18       A.    Yes, it does.

19       Q.    So the fact that John French's car went

20   missing on the evening of November 10th of 1984 around  10:46:06

21   the same time that Theresa Fusco went missing and was

22   later found with a pair of ladies' striped blue jeans

23   inside-out in the car consistent with what the missing

24   poster reported that she'd been last wearing, that was

25   a big lead at the time for the police department,    10:46:26

1      right?

2           A.    It was something to look at, yes.

3           Q.    It was an important lead to be explored.

4           A.    I would say it would be a lead.

5           Q.    It was the first big lead you had in the        10:46:38

6      case, wasn't it?

7           A.    I can't remember exactly if that was the

8      first big lead or not.

9           Q.    Can you think of any other strong lead you

10     had in the case before the focus turned to John Kogut,   10:46:54

11     John Restivo and Dennis Halstead other than the

12     discovery of John French's car with the inside-out blue

13     striped jeans in it?

14          A.    Not that I can remember.

15          Q.    And this evidence, too, is a lead --           10:47:26

16     withdrawn.

17               There was never any connection between John

18     French's car and John Kogut, John Restivo or Dennis

19     Halstead, right?

20          A.    Not to my knowledge.                           10:47:46

21          Q.    So this is a lead that points in a different

22     direction from those three men.

23          A.    Yes.

24          Q.    So that's information that should have been

25     turned over to the prosecutor as something that would    10:47:56

Page 420

1    be helpful to their defense, right?

2            MR. FREEMAN:  Objection.

3            THE WITNESS:  I have no idea.

4    BY MS. CORNWALL:

5        Q.    You have no idea?                        10:48:12

6        A.    No.

7        Q.    Well, we discussed a moment ago, sir, that

8    information pointing in the direction of a different

9    suspect is one kind of information that helps

10   defendants prove their innocence, right?           10:48:26

11       A.    That's correct.

12       Q.    And information that helps them to prove

13   their innocence is information that has to be turned

14   over to the prosecutor because criminal defendants have

15   a Constitutional right of access to it.            10:48:36

16       A.    That's right.

17       Q.    Okay.  So the information about the

18   disappearance of the French car, the discovery of the

19   French car, the finding of the blue striped jeans

20   inside-out consistent with the jeans the victim had   10:48:48

21   last been seen wearing, that's information consistent

22   with the innocence of John Restivo, Dennis Halstead and

23   John Kogut, right?

24       A.    Yep.

25           MR. FREEMAN:  Objection.                   10:49:02

Page 421

1    BY MS. CORNWALL:

2        Q.    And it should have been turned over.

3        A.    I'm assuming it was.

4        Q.    I'm not asking whether -- you didn't turn it

5    over, did you?                                      10:49:06

6        A.    No.

7        Q.    That would have been Joe Volpe's job?

8        A.    He would have discussed it with Fred Kline.

9        Q.    It would have been his duty to discuss it

10   with Fred Kline, right?                             10:49:16

11       A.    He would have made Fred Kline aware of it.

12       Q.    Well, were you present at any conversations

13   between Mr. Volpe and Mr. Kline?

14       A.    No.

15       Q.    You were relying on Mr. Volpe to do his duty  10:49:26

16   to disclose information that criminal defendants had a

17   right to, as the carrying detective.

18       A.    Yes.

19       Q.    In your conversations with Mr. French in

20   December of 1984 did you learn where he had been when  10:49:50

21   the car went missing?

22       A.    I don't recall what he said.

23       Q.    To your knowledge were the other friends who

24   were gathered together with him when his car went

25   missing, were those people interviewed by the police?  10:50:08

Frank Sirianni

```
                                                    Page 422
 1       A.    Probably were.

 2       Q.    So is it fair to say from your answer that

 3  you're not sure?

 4       A.    I'm not.

 5       Q.    They should have been.                 10:50:22

 6       A.    Yes.

 7       Q.    That would have been the thorough way to go

 8  about things.

 9       A.    I would think so.

10       Q.    To your knowledge, was the gas station     10:50:28

11  attendant at the lot where the car had gone missing

12  interviewed?

13       A.    I don't recall.

14       Q.    He should have been, right?

15       A.    I would assume so.                     10:50:40

16       Q.    For a thorough investigation of the French

17  car lead.

18       A.    Uh-huh.   Yes.

19       Q.    Shaun Spillane was your commanding officer,

20  right?                                            10:51:10

21       A.    Yes, he was.

22       Q.    I'm going to show you two documents, one is

23  a very old what looks like a mimeographed copy, Exhibit

24  184 that's hard to make out so we've gone ahead and

25  typed up another copy which is a lot easier to read.  10:51:30
```

Frank Sirianni

Page 423

1    It's Exhibit 185.

2           And I'd like to ask you a couple of

3    questions to see if you agree with some of the things

4    that your commanding officer said about the case, all

5    right?                                                10:51:50

6    A.    Yes.

7    Q.    And you can refer to whichever version you

8    prefer.

9           MR. FREEMAN:   I don't have time to read

10          this, but I'm assuming it's an accurate copy.   10:51:56

11          And I reserve the right if I find something

12          different to bring that up later.

13          MS. CORNWALL:   Sure.

14   BY MS. CORNWALL:

15   Q.    Let's look at paragraph 2.  On the fourth    10:52:10

16   line down of the Exhibit 185, the retyped version,

17   Shaun Spillane wrote, "During the course of the initial

18   investigation at the command post approximately 500

19   persons were interviewed.  As the investigation

20   progressed, few new developments surfaced.  After       10:52:32

21   approximately two months the precinct squad detectives

22   returned to their commands.  As a result of the

23   manpower loss from the investigation of this case,

24   Detective Volpe requested to have two bureau of special

25   operations men assigned so that they could pick up      10:52:48

Frank Sirianni

Page 424

1      individuals or stake out residences so that they could

2      be interviewed or interrogated by detectives.

3      Subsequently, Police Officer Michael Connaughton and

4      Police Officer William Diehl were assigned to the

5      homicide squad effective January 5th of 1985."          10:53:06

6              Do you see that there?

7      A.      Yes, I do.

8      Q.      Do you agree with CO Spillane that there was

9      a loss of manpower in this homicide investigation after

10     the first month or two?                                  10:53:18

11     A.      Yes.

12     Q.      And Volpe was left without other homicide

13     detectives to work with, so he had to recruit officers

14     Connaughton and Diehl.

15     A.      Yes.                                              10:53:34

16     Q.      And, in fact, there was a period of time in

17     early 1985 when you had less to do with the

18     investigation as well, right?

19     A.      I believe so, yes.

20     Q.      And you picked up again more regularly once     10:53:44

21     you were asked to find Mr. Smyle and you did, in fact,

22     find him.

23     A.      Yes.

24     Q.      Turning to paragraph 7 of CO Spillane's

25     letter, if you would.                                    10:54:02

Frank Sirianni

Page 425

1          Do you have it?

2     A.    Yes, I do.

3     Q.    On the last page of the exhibit the first

4   full sentence at the top of that page says, "This was

5   no" -- it's going to be up here.  Excuse me.  Starting  10:54:26

6   here he writes, "This was no ordinary homicide.  The

7   discovery of the body of a second missing person from

8   Lynbrook aroused the entire South Shore community of

9   Nassau County.  This one had to be solved."

10          Do you see that?                               10:54:50

11     A.    Yes.

12     Q.    And do you agree with CO Spillane that this

13   was no ordinary homicide, it had to be solved?

14          MR. FREEMAN:  Objection.

15   BY MS. CORNWALL:                                      10:55:04

16     Q.    Given the context in which the body was

17   found and the fact that other girls had gone missing in

18   the same county.

19     A.    Every case has to, especially a homicide

20   case, we like to solve every homicide case.           10:55:22

21     Q.    Of course.  Would you agree that there was a

22   particular pressure to solve this homicide case given

23   that other girls had gone missing?

24     A.    Yes.  Are you referring to Kelly Morrissey?

25     Q.    Well, there were a number of other girls,     10:55:38

Frank Sirianni

Page 426

1    right?

2        A.    Yeah.

3        Q.    Jacqueline Martarella?

4        A.    Yeah.

5        Q.    Went missing on March 26th of 1985, March    10:55:44

6    27th of 1985, right?

7        A.    I believe so.

8        Q.    Kelly Morrissey went missing --

9        A.    Still missing.

10       Q.    -- in June of 1984, right?                    10:55:56

11       A.    Yes.

12       Q.    And in that context in particular there was

13   incredible pressure from the community and from the

14   press and from within the department to find the

15   killer.                                                 10:56:06

16            MR. FREEMAN:  Objection.

17            THE WITNESS:  We didn't get any pressure

18       that I know of.  We just did our job.

19   BY MS. CORNWALL:

20       Q.    Would you agree with your CO that this was   10:56:14

21   no ordinary homicide, the discovery of the body of a

22   second missing person from Lynbrook aroused the entire

23   South Shore community of Nassau County?

24       A.    The community was aroused by it, yes.

25       Q.    There was intense public concern about this  10:56:36

Frank Sirianni

Page 427

1   case.

2          MR. FREEMAN:  Objection.

3          THE WITNESS:  I don't know what you mean by

4      intense.  I didn't feel any pressure.

5   BY MS. CORNWALL:                                10:56:48

6      Q.    You personally didn't feel pressure?

7      A.    No.

8      Q.    You weren't the carrying detective, were

9   you?

10     A.    No.                                    10:56:52

11     Q.    You were given assignments and you carried

12  them out.

13     A.    Yes.

14     Q.    It's a very different thing to carry an

15  entire homicide on your shoulders.             10:57:00

16     A.    Yes, it is.

17     Q.    Referring to CO Spillane's letter, let's

18  look at paragraph 4, which I placed in front of you.

19  And there's a highlighted sentence there.

20     A.    Yes.                                   10:57:52

21     Q.    CO Spillane writes, "Once Kogut was

22  arrested" -- and by the way, that's March 27th of 1985,

23  right?

24     A.    I guess it is, yes.

25     Q.    "Once Kogut was arrested, the only thing we  10:58:06

Frank Sirianni

Page 428

1   were left with was a statement of a co-defendant which

2   would not be admissible against the other two

3   defendants.  Unable to speak with them because of the

4   Miranda warnings by the attorney, we were left with a

5   very weak if non-existent case against the other two      10:58:24

6   individuals."

7           Do you see that?

8       A.    Yes, I do.

9       Q.    And the other two individuals refers to John

10  Restivo and Dennis Halstead, right?                        10:58:34

11      A.    Yes.

12      Q.    Do you agree with CO Spillane that as of the

13  date of Kogut's arrest, March 26th or 27th of 1985,

14  there was a very weak if non-existent case against John

15  Restivo and Dennis Halstead?                               10:58:52

16          MR. FREEMAN:  Objection.

17          THE WITNESS:  I can't answer for Shaun and

18      what he thought was weak.

19  BY MS. CORNWALL:

20      Q.    Let me show you his deposition from April       10:59:06

21  21st of 2010.  I'm going to point out to page 253

22  starting at line 22.

23          You see that?

24          I asked him, "Question:  Is it fair to say

25  as of the date of Kogut's arrest, which was March 26th, 10:59:26

Page 429

1  1985, there was a very weak if non-existent case

2  against Mr. Restivo and Mr. Halstead?"

3          And he answered, "Yes."

4          Do you see that?

5      A.    Yes, I do.                                    10:59:38

6      Q.    All right.  Now, as the CO of homicide, he

7  was intimately familiar with the case, right?

8      A.    Yes, he was.

9      Q.    So he was in a position to know how strong

10  the case was against John Restivo and Dennis Halstead   10:59:50

11  as of the date that John Kogut was arrested.

12     A.    Yes.

13     Q.    So do you agree with him that as of March

14  26th of 1985 there was a very weak if non-existent

15  against Mr. Restivo and Mr. Halstead?                  11:00:06

16          MR. FREEMAN:  Objection.

17          THE WITNESS:  I really can't answer that,

18      because I don't know.

19  BY MS. CORNWALL:

20     Q.    Sir, was there any reliable evidence against 11:00:18

21  Mr. Restivo and Mr. Halstead that could be used against

22  them as of March 26th of 1985?

23     A.    You're talking physical evidence?

24     Q.    Any reliable evidence at all.

25     A.    Well, would be the statement that Harry      11:00:38

Page 430

1    Smyle gave.

2        Q.    Which one?

3        A.    The first one where he said he was with John

4    Restivo and they were driving and he mentioned that

5    they'd find her strangled somewhere before the body was    11:00:54

6    even found.

7        Q.    And Harry Smyle gave you that statement

8    when?

9        A.    The 7th, I think.

10       Q.    Of March of 1985.                                 11:01:08

11       A.    I believe so.

12       Q.    Four months after it was publicly reported

13   that Theresa Fusco's body had been found and that she

14   had been strangled, right?

15       A.    Yeah, well, he said that, he stated that        11:01:24

16   prior to Thanksgiving and before Christmas.

17       Q.    But you didn't hear him make that claim

18   until four months after the body had been found

19   strangled, right?

20       A.    Yes.                                            11:01:38

21       Q.    Would you have expected someone who had

22   heard such a thing to have called the police when he

23   heard it?

24       A.    I would suspect somebody would call the

25   police.                                                   11:01:54

Frank Sirianni

Page 431

1    Q.    But he didn't call the police to report

2    that, did he?

3    A.    No, he didn't.

4    Q.    So as of March 26th of 1985, the police

5    department needed to corroborate John Kogut's          11:02:16

6    confession for one, right?

7    A.    Yes.

8    Q.    And it needed to build a case against John

9    Restivo and Dennis Halstead because John Kogut's

10   confession could not be introduced against them.        11:02:26

11           MR. FREEMAN:  Objection.

12           THE WITNESS:  The way I look at it, we first

13       got Harry Smyle; Harry led us to John Restivo;

14       Restivo then led us to Kogut and Halstead.

15   BY MS. CORNWALL:                                         11:02:58

16   Q.    As of March 26th of 1985, when Kogut was

17   arrested, wasn't the case against Mr. Restivo and

18   Mr. Halstead very weak if non-existent?

19           MR. FREEMAN:  Objection.

20           THE WITNESS:  I can't answer that and say it  11:03:24

21       was weak.

22   BY MS. CORNWALL:

23   Q.    You needed more, right?

24   A.    You try to get more.

25   Q.    Well, you needed more.  You didn't have         11:03:32

Frank Sirianni

Page 432

1    probable cause to arrest John Restivo or Dennis

2    Halstead as of March 26th of 1985.

3              MR. FREEMAN:  Objection.

4    BY MS. CORNWALL:

5         Q.   Right?                              11:03:44

6         A.   I'm not going to answer that.

7         Q.   Why not, sir?

8         A.   I don't remember.

9         Q.   You don't remember?

10        A.   No.                                 11:03:50

11        Q.   You don't remember.

12             Other than the Harry Smyle statement can you

13   think of any other evidence incriminating John Restivo

14   and Dennis Halstead as of March 26th of 1985?

15        A.   Not that I can recall.             11:04:02

16        Q.   Did Joe Volpe assign you the job of trying

17   to corroborate the fact that the blue van was operative

18   on November 10th, 1984?

19        A.   He might have.  I don't recall.  He might

20   have, yes.                                   11:04:32

21        Q.   And Harry Smyle was familiar with the blue

22   van, right?

23        A.   So he said, yes.

24        Q.   And he told you that he had seen it up on

25   blocks before Thanksgiving, right?            11:04:38

Frank Sirianni

Page 433

1      A.    I don't recall.

2      Q.    You would need to rely on your

3  contemporaneous notes to be able to remember that?

4      A.    Yes.

5      Q.    But you don't have any reflecting that, do    11:04:50

6  you?

7      A.    Not that I know of, no.

8      Q.    You didn't take a statement from him to that

9  effect either?

10      A.    Not that I recall, no.                          11:05:00

11      Q.    You never made sure the prosecutor was aware

12  Harry Smyle had seen that van on blocks during the two

13  weeks prior to November 14th.

14          MR. FREEMAN:  Objection.

15          THE WITNESS:  Not that I can recall.              11:05:16

16  BY MS. CORNWALL:

17      Q.    Harry Smyle told you specifically that the

18  van was on blocks because the Restivo family did not

19  want Charlie Restivo, John's brother, driving it drunk

20  because they knew he was going to be drunk because he    11:05:30

21  was about to go to jail on November 14th of 1984,

22  right?

23      A.    I don't know about that.  I really don't.

24      Q.    You don't remember that?

25      A.    I don't.                                        11:05:40

Frank Sirianni

Page 434

1    Q.    You would need again to rely on your notes?

2    A.    Yes.

3    Q.    Which, if you took any, you would have

4    handed over to Mr. Volpe.

5    A.    Yes.  They would have been in the file.    11:05:48

6    Q.    Sir, you testified yesterday that Harry

7    Smyle never told you he had a nervous breakdown; do you

8    remember that testimony?

9    A.    Yes.

10   Q.    And is that your recollection today?    11:06:08

11   A.    Thinking back, he did say -- mention that he

12   did have a nervous breakdown.

13   Q.    He did, didn't he?

14   A.    Yes.

15   Q.    So when you testified under questioning from  11:06:20

16   your attorney yesterday that Harry Smyle never told you

17   he had a nervous breakdown, that was wrong.

18   A.    Yes, it was.  But I recalled it later on.

19   Q.    When did you recall that Harry Smyle did, in

20   fact, tell you he had had a nervous breakdown?    11:06:38

21   A.    When I was driving home.

22   Q.    What else in your testimony yesterday was

23   wrong?

24   A.    Nothing that I can remember.

25   Q.    Did you review the transcript of your June    11:06:54

Frank Sirianni

Page 435

1   15th, 2010 deposition at any time before testifying

2   here?

3        A.    No.

4        Q.    Yesterday you testified that Harry Smyle

5   called the police to offer information on March 7th; is 11:07:20

6   that accurate?

7        A.    It could be, yes.

8        Q.    And you also testified that Harry Smyle

9   called the police to offer information on March 27th.

10       A.    Harry used to call quite often.          11:07:40

11       Q.    Uh-huh.  And is it your testimony that each

12   time the police department had contact with Harry Smyle

13   after that first time on March 5th when you went out

14   and you picked him up as he got into his car, each time

15   thereafter Harry Smyle contacted the police department? 11:08:00

16       A.    Yes, he would call.

17       Q.    It wasn't because the police department was

18   going after him; that's your testimony.

19       A.    That's true.

20       Q.    So he was just continually volunteering      11:08:12

21   information.

22       A.    Yes.

23       Q.    Every time after March 5th.

24       A.    Yes, he was.

25       Q.    I believe you testified yesterday that the   11:08:24

Page 436

1    first morning, March 5th -- withdrawn.

2              I believe you testified yesterday that the

3    first time you started surveilling Harry Smyle was

4    about an hour or so before you spoke to him on March

5    5th; is that accurate?                          11:08:44

6    A.    Yeah, could be.

7    Q.    Well, let's do it this way.  When did you

8    begin surveillance on Harry Smyle?

9    A.    I don't really recall, I don't.

10   Q.    Was it the same day that you first spoke to  11:09:02

11   him?

12   A.    I can't recall.

13   Q.    You testified previously that you'd been

14   surveilling him for a couple of days.

15   A.    Yes.                                       11:09:18

16   Q.    Does that sound accurate to you?

17   A.    That sounds right.

18   Q.    And I believe you testified yesterday that

19   on March 5th you were accompanied by Detective Volpe in

20   the unmarked car?                               11:09:30

21   A.    I had to think about that, too.  Either

22   Volpe or Perrino.

23   Q.    So as you sit here today, you're not sure

24   who you were with?

25   A.    Right.                                     11:09:38

Frank Sirianni

Page 437

1        Q.    I believe yesterday you testified that you

2    were with Detective Volpe when questioning Mr. Smyle on

3    the 5th; that was your testimony yesterday, right?

4        A.    I believe that's right, yeah.

5        Q.    And as you sit here today, are you still      11:09:52

6    confident that you questioned Mr. Smyle on March 5th

7    along with Volpe?

8        A.    No, I think it was Danny was with me,

9    Perrino.

10       Q.    So that's something else you were wrong       11:10:02

11   about yesterday.

12       A.    I wasn't wrong, I just can't remember going

13   back 27 years.

14       Q.    Absolutely.  It's been a very long time.

15       A.    Yes, it has.                                  11:10:10

16       Q.    And you know how to say "I don't remember"

17   if, in fact, you don't remember, right?

18       A.    I don't remember.

19       Q.    But you testified that you were with Volpe.

20       A.    Because he was the homicide lead detective.   11:10:18

21           MR. FREEMAN:  I think the record will speak

22        for itself how he answered the question

23        yesterday.

24   BY MS. CORNWALL:

25       Q.    Sir, what's a 262?                            11:10:28

Frank Sirianni

Page 438

1      A.     It's a -- it's the case when you type

2  everything up.

3      Q.     It's a police report, right?

4      A.     Right.

5      Q.     You didn't fill out any police reports in    11:10:42

6  this case, no 262s.

7      A.     No.

8      Q.     Why not?

9      A.     I'm not the lead detective.

10     Q.     So is it your understanding of the practice   11:10:52

11  and the policy in the Nassau County Homicide Unit back

12  in the mid '80s that it is only the lead detectives's

13  job to write formal police reports?

14     A.     Ah, for the whole case it's his

15  responsibility, yeah, to put it down in a 262.        11:11:10

16     Q.     And under what circumstances, as far as you

17  understand it, should a 262 be filled out?

18     A.     When the case is coming to a conclusion.

19     Q.     And what does that mean?  When you've made

20  an arrest?                                            11:11:30

21     A.     When you make an arrest.

22     Q.     And what should be in the 262?

23     A.     From the day we found the body, time of the

24  notification and the day we found the body, everything,

25  crime scene.                                          11:11:44

Page 439

1      Q.    As sort of a closeout report, if you will?

2      A.    It's like, yeah, full report.

3      Q.    And on the lead sheets, some of which we

4   looked at yesterday, there's not a reference to when

5   the sheet is actually filled out, is there?            11:12:02

6      A.    Not that I can recall.

7      Q.    So looking back 20, 25 years later, we don't

8   know when any given lead sheet was actually filled out.

9      A.    No.  We don't.

10           Can we take a break?                           11:12:46

11           MS. CORNWALL:  Sure.

12           VIDEOGRAPHER:  Standby to go off media unit

13       one.  Going off the record at 11:15 a.m.

14           (A recess was taken.)

15           VIDEOGRAPHER:  We're now back on media unit   11:24:12

16       number one.  The time back on the record is

17       11:26 a.m.

18   BY MS. CORNWALL:

19      Q.    Mr. Sirianni, before we broke you testified

20   that the one piece of information that you had that    11:24:32

21   might incriminate John Restivo as of March 26th of '85,

22   separate from the Kogut confession, was the statement

23   you had taken from Harry Smyle on March 7th, right?

24      A.    Yes.

25      Q.    And the reason why you thought that tended    11:24:54

Frank Sirianni

Page 440

1    to incriminate John Restivo was that it was a statement

2    alleging that before Thanksgiving of 1984 Mr. Restivo

3    had said to Mr. Smyle, they'll probably find Theresa

4    Fusco strangled somewhere, right?

5        A.    Yes.                                        11:25:16

6        Q.    And the reason why you thought that was an

7    incriminating statement was that the statement was

8    alleged to have been made before the body was

9    discovered and found to have been strangled.

10       A.    Yes.                                        11:25:34

11       Q.    Now, when we spoke a year ago, we discussed

12   the fact that there were a number of other people out

13   there who had reported hearing that Theresa Fusco was

14   strangled even before her body was found.  Do you

15   remember we discussed that?                           11:25:54

16       A.    I think we did.

17       Q.    Let me show you the exhibit 194 that we were

18   referring to.

19            Feel free to take a look through it and

20   refresh your memory.  As we talked about previously,   11:26:22

21   each of these documents represents a report to the

22   police that there were rumors by various people that

23   Theresa Fusco had been strangled.

24       A.    Yes, on the lead sheets.  Yes.

25       Q.    And that there were a number of different    11:26:48

Frank Sirianni

Page 441

1    people who were circulating that rumor, or who had

2    heard that rumor before December 5th of 1984 when the

3    body was found, right?

4        A.    I believe so.

5        Q.    So after Theresa Fusco was found, did anyone  11:27:04

6    go back to talk to Tim Kehoo, for example?

7        A.    Tim Kehoo?

8        Q.    Withdrawn.

9              After the body was found, anyone go back to

10   any of the people who had earlier reported hearing    11:27:24

11   rumors that the body had been strangled?

12       A.    I don't remember, I really don't.

13       Q.    So you didn't consider them suspects based

14   on the fact that they said, oh, yes, she'd been

15   strangled before it was publicly known?            11:27:40

16       A.    True.

17       Q.    Because it was a rumor.

18       A.    Yes.

19       Q.    Just like if John Restivo had said to Harry

20   Smyle before Thanksgiving of 1984, they'll probably    11:27:48

21   find her strangled, that's repeating a rumor.

22             MR. FREEMAN:  Objection.

23             THE WITNESS:  I can't say it's a rumor,

24        repeating a rumor.  I don't know if John heard

25        the rumor in the beginning.                    11:28:06

Frank Sirianni

Page 442

1    BY MS. CORNWALL:

2        Q.    It's something you'd want to ask.

3        A.    Yes.

4        Q.    Something you'd want to investigate further.

5        A.    Yes.                                    11:28:12

6        Q.    On its face it's no more incriminating than

7    when Tim Kehoo says it or Ann Marie Gerace says it or

8    Maryann Liguori says it before the body is found,

9    right?

10       A.    Yes.                                    11:28:32

11       Q.    Mr. Sirianni, did you ever install a wire

12   tap or eavesdropping device in Harry Smyle's apartment?

13       A.    No.

14       Q.    Are you aware of whether any such device was

15   ever placed in his apartment, his home?          11:28:48

16       A.    No.

17       Q.    You don't know?

18       A.    I don't believe there was one.

19       Q.    Who would have been responsible for doing

20   that if it had been done?                        11:29:02

21       A.    Joe Volpe and Fred Kline.

22       Q.    Presumably there would be some documentation

23   of it if it had happened.

24       A.    Be a warrant.

25             MS. CORNWALL:  I will reserve the balance of  11:29:22

Frank Sirianni

Page 443

1          time, questions for now and defer to

2          Mr. Casteleiro.  Thank you.

3               THE WITNESS:  You're welcome.

4                    CROSS EXAMINATION

5     BY MR. CASTELEIRO:

6      Q.     Good morning, Mr. Sirianni.  I'm Paul

7     Casteleiro.  I don't know if you recall meeting me back

8     in 2010.

9      A.     Without the beard.

10     Q.     Exactly, without the beard.  Without all the  11:29:42

11    gray.

12               I'm going to ask you a couple of questions.

13    I represent Mr. Kogut along with Anthony Grandinette.

14               I want to ask you some questions about the

15    command center.  You referred to the command center in  11:29:54

16    your testimony yesterday to some questions from

17    Mr. Freeman at one point.  The command center was

18    located on Park Place; is that correct?

19     A.     I don't know if it was Park Place or Rocklyn

20    Avenue.                                                   11:30:14

21     Q.     What was the command center?  Did it have a

22    physical structure?

23     A.     It's like an RV.  And the word Nassau County

24    Police Command Center written on it.

25     Q.     And was the RV manned on a continuous basis?  11:30:26

Frank Sirianni

Page 444

1    A.    Yes.

2    Q.    And I take it if it was -- Park Place is the

3 street where you would -- right off of where the body

4 was found, correct?

5    A.    Correct.                              11:30:44

6    Q.    And Rocklyn is the street if you walk down

7 the path where the body was found leads you out to

8 Rocklyn, correct?

9    A.    Correct.

10    Q.    Now, in your testimony I believe you        11:30:56

11 indicated that people would go in and out of the

12 command center.

13    A.    That's true.

14    Q.    At any point in time were you one of the

15 people manning that center?                      11:31:14

16    A.    No.  I was mostly out on the street.

17    Q.    And do you know who was manning it?  Was

18 Detective Volpe manning it?

19    A.    Joe could have been there on the phones.  He

20 could be in and out.                             11:31:28

21    Q.    And I take it you'd be using the command

22 center and you'd also be using police headquarters,

23 detective bureau, correct?

24    A.    Yes.

25    Q.    Detective squad.                        11:31:40

Frank Sirianni

Page 445

1          Could you tell me the period of time that

2     the command center was there?

3          A.    I'd be guessing.  I'd say maybe a month,

4     month and a half, maybe.

5          Q.    Well, in Shaun Spillane's memorandum he        11:31:56

6     refers to kind of at the end of December or the end of

7     January, beginning of January I guess it was that

8     things had died down, leads had died down, correct?

9          A.    That's the first time I've seen his

10    statement.                                                11:32:14

11         Q.    I'm going to show you what's been marked

12    Exhibit 185, which is the more legible copy of it.  He

13    says that, on paragraph 2, it says, "During the course

14    of the initial investigation at the command post,"

15    which I assume is the command center, correct?  Same     11:33:10

16    thing?

17              Pardon?

18         A.    Oh, okay, at the command post?

19         Q.    Yeah.

20         A.    Background?                                    11:33:16

21         Q.    Right.

22         A.    Okay, that's where you're talking about?

23         Q.    Right.

24              Let's go up to paragraph 1, the last full

25    sentence it starts off with, "A homicide command post    11:33:24

Frank Sirianni

Page 446

1    was set up."

2         A.    Yes.

3         Q.    "A homicide command post was set up in the

4    vicinity of Park Place in Lynbrook.  And Detective

5    Volpe and other detectives and approximately five other   11:33:38

6    precinct squad detectives were assigned to assist in

7    the investigation of the murder of Theresa Fusco."

8              That conforms with your memory of it?

9         A.    Yes, it does.

10        Q.    And he then says in paragraph 2 of Exhibit   11:33:50

11   185, on the third full sentence, the fourth line down

12   it says, "During the course of the initial

13   investigation at the command post approximately 500

14   persons were interviewed.  As the investigation

15   progressed, few new developments surfaced.  After   11:34:12

16   approximately two months the precinct detectives

17   returned to their commands."

18        A.    Yes.

19        Q.    Now, as I understand this memo, and you

20   correct me if I'm wrong, that probably at the end of   11:34:30

21   January the command post is done.

22        A.    I would say so.

23        Q.    That would mean these detectives that have

24   been assigned were pulled out and sent back to their

25   regular units, correct?   11:34:44

Page 447

1     A.   Yes.

2     Q.   So for approximately -- can we agree for

3  approximately two months there's a command post sitting

4  at Park Place in Lynbrook by where the body was found,

5  correct?                                          11:35:00

6     A.   Yes.

7     Q.   You had also indicated in your testimony

8  yesterday that Harry Smyle and his wife at some point

9  told you they went and visited the spot where the body

10 was found, correct?                               11:35:16

11    A.   Yes.

12    Q.   And so where the body was found given the

13 command post being present there and Harry Smyle -- did

14 Harry Smyle -- let me backtrack.

15         Did Harry Smyle indicate to you when he and  11:35:28

16 his wife went to visit the scene where the body was

17 found?

18    A.   Gee, I really can't recall.

19    Q.   But it's fair to say that he didn't visit

20 the scene pursuant to directions from the police or    11:35:48

21 somebody like that, he had done this on his own as he

22 told you, correct?

23    A.   Yes, he did.

24    Q.   I assume he told you this in one of the

25 first interviews you had with him.                  11:36:02

Frank Sirianni

Page 448

1      A.      He might have.  I don't recall.

2      Q.      Would it be fair to say that given the

3   command post being there and the obvious notoriety of

4   this particular case and the disappearance of Theresa

5   Fusco and the finding of her body that it was pretty     11:36:26

6   common knowledge exactly where she was found?

7      A.      The area where she was found, yes.

8      Q.      Yeah, the so-called Fort area, because Park

9   Place is right off the Fort area, correct?

10      A.      That's what they called it.  People that     11:36:46

11   grew up in that area called it the Fort.

12      Q.      Right.

13              Now, on March 25th of 1985 you were working

14   the 4 to 12 shift, correct?

15      A.      Yes.                                          11:37:16

16      Q.      And you stayed beyond your shift, correct?

17      A.      Yes.

18      Q.      And as I understand it, you stayed to 3:00

19   in the morning?

20      A.      Yes.                                          11:37:26

21      Q.      And during the time that you were, at least

22   from 12:00 to 3:00 in the morning you were sitting on

23   the wire, which was the wire, the eavesdropping wire of

24   the home of Dennis Halstead, correct, the apartment?

25      A.      Correct.                                      11:37:44

Frank Sirianni

Page 449

1      Q.     And during that period of time you're

2    listening to see whether there's any calls or

3    statements made during any conversations in the home,

4    correct?

5      A.     Correct.                                    11:37:54

6      Q.     And this warrant is actually a warrant

7    bugging the house as opposed to bugging the phone,

8    correct?

9      A.     I don't know what the warrant stated.

10     Q.     Well, it was both, right, you had the phone   11:38:10

11   and you had the home?

12     A.     Whoever applied for it.

13     Q.     Okay.  And you had a monitoring device where

14   you could listen in on any activity, correct?

15     A.     Correct.                                    11:38:24

16     Q.     I take it from reading your prior testimony

17   that you don't recall any particular conversation or

18   substance of any conversation or phone call or anything

19   that you might have heard between 12:00 and 3:00 in the

20   morning on the morning of March the 26th, 1985,        11:38:42

21   correct?

22     A.     Not that I can recall.

23     Q.     Now, you testified yesterday in the

24   questions by Mr. Freeman that when you left at 3 that

25   you might have spoken to Volpe or the supervisor, but   11:39:06

Page 450

1    you don't recall.

2         A.    I don't.

3         Q.    And you also testified that you got a

4    telephone call, you think, to come back at 8:30.

5         A.    8:30 in the morning.                      11:39:26

6         Q.    Correct?

7         A.    Yes.

8         Q.    Now, that testimony differs substantially

9    from your prior testimony on this score, doesn't it?

10        A.    How so?                                   11:39:40

11        Q.    Well, you previously testified that you had

12   a conversation with Joe Volpe at 3:00 in the morning

13   and Volpe told you to come in at 8:30 in the morning.

14        A.    It could have very well happened.

15        Q.    Well, do you recall testifying to exactly  11:39:58

16   those facts that you had a conversation with Joe Volpe

17   and Joe Volpe told you to come in?

18        A.    Probably did.

19             MR. CASTELEIRO:  Could we have the prior

20        deposition?                                     11:40:18

21   BY MR. CASTELEIRO:

22        Q.    I'd ask you to turn to page 190 of -- you

23   recall testifying in the prior deposition, correct?

24        A.    Yes.

25        Q.    Now, if you go down to line 23 on page 190.  11:40:40

Frank Sirianni

Page 451

1    The question is:  "Then they go into the interrogation

2    room" -- by "they" you're referring to Detective Volpe

3    and Mr. Kogut and your testimony here is either

4    Connaughton or Dempsey at 12:00 and you're sitting on

5    the wire.                                              11:41:08

6         A.    Yes.

7         Q.    And they go in and Volpe says -- and I

8    believe at some point before you left Volpe says to

9    you, "Do me a favor, come back at 8:30 in the morning."

10             And you answer, "Yes."                       11:41:18

11        A.    That probably did happen.  I don't recall

12   today unless I look at this here prior testimony.

13        Q.    So you just don't recall?

14             Didn't you review this before you came here?

15   You knew you were coming for a deposition.             11:41:36

16        A.    No, I didn't read this.  This here?

17        Q.    Yeah, this.

18        A.    No.

19        Q.    Your prior testimony.  You ever -- after you

20   testified the last time in deposition, did you ever    11:41:44

21   review a transcript of what your testimony was?

22        A.    No, I forgot about the case after.  I

23   thought that was the end of the case.

24        Q.    Do you recall during your last deposition

25   you were asked a whole series of questions beginning   11:41:58

Frank Sirianni

Page 452

1    page 190 about the fact that Volpe when he comes out

2    and tells you, come back at 3:00?

3              MR. FREEMAN:  You mean come back at 8:30?

4              MR. CASTELEIRO:  Thank you.

5    BY MR. CASTELEIRO:                                11:42:14

6        Q.    When he comes out and tells you at 3:00 to

7    come back at 8:30 in the morning that Volpe never tells

8    you anything about, hey, this case that we've been

9    breaking our backs about is, it's breaking, it's

10   breaking, this guy's in here confessing, do you        11:42:34

11   remember all those questions they asked you?

12       A.    No, I don't.

13       Q.    What I'm going to ask you to do is take a

14   couple of minutes and I want you to read pages 190

15   through page 199.                                    11:42:48

16       A.    From the top of 190?

17       Q.    No, from line 23 on 190 to the top, the

18   first line of page 199.  So it's all of 191 through

19   198.

20       A.    All right.                                 11:44:36

21             Okay.

22       Q.    You've read it?

23             Now, Mr. Sirianni, you've read pages 190 to

24   199?

25       A.    Yes.                                       11:50:52

Frank Sirianni

Page 453

1     Q.    Of the deposition of June the 15th, 2010?

2     A.    Yes.

3     Q.    And during that questioning in that

4  deposition you were asked a series of questions as to

5  who told you to come back at 8:30 in the morning and     11:51:08

6  you indicated that it was Joseph Volpe, correct?

7     A.    Correct.

8     Q.    And you also indicated that during that

9  conversation, or any conversation that night with Volpe

10 that he never said anything to you about a break in the  11:51:30

11 case that this guy was in here confessing, correct?

12    A.    No, he -- correct.

13    Q.    And that you didn't question him, when he

14 told you to come back at 8:30 in the morning you didn't

15 question him, you just assumed it had something to do   11:51:48

16 with the case, but you didn't question him about it,

17 correct?

18    A.    Correct.

19    Q.    And at the time you left at 3:00 on the

20 morning of, early morning hours of March 26th, 1985 you  11:52:04

21 had no idea in a sense that Mr. Kogut was in there

22 confessing because Joe Volpe didn't tell you anything,

23 correct?

24    A.    Correct.

25    Q.    And neither did Detective Dempsey, correct?  11:52:16

Frank Sirianni

Page 454

1      A.    Correct.

2      Q.    And neither did Detective Martino who had

3  all participated in the interrogation of John Kogut

4  that morning, correct?

5      A.    Correct.                                11:52:28

6      Q.    Now, you had indicated to -- strike that.

7           But yet when you testified yesterday,

8  despite fairly extensive questions on what I would

9  consider, you may differ, but I'll ask you, what you

10  consider a significant point that was being made during 11:52:56

11  that questioning that Volpe never told -- Volpe,

12  Dempsey, Martino never told you anything about a

13  confession when you leave at 3:00 in the morning

14  despite your working on the case for, since the

15  discovery of the body, a good four months, told you    11:53:12

16  nothing about it, you walked out of there, you didn't

17  know anything about it, but yet he told you to come

18  back at 8:30.

19           Significant point, isn't it?

20      A.    I don't think so.                        11:53:24

21      Q.    You don't think so.  You don't think that

22  the fact that a case you guys have been working on, a

23  case in which your commanding officer Spillane said

24  approximately 500 people were interviewed at the

25  command post and you've had no break in the case and   11:53:42

Frank Sirianni

Page 455

1    all of a sudden you have this guy who's in there,

2    according to Volpe and Dempsey, confessing and when he

3    comes out and tells you to come back at 3:00 -- at 8:30

4    the next morning now you've worked three hours beyond

5    your shift and he says nothing to you at all about a          11:54:04

6    confession and a break in the case, you don't think

7    that's significant?

8         A.    No.  I do not.

9         Q.    And it's not until the next morning when you

10   come in that you learn for the first time when Joe          11:54:28

11   Volpe hands you this signed statement, correct?

12        A.    Correct.

13        Q.    The signed statement from Kogut that you

14   learned for the first time that, in fact, there's been

15   a confession in the case, correct?                          11:54:46

16        A.    Correct.

17        Q.    As I understand it, you then sit down and

18   you read the confession, correct?

19        A.    I did.

20        Q.    Now, you indicated that, yesterday in           11:55:04

21   questioning by Mr. Freeman that Harry Smyle related a

22   conversation that he had with John Kogut on

23   approximately two weeks before March the 27th, 1985,

24   the conversation had occurred, according to Mr. Smyle,

25   in the Shell Creek Park.  Do you recall that testimony  11:55:42

Frank Sirianni

Page 456

```
 1    you gave yesterday?

 2        A.    Yes.

 3        Q.    And in that testimony that you gave

 4    yesterday you had indicated that Harry Smyle met Kogut

 5    at the Shell Creek Park and told Mr. Kogut that John      11:56:02

 6    Restivo had been picked up by the Nassau County Police

 7    Department, correct?

 8        A.    Correct.

 9        Q.    And then you related that Kogut was really

10    pissed off and mad that Restivo had opened his mouth      11:56:20

11    and was talking, correct?

12        A.    Yes.

13        Q.    And this is all in this conversation of

14    March the 27th, correct?

15        A.    I believe it was, yes.                          11:56:34

16        Q.    But you weren't a participant in the

17    conversation of March 27th, were you?

18        A.    Not that I recall, no.

19        Q.    And as a result of that -- as a result of

20    that interview on March 27th by Detective Perrino of      11:56:50

21    Harry Smyle at which you were not present, he relates

22    the conversation, the alleged conversation he had with

23    John Kogut at the Shell Creek Park some two weeks

24    before March 27th, correct?

25        A.    Yes.                                            11:57:12
```

Frank Sirianni

Page 457

1        Q.     And have you reviewed this statement of

2    Harry Smyle that's been marked as Exhibit 198?

3        A.     I believe I did read it.

4        Q.     And in that statement, the handwritten

5    statement, a five-page statement of Mr. Smyle,          11:57:26

6    Mr. Smyle relates the conversation he allegedly had

7    with John Kogut in the Shell Creek Park, does he not?

8        A.     Yes, he does.

9        Q.     And he states on page 3 of Exhibit 198, "It

10    was between 2:30 and 3:00 I met John Kogut down there"  11:57:48

11    at the park.  I added "At the park."

12             "I had met Kogut through John Restivo at

13    Dennis Halstead's apartment.  I told Kogut that John

14    Restivo had been picked up by the police and

15    questioned.  Kogut was surprised and very inquisitive  11:58:10

16    asking why.  I told him I did not know."

17             That's the sum and substance of the

18    conversation he says he had with John Kogut in his

19    written statement.  And yet you testified yesterday

20    that Kogut was pissed off and angry that Restivo was   11:58:28

21    suddenly talking to the police.

22        A.     I did.

23        Q.     You didn't even participate in the

24    conversation.

25        A.     No, I didn't.                               11:58:42

Page 458

1          Q.    Are you making it up as you go?

2          A.    No, I don't, I didn't.

3          Q.    Well, your partner Perrino took a statement,

4     Exhibit 198, he typed up a statement Exhibit 199 and in

5     both of those statements it relates the same exact      11:58:58

6     content of the conversation that Smyle had with John

7     Kogut on some two weeks before March the 27th, 1985.

8          A.    Uh-huh.

9          Q.    And nowhere in that, in either of those

10    statements is there anything about Kogut being pissed   11:59:22

11    off or Kogut is angry that John Restivo is talking to

12    the police.  In fact, Smyle says to them, says to the

13    police, your partner, who you worked with all these

14    years, says to your partner, I told him I didn't know

15    why he was picked up.                                   11:59:40

16          Correct?

17         A.    That Harry said that?

18         Q.    That Harry said that.

19         A.    Whatever Danny put down on the paper, yeah.

20         Q.    Then you're here testifying now for the      11:59:56

21    first time in the history of this case since 1984 when

22    the case started, December the 5th for the first time

23    ever yesterday you testified that Harry Smyle had a

24    conversation with John Kogut and related the fact that

25    Restivo had been arrested and Kogut was pissed off and  12:00:18

Frank Sirianni

Page 459

1    angry that he was now talking to the police.

2        A.    Well, that was my mistake.

3        Q.    And it never happened, right?  That

4    conversation never, ever happened.

5        A.    That he was pissed off?              12:00:34

6        Q.    This conversation that you related that

7    Smyle said occurred between him and John Kogut.

8        A.    The conversation that Harry had with Danny

9    Perrino that's what I was going by.

10       Q.    Okay, well, that conversation with Danny    12:00:52

11   Perrino there's not a word, not one single word about

12   Kogut being pissed off, Kogut saying anything about

13   Restivo talking to the police, nothing, correct?

14       A.    Yeah.  I was wrong.

15       Q.    You were also wrong when you testified    12:01:22

16   yesterday that when you were on your way to the

17   cemetery that at Lakeview and Ocean Kogut told you guys

18   to make a left-hand turn on to Ocean.  You were also

19   wrong in saying that, correct?

20       A.    Why do you say that?                  12:01:44

21       Q.    Because you've testified repeatedly over the

22   years that you didn't have any conversation with Kogut

23   other than small talk until you got to the corner of

24   Merrick and Ocean, Ocean and Merrick.

25       A.    I think, if I remember, I testified that he    12:01:58

Frank Sirianni

Page 460

1   directed us down to the scene.

2        Q.    You testified yesterday in questions from

3   Mr. Freeman that when you got to the intersection of

4   Lakeview and Ocean Kogut told us to make a left.

5   That's what you testified to yesterday.              12:02:18

6             Now, you've previously testified repeatedly,

7   repeatedly in the trials of Kogut and hearings of Kogut

8   that, in fact, it wasn't until you got to the corner of

9   Ocean and Merrick that Kogut said anything.  And then

10  you asked him, What did you do here?  At the          12:02:40

11  intersection of Ocean and Merrick you asked him, What

12  do you do here?

13            And then he said, make a right.

14            Isn't that correct?

15       A.    If that's what I testified to.             12:02:52

16            MR. CASTELEIRO:  We're stopping.

17            VIDEOGRAPHER:  Before you start another

18        question.  Standby to go off media unit one.  At

19        12:05 going off video record.

20            (A recess was taken.)                       12:06:38

21            VIDEOGRAPHER:  We're now back on media unit

22        number two.  The time back on is 12:11 p.m.

23            (Plaintiff's Exhibit 272 was marked for

24        identification.)

25  BY MR. CASTELEIRO:                                    12:08:44

Frank Sirianni

Page 461

1          Q.    Mr. Sirianni, when we stopped we were

2     talking about when Mr. Kogut first spoke in the car

3     ride to the cemetery.

4          A.    Yes.

5          Q.    I want to show you what's been marked          12:09:00

6     Exhibit 272.  And that's a partial transcript of your

7     testimony in a Huntley hearing in March of 1986 in the

8     case of the people versus John Kogut.

9                Now, in that you were asked at the top of

10    the page 257 it says, "Sergeant Campbell took the most  12:09:44

11    direct route."

12               And there was a question, "Did there come a

13    time that Sergeant Campbell turned to you and asked

14    you, Where do we go now, or words to that effect?

15               And you answered, "No, sir, not that I        12:10:00

16    recall."

17               The next question, "Did you have any

18    conversation with John Kogut while the car was going

19    from police headquarters to the back roads of Garden

20    City, Cherry Valley Road?"

21               "Answer:  No.  He spoke very little.

22               "Question:  Was he smoking at the time?

23               "Answer:  He was mostly smoking the

24    cigarettes.

25               "Question:  Would it be fair to say he was    12:10:24

Page 462

1    chain smoking while in the car?

2             "Answer:  He smoked quite a few.

3             "Now, when you entered Lakeview Avenue up to

4    that point had you had any conversation with John

5    Kogut?                                          12:10:36

6             "Answer:  If I did, it would be small talk.

7             "Question:  While on Lakeview, did you have

8    any conversation with him other than small talk?

9             "Answer:  Not that I recall.

10            "Did there come a time before arriving     12:10:48

11   within the confines of Lynbrook that you asked John

12   Kogut any questions?

13            "Answer:  Not until we got to Ocean Avenue

14   and Merrick Road.

15            "Question:  Now at this point you were going  12:11:04

16   south on Ocean Avenue.

17            "Answer:  That's correct.

18            "Question:  And as you were approaching

19   Merrick Road you asked him a question?

20            "Answer:  Yes, sir, I did."           12:11:14

21            Do you recall that testimony in 1986?

22        A.    Now that I'm looking at it, yes.

23        Q.    I want to show you what's been marked

24   Exhibit 273.

25            (Plaintiff's Exhibit 273 was marked for    12:11:32

Page 463

1    identification.)

2    BY MR. CASTELEIRO:

3        Q.    Page 573 of your testimony at the trial of

4    John Kogut.

5            "Question:  Can you describe what happened    12:12:16

6    when you left the homicide squad?

7            "Answer:  Yes, sir.  We left the homicide

8    squad and he entered the department car number 1062.

9    Detective Sergeant Campbell was the driver.  Detective

10   Waltman was sitting in the front passenger seat.  I was 12:12:32

11   sitting behind Detective Sergeant Campbell and

12   Mr. Kogut was sitting behind Mr. Waltman, Detective

13   Waltman.  We exited the police parking field and drove

14   down to Cherry Hill Road and took that to Woodfield

15   Road.  We took Woodfield Road to Lake Avenue and made a 12:12:50

16   right-hand turn on Lakeview, took it up to Ocean, at

17   that point we made a left-hand turn on Ocean and headed

18   southbound to ocean.

19           "Did there come a time when you reached the

20   area of Lynbrook in Nassau County?                      12:13:06

21           "Answer:  Yes, sir.

22           "Question:  Was that in the vicinity of

23   Ocean Avenue and Merrick Road?

24           "Answer:  Yes, sir, it was.

25           "Question:  Could you describe what happened  12:13:18

Frank Sirianni

Page 464

1   as you were going down Ocean Avenue towards Merrick

2   road?

3          "Answer:  When we got to that vicinity I

4   asked John Kogut, 'What did you do on November 10th,

5   the night of November the 10th?'          12:13:28

6          "He then directed us to make a right-hand

7   turn on Merrick Road from Ocean Avenue and head west

8   bound on Merrick Road."

9          Correct?

10     A.   Correct, sir.                     12:13:40

11     Q.   And nowhere in your previous testimony

12   regarding this ride to the cemetery is there anything

13   about him saying, you have to make a left at the

14   intersection of Lakeview and Ocean, you have to make a

15   left on to Ocean, correct?                12:13:56

16     A.   Correct.

17     Q.   So were you mistaken when you testified

18   yesterday that Mr. Kogut said at the intersection at

19   Lakeview and Ocean to make a left?

20     A.   Yes.                              12:14:08

21     Q.   Now, as you're driving down Ocean heading

22   towards Merrick, as you get close to the intersection

23   of Ocean Avenue -- Ocean and Merrick, on your

24   right-hand side is the cemetery, correct?

25     A.   Correct.                          12:14:28

Frank Sirianni

Page 465

1          Q.    And as you go down Ocean and you're

2    travelling on Ocean, you can see the cemetery by just

3    looking to your right out the window, correct?

4          A.    Correct.

5          Q.    Now, you had been to the cemetery on a        12:14:42

6    number of occasions, correct?  At least two times?

7          A.    Yes.

8          Q.    And you had searched it, correct?

9          A.    Yes.

10         Q.    And I believe you previously testified you    12:14:52

11   spent an hour, hour and a half in the cemetery

12   searching it, prior to March the 26th, 1985, correct?

13         A.    I would say so, yes.

14         Q.    Now, when you testified yesterday you

15   indicated as you got to the cemetery that -- let me     12:15:26

16   withdraw that.

17               Could I have this marked?

18               (Plaintiff's Exhibit 274 was marked for

19   identification.)

20   BY MR. CASTELEIRO:                                      12:16:06

21         Q.    Now, you testified yesterday when you got to

22   the cemetery and you got out of the car very

23   graphically you clasped your hands together and you

24   said you asked Kogut where he, you know, where he

25   killed Theresa Fusco and Kogut put his hands up and     12:16:46

Frank Sirianni

Page 466

1    pointed to a spot in the cemetery, correct?

2        A.    Correct.

3        Q.    Now, you recall testifying in the 2005 trial

4    of John Kogut?

5        A.    Vaguely.                                    12:17:06

6        Q.    Vaguely?

7              Well, I'm going to direct your attention to

8    Exhibit 274 at the bottom of page 1083, which is the

9    first page of this excerpt.  And you were asked the

10   following question by the prosecutor in the case,    12:17:26

11   "Question:  Describe for the Court what happened when

12   you got out of the car at that location."  The

13   cemetery.

14       A.    Which --

15       Q.    When we got out of the car -- I'm sorry,    12:17:42

16   1083, it's the first page in.

17       A.    Okay.

18       Q.    1083, line 22.

19       A.    Okay.

20       Q.    Question is, was asked of you by the trial  12:17:56

21   prosecutor, "Describe for the Court what happened when

22   you got out of the car at that location.

23             "Answer:  When we got out of the car, all

24   four of us, John led me and Sergeant Campbell and

25   Detective Waltman in this pathway going down like this  12:18:14

Frank Sirianni

Page 467

1    to this area."

2              Nothing at all in your answer in the retrial

3    of John Kogut about John Kogut getting out of the car

4    and putting his hands up and pointing to a spot,

5    correct?                                          12:18:34

6         A.    At this time I didn't recall that, but I do

7    now.

8         Q.    Oh, so in 2005 you didn't recall it and you

9    didn't recall it in 1986, you didn't recall it in the

10   first trial of Mr. Kogut, but today you suddenly recall 12:18:44

11   it, or yesterday.

12        A.    You're bringing back old memories.

13        Q.    There's a lot of things you previously

14   testified that you forgot, correct?

15        A.    Yes, I do.  I did.                      12:18:58

16        Q.    When you were being prepped, did you go

17   through that, that part of it -- I'll withdraw that.

18              You were prepped on this case for what,

19   Monday and you were prepped on this case on Tuesday in

20   the morning and then you were prepped six weeks prior  12:19:26

21   to Monday, correct?

22        A.    Correct.

23        Q.    By your attorneys.

24              And then when you testified yesterday for

25   the first time in the history of this case, it's been  12:19:40

Page 468

1   going on since 1984, you testified that when Kogut gets

2   out of the car he puts his hands together, because he's

3   cuffed, correct?

4       A.    Correct.

5       Q.    And he points to the spot where he allegedly  12:19:58

6   killed Theresa Fusco, correct?

7       A.    Yes, he did.

8       Q.    Uh-huh.

9             And in 1986 did you forget that occurred?

10      A.    Yes.                                           12:20:14

11      Q.    And in 2005 when Mr. Kogut was on trial for

12  the murder of Theresa Fusco did you forget that that's

13  what occurred?

14      A.    Yes, I did.

15      Q.    Now, when -- on March the 26th when you go    12:20:36

16  to the spot where Theresa Fusco's body was found, there

17  were pallets still there, correct?

18      A.    Yes.

19      Q.    And there was a marker where Theresa's body

20  was, correct?                                           12:21:00

21      A.    A stick.

22      Q.    A stick.  And they were at the scene for

23  anybody and everybody to see, correct?

24      A.    Whoever knew where her body was found.

25      Q.    Or maybe even whoever had ever been to the    12:21:16

Frank Sirianni

Page 469

1    command center, which was right off of where the body

2    was found, correct?

3        A.    Could be.

4        Q.    Now, when you take Kogut on what you

5    referred to as the tour, this is after you've read the    12:21:42

6    statement, correct?

7        A.    Correct.

8        Q.    And as you're doing this tour, as you, I

9    think, related to Mr. Freeman in his questioning of

10   you, that you're not questioning or interrogating John    12:22:02

11   Kogut as you're doing this tour, correct?

12       A.    No, I'm not.

13       Q.    You're just taking him to the spots where --

14   Waltman is with you, Detective Waltman?

15       A.    Yes.                                            12:22:18

16       Q.    And Soupy Campbell is with you, correct?

17       A.    Yes.

18       Q.    And they also know the contents of the

19   statement, correct?

20       A.    I would assume so, yes.                         12:22:26

21       Q.    And so everybody, all three of you guys know

22   exactly where you're going when you get into the police

23   car at headquarters and start the drive to the

24   cemetery, correct?

25       A.    Yes.                                            12:22:42

Frank Sirianni

Page 470

1    Q.    And you know you're going to go to the

2    cemetery.  And then from the cemetery you know you're

3    going to go to the spot where Theresa's body was found,

4    correct?  A few short blocks away.

5    A.    We knew we were going to the cemetery, but    12:22:56

6    we didn't know where he actually killed her in the

7    cemetery.

8    Q.    You're not answering my question.

9          You're taking him to the cemetery?

10   A.    Yes.                                          12:23:08

11   Q.    You know that, right?

12   A.    Right.

13   Q.    Because he says in this confession, I killed

14   her in the cemetery, correct?

15   A.    Yes.                                          12:23:14

16   Q.    And then you're going to take him, you all

17   know and then you're going to take him to the spot

18   where her body was found, which everybody knows, right?

19   You know it, Sergeant -- I mean Detective Waltman knows

20   it, Soupy Campbell knows it, correct?                12:23:28

21   A.    Correct.

22   Q.    You all know exactly where you're going.

23   A.    Yes.

24   Q.    And your objective is -- your objective is

25   not to interrogate Kogut, correct, as you do this tour? 12:23:38

Frank Sirianni

Page 471

1      A.    Correct.

2      Q.    You're just going to take it here, show us

3  the cemetery, here show us where the body was, correct?

4      A.    Correct.

5      Q.    That's the only thing you're doing.  You're    12:23:48

6  not seeking, as you're doing this, to further

7  interrogate Mr. Kogut.

8      A.    No.

9      Q.    Now, you indicated that the statement of

10 John Kogut in questions by Mr. Freeman yesterday that    12:24:30

11 there were things in the statement that he gave that,

12 you know, the police were not aware of.  And one of the

13 things you said was the police were not aware of that

14 Kogut was coming from a moving job, correct?  That's

15 one of the things you said, right?                        12:24:56

16     A.    Didn't know that.

17     Q.    But the police never, ever corroborated

18 that, correct?

19     A.    I can't answer that.  I don't know.

20     Q.    You said that -- you also said the police    12:25:10

21 were not aware that a group of three men were drinking

22 and smoking pot and that Restivo was driving, Halstead

23 was in the passenger seat and Kogut was on a cushion,

24 correct?

25     A.    Yes.                                           12:25:26

Page 472

1     Q.    That's what you said, you said the police

2   never knew that.

3          Well, the police have never been able to

4   find anything to corroborate that alleged fact,

5   correct?                                        12:25:36

6     A.    Not to my knowledge.

7     Q.    You also said that, oh, the police didn't

8   know she was picked up at the 30-mile-per-hour sign on

9   Merrick Road, correct?

10    A.    That's correct.                          12:25:46

11    Q.    And there's been nothing to corroborate that

12  fact, correct?

13    A.    Correct.

14    Q.    You also said the police didn't know who

15  grabbed her first and there's nothing -- correct, you  12:25:58

16  said that?

17    A.    If I said it.

18    Q.    You said it yesterday, right?

19    A.    Yeah.

20    Q.    And nobody, the police have never been able  12:26:06

21  to corroborate that fact, correct?

22    A.    Not that I know of.

23    Q.    And the police have never been able to

24  corroborate the fact that any one of these three

25  people, Halstead, Restivo or Kogut ever knew Theresa  12:26:22

Page 473

1   Fusco, correct?

2           MR. FREEMAN:  Objection.

3           THE WITNESS:  I can't answer that.  I don't

4       know.

5   BY MR. CASTELEIRO:

6       Q.   You indicated that, in the questions this

7   morning with Ms. Cornwall that Plaintiff's Exhibit 168,

8   the poster of Theresa Fusco --

9       A.   The missing person.

10      Q.   Yeah, the missing person, this poster 168    12:27:16

11  was up all over the area, correct?

12      A.   Yes.

13      Q.   It was -- and I assume it was displayed on

14  lamp posts and in store windows and things like that,

15  correct?                                              12:27:34

16      A.   Yes.

17      Q.   Would you say it was prominently displayed?

18      A.   I would say so, yes.

19      Q.   So people in Lynbrook clearly were aware of

20  it, correct?                                          12:27:48

21      A.   Yes.

22      Q.   And the poster, the poster remained up once

23  Theresa's body was discovered?

24      A.   I don't recall if it was up.

25      Q.   Now, the command center down at the, on Park  12:28:06

Frank Sirianni

Page 474

1    Place, did it have any signage on it other than Nassau

2    County Police Department?

3         A.    Command post.

4         Q.    Command post.

5               And where was that sign that said command    12:28:18

6    post?

7         A.    It's on, I believe it's written on the side

8    of the bus or RV, whatever you want to call it.

9         Q.    And that command post had facilities for, to

10   interview witnesses, correct, inside?              12:28:36

11        A.    Yes.

12        Q.    It had little rooms I take it.

13        A.    No, if I -- that command post in the back I

14   think you'd interview somebody, in the back of the bus.

15             MR. CASTELEIRO:  If I may just have one     12:29:20

16        second.

17   BY MR. CASTELEIRO:

18        Q.    Mr. Sirianni, you indicated that, in a

19   question by Mr. Freeman yesterday that your condition,

20   your health precluded you from flying on doctor's    12:29:48

21   orders, correct?

22        A.    Correct.

23        Q.    Does your condition prevent you from riding

24   in a car any kind of distance or travelling in a train

25   any kind of distance?                               12:30:04

Page 475

1      A.    Yes.

2      Q.    So you're not able to ride in a train or

3   ride in a car, say, you know, a couple --

4      A.    Without oxygen.

5      Q.    Without oxygen.  So if you have oxygen, you    12:30:16

6   can do it?

7      A.    Yeah, but that's a hassle.

8      Q.    It's a hassle.  Okay.

9            I have nothing further.

10           MS. CORNWALL:  We'll reserve the balance of    12:30:26

11        time.

12           MR. FREEMAN:  I have a few questions for

13        clarification.

14           MS. CORNWALL:  I'm not sure if that's

15        covered by the order.                            12:30:34

16           MR. FREEMAN:  It's certainly been done at

17        every deposition I've been to as an

18        accommodation to both sides.  I think you'll

19        recall that, especially by Mr. Grandinette.

20           MS. CORNWALL:  I believe that the             12:30:50

21        questioning, or the proffer to the Court for

22        this particular deposition was a representation

23        that given Mr. Sirianni's health issue you

24        needed to do your direct examination of him for

25        preservation purposes for trial.  And you had an  12:31:08

Frank Sirianni

Page 476

1          order to be able to depose him yesterday and we

2          were given up to three hours today.  That's my

3          understanding.

4              MR. FREEMAN:  Well, I certainly didn't use

5          up my time and I don't believe that the judge's    12:31:22

6          ruling was based on preservation.

7              In any event, I just have a few questions.

8              MS. CORNWALL:  Note my objection for the

9          record.

10                   REDIRECT EXAMINATION

11     BY MR. FREEMAN:

12          Q.   Detective Sirianni, you were asked some

13     questions by Ms. Cornwall about the SIB file.

14          A.   Yes, sir.

15          Q.   Remember those questions?                     12:31:44

16          A.   Yes, sir.

17          Q.   Based on previous questions by Ms. Cornwall,

18     it was determined earlier today that there was a file

19     that Joe Volpe may have had called a case file.

20          A.   Yes, sir.                                     12:32:00

21          Q.   Which he actually did have.

22          A.   Yes, he did.

23          Q.   And I believe it was your testimony that

24     there were separate files kept by SIB.

25          A.   Yes, sir.                                     12:32:12

Page 477

1    Q.    Is that correct?

2    A.    Yes, it is.  They maintain their file.

3    Q.    Do you know for sure that there was a

4    separate SIB file in this case?

5    A.    For a fact, no.                                  12:32:20

6    Q.    But that would be standard operating

7    procedure?

8    A.    Yes, sir.

9    Q.    You were asked a question as to whether the

10   SIB unit, assuming they had a case file, would SIB be   12:32:32

11   responsible for turning over the case file to the

12   prosecutor, or would they turn it over to Volpe first

13   and then their part of the case file or their case file

14   would get turned over to the prosecutor, if you know.

15         MS. CORNWALL:  Objection to form.                 12:32:56

16      Objection, leading.  Objection, asked and

17      answered.

18   BY MR. FREEMAN:

19   Q.    Do you understand my question?

20   A.    If I understand it correctly, you're saying       12:33:02

21   that the SIB tech would bring his folder to Volpe and

22   then Volpe would then --

23   Q.    I don't know the answer to the question.

24   I'm asking you if, according to your understanding, the

25   SIB case file, if one existed, would that go directly   12:33:16

Frank Sirianni

Page 478

1    to the prosecutor, would SIB unit turn over the folder

2    in a homicide case to the prosecutor, or would it go to

3    Volpe first and then turned over to the prosecutor?  If

4    you know.

5            MS. CORNWALL:  Objection.                    12:33:36

6            THE WITNESS:  I really don't remember how

7        that worked at this date.

8    BY MR. FREEMAN:

9        Q.   I'd like you to look at Exhibit Deposition

10   199 and ask you to look at the first paragraph.  Read   12:34:08

11   it to yourself, please.

12           Did you read it?

13       A.   The top paragraph?

14       Q.   Yes.

15       A.   Yes.                                         12:34:54

16       Q.   Okay.  Would you read it into the record,

17   please.

18       A.   "Was surprised and very inquisitive asking

19   why I" --

20       Q.   Why don't you read the beginning of the      12:35:04

21   sentence from the prior page so it has some context.

22       A.   "About two weeks ago on the weekend I took

23   my two kids down to Shell Creek Park Island Park.  It

24   was between 2:30 and 3 p.m.  I met John Kogut down

25   there.  I had met Kogut through John Restivo at Dennis  12:35:22

Frank Sirianni

Page 479

1    Halstead's apartment.  I told Kogut that John Restivo

2    had been picked up by the police and questioned.  Kogut

3    was surprised and very inquisitive asking why.  I told

4    him I did not know.  I then asked him where he was

5    living and he said around the park, but he would not    12:35:42

6    say where.

7            "That night I got a telephone call from John

8    Restivo and he was like a maniac wanting to know why I

9    was telling this to Kogut.  He told me to keep my mouth

10   shut.  I then asked him if he had anything to worry     12:36:00

11   about.  He seemed to quiet down and he said that he did

12   not kill her.  About five minutes later I called up

13   John -- I called John up because I was pissed and told

14   John, if you got problems, don't call my house."

15           MS. CORNWALL:  Objection for the record.       12:36:20

16   BY MR. FREEMAN:

17       Q.    Now, is that paragraph that you just read,

18   is that consistent with your understanding of the facts

19   of this case as you took them during -- or Perrino took

20   them during the investigation of this case?            12:36:42

21       A.    Yes.

22       Q.    Do you see the word "pissed off"?

23       A.    Yes.

24       Q.    Who does that apply to?

25           MS. CORNWALL:  Objection.                       12:36:50

Frank Sirianni

Page 480

1              THE WITNESS:  Restivo.

2    BY MR. FREEMAN:

3       Q.    Did you make a mistake earlier?

4              MS. CORNWALL:  Objection.

5              THE WITNESS:  Yes.                    12:36:54

6    BY MR. FREEMAN:

7       Q.    Who did you attribute it to earlier?

8       A.    To Kogut.

9       Q.    Now that you've read it again to yourself

10   and into the record, are there any other changes or   12:37:04

11   mistakes that you're aware of?

12      A.    No.

13      Q.    Do you recall testifying yesterday that

14   about the incident -- not the incident.  Withdrawn.

15             Do you recall testifying yesterday about   12:37:32

16   leaving the headquarters Nassau County Police

17   Department headquarters the early morning hours of

18   March 26th?  Do you remember you were working a wire?

19      A.    Yes.

20      Q.    And you -- is it fair to say --         12:37:48

21      A.    3:00.

22      Q.    -- you left around 3 a.m.?

23      A.    Yes.

24      Q.    Did you know any specifics about a case

25   breaking?                                       12:38:02

Frank Sirianni

Page 481

1       A.    No, sir, not at that time.

2       Q.    Did you have any feelings with respect to

3   why you were being called back in the morning or why

4   you were, in fact, called back?

5             MR. CASTELEIRO:  Objection.              12:38:14

6             THE WITNESS:  No, sir.

7   BY MR. FREEMAN:

8       Q.    Pardon?

9       A.    No, sir.

10      Q.    Do you recall being asked yesterday whether   12:38:20

11  it was unusual to come back early in the morning after

12  a 4 to 12 shift?

13      A.    Yes, sir.

14      Q.    And why was it unusual to get called back?

15      A.    Why was it unusual?                      12:38:38

16      Q.    Yeah.  I mean, how many hours of sleep had

17  you --

18            MR. CASTELEIRO:  He said it wasn't unusual.

19            THE WITNESS:  About three hours.

20  BY MR. FREEMAN:

21      Q.    I'm sorry if I misspoke.

22            Did you know the reason why you were being

23  called back before you got back at 8:30 in the morning?

24      A.    No, sir.

25      Q.    You testified just a moment ago that the   12:39:02

Frank Sirianni

Page 482

1    object of taking Mr. Kogut out on a tour was to have

2    him point out where certain things happened, correct?

3        A.    Correct.

4        Q.    The object was not to question or

5    interrogate him, correct?                          12:39:22

6        A.    Correct.

7        Q.    Even though the object was not to

8    interrogate him, did he make certain statements during

9    the tour that were incriminating?

10       A.    Yes.                                       12:39:34

11           MR. FREEMAN:  I have nothing further.

12           MR. CASTELEIRO:  Nothing further.

13           MS. CORNWALL:  Nor do I.  Thank you.

14           VIDEOGRAPHER:  Standby to go off video.

15       This concludes media unit two and our            12:39:42

16       deposition.  The time is 12:42 p.m.

17           (The deposition concluded at 12:42 p.m.)

18

19                    _____

20                         FRANK SIRIANNI

21

22   Subscribed and sworn to before me

23   This _____ day of _____, 2012

24   _____

25           NOTARY PUBLIC

Frank Sirianni

Page 483

1                    CERTIFICATE OF OATH

2

3

4

5    STATE OF FLORIDA

6    COUNTY OF PALM BEACH

7

8         I, Tracey LoCastro, RPR, Notary Public,

9    State of Florida, certify that FRANK SIRIANNI

10   personally appeared before me on Wednesday, December

11   14, 2011 and was duly sworn.

12

13        WITNESS my hand and official seal on this

14   29th day of December    , 2011.

15

16

17

18

19   _____

20      TRACEY S. LOCASTRO, RPR

21      Notary Public

22      Commission #DD 0793034

23      Expires July 31, 2012

24

25

Frank Sirianni

Page 484

1                    REPORTER'S CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6           I, TRACEY S. LOCASTRO, RPR, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition of FRANK SIRIANNI; that a review

9    of the transcript was not requested; and that the

10   foregoing transcript, pages 386 through 483, is a true

11   record of my stenographic notes.

12

13          I FURTHER CERTIFY that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18

19          Dated this 29ᵗʰ day of December , 2011

20   at Palm Beach County, Florida.

21

22

23

24   _____

25        TRACEY S. LOCASTRO, RPR

Page 485

1
ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

2

CASE NAME: Kogut v. Nassau County

3
DATE OF DEPOSITION: December 14, 2011

WITNESSES' NAME: Frank Sirianni

4
5
PAGE    LINE (S)        CHANGE                    REASON

___|_____|_____|_____

6
___|_____|_____|_____

7
___|_____|_____|_____

8
___|_____|_____|_____

9
___|_____|_____|_____

10
___|_____|_____|_____

11
___|_____|_____|_____

12
___|_____|_____|_____

13
___|_____|_____|_____

14
___|_____|_____|_____

15
___|_____|_____|_____

16
___|_____|_____|_____

17
___|_____|_____|_____

18
___|_____|_____|_____

19
___|_____|_____|_____

20
21
                                        _____
                                        Frank Sirianni

22
SUBSCRIBED AND SWORN TO BEFORE ME

THIS _____ DAY OF _____, 20__.

23
24

25
_____        _____
(NOTARY PUBLIC)             MY COMMISSION EXPIRES:

Frank Sirianni

**[& - 80s]**                                                                Page 1

**&**

**&**   388:2,7,12

**0**

**06**   387:2,3
**0793034**   483:22

**1**

**1**   445:24
**10**   394:25 396:24
**100**   388:13
**10007**   388:14
**10013**   388:3
**1062**   463:8
**1083**   466:8,16,18
**10:00**   392:18 393:7
**10:14**   387:11 390:7
**10th**   418:20 432:18
   464:4,5
**11-10-84**   409:11
**11-18-84**   409:15
**114**   388:8
**11501**   388:9
**11:15**   439:13
**11:26**   439:17
**12**   396:14 448:14
   481:12
**12-27-84**   417:1
**12-7-84**   411:23
**12:00**   448:22 449:19
   451:4
**12:05**   460:19
**12:11**   460:22
**12:42**   387:11 482:16
   482:17
**14**   387:10 483:11
   485:3
**14th**   390:6 433:13
   433:21
**15th**   399:17 435:1
   453:1
**1601**   387:10
**161**   408:24 409:25
**163**   408:8 411:21

**164**   416:12
**168**   418:13 473:7,10
**169**   412:19 413:22
   415:11
**18**   399:21
**184**   422:24
**1840**   409:8
**185**   423:1,16 445:12
   446:11
**190**   450:22,25 452:1
   452:14,16,17,23
**191**   452:18
**194**   440:17
**1971**   409:11
**198**   452:19 457:2,9
   458:4
**1984**   396:12 400:1
   400:20 401:16
   408:17,20 409:8
   411:17 414:25
   418:20 421:20
   426:10 432:18
   433:21 440:2 441:2
   441:20 458:21
   468:1
**1985**   395:17 400:20
   401:16 424:5,17
   426:5,6 427:22
   428:13 429:1,14,22
   430:10 431:4,16
   432:2,14 448:13
   449:20 453:20
   455:23 458:7
   465:12
**1986**   461:7 462:21
   467:9 468:9
**199**   452:15,18,24
   458:4 478:10

**2**

**2**   423:15 445:13
   446:10
**20**   397:1 439:7
   485:22

**2005**   466:3 467:8
   468:11
**2010**   399:17 428:21
   435:1 443:8 453:1
**2011**   387:10 390:6
   483:11,14 484:19
   485:3
**2012**   483:23
**21**   395:23 411:23
**212.608.0808**   388:14
**212.965.9081**   388:4
**2130**   409:14
**21st**   428:21
**22**   428:22 466:18
**23**   450:25 452:17
**2305**   409:14
**25**   439:7
**253**   428:21
**257**   461:10
**25th**   448:13
**262**   437:25 438:15
   438:17,22
**262s**   438:6
**26th**   426:5 428:13
   428:25 429:14,22
   431:4,16 432:2,14
   439:21 449:20
   453:20 465:12
   468:15 480:18
**27**   437:13
**272**   389:9 460:23
   461:6
**273**   389:10 462:24
   462:25
**274**   389:10 465:18
   466:8
**27th**   426:6 427:22
   428:13 435:9
   455:23 456:14,17
   456:20,24 458:7
**2:30**   457:10 478:24

**3**

**3**   387:13 449:24
   457:9 478:24

**480:22**
**30**   388:13 399:20
   472:8
**31**   483:23
**386**   484:10
**390**   389:2

**4**

**4**   427:18 448:14
   481:12
**40**   395:1
**420**   388:8
**443**   389:3
**460**   389:9
**462**   389:10
**465**   389:10
**476**   389:4
**483**   484:10

**5**

**500**   423:18 446:13
   454:24
**516.248.5317**   388:9
**5233**   409:12
**573**   463:3
**58**   409:9 411:24
**599-3227**   412:1
**5th**   414:25 424:5
   435:13,23 436:1,5
   436:19 437:3,6
   441:2 458:22

**6**

**6695**   387:2,3
**6th**   409:8

**7**

**7**   424:24
**7-31-63**   411:24
**7th**   395:12,17
   408:17,20 410:1
   411:17 412:12
   430:9 435:5 439:23

**8**

**80s**   438:12

**85** 400:1 439:21

**9**

**99** 388:3
**9:15** 392:16
**9:30** 392:16

**a**

**a.m.** 387:11 390:7
   395:1 439:13,17
   480:22
**abduction** 414:16
**able** 407:14,19
   433:3 472:3,20,23
   475:2 476:1
**absolutely** 437:14
**access** 399:8 400:1
   400:21 401:17
   402:8 404:3 420:15
**accommodation**
   475:18
**accompanied**
   436:19
**accurate** 423:10
   435:6 436:5,16
**action** 484:16,17
**activity** 449:14
**added** 457:11
**addition** 406:22
**admissible** 428:2
**afraid** 410:18
**afternoon** 392:2
**ago** 391:12,12,16
   393:14 394:24
   399:7 420:7 440:11
   478:22 481:25
**agree** 403:23 423:3
   424:8 425:12,21
   426:20 428:12
   429:13 447:2
**ah** 438:14
**ahead** 422:24
**al** 387:7
**alleged** 440:8
   456:22 472:4

**allegedly** 457:6
   468:5
**alleging** 440:2
**allen** 405:17
**angry** 457:20
   458:11 459:1
**ann** 442:7
**answer** 400:4,13,24
   402:5,18,19 403:1
   403:15,20 406:18
   407:14 410:25
   411:3 422:2 428:17
   429:17 431:20
   432:6 451:10
   461:21,23 462:2,6,9
   462:13,17,20 463:7
   463:21,24 464:3
   466:23 467:2
   471:19 473:3
   477:23
**answered** 401:9
   429:3 437:22
   461:15 477:17
**answering** 470:8
**answers** 417:5
**anthony** 443:13
**anybody** 405:16
   468:23
**apartment** 442:12
   442:15 448:24
   457:13 479:1
**appearances** 388:1
**appeared** 483:10
**appears** 413:10
**applied** 449:12
**apply** 479:24
**appointment** 391:23
**approaching** 462:18
**approximately**
   423:18,21 446:5,13
   446:16 447:2,3
   454:24 455:23
**april** 428:20
**area** 413:10,14
   414:10 448:7,8,9,11

**463**:20 467:1
   473:11
**areas** 402:20
**argue** 403:9
**aroused** 425:8
   426:22,24
**arrest** 428:13,25
   432:1 438:20,21
**arrested** 427:22,25
   429:11 431:17
   458:25
**arriving** 462:10
**arrow** 399:22
**asked** 399:25 400:10
   400:19 401:5
   407:11 417:16
   424:21 428:24
   451:25 452:11
   453:4 460:10,11
   461:9,13 462:11,19
   464:4 465:24 466:9
   466:20 476:12
   477:9,16 479:4,10
   481:10
**asking** 417:2 418:5
   421:4 457:16
   477:24 478:18
   479:3
**assign** 432:16
**assigned** 396:1
   405:16 423:25
   424:4 446:6,24
**assignment** 396:10
**assignments** 396:6
   396:13 427:11
**assist** 446:6
**assume** 398:21
   422:15 445:15
   447:24 469:20
   473:13
**assumed** 453:15
**assuming** 421:3
   423:10 477:10
**ate** 394:1,6

**attendant** 422:11
**attended** 405:4
**attention** 399:20
   466:7
**attorney** 428:4
   434:16 484:14,16
**attorneys** 390:25
   394:10 467:23
**attribute** 480:7
**authorized** 484:7
**avenue** 409:13,13
   443:20 462:3,13,16
   463:15,23 464:1,7
   464:23
**aware** 397:4 403:7
   414:5 415:4,8 418:9
   421:11 433:11
   442:14 471:12,13
   471:21 473:19
   480:11

**b**

**back** 393:24 406:1
   411:10 412:5
   434:11 437:13
   438:11 439:7,15,16
   441:6,9 443:7
   446:24 450:4 451:9
   452:2,3,7 453:5,14
   454:18 455:3
   460:21,22 461:19
   467:12 474:13,14
   481:3,4,11,14,23,23
**background** 445:20
**backs** 452:9
**backtrack** 447:14
**balance** 442:25
   475:10
**based** 441:13 476:6
   476:17
**basis** 396:15 443:25
**beach** 387:11 483:6
   484:4,20
**beard** 443:9,10

Frank Sirianni

**[bed - collected]**                                                Page 3

bed  412:6
beginning  441:25
  445:7 451:25
  478:20
believe  395:9,13,22
  402:12 406:10
  412:22 424:19
  426:7 430:11
  435:25 436:2,18
  437:1,4 441:4
  442:18 444:10
  451:8 456:15 457:3
  465:10 474:7
  475:20 476:5,23
belvedere  387:10
beyond  402:13
  448:16 455:4
big  418:25 419:5,8
biweekly  405:2
  406:22
bjn  409:12
blocks  432:25
  433:12,18 470:4
blood  398:3 417:24
blue  409:20,20
  414:6,13 418:11,17
  418:22 419:12
  420:19 432:17,21
bodily  398:4
body  410:18 411:14
  414:10,25 425:7,16
  426:21 430:5,13,18
  438:23,24 440:8,14
  441:3,9,11 442:8
  444:3,7 447:4,9,12
  447:16 448:5
  454:15 468:16,19
  468:24 469:1 470:3
  470:18 471:3
  473:23
born  411:24
bottom  466:8
bound  464:8
brady  399:8 402:15
  406:8

break  392:17
  439:10 453:10
  454:25 455:6
breakdown  434:7
  434:12,17,20
breaking  452:9,9,10
  480:25
bring  423:12 477:21
bringing  467:12
broadway  411:24
broke  439:19
brother  433:19
brought  415:18
brown  412:3
brustin  388:2
bugging  449:7,7
build  431:8
building  415:14,15
bureau  397:24
  417:19 423:24
  444:23
bus  474:8,14

**c**

c  390:1
call  430:24 431:1
  435:10,16 449:18
  450:4 474:8 479:7
  479:14
called  410:15,22,24
  411:3 414:19
  430:22 435:5,9
  448:8,10,11 476:19
  479:12,13 481:3,4
  481:14,23
calling  399:20
  415:24
calls  449:2
campbell  405:7
  461:10,13 463:9,11
  466:24 469:16
  470:20
car  409:12,16,18
  410:15 411:8,8,13
  412:6,15,16,20

413:15,25 414:7,9
  414:11,14,16
  415:18 416:3,13
  417:3,19 418:2,6,19
  418:23 419:12,18
  420:18,19 421:21
  421:24 422:11,17
  435:14 436:20
  461:2,18 462:1
  463:8 465:22
  466:12,15,22,23
  467:3 468:2 469:23
  474:24 475:3
carried  427:11
carry  427:14
carrying  421:17
  427:8
case  396:10,18,21
  398:13,14,17,17,20
  398:23,25 404:9,21
  405:2,16 406:23,24
  411:12 419:6,10
  423:4,23 425:19,20
  425:20,22 427:1
  428:5,14 429:1,7,10
  431:8,17 438:1,6,14
  438:18 448:4
  451:22,23 452:8
  453:11,16 454:14
  454:22,23,25 455:6
  455:15 458:21,22
  461:8 466:10
  467:18,19,25
  476:19 477:4,10,11
  477:13,13,25 478:2
  479:19,20 480:24
  485:2
cases  396:4,9,18
  398:11
casteleiro  388:10
  389:4 443:2,5,7
  450:19,21 452:4,5
  460:16,25 463:2
  465:20 473:5
  474:15,17 481:5,18

482:12
cause  387:21 432:1
cemetery  459:17
  461:3 464:12,24
  465:2,5,11,15,22
  466:1,13 469:24
  470:2,2,5,7,9,14
  471:3
center  443:15,15,17
  443:21,24 444:12
  444:15,22 445:2,15
  469:1 473:25
certain  402:14,16
  482:2,8
certainly  475:16
  476:4
certificate  483:1
  484:1
certify  483:9 484:6
  484:13
chain  462:1
change  412:8 485:5
changes  480:10
charlie  433:19
check  416:3
cherry  461:20
  463:14
christmas  430:16
cigarettes  461:24
circulating  441:1
circumstances
  438:16
city  461:20
claim  430:17
clarification  406:8
  475:13
clasped  465:23
clear  406:11
clearly  473:19
client's  406:18
close  411:14 464:22
closeout  439:1
collected  397:16
  404:14

collecting 397:22
398:6
collection 397:5
412:19
color 417:7,11,16
418:6
combing 417:19,21
come 392:1 407:2,3
450:4,13,17 451:9
452:2,3,7 453:5,14
454:17 455:3,10
461:12 462:10
463:19 481:11
comes 452:1,6 455:3
coming 438:18
451:15 471:14
command 423:18
443:15,15,17,21,24
444:12,21 445:2,14
445:15,18,25 446:3
446:13,21 447:3,13
448:3 454:25 469:1
473:25 474:3,4,5,9
474:13
commanding
422:19 423:4
454:23
commands 423:22
446:17
commission 483:22
485:25
common 448:6
community 425:8
426:13,23,24
concern 426:25
concerned 410:15
concluded 482:17
concludes 482:15
conclusion 438:18
condition 474:19,23
conduct 416:6
confessing 452:10
453:11,22 455:2
confession 431:6,10
439:22 454:13

455:6,15,18 470:13
confident 437:6
confines 462:11
conforms 446:8
connaughton
405:20 410:12
424:3,14 451:4
connected 484:16
connection 410:19
419:17
consider 441:13
454:9,10
consistent 400:7,16
401:2,12 418:23
420:20,21 479:18
constitutional
420:15
contact 435:12
contacted 435:15
contemporaneous
433:3
content 458:6
contents 469:18
context 425:16
426:12 478:21
continually 435:20
continuation 390:4
continue 394:5
continued 387:14
continuous 443:25
conversation 416:18
449:17,18 450:12
450:16 453:9,9
455:22,24 456:13
456:17,22,22 457:6
457:18,24 458:6,24
459:4,6,8,10,22
461:18 462:4,8
conversations 394:9
421:12,19 449:3
copy 422:23,25
423:10 445:12
corner 409:13
459:23 460:8

cornwall 388:5
389:3 390:14,17
402:4,17,25 403:17
406:3,10,20,21
410:21 411:1 415:6
415:7,22 416:1,4
420:4 421:1 423:13
423:14 425:15
426:19 427:5
428:19 429:19
431:15,22 432:4
433:16 437:24
439:11,18 442:1,25
473:7 475:10,14,20
476:8,13,17 477:15
478:5 479:15,25
480:4 482:13
correct 392:10
393:4 420:11
443:18 444:4,5,8,9
444:23 445:8,15
446:20,25 447:5,10
447:22 448:9,14,16
448:24,25 449:4,5,8
449:14,15,21 450:6
450:23 453:6,7,11
453:12,17,18,23,24
453:25 454:1,4,5
455:11,12,15,16,18
456:7,8,11,14,24
458:16 459:13,19
460:14 462:17
464:9,10,15,16,24
464:25 465:3,4,6,8
465:12 466:1,2
467:5,14,21,22
468:3,4,6,17,20,23
469:2,6,7,11,16,19
469:24 470:4,14,20
470:21,25 471:1,3,4
471:14,18,24 472:5
472:9,10,12,13,15
472:21 473:1,11,15
473:20 474:10,21
474:22 477:1 482:2

482:3,5,6
correctly 477:20
corresponding
401:20
corroborate 431:5
432:17 472:4,11,21
472:24
corroborated
471:17
corroborating 416:8
counsel 388:5,10,16
389:11 484:14,16
country 388:8
county 387:7 388:16
395:23 397:9
414:19 415:8,12,17
425:9,18 426:23
438:11 443:23
456:6 463:20 474:2
480:16 483:6 484:4
484:20 485:2
couple 392:4 423:2
436:14 443:12
452:14 475:3
course 408:2,6
418:9 423:17
425:21 445:13
446:12
court 387:1 466:11
466:21 475:21
covered 475:15
created 404:22
credibility 400:23
creek 455:25 456:5
456:23 457:7
478:23
crime 397:13,14,15
398:10,22 404:22
416:2 438:25
criminal 399:7
400:1,20 401:16
402:7,21 403:3,8
420:14 421:16
cross 389:2,3 390:13
443:4

**cuffed** 468:3
**cushion** 471:23
**cv** 387:2,3

**d**

**d** 389:1 390:1
**daily** 407:7
**danny** 437:8 458:19
459:8,10
**date** 391:25 399:18
409:14 416:21
428:13,25 429:11
478:7 485:3
**dated** 484:19
**day** 392:1,11,19,21
392:22 393:3
408:25 414:3
436:10 438:23,24
483:14 484:19
485:22
**days** 393:14 415:2
436:14
**dd** 483:22
**dead** 410:17
**debbie** 390:17
**debi** 388:4,5
**december** 387:10
390:6 396:12
408:17 409:8 410:1
411:17 412:12
414:25 421:20
441:2 445:6 458:22
483:10 485:3
**defendant** 388:16
402:21 403:3 428:1
**defendant's** 403:25
**defendants** 387:8,21
399:8 400:1,20
401:16,23 402:8
403:8 404:3 420:10
420:14 421:16
428:3
**defense** 401:18
402:9 403:8,12
420:1

**defer** 443:1
**dempsey** 405:22
451:4 453:25
454:12 455:2
**dennis** 390:18
419:11,18 420:22
428:10,15 429:10
431:9 432:1,14
448:24 457:13
478:25
**department** 397:9
397:12,21 407:14
414:19 415:9,12,18
418:25 426:14
431:5 435:12,15,17
456:7 463:8 474:2
480:17
**depose** 476:1
**deposition** 387:15
387:21 390:5 395:3
395:20 399:17
428:20 435:1
450:20,23 451:15
451:20,24 453:1,4
475:17,22 478:9
482:16,17 484:8
485:3
**describe** 463:5,25
466:11,21
**description** 417:13
**despite** 454:8,14
**detective** 395:23
404:8,13,14 405:9
405:13,17,22 412:1
412:8 421:17
423:24 427:8
436:19 437:2,20
438:9 444:18,23,25
446:4 451:2 453:25
454:2 456:20 463:9
463:9,11,12 466:25
469:14 470:19
476:12
**detectives** 401:21
423:21 424:2,13

446:5,6,16,23
**detectives's** 438:12
**determined** 476:18
**developments**
423:20 446:15
**device** 442:12,14
449:13
**died** 445:8,8
**diehl** 405:20 410:13
424:4,14
**differ** 454:9
**different** 403:24
407:10 419:21
420:8 423:12
427:14 440:25
**differs** 450:8
**direct** 461:11 466:7
475:24
**directed** 460:1
464:6
**direction** 402:23
419:22 420:8
**directions** 447:20
**directly** 404:12,23
477:25
**disappearance**
414:15 420:18
448:4
**disclose** 399:4
421:16
**disclosing** 404:18,23
**discovered** 440:9
473:23
**discovery** 419:12
420:18 425:7
426:21 454:15
**discuss** 421:9
**discussed** 399:3
407:23 420:7 421:8
440:11,15
**discussion** 406:4
407:7
**displayed** 473:13,17
**distance** 474:24,25

**district** 387:1,1
**docket** 387:2
**doctor's** 474:20
**document** 397:18
408:9 416:15,22,24
**documentation**
442:22
**documented** 397:20
**documents** 392:5
393:16,18 394:21
395:20 422:22
440:21
**doing** 398:18 399:1
442:19 469:8,11
471:5,6
**downstairs** 394:1,6
**drinking** 471:21
**drive** 469:23
**driver** 463:9
**driving** 430:4
433:19 434:21
464:21 471:22
**drove** 409:18 411:9
463:13
**drunk** 433:19,20
**duly** 390:10 483:11
**duty** 400:11 401:6
401:20 421:9,15

**e**

**e** 388:4 389:1 390:1
390:1
**earlier** 404:2 441:10
476:18 480:3,7
**early** 424:17 453:20
480:17 481:11
**easier** 422:25
**eastern** 387:1
**eat** 393:25 394:1
**eavesdropping**
442:12 448:23
**effect** 433:9 461:14
**effective** 424:5
**either** 410:11 418:1
433:9 436:21 451:3

458:9
emergency 415:14
  415:15
employee 484:14,15
entered 409:16
  462:3 463:8
entire 425:8 426:22
  427:15
errata 485:1
especially 425:19
  475:19
esq 388:5,10,15,15
estimate 396:20
et 387:7
evening 418:20
event 476:7
everybody 468:23
  469:21 470:18
everybody's 404:16
  404:17
evidence 397:6,16
  397:22 398:2,7,19
  399:8 403:11
  415:19 416:7
  417:22 419:15
  429:20,23,24
  432:13
exact 458:5
exactly 419:7
  443:10 448:6
  450:15 469:22
  470:22
examination 389:2
  389:3,4 390:13
  443:4 475:24
  476:10
examined 390:10
example 441:6
excerpt 466:9
excuse 405:25 425:5
exhibit 389:9,10,10
  408:8,24 411:20
  413:22 415:11
  416:12 418:13
  422:23 423:1,16

425:3 440:17
445:12 446:10
457:2,9 458:4,4
460:23 461:6
462:24,25 465:18
466:8 473:7 478:9
exhibits 389:8,11
existed 477:25
existent 428:5,14
  429:1,14 431:18
exited 463:13
expected 430:21
experience 397:3
expires 483:23
  485:25
explored 414:18
  419:3
extensive 454:8

**f**

face 442:6
facilities 474:9
fact 414:9,11,13
  415:11 416:11
  418:19 424:16,21
  425:17 432:17
  434:20 437:17
  440:12 441:14
  452:1 454:22
  455:14 458:12,24
  460:8 472:4,12,21
  472:24 477:5 481:4
facts 450:16 479:18
fair 396:17 398:16
  407:7 409:25
  414:24 417:2 418:8
  422:2 428:24
  447:19 448:2
  461:25 480:20
fairly 454:8
familiar 398:9
  406:23,25 407:1,4
  407:21 408:18,21
  408:24 410:2 429:7
  432:21

family 433:18
far 414:23 438:16
favor 451:9
feel 427:4,6 440:19
feelings 481:2
fellows 416:2
felt 412:3,7
ferguson 391:10
  401:8
field 463:13
file 398:23,25
  406:23,25 407:16
  434:5 476:13,18,19
  477:2,4,10,11,13,13
  477:25
filed 387:21
files 398:13,17,20
  404:21 476:24
fill 438:5
filled 438:17 439:5,8
financially 484:17
find 423:11 424:21
  424:22 426:14
  430:5 440:3 441:21
  472:4
finding 413:15
  420:19 448:5
fine 399:15 406:20
first 390:10 395:11
  419:5,8 424:10
  425:3 430:3 431:12
  435:13 436:1,3,10
  445:9 447:25
  452:18 455:10,14
  458:21,22 461:2
  466:9,16 467:10,25
  472:15 477:12
  478:3,10
five 446:5 457:5
  479:12
floorboard 409:21
florida 387:11,20
  391:18 483:5,9
  484:3,20

fluids 398:4
flying 474:20
focus 419:10
folder 477:21 478:1
following 466:10
follows 390:11
foregoing 484:8,10
forensic 397:6
  415:19 416:6,7
  417:21
forget 468:9,12
forgot 451:22
  467:14
form 477:15
formal 438:13
fort 448:8,9,11
forty 394:20
forward 412:23
found 409:16,19,21
  410:18 411:9,15
  414:6,10,13,25
  418:2,22 425:17
  430:6,13,18 438:23
  438:24 440:9,14
  441:3,5,9 442:8
  444:4,7 447:4,10,12
  447:17 448:6,7
  468:16,24 469:2
  470:3,18
four 430:12,18
  454:15 466:24
fourth 423:15
  446:11
fpr 483:20 484:24
frank 387:15 390:4
  390:9 483:9 484:8
  485:3,21
fred 421:8,10,11
  442:21
free 440:19
freeman 388:12,15
  389:5 391:10 392:8
  393:1 394:17 402:3
  402:12,24 403:14
  405:25 406:7,12,16

Frank Sirianni

407:11 410:20,23
415:5,21,24 420:2
420:25 423:9
425:14 426:16
427:2 428:16
429:16 431:11,19
432:3 433:14
437:21 441:22
443:17 449:24
452:3 455:21 460:3
469:9 471:10 473:2
474:19 475:12,16
476:4,11 477:18
478:8 479:16 480:2
480:6 481:7,20
482:11
**french** 408:12,16,21
408:25 409:10,15
410:1 411:2,5,17,22
411:23 412:12
413:3,14,24 414:3
414:19 415:5
416:11,19 417:2
420:18,19 421:19
422:16
**french's** 418:19
419:12,18
**friend** 412:7
**friends** 421:23
**front** 427:18 463:10
**full** 425:4 439:2
445:24 446:11
**further** 442:4 471:6
475:9 482:11,12
484:13
**fusco** 396:10,18,21
404:9 406:24
410:16 411:12
414:16 415:20
416:8 418:10,21
440:4,13,23 441:5
446:7 448:5 465:25
468:6,12 473:1,8
**fusco's** 430:13
468:16

**g**

**g** 390:1
**game** 403:20
**garages** 415:13
**garden** 461:19
**gas** 411:13 422:10
**gathered** 421:24
**gee** 447:18
**generally** 401:15
**gerace** 442:7
**getting** 467:3
**ginsberg** 388:12
**girls** 425:17,23,25
**given** 398:17,19
402:10 408:18
425:16,22 427:11
439:8 447:12 448:2
475:23 476:2
**giving** 407:13
**go** 393:8,11 409:5
411:5 413:5 422:7
433:21 439:12
441:6,9 444:11
445:24 450:25
451:1,7 458:1
460:18 461:14
465:1 467:16
468:15 470:1,3
477:25 478:2
482:14
**going** 390:21 398:23
399:1,21 409:19
417:19 422:22
425:5 428:21 432:6
433:20 435:18
437:12 439:13
443:12 445:11
452:13 459:9
460:19 461:18
462:15 464:1 466:7
466:25 468:1
469:22 470:1,3,5,16
470:17,22 471:2

**good** 390:15,16
443:6 454:15
**grabbed** 472:15
**grandinette** 388:7
443:13 475:19
**graphically** 465:23
**gray** 443:11
**great** 399:15
**grew** 448:11
**ground** 412:25
413:21
**group** 471:21
**guess** 396:22,23
427:24 445:7
**guessing** 445:3
**guy** 453:11 455:1
**guy's** 452:10
**guys** 454:22 459:17
469:21

**h**

**hair** 398:3 417:1,7
417:11,16,20,23,24
418:2,2,6
**half** 391:21 399:7
445:4 465:11
**halfway** 409:22
**halstead** 388:5
390:18 419:11,19
420:22 428:10,15
429:2,10,15,21
431:9,14,18 432:2
432:14 448:24
471:22 472:25
**halstead's** 457:13
479:1
**hand** 459:18 463:16
463:17 464:6,24
483:13
**handed** 434:4
**hands** 455:11
465:23,25 467:4
468:2
**handwriting** 395:15
408:13 416:16

**handwritten** 395:14
395:16 457:4
**happen** 451:11
**happened** 442:23
450:14 459:3,4
463:5,25 466:11,21
482:2
**hard** 393:13 422:24
**harry** 395:6,7,17
407:17,20 429:25
430:7 431:13,13
432:12,21 433:12
433:17 434:6,16,19
435:4,8,10,12,15
436:3,8 439:23
441:19 442:12
447:8,13,14,15
455:21 456:4,21
457:2 458:17,18,23
459:8
**hassle** 475:7,8
**head** 464:7
**headed** 463:17
**heading** 464:21
**headquarters**
444:22 461:19
469:23 480:16,17
**health** 474:20
475:23
**hear** 430:17
**heard** 430:22,23
441:2,24 449:19
**hearing** 440:13
441:10 461:7
**hearings** 460:7
**held** 405:2 406:4
**helpful** 399:4,8
401:18,25 402:9,21
420:1
**helps** 399:14 420:9
420:12
**hey** 452:8
**highlighted** 427:19
**hill** 463:14

**[history - june]**                                                    Page 8

history   458:21
  467:25
home   391:17 394:25
  409:10 411:10,25
  412:2 434:21
  442:15 448:24
  449:3,11
homicide   396:7,9,13
  396:18 397:3,4
  398:11,14,16,18,19
  407:15 412:2,9
  424:5,9,12 425:6,13
  425:19,20,22
  426:21 427:15
  429:6 437:20
  438:11 445:25
  446:3 463:6,7 478:2
hotel   394:2,3
hour   391:21 436:4
  465:11,11 472:8
hours   391:22 392:4
  409:8,14 453:20
  455:4 476:2 480:17
  481:16,19
house   392:1 449:7
  479:14
how's   399:14
hudson   388:3
huh   418:15 422:18
  435:11 458:8 468:8
huntley   461:7

i

idea   420:3,5 453:21
identification
  460:24 463:1
  465:19
identified   412:4
  413:3
identify   415:19
  417:3 418:3
importance   413:9
important   416:5
  417:25 419:3

impound   415:12
incident   480:14,14
include   398:22
  402:1 405:17,19
including   417:23
inconsistent   402:1
  402:10,15
incredible   426:13
incriminate   439:21
  440:1
incriminating
  432:13 440:7 442:6
  482:9
indicate   447:15
indicated   444:11
  447:7 453:6,8 454:6
  455:20 456:4
  465:15 471:9 473:6
  474:18
indicates   418:16
individuals   424:1
  428:6,9
information   399:5
  400:2,12,21 401:7
  401:17,22,25 402:7
  402:9 403:12,24
  404:4,9,19,24 406:9
  407:12,20 408:24
  410:2 419:24 420:8
  420:9,12,13,17,21
  421:16 435:5,9,21
  439:20
initial   423:17
  445:14 446:12
innocence   400:3
  403:25 404:5
  420:10,13,22
inquisitive   457:15
  478:18 479:3
inside   409:21 414:7
  414:14 418:23
  419:12 420:20
  474:10
install   442:11

instances   402:14
intense   426:25
  427:4
interested   484:17
interrogate   470:25
  471:7 482:5,8
interrogated   424:2
interrogating
  469:10
interrogation   451:1
  454:3
intersection   460:3
  460:11 464:14,18
  464:22
interview   408:25
  410:9 411:5 456:20
  474:10,14
interviewed   411:2
  421:25 422:12
  423:19 424:2
  446:14 454:24
interviews   447:25
intimately   429:7
introduced   431:10
investigate   442:4
investigated   407:5
investigation   397:23
  398:18 407:9,21,25
  408:3,6,19 414:22
  416:6 417:19
  422:16 423:18,19
  423:23 424:9,18
  445:14 446:7,13,14
  479:20
investigations   397:4
involved   397:5
involvement   408:2
island   478:23
issue   475:23
items   412:11,14

j

jacket   398:17
jackets   398:14

jacqueline   426:3
jail   433:21
january   408:20
  424:5 445:7,7
  446:21
jeans   409:20,20,21
  414:6,13 418:11,17
  418:22 419:13
  420:19,20
job   421:7 426:18
  432:16 438:13
  471:14
joe   405:9 421:7
  432:16 442:21
  444:19 450:12,16
  450:17 453:22
  455:10 476:19
john   390:17 408:12
  408:15,21,25
  409:10 410:1
  411:22,23 416:19
  417:2 418:19
  419:10,11,12,17,18
  419:18 420:22,23
  428:9,14 429:10,11
  430:3 431:5,8,9,13
  432:1,13 439:21
  440:1 441:19,24
  454:3 455:22 456:5
  456:23 457:7,10,12
  457:13,18 458:6,11
  458:24 459:7 461:8
  461:18 462:4,11
  463:4 464:4 466:4
  466:24 467:3,3
  469:10 471:10
  478:24,25 479:1,7
  479:13,13,14
john's   433:19
joseph   453:6
js   387:2,3
judge's   476:5
july   483:23
june   399:17 426:10
  434:25 453:1

| k | | | |
|---|---|---|---|
| **keep** 398:19 412:8 479:9 | **known** 400:2 403:11 404:4 407:13 441:15 | 419:9,15,21 422:17 437:20 438:9,12 439:3,8 440:24 | **llc** 485:1 |
| **kehoo** 441:6,7 442:7 | **knows** 470:18,19,20 | **leading** 477:16 | **llp** 388:2,7 |
| **kelly** 425:24 426:8 | **kogut** 387:4 388:10 | **leads** 402:22 407:1,3 | **locastro** 387:18 483:8,20 484:6,24 |
| **kept** 476:24 | 419:10,18 420:23 | 407:4 444:7 445:8 | **located** 443:18 |
| **keys** 409:18 | 427:21,25 429:11 | **learn** 421:20 455:10 | **location** 466:12,22 |
| **kids** 478:23 | 431:14,16 439:22 | **learned** 455:14 | **logs** 397:19 |
| **kill** 479:12 | 443:13 451:3 | **leave** 392:3 406:19 454:13 | **long** 391:20 393:8,9 393:13 394:19 |
| **killed** 465:25 468:6 470:6,13 | 453:21 454:3 455:13,22 456:4,5,9 | **leaving** 480:16 | 403:20 437:14 |
| **killer** 426:15 | 456:23 457:7,10,12 | **led** 431:13,14 466:24 | **look** 392:5 393:16 394:21 395:19 |
| **kind** 397:5 401:25 402:7 420:9 445:6 | 457:13,15,18,20 458:7,10,11,24,25 | **left** 394:8,10,12,12 394:14 424:12 | 399:16 408:7 412:18 419:2 |
| 474:24,25 | 459:7,12,12,17,22 | 428:1,4 449:24 | 423:15 427:18 |
| **kline** 421:8,10,11,13 442:21 | 460:4,7,7,9 461:2,8 461:18 462:5,12 | 451:8 453:19 459:18 460:4 463:6 | 431:12 440:19 451:12 478:9,10 |
| **knew** 398:12 407:15 | 463:4,12 464:4,18 | 463:7,17 464:13,15 | **looked** 395:4,5 404:3 439:4 |
| 407:17 413:12 417:18 433:20 | 465:24,25 466:4 467:3,3,10 468:1,11 | 464:19 480:22 | **looking** 393:10,18 |
| 451:15 468:24 | 469:4,11 470:25 | **legal** 403:8 | 409:15 439:7 |
| 470:5 472:2,25 | 471:7,10,14,23 | **legible** 445:12 | 462:22 465:3 |
| **know** 393:10 402:19 | 472:25 478:24,25 | **length** 412:3,5,24 413:2,20 | **looks** 422:23 |
| 403:15,19 407:19 | 479:1,2,9 480:8 | **letter** 424:25 427:17 | **lori** 409:19 |
| 409:9 417:11,25 | 482:1 485:2 | **liguori** 442:8 | **loss** 423:23 424:9 |
| 426:18 427:3 429:9 | **kogut's** 428:13,25 431:5,9 | **likewise** 404:21 | **lot** 422:11,25 467:13 |
| 429:18 433:7,23 | | **limani** 388:15 391:10,15 392:9 | **lou** 391:13,14 |
| 437:16 439:8 | | l | 393:1 394:25 | **louis** 388:15 |
| 441:24 442:17 | **ladies** 409:20 414:6 | **line** 399:21 407:11 | **lunch** 393:21 394:7 395:1 |
| 443:7,19 444:17 | 414:13 418:22 | 423:16 428:22 | **lunchtime** 393:11 |
| 449:9 454:17 | **lake** 463:15 | 446:11 450:25 | **lynbrook** 409:18 |
| 457:16 458:14 | **lakeview** 409:13,16 | 452:17,18 466:18 | 425:8 426:22 446:4 |
| 465:24 469:18,21 | 459:17 460:4 462:3 | 485:5 | 447:4 462:11 |
| 470:1,2,6,11,17,19 | 462:7 463:16 | **link** 414:15 | 463:20 473:19 |
| 470:22 471:12,16 | 464:14,19 | **linking** 415:20 | |
| 471:19 472:8,14,22 | **lamp** 473:14 | **listen** 449:14 | m |
| 473:4 475:3 477:3 | **large** 387:20 | **listening** 449:2 | **m** 388:15 |
| 477:14,23 478:4 | **late** 392:2 | **lists** 397:19 | **mad** 456:10 |
| 479:4,8 480:24 | **lawyers** 391:10 | **little** 399:22 461:21 | **mail** 388:4 |
| 481:22 | 393:21 394:13 | 474:12 | **maintain** 477:2 |
| **knowledge** 402:13 | **lead** 404:13,14 | **live** 411:24 | **major** 396:4 |
| 419:20 421:23 | 405:9 410:7,8 411:6 | **living** 479:5 | **making** 458:1 |
| 422:10 448:6 472:6 | 411:7 414:18 | | **malvern** 409:9 411:24 |
| | 418:25 419:3,4,5,8 | | |

Frank Sirianni

maniac 479:8
manned 443:25
manning 444:15,17
  444:18
manpower 423:23
  424:9
march 395:12,17
  426:5,5 427:22
  428:13,25 429:13
  429:22 430:10
  431:4,16 432:2,14
  435:5,9,13,23 436:1
  436:4,19 437:6
  439:21,23 448:13
  449:20 453:20
  455:23 456:14,17
  456:20,24 458:7
  461:7 465:12
  468:15 480:18
marie 442:7
marked 408:8
  412:19 445:11
  457:2 460:23 461:5
  462:23,25 465:17
  465:18
marker 468:19
martarella 426:3
martino 454:2,12
maryann 442:8
material 399:9
mean 406:8 427:3
  438:19 446:23
  452:3 470:19
  481:16
meaning 415:5
media 439:12,15
  460:18,21 482:15
meet 391:5,9 392:15
  393:5
meeting 391:16,20
  392:6,13,25 393:8
  393:13 394:5,22,24
  394:25 443:7
meetings 405:2,4
  406:23

members 407:8
memo 446:19
memorandum
  445:5
memories 467:12
memory 440:20
  446:8
men 419:22 423:25
  471:21
mention 434:11
mentioned 392:8,25
  394:16 430:4
merrick 459:24,24
  460:9,11 462:14,19
  463:23 464:1,7,8,22
  464:23 472:9
met 390:19 391:12
  391:15 392:8 394:7
  394:16 456:4
  457:10,12 478:24
  478:25
michael 424:3
mid 438:12
mile 472:8
mimeographed
  422:23
mine 408:14 412:5
mineola 388:9
minute 393:23
minutes 394:8,20
  395:1 452:14
  479:12
miranda 428:4
missed 406:1
missing 410:17
  413:18 414:9,11,12
  418:10,12,14,20,21
  418:23 421:21,25
  422:11 425:7,17,23
  426:5,8,9,22 473:9
  473:10
misspoke 481:21
mistake 459:2 480:3
mistaken 464:17

mistakes 480:11
moment 420:7
  481:25
monday 391:13
  392:9,22 393:16,19
  393:22 394:10
  467:19,21
monday's 394:25
monitoring 449:13
month 424:10 445:3
  445:4
months 423:21
  430:12,18 446:16
  447:3 454:15
morning 390:15,16
  390:22 393:6
  394:11,17 436:1
  443:6 448:19,22
  449:20,20 450:5,12
  450:13 451:9 452:7
  453:5,14,20,20
  454:4,13 455:4,9
  467:20 473:7
  480:17 481:3,11,23
morrissey 425:24
  426:8
mother 411:25
mouth 456:10 479:9
moving 471:14
murder 446:7
  468:12

n

n 389:1 390:1
nadjia 388:15
  391:13,14,15
name 409:9 410:8
  411:6,23 485:2,3
nassau 387:7 388:16
  395:23 397:9
  414:19 415:8,12,17
  425:9 426:23
  438:11 443:23
  456:6 463:20 474:1
  480:16 485:2

near 409:17 413:10
  414:10
necessarily 403:2
need 433:2 434:1
needed 396:15
  402:22 431:5,8,23
  431:25 475:24
neither 453:25
  454:2
nervous 434:7,12,17
  434:20
neufeld 388:2
never 409:2,3 410:5
  419:17 433:11
  434:7,16 452:7
  453:10 454:11,12
  459:3,4 471:17
  472:2,3,20,23
new 387:1 388:3,3,9
  388:14,14 407:20
  409:9,12 411:25
  423:20 446:15
  485:1
night 410:16 453:9
  464:5 479:7
non 428:5,14 429:1
  429:14 431:18
nooter 388:12
notary 387:19 483:8
  483:21 485:25
note 476:8
notes 404:15,16,17
  408:25 416:18
  433:3 434:1 484:11
notice 387:20
notification 438:24
notoriety 448:3
november 418:20
  432:18 433:13,21
  464:4,5
nsbcivilrights.com
  388:4
number 412:1
  425:25 439:16
  440:12,25 460:22

463:8 465:6

**o**

o  390:1
oath  483:1
object  406:7,16
    482:1,4,7
objected  401:8
objecting  402:12
objection  402:3,24
    402:24 403:14
    410:20 415:21
    420:2,25 425:14
    426:16 427:2
    428:16 429:16
    431:11,19 432:3
    433:14 441:22
    473:2 476:8 477:15
    477:16,16 478:5
    479:15,25 480:4
    481:5
objective  470:24,24
observe  403:4
obvious  448:3
occasions  465:6
occurred  455:24
    459:7 468:9,13
ocean  409:13 459:17
    459:18,24,24 460:4
    460:9,11 462:13,16
    463:16,17,18,23
    464:1,7,14,15,19,21
    464:23,23 465:1,2
offer  435:5,9
offering  407:20
officer  401:6 422:19
    423:4 424:3,4
    454:23
officers  405:19
    424:13
official  483:13
oh  441:14 445:18
    467:8 472:7
okay  392:22 403:23
    420:17 445:18,22

449:13 452:21
    459:10 466:17,19
    475:8 478:16
old  388:8 411:24
    422:23 467:12
oldsmobile  409:11
once  424:20 427:21
    427:25 473:22
opened  456:10
operating  477:6
operations  423:25
operative  432:17
opportunity  390:24
opposed  449:7
order  407:19 475:15
    476:1
orders  474:21
ordinary  425:6,13
    426:21
oxygen  475:4,5,5

**p**

p  390:1
p.m.  387:11 460:22
    478:24 482:16,17
page  389:1,8 399:20
    412:23,24 416:24
    425:3,4 428:21
    450:22,25 452:1,15
    452:18 457:5,9
    461:10 463:3 466:8
    466:9,16 478:21
    485:5
pages  452:14,23
    484:10
pair  409:19 414:5
    418:22
pallets  468:17
palm  387:11 483:6
    484:4,20
paper  458:19
paragraph  423:15
    424:24 427:18
    445:13,24 446:10
    478:10,13 479:17

pardon  445:17
    481:8
park  443:18,19
    444:2 446:4 447:4
    448:8 455:25 456:5
    456:23 457:7,11,11
    473:25 478:23,23
    479:5
parked  409:12,16
parking  413:10
    463:13
part  397:10 401:21
    414:22 467:17
    477:13
partial  461:6
participant  456:16
participate  457:23
participated  454:3
particular  397:8
    425:22 426:12
    448:4 449:17
    475:22
parties  484:14,15
partner  458:3,13,14
passenger  409:22
    463:10 471:23
path  444:7
pathway  466:25
paul  388:10 443:6
pd  409:18,19
people  415:25
    416:12 417:3,14
    421:25 440:12,22
    441:1,10 444:11,15
    448:10 454:24
    461:8 472:25
    473:19
period  424:16 445:1
    449:1
perrino  405:13
    410:11,12 436:22
    437:9 456:20 458:3
    459:9,11 479:19
person  391:5 410:24
    425:7 426:22 473:9

473:10
personally  427:6
    483:10
persons  423:19
    446:14
phone  388:4,9,14
    391:3 394:14 412:1
    449:7,10,18
phones  444:19
photograph  412:24
    413:22
photographed
    397:17
photographs  397:18
    412:20 413:6
physical  429:23
    443:22
pick  423:25
picked  424:20
    435:14 456:6
    457:14 458:15
    472:8 479:2
piece  439:20
pissed  456:10
    457:20 458:10,25
    459:5,12 479:13,22
place  390:5 443:18
    443:19 444:2 446:4
    447:4 448:9 474:1
placed  427:18
    442:15
plaintiff  387:5
    388:10
plaintiff's  389:9,10
    389:10 409:24
    460:23 462:25
    465:18 473:7
plaintiffs  388:5
please  399:16
    406:13 408:7
    411:20 412:18
    478:11,17
point  428:21 443:17
    444:14 447:8 451:8
    454:10,19 462:4,15

463:17 482:2
**pointed** 466:1
**pointing** 402:23
403:24 420:8 467:4
**points** 419:21 468:5
**police** 397:9 400:2
401:6 403:11 404:4
405:19 407:13
410:15,22,24 411:4
414:19 415:9,12,17
418:25 421:25
424:3,4 430:22,25
431:1,4 435:5,9,12
435:15,17 438:3,5
438:13 440:22
443:24 444:22
447:20 456:6
457:14,21 458:12
458:13 459:1,13
461:19 463:13
469:22 471:12,13
471:17,20 472:1,3,7
472:14,20,23 474:2
479:2 480:16
**policy** 438:11
**portion** 406:5,14
**position** 429:9
**positively** 412:4
**post** 423:18 445:14
445:18,25 446:3,13
446:21 447:3,13
448:3 454:25 474:3
474:4,6,9,13
**poster** 418:12,14,24
473:8,10,22,22
**posts** 473:14
**pot** 471:22
**pouch** 412:3,4,7
**practice** 438:10
**precinct** 423:21
446:6,16
**precluded** 474:20
**prefer** 423:8
**prepare** 390:25
391:11 395:2,20

**prepped** 467:16,18
467:19,20
**present** 409:8 412:2
421:12 447:13
456:21
**presenting** 401:18
**preservation** 475:25
476:6
**press** 426:14
**pressure** 425:22
426:13,17 427:4,6
**presumably** 442:22
**pretty** 448:5
**prevent** 474:23
**previous** 464:11
476:17
**previously** 399:4
404:8 408:8 412:19
436:13 440:20
450:11 460:6
465:10 467:13
**prior** 396:9 402:1,10
402:15 409:18
430:16 433:13
449:16 450:9,19,23
451:12,19 465:12
467:20 478:21
**probable** 432:1
**probably** 393:7
398:24 422:1 440:3
441:20 446:20
450:18 451:11
**problems** 479:14
**procedure** 477:7
**processing** 415:9,18
**professional** 387:19
**proffer** 475:21
**progressed** 423:20
446:15
**prominently** 473:17
**prosecution** 400:12
400:22 402:1,10
**prosecutor** 401:7
402:22 403:13
404:19 419:25

420:14 433:11
466:10,21 477:12
477:14 478:1,2,3
**prosecutors** 401:21
404:9,24
**protocols** 398:10
**prove** 420:10,12
**provide** 400:11
**provided** 404:8
**proximity** 411:14
**public** 387:19
426:25 483:8,21
485:25
**publicly** 430:12
441:15
**pulled** 446:24
**purposes** 475:25
**pursuant** 387:20
447:20
**put** 438:15 458:19
465:25
**puts** 468:2
**putting** 467:4

**q**

**question** 400:10
406:1,2,10,17
414:14 428:24
437:22 451:1
453:13,15,16
460:18 461:12,17
461:22,25 462:7,15
462:18,19 463:5,22
463:25 466:10,11
466:20 470:8
474:19 477:9,19,23
482:4
**questioned** 392:11
437:6 457:15 479:2
**questioning** 434:15
437:2 453:3 454:11
455:21 469:9,10
475:21
**questions** 390:21
407:12,15 423:3

443:1,12,14,16
449:24 451:25
452:11 453:4 454:8
460:2 462:12
471:10 473:6
475:12 476:7,13,15
476:17
**quiet** 479:11
**quite** 435:10 462:2

**r**

**r** 390:1
**railroad** 409:17
411:9 413:11
**raised** 414:14
**reached** 463:19
**read** 406:1,5,12,14
407:3 409:6 411:19
412:9 422:25 423:9
451:16 452:14,22
452:23 455:18
457:3 469:5 478:10
478:12,16,20
479:17 480:9
**reading** 449:16
**really** 393:12 402:19
410:12 429:17
433:23 436:9
441:12 447:18
456:9 478:6
**rear** 409:21
**reason** 415:17
439:25 440:6
481:22 485:5
**recall** 393:9,17,20
394:23 398:14
399:6,10 410:12
413:13 414:4
421:22 422:13
432:15,19 433:1,10
433:15 434:19
436:9,12 439:6
443:7 447:18 448:1
449:17,22 450:1,15
450:23 451:11,13

**[recall - rv]**

451:24 455:25
456:18 461:16
462:9,21 466:3
467:6,8,9,9,10
473:24 475:19
480:13,15 481:10
**recalled** 434:18
**recess** 439:14
460:20
**recognize** 408:9
**recollection** 434:10
**record** 390:4,6
406:4,5,14 409:6
411:20 437:21
439:13,16 460:19
476:9 478:16
479:15 480:10
484:11
**recovered** 412:16
**recruit** 424:13
**redirect** 389:4
476:10
**refer** 423:7
**reference** 439:4
**referred** 443:15
469:5
**referring** 392:19,22
412:20 418:14
425:24 427:17
440:18 451:2
**refers** 428:9 445:6
**reflected** 413:21
**reflecting** 416:18
433:5
**refresh** 440:20
**regarding** 464:12
**registered** 387:18
**registration** 409:11
**regular** 446:25
**regularly** 424:20
**related** 455:21
456:9 458:24 459:6
469:9
**relates** 456:21 457:6
458:5

**relative** 484:13,15
**reliable** 429:20,24
**rely** 433:2 434:1
**relying** 421:15
**remained** 473:22
**remember** 391:25
393:13,18 399:11
403:21 410:13
419:7,14 432:8,9,11
433:3,24 434:8,24
437:12,16,17,18
440:15 441:12
452:11 459:25
476:15 478:6
480:18
**repeatedly** 459:21
460:6,7
**repeating** 441:21,24
**report** 431:1 438:3
439:1,2 440:21
484:7
**reported** 387:18
410:17 413:14
418:24 430:12
440:13 441:10
**reporter** 387:19
406:6,15
**reporter's** 484:1
**reporting** 485:1
**reports** 438:5,13
**represent** 390:17
443:13
**representation**
475:22
**represents** 440:21
**requested** 423:24
484:9
**reserve** 423:11
442:25 475:10
**residences** 424:1
**respect** 481:2
**responsibility**
398:12 399:4
404:18,23 438:15

**responsible** 397:10
397:21 398:6
442:19 477:11
**responsive** 406:18
**restaurant** 394:3
**restivo** 388:5 390:18
419:11,18 420:22
428:10,15 429:2,10
429:15,21 430:4
431:9,13,14,17
432:1,13 433:18,19
439:21 440:1,2
441:19 456:6,10
457:12,14,20
458:11,25 459:13
471:22 472:25
478:25 479:1,8
480:1
**result** 423:22 456:19
456:19
**retained** 389:11
**retrial** 467:2
**returned** 423:22
446:17
**retyped** 423:16
**review** 434:25
451:14,21 484:8
**reviewed** 457:1
**ride** 461:3 464:12
475:2,3
**riding** 474:23
**right** 390:19,23
392:14,24 395:24
395:25 397:3 399:8
399:18 400:1,8,19
400:21,25 401:10
401:17 402:2,8,11
403:13 404:3,7,10
404:24 407:24
408:3,7,21,23
409:21,22 410:6,19
410:22 411:2
412:11,21,23
413:13 414:2,16,20
415:23 416:13

417:23 418:3 419:1
419:19 420:1,10,15
420:16,23 421:10
421:17 422:14,20
423:5,11 424:18
426:1,6,10 427:23
428:10 429:6,7
430:14,19 431:6,23
432:5,22,25 433:22
436:17,25 437:3,4
437:17 438:3,4
439:23 440:4 441:3
442:9 444:3 445:21
445:23 448:9,12
449:10 452:20
459:3 460:13
463:16 464:6,24
465:3 469:1 470:11
470:12,18 471:15
472:18
**road** 387:10 388:8
409:17 413:10
461:20 462:14,19
463:14,15,15,23
464:2,7,8 472:9
**roads** 461:19
**robbery** 396:2
**rocklyn** 443:19
444:6,8
**room** 451:2
**rooms** 474:12
**rope** 412:3,4,5,25
413:2,20,25
**route** 461:11
**rpr** 483:8,20 484:6
484:24
**rule** 418:2
**ruling** 476:6
**rumor** 441:1,2,17
441:21,23,24,25
**rumors** 440:22
441:11
**rv** 443:23,25 474:8

| s | | | |
|---|---|---|---|
| s  387:18 390:1 483:20 484:6,24 485:5 | seeking  471:6 | showed  412:3,12 413:2,24 | situations  402:16 |
| sample  417:1 | seen  409:2,3,24 410:5 420:21 432:24 433:12 445:9 | showing  416:12 418:13 | six  391:12,12,15 394:24 467:20 |
| samples  417:20 | semen  417:24 | shows  415:11 | sleep  481:16 |
| saying  403:21 459:12,19 464:13 477:20 | sense  453:21 | shut  479:10 | small  459:23 462:6 462:8 |
| says  425:4 442:7,7,8 445:13,13 446:10 446:12 451:7,8 455:5 457:18 458:12,12,14 461:10 470:13 | sent  446:24 | sib  397:25 398:6,10 398:18,25 404:22 476:13,24 477:4,10 477:10,21,25 478:1 | smoked  462:2 |
| scene  397:13,14,17 398:10,22 404:22 413:5 416:2 418:10 438:25 447:16,20 460:1 468:22 | sentence  425:4 427:19 445:25 446:11 478:21 | side  413:10 464:24 474:7 | smoking  461:22,23 462:1 471:22 |
| scheck  388:2 | separate  404:21 439:22 476:24 477:4 | sides  475:18 | smyle  395:7,17 407:12,18,20 424:21 430:1,7 431:13 432:12,21 433:12,17 434:7,16 434:19 435:4,8,12 435:15 436:3,8 437:2,6 439:23 440:3 441:20 447:8 447:13,14,15 455:21,24 456:4,21 457:2,5,6 458:6,12 458:23 459:7 |
| scientific  397:23 417:18 | sergeant  405:7 461:10,13 463:9,11 466:24 470:19 | sign  395:17 472:8 474:5 | |
| scope  402:13 | series  451:25 453:4 | signage  474:1 | |
| score  450:9 | serio  388:7 | signed  395:12 412:9 455:11,13 | smyle's  395:6 442:12 |
| screen  397:15 | serology  398:4 | significant  454:10 454:19 455:7 | solve  425:20,22 |
| seal  483:13 | services  415:15 | single  459:11 | solved  425:9,13 |
| searched  465:8 | set  446:1,3 | sir  403:23 411:2 420:7 429:20 432:7 434:6 437:25 461:15 462:20 463:7,21,24 464:10 476:14,16,20,25 477:8 481:1,6,9,13 481:24 | somebody  430:24 447:21 474:14 |
| searching  465:12 | share  401:7 | | sorry  466:15 481:21 |
| seat  409:22 412:5 463:10 471:23 | shaun  405:5 422:19 423:17 428:17 445:5 | | sort  439:1 |
| second  405:25 412:24 413:21 425:7 426:22 474:16 | she'd  418:10,16,24 441:14 | | sound  436:16 |
| | sheet  410:7,8 411:6 411:7 439:5,8 485:1 | sirianni  387:15 390:9,15,24 405:1 406:22 412:1,9 439:19 442:11 443:6 452:23 461:1 474:18 476:12 483:9 484:8 485:3 485:21 | sounds  436:17 |
| sedan  409:11 | sheets  439:3 440:24 | | soupy  405:7 469:16 470:20 |
| see  399:13,23 400:5 400:14 410:14 415:18 416:7,23 423:3 424:6 425:10 428:7,23 429:4 449:2 465:2 468:23 479:22 | shell  455:25 456:5 456:23 457:7 478:23 | | south  425:8 426:23 462:16 |
| | shift  448:14,16 455:5 481:12 | | southbound  463:18 |
| | shore  425:8 426:23 | sirianni's  390:5 475:23 | southwest  409:12 |
| | short  394:7 470:4 | sister  409:19 | speak  391:3 394:13 428:3 437:21 |
| | shoulders  427:15 | sisters  411:25 | speaking  401:15 |
| | show  399:13 400:3 403:25 404:4 412:14 422:22 428:20 440:17 445:11 461:5 462:23 471:2,3 | sit  436:23 437:5 455:17 | special  423:24 |
| | | sitting  447:3 448:22 451:4 463:10,11,12 | specifically  408:23 433:17 |

specifics 480:24
speed 407:24
spent 465:11
spillane 405:5
 422:19 423:17
 424:8 425:12
 427:21 428:12
 454:23
spillane's 424:24
 427:17 445:5
spoke 398:13 415:2
 416:11 436:4,10
 440:11 461:2,21
spoken 449:25
spot 447:9 466:1
 467:4 468:5,16
 470:3,17
spots 469:13
squad 396:2,7 412:2
 412:9 423:21 424:5
 444:25 446:6 463:6
 463:8
stake 424:1
standard 477:6
standby 439:12
 460:18 482:14
start 399:21 460:17
 469:23
started 394:19
 436:3 458:22
starting 425:5
 428:22
starts 445:25
state 387:20 483:5,9
 484:3
stated 409:10
 430:15 449:9
statement 395:4,5,6
 395:7,11,12,16,19
 402:11,15 407:17
 408:12,15,20 409:2
 410:1,3 411:16,19
 411:22 414:23
 428:1 429:25 430:7
 432:12 433:8

439:22 440:1,7,7
 445:10 455:11,13
 457:1,4,5,5,19
 458:3,4 469:6,19
 471:9,11
statements 402:1
 449:3 458:5,10
 482:8
states 387:1 457:9
station 411:9,13
 422:10
status 407:9 408:18
stayed 448:16,18
stenographic 484:11
stenographically
 484:7
stick 468:21,22
stolen 409:14
 410:16 411:8,13
stopped 461:1
stopping 460:16
store 473:14
story 412:8
strangled 430:5,14
 430:19 440:4,9,14
 440:23 441:11,15
 441:21
strategy 403:8
street 388:3,13
 409:9 444:3,6,16
strike 454:6
striped 414:13
 418:11,17,22
 419:13 420:19
stripes 409:20 414:6
strong 419:9 429:9
structure 443:22
submitted 417:1
subscribed 485:22
subsequently 424:3
substance 449:18
 457:17
substantially 450:8
sudden 455:1

suddenly 457:21
 467:10
suite 388:8,13
sum 457:17
supervisor 449:25
support 403:12
sure 393:12 401:21
 405:23,23 406:3,17
 422:3 423:13
 433:11 436:23
 439:11 475:14
 477:3
surfaced 423:20
 446:15
surprised 457:15
 478:18 479:3
surveillance 436:8
surveilling 436:3,14
suspect 402:23
 403:24 418:3 420:9
 430:24
suspects 441:13
sworn 390:10
 483:11 485:22

**t**

t 408:12,16 409:10
 411:22,23
take 393:23 399:16
 404:23 408:7,15
 410:1 411:16
 412:18 416:3 433:8
 439:10 440:19
 444:2,21 449:16
 452:13 469:4
 470:16,17 471:2
 474:12
taken 411:22 412:15
 413:6 439:14,23
 460:20
talk 414:2 441:6
 459:23 462:6,8
talked 399:7 407:10
 440:20

talking 429:23
 445:22 456:11
 457:21 458:11
 459:1,13 461:2
tap 442:12
team 407:8
tech 477:21
telephone 450:4
 479:7
tell 434:20 445:1
 453:22
telling 412:8 479:9
tells 452:2,6,7 455:3
temporary 396:6,10
 396:13
tend 400:2 404:4
tended 439:25
testified 390:11
 392:23 394:11
 395:22 399:6,17
 403:6 404:2,7 405:1
 434:6,15 435:4,8,25
 436:2,13,18 437:1
 437:19 439:19
 449:23 450:3,11
 451:20 454:7
 457:19 458:23
 459:15,21,25 460:2
 460:5,6,15 464:17
 465:10,14,21
 467:14,24 468:1
 481:25
testify 393:3
testifying 394:19
 435:1 450:15,23
 458:20 466:3
 480:13,15
testimony 390:25
 391:11 392:20
 399:13 434:8,22
 435:11,18 437:3
 443:16 444:10
 447:7 449:16 450:8
 450:9 451:3,12,19
 451:21 455:25

456:3 461:7 462:21
463:3 464:11
476:23
**testing** 397:5,22
398:7,18 416:6
**thank** 390:7 409:23
443:2 452:4 482:13
**thanksgiving**
430:16 432:25
440:2 441:20
**theory** 403:12 416:8
**theresa** 410:16
414:16 415:20
416:8 418:9,21
430:13 440:3,13,23
441:5 446:7 448:4
465:25 468:6,12,16
472:25 473:8
**theresa's** 468:19
470:3 473:23
**thing** 427:14,25
430:22 445:16
471:5
**things** 399:3 407:10
422:8 423:3 445:8
467:13 471:11,13
471:15 473:14
482:2
**think** 393:24 395:11
406:1,16 416:10
419:9 422:9 430:9
432:13 436:21
437:8,21 440:16
450:4 454:20,21,21
455:6 459:25 469:9
474:14 475:18
**thinking** 434:11
**third** 416:24 446:11
**thorough** 416:5
422:7,16
**thought** 428:18
439:25 440:6
451:23
**three** 419:22 455:4
469:21 471:21

**trace** 397:22 398:2
**tracey** 387:18 483:8
483:20 484:6,24
**tracks** 409:17
413:11
**train** 474:24 475:2
**transcript** 399:16
399:21 434:25
451:21 461:6 484:9
484:10
**transported** 412:7
**travelling** 465:2
474:24
**trial** 463:3 466:3,20
467:10 468:11
475:25
**trials** 403:5 460:7
**true** 435:19 441:16
444:13 484:10
**truth** 412:10
**try** 431:24
**trying** 432:16
**tuesday** 394:11
467:19
**turn** 401:22 406:8
421:4 450:22
459:18 463:16,17
464:7 477:12 478:1
**turned** 402:22
403:13 419:10,25
420:13 421:2
461:13 477:14
478:3
**turning** 424:24
477:11
**two** 391:21 393:14
410:19 411:25
415:2 422:22
423:21,24 424:10
428:2,5,9 433:12
446:16 447:3
455:23 456:23
458:7 460:22 465:6
478:22,23 482:15

472:24 476:2
481:19
**tie** 412:6
**till** 395:1
**tim** 441:6,7 442:7
**time** 390:6 392:1,15
393:5 396:1 403:4,4
403:20 408:1,4,5,19
408:22 409:14,25
413:12 414:12
418:21,25 423:9
424:16 435:1,12,13
435:14,23 436:3
437:14 438:23
439:16 443:1
444:14 445:1,9
448:21 449:1
451:20 453:19
455:10,14 458:21
458:22 460:22
461:13,22 462:10
463:19 467:6,25
475:11 476:5 481:1
482:16
**times** 391:7,9 465:6
**timing** 414:11
**today** 400:8,17
401:3,13 412:1
434:10 436:23
437:5 451:12
467:10 476:2,18
**told** 432:24 433:17
434:7,16 447:9,22
447:24 450:13,17
453:5,14 454:11,12
454:15,17 456:5
457:13,16 458:14
459:17 460:4 479:1
479:3,9,13
**top** 425:4 452:16,17
461:9 478:13
**total** 391:9
**tour** 469:5,8,11
470:25 482:1,9

**type** 417:21 438:1
**typed** 395:14 422:25
458:4

**u**

**uh** 418:15 422:18
435:11 458:8 468:8
**unable** 428:3
**undermine** 400:22
**understand** 399:25
400:11,20 401:6
438:17 446:19
448:18 455:17
477:19,20
**understanding**
400:8,17 401:3,13
401:16 415:25
438:10 476:3
477:24 479:18
**understood** 402:20
**unit** 397:8,14,15
398:10,22 404:22
438:11 439:12,15
460:18,21 477:10
478:1 482:15
**united** 387:1
**units** 397:8 398:18
446:25
**unmarked** 436:20
**unusual** 481:11,14
481:15,18
**upstairs** 392:18
**use** 476:4

**v**

**v** 485:2
**vague** 406:17
**vaguely** 466:5,6
**valley** 461:20
**van** 432:17,22
433:12,18
**various** 397:5
440:22
**vehicle** 415:9,11,19
416:6,9 418:1

Frank Sirianni

**[veritext - york]**

Page 17

**veritext** 485:1
**version** 395:14
  423:7,16
**versus** 461:8
**vesey** 388:13
**vicinity** 446:4
  463:22 464:3
**victim** 414:12 418:3
  420:20
**video** 390:3 460:19
  482:14
**videographer** 390:3
  439:12,15 460:17
  460:21 482:14
**videotaped** 387:14
**visit** 447:16,19
**visited** 447:9
**volpe** 404:8 405:9
  406:9 421:13,15
  423:24 424:12
  432:16 434:4
  436:19,22 437:2,7
  437:19 442:21
  444:18 446:5
  449:25 450:12,13
  450:16,17 451:2,7,8
  452:1,7 453:6,9,22
  454:11,11 455:2,11
  476:19 477:12,21
  477:22 478:3
**volpe's** 421:7
**volume** 387:13
**volunteering** 435:20
**vs** 387:6

**w**

**wait** 393:23
**walk** 444:6
**walked** 454:16
**waltman** 463:10,12
  463:13 466:25
  469:14,14 470:19
**want** 396:23 402:6
  433:19 442:2,4
  443:14 452:14

461:5 462:23 474:8
**wanted** 417:11
**wanting** 479:8
**warnings** 428:4
**warrant** 442:24
  449:6,6,9
**watch** 393:10
**way** 416:21 422:7
  427:22 431:12
  436:7 459:16
**wdw** 387:2,3
**we've** 390:19 399:3
  422:24 452:8
**weak** 428:5,14,18
  429:1,14 431:18,21
**wearing** 418:10,16
  418:24 420:21
**wednesday** 387:10
  483:10
**week** 413:17
**weekend** 478:22
**weeks** 391:12,12,15
  394:24 433:13
  455:23 456:23
  458:7 467:20
  478:22
**welcome** 443:3
**went** 393:9 409:15
  409:25 410:8,14
  411:16 413:12
  414:11,12 418:10
  418:19,21 421:21
  421:24 426:5,8
  435:13 447:9,16
**west** 387:11 464:7
**whichever** 423:7
**wife** 447:8,16
**william** 424:4
**window** 465:3
**windows** 473:14
**wire** 442:11 448:23
  448:23,23 451:5
  480:18
**withdraw** 465:16
  467:17

**withdrawn** 399:5
  403:3 414:24 418:8
  419:16 436:1 441:8
  480:14
**witness** 390:12
  402:2,10,14 403:15
  410:23,25 416:2
  420:3 426:17 427:3
  428:17 429:11
  431:12,20 433:15
  441:23 443:3 473:3
  478:6 480:1,5 481:6
  481:19 483:13
**witnesses** 400:22
  474:10
**witnesses'** 485:3
**woodfield** 409:17
  463:14,15
**word** 443:23 459:11
  459:11 479:22
**words** 461:14
**work** 397:10 399:1
  424:13
**worked** 396:9,17,20
  398:11 403:5 455:4
  458:13 478:7
**working** 448:13
  454:14,22 480:18
**worry** 479:10
**write** 438:13
**writes** 425:6 427:21
**written** 443:24
  457:19 474:7
**wrong** 434:17,23
  437:10,12 446:20
  459:14,15,19
**wrote** 395:16 417:5
  417:7 423:17

**x**

**x** 389:1

**y**

**yeah** 394:4 426:2,4
  430:15 436:6 437:4
  438:15 439:2

445:19 448:8
  451:17 458:19
  459:14 472:19
  473:10 475:7
  481:16
**year** 399:7 440:11
**years** 395:23 396:12
  398:11 411:23
  437:13 439:7
  458:14 459:22
**yep** 420:24
**yesterday** 391:8,13
  392:19 394:17
  395:22 398:13
  407:12 434:6,16,22
  435:4,25 436:2,18
  437:1,3,11,23 439:4
  443:16 447:8
  449:23 454:7
  455:20 456:1,4
  457:19 458:23
  459:16 460:2,5
  464:18 465:14,21
  467:11,24 471:10
  472:18 474:19
  476:1 480:13,15
  481:10
**yesterday's** 390:25
  391:11 395:1
**york** 387:1 388:3,3
  388:9,14,14 409:10
  409:12 411:25
  485:1