Newsome, the next witness to be offered by the People. As a result of my perusal of this material, it seems reasonable to me to conclude that Mr. Newsome is a police informant, whether paid or unpaid. The possibility existed that he was placed in the tier with the specific assignment of gathering information, whatever it may be. I would like to explore that prior to his testimony in chief. In the event he is of course as I have concluded the possibility that he is, I would ask that you suppress his evidence.

THE COURT: Mr. Klein?

MR. KLEIN: I have no objection to the inquest.

S A M U E L   L .   N E W S O M E , a witness on behalf of the People, having been first duly sworn, testified as follows:

MR. FAMIGHETTI: May I inquire, Judge?

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. FAMIGHETTI:

Q    Mr. Newsome, how long did you know Detective Harry Pizer of the Major Case Squad?

A    About a year and a half.

Q    When did you first meet him?

A    I don't remember the date I first met him.
But, it was around June, July of '85.

Q    And it's a fact, is it not, Mr. Newsome that
as a result of that relationship with Detective Pizer
that you became his informant; is that correct?

A    Around that time.

Q    Around that time?

A    Yes, I did.

Q    As a matter of fact, he told you - - he asked
you to keep your eyes and ears out to the street and report
to him of any criminal activity that may be occurring?

            MR. KLEIN:  I object to that unless

            there is a time put on it.

            MR. FAMIGHETTI:  He said June or July.

            THE COURT:   June or July, '85?

A    Yes, I did.

Q    From time to time you would report to him regarding
some information that you had acquired; is that right?

A    Around that time, I did.

Q    And you have been asked to come in and testify
here about alleged conversation that you had with Dennis
Halstead; is that right?

A    Yes, I did.

Q    As a matter of fact, you were Detective Pizer's informant on the day that this occurred?

A    No, I was not.

Q    Well, this conversation allegedly occurred sometime in January, 1986; is that right?

A    Yes.

Q    And you just testified, did you not, that in June or July of 1985 you became Detective Pizer's informant; is that right?

A    Yes, I did.

Q    And you were still his informant in January of 1986; is that correct?

A    No, I wasn't.

Q    You terminated that relationship with him?

A    (No response.)

Q    As a result of that did that relationship terminate if you can tell?

A    You mean when I was in jail?  When I was incarcerat When I was locked up?

Q    You said in June or July of 1985 you met Detective Pizer and you agreed to be his informant?

A    Yes, I did.

Q    That relationship between Detective Pizer and yourself was an ongoing relationship, wasn't it?

Newsome/hearing                    1032

A    Up to a point.

Q    Would you explain that to me?

A    When I was put in jail for a violation of probation, we no longer had no relation on informing.

Q    How did that terminate you?  Did you tell him you were no longer going to be an informant?

A    No.  It was something I was helping on at the time because I was violating my probation.

Q    You were helping him with some other case and we really don't want to know about that, all right?

A    Yes.

Q    But any information you acquired along the way, you passed on to him?

A    Yes, I did.

Q    And he knew that you would be doing that?

MR. KLEIN:  Objection to what he knew.

THE COURT:  Sustained.

Q    You would come to him with information.  He didn't appear to be surprised, did he?

MR. KLEIN:  Objection.

THE COURT:  Sustained.

Q    Did you have - - did you call him from time to time with specific information about different crimes?

MR. KLEIN:  At what point, Judge?

THE COURT:    On and after June or July,

'86.

Q       Right?

A       Yes.   After that if I had any information did

I call him?

Q       How many times between June and July, 1985 and

this particular incident did you call him with information?

A       Only about three times.

Q       So it was - - am I wrong to say Mr. Newsome,

I'm not trying to trick you here.  It was an ongoing relation

When you had the information you would call the detective?

A       Yes.

Q       You acquired some information in the jail on

January 30th, 1986 or thereabouts?

A       Right.

Q       And you called the detective?

A       The reason I called him, I didn't know anybody

else had called on that particular trace.

Q       But you had called him in the past?

A       Yes.

Q       You had been his informant?

A       Yes.

Q       When you acquired some information that you

thought was important you continued to be his informant

Newsome/hearing                          1034

and you called him; isn't that correct?

        MR. KLEIN:  Objection to the form of the

question.

        THE COURT:  Sustained.

Q    You called Detective Pizer and you gave him

some information?

A    Yes, I did.

Q    And did he tell you to continue to operate in

that capacity as his informant?

A    No, he didn't.

Q    What did he tell you?

A    He told me that he would relay the message in

the homicide and he would get somebody down to talk to

me.

Q    Did anybody ever come from homicide to talk

to you?

A    Yes, they did.

Q    When did they come?

A    They came on the second visit.  I don't recall

the date that they came on.  It was maybe two or three

days later.

Q    Were you still in jail then?

A    Yes, I was.

Q    Who did you speak to?

Newsome/hearing           .                    1035

A    I spoke to a Detective Volpe.  But, I don't
recall his partner's name at the time, but I did speak
to Detective Volpe.

Q    And that was two or three days after you spoke
to Detective Pizer?

A    Yes.

Q    Did Detective Volpe take the statement from
you?

A    No, he didn't.

Q    Did he make any notes or memoranda regarding
the conversation?

A    No, no notes.

Q    Did he give you any isntructions?

A    No, he didn't.

            MR. FAMIGHETTI:  I have nothing further,
            Judge.

            MR. KLEIN:  May I ask some questions, your
            Honor.

            THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. KLEIN:

Q    Mr. Newsome, on January 29th, of 1986, you were
sentenced to 60 days in jail; is that correct?

A    Yes, I was.

Q    That was for a violation of probation?

A    Yes.

Q    The conversation that you had with Mr. Halstead,
was that before you were sentenced or after you were sentenced

A    After I was sentenced.

Q    And when you went into jail on January 29th
of '68, did any police officers ask you to do anything
for them while you were in the jail?

A    No, they didn't.

Q    Were you working on any cases for Detective
Pizer after you were sentenced on January 29th?

A    No, I wasn't.

Q    The tier that you were on on January 29th, did
the police have anything to do with putting you on that
tier?

A    No, they didn't.

q    Did you know anything about this case from the
Police Department prior to January 29th, 1986?

A    No, I didn't.

MR. FAMIGHETTI:  Objection, Judge.

THE COURT:  What's the basis of the objection?

MR. FAMIGHETTI:  I'm really objecting because

it would be difficult for this man to know what

the Police Department knew about this case.

Newsome/hearing                    1037

THE COURT:   The question I thought was
did he know.

MR. FAMIGHETTI:   I'm sorry.

THE COURT:   Objection overruled.

Q     Had anyone asked you to talk to anybody in the
jail about this case?

A     No.

Q     Had anyone asked you to talk to anyone in the
jail about any case?

A     No.

Q     At the time that you were sentenced to 60 days,
did Detective pizer ask you to do anything in the jail?

A     No, he didn't.

Q     After you had a conversation with Dennis Halstead
did you try to work without any arrangement with the police
or the District Attorney's office?

MR. FAMIGHETTI:   Objection.

A     No, I didn't.

THE COURT:   I will sustain the objection.

MR. FAMIGHETTI:   I ask it be stricken.

THE COURT:   It will be.

Q     Has anyone offered you any benefit as far as
your cases are concerned or anything along that line for
your testimony in this case?

1                              Newsome/hearing                        1038

2              MR. FAMIGHETTI:  Objection.

3              THE COURT:  Sustained.

4       Q    Did you expect to receive anything from providing

5  this information to the police?

6       A    No, I didn't.

7              MR. KLEIN:  I have no further questions.

8              MR. FAMIGHETTI:  Just one other question.

9  REDIRECT EXAMINATION

10     BY MR. FAMIGHETTI:

11      Q    Mr. Newsome, when was the last time you saw

12  Mr. Pizer or spoke to him, last time before today?

13      A    It was when he came back down to the county

14  with Detective Volpe.

15      Q    He was with Volpe the second time?

16      A    Yes.   That's the last time I saw him.

17      Q    Have you spoken to him on the telephone between

18  that time and today?

19      A    No, I haven't.

20      Q    Have you given him any further information regarding

21  any further activities?

22      A    No, I haven't.

23              MR. FAMIGHETTI:  Thank you, Mr. Newsome.

24              THE COURT:  You may step down, sir.

25              (Thereupon the witness was excused.)

THE COURT:  Do you wish to be heard?

MR. FAMIGHETTI:  Yes, if your Honor please.
I think it's obvious from the witness' testimony
that Mr. Newsome was developed as Detective
Pizer's confidential informant to work directly
for him for a period of time including the time
he was in the Nassau County Jail. You just
don't turn that relationship on and off.  I
think all of us know in this business what was
transpiring  between Mr. Newsome and Detective
Pizer.  It seems obvious to me that at the time
Mr. Newsome placed into the jail, he was indeed
a police officer's confidential informant and
continued to be so throughout the period of
time that we are talking about here.  Based
upon that, he acted in the capacity of an agent
of that police officer and as a consequence
of that agency, if your Honor please, any statement
made allegedly to have been made by Mr. Halstead
to him violated Mr. Halstead's rights to counsel
which had attached at the time.

MR. KLEIN:  I can't disagree with that
more.  The fact that this witness had been a
confidential informant in the past, doesn't

label him a confidential informant for his entire

life. He indicated that he was sentenced and

that he was sentenced to 60 days in jail. That

his relationship with Detective Pizer as a confi-

dential informant had ended at that time. He

indicated that nobody sent him into the jail

to seek information about this case or any other

case. He didn't even expect any benefit to

avow to him as a result of providing this informatic

to the police. Merely because he was previously

an informant for the police doesn't mean that

when he is in the jail and has a conversation

with somebody and then provides that information

for the police, that he is doing that as

an agent of the police. I think it's clear

from his testimony that he was just having a

conversation with him as any other inmate would

have and provided that information without any

expectation or benefit to himself.

MR. FAMIGHETTI: I offer for your considerati

People vs. Cardona, Court of Appeals 41 New

York 2nd, 233, as well as two miscellaneous

cases, People vs. Odeo Dinardo (phonetic) Supreme

Court 321, 330, People vs. Brooks, miscellaneous

1041

2nd, 294.

THE COURT: May I see them?

MR. FAMIGHETTI: Yes. (Handed.)

THE COURT: All right, gentlemen, give me a few minutes to read these. (Pause.)

MR. FAMIGHETTI: If your Honor please, I have one further comment to make regarding my application. That is that it is my understanding that the burden of proof on this particular issue now is placed upon the People, proof beyond a reasonable doubt that this individual is not a police agent or informant in connection with the activities that occurred.

THE COURT: At the conclusion of the testimony I find that there did exist a relationship between the witness who testified, Newsome and Detective Pizer of the Major Case Squad. I also find that based upon the testimony adduced at this hearing that the witness had been sentenced at that time and he, as he testified here, I find that he called Detective Pizer because he was the only one he knew to call. He had not been placed on the tier at the insistance of the police or the prosecution and I find

that he was not acting under their direction

and that the relationship between Pizer and

Newsome had terminated prior to the time that

Newsome related his conversation with the defendant

Halstead to Piser and subsequently spoke to

him.  I therefore find that he is not an agent

of the police or the prosecution.

        MR. FAMIGHETTI:  Exception, your Honor.

        (Thereupon the jury enters the courtroom.)

        THE COURT:  Once again, ladies and gentlemen,

I must apologize for the delay.  I think hopefully

you will find that it will not reoccur as we

go forward.

        Mr. Klein, call your next witness.

S A M U E L   N E W S O M E , a witness on behalf of the

        People, having been first duly sworn, testified

        as follows:

DIRECT EXAMINATION

        BY MR. KLEIN:

        Q    Good afternoon, Mr. Newsome.

        A    Good afternoon.

        Q    How old are you?

        A    Fourty-one.

        Q    Can you tell the jury what you do for a living?

A    I work for B & S Moving and Storage, Hampton Road, Oceanside. I move furniture. I'm a household mover.

Q    How long have you been doing that type of work ?

A    For about 16 years.

Q    Let me direct your attention, Mr. Newsome, to January of 1986. Were you in the Nassau County Jail under a sentence during January of 1986?

A    Yes, I were.

Q    When did you enter the Nassau County Jail in January of '86?

A    January 29th.

Q    And what were you in jail for?

A    Violation of probation for possession of marijuana.

Q    The charge that you were on probation for was violation of probation was possession of marijuana?

A    Yes.

Q    You violated that probation?

A    Yes.

Q    How did you violate that probation?

A    By not reporting when I was supposed to report.

Q    Did you have a sentence on that charge?

A    Yes, I did.

Q    What was that sentence?

A    Sixty days.

Q     You began serving that on January 29th?

A     Yes, I did.

Q     Were you in the Nassau County Jail on that charge
before you were sentenced?

A     No, I was not.   I was out on ROC.

Q     You were released in your own recognizance?

A     Right.

Q     Now, what tier in the Nassau County Jail were
you assigned to after you were sentenced?

A     C-3.

Q     And did you have occasion to meet the defendant
Dennis Halstead while you were on that tier?

A     Yes, I did.

Q     How long were you on that tier?

A     I was there the entire sentence.

Q     Do you see Mr. Halstead in the courtroom today?

A     Yes, I do.

Q     Would you point him out and describe what he
is wearing today, please?

A     Sitting to the left, near the wall, with the
blue suit.

Q     Your left?

A     My left.

          MR. KLEIN:   Indicating the defendant,

1  
2  your Honor.

3  THE COURT:  Yes.

4  Q    Can you describe for the jury, Mr. newsome,

5  how it was that you met Dennis Halstead in the jail?

6  A    On my second day there I was approached by him.

7  He asked me do I know how to play a game called "spade."

8  Yes, I did.  He asked me to I want to play and I said,

9  "Yes."  We went to his cell to play.

10  Q    Is that a card game?

11  A    Yes.

12  Q    Where did you go to play that card game?

13  A    We played the card game in his cell.

14  Q    Was there anybody else with you at this time?

15  A    Not when we first started.

16  Q    Did you have a conversation with the defendant

17  Dennis Halstead after you began to play cards?

18  A    Yes.

19  Q    Can you describe that conversation?

20  A    He asked me what I was in jail for.  I said

21  I was in for violation of probation and I asked him what

22  he was in jail for.  He said he was accused of rape and

23  murder.

24  Q    What did he tell you about that charge?

25  A    He didn't say anything right then.  We were

1   still playing cards.  I noticed that he kept chewing on

2   his nails and he was acting nervous.

3                  MR. FAMIGHETTI:  Objection.

4                  THE COURT:  Yes.  The jury will disregard

5          the term "acting nervous."

6       Q    You observed him biting his fingernails while

7   he was playing cards?

8       A    Yes.

9       Q    Did you ask him anything about that?

10                 MR. FAMIGHETTI:  Objection, leading, if

11         your Honor please.

12                 THE COURT:  I will permit it.  Overruled.

13      Q    What did you ask him about that?

14      A    I asked him if he didn't do anything, why do

15  he have to be nervous?

16      Q    Did he say anything to you?

17      A    Yes.

18      Q    What did he say?

19      A    He said he will be out by the end of the summer,

20  by the middle of the summer, he will be out because they

21  didn't have enough evidence on him to hold him.

22      Q    Did he say anything about the charges at that

23  time?

24      A    No.  He didn't say anything about the charges

but he said he was riding around with a couple of his

friends.

            MR. ROBINSON:  Objection, Judge.  Not responsiv

            THE COURT:  May I have the question read

      back, please?

           (Question read back.)

            THE COURT:  Motion granted.

    Q   Mr. Newsome, when you asked him was he nervous

and he told you that he was going to be out in the summer,

that they didn't have enough evidence on him.  Did he

say anything else about his involvement at that time?

    A   Yes, he did.

    Q   What did he say?

    A   He said that he did it, but they couldn't prove

it.

    Q   Did he tell you what he did?

    A   Yes, he said that.

    Q   What did he say?

    A   He said that the three of them, they took turns

molesting her.

    Q   Is that the word used?

    A   That wasn't the word he used.  But that's the

word I'm using. He said the three of them fucked her.

    Q   Those were his words?

A    Yes.

Q    Did he tell you how it started?

A    He told me he picked up - - they picked up the girl hitchhiking, he said.

Q    I'm sorry, I can't hear you.

A    He told me they picked up the girl hitchhiking. One of his friends made an advance at her and she refused.

Q    Did he say what she was picked up in?

A    A van.

Q    Did he say whose van it was?

MR. FAMIGHETTI:  Objection.  It was completely leading the witness.

THE COURT:  Objection to the question is sustained.

Q    What did he tell you about the van, Mr. Newsome?

MR. ROBINSON:  Objection.

THE COURT:  I will permit it.

A    He told me that they picked her up in a van. She had just got fired from a fast food job that she was working on.  She got picked up.  His friend made an advance and she refused.  She started tussling in back of the van as they were riding around until she got tired and then he said the three of them took turns.

Q    Took turns what?

A    Having sex with her.

Q    Is that the word he used?

A    No, he said the three of them fucked her, that's what he said.

Q    Did you ask him anything about that at that point?

A    I asked him did you molest her too and he looked at me and smiled.

THE COURT:  I couldn't understand that?

A    He smiled when I asked him did he molest her too and he said, "Yes, we all did."

Q    What kind of description did he give you of the girl?

MR. FAMIGHETTI:  Objection.  Leading again.

THE COURT:  Sustained.

Q    What if any description did he give of the girl?

A    Only description that he give me was a young, beautiful Italian girl.

Q    What did he say about his own or what if anything did he say about his own physical condition?

A    He said - -

MR. FAMIGHETTI:  Judge, I'm going to again object.  The prosecutor continues to lead this witness into every issue that is pertinent with

Newsome-People-direct                     1050

1

2      his testimony.

3              THE COURT: You must refrain from leading

4      the witness.

5              MR. KLEIN: I'm directing his inquiry to

6      a particular area.

7              THE COURT: I understand that. But, it's

8      also my duty to tell you that you should not

9      as a prosecutor lead the witness on direct examinatio

10             MR. KLEIN: I will try not to.

11     Q    What if anything did Mr. Halstead tell you about

12     his physical condition?

13             MR. FAMIGHETTI: Objection, again.

14             THE COURT: I'm going to permit it.  Overruled.

15     A    He said they took turns driving the truck, the

16     other two guys. He said he wouldn't drive because he

17     was too high.

18     Q    Did he mention what he was high on?

19             MR. FAMIGHETTI: Objection.  I ask to

20     approach.

21             THE COURT: At the bench on the record.

22     (Thereupon a discussion ensued at the bench

23     not within hearing of jury. )

24             MR. FAMIGHETTI: Specifically, I'm objecting

25     to any reference of illegal use or possession

Newsome-People-direct                                    1051

of narcotics by Mr. Halstead in the questioning.

MR. KLEIN: This is part of the crime.
This is part of the crime. I opened. This
is my proof. Their physical conditions at the
time of the crime.

THE COURT: Yes. I will permit it. Objection
overruled.

MR. FAMIGHETTI: Exception, Judge.

(The following ensued in open court.)

Q    Mr. Newsome, what if anything did Mr. Halstead
tell you he was high on?

A    He said he was drinking beer and smoking pot
and sniffing cocaine.

Q    What if anything did he say happened after telling
you what the three people did with the girl?

A    Nothing. He said they drove around for awhile
and they dumped her out somewhere around Lynbrook or Valley
Stream. He asked me - - told me he talked to me about
to keep it to myself. Don't let it get out of the cell.

Q    What if anything did he say they did to the
girl before dumping her out of the van?

MR. FAMIGHETTI: Objection. Again, leading.

THE COURT: Sustained.

Q    What if anything did they say happened to the

Newsome-People-direct                                    1052

girl other than having sex?

           MR. ROBINSON: Objection.

           THE COURT: Sustained.

Q   What did the defendant Dennis Halstead say to you about what happened to the girl other than having sex?

           MR. FAMIGHETTI: Same objection.

           THE COURT: I will permit it.

A   He said his friend John grabbed her around the neck and I don't recall whatever the rest of the question what you said. But, he said he did something to her neck before she was dumped out of the van.

Q   How long after this conversation, Mr. Newsome, did you tell anybody about it?

A   About two days later.

Q   Who did you tell?

A   I called up Detective Piser.

Q   Detective Piser?

A   Yes.

Q   Is that a detective you had known from before?

A   Yes.

           MR. KLEIN: Thank you, Mr. Newsome.

CROSS-EXAMINATION

    BY MR. FAMIGHETTI:

Newsome-People-cross                    1053

Q    You say you were in jail on January 29th, 1986;
is that right?

A    Yes.

Q    As a matter of fact, you were sentenced on that
day to 60 days in the Nassau County Jail by Judge Fertig?

A    Yes.

Q    for a violation of probation?

A    Yes.

Q    As a matter of fact, you had some other pending
charges on that day; is that right?

A    I didn't have no other pending charges.

Q    Didn't you have a pending charge of criminal
possession of marijuana in the fifth degree?

A    That case was dropped, dismissed.

Q    You say that case was dropped, sir?

A    It was dropped.  The plea of guilty to the violation
of probation.

Q    So in other words, it really wasn't true what
you testified to that the violation of probation was only
because you didn't report, correct?

A    It was.

Q    But it also included the fact that you were
found in possession of marijuana on January 2nd, 1986
in Roosevelt, Long Island; is that correct?

A     It wasn't in Roosevelt.  That's what the detective
said it was at.

Q     Where was it?

A     It was in Hempstead.

Q     Now, did you know Mr. Newsome that on May 1st,
1986 - - by the way you were released from the Nassau
County Jail when?

A     March 6th.

Q     March 6th, 1986?

A     Yes.

Q     Were you aware Mr. Newsome, on May 1st, 1986
a warrant was issued for your arrest for criminal possession
of marijuana in the fifth degree?

A     No, I wasn't.

Q     That warrant is active even today, even as you
sit here today?

                    MR. KLEIN:  Objection.

                    THE COURT:  I will permit it.

A     No.

Q     You didn't know that?

A     There is no warrant for my arrest.

Q     Now Mr. Newsome, you have been in trouble with
the police before, have you not?

A     Yes, I have.

Q    And as a matter of fact, on August 25th, 1970,
you were first convicted - - I'm sorry, October 18th,
1973 you were convicted of the crime of operating a motor
vehicle while intoxicated; is that right?

A    Yes.

Q    Then back in September 26th, 1981, you were
convicted of possession of stolen property?

A    Yes.

Q    Did you go to jail for that, Mr. Newsome?

A    No.  I served three year probation on that.

Q    Then on December 22nd, 1983, you were convicted
of attempted assault in the third degree; isn't that correct?

A    Yes.

Q    That arose out of an assault that you committed,
sir, on an individual in Roosevelt, New York on June 24th,
1983 with some type of weapon; isn't that correct?

A    No, it's not correct.  No, that's not correct.

Q    That's the allegation made?

        MR. KLEIN:  Objection, to the allegation.

        THE COURT:  Sustained.

Q    So that assault in the second degree was a D
felony?

A    It was two D felonies, but the case was dismissed.

        MR. KLEIN:  I object to this as to his

Newsome-People-cross                                    1056

question what he was arrested for in 1983.

THE COURT:  With respect to what he was

arrested for, I sustain the objection.  But,

I'm not precluding the inquiry.

Q    Well, okay, Mr. Newsome, then on November 18th,

1983 in Roosevelt, New York, you are arrested for sail

of marijuana; is that right, were you accused of that?

A    No, I wasn't.

Q          Nevertheless, sir, on January 19th, 1984

you pled guilty to criminal possession of marijuana and

took 45 days sentence in the Nassau County Correctional

Center?

A    I didn't serve no time.

Q    On January 17th, 1984 were you in fact convicted

of criminal possession of marijuana by means of a plea

of guilty?

A    Yes, but I didn't serve no 45 days in jail for

that.

Q    All right.  If you say so, Mr. Newsome, fine.

But, isn't it also true that that conviction arose out

of a charge that you were selling marijuana in Roosevelt

on November 18th, 1983?

MR. KLEIN:  Objection.

A    Yeah.

Newsome-People-cross                                          1057

THE COURT:  Is that what he was convicted

of?

MR. FAMIGHETTI:  He already - -

A     I wasn't convicted of that.

THE COURT:  Objection sustained.

Q     You were indeed selling marijuana on the streets

of Roosevelt in November, 1983?

A     No, I wasn't.

Q     You do smoke marijuana, don't you, sir?

A     Yes, I did.

Q     You use other drugs too, don't you?

A     I drink beer.  I don't use marijuana any more.

I just drink beer occasionally.

Q     Now, on January 5th, 1984, Mr. Newsome, were

you again in possession of marijuana in Roosevelt, New

York?

A     No, I wasn't.

Q     Didn't you plead guilty to that charge, sir,

on January - - I'm sorry - - withdrawn.  I apologize,

Mr. Newsome.  On January 2nd, 1985, you were in possession

of marijuana in Roosevelt, New York or Hempstead, you

said; is that right?

A     I didn't have it.  My girlfriend had it.  We

was in the car together.  I was in the car.  It wasn't

on my possession.

Q    As a result of possessing that with your girlfriend
on January 29th, you pled guilty in front of Judge Fertig;
is that correct?

A    For a violation of probation, yes.

Q    Was that violation pending before your arrest?

A    Yes.

Q    You say the plea of guilty to that satisfied
the charge of January 2nd, 1985 charge?

A    Yes.

Q    And you are surprised that there is a warrant
for your arrest out at the present time?

        MR. KLEIN:  Objection.

        MR. FAMIGHETTI:  Good faith offer, your
        Honor.

        THE COURT:  Sustained.

Q    Isn't it a fact, Mr. Newsome what you really
are besides a mover is a purveyor of marijuana in the
Hempstead, Roosevelt area?

A    No, that's not true.

Q    Isn't it a fact, sir, that you are a known seller
of marijuana in the Hempstead, Roosevelt area?

A    No, that's not ture.

Q    Known especially to the police of this County?

2        A      No.

3        Q      Now, in June and July of 1985, you came in contact

4    with a police officer from the major case squad named

5    Harry Piser; is that correct?

6        A      Yes.

7        Q      As a matter of fact, Detective Piser gave you

8    a break so that you would operate as his informant; isn't

9    that correct?

10       A      No, it's not true.

11       Q      But, you did operate did you not, Mr. Newsome

12   as Detective Piser's informant?

13       A      Yes, sir, at one time I did.

14       Q      That was way before you met Dennis Halstead;

15   is that correct?

16       A      Yes.

17       Q      You were a police confidential informant working

18   for a detective in the Major Case Squad; is that a fair

19   statement?

20       A      Not now, I'm not.

21       Q      No, no.  At the time?

22       A      At the time, yes.

23       Q      As a matter of fact, your function as a police

24   officer undercover confidential informant was to snitch

25   on other people?

A    No, it wasn't.

Q    That relationship with Detective Piser continued right up until the time you were placed in the Nassau County Jail; is that correct?

A    No, it isn't.

Q    When did it terminate?

A    After the case was finished.

Q    You were working with him on one case?

A    Yes.  You weren't working with him on any other cases?

A    No, I wasn't.

Q    As a matter of fact though, that whenever any information came across, you came across, which related to criminal activity, that you were instructed by Detective Piser to inform him of it?

A    No, I was not.

Q    In fact, if you know - -

A    No, I wasn't informed to give him any information on any criminal activity after that case was over.

Q    But, before that case was over, were you?

A    Yes.

Q    When was that case over?

A    Around August, September of '85.

Q    Now, you are in jail for possession of marijuana

and a violation of probation an old probation, correct?

A    Correct.

Q    Was that on the assault case?

A    No, it wasn't.

Q    On the prior marijuana case?

A    It was on the first one.

Q    The reason you became an informant to Detective
Piser, Mr. Newsome, was because you believed you could
act on the streets of this County selling marijuana with
impunity?

A    No, I did not.

Q    You felt that if you were a police officer's
informant, he would protect your from arrest and from
prosecution for sale and possession of narcotics on the
streets of this County; is that correct, sir?

A    It's not a fact.  I never thought of it that
way.

Q    Now Judge Fertig sentenced you to 60 days in
the Nassau County Jail?

A    Yes.

Q    He specifically ordered that you be placed in
protective custody, is that true?

A    Yes, he did.

Q    Do you know why he made such an order, sir?

A    Yes, I know.

Q    For a 60 day sentence?

A    Yes.  It was on another related case.  They
didn't want me in contact with the other prisoners.

Q    Because you are an informant?

A    No.  That wasn't it.

Q    Wasn't that the reason that you felt they had
to put you in protective custody from the other inmates
because they knew you were an informant?

A    No, it wasn't that.  That was supposed to keep
me out of trouble.

Q    You asked for that from your attorney?

A    No, I didn't.

Q    Did you?

A    Through my attorney?

Q    Yes.

A    Yes.

Q    You wanted to go to protective custody?

A    I didn't want to go in there and get another
charge.

Q    You didn't want to go into the general population
and get beaten up?

A    Not me beat up.  It could have been someone
else beat up.

1                      Newsome-People-cross         1063

2      Q   Now, you are sentenced by Judge Fertig in this

3  County on the 29th; is that right?

4      A   Yes.

5      Q   And about what time of day is that here that

6  you were in court?

7      A   I was in court all morning.  In fact, I was

8  about the last one to go before the Judge.

9      Q   That's maybe three, four o'clock in the afternoon?

10      A   That's right.

11      Q   He sentenced you to the 60 day sentence, correct?

12      A   Yes.  He put you in protective custody because

13  you asked him to?

14      A   I didn't ask him to.  My lawyer.

15      Q   But you asked your lawyer to ask him?

16      A   Yes, I did.

17      Q   They took you downstairs in this building or

18  the District Court, wherever you happened to be until

19  the trucks are ready to take you over to the Nassau County

20  Jail?

21      A   That's right.

22      Q   What time did you arrive at the jail that day,

23  January 29th?

24      A   I don't recall.  It must have been around 6:30,

25  seven o'clock.

1

2      Q   There are certain preliminary things that have

3   to occur as a result of your admission to the jail; is

4   that right?

5      A   Yes.

6      Q   As a matter of fact, this evening you had to

7   get a physical, you had to see the doctor?

8      A   Yes.

9      Q   And then you were finally assigned up onto a

10  tier?

11     A   Right.

12        THE COURT:  Mr. Famighetti, I hate to

13        interrupt.  I have another matter that requires

14        my attention.

15        Step down, Mr. Newsome.  We will have to

16        adjourn till two o'clock, ladies and gentlemen

17        with the admonition not to discuss the case

18        among yourselves or with anyone else or permit

19        anyone else to discuss it with you.  We will

20        rejoin at two o'clock.

21          (Thereupon the jury leaves the courtroom.)

22          (Thereupon a luncheon recess was taken.)

23          -  -  -

24        A F T E R N O O N   S E S S I O N

25          (Thereupon the jury enters the courtroom.)

THE CLERK: People against John Restivo and Dennis Halstead, indictment number 61322. People ready?

MR. KLEIN: Ready.

THE CLERK: Defendants ready?

MR. ROBINSON: Restivo ready.

MR. FAMIGHETTI: Halstead ready.

THE CLERK: Call Mr. Newsome.

(Thereupon Samuel Newsome resumed the witness stand.)

THE CLERK: You are still under oath; do you understand?

THE WITNESS: Yes.

MR. FAMIGHETTI: Would you read the last question and answer back, please?

(Question and answer read back.)

FURTHER CROSS-EXAMINATION

BY MR. FAMIGHETTI:

Q   Good afternoon, Mr. Newsome.

A   Good afternoon.

Q   We were talking before the break about your admission into the Nassau County Jail, do you recall that?

A   Yes.

Q   We talked also - - I believe where we ended

was at a point where you had completed the procedures

that coincided with being admitted into the jail and finally

got up to Tier C-3, I believe that's the tier you said

you were assigned to; is that correct?

A    Yes.

Q    About what time was it that you got up to C-3?

A    Maybe about eight o'clock.

Q    Now, on that particular night, how did you spend

your time?

A    I spend my time by going in and preparing my

bed and after that, I took a shower and I laid down.

Q    And you went to sleep?

A    No, I didn't go right to sleep.

Q    Well, it's about eight o'clock, you got up there?

A    Yes.

Q    You got your bed prepared. You took your shower

and by the time you laid down, what time was it?

A    I really don't know. By not having a watch,

I'd say maybe 9:30, ten o'clock.

Q    What time do they lock you in?

A    It's not the same time every night. So, I really

couldn't say about the time. It might have been 10:30.

Q    Okay. But, would it be fair to say that you

really didn't get an opportunity that night to get to

know anybody on the tier?

    A    Well, I knew one guy when I went in there.

    Q    Who was that, sir.

    A    I forget his name. He live in Hempstead. But,
I forget his name.

    Q    You had some conversation that night?

    A    I just spoke to him. That was it. No conversation.

    Q    You went to sleep and you woke up the next day
and that was January 30th; is that correct?

    A    Right.

    Q    January 30th is the day that you say that you
had this conversation with Dennis Halstead?

    A    Yes.

    Q    About what time of day was this?

    A    It was before lunch. Before noon.

    Q    Well, could you do a little better than that?

    A    It was in the morning time, before lunch. Before
lunch time, I would say about ten, 10:30.

    Q    And just tell us again how it came to be that
you met Mr. Halstead?

    A    He'd ask me my name and I told him.

    Q    What did you say to him?

    A    On the tier?

    Q    Well, where on the tier, in his cell, your cell?

A     No, it wasn't in the cell.  It was like down by my cell.

Q     Was he walking by?

A     Yes, he was walking by.

Q     Where were you located?

A     Standing right in front of my cell.

q     And were other people around?

A     It was a few people around, but I wasn't talking to anyone.

Q     And that day, January 3rd, 1986, was the first day that you had laid eyes on Dennis Halstead in your whole life; is that correct?

A     Yes, I seen him on the 30th when I went in on the 29th, when I went in, but I didn't do no talking.

Q     But, you never knew him before?

A     No.

Q     That's the first time you met him that day?

A     Yes.

Q     And he said something to you or you said something to him?

A     Well, we both spoke.

Q     Okay.  Tell us what happened?

A     He spoke to me and asked me what my name and I told him my name and he told me his name.

Q    Did he tell you that he had any particular function on the tier?

A    No, he didn't.

Q    Did you know that he was the tier man?

A    Not when I went in.

Q    Was he the tier man?

A    Not when I went in, he wasn't.

Q    What is a tier man, for the benefit of the jury?

A    He gives toilet tissue if you need tissue. Serves the food, pass out the silverware, takes it up when it's over. Keep the aisle clean on our side there.

Q    That's a favored position, is it not?

A    Yes.

Q    You get a little extra food that way?

A    Yes.

q    Other benefits; is that correct?

A    From being the tier man.

Q    Now, you say you had a conversation with Mr. Halstead at that particular point, the initial period of time that you met him. Would you relate that to us?

A    He asked me did I know how to play spades. It's a game in cards.

Q    Is that like hearts?

A    Yes.

Newsome-People-cross                    1070

Q    Same, except playing with spades?

A    Yes, playing spades.

Q    This was in the morning?

A    Yes, it was before lunch.

Q    And he invited you to play cards?

q    A    He asked me did I want to play a game and I
said, "Yes."

Q    Did you play anything other than for just fun
or did you gamble?

A    Well, after that we was like play for cereal
or milk.

Q    Cigarettes or something like that?

A    I never played for cigarettes.

Q    Cereal or milk?

A    Yes.

Q    That was the stakes?

A    After he said to you do you play cards and you
said, "yes," then what happened?

A    I went to the cell and played some spades.

q    You went to his cell?

A    Yes.

Q    You didn't have the cards with you?

A    He had the cards.

Q    He didn't have the cards with him?

A    Not in his hands.  He had them in the cell.

Q    You went back to his cell to get the cards and play cards?

A    We went back to play cards in his cell.

Q    You went to play cards in his cell because you went back to get them?

A    We played cards in his cell because that's where the cards were and he asked me to play the game.

Q    How far from his cell was your cell located?

A    Counting from my cell 3-A his cell would be 6-S.

Q    You get into the cell pretty quickly after you met and he asked you if you wanted to play, is that a fair statement?

A    He asked me in front of my cell.  We didn't play cards until after lunch because they called a lock up for lunch.

Q    In other words, he asked you to play cards in the morning before lunch?

A    Right.

Q    And asked you if you played spades.  You said you did?

A    Right.

Q    You didn't play then, you played after lunch?

A    After lunch.

Q    You didn't have any further conversation with Dennis Halstead between the time he asked you to play spades and the time you went back to the cell?

A    After lunch, because we couldn't play, because they called lock in for chow and everybody had to be locked in.

Q    You couldn't talk to him during that period of time when you were locked in?

A    No .

Q    And would you just give me, so I understand this, an estimate of how much time it took you to discuss -- introducing yourself and deciding to play cards after lunch?

A    About 15 minutes to a half hour.

Q    That long?

A    We was going to play before they called lock in.  We were getting ready to play then.

Q    So, you had a little chit-chat for ten or 15 minutes and then you got locked in and then you didn't get to play the game until after one?

A    True.

Q    Then after lunch what happened?

A    We went back to start the game.  That's when

Newsome-People-cross                              1073

he asked me what are you in here for.

Q     You go back, you go - - you walk down to Halstead's
cell or did he ask you to come down?

A     He didn't ask me to come down.  We were going
to resume playing the game after lunch anyway so I went
down on my own.

Q     You just walked in?

A     Yes.

Q     He was in the cell himself?

A     He wasn't in the cell, he was standing out.

Q     By himself?

A     He was talking with someone.  I don't know the
name of the person he was talking to.

Q     There was another inmate there?

A     Yes.

Q     Any other inmates around?

A     Not when we started playing cards.

Q     You started to play cards, is that when this
conversation took place that you testified here about?

A     That's when it took place when he asked me what
I was in for.

Q     Is that while you were playing cards?

A     No, I wasn't.  We were playing cards to pass
the time.  I didn't start a conversation about what he

1

2   was in for or what I was in for.  He started a conversation.

3        Q   He started the conversation, is that when you

4   were playing cards?

5        A   Yes.

6        Q   Is that when you first started to play cards?

7        A   That's right.

8        Q   As you sat down he didn't know you too well,

9   did he?

10       A   No.

11       Q   You didn't know him too well?

12       A   He asked me what are you in for.

13       Q   You said, violation of probation and - -

14       A   Yes.

15       Q   And then you said what are you in for?

16       A   yes.

17       Q   And then what did he say?

18       A   He said he was accused of murder and rape.

19       Q   Accused?

20       A   Yes.

21       Q   What happened then?

22       A   We kept talking.  After he said he was accused

23   of murder and rape, we kept talking.  He said, "I will

24   be out of here by the summer."

25       Q   This came right after he told you he was accused

of murder and rape and that's when he told you, "I will

be out of here by the summer?"

    A    That's right.

    Q    Because they have no evidence against me?

    A    Right.

    Q    What happened then?

    A    He said, "Although I did do it, but my - - my

two other friends - - but they don't have enough evidence

to hold me."

    Q    You first saw the man the first time in your

life, first time in your life in the morning?

    A    Yes.

    Q    You talked to him about ten minutes or 15 minutes?

    A    Fifteen minutes, half an hour.

    Q    Okay.

    A    Yes.

    Q    You got locked in?

    A    Yes, we did.

    Q    You are now walking down after lock in, after

lunch.  You now talked a couple minutes.  He asked you

what are you in here for and you tell him, is that correct?

    A    Correct.

    Q    You say to him what are you in for and he tells

you; is that correct?

A     Correct.

Q     And then he tells you they haven't got enough evidence even though I did it.  He volunteered that?

A     He said it.  I didn't ask him did he do it.  I don't know why he did it.  But that's what he told me.

Q     Mr. Newsome, you are testifying here that this man after seeing you for 15 minutes, okay, meeting you for another five minutes, perhaps while you are playing cards, confesses and implicates himself in a murder; is that what you are saying?

          MR. KLEIN:  Objection.

          THE COURT:  Sustained.

Q     Is the time right, 15, 20 minutes?

A     I said 15 to 30 minutes when he first approached me about cards, but it was later than that when we started playing cards.

Q     How many other people are on this tier?

A     It was filled up when I was there.  I think it's 75.  It's like 19, 21 people, I think.  23 people, something like that.

Q     Twenty-one people on this tier and you knew, did you not, that Dennis Halstead was at the county jail since June 21st, 1985, did you not?

A     I didn't know that until he told me.

Q    He told you he was there since June?

A    Yeah.

Q    And there are 20 people on the tier and he has been there consistently with 20 other people in a group since June; is that correct?

A    Yes.

Q    He picked you out to confess this crime to you after you knew him for 15 minutes, is that what you are referring to today?

MR. KLEIN:  Objection.

THE COURT:  I will permit it.

A    I didn't say he picked me out to confess to me.  He could have said it to someone else also.  But, I'm telling you what he told me.

Q    Now, let me ask you this, Mr. Newsome, what did he tell you?

A    He told me that he was riding around with two of his other friends in a van.

Q    He said, "a van?"

A    Yes.

Q    Did he tell you the color of the van?

A    He didn't tell me the color.

Q    Did he tell you the make or model of the van?

A    No, he didn't.

Q    What else?

A    He said they picked up a girl hitchhiking.

Q    Now, are you sure that he said "hitchhiking?"

A    That's the word what I took it.  That's what
I heard.

Q    So this girl now is hitchhiking?

A    Yes.

Q    Go ahead.

A    He said he picked her up and one of his friends
that was driving the van made an advance.

Q    He is telling you this story right in one continuous
period; is that correct?

A    One continuous period, yes.

Q    He didn't tell you a little bit, tell you  a
little bit more?

A    During the course of playing cards, he was saying
a little bit here.

Q    Did you sit there playing spades and he was
relating this crime to you?

A    At the time he was talking, we weren't playing
cards, we were just holding the hands.

Q    You say he said he picked up this girl hitchhiking
right?

A    Yes.

Q    And he was in a van.  Did he say where he picked her up?

A    No.

Q    Did he say what village?

A    He didn't say what village.

Q    What county?

A    He didn't say that but I assume it's Nassau County.

Q    Did he say what road it was on?

A    I don't recall that.

Q    Did he ever mention a roller skating rink to you?

A    No.

Q    Never said Hot Skates?

A    No.

Q    What else did he tell you?

A    He told me after his friend had made an advance at her that she refused, that they started tussling back in the van.

Q    He didn't tell you the names of his friends, did he?

A    He called out one name.  I remember the first name was John.

Q    When you told the story to Detective Pizer you

didn't tell him that he gave you any names, did you?

A    Maybe he didn't put it down but I told him.

Q    Did you tell him that he did it with two other whites, no names, in van, owned by one of the guys?

A    That's the way I stated it to him.

Q    No names?

A    Just one. One name. I told him. I don't know if he wrote it down.

Q    Did you say to him that he did it with two other whites, no names, in van, owned by one of the guys?

A    That's the way I say to him. I'm sure I thought I gave him the name.

Q    But you gave Detective Connaughton a name when you give a second statement about this case just a few weeks ago on October 22nd, 1986; is that right?

A    Correct.  I thought I give Detective Pizer the name also, but he forget to write it down.

Q    Don't you think Detective Piser would have written down the name if you would have given it to him?

MR. KLEIN:  Objection.

THE COURT:  Sustained.

Q    You know Detective Pizer for a long time, Major Case Squad?

A    No.  Just 1985 until the case was closed.

Q    That case was Butch Vailles, wasn't it?

A    No, it wasn't.

Q    Now, what did you tell him - - what did he tell you after that?

A    After what?

Q    You say continue the story?  You said two friends in the van?

A    After they tussled in the van and she fall, until she gets tired and he tell me that all three of them had sex with her.  All three of them fucked her. After that they rode around for awhile.

Q    Did he say that she screamed?

A    I don't recall him ever saying that she screamed.

Q    He did say that she struggled?

A    Yes.

Q    And they had sex with her?

A    That's right.

Q    Did he tell you that they ripped her clothes off or took her clothes off?

A    He didn't tell me that they ripped her clothes off but I'm sure they did.

Q    Did he tell you what she was wearing?

A    No.

Q    Other than that she was a beautiful young Italian

girl, did he tell you anything about her?

      A   No.

      Q   Color of her hair?

      A   No.

      Q   Her complexion?

      A   Didn't mention that.

      Q   Her height?

      A   Didn't mention that.

      Q   Her weight?

      A   No.

      Q   Did he tell you her name?

      A   No, he didn't.

      Q   Did he tell you whether anybody knew her of the three?

      A   No, he did not.

      Q   Did you then take it that this was a stranger?

          MR. KLEIN:  Objection.

          THE COURT:  Sustained.

      Q   What else did he tell you, Mr. Newsome?

      A   Nothing.  But, he said after that that they rode around for awhile and that his friend grabbed her by the neck again.  He did something.  I don't recall exactly what he said he did when he grabbed her by the neck and - - but, after that - -

Q    he told you they rode around for awhile?

A    Right.

Q    Did he tell you what time it was?

A    He didn't mention the time at all.

Q    Did he tell you where they rode, where they
were riding?

A    He didn't say.  He just said around.

Q    He said the three  of them had sex with this
girl?

A    Yes.

Q    It was forcible?

A    That's right.

Q    And he smiled about it?

A    Yes, he did.

Q    He tells you - - he knows you for a half hour,
never met you before in his life. He told you he forcibly
raped the girl and smiled about it?

A    Yes, he did.    There was more than a half hour.

Q    It was?  An hour?

A    It was more than an hour.

Q    Now, he tells you that they did something with
her neck?

A    Yes, he did.

Q    Did he tell you that she was choked manually

Newsome-People-cross                    1084

by somebody's hands?

    A    He didn't say that she was choked manually. He just said he grabbed her by the neck.

    Q    Who grabbed her by the neck?

    A    I think one of his friends.  I think he said, "John."

    Q    You do not know?

    A    No.

    Q    You do not remember what they did with the girl?

    A    All I remember is when he said he grabbed her by the neck.

    Q    Do you know what a mover's strap is?

    A    Yes, I know what it is.

    Q    You are  in the moving business,  right?

    A    Yes.

    Q    Describe to this jury what a mover's strap is?

    A    It depends on what type of straps you are talking about.

    Q    What type of straps do they have in that business?

    A    They have straps that you hook in each wall when you get ready to tie off a shipment to keep it from falling from the floor and breaking the furniture.

    Q    Will you describe the strap?

           MR. KLEIN:  Objection, Judge.

Newsome-People-cross                                    1085

             THE COURT:  He said there are different straps.

             MR. KLEIN:  He didn't testify to that.

             MR. FAMIGHETTI:  He testified about tying the straps on the wall in the truck.

             THE COURT:  Are you making an objection?

             MR. KLEIN:  Yes.

             THE COURT:  Objection sustained.

Q    Describe a typical mover's strap to this jury, if you can?

             MR. KLEIN:  Objection.

             THE COURT:  Sustained.

Q    You have been in this business 16 years?

A    Yes.

Q    You use equipment in connection with your function as a mover, do you not?

A    Yes, I do.

Q    And you use these mover's straps during the course of your employment, do you?

A    Yes, I do.

Q    For 16 years?

A    Yes.

Q    Any straps less than three inches in width?

             MR. KLEIN:  Objection.

Newsome-People-cross                           1086

THE COURT:  Sustained.

A     They - -

THE COURT:  Don't answer the question.

Q     Describe it for us?

MR. KLEIN:  Objection.

THE COURT:  Sustained.

MR. FAMIGHETTI:  I can't think of anyone
more qualified to do that, Judge.

THE COURT:  I can.  I'm not going to engage
in that.  I don't want any more questions on
this line from this witness, Mr. Famighetti.

MR. FAMIGHETTI:  Exception.

Q     Okay.  Well, he didn't tell you that he strangled
her with a mover's strap, did he?

A     No.

Q     He didn't tell you that this girl was strangled
with a rope, did he?

A     No.

Q     He didn't tell you anything about strangling,
did he?

A     No.

Q     He just said that they did something to her
neck?

A     That's all.

Newsome-People-cross                                1087

Q    Did he tell you that the girl was killed?

A    He didn't tell me that she was killed.  He just say he grabbed her by the neck.

Q    And this all allegedly took place in the van; is that right?

A    Yes.

Q    He never told you that this girl was outside on the ground somewhere?

A    No.

Q    Now, they said they dumped her - - you told me that you said they dumped her out?

A    Yes, I did.

Q    Where did they dump her?

A    Somewhere around Lynbrook or Valley Stream.

Q    He didn't know?

A    No.

Q    Did he say anything to you about railroad tracks?

A    No.

Q    Anything about woods?

A    No.

Q    At the conclusion of the statement that he alleged made to you, he said don't let this leave the cell?

A    Exactly.

Q    At the conclusion of that statement, how long

did you know Dennis Halstead?

A    I would say altogether maybe about three, four
hours.

Q    How long were you in contact with him during
the course of the day? Face to face?

A    Sometime - - most of the day we played cards.

Q    Now, when this statement was made to you it
was just you and Dennis; is that correct, in his cell
playing cards?

A    It was just the two of us and after the conversation
was over there were four of us playing like partners.

Q    Four guys were playing?

A    Yes.

Q    The people that he was playing with were people
who had been on the tier much longer than you?

A    That's right.

Q    You were all together?

A    Right.

Q    Nothing ever was mentioned in front of them?

A    Not while we were playing.

Q    There was nobody other than you and Halstead
in the cell at the time he made these admissions?

A    No one but he and I.

Q    And you never brought this up before anyone

else?

    A    No, I didn't.

    Q    So, the only thing we have here to verify what
you are saying, Mr. Newsome, is your word and your word
alone; is that correct?

              MR. KLEIN:  Objection.

              THE COURT:  Objection sustained.

    Q    There were no other witnesses to this alleged
admission; is that right?

    A    Correct.

    Q    Now, you say that after this incident occurred,
you did something, correct?  You called Detective Pizer?

    A    Yes, I did.

    Q    And when did you do that?

    A    I called him the next day.

    Q    That would be January 31st, is that right?

    A    Yes, sir.

    Q    Did he come out to see you right away?

    A    No, he didn't.

    Q    Did you have occasion to tell them what you
wanted to talk to them about?

    A    I didn't tell him over the phone.  I told him
when he came up.

    Q    You didn't tell him over the phone?

A     No, I didn't.

Q          How come you didn't tell him over the phone?

A     I didn't speak to him on the phone about it.

Q     You were concerned about talking over a telephone?

A     Not that I was concerned.  It's just that he said he will talk to me when you come up.

Q     Did you tell him it involved the Fusco murder?

A     No, I didn't.

Q     Did you tell him it concerned a murder?

A     No.

Q     What just did you tell him?

A     I told him I had some very important information that might be of some use.

Q     That's the fellow who you acted as a confidential informant for in the past?

A     Yes.

Q     He wasn't surprised to hear from you that you had important information, was he?

          MR. KLEIN:  Objection.

          THE COURT:  Sustained.

Q     But, you determined in your own mind that this was important information?

A     Yes, I did.

Q     So important that it was not - - withdrawn.

This information was so important that you didn't want to talk about it over the phone?

A    Not that I didn't want to talk about it over the phone, he said he would speak to me when he come down.

Q    You didn't tell him anything over the phone?

A    No, I didn't.

Q    Now, he comes to see you on February 24th, correct?

A    Yes.

Q    By the way, Mr. Newsome, did you have an opportunity to review some of the statements you gave in this case prior to testifying here today?

A    Yes, I did.

Q    Did you review certain notes made by Detective Pizer dated February 24th, 1986?

A    Yes, I did.

Q    Those weren't yours - - that wasn't your statement, though, that's just what you told me?

A    Yes.

Q    Then you made a subsequent statement on October 22nd, 1986, is that right?

A    Yes.

Q    And that was just a couple weeks ago, right?

A    Right.

Q    You reviewed that day also?

A     Yes.

Q     And--but before you did the statement with
Dectective Connaughton on October 24, 1986, didn't he
give you an opportunity to review Dective Pizer's notes?

A     No, I didn't.

Q     He didn't?

A     No.

Q     Now finally, on October 24, 1986, did you have
an opportunity to speak to Detective Pizer; is that right?

        MR. KLEIN:  When?

        THE COURT:  October 24th?

        MR. FAMIGHETTI:  I'm sorry.  Withdrawn.

Q     February 24, 1986 you had a opportunity to
speak to Detective Pizer; is that right?

A     Yes.

Q     Is that the only time he saw you was February 24
1986?

A     He saw me one other time.

Q     When was that?

A     I don't recall the day, but I was the first
visit he made. That was on the 24th.  The next visit
when he brought down the homicide detective Volpe.  I
don't recall the date on it, but that wasthe second

time.  That was the last time I saw him.

Q    Could that be March 3rd?  Is that a few days before you were released?

A    It could have been around that time.

Q    As a matter of fact, in the statement you made to Detective Connaughton, dated October 22nd, 1986, you told Detective Connaughton you were in the Nassau County Correctional facility from mid-January to mid-March? That's not correct?

A    I said I was in from January 29th.  I made a mistake.  It wasn't mid-January.

Q         It wasn't mid-January?

A    No.

Q    You told Detective Connaughton that?

A    That I was in mid-January, no, I did not.

Q    You read this statement, did you not?

A    Yes, I did.

Q    It says mid-January, does it not?

A    January 29th, when I was sentenced I went in there.

THE COURT:  That's not what he told you. Do you know what the statement says?

THE WITNESS:  Yes, I know what the statement says.

Newsome-People-cross                    1094

Q    Did you read it?

A    Yes.

Q    Does it say mid-January?

A    It could have been corrected.

Q    But you didn't do that?

A    (No response.)

Q    Now, on February 24th, when Detective Pizer finally came to see you, you had a lot of things to tell him, didn't you?

A    Yes. I told him some of the things.

Q    Isn't it a fact you told him about this Halstead thing and you told him you didn't have any names at that time; is that correct?

A    Yes.

Q    Detective Pizer referred to you as the C.I., did he not?

        MR. KLEIN:  Objection.

A    No.

        THE COURT:  I will permit it.

Q    You read these notes of Detective Pizer?

        MR. KLEIN: I object to the notes.

        THE COURT:  Sustained.

Q    Do you know an individual named Tom McBride?

A    Yes, him inside there.

Q    You met him where?

A    In the facility.

Q    What tier was he on?

A    The same tier.

Q    Did you give Detective Pizer some information about Tom McBride?

A    Yes, I did.

Q    Did you have some incriminating information about Mr. McBride as well as Mr. Halstead?

A    Yes.

Q    How about a Mr. Ansel, did you give Mr. Pizer on Februrary 24th, information about Mr. Ansel?

A    Yes.  That was the case I was working on.

Q    I thought that case ended in December?

A    It did.

Q    But, you continued to give Detective Pizer information about Mr. Ansel's case, even on February 24th, 1986; is that correct?

A    Yes, it is.

Q    You gave him some incriminating information about Mr. Ansel; is that correct?

A    Yes.

Q    So you gave Detective Pizer incriminating information about Tom McBride and Dennis Halstead on that day?

A    Yes.

Q    Then you gave him some incriminating information about a male black named Bob from Roosevelt?

A    Yes.

Q    You gave him some incriminating evidence on the same day about a man named Christiansen?

A    Yes.

Q    So altogether that day, in that one interview, you gave Detective Pizer incriminating evidence about Christiansen, who you said sold cocaine?

A    Yes.

Q    About a  male black who sells a large amount of cocaine in Roosevelt?

A    Yes.

Q    You gave him some information about Mr. Ansel who hangs out at the Garden of Eden in Hempstead; is that right?

A    That's right.

Q    And you gave some information about Tom McBride; is that right?

A    Right.

Q    And of course, the information - - you also gave some information about Dennis Halstead?

A    Correct.

1

2      Q    And you don't expect to receive anything in

3   return for that?

4      A    No, I don't.  I wasn't offered anything at all.

5      Q    But, you are not - - you just do that because

6   you are a good citizen; is that right?

7      A    I have three daughters of my own.  Could be

8   somebody coming forward about one of mine.

9      Q    How about with the cocaine and the pot?  You

10  used to smoke?

11     A    I used to.

12     Q    You sell pot?

13     A    I never sold any.

14     Q    How would you like somebody to sell some pot

15  to your small little daughters?

16     A    I don't sell pot.

17     Q    Now, I think you said that when this conversation

18  took place in the cell that you - - it didn't come right

19  out, did it?

20     A    Not all at once.

21     Q    In other words, what I believe you testified

22  to was that after Halstead asked you what you were in

23  there for and you said violation of probation and you

24  asked him what are you in here for he said I'm accused,

25  right?

Newsome-People-cross                              1098

A    Yes.

Q    Of murder and rape?

A    That's correct.

Q    He didn't then confess, did he?

A    Yes, he did.

Q    Didn't you tell this jury on your direct examination that you were playing cards and you noticed that he was biting his nails, didn't that happen?

A    Yes.

Q    And then you said to him and this is how you did it?   Mr. Halstead, if you didn't do it, why are you biting your nails?

A    I said, "Why are you so nervous?"

Q    Did you or did you not say to him if you didn't do it, why are you so nervous?

A    Yes.

Q    He had been sitting in that jail cell since June, 1985; is that correct?

        MR. KLEIN: Objection, your Honor.

        THE COURT:  Well, if he knows, I will permit it.

A    Yes, that's what he told me.

Q    Now, you infer from the fact that he is biting his nails he is nervous about this case.  You met him

Newsome-People-cross                                    1099

an hour ago; is that right?

    A    I didn't say he was nervous about the case.
If he didn't do it why was he so nervous.  He wouldn't
have anything to hide.

    Q         Why would he be nervous anyway sitting
in jail, waiting for trial some six, eight months hence?
Why did you infer that he was nervous about the case,
Mr. Newsome?

              MR. KLEIN:  Objection.

              THE COURT:  Sustained.

    Q    You asked him why are you so nervous about the
case?  Why are you biting your nails?  Could he have been
nervous about something else?

              MR. KLEIN:  Objection.

              THE COURT:  Sustained.

    Q    By the way, how do you play spades, Mr. Newsome?

    A    How do you play spades?

    Q    Yes.

    A    There are 13 spades in the deck.  Ace high down.
If you play with wild cards, you use the jokers and duces.

    Q    Isn't it a game that has to be played with four
people?

    A    It could be played with two peoples also.

    Q    There comes a time, Mr. Newsome that you are

Newsome-People-cross

1100

on tier three that Dennis Halstead becomes a tierman?

A    Just before I was discharged.  About a week.

Q    Isn't it a fact that you were pretty upset when they designated Halstead to be tierman?

A    No, I did not.

Q    Didn't you make complaints to some jail officials about Halstead being tierman?

A    No.

Q    Didn't you say that they should make a statement that they should have voted or instead of being placed by the prison officials?

A    No, I never made a statement like that.

Q    Were you pretty angry about that?

A    No, I wasn't.

Q    After this alleged admission that was made to you, Mr. Newsome, did you have occasion to speak to Halstead again about anything else?

A    Well, after he was elected tierman, he didn't have anything to say to me after that.  He said - - that was it.  I spoke occasionally and that was it.

Q    I don't understand why don't you explain that?

A    After he became the tierman, after that?

Q    Yes.

A    He didn't have anything to say to me.

Q    He didn't want to be friendly with you any more?

A    Because of I guess, because Thomas McBride was pretty tight friends.

Q    Thomas McBride, is that the other man that you informed on?

A    Yes.

Q    He and McBride were friendly?

A    Yes.    During the course of my last week in there.

Q    I'm sorry?

A    Is my last week in there he was friends before that.    McBride came on the tier after I was there.

Q    You didn't get along with McBride?

A    I got along with everybody.

Q    Why wouldn't Halstead speak to you any more after he got friendly with Mr. McBride?  I don't understand?

A    I guess because McBride had an argument and he didn't want to be in.

Q    McBride and you had an argument?

A    Yeah, about the newspapers.

Q    Newspapers?

A    Yes.    Every tier gets a paper everyday.

Q    When was that argument?

          MR. KLEIN: Objection, your Honor.

Newsome-People-cross                    1102

THE COURT:  What's that got to do with it?

MR. FAMIGHETTI:  I want to explore whether he had any problems with Mr. Halstead as well.

THE COURT:  Well, ask him.

Q    So, you had that argument with McBride and soon after that you didn't get along with Halstead?

A    Correct.

Q    He was the tierman, and he decided to have nothing more to do with you?

A    Correct.

Q    As a result of his designation as the tierman, did he deprive you of food or anything?  I got the same amount of food that I was given everyday.  I didn't look for anything extra.  I just got what I had coming to me.

Q    You did look for something extra, that's really why you were angry?

A    I didn't look for anything extra.

Q    He had a fight with you because you had a fight with Tom McBride?

A    No.  I'm not a big eater anyway.

MR. FAMIGHETTI:  Thank you, Mr. Newsome.

CROSS-EXAMINATION

BY MR. ROBINSON:

Newsome-People-cross                                      1103

Q    Good afternoon, Mr. Newsome.

A    Good afternoon.

Q    Now, you indicated the first time you received
this information and you spoke to Mr. Halstead, he told
you immediately of this confession?

MR. KLEIN:  I object.  We have gone over
that for half a day.

MR. ROBINSON:  I would like to - - it goes
towards credibility.

THE COURT:  Step down.  Record, come up.

(Thereupon a discussion ensued at the bench
not within hearing of jury.)

MR. KLEIN:  Judge, this is going on --
this is about the third time this has happened
at the trial.  A witness testified with the
conversation of one defendant and then both
attorneys seek to cross-examine him on the same
areas.  Now, he didn't mention Mr. Restivo's
name once.  He didn't mention he had any  con-
versations.

THE COURT:  He mentioned somebody.

MR. KLEIN:  John.  Let him cross-examine
on that one issue.  To go over his prior testimony
again and go over this again - -

THE COURT:  He's not doing that.

MR. KLEIN:  That's what he did with the other witnesses.

THE COURT:  Go ahead.

MR. ROBINSON:  I would indicate my offer of proof is this:  It goes to an inconsistency to what he said on direct.  In his statement of October 22nd, he said Halstead first said I didn't do it.  He didn't ever say that on the stand.  I feel it goes to his credibility, to his entire credibility, because later on it indicates in this statement that he says John, the name John comes up.  However, in notes of Detective Pizer, there is no such name. I feel I have a right to go into his direct and the inconsistency of October 22nd.  Also, the notes that he made on this conversation in March of '86.  I feel that those kind of inconsistencies is important.  The way of developing it is technique, not necessarily content.

MR. KLEIN:  We have gone over the whole thing already.

MR. ROBINSON:  He didn't say it at all.

THE COURT:  I won't restrict you as far

1   as who John was.

2       MR. KLEIN:  You want to bring out that

3   John is your client?  The way it is now, I think

4   you are crazy.

5       MR. ROBINSON:  I think I have a right to

6   explore this.  What I am asking you to do is

7   not to limit me in my technique of how to examine.

8       MR. KLEIN:  Are you going to instruct the

9   jury that what Mr. Newsome has to say shouldn't

10  have any affect on Mr. Restivo?

11      MR. ROBINSON:  How can you say that?

12      MR. KLEIN:  Because it's the law.

13      MR. ROBINSON:  We are not dealing with

14  a void.

15      THE COURT:  To an extent I agree with Mr.

16  Robinson.  I'm not going to restrict, but I'm

17  going to cut you down.

18      MR. ROBINSON:  I'm going to pare it down

19  myself.  I don't want to be here all day.

20      (The following ensued in open court.)

21  Q    Mr. Newsome, you were on that particular tier,

22  C-3, because that was protective custody; is that correct?

23  A    Yes.

24  Q    The reason you were on protective custody is

1

2    because you were sent there to obtain information about

3    inmates that were on C-3; is that right?

4         A    No, sir.

5         Q    You used the technique of saying that you were

6    being threatened in order to get on that tier; is that

7    right?

8         A    No, it wasn't.

9         Q    In fact, you told the prison officials that

10   you were an informant and they knew that when you went

11   to C-3, right?

12        A    No.

13        Q    Didn't you inform them of that?

14        A    No.

15                  MR. KLEIN:  I object to this.

16                  THE COURT:  We have been over this, Mr.

17             Robinson.

18                  MR. ROBINSON:  All right.  I will move

19             on.

20        Q    Now, when you spoke to Detective Pizer on the

21   24th of February, my client's name never came up, did

22   it?

23                  MR. KLEIN:  Objection.  How does he know

24             what his client's name is?

25        Q    Do you know who this man is here?

Newsome-People-cross                           1107

1

2      A     No, I don't.

3      Q     Are you sure?

4      A     Positive.

5      Q     Well, who do you work for again, sir?

6      A     Who do I work for?

7      Q     Who do you work for?

8      A     I work for B. Neilson, Moving and Storage.

9   Agent for North America.

10     Q     Isn't it a fact that Move-Rite Moving dealt

11  with that group?

12     A     Not that I know of.  I have no knowledge of

13  that.

14     Q     You knew the name Move-Rite?

15     A     I heard of the name, but I never worked for

16  them.   This is a small firm.  I never even seen one of

17  their trucks.

18     Q     On February 24th, you didn't know the name John

19  at all, did you?

20     A     I didn't know the name John until it was brought

21  up in the conversation between Halstead and I.

22     Q     You didn't know the name until it was brought

23  up when Detective Volpe spoke to you with Officer Connaughton

24  isn't it a fact?

25     A     No.

Newsome-People-cross                              1108

1

2      Q    Well, there is no mention of John anywhere in

3    notes made by Detective Pizer, is there?

4               MR. KLEIN:  Objection, Judge.

5               THE COURT  Sustained.

6      Q    You never told Detective Pizer the name John

7    at all, did you?

8      A    I mentioned the name.  I don't know why it wasn't

9    in the statement.

10     Q    I don't know why it w

11               MR. KLEIN:  I object to his comments.

12               THE COURT:  Now, that's improper, Mr. Robinson.

13     Q    You didn't utilize that terminology at all,

14   the name John, at all until October 22nd, after this trial

15   was already underway, did you?

16     A    I use the name to Detective Pizer.  Like I say,

17   I don't know why it wasn't in that statement.

18     Q    Well, this very very important information that

19   you have and that you gave to this detective on February

20   2nd of this year, didn't turn up in a statement of any

21   sort until October 22nd of this year; is that right?

22               MR. KLEIN:  Objection.

23               THE COURT:  Objection sustained.

24     Q    Let me ask you something else.  You know you

25   said on direct examination that as soon as you started

talking to Dennis Halstead he started confessing and telling

you all about it?

          MR. KLEIN:  Objection.

          THE COURT:  Sustained.

          MR. KLEIN:  Could we please move on to

      something relevant?

          THE COURT:  Never mind the comments.  Go

      ahead.

    Q    When you made the statement on October 22nd,

didn't you indicate and didn't you in fact sign such a

statement wherein you told Detective Volpe and Officer

Connaughton when Dennis first replied here, I am accused

of murder and rape and I didn't do it?

    A    Yes.

    Q           You didn't tell us that on direct examination,

did you?

    A           MR. KLEIN:  Objection.  Yes he did.

          THE COURT:  Objection sustained.

          MR. ROBINSON:  I would ask for a read back.

          THE COURT:  Mr. Robinson, please move on.

    Q    Now, you told us also that somebody grabbed

her around the neck; is that right, but you didn't know

what happened with that?

    A    Yes.

Newsome-People-cross                                 1110

Q    And yet you told us that Detective Pizer forwarded you or told you that he was going to send you to the Homicide Bureau; is that right?

A    He didn't say he was going to send me to the Homicide Bureau.  He said he would get somebody from Homicide down to talk to me.

Q    You didn't tell him anything about a homicide, did you?

MR. KLEIN:  Objection.

THE COURT:  Sustained.

Q    Well, you didn't say anything about a girl being murdered here, did you?

A    No, I didn't.

Q    You didn't say anything about a strangulation, did you?

A    No, I didn't.

Q    So, you didn't tell this Detective Pizer anything about a murder as far as you are concerned, didn't you?

MR. KLEIN:  Objection.  He said they threw the body out of the van.

THE COURT:  Objection sustained.

MR. ROBINSON:  I don't think he said a body out of the van.  That's what I am trying to get.  I'm asking for a little bit of latitude

to cross-examine him.

THE COURT:  Ask your next question.

Q    Mr. Newsome, the way in which you gleaned this information was by reading newspapers, wasn't it, sir, the same newspapers that you got in the fight with Mr. McBride about?

A    Yes.

Q    You never read about this case in the paper at all?

A    No.

Q    Not at all?

A    No.

Q    But you read the papers in the jail?

A    Yes, I read the sports.

Q    That's what you were fighting over?

A    No, I - - they said I had the paper. I did not, didn't have it.  That's when the argument broke out.

Q    When you were talking to Police Officer Connaughton and Detective Volpe, did they make any notes prior to putting this statement down?

A    No.

Q    They didn't make any notes beforehand as to what you had told Detective Pizer and how it may have changed - -

Newsome-People-cross                                    1112

MR. KLEIN:  Objection to the question,

Judge.

THE COURT:  Sustained.

Q    Well, did your statements change between the time you spoke to Detective Piser the time you spoke to Officer Connaughton?

MR. KLEIN:  Objection.

THE COURT:  Sustained.

Q    Isn't it a fact that Detective Volpe told you the name John, isn't that how that got into that statement?

A    No, it's not.

MR. ROBINSON:  No further questions.

THE COURT:  Anything further?

MR. KLEIN:  No, your Honor.

THE COURT:  Thank you, Mr. Newsome.

(Thereupon the witness was excused.)

THE COURT:  Next witness, Mr. Klein?

MR. KLEIN:  At this time, I want to play that tape.

THE COURT:  Do you need a short recess to set it up?

MR. KLEIN:  No problem at all.  I just ask that it be marked.

MR. FAMIGHETTI:  Can we approach on this,