UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————————X

JOHN KOGUT,                                         06-CV-6695
                          Plaintiff,                (JS)(WDW)

THE COUNTY OF NASSAU, POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE,
DETECTIVE DENNIS FARRELL, CAROLANN HESSMAN AS
 EXECUTRIX OF THE ESTATE OF DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
CHARLES FRAAS, DETECTIVE FRANK SIRIANNI, DETECTIVE
HARRY WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, JOHN DOES 1-5, DETECTIVE THOMAS
ALLAN, DETECTIVE RICHARD BRUSA, DETECTIVE JACK
SHARKEY, DETECTIVE DANIEL PERRINO, DETECTIVE
SERGEANT CAMPBELL, and RICHARD ROE SUPERVISORS 1-10

———————————————————————————X

PLAINTIFF JOHN KOGUT'S MEMORANDUM OF LAW IN OPPOSTION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.      PRELIMINARY STATEMENT

This is a 42 U.S.C. § 1983 action for damages by the plaintiff John Kogut, a United

States citizen, against the named Defendants for various State and Federal constitutional and

civil rights violations stemming from his arrest and multiple prosecutions for the rape and

murder of Teresa Fusco. The Defendants' limited summary judgment motion should be denied.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issues of fact exist and the movant is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) The moving party bears the burden

of demonstrating the absence of any genuine issues of material fact. If such a showing is made,

the nonmoving party then bears the burden of coming forward with "specific facts showing that

there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Signorile By and Through Signorile v.

City of New York, 877 F.Supp. 403 (EDNY, 1995) In deciding the motion all ambiguities must

be resolved and all inferences drawn in favor of the nonmoving party. Tobing v. City of New

York, 929 F.Supp. 86, 89 (SDNY, 1996)  As stated in Tobing:

> "…the trial court's task at the summary judgment motion stage of the litigation is
> carefully limited to discerning whether there are any genuine issues of material
> fact to be tried, not to deciding them. Its duty, in short, is confined at this point to
> issue finding; it does not extend to issue-resolution." Id.

## II.      ALLEGED BASIS FOR SUMMARY JUDGMENT

The defendants maintain they are entitled to summary judgment or partial summary

judgment on Counts 3, 5, 6, and 11 of the plaintiff Kogut's complaint "to the extent each of those

Counts is predicated on either a failure to accord him his Miranda rights or to disclose

Brady/Giglio material. According to the defendants " it was not clearly established" (1) "…at the

relevant time period that Miranda v. Arizona, 384 U.S. 436 (1966), announced a constitutional

rule, such that the failure to provide Miranda warnings during a period of custodial interrogation itself established a constitutional violation," and (2) "…it was not clearly established that between 1984 and 1986, criminal defendants were entitled to be provided with Brady/Giglio materials known only to the police but not to prosecutors, or that any associated disclosure duty inhered to police officers" (Count 11) [DE 223, p. 5]

Defendants also seek summary judgment under Count 4, Kogut's malicious prosecution claim related to his second trial in 2005, on the ill conceived grounds that the individual defendants' played no role in the decision to retry him. [DE 223, p. 24]

Finally, Defendants' claim entitlement to summary judgment under Counts 9 and 10, plaintiff's Monell claims, on the grounds that plaintiff cannot establish the existence of an unconstitutional custom, policy, or practice at the time of Kogut's interrogation.

### III.  THE DEFENDANTS ARE NEITHER ENTITLED TO QUALIFIED IMMUNITY UNDER COUNT 3, MALICIOUS PROSECUTION (1986 TRIAL), NOR COUNTS 5 AND 6, FALSIFICATION OF EVIDENCE

**The Plaintiff Has Not Asserted a Stand-alone Claim for a Violation of His Miranda Rights Absent Coercion, But Instead That the Defendants Violation of His Miranda Rights During His Interrogation Was But One of a Multitude of Acts of Misconduct Committed By Defendants and Forming the Basis of His Malicious Prosecution Claim in Count 3 and His Falsification Claims in Counts 5 and 6.**

### A.    Count 3  Malicious Prosecution

The defendants do not maintain they are entitled to qualified immunity on the plaintiff's malicious prosecution claim (Count 3) or his falsification of evidence and documents claims (Counts 5 and 6) or that there is no genuine issue of fact as to those counts, but instead maintain they are entitled to qualified immunity and partial summary judgment in so far as a Miranda violation forms "…a basis for liability independent of proof of actual coercion." [DE 223, p. 17,

2

fn. 9, p. 16] Their argument is strictly a legal one in which they assert that a criminal defendant during interrogation did not have a constitutional right to Miranda warnings until the court decided in Dickerson v. United States, 530 U.S. 428 (2000) that Miranda rights were constitutionally based and could not be overruled by legislative action.

The plaintiff has never asserted that the failure to accord him his Miranda rights constitutes the sole basis of either his malicious prosecution claim (Count 3) or his falsification of evidence and documents claims (Counts 5 and 6). Instead, the plaintiff has contended that the failure to accord him his Miranda rights, during his interrogation, is but one component part of the overall claims in each count. Indeed, the defendants appear to concede in their moving papers that if the plaintiff is contending that the Miranda violation is a part of plaintiff's claim that he was coerced into confessing, or a part of his falsification of evidence claims, that they are not entitled to partial summary judgment by acknowledging that a Miranda violation coupled with compelled self-incriminatory statements constitutes a recognizable constitutional claim. Oregon v. Elstad, 470 U.S. 298, 306 (1985) [DE 223, p. 16]

Count 3 of the complaint asserts a malicious prosecution claim under 42 USC §1983 for Kogut's 1986 murder trial. To state a claim for malicious prosecution plaintiff must establish the following four elements: "(1) commencement or continuance of a criminal proceeding, (2) lack of probable cause, (3) existence of malice, and (4) termination in plaintiff's favor." DiBlasio v. City of New York, 102 F.3d 654, 657 (2nd Cir. 1996)

The factual allegations in the Kogut complaint and in his deposition clearly establish each of the first three elements of his malicious prosecution claim. As to the fourth element, "a favorable termination on the merits," this Court in its decision dated December 11, 2009 held as a matter of law that the plaintiff has satisfied the "favorable termination" element. [DE 83, p. 16]

3

Specifically, Kogut in his complaint and his deposition testimony has established that the defendants:

1.    Physically and verbally abused and intimidated him during his interrogation [Exhibit AA, Kogut Deposition, at 136-143, 153-156];

2.    Denied him his right to counsel, to remain silent, and to leave the homicide unit [Id. at 121, 152, 154-155];

3.    Coerced him into signing a confession created by the defendants Volpe and Dempsey (which also constitutes a creation of false evidence) [Id. at 242-245, 209];

4.    Coerced him into signing a "Miranda Rights Card" after his "interrogation" ended (which also constitutes a creation of false evidence) [Id. at 152-153, 208; Exhibit BB, p.8] Kogut's Miranda card is signed the day after his interrogation began. [Id.] Both, Volpe and Dempsey have previously lied under oath about this issue maintaining they merely misdated the rights card, despite the fact that (a) the Miranda card constitutes a critical and significant piece of evidence [Exhibit O, Volpe 2005 Trial Testimony, at 1368-14 to 24, 1443-3 to 1444-17]; and (b) the case was high profile involving the vast resources of the NCPD. [DE 223, p. 8]

5.    Intimidated and coerced him into participating in a videotaped summary of his "confession" containing the same fictitious content as the false "confession" created and written by Volpe and Dempsey [Exhibit AA,  at 136-143, 152-153; Exhibit BB];

6.    Planted evidence (the Fusco Hairs) in the Restivo van subsequent to his arrest (which also constitutes a creation of false evidence), and used the planted evidence against him at trial allegedly as being corroborative of the confession they fabricated [Exhibit W, Decision, People v. Kogut, Hon. Victor Ort, J.S.C., dated December 21, 2005; Exhibit X, Dr. Peter Deforest, Daubert Testimony, May 24, 2012, at 550-553];

7.    Initiated a criminal proceeding against him based on the fabricated evidence and testified falsely at the grand jury, pre-trial, and trial stages concerning the false evidence; and

8.    Suppressed exculpatory evidence going directly to disproving the falsity of the fabricated confession and evidence. [See, DE 223 pp. 7-11; DE 224-3 to DE 224-17, Defendant's Exhibits C to Q, suppressed French/Smith documents and deposition testimony]

In sum, Kogut has never alleged a constitutional claim predicated solely on a Miranda violation absent allegations of coercion. Rather, he has always maintained that defendants created a Miranda card, executed as a result of duress and coercion, after the creation of his false confession, in order to substantiate the validity of that confession. Creation of the Miranda card and the false testimony related thereto are merely component parts to his malicious prosecution and falsification of evidence claims. The defendants are not entitled to summary judgment in so far as the plaintiff's claims are based on their violation of his Miranda rights.

**B.    Counts 5 and 6  Falsification of Evidence**

Although the defendants move for summary judgement on the grounds of qualified immunity as to the plaintiff's falsification of evidence claims in Counts 5 and 6, their moving papers are completely devoid of any factual or legal arguments asserting a basis for the application of qualified immunity to either Count 5 or Count 6.

Notwithstanding the foregoing, Counts 5 and 6 assert claims for the falsification of evidence under 42 USC §1983. "In order to establish a claim for falsified evidence a plaintiff must demonstrate the following: (1) that defendant utilized misconduct in order to procure false evidence; (2) that the plaintiff suffered a deprivation of liberty; and (3) that the "deprivation of liberty may be considered a legally cognizable result of the initial misconduct." Zahrey v. Coffey, 221 F.3d 342, 348 (2nd Cir. 2000)

Kogut's complaint and deposition sufficiently establish that defendants knowingly fabricated and distributed false evidence. As this Court held in its 12(c) decision "...the

**IV.    THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THE PLAINTIFF'S SUPPRESSION OF EXCULPATORY EVIDENCE CLAIM IN COUNT 11**

The defendants concede there is a genuine issue of material fact whether they divulged to the prosecution what they term as "arguably exculpatory" evidence, but maintain they "did not violate any law 'clearly established' at the time of the official action." [DE 223, pp. 7-8] The defendants' argument, like their Miranda argument, is a strictly legal one. According to the defendants it was not until 1995 when the Court decided <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), that the government's obligation to disclose exculpatory evidence to a criminal defendant under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) was made applicable to information within the control of the police. Alternatively, the defendants contend even if the court disagrees with their <u>Kyles v. Whitley</u> argument, that the earliest time the duty of the police to disclose exculpatory evidence to the prosecutor became "clearly established" was in 1992 with the Second Circuit's decision in <u>Walker v. City of New York</u>, 974 F.2d 293 (2nd Cir. 1992).

The arguments of the defendants completely ignore what occurred in <u>Whitley</u> and the "clearly established" law existing at the time of the plaintiff's trial which imposed a duty on the police to disclose exculpatory evidence to prosecutors to prevent them from framing an individual. See, <u>Carter v. Harrison,</u> 612 F.Supp. 749, 756-758 (EDNY, 1985) ("If all evidence is gathered and recorded, the exculpatory nature of a certain portion becomes evident when the police focus on a particular suspect. It is at that point that the police officer has a duty to bring to the attention of his supervisor or the prosecutor any evidence that might exculpate the defendant"); <u>People v. Russo</u>, 109 AD.2d 855, 856, (App. Div. 1985) (decided on March 18, 1985, involving an appeal of a September 1983 robbery conviction in Nassau County in which the defendant maintained the police failed to disclose certain photographs. Although the

7

Appellate Division rejected the defendant's claims that the photographs were exculpatory, it clearly stated that "the police have a duty to disclose exculpatory material in their control.")

In <u>Kyles v. Whitley</u> the State of Louisiana argued in its brief that it should not be accountable under <u>United States v. Bagley</u>, 473 U.S. 667 (1985) and <u>Brady v. Maryland</u>, <u>supra</u> for the non-disclosure of exculpatory evidence known only to police investigators and not the prosecutor. At oral argument Louisiana withdrew this argument, "conceding that the State is 'held to a disclosure standard based on what all State officers at the time know.'" <u>Whitley</u>, 514 U.S. at 438, fn. 11. The Court, however, chose to address itself to the withdrawn argument stating, "to accommodate the State in this manner would, however, amount to a serious change of course from the <u>Brady</u> line of cases." <u>Whitley</u>, 514 U.S. at 438.  In other words, the <u>Brady</u> line of cases always required the police to disclose exculpatory evidence in its possession to the prosecutor, for if it was otherwise, the prosecutor's duty to disclose would be rendered a nullity because the police would have been substituted, "For the prosecutor and even for the courts as the final arbiters of the government's obligation to ensure fair trials." <u>Id.</u>

In essence, the defendants maintain because Louisiana made a specious argument in <u>Kyles v Whitley</u> that it was only with the Court's rejection of the argument that it became "clearly established" the police had a duty to disclose exculpatory evidence to a prosecutor.  The defendant's definition of the meaning of "clearly established," i.e., the action must have been declared unlawful by the United States Supreme Court to be "clearly established" has long been rejected by the Court. As stated in <u>Anderson v Creighton</u>, 483 U.S. 635, 640 (1987):

> "The contours of the right (violated) must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful…but it is to say that in light of pre-existing law the unlawfulness must be apparent…" (citations omitted)

Allowing that they may be wrong in their reading of <u>Kyles</u>, the defendants alternatively maintain even if a police officer's duty to disclose exculpatory evidence to a prosecutor predates <u>Kyles</u> the duty was not clearly established until 1992 when <u>Walker v. City of New York</u>, <u>supra</u> was decided. Just as with their analysis of <u>Kyles</u> the defendants misread what the issue was that was decided in <u>Walker</u>, i.e., do the police "have an obligation with respect to exculpatory evidence <u>beyond</u> disclosing that evidence to the prosecutor" (emphasis added) <u>Id</u>. at 299-300. It is a given in the question that police already had a clearly established duty to turn over exculpatory evidence to the prosecutor. In answering the question that the police did not have a duty beyond disclosure to the prosecutor the court stated, "the police satisfy their obligations under <u>Brady</u> when they turn exculpatory evidence over to prosecutors" <u>Id</u>. at 300.

According to the defendants <u>Jean v. Collins</u>, 155 F.3d 701 (4th Cir. 1998) (En banc) supports their position that in 1986 the law was not clearly established that a police officer had a duty to disclose exculpatory evidence to the prosecutor thereby entitling defendants to qualified immunity. However, <u>Jean</u> was vacated and remanded by the Supreme Court in 1999, <u>Jean v. Collins</u>, 526 U.S. 1142 (1999). On remand the Court, at a minimum, articulated the converse of defendants' position holding that the intentional withholding of exculpatory evidence by police to prosecutors, to deprive the defendant of a fair trial, constituted a violation of a clearly established constitutional right. <u>Jean v. Collins</u>, 221 F.3d. 656, 663 (4th Cir. 2000) (En banc)

There has never been any question that police officers were prohibited from framing a criminal defendant by suppressing exculpatory evidence as the defendants did in this case. In <u>Barbee v. Warden</u>, 331 F.2d 842 (4th Cir. 1964) a Federal Habeas Corpus action decided one year after <u>Brady v. Maryland</u>, <u>supra</u>, the petitioner claimed the State suppressed exculpatory

9

evidence concerning ballistics and fingerprint tests on a handgun allegedly belonging to the petitioner and used during the shooting in issue at his 1958 trial. The State argued in opposition because the prosecuting attorney had no knowledge of the suppressed reports in the possession of the police that the petitioner was entitled to no relief. In rejecting the State's argument the Court held the police are part of the prosecution and that the taint on the trial is no less because the police, rather than the prosecutor, suppressed the evidence. The Court stated the following:

> "If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. 'The cruelest lies are often told in silence.' If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging." Id. at 846

See also, Newsome v. McCabe, 256 F.3d 747, 752 (7th Cir. 2001), (a §1983 action arising out of a 1979 arrest, a 1980 conviction, and a 1994 reversal of conviction, the court held "it clearly established in 1979 and 1980 that the police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup." In a supplemental opinion, on a petition for rehearing, in Newsome v. McCabe, 260 F.3d 824, 824 (7th Cir. 2001), the court stated if the police "deliberately withheld information, seeking to misdirect or mislead the prosecutors and the defense, then there is a genuine constitutional problem."); Geter v. Fortenberg, 849 F.2d 1550, 1558 (5th Cir. 1988) (a §1983 action arising out of the plaintiff's 1982 arrest and conviction, the Court stated, "A police officer cannot avail himself of a qualified immunity defense if he…deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles."); Mayes v. City of Hammund, 442 F.Supp 2d 587 (MD JND, 2006) (a §1983 action arising out of a 1982 conviction vacated in 2001 based on the non-disclosure that a public employee had hypnotized the victim during the investigation, the

court stated, "When a police officer prevents the prosecutor from complying with his duty to produce exculpatory or impeaching evidence by failing to disclose such evidence to the prosecutor, then the officer violates his obligations under Brady and is liable to the criminal defendant for violating his rights under the Due Process clause of the Fourteenth Amendment"); Jones v. City of Chicago, 856 F.2d. 985, 995 (7th Cir. 1988) (a §1983 action arising out of a 1982 trial, the Court said that police "attempts to circumvent the (Brady) rule…by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be

p.m., while it was parked on Lakeview and Ocean Avenues, only blocks away from Hot Skates, and reported stolen at 11:35 p.m. that same day, and the disappearance of Theresa Fusco sometime after 9:47 p.m. when she clocked out at Hot Skates. At the time Ms. Fusco clocked out she was reported to be wearing "blue striped jeans," as reported by defendant Joseph Volpe, in a formal all-points bulletin alarm to law enforcement authorities dated December 7, 1984. In response to French's call homicide detectives immediately went to his home to interview him and his sister Lori French, now Gabberty. [DE 224-7, pp. 35-36; 84-86 - French Deposition; Exhibits E, M, N] The evidence established on November 18, 1984, French, accompanied by his sister Lori, discovered his car parked on Woodfield Road, near the railroad tracks, and inside the vehicle Lori sister found "a pair of ladies blue jeans with stripes which were turned inside out." [DE 224-3] Mr. French and his sister immediately reported the recovery of the car to the NCPD and turned over to them the "blue striped jeans" but the police threw them out and "closed" the stolen motor vehicle case with the recovery of the vehicle. [Exhibit N] On December 6, 1984 the police took possession of Mr. French's vehicle, which French had cleaned up after he found it, to be forensically examined. According to French he was a "little anal about neatness and things" and probably cleaned the car after he recovered it, so it is not surprising no evidence was recovered from it other than the jeans that were thrown away by the police. [DE 224-7, pp. 33-34, French Deposition] According to Lori Gabberty, nee French, during her interview by the police she was asked lots of questions about the striped jeans and shown samples of jeans to see if she could identify the type of jeans she found in the car. [DE 224-8, pp. 27-29; 58, Gabberty Depoisition] In a statement Mr. French gave on December 7, 1984 to the defendant Frank Sirrianni he identified a length of rope that the police found in the back seat of his automobile. [DE 224-3, Notes – French Interview; DE 224-5, French Statement] Significantly, the medical

12

examiner, Dr. McCarthy, told defendant Volpe that the ligature instrument used to strangle Fusco was a hard nylon type rope. [Exhibit O, Volpe transcript at 1473 to 1474] Lastly, Debra Smith reported to the police on December 9, 1984 that she observed a vehicle, which she was 90% sure was the French car, parked adjacent to the crime scene after hearing screams in the vicinity where Theresa Fusco's body was later recovered. [DE 224-10, Volpe Lead Sheet] These facts specifically contradicted the confession in that they suggest that Theresa Fusco was abducted and raped by an unknown perpetrator using Mr. French's vehicle as evidenced by the striped jeans and rope recovered in the French vehicle as well as the screams heard in the area by Smith. Unfortunately, this evidence was suppressed and only discovered by the plaintiffs in 2010. Clearly the suppressed evidence belied the confession and it is for this reason that the defendants never disclosed it to the prosecutors for disclosure to the defendants. In their moving papers the defendants attempt to impugn Ms. Smith's report by maintaining she is mentally ill, but there was no evidence documented establishing that the police were aware at any time in 1984 that Ms. Smith suffered from mental illness. [DE 222, p.9; DE 224-10 to 12, Smith Documents]

## V.    COUNT 4  MALICIOUS PROSECUTION

The defendants seek summary judgment on the plaintiff's malicious prosecution claim arising from his 2005 retrial as alleged in Count 4, arguing that none of the named defendants participated in the decision to retry Kogut thereby absolving them of any liability. [DE 223, p. 24] The defendants also maintain that there existed "arguable probable cause" at the time of the Kogut 2005 retrial, even though they concede there is a material dispute of fact as to probable cause at Mr. Kogut's first trial. [DE 223, p. 25] According to the defendants, because Kogut was convicted in his first trial after testifying, probable cause is established going forward and they

13

are entitled to summary judgment under a qualified immunity analysis. [Id.] This latter argument is no more than an attempt by the defendants to resurrect their prior failed argument of issue proclusion as a result of the original trial.

The existence of probable cause is a complete defense to both Federal and New York State law claims of malicious prosecution, Boyd v. City of New York, 336 F.3d 72, 76 (2nd Cir. 2003); Savino v. City of New York, 331 F.3d 63, 72 (2nd Cir. 2003), and an "indictment by a grand jury creates a presumption of probable cause." Id. The presumption of probable cause, however, may be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence, or other police conduct undertaken in bad faith. Id. (quoting, Colon v. City of New York, 60 NY.2d 78, 83, 468 NYS.2d 453 (1983) Thus, where some evidence exists that arresting officers may have "lied to secure an indictment" concerning facts crucial to probable cause and "a jury could reasonably find that the indictment was secured by bad faith or perjury," the presumption of probable cause may be overcome. Boyd v. City of New York, supra at 77

Here, Kogut has asserted that police coerced him into signing a false confession, created by Volpe and Dempsey, and thereafter coerced him in participating in a videotaped statement to prosecutors. In brief summary, Kogut testified to the following facts during his two day deposition:

1.      Initially, he calmly told detectives Volpe, Dempsey, and Martino he was not involved in nor had any knowledge of the rape and murder of Fusco. [Exhibit AA, at 120-2 to 7];

14

2.    When defendants persisted that he was involved, he requested a lawyer, sought permission to make a phone call, and told Volpe, Dempsey, and Martino that they were "fucking crazy." [Id. at 121-15 to 19; 126-17 to 21];

3.    All night long Dempsey screamed in his face. [Id. at 143-17 to 24];

4.    Throughout the entire interrogation Volpe and Dempsey told him this was the girl he killed. [Id. at 146-8 to 22];

5.    Neither Volpe nor Dempsey asked him any questions during the interrogation; rather, they told him what he did, to which he replied, "…they were on fucking drugs. They were crazy; that I had no knowledge of this crime, nor did I have anything to do with this crime. And I asked to leave." [Id. at 149-9 to 14]; "I was like, I don't know this girl. I never met this girl. I don't fucking—I don't know her name. I don't know what she looks like." [Id. at 149-150-19 to 2]; Despite his claims of innocence Volpe and Dempsey kept telling him they had scientific evidence and that he was a liar. [Id. at 150-22 to 24]

As summarized below, Kogut repeatedly testified that the words in his alleged voluntary confession were all created by Volpe:

> Q.  Did—it's your testimony that these words, the words that I just read to you, the words on this—in this confession were not uttered, spoken by you; they were created by Volpe, correct?
>
> A.  They were told to me yes. Volpe told me this whole statement. I didn't say nothing."
> [Exhibit AA, at 230-3 to 10]

It is undisputed that Volpe authored the entire statement. Kogut allegedly "approved" its content. [Exhibit O, Volpe 2005 Trial Testimony at 1475-76]

Concerning the videotaped statement to ADA Peck, Kogut testified that he merely parroted the confession created and written by Volpe and Dempsey that was "pounded into him all night" under threats of rape and murder:

> Q.  Ok. Well, you did answer questions when ADA Peck asked you questions, correct?
>
> A.  Because it was pounded into me for those—how many hours I was in there for the interrogation, and Volpe was sitting right in the room in the corner when I did

confessions, and rights card, plus the planting of physical evidence -- the Fusco hairs), and

forwards that information to prosecutors, he violates the accused's constitutional right to a fair

trial, and the harm occasioned by such unconscionable action is redressable in an action for

damages under 42 U.S.C. §1983. Ricutti, supra at 130

  As for the second element, when the defendants fabricated a confession and false

evidence and forwarded that evidence to prosecutors, no reasonable police officer in the same

circumstances and possessing the same knowledge as the defendants could have reasonably

believed that probable cause existed in the light of well established law. Id. "Like a prosecutor's

knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and

forwarding to prosecutors a known false evidence works an unacceptable corruption of the truth-

seeking function of the trial process." Ricutti, supra (quoting United States v. Agurs, 427 U.S. 97

(1976); See also, Manganiello v. City of New York, 612 F.3d 149 (2nd Cir. 2010) (affirming the

jury's verdict finding for plaintiff in a malicious prosecution claim following a murder acquittal

based upon the procurement of a false confession); Edwards v. Pretsch, 180 F.Supp 499 (SDNY,

2002) (factual issue existed concerning coerced confession claim precluding summary judgment

as to officers qualified immunity defense); Nilenan v. Whalen, 911 F.Supp 656 (SDNY, 1996)

(genuine issues of fact concerning coerced confession precluded summary judgment in favor of

police officer on grounds of qualified immunity). Here, a reasonable jury could conclude that

Volpe, Dempsey, and other defendants violated Kogut's clearly established constitutional rights

by conspiring to fabricate and forward to prosecutors a known false confession, planting of

physical evidence (the Fusco hairs) and coercing Kogut to participate in a false videotaped

interview with prosecutors, all of which would, and did, influence a jury's verdict—as evidenced by Kogut's 1986 conviction despite his testimony.

As stated above, in order to establish a claim for malicious prosecution the plaintiff must establish 1) commencement or continuance of a criminal proceeding 2) lack of probable cause, 3) existence of malice and 4) termination in plaintiff's favor. DiBlasio v New York, supra

A jury may find that a defendant initiated a prosecution where he filed charges or prepared an alleged false confession and "forward(ed) that information to prosecutors." Ricciuti, supra at 130  The decision by prosecutors to continue the criminal proceedings against Kogut, after the vacatur, does not alter the law as to the first element of malicious prosecution.

The argument employed by the defendants, that the decision to retry Kogut was solely the prosecutors, who enjoy absolute immunity and whom Kogut did not sue, must be denied upon the law and facts. In short, the defendants argue that even if they procured a false confession for the rape and murder of Ms. Fucso by the unconstitutional and unconscionable means described in Kogut's deposition testimony, they enjoy immunity from their heinous actions, because prosecutors, despite relying on the false confession they forwarded to them and their perjurious laden factual accounts surrounding its procurement, elected to retry Kogut.

Courts have long held that police cannot hide behind the fraud they perpetrate on others, the natural consequence of which is to improperly effect the truth seeking process by misleading decision makers. Irrespective of whom the decision maker may be, or that body's legal right to immunity in exercising its decision making in the context of a 1983 action, it is of no import to dishonest police officers.  Thus, a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial, none of these decisions

will shield a police officer who deliberately supplied misleading information that influenced the decision. Jones v. City of Chicago, supra 994 ; See, e.g. Myers v. Morris, 810 F.2d 1437, 1457 (8th Cir. 1997); Hand v. Gary, 838, F.2d 1420 (5th Cir. 1988); Smiddy v. Barney, 665 F.2d 261, 266-67 (9th Cir. 1981); Dellums v. Powell, 566 F.2d 167, 192-94 (DC  Cir. 1977); Ames v. United States, 600 F.2d 183, 185 (8th Cir. 1979) (Dictum) cf. McClaughlin v. Alban, 775 F.2d. 389 (DC Cir. 1985) (Per curium).

 The defendants concede in their brief that material issues of fact existed regarding probable cause to prosecute Kogut in 1986. [DE 223, pg. 25] Despite this admission, defendants argue that in 2005, after the criminal vacatur of Kogut's 1986 conviction, that because Kogut was convicted in 1986 after a full trial and having testified under oath, that his conviction serves as evidence of the existence of probable cause. As this Court correctly stated in its 12(c) decision, however, "(a) vacated judgment, by definition, cannot have any preclusive effect in subsequent litigation." Boston Firefighters Union v. Boston Police Patrolmen's Ass'n, 468 U.S. 1206, 1211, 104 S.Ct. 3576 (1984); [DE 83, pg. 24-26]

 The defense's attempt to resurrect their prior failed legal argument of issue preclusion, albeit under different clothing, is legally flawed and logically unpersuasive.  It suggests that if

of those responsibilities which the police must have toward the citizenry in an open and free society."

The "lack of probable cause generally creates an inference of malice." Boyd v. City of New York, 336 F3d at 78; Ricciuti, 124 F.3d at 131; Lowth v. Town of Cheektowaga, 82 F3d 563, 573 (2nd Cir. 1996) (malice may also be established by a showing that the prosecution was undertaken by improper or ill motives, or in reckless disregard of plaintiff's rights); Pinsky v. Duncan, 79 F.3d 306, 313 (2nd Cir. 1996); Lowth v. Town of Cheektowaga, supra, at 573 (malice may be proven by showing "a wrong or improper motive, something other than a desire to see the ends of justice served")

Here, malice on the part of Volpe, Dempsey, and other named defendants has been established by the showing of their willingness to coerce an inculpatory written and videotaped confession, the planting of hairs, and their perjurious statements at the grand jury, pre-trial and trial stages (1986 and 2005) concerning the circumstances of the Kogut "confessions".

As pointed out, this Court in its December 11, 2009 decision held as a matter of law that the plaintiff has satisfied the fourth element of "favorable termination" element [DE 83, p. 16]

It is difficult to comprehend that the defendants could concede material issues of fact existed concerning probable cause in 1986, yet maintain probable cause existed in 2005 given the plaintiff's 1986 conviction was vacated and that the reprosecution was based on the same false evidence as was the original trial, Kogut's alleged confession, and the other enumerated false evidence.

**VI.    THE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S MONELL CLAIM, COUNTS 9  MUST BE DENIED**

The defendants concede, "viewed in a light most favorable to plaintiff's, these incidents involving Moore, Lee and Martinez may evidence an unconstitutional policy or practice existing between 1995 and 2001."  (D.E. 223, p. 20)  Despite this concession that several defendant Homicide Detectives obtained false confessions and utilized that false and fabricated evidence at trial, defendants maintain these incidents cannot constitute a "policy," "practice," or "custom," Monell v Dept. Soc. Serv. City of New York, 436 U.S. 658, 690-692 (1975),  because they occurred after Kogut's 1985 "confession." The defendants are mistaken because post event occurrences are admissible to establish custom or practice. Henry v County of Shasta, 132 F.3d 512 (9th Cir. 1997)

As early as 1998, seven years prior to the retrial, Defendant Nassau County was fully aware of several high profile homicide cases in which alleged voluntary confessions were subsequently determined to be fabricated and false. These cases were: People v. Robert Moore [Exhibits P1 to P10, S]; People v. Jose Martinez [Exhibits S, U]; and People v. Shonnard Lee [Exhibits R1, R2, S] The defendants contend because these cases all occurred after the Kogut interrogation they do not provide any evidence of an unconstitutional "custom" or "policy" existing in 1985 when the plaintiff's confession was extracted. The defendants' position, however, was rejected in Henry v the County of Shasta, supra, at 519 by the Court which held that subsequent events "are highly probative" to establish the existence of an unconstitutional custom or practice at an earlier time.

In Shasta, the plaintiff Henry, following his  arrest for a routine traffic violation was stripped naked by the several jail personnel and placed in a "safe room." The plaintiff sought

recovery against the municipality arguing it adopted a policy of abusing persons arrested for minor traffic infractions and/or alternatively, it acted with deliberate indifference to the constitutional violations and thus are liable under Monell.  The plaintiff offered the declarations of two individuals, Michael May and Robert Burns, who described nearly identical unconstitutional treatment at the hands of jail employees occurring after Henry's arrest.  The District Court granted summary judgment on the Monell claim predicated on Henry's failure to produce evidence of a pattern or practice or claim of deliberate indifference, on the date of his arrest. Id. at 517 In reversing the district court, the Court gave great weight to the post incident events detailed in the declarations of May and Burns. The Court said:

> "In holding that the May and Burns declarations may be used to establish municipal liability although the events therein occurred after the series of incidents that serves as the basis for Henry's claims, we reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendants policy or custom, but is highly probative with respect to that inquiry."

> Id. at 519; See also Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir. 1991) See Also Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989); Black v. Stephens, 662 F.2d 181 (3rd Cir. 1981); Jones v. City of Chicago, supra

In order to establish a Monell claim, the plaintiff must establish an unconstitutional custom or practice so well settled that the policy making officials of the municipality had either actual or constructive knowledge of it yet did nothing to end the practice. Oklahoma City v. Tuttle, 471 U.S. 808, 818-820 (1985). Further, the plaintiff must show that the custom or practice was the "moving" force behind the plaintiff's Constitutional deprivation. Id. at 819

Additional support for the plaintiff's Monell claim is found in the deposition testimony of Detective O'Leary who was assigned to re-investigate the case prior to the retrial of Kogut.  His

testimony leaves no doubt that the constitutional abuses by the NCPD Homicide Squad had become so prevalent that a "custom" or "policy" allowing such abuses to continue permeated throughout the department and manifested themselves up to and throughout the Kogut retrial.

In his testimony O'Leary acknowledges, prior to the retrial, he was aware of the following;

1.     Read Newsday Article entitled "Nassau Cops Accused of Using Coercive Tactics to Get Suspects to Admit to Crimes They Didn't Commit." [Exhibits CC, pp. 161-163; R2; S]

2.     A committee of four high ranking law enforcement officials investigated how homicide detectives interrogated suspects, the committee being formed due to the cases between 1995-2001 involving Lee, Martinez, Moore and two other men, all strangers to each other, but

was directed to pursue only theories that supported the confession of Kogut and thereby establish his guilt. [Exhibit CC, pp. 132-133]  Det. O'Leary's admissions, coupled with his refusal to even consider that defendants Volpe and Dempsey coerced and fabricated Kogut's confession, despite the DNA evidence and his actual knowledge that the defendants and other detectives in the unit were involved in procuring false confessions, provides powerful evidence that this "was the way things were done and had been done..."  Bordanaro v. McLeod, supra, citing Kibbe v City of Springfield, 777 F.2d 801, 806 (1985) quoting Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir. 1985) (citations omitted) Det. O'Leary's testimony, coupled with the vacatur of the Kogut's conviction, leaves no doubt that plaintiff has established actual notice amongst the municipal policy makers of an unconstitutional custom or practice existing within the homicide bureau from 1995 through 2005.  In short, the NCPD has done everything it could, including re-prosecuting Kogut, to validate those practices occurring within the homicide unit.

As indicated above, "Custom or Usage" in the language of 1983, may also establish municipality liability. Monell, 436 U.S. at 690-691.  "Custom or Usage"

> "...may be attributed to a municipality when...either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees. Actual knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them."

Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir. 1987)

Defendants' argument that no evidence of an unconstitutional custom or practice existed in 1985 completely ignores the interrogation and coerced statement of co-plaintiff, John Restivo [DE 223, p. 20] On March 6, 1985, Restivo was taken into custody by defendants Volpe and Dempsey and interrogated for approximately twenty-four hours.  During his interrogation, Restivo alleged that he was physically assaulted, prohibited from contacting family or counsel,

24

or leaving the homicide bureau until giving an incriminating statement against Halstead.   Upon

his release, Restivo attorney Theodore Robinson immediately wrote authorities, including Police

Commissioner Samuel Rozzi, setting forth allegations of harassment of "potential witnesses,"

threats of violence, prolonged detention as well as the lack of telephone access. The Municipal

defendant was placed on notice that its employees were deliberately "coercing statements from

these potential witnesses."  (Emphasis added)  [Exhibit EE, Affidavit of Theodore Robinson,

Esq., ¶ 9]  The Robinson affidavit unequivocally establishes that then Commissioner Rozzi, the

primary policy maker for the NCPD including training and supervision of members of the

homicide bureau, was informed that the defendants herein were engaged in unlawful and

unconstitutional abuses of authority. At this point, it was absolutely incumbent upon the

Commissioner to insure that those whose duty it was to investigate the Fusco murder did so with

full fidelity to the Constitution.  By allowing the Kogut interrogation, nearly a month after

receiving notice that the defendants Dempsey and Volpe were blatantly violating the rights of

Restivo, to go unchecked and unsupervised, Commissioner Rozzi not only displayed deliberate

indifference, but his inaction encouraged the conduct to continue unabated without concern of

investigation or punishment. In fact, not only did municipal policy makers display a deliberate

indifference to this improper behavior, taking no steps to investigate or correct it, they instead

rewarded that behavior when Lt. Spillane, commanding officer of the homicide bureau, issued a

letter requesting a commendation for Det. Volpe. [DE 224-2] Not surprisingly then, these

unconstitutional abuses as testified to by Kogut at his 1986 trial, led to the false confession  and

his unjust 18.5 years imprisonment. [DE 223, p. 25] Failure to act by the Commissioner in this

case, constitutes the "moving force" behind the constitutional violations as illustrated in Spell v.

"The disposition of the policymaker may be inferred from his conduct after the events of that night. Following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error. The officers testified at the trial that no changes had been made in their policies. If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do on August 11, 1981 was not acceptable to the police chief, changes would have been made."

The Nassau County Homicide Bureau's unconstitutional practices continued for over two decades. It was not until your Honor's involvement in the Lee and Martinez cases that the County assembled a panel of high ranking officials in 2005 to review interrogation practices, and

of days, or weeks, and there was, otherwise, no specific training policy in place. (Id at 57-58) No written rules existed governing homicide investigations, including detectives conduct during interrogations, etc.(Id) Likewise, as supervisor of the Homicide Bureau, Spillane's role was strictly administrative only. Concerning discipline, to the point of amazement, Spillane acknowledged no specific protocol existed to investigate complaints against homicide detectives (Id at 59-60). Contrary to defendants' claims that plaintiff fails to "identify a specific deficiency in the city's training program," Fischer dedicates ten pages of his report entitled, "Training and Supervision," addressing this very issue, none of which is rebutted by the defendants in any manner. (Id at 56-66)

In addition to the foregoing, plaintiff alleges that the "on the job training" consisted of teaching incoming, novice homicide detectives, unconstitutional interrogation tactics to secure confessions. Accordingly, accepting plaintiff's allegations as true, combined with the uncontroverted findings of Russell Fischer, "on the job training" under these circumstances, could never support a summary dismissal. If as alleged here, it was these constitutional violations which lead to the coercion and fabrication of the Kogut confession, the obvious focal point of both Kogut's trials, it is self evident that the Municipal wrong was the causal link to Kogut's injury, 18.5 years behind bars for a crime he did not commit. See, Kibby v City of Springfield, 777 F.2d 801, 805-06 (1st. Cir. 1985); Grandstaff, 767 F.2d at 171-72

## VIII.   COUNT 18 STATE LAW NEGLIGENT SUPERVISION CLAIM

Defendants' motion should be denied in that it totally mischaracterizes plaintiff's state law claim for negligent supervision as "a claim for negligent training in investigative procedures is akin to a claim for negligent investigation or prosecution, which is not actionable in New York." (DE 223 pages 21-22). Clearly, Kogut's negligent supervision claim does not sound in

strictly negligent investigation, nor negligent prosecution. (DE 224-19, Kogut complaint at ¶ 149-153)  Accordingly, based upon the same factual proofs discussed under Count 10 above, Kogut's state law negligent supervision claim must survive.

Based upon the foregoing the defendants motion for Summary Judgment should be denied in all respects.

Dated: Mineola, New York
July 2, 2012

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Anthony M. Grandinette
_____
ANTHONY M. GRANDINETTE/AMG-5913
114 Old Country Road, Suite 420
Mineola, New York 11501
(516) 248-5317

/s/ Paul Casteleiro
_____
PAUL CASTELEIRO/PC-0092
200 Washington Street, 5th Floor
Hoboken, New Jersey 07030
(201) 656-1696

Attorneys for Plaintiff
John Kogut

</div>