UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN KOGUT, | ) |
| Plaintiff, | ) |
| | ) |
| -against- | ) |
| | ) |
| THE COUNTY OF NASSAU, POLICE | ) |
| COMMISSIONER DONALD KANE, POLICE | ) |
| COMMISSIONER WILLIAM J. WILLETT (2005), | ) |
| POLICE COMMISSIONER JAMES LAWRENCE, | ) 06-CV-6695 (JS)(WDW) |
| DETECTIVE SEAN SPILLANE (HEAD OF HOMICIDE | ) |
| 1985), DETECTIVE DENNIS FARRELL (HEAD OF | ) |
| HOMICIDE 2005), CAROLANN HESSEMAN, AS | ) |
| EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE, | ) |
| DETECTIVE ROBERT DEMPSEY, DETECTIVE | ) |
| ALBERT MARTINO, DETECTIVE WAYNE | ) |
| BIRDSALL, DETECTIVE MILTON G. GRUBER, | ) |
| DETECTIVE CHARLES FRAAS, DETECTIVE FRANK | ) |
| SIRIANNI, DETECTIVE HARRY WALTMAN, P.O. | ) |
| MICHAEL CONNAUGHTON, P.O. WILLIAM DIEHL, | ) |
| and JOHN DOES 1-5, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| JOHN RESTIVO, DENNIS HALSTEAD, MELISSA | ) |
| LULLO, JASON HALSTEAD, TAYLOR HALSTEAD, | ) |
| and HEATHER HALSTEAD, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -against- | ) |
| | ) |
| NASSAU COUNTY, CAROLANN HESSEMAN, AS | ) |
| EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE, | ) |
| in his individual capacity, ROBERT DEMPSEY, | ) 06-CV-6720(JS)(WDW) |
| in his individual capacity, FRANK SIRIANNI, | ) |
| in his individual capacity, MILTON GRUBER, | ) |
| in his individual capacity, HARRY WALTMAN | ) |
| in his individual capacity ALBERT MARTINO, | ) |
| in his individual capacity, CHARLIE FRAAS, | ) |
| in his individual capacity, THOMAS ALLAN | ) |
| in his individual capacity, RICHARD BRUSA, | ) |
| in his individual capacity, VINCENT DONNELLY, | ) |
| in his individual capacity, MICHAEL | |

CONNAUGHTON, in his individual capacity,                )
WAYNE BIRDSALL, in his individual capacity,             )
WILLIAM DIEHL, in his individual capacity,              )
JACK SHARKEY, in his individual capacity,               )
DANIEL PERRINO, in his individual capacity,             )
ANTHONY KOZIER, in his individual capacity,             )
Detective Sergeant CAMPBELL, (Shield #48),              )
in his individual capacity, SEAN SPILLANE,              )
in his individual capacity, RICHARD ROE                 )
SUPERVISORS #1-10, in their individual                  )
capacities,                                             )
                                                        )
                    Defendants.                         )

---

### PLAINTIFFS JOHN RESTIVO AND DENNIS HALSTEAD'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Barry C. Scheck
Debi Cornwall
Anna Benvenutti Hoffmann
Sonam Henderson
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson St., 8th Floor
New York, NY 10013

**Attorneys for plaintiffs
John Restivo and Dennis Halstead**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    I.   **The Law Clearly Proscribed Defendants' Unconstitutional**   6
       **Course of Conduct** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

       A.  **Defendants' Selective Facts are Irrelevant and Misleading** . . . . . . . . . . . . . .   8

       B.  **The Police Duty Not to Suppress *Brady/Giglio* Material from Prosecutors Was**   9
          **Clearly Established** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

          1.  **The 1986 Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

          2.  **Post-Conviction, Post-*Walker*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

   II.  **There is a Dispute of Material Fact as to Whether Defendants Conspired with Non-**
      **County Employees to Violate Plaintiffs' Constitutional Rights** . . . . . . . . . . .   15

       A.  **There is a Triable Dispute About Whether Defendants Conspired with Witnesses to**
          **Concoct False Statements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

   III.   **There is a Dispute of Material Fact as to Plaintiffs' *Monell* Claim** . . . . . . . .   18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

# TABLE OF AUTHORITIES

## Federal Cases

*Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004)................................. 21

*Batista v. Rodriguez*, 702 F.2d 393 (2d Cir. 1983) ...................................................... 19

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) ................................................ 19

*Binder & Binder PC v. Barnhart*, 481 F.3d 141 (2d Cir. 2007) ...................................... 2

*Blake v. Race*, 487 F. Supp. 2d 187 n.21 (E.D.N.Y. 2007) ........................................... 11

*Bordanero v. McLeod*, 871 F.2d 1151 (1st Cir. 1989)................................................... 25

*Boyd v. City of New York,* 336 F.3d 72 (2d Cir. 2003) ................................................ 4

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................... passim

*Brown v. Bryan County*, 219 F.3d 450 (5th Cir. 2000)................................................ 19

*Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) ................................... 12

*Carter v. Harrison*, 612 F. Supp. 749 n.5 (E.D.N.Y. 1985) ......................................... 10

*Chepilko v. City of New York*, No. 06-CV-5491 (ARR)(LB),
2012 WL 398700 (E.D.N.Y. Feb. 6, 2012)......................................................... 25

*Cooper v. Dupnik*, 963 F.3d 1220 (9th Cir. 1992)........................................................ 7

*District Attorney's Office v. Osborne*, 557 U.S. 52 (2009)......................................... 14

*Dunlop v. City of New York*, No. 06 Civ. 0433(RJS),
2008 WL 1970002 (S.D.N.Y. May 6, 2008) ...................................................... 15

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986) ................................... 19, 24

*Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991) ......................................... 19

*Giglio v. U.S.*, 405 U.S. 150 (1972)................................................................... 9

*Goodwin v Metts*, 885 F.2d 157 (4th Cir. 1989) .................................................. 12, 13

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) .................................... 23

i

*Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001) ...................................................... 24

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011) ............................................................. 10, 13

*Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987) ............................................................ 24

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) ........................................................... 24

*Hilliard v. Williams,* 516 F.2d 1344 (6th Cir. 1975) .................................................................. 12

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................................................... 8

*In re Dana Corp.*, 574 F.3d 129 (2d Cir. 2009) ........................................................................... 2

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011 ............................................................... 7, 11, 12

*Jean v. Collins ("Jean I")*, 155 F.3d 701 (4th Cir. 1998), *rev'd*, 526 U.S. 1142 (1999) ............. 13

*Jean v. Collins ("Jean II")*, 221 F.3d 656 (4th Cir. 2000) .......................................................... 13

*Jeffes v. Barnes*, 208 F.3d 49 (2d Cir. 2000) ............................................................................ 19

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................................. 12, 13

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) ........................................................................... 8

*Limone v. U.S.*, 271 F. Supp. 2d 345 (D. Mass. 2003) ................................................................. 7

*Miranda v. Arizona*, 384 U.S. 436 (1966) ......................................................................... 7, 21, 22

*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978) .......................................................... passim

*Mooney v. Holohan,* 294 U.S. 103 (1935) ............................................................................. 9, 18

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2003) .................................................................. 12

*O'Brien v. Nat'l. Gypsum Co.*, 944 F.2d 69 (2d Cir. 1991) ........................................................... 2

*Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415 (2d Cir. 2009) .......... passim

*Olsen v. Correiro*, 189 F.3d 52 (1st Cir. 1999) .......................................................................... 12

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999) ............................................................ 16, 18

*Parrish v. Luckie*, 963 F.2d 201 (8th Cir. 1992) ........................................................................ 24

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) ................................................................ 12

*Pina v. Henderson*, 586 F. Supp. 1452 (E.D.N.Y. 1984),
    *rev'd on other grounds*, 752 F.2d 47, 50 (2d Cir. 1985)................................................ 10

*Pyle v. Kansas*, 317 U.S. 213 (1942) .................................................................................... 9, 18

*Rounseville v. Zahl*, 13 F.3d 625 (2d Cir. 1994) .................................................................... 16

*Ricciuti v. N.Y.C. Trans. Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ........................................ 25

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) ...................................................................... 2

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007)......................................................... 8

*Saucier v. Katz*, 533 U.S. 194 (2001) ....................................................................................... 9

*Sorlucco v. NYPD,* 971 F.2d 864 (2d Cir. 1992) .................................................................... 22

*Turpin v. Mailet*, 619 F.2d 196 (2d Cir. 1980) ...................................................................... 24

*U.S. v Gaviria*, 804 F. Supp. 476 (E.D.N.Y. 1992) ................................................................ 18

*U.S. v. Henry*, 325 F.3d 93 (2d Cir. 2003) ............................................................................. 16

*U.S. v. Marrapese*, 486 F.2d 918 (2d. Cir. 1973) ................................................................... 16

*U.S. v. Morell*, 524 F.2d 550 (2d Cir. 1975) .......................................................................... 10

*U.S. v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010)....................................................................... 16

*U.S. v. Villegas*, 899 F. 2d 1324 (2d Cir. 1990)...................................................................... 18

*Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995)................................................... 20, 23

*Vineyard v. County of Murray*, 990 F.2d 1207 (11th Cir. 1993) ............................................ 19

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992)............................................... passim

*Wechsler v. Hunt Health Systems, Ltd.*, No. 94 Civ. 8294 (PKL),
    1999 WL 672902 (S.D.N.Y. Aug. 27, 1999)................................................................... 4

*Wedra v. Thomas, 671 F.2d 713 (2d Cir. 1982)* ..................................................................... 10

*Whitlock v. Brueggemann*, --- F.3d ---, 2012 WL 1939906 (7th Cir. May 30, 2012) ................. 14

*Williams v. City of Saginaw*, Nos. 00–10241–BC, 00–10244–BC,
    2002 WL 1798907 (E.D. Mich. Aug. 6, 2002) .................................................... 18

*Wilson v. Lane*, 526 U.S. 603 (1999) ........................................................................ 9

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ........................................ 25

*Zahra v. Town of Southold*, 48 F.3d 674 (2d Cir. 1995) ............................................ 19

*Zahrey v. City of New York*, No. 98 Civ. 4546 (DCP)(JCF),
    2009 WL 54495 (S.D.N.Y. Jan. 7, 2009) ……………………………………………18

*Zahrey v. Coffee*, 221 F.3d 342 (2d Cir. 2000) ........................................................ 18

**State Cases**

*Haynes v. City of New York*, 815 N.Y.S.2d 143 (2d Dep't 2006) ................................ 7

*People v. Evans*, 417 N.Y.S.2d 99 (2d Dept. 1979) .................................................. 21

*People v. Russo*, 486 N.Y.S.2d 769 (2d Dep't. 1985) ................................................ 11

*People v. Saddy*, 445 N.Y.S.2d 601 (1981) .............................................................. 11

*People v. Valle,* 469 N.Y.S.2d 305 (N.Y. Co. Ct. (Nassau County) 1983 .................. 21

**Federal Rules**

Fed. R. Civ. P. 56(c) ................................................................................................... 2

## INTRODUCTION

It is undisputed that there are triable issues of material fact as to the heart of plaintiff John Restivo and Dennis Halstead's claims. That is, defendants concede there is ample evidence for a jury to decide that both men were indicted, tried and convicted of a horrible rape/murder they did not commit on the basis of evidence fabricated by the Nassau County Police Department defendants—hairs planted in the alleged abduction vehicle, John Restivo's blue van, and false witness statements. Defendants further concede a jury could find plaintiffs spent 18 years of wrongful imprisonment while deprived the benefit of material exculpatory and impeachment information the NCPD defendants suppressed from prosecutors, including the truth about defendants' own misconduct as well as a lead indicating Theresa Fusco's killer had not used Restivo's van, but rather stolen John French's car and, when he abandoned it, left the striped jeans Fusco had been wearing when she disappeared in the car, inside-out, stuffed under the seat.

But because defendants' motion for partial summary judgment largely ignores the many claims they concede must go to the jury, the context for the few claims on which they *do* move is lost. First, defendants contend that they have qualified immunity for the claim under *Brady v. Maryland*, 373 U.S. 83 (1963), arguing it was not clearly established by 1986 that their suppression of evidence was unlawful. But qualified immunity is a nonissue given both the pre-existing Supreme Court and Second Circuit law and the egregious course of misconduct in this case, which continued for years after plaintiffs' convictions even as it became clear that there was no credible evidence of their guilt. Second, defendants claim plaintiffs have failed to establish evidence supporting the § 1983 conspiracy and municipal liability claims, but ignore the evidence plaintiffs have marshaled. The motion should be denied in full.[1]

---

[1] Plaintiffs join in the arguments of co-plaintiff John Kogut in his separate opposition brief.

**STANDARD**

Summary judgment is improper unless defendants show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). In considering defendants' motion the Court may not make credibility determinations or weigh the evidence, but instead "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to," the plaintiffs. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). Since "a jury is free to believe part and disbelieve part of any witness's testimony","the court considering a summary judgment motion must disregard all evidence favorable to the moving party that the jury is not required to believe." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (internal citations and quotations omitted, emphasis in original). Furthermore, "it is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts." *O'Brien v. Nat'l. Gypsum Co.*, 944 F.2d 69, 72 (2d Cir. 1991). "All reasonable inferences must be construed in [plaintiffs'] favor, and if there is any evidence in the record from any source from which a reasonable inference in [plaintiffs'] favor may be drawn, [defendants] simply cannot obtain a summary judgment." *Binder & Binder PC*, 481 F.3d at 148 (internal quotation and citation omitted).

**RELEVANT FACTS**

The facts, considered in the light most favorable to plaintiffs, establish the following[2]:

Sixteen year-old Theresa Fusco was last seen alive at approximately 9:47 p.m. on November 10, 1984, leaving Hot Skates roller rink in Lynbrook, NY; she was wearing striped

---

[2] Many of these facts establish relevant context for the motion but, because they relate to claims that defendants concede must go to the jury, have not been included in either Plaintiffs' Response to Defendants' Statement of Undisputed Facts (abbreviated D) or Plaintiffs' Statement of Disputed Facts (abbreviated P).  Should the Court wish to see evidentiary support for any of these facts, plaintiffs will be happy to provide it.

blue jeans. D2,3. On December 5, 1984, her naked body was found a short distance away alongside the railroad tracks. D9. She had been raped and strangled by a ligature. *Id.* The foremost lead NCPD officers investigated in the next few days related to the car of John French. D27. Around the same time Miss Fusco disappeared, only half a mile away, John French's car was stolen. D5,6. When he located it a week later, the windshield was cracked (consistent with a struggle), the rearview mirror was broken off (consistent with mirrored glass found near Fusco's body), rope from the car was missing (consistent with the ligature strangulation), and the license plates had been switched with plates stolen from another car. D7,14. Most significantly, John and his sister Lori found a pair of girl's striped jeans, inside out, stuffed under the passenger seat; 16-year-old Lori thought they looked like they belonged to someone her age. D8. NCPD officers took this lead very seriously, impounding French's car for forensic analysis and questioning John and Lori about the jeans, but the forensic investigation stalled out; John had thoroughly cleaned the car after recovering it, and the Lynbrook police, who received the jeans from the Frenches, threw them away. D11–22,27. Independently, witness Debra Smith called to report hearing a scream near where Fusco's body was found and seeing a car she later identified as French's parked below the railway trestle. D17–22. Defendants never eliminated a connection between the Fusco rape/murder and French's car, but stopped investigating this lead. D27.

After several months with no progress in the investigation, NCPD officers were increasingly relying on pressuring witnesses in an attempt to generate leads.  One such witness was Harry Smyle, a Vietnam vet with PTSD taking narcotic medications for serious back pain, who under nine hours of interrogation by NCPD officers told them that John Restivo had made a suspicious statement to him about the Fusco murder. P2–16. Restivo, who is innocent of any involvement in the Fusco murder, never made the statement Smyle attributed to him. P7. Volpe

and Dempsey then picked up Restivo, interrogated him for approximately 24 hours and physically assaulted him, only permitting him to leave after he had signed a false statement Volpe had written out for him claiming that he had heard Dennis Halstead make admissions about the Fusco murder. P59. Halstead is also completely innocent, and never made any such admissions. P35. Once he was released, Restivo immediately told his attorney, Ted Robinson, about the abuse; Robinson photographed Restivo's injuries and complained repeatedly to everyone in the Nassau County power structure about this mistreatment. P60–64. Robinson's allegations were never investigated, but the prosecution never used the statement elicited from Restivo either in the grand jury that indicted him and Mr. Halstead or at trial. P63–66.

At that point, the police, by their own account had "a very weak, if nonsexist[e]nt case against Halstead and Restivo." D28. After the police seized John Restivo's blue van, which they theorized had been used by Restivo, Halstead and John Kogut to abduct and rape Fusco, Volpe planted several of the hair standards that had been taken from Fusco's body at autopsy among the hairs that had been collected from Restivo's van.  The hair examiner's subsequent report that hairs allegedly found in Restivo's van were consistent with Theresa Fusco's was the only physical or forensic evidence ever connecting plaintiffs to the crime.  On the basis of the planted hairs and the coerced Smyle statement, Restivo and Halstead were indicted.[3]

Before and after the indictment, NCPD officers continued to drum up statements from jailhouse informants or drug-addicted acquaintances of plaintiffs to support the prosecution,

---

[3] In response to contention interrogatories, defendants list several other pieces of evidence that they claim supported probable cause, including notably John Kogut's confession and John Restivo's "failing" of a polygraph.  PX382 ¶¶ 21, 22. *See Wechsler v. Hunt Health Systems, Ltd.*, No. 94 Civ. 8294 (PKL), 1999 WL 672902, at *2 (S.D.N.Y. Aug. 27, 1999) (contention interrogatory responses are binding judicial admissions). However, evidence that is inadmissible may not provide probable cause to prosecute.  *See Boyd v. City of New York,* 336 F.3d 72, 77 (2d Cir. 2003).  Because both items were inadmissible, neither Kogut's confession nor Restivo's polygraph results were ever introduced against Halstead or Restivo at the grand jury or trial.

using either coercive means, promises of benefits, or both. P2–43. This included coercive tactics by both Volpe and Dempsey, who each later coerced admittedly false confessions in other cases. P71–87. The evidence against Restivo and Halstead at trial included the hair evidence, coerced testimony from Harry Smyle and Carl Pozzini about ambiguous statements they had allegedly overheard, and false testimony from Brian O'Hanlon, Samuel Newsome and Steven Dorfman— induced by defendants—about admissions Halstead and Restivo had allegedly made while incarcerated. P2–16,23–43. Neither prosecutors nor defense counsel ever heard about the exculpatory French car/striped jeans lead because Volpe intentionally suppressed it. D31. Based on this fabricated and coerced inculpatory evidence, and in the absence of the suppressed exculpatory evidence, Restivo and Halstead were wrongfully convicted.

In 1993-95, by agreement with the NCDA, three labs performed then-state-of-the-art DQ Alpha testing on male DNA from samples collected from Fusco's vagina at autopsy. P89. As defendants admit, testing by two of the labs excluded all three men; testing by the third lab was less probative, excluding Halstead entirely but including Restivo and Kogut, along with approximately 95% of the U.S. population, as a potential source of the DNA. P90.

Restivo and Halstead filed CPL § 440 motions for a new trial based on these DNA results, and the NCDA seriously considered consenting to the motion.  P91–92. D.A. Denis Dillon asked Appeals Bureau Chief Peter Weinstein and Deputy Chief Bruce Whitney to recommend a course of action. P93. The result, a 17-page memo, catalogued the many problems and weaknesses in the evidence used against Restivo and Halstead at trial and urged Dillon to consent to the new trial motion. P94–98. But because Volpe continued to actively suppress it, Weinstein knew nothing about the French car/striped jeans lead or any other undisclosed exculpatory information, much less evidence of Volpe's deliberate misconduct; if he had, he

would have included it in the memo and expected it to be weighed in the DA's evaluation of the motion for a new trial. P99. Unaware of this evidence, the NCDA opposed the motion and it was denied. The prosecution continued, and plaintiffs remained in prison for 7 more years. P100.

Finally, in 2001–2003, new DNA testing was done using the more discriminating STR technique. D42. After this testing, too, excluded all three men, the NCDA consented to vacate the convictions and, ultimately, dismiss the indictments against Restivo and Halstead. D42,44. When dismissing the indictment, ADA Fred Klein noted that the DNA "basically disprov[es] our theory of the case from the only direct evidence we had, which was these jail-house admissions" and that they had nothing but speculation to explain the DNA exclusions. D44.

## ARGUMENT

### I.     The Law Clearly Proscribed Defendants' Unconstitutional Course of Conduct

Defendants make no factual or legal challenge to plaintiffs' claims that defendants maliciously prosecuted them or that they deprived them of a fair trial by fabricating evidence against them.  It is clear that those claims must go to the jury.[4]  Nor do defendants dispute that a jury could find that they intentionally withheld exculpatory evidence—most notably, the French car/striped jeans lead—from the prosecution, and that this evidence was material. The only challenge defendants make to any of plaintiffs' core claims is their narrow assertion that defendants are entitled to qualified immunity for their intentional suppression of this exculpatory evidence, because they claim it was not clearly established by 1986 that such conduct was unconstitutional. (D.E. 223 at 5.)[5] But both Supreme Court and Second Circuit precedent made

---

[4] This includes Counts I and VIII (federal and state malicious prosecution), Count II (fabrication of evidence) and Count V (supervisory liability) of plaintiffs' Amended Complaint, Case No. 2:06 Civ. 6720 (JS)(WDW), D.E. 33.
[5] The other "theories of liability" for which defendants claim immunity—failure to conduct a constitutionally adequate investigation (D.E. 223 at 5-7) and failure to provide warnings pursuant

plain well before 1986 that defendants' suppression of evidence was unlawful, precluding qualified immunity.  *See Jackler v. Byrne*, 658 F.3d 225, 242-43 (2d Cir. 2011).

Moreover, defendants' selective focus on the suppression of evidence theory artificially obscures the full course of unconstitutional conduct alleged here, allegations defendants acknowledge a jury must hear: the deliberate planting of evidence, the fabrication and coercion of witness statements, and active cover-ups of defendants' own misconduct, causing both the initiation and continuation of a prosecution lacking in probable cause and an unfair trial.  In another situation, like this one, in which defendants "miss the forest for the trees," a federal district court in Massachusetts rejected officers' claim of qualified immunity for a failure to disclose *Brady* evidence in **1967** (a mere 4 years after *Brady* itself), holding "[t]he defendants' argument draws the issue much too narrowly. . . .  It is, in a word, ridiculous to suggest that, at any time in this nation's history, a reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit."  *Limone v. U.S.*, 271 F. Supp. 2d 345, 349, 365-66 (D. Mass. 2003).  The First Circuit affirmed, calling the question

> easy pickings. . . Although constitutional interpretation occasionally can prove recondite, some truths are self-evident. This is one such: if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.

*Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("[T]he salient [qualified immunity] question  . . . is whether the state of the law . . .

---

to *Miranda v. Arizona*, 384 U.S. 436 (1966) during custodial interrogation (D.E. 223 at 15-17)—are not plaintiffs' theories of liability at all.  Rather, the failures in the investigation are evidence relevant to the malicious prosecution claims, *see, e.g., Haynes v. City of New York*, 815 N.Y.S.2d 143, 146 (2d Dep't 2006) (presumption of probable cause may be overcome by proof "police failed to make further inquiry when a reasonable person would have done so") and the failures to warn are evidence relevant to claims of coercing and fabricating witness statements, *see, e.g., Cooper v. Dupnik*, 963 F.3d 1220, 1248 (9th Cir. 1992) (en banc), each of which defendants concede must be tried.

gave [defendants] fair warning that their alleged treatment of [plaintiffs] was unconstitutional."); *Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007) (denying qualified immunity where "the proffered evidence would support a jury finding that [defendants] acted intentionally in hiding exculpatory evidence and misleading [plaintiff]"; the question is if "reasonable officers could disagree about *whether* conduct is illegal, not . . .[if] they know the precise constitutional reason *why* it is not lawful") (emphasis in original).  This is not a case for qualified immunity.

### A.    Defendants' Selective Facts are Irrelevant and Misleading

Given defendants' concession that there is a triable issue of fact as to whether Volpe suppressed material exculpatory evidence, D.E. 223 at 7, their four-page digression into the facts is a red herring. It is also deeply misleading. For example, they describe the French car/striped jeans lead dismissively as "a lead that didn't pan out that had nothing to do with John Restivo, Dennis Halstead or John Kogut," D.E. 223 at 10, ignoring that Volpe specifically admitted that this lead was *Brady* material that he had an obligation to disclose to the prosecutor so it would be provided to the defense. D31. They quote initial prosecutor Edward McCarty (who admits he never heard about the French car, striped jeans, or Debra Smith during his involvement in the case) on why, hypothetically, he might have discounted the lead, D.E. 223 at 10, but ignore trial prosecutor Klein's testimony that, if the striped jeans in the French car were Fusco's, to call it a big deal would be an "understate[ment]." D26. They discuss credibility issues with Debra Smith at her 2011 deposition, D.E. 223 at 9, but ignore that her evidence is completely independent of the French car/striped jeans lead, which came from John and Lori French and is *Brady* material on its own; that there is no record anywhere in the police file of any concerns with Smith's credibility as of 1984, as there should have been had that been an issue when the police had her identify John French's car; and that Volpe himself testified that he viewed Smith as a "very

8

interesting" lead. D23. If there were really any question whether a jury could find that defendants deprived plaintiffs of a fair trial by intentionally withholding exculpatory evidence, defendants would have moved for summary judgment on that basis.  They did not.

    **B.**    **The Police Duty Not to Suppress *Brady/Giglio* Material from Prosecutors Was Clearly Established**

        **1.**    **The 1986 Trial**

Defendants are not entitled to qualified immunity for their suppression of this exculpatory evidence. Qualified immunity does not apply if reasonable officers were "on notice [that] their conduct [was] unlawful," *Saucier v. Katz*, 533 U.S. 194, 206 (2001). The operative question is whether, based on any "cases of controlling authority in their jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority," *Wilson v. Lane*, 526 U.S. 603, 617 (1999), reasonable officers would know better. Controlling authority includes cases from the Supreme Court and the Second Circuit existing at the time of the violation. *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 433 (2d Cir. 2009).

That a reasonable police officer knew in 1986 that he could not suppress exculpatory evidence can hardly be disputed. The Supreme Court has long held that officials who suppress material exculpatory or impeachment evidence violate criminal defendants' Fourteenth Amendment right to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Mooney v. Holohan,* 294 U.S. 103, 112-13 (1935) (prosecuting authorities' use of perjured testimony and deliberate suppression of impeachment information is a due process violation); *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942) (holding that "allegations that [the petitioner's] imprisonment resulted from . . . the deliberate suppression by [state] authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution"); *see also Haley v. City of Boston*, 657 F.3d 39, 50 (1st Cir. 2011) ("Context makes it apparent that [*Pyle's*] holding

encompasses the misconduct of police officers."). Volpe and other defendants admittedly knew in 1986 they had a *Brady* obligation to disclose exculpatory information to prosecutors. D30.

In arguing, despite these admissions, that this established duty did not extend to police officers, defendants notably ignore pre-1986 Second Circuit case law on this issue. But the rule then in place in the Second Circuit was clear: suppression of evidence by officers sufficiently involved in a case to be considered an "arm of the prosecution" violated *Brady*. *See Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982) ("[T]he knowledge of a police officer may be attributable to the prosecutor if the officer acted as an arm of the prosecution"); *U.S. v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975) (finding that even if A.U.S.A. was not aware of suppressed evidence, agent who actively participated in investigation could be deemed "arm of the prosecutor" in considering whether suppression was *Brady* violation); *see also Carter v. Harrison*, 612 F. Supp. 749, 756 n.5 (E.D.N.Y. 1985) ("There is little doubt that police officers have a *Brady* obligation to disclose exculpatory information."). Indeed, as Judge Weinstein identified in May 1984 (before plaintiffs' arrests): "The Second Circuit rule is that information in the hands of someone who can be viewed as 'the arm of the prosecutor' triggers the application of the *Brady* requirement of disclosure." *Pina v. Henderson*, 586 F. Supp. 1452, 1456–57 (E.D.N.Y. 1984) (finding that because "the police officer did testify in Pina's trial and was the investigating officer[, h]e qualifies as an arm of the prosecution and his information must be attributed to the prosecutor."), *rev'd on other grounds*, 752 F.2d 47, 50 (2d Cir. 1985).[6] That the cases defendants cite subsequently made plain the *Brady* duty applied even more broadly to all

---

[6] There can be no dispute that Volpe, as the lead detective who took responsibility for disclosing investigative materials to the prosecutor and testified in both the grand jury and at trial, was an arm of the prosecution. D10.

police officers is irrelevant, as there can be no doubt defendants' conduct was unlawful under both the then-existing standard and the later law.  *See Jackler*, 658 F.3d at 243.[7]

Rather than address any of this pre-existing law, defendants discuss only one Second Circuit case—*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992)—and speciously reason backwards that since *Walker* plainly established the unconstitutionality of police officers' suppression of exculpatory evidence from prosecutors, it must have been unclear before 1992. But what *Walker* clarified was that "police s*atisfy* their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors," 974 F.2d at 299 (emphasis added), not that police have obligations under *Brady* in the first place. In other words, *Walker* established a limitation on the pre-existing *Brady* duty on police officers recognized in the Second Circuit: that it only required police to produce evidence to the prosecution, not directly to the defense.  As Judge Bianco held in rejecting a claim to qualified immunity based on a police officer's 1990 suppression of exculpatory evidence from the prosecution:

> [*Walker*] dealt with an incident that occurred in 1971, [and] the Second Circuit recognized that *Brady* did create a disclosure obligation on the police, but that such obligation was satisfied where police shared all exculpatory evidence with the prosecutors. Thus, the Second Circuit recognized that before 1990 [indeed as early as 1971], there was a duty on the part of officers to disclose evidence to prosecutors.

*Blake v. Race*, 487 F. Supp. 2d 187, 216 n.21 (E.D.N.Y. 2007) (citation omitted).[8]

---

[7] New York state courts also recognized this rule prior to the suppressions at issue here.  *See, e.g., People v. Russo*, 486 N.Y.S.2d 769, 771 (2d Dep't. 1985) ("[T]he police have a duty to disclose exculpatory material in their control" if that evidence is material); *People v. Saddy*, 445 N.Y.S.2d 601, 604 (1981) ("In order to safeguard the defendant's rights under *Brady* . . . law enforcement officials . . . are under a duty to diligently preserve all materials which may be subject to disclosure.").

[8] And even were one to credit defendants' reading of *Walker* that the 1992 decision created ambiguity about what had been the law in the past (a reading unsupported by either *Walker* or the prior Second Circuit law), "[a]ny uncertainty introduced by [cases] . . . which were not decided until after defendants' [conduct] . . . would not entitle defendants to qualified immunity because the availability of that defense depends on whether the unlawfulness of their conduct

Furthermore, defendants improperly attempt to paint the extension and clarification of one aspect of the law on police duties under *Brady*—the no-fault standard that applies in criminal prosecutions—as establishing the basic duty. *See Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (suppression of favorable material evidence is *Brady* violation "irrespective of the good faith or bad faith of the prosecution") (quoting *Brady*, 373 U.S. at 87).  But the core duty at issue here— the prohibition on the deliberate or reckless suppression of evidence—existed long before *Kyles*; as a result, courts around the country have repeatedly denied qualified immunity to officer-defendants in § 1983 suits alleging pre-1986 suppressions of evidence. *See Olsen v. Correiro*, 189 F.3d 52, 56 (1st Cir. 1999) (upholding § 1983 action against police officers for failing to turn over exculpatory evidence in 1985); *Goodwin v Metts*, 885 F.2d 157, 162 (4th Cir. 1989) (ruling on police actions in 1984 that "police officer who withholds exculpatory information from the prosecutor can be liable under . . . § 1983"); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 480 n.11 (5th Cir. 1999) (ruling that *Brady* obligations extended to police officers since 1967); *Hilliard v. Williams,* 516 F.2d 1344, 1350 (6th Cir. 1975) (upholding § 1983 *Brady* cause of action against state police officer who withheld exculpatory evidence in 1970 and "played an active role in the prosecution"), *vacated on other grounds*, 424 U.S. 961 (1976); *Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2003) ("[W]as it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information . . . ?  The answer is yes"); *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004) ("We have no doubt that, in light of these holdings, an official in [a municipal forensic chemist's] position in 1986 had 'fair warning' that the deliberate or reckless . . . omission of evidence was a constitutional violation").

What plaintiffs' evidence establishes here is even stronger: the deliberate hiding of

was apparent in light of "'*pre*-existing law.'" *Jackler*, 658 F.3d at 243 (internal citation omitted, emphasis in original).

exculpatory evidence in bad faith.  Plaintiffs' counsel, who routinely litigate these claims around the country, are unaware of a single court anywhere ever holding that officers were entitled to qualified immunity for such conduct—and defendants have not cited any.  The one case they do cite, the vacated 1998 Fourth Circuit decision in *Jean v. Collins*, certainly does not stand for that proposition. *Jean v. Collins ("Jean I")*, 155 F.3d 701 (4th Cir. 1998), *rev'd*, 526 U.S. 1142 (1999). As the decision on remand from the Supreme Court makes clear, there was not only no evidence of bad faith suppression of evidence in *Jean*, there was not even enough proof that the failure to disclose was more than negligent to make out a § 1983 claim. *Jean II*, 221 F.3d 656, 663 (4th Cir. 2000) ("[W]hat occurred here was at worst a negligent miscommunication" between the prosecutor and police.); *see also Haley*, 657 F.3d at 48-51 (finding no qualified immunity for officers' 1972 deliberate suppression of exculpatory evidence from prosecutor, even while holding the no-fault duty to disclose impeachment evidence did not clearly extend to police in 1972).  Even *Jean I* recognized the viability of *Goodwin v. Metts*, a 1989 Fourth Circuit decision denying qualified immunity to an officer for his 1984 suppression of exculpatory evidence from the prosecution (under circumstances supporting a finding of deliberate suppression and bad faith). 155 F.3d at 710 n.3. And in any event, Fourth Circuit law does not control (as the *Jean I* court recognized): "[i]f a right is clearly established in this circuit but not in another circuit, that conflict will not shield the official from liability." 155 F.3d at 709.

### 2.     Post-Conviction,  Post-*Walker*

While essentially conceding that the *Brady* duties of police were clearly established in the Second Circuit by the time of *Walker* (1992), and in the whole country by the time of *Kyles v. Whitley* (April 19, 1995), defendants cite *District Attorney's Office v. Osborne*, 557 U.S. 52, 68-69 (2009), in support of the claim that the disclosure duty ends at conviction. (D.E. 223 at 12, n.5

& 14.) But this reading of *Osborne* is far too broad. In *Osborne*, unlike this case, the exculpatory value of the evidence at issue was speculative; the petitioner was seeking "not exculpatory evidence that had been in existence at the time of his original trial" and withheld, *Whitlock v. Brueggemann*, --- F.3d ---, 2012 WL 1939906, at *18 (7th Cir. May 30, 2012), but instead access to evidence for DNA testing "that might prove him innocent." *Osborne*, 557 U.S. at 72. As the Seventh Circuit recently confirmed in *Whitlock*, *Osborne* did not change the rule that "*Brady* and its progeny impose an obligation on state actors to disclose [actually] exculpatory evidence that is discovered before or during trial. This obligation does not cease to exist at the moment of conviction.  Otherwise no one could argue a *Brady* point either on direct appeal or in a [habeas petition]." 2012 WL 1939906, at *19 (citations omitted).

Here, the evidence establishes Volpe not only suppressed exculpatory evidence before and during trial, he continued to make affirmative misrepresentations to the prosecution about this same exculpatory evidence at key points after trial.  In particular, in 1995, after DNA testing had excluded Restivo, Halstead and Kogut as the source of the semen found in Theresa Fusco's body, the prosecution seriously considered consenting to the vacatur of Restivo and Halstead's convictions. Volpe, who was in contact with the prosecutors, and knew about the DNA, misled them about the evidence, including hiding his own misconduct and the French car/striped jeans lead. D31–32,P99. Not knowing about this other exculpatory evidence, the prosecution opposed vacatur and plaintiffs lost their motion; plaintiffs would remain wrongly incarcerated for another seven years. P100. Again after 2002, when Volpe was specifically asked by new carrying detective O'Leary about the forensic report of the French car he had found in the file, Volpe lied to O'Leary, telling him he had "looked into it -- checked it every way" and had determined that "the car had nothing to do with the homicide." D31. Volpe never told O'Leary any of the facts

that made the French car exculpatory: such as that the French car was stolen at the same time Theresa Fusco went missing, that girls' striped jeans had been found in the car, or that when French notified the Homicide Bureau about his discovery, Nassau County police had brought a pair of jeans for French's sister Lori to examine. As a result, this exculpatory lead remained secret for years—through the retrial and acquittal of Kogut and the dismissal of the Restivo/Halstead indictment—until discovery in this lawsuit exposed the truth. These actions not only establish a claim for a continuation of a malicious prosecution (a claim defendants have not moved to dismiss), but also prove independent *Brady* violations. And given that even defendants concede Volpe's *Brady* duties were clearly established by 1995, there can be no doubt he is not entitled to qualified immunity for these post-conviction suppressions.

## II.  There is a Dispute of Material Fact as to Whether Defendants Conspired with Non-County Employees to Violate Plaintiffs' Constitutional Rights

Defendants do not dispute that plaintiffs have ample evidence to establish a factual conspiracy among the NCPD defendants. As stated above, defendants agree a jury could find defendants together engaged in a host of constitutional violations during the Fusco investigation, including fabrication of evidence, suppression of exculpatory evidence, and malicious prosecution, collectively framing plaintiffs for a rape/murder they did not commit.  The only question is whether, given this Court's ruling that the intracorporate conspiracy doctrine applies, *see* D.E. 67 at 32-33,[9] plaintiffs have sufficient evidence to establish the participation in this conspiracy of at least one non-NCPD actor. *See Dunlop v. City of New York*, No. 06 Civ. 0433(RJS), 2008 WL 1970002 at *13-14 (S.D.N.Y. May 6, 2008).  Plaintiffs do.

---

[9] Plaintiffs respectfully maintain their objection to applying the intracorporate conspiracy doctrine to § 1983 claims but recognize it as the law of the case given the Court's prior ruling.

A § 1983 conspiracy requires: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and . . . intent may be established through circumstantial evidence." *In re Dana Corp.*, 574 F.3d at 153-59 (internal quotation omitted) (reversing summary judgment dismissal of conspiracy claim where, despite the "self-serving" denials of participation by all defendants, circumstantial evidence supported the claim)[10]; *see also Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994) (noting "conspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence"). Conspiratorial agreement includes a "tacit understanding"; "[t]here need not be any written statement or even a speaking of words which expressly communicates agreement." *U.S. v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010) (internal quotation and citation omitted); *see also U.S. v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003) ("The mere fact that Panek participated with Henry in the suspicious transactions at issue suggests an agreement."). Once a conspiracy is established, participation of another actor in the conspiracy takes "only slight evidence." *See U.S. v. Marrapese*, 486 F.2d 918 (2d. Cir. 1973).

A.     **There is a Triable Dispute About Whether Defendants Conspired with Witnesses to Concoct False Statements**

The case against Halstead and Restivo was built on two pillars: the planted hair evidence, and false statements from various witnesses that they had heard Halstead or Restivo make admissions about the Fusco murder. D34. This included evidence from Harry Smyle, Kenneth

---

[10] Despite defendants' focus on the lack of direct testimony (from dead participants) as to the existence of the conspiracy, no such direct evidence is required.

Cockerel and Carl Pozzini at the grand jury and Smyle, Steven Dorfman, Brian O'Hanlon, and Sam Newsome at trial. P2–43. As ADA Klein characterized all this cooperating witness evidence when ultimately moving to dismiss the Restivo/Halstead indictment in 2005:

> we had direct statements that were alleged to have been made to either inmates in the Nassau County Jail or drug addicted acquaintances of the defendants, all of whom received benefits for their testimony against these two defendants…  Moreover, Judge, the DNA evidence directly contradicts the admissions that these two defendants were supposed to have made to jail inmates and other people getting deals, admissions that obviously in the law are inherently suspect because of the source and the benefits that were accorded to these people as a result of their testimony.

P1. But the NCPD defendants knew more than Klein. They knew that the hairs had been planted and that an undisclosed lead indicated the true perpetrator had used French's car, not Restivo's van, to abduct Theresa Fusco.  They also knew the suspicious circumstances that lead to each of these cooperating witness statements. For example, heroin-addict Brian O'Hanlon, who initially truthfully denied he had any information about the Fusco murder, only incriminated Dennis Halstead after being interrogated for 10 hours, when he was due for another fix and was heading towards withdrawal symptoms. P33–37. In another instance, jailhouse-snitch Sam Newsome initially reported that Halstead admitted to him participation in the crime but did not name his accomplices; after meeting with Volpe and Connaughton, Newsome signed a statement that Halstead had told him he committed the crime with someone named "John"; Newsome received benefits in exchange.  P38–43. In other words, a reasonable jury could find defendants had ample basis to know that this witness evidence was not only "inherently suspect," it was actually false. There is more than sufficient evidence to support a jury finding that individual NCPD defendants Volpe, Allen, Sirianni, Perrino and Connaughton, faced with what Homicide's Commanding Officer, Lt. Sean Spillane, deemed a "weak, if nonexistent case" against plaintiffs Restivo and Halstead, D28, conspired with *each* of these cooperating witnesses to violate plaintiffs'

constitutional rights by providing false evidence.[11] P2–43. *See Zahrey v. City of New York*, No. 98 Civ. 4546 (DCP)(JCF), 2009 WL 54495, at *10 (S.D.N.Y. Jan. 7, 2009) (denying summary judgment to police for eliciting false statement from informant who was "at best of questionable veracity" and "changed his story over time throughout his repeated interviews"). That is the essence of a § 1983 conspiracy. *See Pangburn*, 200 F.3d at 72. Even if these witnesses were pressured to participate in the police conspiracy, that does not prevent them from being co-conspirators. *See, e.g., U.S. v. Villegas*, 899 F. 2d 1324 (2d Cir. 1990); *U.S. v Gaviria*, 804 F. Supp. 476, 477 (E.D.N.Y. 1992). And the participation of just *one* of these cooperating witnesses prevents the application of the intracorporate conspiracy doctrine. *See, e.g., Williams v. City of Saginaw*, Nos. 00–10241–BC, 00–10244–BC, 2002 WL 1798907, at *7 (E.D. Mich. Aug. 6, 2002) (holding intracorporate conspiracy doctrine did not bar police conspiracy claim "since [informant] Wilbert, a non-police officer, is also alleged to be a coconspirator.").

## III.   There is a Dispute of Material Fact as to Plaintiffs' *Monell* Claim

While acknowledging the existence of a triable dispute of fact as to the underlying malicious prosecution and unfair trial claims (both the fabrication and suppression theories), defendants contend there is no such dispute on plaintiffs' claim under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). But there is a mountain of evidence these constitutional violations—which were committed by more than 10 separate defendants and continued through 2005—were the predictable result of the County's failure to supervise and discipline its homicide

---

[11] Despite defendants' attempt to color the allegations, the sponsorship of false witness statements is hardly the run-of-the-mill "use of cooperating witnesses"; it is obviously unconstitutional. *See Pyle*, 317 U.S. at 216 (knowing use of false evidence to obtain conviction violates Fourteenth Amendment); *Mooney*, 294 U.S. at 112-13 (same); *Zahrey v. Coffee*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing clearly established constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.").

detectives, even after receiving indisputable proof they had engaged in serious misconduct, rendering the County liable. *See Okin v. Village of Cornwall-on-Hudson Police Dept.*, 577 F.3d 415, 439-40 (2d Cir. 2009); *Walker*, 974 F.2d at 297-98.

Courts in and out of this Circuit have consistently recognized failure to supervise and discipline as a viable theory of *Monell* liability. *See, e.g., Gentile v. County of Suffolk*, 926 F.2d 142, 152 (2d Cir. 1991) (sustaining malicious prosecution claim against governmental entity based on county's failure to properly discipline officers); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328-32 (2d Cir. 1986) (sustaining *Monell* jury verdict on proof City had a policy of failing to supervise and discipline police officers that amounted to deliberate indifference to the officers' use of excessive force); *Jeffes v. Barnes*, 208 F.3d 49, 62-64 (2d Cir. 2000); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983); *Brown v. Bryan County*, 219 F.3d 450, 462-63 (5th Cir. 2000) (upholding municipal liability based on failure to train and supervise particular officer despite notice of risk he would violate constitutional rights); *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) (holding jury could find inadequate procedures for investigating civilian complaints caused constitutional violations); *Vineyard v. County of Murray*, 990 F.2d 1207, 1212-13 (11th Cir. 1993) (upholding jury verdict that inadequate procedures for handling complaints against officers caused constitutional violations).

The record is plain that NCPD homicide detectives received no supervision. P45–58. Homicide's C.O. during the Fusco investigation, Lt. Spillane, testified in his deposition that he did not guide detectives in their work, summing up the Bureau's attitude toward supervision by agreeing that homicide detectives were grownups who did not need hand-holding. P45–46. There was no requirement that detectives take notes, much less prepare formal police reports of their actions—and thus no feasible way supervisors *could* supervise homicide investigations. P46,58.

19

Furthermore, despite this lack of supervision, homicide detectives were essentially untrained. P47–52. Every defendant and NCPD employee who was asked acknowledged that training for homicide detectives was only "on the job"; the County had no homicide training or written policies on the fundamentals of homicide investigation: nothing limiting the conduct or length of an interrogation, nothing regarding the offer of benefits or exertion of pressure to suspects or informants, nothing on writing police reports, nor anything regarding the duty to document and disclose exculpatory evidence. *Id.*

Plaintiffs' police practices expert, Russell Fischer[12], opines that this environment, lacking any meaningful guidance or oversight, and requiring no contemporaneous documentation of investigative acts, was an egregious departure from generally accepted police practices of the time. P54–58. It essentially invited homicide detectives to close cases by cutting constitutional corners in every aspect of their work: conducting coercive interrogations, manufacturing false statements, suppressing the truth and engaging in post-conviction cover-ups. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (holding that municipality's "deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated.") (internal citation omitted). That obvious risk, indeed that invitation, was borne out here, giving rise to *Monell* liability. *See Okin*, 577 F.3d at 439-41; *Walker*, 974 F.2d at 298 (finding that lack of police *Brady* policy supports *Monell* claim if police withhold *Brady* material from prosecutor).

---

[12] Fischer spent 33 years at the Miami Dade Police Department, working at every level up to Chief of the Criminal Investigations Division. He has taught police personnel since 1986, been an instructor for the International Association of Chiefs of Police ("IACP") since 2005, and worked as a consultant for the U.S. Department of Justice. P53.

More importantly, once detectives accepted the invitation to commit serious misconduct, and despite the County's awareness that they had done so, no one disciplined them. P59–101. As an initial matter, defendants improperly assume that, in order to hold the County liable, plaintiffs must prove the County was deliberately indifferent before 1985. *See* D.E. 223 at 19. But neither plaintiffs' injury nor defendants' conduct was limited to 1985; plaintiffs were imprisoned continuously for 18 years, and subject to conditions of confinement under pending murder charges for 2 ½ more. Defendants took actions to continue the prosecution throughout that time. If at any point during that period—including, notably, the time in 1995 when plaintiffs moved unsuccessfully to vacate their convictions based on the initial DNA exclusion, and the time in 2003 when their convictions were vacated based on additional DNA results but the charges were not dismissed—a jury could find the County caused plaintiffs' continuing injury, the *Monell* claim must be tried.  But plaintiffs have proof the County *was* on notice *of the specific problems in the Fusco investigation* long before plaintiffs' malicious prosecutions finally ended in 2005, before their 1986 convictions, and even before their 1985 arrests.[13]  *See, e.g., Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("[M]unicipal liability lies where the subordinate's misconduct is 'so manifest as to imply the constructive acquiescence of senior

---

[13] Nassau County also had notice of serious problems in the department before the Fusco investigation ever began. In 1979, the Second Department reversed a manslaughter conviction, holding that a 17 year-old homicide suspect's confession was illegally obtained where Nassau County homicide detectives interrogated him while evading his mother's attempts to contact him.  *People v. Evans*, 417 N.Y.S.2d 99 (2d Dept. 1979). Then in 1983, a local judge suppressed a criminal defendant's inculpatory statement because NCPD officers had not provided proper *Miranda* warnings. *People v. Valle,* 469 N.Y.S.2d 305 (N.Y. Co. Ct. (Nassau County) 1983). As a direct result, NCPD *Miranda* policy changed on February 15, 1984, not because of any deficiency in the prior policy as written, but because the opinion "underscored the failure of members to adhere to the established procedures." Unsurprisingly, the new official policy failed to correct the unwritten custom. P49. *See Monell*, 436 U.S. at 691 (finding that unwritten municipal practices "could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law").

policy-making officials') (quoting *Sorlucco v. NYPD,* 971 F.2d 864, 870–71 (2d Cir. 1992)).

Dempsey and Volpe interrogated John Restivo overnight from March 5-6, 1985. P59. During those 20 hours, they isolated him (denying his request for an attorney and refusing him phone calls), assaulted him (Dempsey choked him and hit him, knocking him off his chair), and pressured him into signing a false statement they drafted incriminating Halstead; in keeping with NCPD tradition, they did not administer *Miranda* warnings. P49,59. Upon his release from custody, Restivo immediately contacted attorney Ted Robinson, who called the Homicide Bureau to file a complaint about the brutally coercive interrogation and to put them on notice that Restivo was represented and therefore could not be questioned again. P60. Det. Dempsey hung up on him. *Id.* Robinson then complained to Spillane, who became "abusive and surly." P61.

Robinson then wrote to Police Commissioner Samuel Rozzi complaining the abuse of Restivo, the Homicide Bureau's refusal to entertain his complaint, and the harassment of Dennis Halstead and others, including "threats of violence, prolonged detention without being permitted a phone call, and coercing statements from these 'potential witnesses.'" P62. Despite Rozzi's written pledge to investigate, there is no evidence that any such action was ever taken. P63. Robinson ultimately filed an Article 78 petition against the Police Commissioner laying out the illegal conduct against John Restivo and Dennis Halstead. P64. Not only did the County did not discipline the officers, several were recommended for a medal of commendation for their work in the Fusco case; this evinces deliberate indifference in the face of actual notice that homicide detectives were conducting coercive interrogations and eliciting false statements, evincing deliberate indifference. P65–66. As plaintiffs' expert Fischer opines, "As the result of an individual filing a complaint against a member of a police department, for the law enforcement agency to not record, investigate and adjudicate that complaint is inconsistent with police

customs and practices at the time this complaint was filed." *Id. See Vann*, 72 F.3d at 1049 ("deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."); *Okin*, 577 F.3d at 439-41 (town's acquiescence to unconstitutional unwritten police customs gave rise to *Monell* liability); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("The disposition of the policymaker may be inferred from his conduct after the events of that night.").

Robinson's complaints were not the only notice that NCPD detectives had engaged in shocking misconduct during the Fusco investigation. At Restivo and Halstead's trial, their lawyers argued that Theresa Fusco's hairs that Volpe alleged had been found in Restivo's van had actually been planted. Hair experts for both the defense *and the prosecution* provided testimony validating that theory: that based on the presence of post-mortem root banding on these hairs, they could not have been left in the van consistent with the prosecution's timeline. P67–70. Yet County authorities never investigated whether Volpe had planted the hair. *Id.* In 1995, Nassau County learned that lead Fusco detective Volpe had coerced a false murder confession from Robert Moore after a 22-hour interrogation; Nassau County subsequently settled a civil suit with Moore. P71–76. In 1997, after a 9-hour interrogation, Robert Dempsey (also involved in the Fusco investigation interrogations) elicited a false murder confession from Shonnard Lee; in 2004, a jury awarded Lee $750,000 in compensatory damages plus $1.25 million in punitive damages against Dempsey. P77–87. Defendants effectively concede that these incidents, together with the Martinez coerced false confession elicited by other NCPD detectives in 2001, support a jury finding of an unconstitutional policy or practice in the NCPD

between 1995 and 2001.[14] P71–88. Neither Volpe nor Dempsey was investigated or disciplined.

Finally, in 1995, and then again in 2001 and 2003, DNA testing established that Halstead, Restivo and Kogut were all innocent of the Fusco murder. P89–101,D42. Not only were the defendants never disciplined, the NCPD's reinvestigation never even considered the possibility that NCPD officers had committed misconduct during the investigation. P101. *See Turpin v. Mailet*, 619 F.2d 196, 2001 (2d Cir. 1980) ("[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts."); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308-14 (11th Cir. 2001); *Parrish v. Luckie*, 963 F.2d 201, 203-06 (8th Cir. 1992); *Harris v. City of Pagedale*, 821 F.2d 499, 504-06 (8th Cir. 1987).

Deliberate indifference was how the County did business. *See Fiacco v. City of Rensselaer*, 783 F.2d 319, 328, 331-32 ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force," and thus "the very failure of the City defendants to conduct a nonsuperficial investigation into civilian claims" amounted to deliberate indifference.); *Henry v. County of Shasta*, 132 F.3d 512, 519-20 (9th Cir. 1997) ("we reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."); *Bordanero v. McLeod*, 871 F.2d 1151, 1166–67 (1st Cir. 1989) (same); *Chepilko v. City of New York*, No. 06-CV-5491 (ARR)(LB), 2012 WL 398700, at *15 (E.D.N.Y. Feb. 6, 2012) ("Subsequent or

---

[14] "Viewed in the light most favorable to Plaintiffs, these incidents involving Moore, Lee and Martinez may evidence an unconstitutional policy or practice existing between 1995 and 2001." D.E. 223 at 20.

contemporaneous conduct can be circumstantial evidence of the existence of preceding municipal policy or custom.").

In short, there is ample evidence for a jury to find that despite clear notice of ongoing constitutional violations, Nassau County put its head in the sand, refusing to investigate or discipline its homicide detectives for blatantly unconstitutional conduct, and effective ratifying their misconduct. *See Okin*, 577 F.3d at 439-41 (reversing grant of summary judgment on *Monell* claim); *Walker*, 974 F.2d at 300 (holding that "[i]f Walker can produce some evidence that policymakers were aware of a pattern of perjury by police officers but failed to institute appropriate training or supervision, his claim can survive summary judgment."); *Ricciuti v. N.Y.C. Trans. Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("The inference that a policy existed may, however, be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction, or evidence that the municipality was on notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used [conduct] in violation of the complainants' civil rights.") (citations omitted); *see also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84 n.14 (2d Cir. 2005) (Knowledge may be established either through proof of actual knowledge or through proof of conscious avoidance or willful blindness). Plaintiffs' *Monell* claim must be tried.

## Conclusion

For the foregoing reasons, defendants' partial summary judgment motion to dismiss plaintiffs' *Brady* claims (Count II) on the basis of qualified immunity, to dismiss the § 1983 conspiracy claims (Count IV) on the basis of the intracorporate conspiracy doctrine, and to dismiss plaintiffs' *Monell* claim (Count VI) should be denied.

Dated: July 2, 2012                                  Respectfully submitted,
         New York, NY


                                                      _/s/ Deborah L. Cornwall_____
                                                     Barry C. Scheck
                                                     Deborah L. Cornwall
                                                     Anna Benvenutti Hoffmann
                                                     Sonam Henderson
                                                     NEUFELD SCHECK & BRUSTIN, LLP
                                                     99 Hudson St., 8th Floor
                                                     New York, NY 10013

                                                     **Attorneys for plaintiffs**
                                                     **John Restivo and Dennis Halstead**

**<u>Certificate of Service</u>**

I hereby certify that a true and accurate copy of Plaintiffs John Restivo and Dennis Halstead's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment was served by ECF and UPS on July 2, 2012, upon the following:


Michael Ferguson, Esq.
Office of the County Attorney
Ralph G. Caso Executive & Legislative Building
1 West Street
Mineola, New York 11501-4820
mferguson@nassaucountyny.gov

Paul Casteleiro, Esq.
200 Washington Street
5th Floor
Hoboken, New Jersey 07030
pcasteleiro@aol.com

Louis Freeman, Esq.
Nadjia Limani, Esq.
Freeman, Nooter & Ginsberg
75 Maiden Lane, Suite 503
New York, New York 10038
freemefree@aol.com
nlimani@aol.com

Anthony M. Grandinette
Grandinette & Serio, LLP
114 Old Country Rd., Suite 420
Mineola, New York 11501
Grandinetteesq@aol.com


   /s/ Sophie Glickstein
      Sophie Glickstein
      Paralegal