UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN KOGUT, <br><br>       Plaintiff, <br><br>   -against- <br><br>THE COUNTY OF NASSAU, POLICE COMMISSIONER DONALD KANE, POLICE COMMISSIONER WILLIAM J. WILLETT (2005), POLICE COMMISSIONER JAMES LAWRENCE, DETECTIVE SEAN SPILLANE (HEAD OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL (HEAD OF HOMICIDE 2005), CAROLANN HESSEMAN, AS EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE, DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE MILTON G. GRUBER, DETECTIVE CHARLES FRAAS, DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O. WILLIAM DIEHL, and JOHN DOES 1-5, <br><br>       Defendants. | 06-CV-6695 (JS)(WDW) |
| JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO, JASON HALSTEAD, TAYLOR HALSTEAD, and HEATHER HALSTEAD, <br><br>       Plaintiffs, <br><br>   -against- <br><br>NASSAU COUNTY, CAROLANN HESSEMAN, AS EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE, in his individual capacity, ROBERT DEMPSEY, in his individual capacity, FRANK SIRIANNI, in his individual capacity, MILTON GRUBER, in his individual capacity, HARRY WALTMAN in his individual capacity ALBERT MARTINO, in his individual capacity, CHARLIE FRAAS, in his individual capacity, THOMAS ALLAN in his individual capacity, RICHARD BRUSA, in his individual capacity, VINCENT DONNELLY, in his individual capacity, MICHAEL | 06-CV-6720(JS)(WDW) |

1

| | |
|---|---|
| CONNAUGHTON, in his individual capacity, | ) |
| WAYNE BIRDSALL, in his individual capacity, | ) |
| WILLIAM DIEHL, in his individual capacity, | ) |
| JACK SHARKEY, in his individual capacity, | ) |
| DANIEL PERRINO, in his individual capacity, | ) |
| ANTHONY KOZIER, in his individual capacity, | ) |
| Detective Sergeant CAMPBELL, (Shield #48), | ) |
| in his individual capacity, SEAN SPILLANE, | ) |
| in his individual capacity, RICHARD ROE | ) |
| SUPERVISORS #1-10, in their individual | ) |
| capacities, | ) |
|  | ) |
| Defendants. | ) |

### PLAINTIFFS JOHN RESTIVO AND DENNIS HALSTEAD'S STATEMENT OF DISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

**Conspiracy**

1. In 2005, when he moved to dismiss the Restivo/Halstead indictment, ADA Klein characterized the cooperating witness evidence as follows:

   > we had direct statements that were alleged to have been made to either inmates in the Nassau County Jail or drug addicted acquaintances of the defendants, all of whom received benefits for their testimony against these two defendants… Moreover, Judge, the DNA evidence directly contradicts the admissions that these two defendants were supposed to have made to jail inmates and other people getting deals, admissions that obviously in the law are inherently suspect because of the source and the benefits that were accorded to these people as a result of their testimony.

   PX71 (*People v. Restivo & Halstead* dismissal hearing transcript) at 4:21–5, 6:23–7:4.

**Grand Jury Witnesses**

   *Harry Smyle*

2. After doing surveillance on Harry Smyle for a couple of days, police approached him on March 5, 1985, and brought him down to the police station; they did not release him from custody until almost 12 hours later. PX134 (NCPD Homicide Bureau March 1985 Blotter Entries) at IP9339 (3/5/85 8:57am entry), IP9341 (3/5/85 20:15 entry); PX192 (Smyle NCPD Form 79); PX345 (Sirianni dep.) 46:24–48:9.

2

3. As defendants learned, Harry Smyle, a Vietnam veteran suffering from PTSD and taking narcotic medications including Percodan for a back injury, was a friend and sometime employee of John Restivo. PX346 (Smyle dep.) 61:12–17, 136:15–37:13, 188:18-25.

4. Smyle told Perrino and Sirianni he was working off the books for the Restivos' moving company while collecting disability from the post office, and was worried police would use that against him. PX346 (Smyle dep.) 200:2–13; PX360 (Smyle decl.) ¶ 16.

5. Smyle was initially placed in a closet-sized room with the heat on high, given the Fusco casefile and treated like a suspect until he said something incriminating about John Restivo. PX345 (Sirianni dep.) 46:24–48:9; PX346 (Smyle dep.) 110:5–111:9, 115:9–18; PX360 (Smyle decl.) ¶¶ 4–5; PX361 (Smyle polygraph card); PX134 (NCPD Homicide Bureau March 1985 Blotter Entries) (blotter showing in at 8:57 am, out at 11:36 am, present at 4:15 pm and out at 8:15 pm).

6. By the end of 9 hours, notes by Sirianni and Perrino reflect that Smyle said Restivo had told him they would find another missing girl in the cemetery and that he knew who had killed Fusco but would not say who; this was reduced to a written statement Sirianni drafted and Smyle signed on March 7, 1985.  PX195 (Smyle 3/7/85 statement).

7. But that statement was false; Restivo never told Smyle that he knew who killed her. PX346 (Smyle dep.) 192:15–93:10; PX360 (Smyle decl.) ¶¶ 6–11; PX344 (J. Restivo dep.) 316:13–25.

8. Smyle now admits that most of this statement was false, saying now that the topic of missing local girl Theresa Fusco came up with John Restivo only once, and Restivo speculated, "they'll find her strangled somewhere."  PX346 (Smyle dep.) 189:15–90:9.

9. Smyle explained his false testimony as follows: Volpe, Perrino and Sirianni had him "pretty well spun around," to the point where he was "so confused I would sign anything."  When Smyle truthfully denied knowing any inculpatory evidence, police "kept pushing me for another answer," "pressuring" him and providing "different scenarios" implicating Restivo: "He's the one, he's the one, he's the one. We know he's the one. We know he's the one." PX346 (Smyle dep.) 188:3–17, 192:11–22.

10. Although Smyle only ever told police that Restivo had made a passing comment before Fusco's body was found to the effect that she would probably be found strangled somewhere, the detectives added additional details to the statements, including that Restivo had told Smyle that he knew the area called the "Fort" and had hung out there as a child. PX360 (Smyle decl.) ¶¶ 6–11; PX195 (Smyle 3/7/85 statement); PX198 (Smyle 3/27/85 statement); PX346 (Smyle dep.) 193:4–24.

11. Detective Sirianni admitted that "it would take more than the report of a rumor" or "someone saying they'll probably find her strangled" for that person to become a suspect.  PX345 (Sirianni dep.) 74:15–75:11.

3

12. In the days and months after that statement was signed, Smyle's house was placed under surveillance and NCPD officers including Volpe, Sirianni, Connaughton and Perrino continued to question him and took additional statements from him. Smyle felt "afraid and intimidated because they wouldn't leave me alone. I felt like they wouldn't go away and give me peace of mind unless I told them what they wanted to hear."

> Q. What did they want to hear?
> A. They wanted to hear that Restivo made an admission to me and that the admission was he knew who killed them but wouldn't tell me because he knew who it was and that, you know, that's why he didn't tell me.
> Q. But, in fact, John Restivo never said that to you, did he?
> A. No.

PX346 (Smyle dep.) 196:5–99:25; PX195 (Smyle 3/7/85 statement); PX198 (Smyle 3/27/85 statement); PX199 (Smyle 3/27/85 typed statement); PX360 (Smyle decl.) ¶¶ 3, 13.

13. Volpe, Sirianni and other police hung around outside Smyle's home, watching him, and coming in to ask him questions about the case through his grand jury testimony, and then again until trial, PX346 (Smyle dep.) 131:2–14; Smyle felt intimidated by this police presence at his home. PX360 (Smyle decl.) ¶¶ 13–15.

14. Smyle believes the pressure to testify consistently with that false statement is part of the reason he was hospitalized for contemplating suicide prior to the trial. PX346 (Smyle dep.) 207:15–08:22; PX360 (Smyle decl.) ¶ 21.

15. Ultimately, Smyle "was so confused and exhausted and felt so much pressure. I wish I had resisted the pressure police put me under to stick with the story." He testified to at the grand jury and again at trial to the false claim that Restivo had admitted he knew the killer. Before Smyle testified at the grand jury, Volpe and Sirianni took him to police headquarters for what felt like half a day before they drove him to court, and Volpe told him how to testify. PX346 (Smyle dep.) 122:5-7, 208:23–09:18; PX360 (Smyle decl.) ¶¶ 18–20, 23.

16. In 2010 Smyle signed a sworn declaration recanting those false statements, confirming the truth of the declaration in his deposition. PX360 (Smyle decl.); PX346 (Smyle dep.) 192:23–93:10.

   *Kenneth Cockerel*

17. On April 19, 1985, after holding and questioning Kenneth Cockerel for approximately 12 hours, Volpe and Allen prepared a statement claiming Cockerel heard Restivo tell his brother Michael, "I got my piece of ass but I didn't choke her," starting to say a name but not finishing it; Cockerel signed it. PX15 (NCPD K. Cockerel Form 79); PX209 (K. Cockerel 4/19/85 statement); PX210 (K. Cockerel Grand Jury testimony) 13:17–24.

18. When he appeared in the grand jury, however, Cockerel recanted and denied he ever heard such an admission from Restivo. He testified that he signed the statement only after a 12

4

hour interrogation, during which Volpe and Allen refused his requests for a phone call: I "told them the truth when I first walked in for about four hours, and they called me a liar for four hours. . . Then they told me they're going to lock me up. . . They said I know a lot more about the case than what I'm telling them. I told them I didn't. They said I did and they're going to lock me up for a material witness or something like that;" PX210 (K. Cockerel Grand Jury testimony) 12:12–23, 14:22–25, 22:7–23:8, 24:6–8, 27:7–13, 31:21–23, 33:5–9.

19. Cockerel testified the details in his statement came from the police talking about the case and telling him they knew he had overheard something between Michael Cockerel and John Restivo; ultimately after police kept "putting ideas in my head," he signed the statement "[j]ust to get out of there," and "[b]ecause I got tired of telling them the truth and them calling me a liar." Cockerel also said that Volpe had threatened him by brandishing a cutdown baseball bat during the interrogation. PX210 (K. Cockerel Grand Jury testimony) 28:17–23, 29:13–23, 31:21–23, 33:4–16, 40:18–42:8.

20. During a break Cockerel was taken to the NCPD Homicide Unit where Sirianni prepared a second statement, this time stating that "I overheard John Restivo mention the name 'Theresa, I was there but I didn't choke the bitch'"; Cockerel signed it. When he resumed the witness stand he testified consistently with the new statement, but stood firm in denying that he ever heard Restivo say "I got my piece of ass." PX208 (K. Cockerel 6/10/85 statement); PX210 (K. Cockerel Grand Jury testimony) 68:1–9, 76:17–24.

21. This testimony, given only after Kenneth Cockerel had his private meeting with Sirianni, was false. John Restivo never said anything like that to Michael Cockerel. PX210 (K. Cockerel Grand Jury testimony) 22:7–11; PX211 (M. Cockerel Grand Jury testimony) 26:5–19.

22. When police questioned Michael Cockerel—who had supposedly had the direct conversation with Restivo Kenneth's statement claimed to overhear—Michael denied it, testifying, "He never said that to me. If he had said that to me I would have turned around and told the police right off." PX211 (M. Cockerel Grand Jury testimony) 26:5–19.

*Carl Pozzini*

23. Carl Pozzini was taken from his home at night and interrogated at police headquarters by Volpe and Allen for five hours. Volpe and Allen then prepared a statement for Carl Pozzini to sign claiming that Pozzini had overheard Restivo admit to Pozzini's cousin, David Rapp, that Restivo had "done something stupid," while "wasted on angel dust" and "was involved and tried to stop it." Pozzini so testified in the grand jury and at trial. PX278 (Pozzini decl.); PX278-A (Pozzini 6/10/85 statement); PX278-B (Pozzini trial testimony); PX342 (Pozzini dep.) 127:9–20, 185:8–16.

24. Pozzini now admits—in both a sworn declaration and again at his deposition—that he never heard any such conversation, and only signed the statement because he was terrified that he would become the suspect if he did not do what police asked. PX278 (Pozzini decl.) ¶¶ 4, 5; PX342 (Pozzini dep.) 89:12–23, 117:7–18:10, 134:23–135:17, 146:3–14, 154:21–55:12, 187:3–23, 189:15–90:6, 192:13–93:14.

5

25. When police questioned David Rapp—who supposedly was a direct participant in the conversation with Restivo which Pozzini claimed to have overheard—Rapp denied it. PX213 (Rapp aff.) ¶¶ 5–8; PX343 (Rapp dep.) 15:2–18:15.

**Trial Witnesses**

26. Defendants and other NCPD witnesses have acknowledged special concerns with the reliability of inmates who offer testimony about jailhouse admissions, given inmates' obvious self-interest and the near impossibility of corroborating their claims. PX330 (Allen dep.) 171:18–173:16; PX331 (Connaughton dep.) 156:2–10, 158:25–159:19, 160:4–18, 237:7–13; *see also* PX341 (O'Leary dep.) 46:9–16 ("Q. A post admission coming to you from an inmate is almost impossible to corroborate; isn't it? A. Yes, ma'am. Q. By definition it's harder to prove such a statement is reliable because you can't corroborate? A. By definition, right."), 51:16–19; PX334 (Farrell dep.) 54:5–55:5, 62:25–63:5, 114:6–117:11; PX337 (Hillman dep.) 212:14–213:22.

### *Steven Dorfman*

27. On April 2, 1986, Connaughton and Diehl went to NCCC and met with Steven Dorfman. Dorfman had a prior criminal record, including a felony assault conviction and was charged with four first degree robberies, all committed on January 22, 1986. PX96 (Connaughton notes 4/2/86 Dorfman interview); PX362 (Dorfman information & indictment); PX100 (Dorfman plea minutes); PX384 (Restivo/Halstead trial transcript) 733:17–740:17.

28. According to notes taken by Connaughton, Dorfman told them that on March 31, 1986, he met John Restivo for the first time and accepted his invitation to play chess. Dorfman claimed that during the chess game, they began to talk and Restivo admitted that he, Halstead and Kogut had picked Fusco up in the van and raped her, after which Kogut strangled her with a scarf. On June 25, 1986, Volpe wrote out a statement to this effect for Dorfman and Dorfman signed it; according to that statement, Dorfman also told Restivo that he was in protective custody because he was a snitch prior to Restivo confessing to him. PX96 (Connaughton notes 4/2/86 Dorfman interview); PX97 (typed Dorfman 4/2/86 interview and 6/25/86 statement); PX384 (Restivo/Halstead trial transcript) 756:11–57:5; PX98 (Dorfman 6/25/86 statement).

29. Dorfman's statement was not true; Restivo is innocent and never told Dorfman that he had any involvement in the Fusco murder. PX384 (Restivo/Halstead trial transcript) 1683:11–1686:4, 1698:7–22; PX344 (J. Restivo dep.) 296:19–297:5.

30. On July 7, 1986, Dorfman and his attorney appeared with ADA Klein before Judge Thorpe, and pled his four counts of first degree robbery, each carrying a twenty-five year sentence, down to a single guilty plea of second degree robbery, for which he was sentenced to an indeterminate sentence of 4 to 8 years. ADA Klein recommended the plea and the sentence to the court, explicitly making the plea conditional on Dorfman testifying when called upon to do so and premising the sentencing recommendation on the information provided by

6

Dorfman and Dorfman's willingness to testify. In addition to testifying against Restivo, Dorfman agreed to testify against his codefendant in one of the robberies. PX100 (Dorfman plea minutes); PX384 (Restivo/Halstead trial transcript) 744:5–16.

31. ADA Klein acknowledged the deal in a letter to Dorfman's attorney, and at the plea and sentencing proceeding specifically noted that Dorfman "has provided information … of a very important nature concerning a pending homicide case in Nassau County, and has indicated his willingness to testify at that trial on behalf of the District Attorney's Office," and it was "[b]ased upon this cooperation [that] the People would recommend the four-to-eight-year sentence" for Dorfman, a term which the sentencing judge noted was "the minimum sentence authorized by law for a prior violent felony offender." PX100 (Dorfman plea minutes) 15:18–16:17, 17:15–17; PX231 (ADA progress notes in *People v. Dorfman*).

32. Dorfman testified at trial, repeating the false story previously written out by Volpe and Connaughton or Diehl. PX384 (Restivo/Halstead trial transcript) 720:22–26:13, 727:15–31:13, 750:16–22.

### *Brian O'Hanlon*

33. Brian O'Hanlon was a heroin-addicted acquaintance of Halstead's with multiple open arrest warrants who shot up ½ an hour before police picked him up for a 10–11-hour marathon of questioning on September 12, 1985. PX340 (B. O'Hanlon dep.) 80:10–81:13, 143:12–44:19.

34. The notes of the first 6 hours of questioning by Connaughton make no reference to any confession from Halstead (only that Halstead knew his apartment was bugged), but the statement O'Hanlon ultimately signed claimed that, during one of four collect calls to O'Hanlon from the NCCC, Halstead gave a detailed confession: he, Restivo and Kogut all raped the victim in a van before Kogut strangled her to death with a rope in a graveyard. PX141 (Waltman notes 9/12/85 B. O'Hanlon interview); PX143 (B. O'Hanlon 9/12/85 statement).

35. This latter statement was false; Dennis Halstead is innocent of the Fusco rape/murder and never told O'Hanlon he had any involvement in the crime. PX384 (Restivo/Halstead trial transcript) 2136:3–17, 2175:8–2177:6, 2178:9–17.

36. O'Hanlon, now a parolee, denies receiving anything more than a several-month reduction in sentencing on multiple pending charges but in fact was sentenced to time served and had several charges dismissed – a much more significant benefit. PX340 (B. O'Hanlon dep.) 92:1–13; PX363 (B. O'Hanlon Criminal Record, filed under seal).

37. At his deposition, O'Hanlon admitted that his trial testimony claiming Halstead never told him his phones were tapped "might have been a lie." PX240 (B. O'Hanlon dep.) 135:8–36:10.

### *Sam Newsome*

7

38. Beginning in June or July 1985, Samuel Newsome was a confidential informant for Detective Harry Pizer of the NCPD Major Case Squad. He had an ongoing relationship with Det. Pizer where he would call Pizer with any criminal information he heard. PX384 (Restivo/Halstead trial transcript) 1029:23–30:18, 1032:23–34:8; PX365 (Newsome NCCC sign-in form).

39. On January 29, 1986, Newsome was sentenced to 60 days for a probation violation. At his request, he was placed in protective custody, on tier c-3. On January 31, 1986, only two days after getting to jail, he called Pizer and told Pizer he had unspecified information for him. Thereafter Pizer went to see him, bringing Volpe along on one occasion. Newsome offered incriminating information on a number of inmates, including Halstead. PX384 (Restivo/Halstead trial transcript) 1033:14–35:13, 1035:23–36:3, 1038:11–16, 1089:12–91:9, 1094:21–96:25, 1105:22–24; PX364 (Newsome NCCC Admin. Seg. report); PX366 (Pizer notes 2/24/86 Newsome interview).

40. Newsome initially told Pizer that a day after he got to the NCCC, he had played cards with Halstead and during this cardgame, Halstead had confessed to the rape in a van of a "hitchhiking" "Italian girl" with two unnamed accomplices. He told Pizer he didn't have the names of the accomplices. PX366 (Pizer notes 2/24/86 Newsome interview); PX384 (Restivo/Halstead trial transcript) 1094:12–15.

41. On October 22, 1986, after the trial was already underway, Newsome signed a statement for Volpe and Connaughton saying that Halstead had had told him that he committed the crime along with someone named "John," PX384 (Restivo/Halstead trial transcript) 1109:10–15; PX367 (Newsome 10/22/86 statement).

42. This statement was false. Dennis Halstead is innocent of the Fusco rape/murder and never told Newsome he had any involvement in the crime. PX384 (Restivo/Halstead trial transcript) 2131:8–32:7, 2136:3–17, 2182:7–84:11.

43. Newsome later testified as a prosecution witness at the Halstead and Restivo trial, insisting that within 3-4 hours after meeting Dennis Halstead, Halstead, while avoiding speaking with other inmates that he had known longer than he knew Newsome, confessed to Newsome his involvement in raping a beautiful Italian girl in a van and then dumping her out of the van after doing something to her neck. PX384 (Restivo/Halstead trial transcript) 1067:12–22, 1072:20–83:24.

44. On May 7, 2012, Judge Wall granted plaintiffs' motion to compel the production of "files relating to informants from the Nassau County Police Department, the Nassau County District Attorney's Office and the Nassau County Correctional Center." D.E. 206. Plaintiffs had requested files related to additional witnesses who had offered false evidence against plaintiffs: Richard Marino, Charles Lewis, Thomas McBride, James Ravenell, Carl Macedonio and Dvid Shafer. Defendants have as yet failed to comply with this order, depriving plaintiffs of potential evidence to establish a conspiracy with these additional parties. *See* D.E. 206, D.E. 192 & 192-1; Cornwall decl. ¶¶ 2–4.

## Monell

### Absence of supervision or training

45. Spillane, the commanding officer for Homicide, never gave his detectives any guidance on how to properly conduct investigations; he simply assigned them the cases and left the investigations up to them. He didn't feel the need to hold their hands; he simply relied on his faith that they would do the right thing. PX347 (Spillane dep.) 51:9–20, 196:3–17, 199:6–24, 201:6–23.

46. Detectives did not have to report on the status of their investigations to their supervisors. There was no requirement that a detective take any notes about what occurred in interrogations or interviews other than that if a confession was made the detectives were to get a written statement. PX347 (Spillane dep.) 66:16–21, 71:13–73:20, 195:22–96:2.

47. NCPD detectives and supervisors were unaware of any written rules or regulations or unwritten procedures or guidelines in 1984 for conducting homicide investigations, including note taking, collection and preservation of evidence. PX347 (Spillane dep.) 50:17–51:8, 52:17–21; PX330 (Allen dep.) 22:21–23:8; PX332 (Dempsey 2/13/09 dep.) 60:21–61:11; PX353 (Fischer rpt.) 63–64.

48. NCPD detectives were also unaware of any written or unwritten rules, regulations or guidelines for interrogating suspects and interviewing witnesses; instead detectives were given complete discretion, including rules regarding the length of interrogations or interviews, the environment in which the interrogations or interviews took place, meals, breaks, allowing suspects to rest or sleep, the use of lies, trickery, deception, pressure, or the use of threats of prosecution or promises of leniency. PX347 (Spillane dep.) 60:16–61:7, 69:19–71:12, 72:17–24, 75:11–77:6, 79:19–82:7, 91:21–92:3, 199:25–200:4; PX330 (Allen dep.) 54:12–15, 114:10–15:10; PX332 (Dempsey 2/13/09 dep.) 60:21-61:3; 61:12-24; PX348 (Volpe dep.) 28:23–29:7, 29:14–17.

49. There was an official policy requiring the delivery of *Miranda* warnings but in 1983 a local judge suppressed a criminal defendant's inculpatory statement because NCPD officers had not provided proper *Miranda* warnings. *People v. Valle,* 469 N.Y.S.2d 305 (N.Y. Co. Ct. (Nassau County) 1983). NCPD *Miranda* policy then changed on February 15, 1984, not because of any deficiency in the prior policy as written, but because the *Valle* opinion "underscored the failure of members to adhere to the established procedures." Despite the new written policy, NCPD officers continued the custom of failing to provide proper *Miranda* warnings.  PX135 (NCPD *Miranda* policy); PX353 (Fischer rpt.) 22.

50. There were also no rules, guidelines or training regarding *Brady* material or governing what information detectives investigating homicides passed on to prosecutors. As supervisor, Spillane took no role in making sure that detectives provided *Rosario* and *Brady* material to prosecutors. PX347 (Spillane dep.) 201:24–03:23, 214:9–15:8; PX331 (Connaughton dep.) 39:14–40:11; PX332 (Dempsey 2/13/09 dep.) 62:3–21; PX334 (Farrell dep.) 29:16–21.

9

51. What training there was for a new homicide detective was entirely informal: the only training that a new detective in Homicide would receive would be to be sent out with a more experienced detective for a short period from a couple of days to a couple of weeks. PX347 (Spillane dep.) 57:10–58:3; PX330 (Allen dep.) 21:10–22:20, 24:9–21; PX348 (Volpe dep.) 26:25–27:14.

52. In 1984–85, homicide detectives received no formal training on how to gather physical evidence, identify eyewitnesses, interviewing witnesses, inducements for witnesses, taking witness statements or interrogating suspects, including no training on how long they could hold suspects for or limits on the pressure that could be applied. PX330 (Allen dep.) 24:9–17, 25:23–28:6; PX331 (Connaughton dep.) 18:24–19:5, 20:15–22:24, 30:13–33:2, 35:15–25, 39:4–13, 39:14–40:11, 137:23–38:9; PX332 (Dempsey 2/13/09 dep.) 62:22–63:5; PX345 (Sirianni dep.) 23:18–25; PX381 (NCPD training docs).

53. Plaintiff's expert Russ Fischer spent 33 years at the Miami Dade Police Department, working at every level up to Chief of the Criminal Investigations Division. He has taught police personnel since 1986, been an instructor for the International Association of Chiefs of Police (IACP) since 2005, and a worked as a consultant for the U.S.D.O.J. PX353 (Fischer rpt.) 1.

54. Fischer opines that the absence of formal training created the potential that officers could engage in incorrect procedures and impart those incorrect procedures on new officers through informal training, violating minimally acceptable police standards. PX353 (Fischer rpt.) 62–63.

55. Similarly, Fischer opines that the absence of policies and procedures regarding report preparation as to homicide investigation was inconsistent with generally accepted police practices. PX353 (Fischer rpt.) 64.

56. Fischer noted that the Fusco "investigation reveals a systematic failure to create and preserve contemporaneous documentation of pertinent information in witness interviews, as well as a failure to disclose this information to the prosecutor." PX353 (Fischer rpt.) 6.

57. Fischer concluded that the supervision and management of the Fusco investigation—lacking any meaningful guidance or oversight, and requiring no contemporaneous documentation of investigative acts—did not meet minimally acceptable police practices in place at the time of the crime and investigation. PX353 (Fischer rpt.) 59–67.

58. As but one example, Det. Volpe did not prepare his 262 Detective Supplemental police report summarizing his investigation in the Fusco homicide case until November 25, 1994—almost 10 years after Ms. Fusco's body was found, and 8 years after Restivo and Halstead were convicted. This 262 report should have been prepared when the case was closed after the 1985 arrests of Halstead, Restivo and Kogut. Even when completed, the eight-page report was woefully deficient, failing to document many material steps in the investigation. These problems with the documentation of the Fusco investigation were a gross violation of appropriate police practices, and made it impossible to have adequate supervision of the

10

investigation.  PX353 (Fischer rpt.) 47, 62–63; PX357 (Volpe 11/25/94 report); PX347 (Spillane dep.) 211:16–24.

**County has notice of problem, fails to investigate or discipline**

*Abusive Interrogation of John Restivo*

59. Dempsey and Volpe interrogated John Restivo overnight from March 5–6, 1985. During those 20 hours, they isolated him (denying his request for an attorney and refusing him phone calls), assaulted him (Dempsey choked him and hit him, knocking him off his chair), and pressured him into signing a false statement they drafted incriminating Halstead; in keeping with NCPD tradition, they did not administer *Miranda* warnings.  PX344 (J. Restivo dep.) 636:22–38:12, 644:5–16; PX134 (NCPD Homicide Bureau March 1985 Blotter Entries) 4 (2105 entry), 7 (1635 entry).

60. Upon his release from custody, Restivo immediately contacted attorney Ted Robinson, who called the Homicide Bureau to file a complaint about the brutally coercive interrogation and to put them on notice that Restivo was represented and therefore could not be questioned again. Det. Dempsey hung up on him. PX296 (Robinson Decl.) ¶ 7; PX385 (Dempsey notes 3/7/85 Robinson call); PX332 (Dempsey 2/13/09 dep.) 177:17–78:6, 182:7–18.

61. Robinson called back to complain to C.O. Spillane, who became "abusive and surly." PX 296 (Robinson Decl.) ¶¶ 4–7; PX347 (Spillane dep.) 103:3–06:13.

62. Robinson then wrote to Police Commissioner Samuel Rozzi complaining the abuse of Restivo, the Homicide Bureau's refusal to entertain his complaint, and the harassment of Dennis Halstead and others, including "threats of violence, prolonged detention without being permitted a phone call, and coercing statements from these 'potential witnesses.'" PX296 (Robinson Decl.) ¶ 9 & C.

63. Despite Rozzi's written pledge to investigate, there is no evidence that any such action was ever taken. PX114 (4/11/85 Robinson affirmation for Art. 78 petition); PX115 (3/28/85 Rozzi letter to Robinson); PX332 (Dempsey dep.) 184:20–86:3; PX347 (Spillane dep.) 93:1–22, 122:11–25.

64. Robinson ultimately filed an Article 78 petition against the Police Commissioner laying out the illegal conduct against John Restivo and Dennis Halstead.  PX114 (4/11/85 Robinson affirmation for Art. 78 petition); PX115 (3/28/85 Rozzi letter to Robinson); PX358 (4/25/85 Robinson reply affirmation)**.**

65. The County still did nothing, which was inconsistent with then-prevailing police customs and practices. PX353 (Fischer rpt.) 7 ("As the result of an individual filing a complaint against a member of a police department, for the law enforcement agency to not record, investigate and adjudicate that complaint is inconsistent with police customs and practices at the time this complaint was filed.").

66. Instead, Spillane recommended that Volpe, Connaughton and Diehl receive a medal of commendation for their work in the Fusco investigation.  PX184 (Spillane commendation letter); PX185 (retyped Spillane commendation letter).

   *Hair planting*

67. At Restivo and Halstead's 1986 trial, their lawyers argued that Theresa Fusco's hairs that Volpe alleged had been found in Restivo's van had actually been planted. Hair experts for both the defense and the prosecution provided testimony validating that theory: that based on the presence of post-mortem root banding on these hairs, they could not have been left in the van consistent with the prosecution's timeline. *See* PX384 (Restivo/Halstead trial transcript) 1281:18–82:7 (Fraas); *id.* at 1817:20–18:19, 1822:5–19, 1828:19–29:8 (Deforest); *id.* at 2216:15–22:20 (Petraco).

68. Yet County authorities never investigated whether Volpe had planted the hair.  PX334 (Farrell dep.) 104:13–20.

69. At Kogut's criminal trial in 2005, Judge Ort found that the questioned hairs were not left in Restivo's van on or about November 10, 1985. PX359 (Kogut acquittal decision).

70. The County still did not investigate whether Volpe had planted the hair.  PX334 (Farrell dep.) 104:13–20.

   *Volpe and Dempsey elicit false confessions in other cases*

   *Robert Moore*

71. In September 1995, Volpe was the lead detective in the investigation of the murder of cab driver Joshua Chisholm.  During that investigation, Volpe and others subjected Robert Moore to a 22 hour interrogation despite having no physical or forensic testimony linking Moore to the crime, and despite a witness having told them even before Moore was taken to the police station that Moore was not the perpetrator. During that prolonged interrogation, Volpe and Moore's other interrogators repeatedly refused his requests for an attorney and responded to his truthful denials by telling him that he was "not going home saying something like that," and ""Don't bullshit me," and by physically attacking him. PX380 (*Moore v. Nassau County*, Volpe dep.) 53:15–54:18; PX378 (*Moore v. Nassau County*, Moore dep.) 48:25–50:3, 50:23–51:23, 53:18–54:20, 58:7–19, 59:3–12; 61:5–62:7, 65:2–75:25, 76:2–77:20, 80:16–82:12, 83:16–18, 84:15–90:21, 116:19–18:8; PX379 (*Moore v. Nassau County*, Mullen dep.) 6:25–8:2.

72. Volpe eventually induced Moore to sign a statement that contained numerous statements Moore had never made and which put him at the scene of Chisholm's murder.  PX378 (*Moore v. Nassau County*, Moore dep.) 92:3–6, 97:12–99:2, 99:7–15, 100:21–12:14, 112:24–13:4, 114:22–15:10; PX376 (Moore statement); PX377 (Moore affidavit) ¶¶ 3, 6.

12

73. Moore was subsequently arrested and charged with felony murder based on the statement Volpe had him sign. Moore was incarcerated on those charges for approximately two weeks, waiting to hear whether the DA would pursue the death penalty against him, before another man confessed to the murder and he was released. PX378 (*Moore v. Nassau County*, Moore dep.) 121:23–24:10, 125:14–27:3; PX377 (Moore affidavit) ¶ 8e.

74. In response to Moore's notice of claim based on the above events, despite confirming that Moore was interrogated for 22 hours and that that interrogation had produced a false confession, Lieutenant Giudice maintained that Volpe and the other officers had done nothing wrong, and tried to smear Moore as a cocaine user. The County settled Moore's civil claims against Det. Volpe and others. PX377 (Moore affidavit) ¶¶ 3, 6, 8g, 11, 13–15.

75. Despite the settlement, the County never investigated or disciplined Volpe. PX383 (Volpe's Disciplinary Record).

76. Volpe lied under oath at Kogut's 2005 retrial concerning the Moore confession claiming Robert Moore was at the scene when he was not. Volpe also misrepresented the facts of the Moore case at his deposition when he claimed he was responsible for freeing Moore, when he was not. PX386 (Kogut 2005 Retrial Transcript) 1491:24–92:11; PX349 (Volpe 11/19/10 dep.) 249:21–250:5, 270:12–271:8; PX227 (*Moore v. Nassau County* docs).

### *Shonnard Lee*

77. On June 17, 1997, high school student Shonnard Lee was arrested, taken to NCPD headquarters, and placed in the hands of Dempsey and another detective, who proceeded to interrogate him for seven hours without first advising him of his *Miranda* rights. The detectives interrogated him about the murder of Sammy Jones; when he denied any knowledge and told them he had been with his brother that night, the detectives called him a liar, screamed at him, and even grabbed his shoulder until Lee broke down crying from the abuse. They also denied his repeated requests to contact his mother and an attorney. PX375 (*Lee v. Nassau County*, Lee dep.) 8:15–21, 12:19–20:6, 21:13–19; 21:20–22:10, 23:22–26:6; PX388 (S. Lee affidavit).

78. Lee's mother called the NCPD headquarters repeatedly during his interrogation and was told that they had no information about him. Finally, after midnight, a detective admitted to her that Lee was at the homicide bureau. Lee's mother told the detective she spoke to that Lee was represented by counsel and that she wished to speak to Lee immediately. She was not allowed to speak to Lee and the interrogation continued. PX389 (D. Lee affidavit).

79. Finally, Dempsey left the room, came back with some paperwork, and told Lee that he needed to sign the pages if he wanted to go home. Lee signed at 1:20 a.m., having been in custody for almost 7 hours. That paperwork contained a document handwritten by Dempsey purporting to be a statement by Lee confessing to having murdered Jones with a baseball bat. PX375 (*Lee v. Nassau County*, S. Lee dep.)27:2-28:3; PX388 (S. Lee affidavit); PX368 (S. Lee statement).

80. Lee never gave any such statement. PX388 (S. Lee affidavit).

81. Dempsey also interrogated one of Lee's friends, Tajuan Crum, without giving him his Miranda warnings, and even after confirming Crum's alibi, threatened Crum that he would be charged himself unless he signed a statement, written by Dempsey, implicating Lee. "Scared to death," Crum signed the statement. PX371 (Crum affidavit); PX370 (Crum statement).

82. Additionally, Dempsey falsified a statement from Winona Hammonds, falsely reporting that she had told Dempsey that she overheard Crum and Lee bragging about killing Jones. PX372 (Hammonds affidavit).

83. Additionally, Dempsey suborned another witness, Jeffrey Bourne, into giving false testimony against Lee alleging that Lee had told Bourne he killed Sammy Jones. PX390 (Bourne affidavit).

84. Dempsey did all this despite the fact that four months before Lee's arrest another witness, Ragan Martin, identified Sammy Jones's killer for Dempsey as Corey Jones, also known as "Sha" and "Corey." Martin subsequently showed Dempsey Corey Jones's house, where one of the detectives took a photo of Jones's Camaro, and also identified Corey Jones from a photo lineup; that lineup included Lee, but Martin did not identify Lee as involved in the murder. PX373 (Martin statement); PX391 (*Lee v. Nassau County*, Martin dep.) 13:21–14:14, 29:24–38:12; PX299 (Various Lee documents at Opinion dismissing Lee indictment); PX302 (Dempsey report); PX303 (Crime Stoppers Flyer); PX304 (Williams statement).

85. Lee was charged, indicted, tried and acquitted. At Lee's criminal trial, Dempsey testified that Lee had admitted to the murder, but the jury acquitted Lee. PX333 (Dempsey 01/24/12 dep.) 453:7–21; PX369 ("Teen Held in Death," *Newsday,* 6/19/97).

86. Lee then brought a civil suit, and in the civil suit, a jury determined that Dempsey maliciously prosecuted Lee and awarded Lee $750,000 in compensatory and $1,250,000 in punitive damages. PX333 (Dempsey 01/24/12 dep.) 446:7–49:15; PX299 (*Lee v. Nassau County* verdict form).

87. Despite this finding by a civil jury that Dempsey had committed serious misconduct, Nassau County never investigated or disciplined Dempsey. PX243A ("False Confessions," *Newsday* 4/11/05); PX300 ("2M in faulty arrest," *Newsday* 5/19/04); PX392 (Dempsey's Disciplinary Record); PX333 (Dempsey 01/24/12 dep.) 451:22–52:21.

### *Anibal Martinez*

88. On August 2, 2001, NCPD Homicide detectives coerced Jose Martinez into signing a false confession to the murder of his best friend. The actual killer was later identified, arrested, and pled guilty. Once the charges against Martinez were dismissed he filed a § 1983 suit, which Nassau County settled. PX250 (Martinez statement); PX251 (*Martinez v. Trujillo*

documents); PX253 (*Martinez v. Trujillo*, complaint); PX254 (Martinez statement, translated); PX341 (O'Leary dep.) 69:4–6; 143:20–24.

### DNA testing

89. In 1993 through 1995, by agreement with the Nassau County District Attorney's Office ("NCDA"), three separate forensic laboratories: CBR Laboratories, Cellmark Diagnostics, and Lifecodes Laboratory conducted "DQ Alpha" testing, an early form of DNA testing, on male DNA taken from vaginal samples collected from Fusco's body at autopsy, as well as comparison blood samples from Dennis Halstead, John Restivo and John Kogut. D.E. 173; PX352 (Defs.' Response to Plaintiffs' 4th Requests to Admit) ¶¶ 16–25.

90. As defendants admit, the DNA testing by CBR and Cellmark excluded all three men as the source of the male DNA found in Fusco's body. Lifecodes' testing also excluded Dennis Halstead as the source of the male DNA present on the vaginal swab. With respect to John Restivo and John Kogut, Lifecodes' testing was less probative: it included them, along with approximately 95% of the U.S. population, as a potential source of the DNA. D.E. 173; PX352 (Defs.' Response to Plaintiffs' 4th Requests to Admit) ¶¶ 19, 23-25. PX393 (Word decl.) ¶ 18f.

91. In 1994, on the basis of this DNA testing, Halstead, Restivo and Kogut filed motions under CPL §440.10 seeking to vacate their convictions on the basis of newly discovered evidence of innocence. PX247 (Weinstein memo).

92. Although the NCDA filed oppositions, they continued to consider internally consenting to Halstead and Restivo's § 440 motions, holding discussions among high-level officials in the Appeals Bureau, ultimately including Denis Dillon, the District Attorney, to discuss the possibility of doing so. The NCDA's office put a great deal of thought, care and consideration into whether to vacate the convictions. Dillon took the issue very seriously and his decision could have gone either way. PX350 (Weinstein 2/10/11 dep.) 168:24–69:10; PX351 (Weinstein 1/13/12 dep.) 23:21–25:14; PX338 (Klein dep.) 776:11–78:2.

93. To assist in his decision, DA Dillon requested that Peter Weinstein, the chief of the appeals bureau, and Bruce Whitney, the deputy chief, who together authored the NCDA's memorandum in opposition to the 440 motions, and trial prosecutor Fred Klein, each present him with a memorandum assessing the impact of the DNA as well as each attorney's recommendation for whether he should consent to vacatur of the convictions. PX350 (Weinstein 2/10/11 dep.) 8:7–14; PX351 (Weinstein 1/13/12 dep.) 23:19–24:10.

94. The result, a 17-page memorandum, catalogued the many problems and weaknesses in the evidence used against Restivo and Halstead at trial and urged Dillon to consent to the new trial motion. PX247 (Weinstein memo).

95. Weinstein and Whitney raised serious doubt about whether the police had taken truthful statements from witnesses who claimed to have heard confessions from the plaintiffs, writing:

15

> it bears emphasis that their confessions were made only to jailhouse informants (Restivo to Dorfman, and Halstead to Newsome) and others with much to gain from their cooperation (Halstead to the O'Hanlons). . . the probative weight of Halstead's alleged confessions was weakened not merely by the character of the persons to whom they were allegedly made, but the circumstances surrounding their making.

PX247 (Weinstein memo) 7, 13.

96. For example, with respect to Dorfman, Weinstein and Whitney noted

> Dorfman's testimony . . . in our opinion, does not ring true. For example, the circumstances under which the confession was purportedly made strain credulity: Restivo supposedly confessed to Dorfman within hours after meeting him, and after learning from Dorfman that he (Dorfman) had 'snitched' on his codefendant. Second, Dorfman, a predicate felon and cocaine and heroin addict, who was in jail for committing four robberies, had much to gain from his information, did, in fact reap such benefits (*i.e.*, as a result of his earlier snitching against his codefendant, he was to receive a 7–14 year sentence; for his information about Restivo, his sentence was reduced to a 4–8 year term.

PX247 (Weinstein memo) 8.

97. Of Brian O'Hanlon, Weinstein and Whitney commented

> There is no doubt that Brian O'Hanlon, a career criminal and drug addict, received some benefit for his cooperation. At the time he first reported this information, which was two months after Halstead's [alleged] incriminating statements to him and only after he was approached by the police, he had four pending cases and there were warrants outstanding for his arrest. Notwithstanding these warrants, he was not arrested upon them at that time. By the time of trial, he had been arrested four or five additional times . . . and each time he was permitted to be released on bail. By the time of trial, he had six pending cases. Initially, this predicate felon was promised by the court a sentence of ten months for his cooperation, but the prosecutor promised a sentencing recommendation of only six months in satisfaction of all his charges. Thus, O'Hanlon's credibility was clearly suspect.

PX247 (Weinstein memo) 13–14.

98. Weinstein and Whitney wrote of Newsome's alleged confession

> [T]he circumstances surrounding Halstead's confession to him strain credulity. According to Newsome, following his sentencing on a violation of probation, he was housed in the same tier as Halstead. On the day after his sentence began, he

16

    met Halstead and during a friendly game of cards between them that same day, Halstead admitted his guilt in detail to this virtual stranger.

PX247 (Weinstein memo) 14–15.

99. But because Volpe continued to actively suppress it, Weinstein knew nothing about the French car/striped jeans lead or any other undisclosed exculpatory information, much less evidence of Volpe's deliberate misconduct; if he had, he would have included it in the memorandum and expected it to be weighed in the DA's evaluation of the motion for a new trial.  PX351 (Weinstein 1/13/12 dep.) 75:17–77:7; 79:25–83:11, 181:2–24.

100. The NCDA opposed the motion and it was denied. The prosecution continued, and plaintiffs remained in prison for 7 more years.  D.E. 173; PX352 (Defs.' Response to Plaintiffs' 4th Requests to Admit).

101. None of defendants were ever disciplined for their misconduct in the Fusco investigation, detailed above.  The NCPD's reinvestigation never even considered the possibility that NCPD officers had committed misconduct during the investigation.  PX332 (Dempsey 2/13/09 dep.) 185:3–19; PX334 (Farrell 01/26/09 dep.) 104:13–20.

Dated: July 2, 2012　　　　　　　　　　　　　　　Respectfully submitted,
　　　　　New York, NY

　　　　　　　　　　　　　　　　　　　　　　　　　　__/s/ Debi Cornwall_____
　　　　　　　　　　　　　　　　　　　　　　　　　　Barry C. Scheck
　　　　　　　　　　　　　　　　　　　　　　　　　　Debi Cornwall
　　　　　　　　　　　　　　　　　　　　　　　　　　Anna Benvenutti Hoffmann
　　　　　　　　　　　　　　　　　　　　　　　　　　Sonam Henderson
　　　　　　　　　　　　　　　　　　　　　　　　　　NEUFELD SCHECK & BRUSTIN, LLP
　　　　　　　　　　　　　　　　　　　　　　　　　　99 Hudson St., 8th Floor
　　　　　　　　　　　　　　　　　　　　　　　　　　New York, NY 10013

　　　　　　　　　　　　　　　　　　　　　　　　　　**Attorneys for plaintiffs**
　　　　　　　　　　　　　　　　　　　　　　　　　　**John Restivo and Dennis Halstead**

## Certificate of Service

        I hereby certify that a true and accurate copy of Plaintiffs John Restivo and Dennis Halstead's Statement of Disputed Material Facts Pursuant to Local Rule 56.1 was served by ECF and UPS on July 2, 2012, upon the following:

| | |
|---|---|
| Michael Ferguson, Esq.<br>Office of the County Attorney<br>Ralph G. Caso Executive & Legislative Building<br>1 West Street<br>Mineola, New York 11501-4820<br>mferguson@nassaucountyny.gov | Paul Casteleiro, Esq.<br>200 Washington Street<br>5th Floor<br>Hoboken, New Jersey 07030<br>pcasteleiro@aol.com |
| Louis Freeman, Esq.<br>Nadjia Limani, Esq.<br>Freeman, Nooter & Ginsberg<br>75 Maiden Lane, Suite 503<br>New York, New York 10038<br>freemefree@aol.com<br>nlimani@aol.com | Anthony M. Grandinette<br>Grandinette & Serio, LLP<br>114 Old Country Rd., Suite 420<br>Mineola, New York 11501<br>Grandinetteesq@aol.com |

                                                                /s/ Sophie Glickstein_____
                                                                  Sophie Glickstein
                                                                  Paralegal