UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
JOHN KOGUT

                             Plaintiff,                         06-CV-6695
                                                                       (JS)(WDW)

          --against—

THE COUNTY OF NASSAU, POLICE COMMISSIONER
DONALD KANE, POLICE COMMISSIONER WILLIAM
J. WILLET (2005), POLICE COMMISSIONER JAMES
LAWRENCE, DETECTIVE SEAN SPILLANE (HEAD OF
HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH
VOLPE, DETECTIVE ROBERT DEMPSEY, DETECTIVE
ALBERT MARTINO, DETECTIVE WAYNE BIRDSALL,
DETECTIVE CHARLES FRAAS, DETECTIVE FRANK
SIRIANI, DETECTIVE HARRY WALTMAN,
P.O. MICHAEL CONNAUGHTON, P.O. WILLIAM DEHL,
and JOHN DOES, 1-5,

                             Defendants.

------------------------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A NEW TRIAL**

# TABLE OF CONTENTS

STATEMENT OF FACTS……………………………………………………………………….1

LEGAL ARGUMENT……………………………………………………………………… 12

POINT ONE

THE VERDICT WAS AGAINST THE CLEAR WEIGHT OF THE
EVIDENCE AND AN ORDER SHOULD ISSUE GRANTING THE
PLAINTIFF KOGUT A NEW TRIAL....................................................................12

POINT TWO

THE ERROR IN PROVIDING THE DELIBERATING JURY WITH
THE RESULTS OF KOGUT'S POLYGRAPH EXAM AS WELL AS
EVIDENCE OF HIS PRIOR ARRESTS RESULTED IN IRREPARABLE
PREJUDICE MANDATING A NEW TRIAL..........................................................14

POINT THREE

THE EXCLUSION OF THE EXPERT TESTIMONY OF SAUL KASSIN
CONSTITUTED PREJUDICIAL ERROR MANDATING A NEW TRIAL.............16

POINT FOUR

THE DENIAL OF THE MOTION FOR SEPARATE TRIALS OF THE
CLAIMS OF THE PLAINTIFFS PREJUDICED KOGUT MANDATING
A NEW TRIAL.....................................................................................................18

POINT FIVE

THE PLAINTIFF KOGUT JOINS IN AND ADOPTS THE ARGUMENTS
OF CO-PLAINTIFFS RESTIVO AND HALSTEAD IN SUPPORT OF
THEIR MOTION FOR A NEW TRIAL.................................................................19

CONCLUSION....................................................................................................20

**STATEMENT OF FACTS**

The plaintiff John Kogut's [hereinafter, "Kogut"] two 42 U.S.C. §1983 claims for malicious prosecution arising respectively from his 1986 and 2005 trials and his 42 U.S.C. §1983 due process of law claim concerning the suppression of exculpatory evidence, along with state law claims, were tried jointly with the claims of co-plaintiffs John Restivo and Dennis Halstead [hereinafter, "Restivo/Halstead"]. Kogut filed his action on December 19, 2006 and Restivo/Halstead filed their lawsuits on December 21, 2006. On March 31, 2009 the two separate actions were consolidated for purposes of discovery.

On July 23, 2012 Restivo/Halstead filed a motion to sever the lawsuits, alleging that they would be prejudiced in a joint trial with Kogut based on Kogut's confession. [DE 312] On August 19, 2012 Kogut joined in the Restivo/Halstead motion arguing that he would suffer irreparable harm if tried with his co-plaintiffs based on their multiple alleged admissions to third parties. [DE 349] The Court denied the severance motion ruling that if separate trials were held the Kogut confession would be admissible against Restivo/Halstead to negate the element of malice on the malicious prosecution claims. [8/16/12, 4-19 to 10-12]

At trial the defendants presented the testimony of Kim Beyer who was 15 or 16 years old in 1984 and Regina Furhmann who was 14 years old in 1984, which established in early 1984 co-plaintiff Halstead was dating a teenage friend of theirs, Gail Cole, that a girl classmate of theirs had a key to Halstead's apartment and that the apartment was used as a hangout by teenage girls who were permitted to drink beer and smoke marijuana while in the apartment. [11/6/12, 4959 to 4963; 4979 to 4984]

Evidence was also introduced through the testimony of Michael Cockeral that on

1

November 11, 1984 in a telephone conversation co-plaintiff Restivo told him he got his dick wet the night before. Cockeral admitted he never told anyone about his conversation with Restivo until February 13, 1986. [10/17/12, 3149-15 to 3150-19] Furthermore, much testimony at trial was elicited from Michael Cockeral and Kenneth Cockeral concerning a statement Kenneth Cockeral contended Restivo made to Michael Cockeral admitting he was present when Theresa Fusco was killed but denying that he choked "the bitch." Michael Cockeral denied Restivo made the statement to him. [10/17/12, 3073-19 to 3077-22; 3151-19 to 3153-15]

Kogut's claims of malicious prosecution and the suppression of exculpatory evidence centered chiefly on his contention that his alleged confession was fabricated by the defendants Joseph Volpe and Robert Dempsey following a polygraph examination which he voluntarily consented to take. The defendants asserted to Kogut during his interrogation that he failed the polygraph. In pretrial pleading the defendants maintained that Kogut, in fact, failed the polygraph and Kogut contended he passed the examination with flying colors offering the testimony of Charles Honts to prove his contention. During pretrial discovery expert reports on the polygraph examination were exchanged supportive of the parties' respective positions [DE 306-2; 306-4] and the defendants filed a motion to preclude the plaintiff from presenting Honts' testimony. [DE305] It was ultimately agreed between the parties that the plaintiff Kogut could testify that the defendants told him during the interrogation that he failed the polygraph, but that the actual results of the Kogut polygraph were inadmissible.

In conformity with the agreement of the parties, a redacted version of the polygraph documentation was admitted into evidence consisting solely of the Consent to Take a

2

Polygraph Examination Form, a redacted copy of the Polygraph Exam Background Form [Px 8, attached as Exhibit 1], and a redacted version of the Polygraph Examination Question Sheet [Px 8A, attached as Exhibit 2]. The Polygraph Exam Background Form was redacted to eliminate the fact that Kogut had 7-8 prior arrests, a prior burglary charge, and had been placed on probation [Exhibt 3, page 2, lower left-hand corner], and that most of his crimes constituted "Under Influence Trouble." [id, middle of right-hand column.] The Polygraph Examination Question Sheet was redacted to eliminate a notation that Kogut was "suspecting Dennis" murdered Theresa Fusco. [id, at p. 6]

On the final day of deliberation the jury requested Px 8 and Px 8A in evidence [See, Court Exhibit 17] and instead of receiving them the jury received all of the documentation generated during Kogut's polygraph examination, none of which was redacted. [Exhibit 3] Included within this documentation were unredacted versions of Px 8 and Px 8A, as well as the Polygraph Examination Card containing the examiner's opinion which stated, in pertinent parts, the following: "OPINION: LYING: J. Kogut answered several of the relevant crime questions with deceptive (Lying) responses, and stated that he was aware of his breathing responses throughout this examination, which altered some of the chart responses…" [Exhibit 3, p. 4]

Counsel for the defendants, Nadjia Limani, Esq., and counsel for Restivo/Halstead, Deborah Cornwall, Esq., gathered and reviewed the Exhibits the jury requested in Court's Exhibit 17 without realizing they were sending in the complete documentation generated during Kogut's polygraph exam, none of which was redacted, and all of which was not in evidence and inadmissible. [11/29/12, 6195-7 to 12] Unfortunately, the error was not picked up until after the documentation was provided to the jurors for their use in their

3

deliberations. [11/29/12, 6199-4 to 6] Once the error was discovered the judge's law clerk went into the jury room to retrieve all the evidence in the room so as to not flag the problem, whereupon a female juror said to the law clerk, "I think you're looking for this one. I think you want this one back," handing the law clerk the inadmissible polygraph documentation. [11/29/12, 6196-4 to 19] Following discussion with the parties the Court issued an instruction to the jury stating that polygraph results were not before them in this case, that the results were inadmissible and the results should not be used by them for any purpose. Each juror was then asked if they could comply with the instruction to disregard anything they may have seen, and they all said they could comply. [11/29/12, 6199-8 to 6200-14]

Kogut's claims revolved around his contention that his confession to the rape and murder of Theresa Fusco was fabricated by the defendants Joseph Volpe and Robert Dempsey following the polygraph examination, who then coerced him into signing the confession. Kogut maintained the truth to his contention that he was coerced and that his confession was fabricated by the defendants was revealed in the scientific evidence, i.e., the DNA evidence, the post mortem root hair banding evidence, the medical examiner's evidence of the manner of strangulation, as well as, the videotaped testimony of Frank Meyers, the alibi evidence of the three plaintiffs, and the fact that all of the factual material in the confession was either known to the defendants and/or theorized by the defendants during their investigation to have occurred.

The DNA Evidence

The DNA evidence established beyond question that the semen found in the victim's vaginal cavity did not belong to either Restivo or Halstead who in the confession were said

4

to have raped the victim. [Px 63] Furthermore, the testimony of the victim's mother Concetta Napoli and the victim's best friend Lisa Kaplan established that she was not sexually active and was a virgin. [9/25/12, 554 to 556; 572-573; 9/27/12, 652, 678] The victim's lack of sexual activity in combination with the DNA evidence obtained from every possible consensual sex partner of the victim's and every known associate of the three plaintiffs which was then compared against the DNA profile obtained from the semen recovered from the victim with negative results [Px 684] established that the semen could not have been deposited by a consensual sex partner or a fourth man whom the plaintiffs were protecting, but instead had to have been deposited by the individual who raped and murdered the victim. As stated by the plaintiffs' DNA expert Charlotte Word, if the victim had consensual sex and then was raped by two men not using condoms, "I would expect to see DNA from all three individuals plus DNA from the female…" and DNA found "would be a mixture of all the sperm donors." [9/20/12, 128-2 to 11] According to Dr. Word, given the concentration of semen recovered from the victim with a large number of sperm with tails the sperm was deposited at most a few hours, less than 12, prior to the victim's death. [9/20/12, 152-8 to 17] Any thought that the DNA of the plaintiffs was not present because they either did not ejaculate or used condoms and that the semen was deposited by a consensual partner was similarly disproved by Dr. Word. She testified that semen deposited in a female just prior to death results in excellent samples for DNA testing, as in this case, because the female "is not up and moving around…normal drainage is not occurring…and extremely good DNA test results can be obtained…." [9/2/12, 151-18 to 152-4] There can be no dispute based on the testimony of the victim's mother, Lisa Kaplan and the Hot Skates personnel, Thomas Gilhooley and Rochelle Bernstein, that the victim

prior to her death had a very active day which included dance classes, walking around town to meet Lisa Kaplan two times, taking a shower in the morning and another prior to going to work, walking to work and working from 6:30 to 9:47 p.m.[9/25/12, 530-531; 539-543; 9/27/12, 653-657; 753-757; 797-800; Px 908]

Furthermore, Dr. Word testified, in response to a hypothetical question asking if the seminal deposit was consistent with the victim engaging in consensual sex within 12 hours of her death and then being assaulted by two men wearing condoms, that it was not consistent because the sperm found would not be in the concentration or quantity recovered from the victim if that occurred. [9/20/12, 154-15 to 156-17] Specifically, she stated:

> "…that the physical act of two subsequent sexual intercourse would contribute to a significant loss of those sperm, sperm stick to the condom and be removed with the condom, the fluids, the sperm in the vaginal cavity would likely be diluted and some removed with the removal of the condom, just the physical act of the sexual intercourse, I would think, would dilute that sample out and would contribute to the recovery of a smll – far smaller number of sperm."

[id, at 156-9 to 17]

Clearly, based on the DNA tests of every conceivable consensual sex partner of the victim, including her father, her brother, her best friend's boyfriend and every known associate of the plaintiffs, the semen recovered from the victim had to have been the semen of Theresa Fusco's rapist and murderer contrary to the statements attributed to Kogut in his confession that Restivo and Halstead raped the victim.

The Hair Evidence

The Q-8 and Q-4 hairs belonging to the victim Theresa Fusco allegedly removed from the Restivo van on March 26, 1985 were in pristine condition unlike any of the other

6

hairs removed from the vehicle. [10/11/12, 2221-2223] The fact that the hairs displayed no indicia such as dirt, debris or mechanical damage, indicating that they had been in the van from November 10, 1984 to March 26, 1985, and were in the identical condition as the victim's autopsy hairs belied the defendants' contention that the hairs were found in the van during the search following Kogut's alleged confession. [10/11/12, 2214 to 2216] The proof positive that the hairs were not recovered from the van but taken from the hairs removed from the victim during her autopsy was established through the testimony of Dr. Max Houck and Nicholas Petraco. Their testimony indisputably established that each of the hairs displayed post mortem root banding [hereinafter, "PMRB"], a decomposition artifact that they testified only occurs in hairs attached to the scalp of a deceased person. PMRB has never been observed in the head hair of a living person. Both men also testified the earliest post mortem root banding has been observed in the hairs of a deceased person is 8 to 10 hours after death, and that a recent study at the "Body Farm" indicated that the earliest post mortem root hair banding occurred was 4 days after death. [10/10/12, 2093 to 2099; 10/11/12, 2217 to 2219; Px 927] The plaintiffs' evidence concerning the pristine condition of Q-8 and Q-4 hairs similar to the autopsy hairs, and that they all displayed PMRB identical to the autopsy hairs, refuted Kogut's confession in which it was stated the victim was strangled on a blanket in the cemetery, then rolled up into the blanket, placed in the van, and driven to the spot where her body was found a few blocks from the cemetery. Simply stated, it was scientifically impossible for the hairs belonging to the victim allegedly found in the Restivo van five months after the crime to have developed PMRB, or stated another way, to have decomposed, in the space of the few minutes the victim was allegedly dead and in the Restivo van.

7

<u>The Forensic Evidence Establishing How the Victim was Strangled</u>

According to the confession [Px 63] the victim was "face up on the blanket" that was spread out on the cemetery ground [Px 63, p. 4] and she started to get frantic so "I got on top of her, put my knees on her shoulders and covered her mouth…I took the rope, which was a hard nylon type. I wrapped it double around her neck then I twisted it like a cork screw…until her body went limp…." [Px 63, p. 5-6] The confession's version of how the murder occurred was completely contradicted by the medical evidence which left no doubt that the victim was strangled from behind and not from the front while lying on her back. Dr. Tamara Bloom, M.D., the Medical Examiner of Nassau County testified, just as she had at the plaintiff Kogut's 2005 criminal trial, that the only mechanism to explain the neck injuries inflicted upon the victim is that the assailant had to be behind her when he was strangling her. [11/7/12, 5115-11 to 5116-1; 5133-15 to 5135-22, 5136-20 to 5137-6, P 239a]

The DNA evidence from the semen recovered from the victim, the DNA evidence gathered from the 89 other individuals subjected to DNA testing, the hair evidence making it impossible that the victim shed her hairs in the Restivo van, and the medical evidence all established the falsity of the plaintiff's confession. This evidence, all of which was uncontradicted, was not the only evidence that the plaintiff presented establishing that the confession was  fabricated by the defendants and the plaintiff Kogut was coerced into signing it. The falsity of the confession was further demonstrated by the uncontradicted testimony at trial that co-plaintiff Restivo's van was not operational on November 10, 1984 and the plaintiffs were never together on that date.

<u>The Van Up On Blocks and The Evidence Proving Kogut, Restivo and Halstead Were Not Together On November 10, 1984</u>

8

There were two foundation facts of the confession, one that Kogut, Restivo and Halstead were in Restivo's blue van, and two, they were coming from a moving job in Hempstead. The plaintiff presented uncontradicted evidence that neither of those foundation facts could possibly be true.

Frank Meyers, a retired F.B.I Special Agent who was married to the sister of Restivo's mother testified in his videotaped deposition that on the evening of Saturday, November 10, 1984, he and his wife Lena went out to dinner with Restivo's mother, Frieda Restivo. According to Mr. Neyers he and his wife picked up Ms. REstivo at her hone at 13 Doxey Place, Lynbrook, at about 7:00 p.m. and went to Captain Steve's Restaurant for dinner. [Meyer Dep. 15-16; 18, Exhibit 4] At approximately 10:45 p.m. the three having finished dinner returned to Doxey Place and because Ms. Restivo forgot to bring her keys they had to walk to the backdoor of the house down the driveway. At the end of the driveway was a two car garage and in front of the garage's left bay was the plaintiff Restivo's blue van with its front whets up on cinder blocks. [Exhibit 4, 18-19; 23; 26-28] All three plaintiffs presented evidence that they were nowhere near the crime on the evening of November 10, 1984. Perhaps the strongest of three alibis putting a lie to the confession was the plaintiff Restivo's. Michael Cockeral and Thomas DeCrescenzo both testified that on November 10, 1984 Restivo was at his new home in Wantagh the entire day sanding floors. [10/7/12, 3129-3132; 11/15/12, 5452 to 5455] That Restivo was in his home and not on a moving job was documented by the multiple receipts for equipment verifying the sanding job [Px 862; Px 863; Px 876] and telephone toll records undisputedly placing Restivo on the telephone with Joanne Edington in his Wantagh home at 10:26 p.m. for 11 minutes and 20 seconds, the precise time he was allegedly raping the victim in his van in

the cemetery. [Px 939]

### All the Facts Contained In the Confession Were Known To Volpe and/or Theorized By Him To Have Occurred

The hallmark of a true confession is one that is consistent with the known facts and tells the police something about the crime that they did not know prior to questioning the suspect. In this case Kogut's confession contains only facts that the police knew, often times in such detail that it is impossible that the plaintiff realistically remembered the facts stated, e.g., the victim's clothing from outerwear to undergarments, her footwear and her multiple items of jewelry. At the same time, the confession confirms all of the central theories the police held going into the interrogation, e.g., that Restivo and Halstead were involved, that the crime occurred in the cemetery across the street from Hot Skate and that a van was involved. Attached [Exhibit 5] is a table containing 42 facts known or theorized by the police to exist prior to Kogut's interrogation all of which circumstantially establishes, independent of the DNA evidence, the post mortem root hair banding evidence, the medical examiner's evidence, the impossibility of the Restivo van being involved in the crime, and the impossibility of Kogut, Restivo and Halstead being together on November 10, 1984, that the defendants Volpe and Dempsey fabricated the plaintiff Kogut's confession.

### The Exclusion of the Expert Testimony of Dr. Saul Kassin On the Psychology of False Confessions

Prior to trial the plaintiff proffered the testimony of Dr. Saul Kassin, an expert on the psychology of police interrogations, to explain to the jury that under certain circumstances, all of which were present in the plaintiff's case, individuals can falsely confess to committing a crime. His report focused on the psychological factors that can increase the risk that an innocent person would falsely confess. [DE 308-1] The Court excluded Mr. Kassin's

testimony, in the absence of a hearing, holding "his knowledge, background, and proffered testimony do not meet the criteria under Rule 702." [9/6/12, 8-7 to 15] The Court reasoned, "The principles and methods are difficult to relate to the issues we have here. Essentially, this is an area that the jurors can decide for themselves. The jury can determine if Kogut was exhausted, high or submitted to clues…or…believed he failed the [polygraph] test, was terrified of the detectives and finally was worn down by refusals to allow him to call a lawyer or his girlfriend." [id, at 8-16 to 24] During jury deliberations one juror in an apparent attempt to explain to his fellow jurors the counter-intuitive phenomenon of a false confession engaged in internet research about false confessions. [11/29/12, 6161-9 to 23; 6162-11 to 25; 6178-21 to 6179-15; 6181-18 to 6182-8] The juror was wrong to engage in independent research, but his actions graphically illustrated the void in the case created by the absence of expert testimony on the subject of false confessions to educate the jurors that in fact false confessions do occur under the circumstances that existed during Kogut's interrogation.

## <u>LEGAL ARGUMENT</u>

### POINT ONE

11

**THE VERDICT WAS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE AND AN ORDER SHOULD ISSUE GRANTING THE PLAINTIFF KOGUT A NEW TRIAL**

In considering a motion for a new trial the District Court must review all of the evidence and exercise its independent judgment to determine whether the verdict was against the clear weight of the evidence. The Court need not view the evidence in the light most favorable to the non-moving party in independently weighing the evidence. The District Court may grant a new trial even if there is substantial evidence to support the jury's verdict if the Court is of the view that "the jury has reached a seriously erroneous result, or that the verdict is against the weight of the evidence, making its enforcement a miscarriage of justice." Smith v Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2nd Cir. 1988); Song v Ives Laboratories, Inc., 957 F.2d 1041, 1047 (2nd Cir. 1992); Benevino v Saydjari, 574 F.2d 676, 684 (2nd Cir. 1978); Shackey v Lasmo, 55 F.Supp.2d 279, 283 (SDNY, 1999)

The DNA evidence recovered from the victim, the DNA evidence obtained from the 89 individuals tested for comparison against the DNA profile obtained from the semen found in the victim, the post mortem root hair banding evidence, the medical evidence concerning the manner of death, the testimony of retired F.B.I. Special Agent Frank Meyers, the undisputed evidence proving that the plaintiffs were not together on the evening of November 10, 1984, and the evidence that the defendants knew or theorized about every fact contained in Kogut's confession, overwhelmingly demonstrates that the verdict in favor of the defendants on each of the plaintiff's claims was against the clear weight of the evidence. To not grant a new trial is to sanction a miscarriage of justice.

The evidence clearly and unmistakably demonstrates that the plaintiff's confession was fabricated by the defendants and that the plaintiff was coerced into confessing and an

12

order granting the plaintiff a new trial pursuant to F. R. Civ. P. 59 should issue.

**POINT TWO**

**THE ERROR IN PROVIDING THE DELIBERATING JURY WITH THE RESULTS OF KOGUT'S POLYGRAPH EXAM AS WELL AS EVIDENCE OF HIS PRIOR ARRESTS RESULTED IN IRREPARABLE PREJUDICE MANDATING A NEW TRIAL**

Polygraph results are inadmissible because of their "overwhelming potential for prejudice" and "because of the danger that the jury will misuse it, giving it substantially more weight than it deserves." United States v Miller, 874 F.2d 1255, 1261 (9th Cir. 1989); United States v Messina, 131 F.3d 36, 42 (2nd Cir. 1997)

In the instant case it was agreed that the results of Kogut's polygraph exam were inadmissible, nevertheless the results were provided to the jury through an error of counsel on the sixth day of its deliberations. Once the error became known the documentation was removed from the jury which, judging by the comment of the juror who handed the documentation to the law clerk that "I think you want this one back," it was too late to overcome the prejudice to the plaintiff engendered by the knowledge that Kogut, according to the polygraph examiner, was lying in denying he had no involvement in the murder of Theresa Fusco.

Yes, it is true that the Court then instructed the jury to not consider the evidence of the results, but simply stated, the damage had already been done and could not be wiped from the minds of the jurors, as indicated by the fact that the jury shortly thereafter returned its verdict.

The plaintiff presented overwhelming proof that his confession was fabricated and untrue, nevertheless the jury found against him and it is submitted that the reason for the jury's verdict was substantially based on the jury's knowledge that Kogut allegedly failed the polygraph examination. An Order should issue granting the plaintiff a new trial.

14

**POINT THREE**

**THE EXCLUSION OF THE EXPERT TESTIMONY OF SAUL KASSIN CONSTITUTED PREJUDICIAL ERROR MANDATING A NEW TRIAL**

Contrary to the Court's conclusion that the jury was capable of deciding "for themselves" in the absence of expert testimony whether Kogut falsely confessed, it is apparent from the juror who did independent internet research on the issue of false confessions that the jury did not believe false confessions occur.

It is hardly obvious that an innocent person would confess to a crime that he or she did not commit. Recognizing that the scientifically-explained phenomenon of false confessions is counterintuitive, numerous federal courts have found expert testimony that "an individual with a certain psychological profile could be more susceptible than other members of the general population to making a false confession" is "helpful" and therefore admissible. United States v Raposo, No. 98 CR 185 (DAB), 1998 WL 879723, at *5 (SDNY 1998) Other courts have noted that "[p]roperly conducted social science research can show that commonly held beliefs are in error," and have allowed experts to "let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." United States v Hall, 93 F.3d 1337, 1345 (7th Cir. 1996)  In United States v Belyea, 159 Fed. Appx. 525, 529 (4th Cir. 2005) the Court noted that "jurors may not know…that people lie on occasion to their own detriment by falsely confessing to crimes they did not commit. The phenomenon of false confessions is counter-intuitive and is not necessarily explained by the general proposition that 'jurors know people lie.'"

False confessions are a well documented phenomenon in the American criminal justice system. The body of work identifying false confessions, exploring factors correlated with such confessions, and tracing implications for wrongful convictions has grown deep roots in the fields of law and social psychology. See, e.g., Brandon Garrett, Convicting the

16

Innocent 14-44 (2010). Professor Kassin's report reliably applied that empirical evidence by examining the circumstances of Kogut's interrogation and identifying the presence of many factors that prior scholarship has shown to be correlated with false confessions.

Dr. Kassin's proffered testimony was based on a vast, relevant, and peer-reviewed scientific literature on the voluntariness of confessions, which examines "[t]he dispositional characteristics (e.g., traits associated with <u>Miranda</u> waivers, compliance, and suggestibility; adolescence; mental retardation; and psychopathology) and situational-interrogation factors (e.g., prolonged detention and isolation; confrontation; presentations of false evidence; and minimization) that influence" outcomes. The purpose of his testimony was to identify the set of factors demonstrably correlated with known instances of false confessions and thereby aid the jury in determining both whether the Kogut confession was false, and if so, whether Kogut's false confession was the result of the defendants' interrogation tactics.

In excluding Dr. Kassin's testimony the Court erred to the prejudice of the plaintiff as made plain during the jury's deliberations. An Order should issue granting the plaintiff a new trial.

**POINT FOUR**

**THE DENIAL OF THE MOTION FOR SEPARATE TRIALS OF THE CLAIMS OF THE PLAINTIFFS PREJUDICED KOGUT MANDATING A NEW TRIAL**

17

The issue of severance was extensively briefed by the plaintiffs prior to trial [DE 312, DE 349] and the plaintiff Kogut incorporates those arguments as if they were fully set forth herein and joins in the "new trial" submission of co-plaintiffs Restivo and Halstead on this issue. The plaintiff Kogut adds the following factual matter to his argument.

The evidence elicited during the trial concerning Halstead's conduct vis-a-vis dating a young teenage girl and maintaining an apartment where young teenage girls were allegedly permitted to hang out, drink beer and smoke marijuana was highly inflammatory and prejudicial to the plaintiff Kogut considering the case involved the rape and murder of a 16 year old girl. The prejudice to Kogut caused by the admission of this evidence, none of which would have been admissible against Kogut if he was tried separately, was compounded by the admission of testimony concerning statements co-plaintiff Restivo allegedly made concerning Theresa Fusco to third parties, i.e., Michael Cockeral and Kenneth Cockeral.

For the reasons stated above, in the prior submissions of the plaintiffs on the issue of severance, and in co-plaintiffs' new trial application submitted today, an Order should issue granting the plaintiff Kogut a new trial based on the failure to sever his trial from that of his co-plaintiffs.

**POINT FIVE**

18

**THE PLAINTIFF KOGUT JOINS IN AND ADOPTS THE ARGUMENTS OF CO-PLAINTIFFS RESTIVO AND HALSTEAD IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL**

Co-plaintiffs Restivo and Halstead are submitting a companion motion for a new trial and the plaintiff Kogut joins in their arguments and claims insofar as they are not inconsistent with the above arguments.

## **CONCLUSION**

For the reasons stated above a new trial should be ordered.


Dated:  December 28, 2012                    Respectfully submitted,
        Hoboken, New Jersey


                                    ___/s/ Paul Casteleiro_____
                                    Paul Casteleiro
                                    200 Washington Street, 5th Fl
                                    Hoboken, New Jersey 07030


                                    ___/s/ Anthony Grandinette_____
                                    Anthony Grandinette
                                    114 Old Country Road, Suite 420
                                    Mineola, New York 11501