5697

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

JOHN KOGUT,                          :
                                        CV 06 6695
        Plaintiff,                   :

            -against-                : U.S. Courthouse
                                       Central Islip, N.Y.
COUNTY OF NASSAU, et al,             :

        Defendants.                  : TRANSCRIPT OF PROCEEDINGS

                                     : November 19, 2012
- - - - - - - - - - - - - - - X 9:30 a.m.
- - - - - - - - - - - - - - - X

JOHN RESTIVO,                        :

        Plaintiff,                   :

            -against-                :

NASSAU COUNTY, et al,                :

        Defendants.                  :

- - - - - - - - - - - - - - - X


BEFORE:

        HONORABLE JOANNA SEYBERT, U.S.D.J.



Court Reporter:      OWEN WICKER
                     HARRY RAPAPORT
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

5698

APPEARANCES:

For the Plaintiffs:   GRANDINETTE & SERIO
                      114 Old Country Road
                      Mineola, New York 11501
                      BY:  ANTHONY M. GRANDINETTE, ESQ.

                      PAUL CASTELEIRO, ESQ.
                      200 Washington Street, Suite 500
                      Hoboken, New Jersey 07030

                      NEUFELD SCHECK & BRUSTIN
                      99 Hudson Street
                      New York, New York 10013
                      By:  BARRY SCHECK, ESQ.
                           DEBI CORNWALL, ESQ.
                           ANNA BENVENUTTI HOFFMANN, ESQ.

For the Defendants:   OFFICE OF THE NASSAU COUNTY ATTORNEY
                      One West Street
                      Mineola, New York 11501
                      By:  MICHAEL J. FERGUSON, ESQ.

                      FREEMAN NOOTER & GINSBERG
                      30 Vesey Street
                      New York, New York 10007
                      BY:  LOUIS M. FREEMAN, ESQ.
                           LEE GINSBERG, ESQ.
                           NADJIA LIMANI, ESQ.


18                       oOo

19

20

21

22

23

24

25

Proceedings

5699

```
 1              M O R N I N G   S E S S I O N
 2          MR. GRANDINETTE:  Good morning.  I looked at the
 3   request last night after receiving it and the jury verdict
 4   sheet.  I know there was no objection to it.  I just want
 5   to be careful and make sure I'm correct in assessing that
 6   our respondeat superior claim stands.
 7          THE COURT:  Yes.
 8          MR. GRANDINETTE:  Thank you.
 9          THE COURT:  That's as to the malicious pro --
10          MR. GRANDINETTE:  That's as to the state law
11   malicious.
12          THE COURT:  Your Rule 50 motion is denied.
13          It appears to the Court that the plaintiffs have
14   provided sufficient evidence for a reasonable jury to
15   conclude that the Brady claims made here in terms of
16   fabricating, not providing, etcetera, material,
17   exculpatory and for impeachment purposes to prior defense
18   counsel, has been violated.
19          So on that basis I'll allow the claim to go to
20   the jury.
21          I'll give you a copy of the second part of the
22   charge which has the addition.
23          Now for the rest of the news today, Juror 2 is
24   meeting with a plumber, and I don't know when she is
25   coming in.  Tomorrow she is supposed to meet with the
```

Proceedings

5700

1    insurance adjuster.  She's been a model juror in that

2    she's been here all the time.  She has been sick, and once

3    or twice she has stayed.

4          In addition, it has been reported to me she has

5    substantial damage in her home, not been able to go back

6    there, and has lost her car.

7          As much as I do not want to release her, it is

8    now 9:30, and without a reasonable estimate as to her

9    return, I'll have to replace her.

10          Any comments from counsel?

11          MR. GRANDINETTE:  Does she have a cell phone?

12          THE COURT:  We've contacted her by cell phone,

13    and I have no idea, as does she have, when she'll be able

14    to return.  It looks like she'll be in substantially

15    later.  She doesn't know how long the plumber will take,

16    as things happen.

17          MR. GRANDINETTE:  What is the story for

18    tomorrow?

19          THE COURT:  She has to meet with the adjusters.

20          MR. GRANDINETTE:  Do we know what time?

21          THE COURT:  Right in the middle of the day.

22    We're talking three hours, Mr. Grandinette.

23          MR. FREEMAN:  Your Honor, are all the other

24    jurors here?

25          THE COURT:  I believe so.

Proceedings

5701

1          MR. FREEMAN:  Because I need a moment to speak

2     with my colleagues.  It will not take very long.

3          There are two other things.

4          THE COURT:  The audiotape.

5          MR. FREEMAN:  Yes, your Honor.

6          THE COURT:  The audiotape.  I put in a

7     stipulation, which is sufficient, that the plaintiffs were

8     given an opportunity --

9          MR. FREEMAN:  Let me see if I understand you.

10    You are putting what we submitted into the charge?

11         THE COURT:  No.  I will tell them right at the

12    beginning.  No, I didn't put in everything.  In fact, if

13    you look at the transcript from Friday, you will see that

14    I indicated on the transcript the very words that I would

15    use.

16         MR. FREEMAN:  One more thing, and I think it is

17    my fault for not bringing it up again.  I thought we would

18    bring in an instruction --

19         THE COURT:  On a felony.

20         MR. FREEMAN:  No.  Joe Volpe, the day that he

21    passed away, and that we were unable to depose him.

22         MR. GRANDINETTE:  Judge, may I be heard on that?

23         I believe that that charge would be

24    inappropriate.

25         If you look at the transcript, the last

Proceedings

5702

1    transcript, Joe Volpe was asked questions by the defense,

2    and then they stopped.

3           At the end of that deposition, Mr. Freeman said:

4    I'm only going to have five minutes of questioning for you

5    or so.  And he asked about 15 minutes.  And that proceeded

6    in a very heated exchange for additional time.

7           I do not know if Mr. Freeman intends to ask more

8    questions at a later date, but if you read the transcript,

9    he never communicated that fact, his intention was to call

10   Joe Volpe back.  It was the end of a long time, and he had

11   health issues.  That's not on the transcript.

12          If they wanted to depose Joseph Volpe, there

13   were several years they could have done that.

14          Judge, there were health issues, but we pressed.

15   Everybody knew, everybody knew, this man had grave health

16   issues.  And the whole purpose of the videotape was this

17   was clearly a preservation deposition.

18          So to allow them now, because they didn't depose

19   him, to get a favorable inference in this charge that, you

20   know, it was only because of his death they didn't

21   question him, I think, is not proper.  They had the

22   opportunity to depose him.

23          We filed the lawsuit in December of 2006, and he

24   passed away many years later.

25          So, you know, under these specific

**Proceedings**

5703

1    circumstances, I think that that charge is unwarranted.

2              MR. FREEMAN:  Your Honor, this is truly

3    outrageous.  We were asked to wait until the plaintiffs

4    were finished with their deposition until we started.  And

5    Mr. Grandinette on that day went on and on and on.

6              And we did have exchanges about how much more

7    Joe Volpe could take.  And it was almost 6 o'clock, if I

8    remember correctly.  And I did ask, maybe five minutes,

9    ten minutes, I can't remember, but certainly -- four

10   pages.  But it was certainly our intention to examine

11   before trial Joseph Volpe.

12             MR. GRANDINETTE:  Judge, there was never a date

13   proffered to us, to any of the plaintiffs' counsel.  Never

14   a letter, never an e-mail:  Listen, let's set a date.

15   We'll depose Joseph Volpe.

16             I'll leave it to your discretion.

17             THE COURT:  How many depositions does the

18   plaintiff have of Mr. Volpe?

19             MS. CORNWALL:  By court order of Magistrate

20   Wall, eight sessions of an hour to an hour and a half

21   each.

22             THE COURT:  Can I get the dates?

23             MS. CORNWALL:  Yes, your Honor.  The dates were

24   January 26, 2009 --

25             THE COURT:  Okay.

Proceedings

5704

1          MS. CORNWALL:  -- March 5 of 2009; March 18 of

2   2009; April 6 of 2009; May 4 of 2009; November 24 of 2009;

3   December 2, 2009, and the last deposition was November 19

4   of 2010.

5          And the times noted on the deposition that it

6   began at 12:23 p.m., and Mr. Freeman's questioning ended

7   at 2:42 p.m.

8          THE COURT:  How much of that was spent in

9   colloquy?

10          MR. GRANDINETTE:  Actually a substantial amount,

11   because we called for rulings.

12          MR. FREEMAN:  And Joseph Volpe died January 3,

13   2011.

14          THE COURT:  I will advise the jury that there

15   were eight sessions of deposition taken for the plaintiffs

16   and that the defendant was unable to examine Mr. Volpe

17   since he died on January 3, 2011.

18          In terms of the stipulation, any audio we have,

19   any other stipulations, and I'll include in the charge

20   about the felony convictions.  It belongs in the charge.

21          MR. FREEMAN:  I agree.

22          THE COURT:  Any other persons testifying other

23   than the defendant?

24          MR. FREEMAN:  Not to my knowledge.

25          MS. CORNWALL:  Your Honor, we have two

Proceedings

5705

1   additional stipulations, one regarding the defendants'

2   hair contention, and another as requested at sidebar

3   relating to the news reports, related details of

4   Ms. Fusco's rape and murder.

5           We'll print a new document, but the substance

6   will be the same, if the Court wishes.

7           THE COURT:  You've agreed on that?

8           MR. FREEMAN:  I have.

9           THE COURT:  Good.

10          MR. FREEMAN:  The footnotes are being removed.

11  We thought that would be confusing.  But other than that,

12  the stipulation is acceptable.

13          THE COURT:  Okay.

14          MS. CORNWALL:  We've labeled the news report

15  stipulation as a stip number 5 and the hair contention

16  stipulation as stip 6.  And we'll hand them up and

17  substitute stip 5 without footnote during the break.

18          MR. FREEMAN:  I don't know if all the jurors are

19  here, so I'll use the time efficiently.

20          THE COURT:  Time wise --

21          MR. FREEMAN:  We object that this go to the

22  jury.  It's a lot of words and phrases that are

23  plaintiffs' arguments and contentions.  This is the kind

24  of thing if they wish to use in summation, it would be on

25  the ELMO but not appropriate to have the jury --

Proceedings

5706

1        THE COURT:  What is that?

2        MS. CORNWALL:  Labeled "plaintiffs' timeline."

3   Each entry's construed as plaintiff-oriented.

4        MR. FREEMAN:  Your Honor, I think this

5   suggestion is breaking new ground.  This is not a new

6   exhibit.  Exhibits go to the jury, not argument.

7        THE COURT:  I will not let it go to the jury.

8   You have:  December 6th, John French called Nassau County

9   homicide bureau regarding the case.  You refer them to the

10  exhibits, and you refer them to additional.

11       The one on December 7th, there is a signed

12  statement:  I've positively identified the rope as mine.

13       You go on to list the exhibits.  It's not four

14  pages.  I'll not let you hand it to the jury.  You are

15  welcome to put it up on the screen but not to the jury.

16       MS. CORNWALL:  Would the stipulated timeline go

17  to the jury that was filed before trial, that both sides

18  have agreed upon?

19       THE COURT:  Yes, you can do that.  But this is

20  jury summation.  It's not an exhibit that will be

21  considered as evidence.  The jury may come up with a whole

22  different line of reasoning.  All right.

23       MR. CASTELEIRO:  Judge, may we have a moment to

24  talk about this jury issue among ourselves?

25       THE COURT:  Sure.

Proceedings

5707

1          (Counsel confer.)

2          MR. GRANDINETTE:  Your Honor, after conferring,

3   we'd like to make the following request.  In light of this

4   juror's incredible effort, we would ask the Court to allow

5   her maybe 45 minutes.  If we can hear from her and we can

6   get our summations in today, the plaintiffs', without

7   losing the juror, we would like to do that.

8          If she is unavailable tomorrow afternoon, then

9   Mr. Freeman can get his summations in in the morning, and

10  we can start in the morning without the loss of the juror.

11          THE COURT:  What is the position of the

12  defendant?

13          MR. FREEMAN:  If I heard Mr. Grandinette

14  correctly, he suggested we wait 45 minutes.

15          THE COURT:  From now?  No, I'm not waiting

16  45 minutes from now.

17          MR. GRANDINETTE:  Judge, I would suggest to wait

18  until --

19          THE COURT:  A quarter of ten.

20          MR. FREEMAN:  Well, let me put it this way.  We

21  are not consenting to excuse her.  We would prefer she be

22  part of the jury and part of the deliberations, and that's

23  our position.  And we'll agree with Mr. Grandinette's

24  suggestion to effectuate that result.

25          THE COURT:  You are in agreement.

Proceedings

5708

1        MR. GRANDINETTE:  May I get a copy of that page

2   of the transcript?

3        THE COURT:  I'll give you until a quarter after

4   ten.  But it will not be that simple.  You can't tell this

5   woman not to be back at her house.  She sustained enough

6   difficulty and sorrow, quite frankly, to be dragged in

7   here.  We all know if there is a plaintiffs' verdict, the

8   case will continue for at least another month.

9        I think we can hold on to the nine we have, at

10  least six of them, to render a verdict.  I'm not happy

11  with that, but there comes a time you can't have a jury

12  with the Court being impacted in this case.

13       So the audiotape stipulation now, I intend to

14  offer it.  You heard audiotape conferences of plaintiff

15  Dennis Halstead.  Plaintiffs were invited to inspect the

16  tape.

17       That was in 2007, right?

18       MS. CORNWALL:  No.  The invitation was in 2012.

19       THE COURT:  The request is 2007 though.

20       I'll just add that one phrase.  The stipulation

21  is on the deposition.

22       Are there any other outstanding stipulations?

23       MS. CORNWALL:  Other than the two we had, no,

24  your Honor.

25       THE COURT:  I'll read those to the jury.

Proceedings

5709

 1          I don't know how many have been waiting for

 2    plumbers, but they are not the most prompt in the world.

 3          MR. SCHECK:  Maybe it was Mr. DeCrescenzo.

 4          THE COURT:  I'll wait until about a quarter

 5    after ten.  I think that is a reasonable compromise.

 6          Now, are there any comments on the verdict

 7    sheet?

 8          We'll see you a quarter after ten.

 9          (Whereupon, a recess was taken.)

10          (Out of the presence of the jury.)

11          THE COURT:  We've contacted the juror again.

12    This is the third call we've made to her, and there is no

13    response.  Charlie is going into the jury room to see if

14    she made any contact with them.  It is a quarter after

15    ten.  So we are going to start.

16          Good morning, Ms. Napoli.  You understand if you

17    become emotional, it will greatly impact this trial.  If

18    you feel you are beginning to cry or whatever it may be,

19    you must step out.  I don't want the jury to focus on you.

20    You are here as a member of the public.  You cannot

21    jeopardize this trial.  Please, with my utmost sympathy,

22    you cannot influence the verdict.

23          MR. GRANDINETTE:  We did explain to Ms. Napoli,

24    on part two of my summation -- I'll give her a warning.

25    Part two, during that first part, I'll be explaining two

Proceedings

5710

```
1    autopsy photographs.  I don't wish to upset her.  If she

2    would like to, she may step out.

3              THE COURT:  What is part two?  Is that the

4    rebuttal?

5              MR. GRANDINETTE:  I'll give her a signal that

6    that is coming up --

7              MR. FREEMAN:  Your Honor, I believe we have some

8    understanding that is coming up.

9              MR. GRANDINETTE:  I'll let you know discretely.

10             THE COURT:  How long is part one?

11             MR. GRANDINETTE:  45 minutes.  That's the plan.

12             (Short recess.)

13             THE COURT:  We did speak to Juror 2.  She

14   indicated that she did speak to the plumber, and she did

15   not know when he would get there.  Plumbers are very

16   strong in demand with the super storm Sandy.

17             You may begin your summation after I give the

18   stipulations to the jury.

19             Bring in the jury, Charlie.

20             (Whereupon, the jury at this time enters the

21   courtroom.)

22             THE COURT:  Please be seated.  Nice to see you

23   all.

24             I'm sure you know Juror 2 is missing.  Because

25   of the time constraint, we had to release this particular
```

Proceedings

5711

1    juror.  She's been extremely dedicated, and I'm sure if

2    Sandy hadn't come along, she'd be with us here today.

3             I have two stipulations regarding this case.

4             First, stipulation 5:

5             Following the discovery of Theresa Fusco's body

6    on December 5, 1984, and prior to the March 26, 1985,

7    interrogation of John Kogut, newspapers reported the

8    following about the crime:

9             One.  The body was located beside the Long

10   Island Rail Road tracks on an area of the north side of

11   the tracks between Rockland Avenue and Park Place.

12            Two.  The body was found nude and was covered

13   with leaves beneath a wooden pallet.

14            Three.  She had been strangled with a rope, wire

15   or similar object and had bruises on her neck and torso.

16            Four.  And she had been sexually assaulted.

17            Stipulation 6 reads as follows:

18            Defendants contend that Theresa Fusco's hair

19   were left in the blue Forward Econoline van depicted in

20   Defendants' Exhibit 222 on November 10, 1984.

21            An additional stipulation is as follows:

22            Eight depositions of Joseph Volpe were conducted

23   by the plaintiffs.  The depositions lasted approximately

24   an hour and a half each.

25            They were held on January 26, 2009; March 5,

Proceedings

5712

1   2009; March 18, 2009; April 6, 2009; May 4, 2009;

2   November 24, 2009, 12/2/09, and November 19, 2010.

3           The last deposition was started by defense

4   counsel and would have continued but for the death of

5   Joseph Volpe on January 3, 2011.

6           I believe this completes the stipulations.

7           On that note, Mr. Grandinette will sum up on

8   behalf of plaintiff John Kogut.  Mr. Grandinette has

9   indicated that the first part of his summation will be

10  around 45 minutes.  We will then break for lunch and

11  resume after that.

12          Let's see how it goes.  Maybe we can go a little

13  longer than that.  But the first part of his summation --

14  when I say "part," he needs a break in between, as the

15  court reporter will.

16          MR. FREEMAN:  What about the tapes?

17          THE COURT:  Are the tapes being played?

18          MR. FREEMAN:  No, I'm not talking about that.

19  The stipulation.

20          THE COURT:  I'm sorry.  One additional

21  stipulation here.

22          Plaintiffs requested the audiotape of plaintiff

23  Dennis Halstead in 2007.  Defendants invited plaintiffs'

24  counsel to inspect those tapes in 2010.  Plaintiffs

25  declined to inspect the tapes because they were advised

Closing Argument by Mr. Grandinette

5713

1    that the tapes could not be played because of their age

2    and condition.

3            That completes my stipulations to you.

4            Mr. Grandinette?

5            MR. GRANDINETTE:  Thank you very much.

6            THE COURT:  You're welcome.

7                              -  -  -

8            MR. GRANDINETTE:  Good morning, ladies and

9    gentlemen.  On behalf of John Kogut, Paul Casteleiro and

10   myself, from the very bottom of my heart, I can't thank

11   you enough for the great personal sacrifice that you've

12   all made to sit as jurors in this case.

13           We've been through a hurricane together.  We've

14   been through a snowstorm together.  The only thing we

15   didn't endure was the coming of the locusts, but it seems

16   we were very close.

17           Summation is an opportunity for counsel to

18   comment on the facts and the evidence as they relate to

19   our claims.

20           You are free to accept or reject counsels'

21   argument, in whole or in part.  If my arguments appear to

22   be consistent with the facts as you recall them from the

23   evidence, which I hope they will be, you may accept them.

24           If counsel makes an argument that is

25   inconsistent with your recollection of the facts or

5714

1    appears illogical, likewise, you are free to reject them.

2              Now, what I'd like to do is I'd like to first

3    review John Kogut's claims, because it has been quite a

4    while.

5              We have three categories of claims.  The first

6    are malicious prosecution; that in 1986, his original

7    criminal trial, we have a state and a federal malicious

8    prosecution claim.

9              Then with respect to his 2005 retrial, we have a

10   malicious prosecution claim on the state and federal

11   level.

12             Now the good news is that the elements for state

13   and federal malicious prosecution are identical, so it

14   makes it easy.  If you find there is a federal violation,

15   you'll find there is a state violation.

16             The elements of malicious prosecution are that

17   there was a criminal proceeding instituted and continued.

18   That element is conceded.  You don't need to worry about

19   it.

20             Second, that it was instituted without probable

21   cause; that it was pursued with malice; and, fourth, that

22   there was a favorable termination of the criminal

23   proceeding on behalf of John Kogut.  And that fourth

24   element is likewise conceded.

25             So the only two elements for your decision on

5715

1    the malicious prosecution claims will be probable cause

2    and malice.

3            As to probable cause, the Judge will define it

4    for you when she gives you the charge.  But probable

5    cause, ladies and gentlemen, means that a person, a

6    reasonable person, put in the defendant's shoes, knowing

7    everything the defendant knew at the time he made the

8    arrest, had a reasonable basis to believe that John Kogut

9    committed this crime.

10           And, folks, because John Kogut was not a suspect

11   up to March 25, 1985, the day of his interrogation, the

12   singular piece of evidence that links him to this crime is

13   the confession.  If that confession was fabricated by the

14   police, then no reasonable person could possibly conclude

15   there was a rational basis that John Kogut committed this

16   crime.

17           With respect to malice -- or before we get to

18   malice, the Judge will instruct you folks that if there is

19   an indictment, that there is a presumption of probable

20   cause.  However, that presumption is rebuttable based upon

21   five factors, all of which we've proved to you during the

22   course of this trial.

23           Number one, the police departments in this case

24   failed to give complete and full disclosure as to the

25   facts.

Closing Argument by Mr. Grandinette

5716

1    Two, that they falsified evidence and

2   misrepresented them through the confession, hair plant.

3   They acted in bad faith, and they presented evidence to

4   the grand jury and the DA which was misrepresented.

5        Fourth, that they failed to make further inquiry

6   when to do so would be appropriate, such as the 2005

7   reinvestigation.

8        Five, that they had egregious deviations from

9   appropriate police protocols as proved through Russ

10  Fischer.

11       Now, any one of these five factors, although I

12  believe we proved them all, rebuts the presumption of

13  probable cause of the grand jury indictment.  I remind

14  you, ADA Judge McCarty said it was very easy to get an

15  indictment against John Kogut in this case because of the

16  confession.  They merely introduced it.

17       We all heard the phrase, you can indict a ham

18  sandwich, and with respect to this fabricated confession,

19  I suggest you can indict a very old ham sandwich.

20       Folks, malice.  The very essence of that is

21  fabricating and planting evidence.  But malice is with a

22  bad intent or ill will or in reckless disregard of

23  Mr. Kogut's constitutional rights.

24       Now, folks, the second category of claims, as

25  you recall, are due process, fair trial rights.  And what

Closing Argument by Mr. Grandinette

5717

1    those rights are, as a brief reminder, is that the police

2    in this case created and fabricated a confession and a

3    rights card.  And they, thereafter, planted the hair of

4    Theresa Fusco from the autopsy in John Restivo's van.

5         And what we, the plaintiff, have proven is

6    through misconduct, John Kogut was coerced into signing

7    those documents.  Those documents were introduced during

8    his criminal proceedings, and as a result of that, he was

9    convicted and he lost his liberty.

10        Also, ladies and gentlemen, the distinction

11   between malicious prosecution and the due process claim,

12   there is not an element of probable cause.

13        Ladies and gentlemen, we'll also be discussing

14   what we call -- John has a claim of a Brady violation.

15   We've heard a lot of testimony about the French materials.

16   I'll not be commenting at all on that.  Please don't

17   mistake my silence as we're abandoning that claim.  It's

18   identical to Mr. Restivo's and Mr. Halstead's claim, and

19   Mr. Scheck will be covering that.  We're trying to prevent

20   you from the torture of both of us presenting that to you.

21        Okay.  Finally, ladies and gentlemen, the third

22   category of claims is that of respondeat superior.  It's a

23   state law claim.  What is means is that Nassau County can

24   be liable for the action of its employees for the state

25   law tort of malicious prosecution.

5718

1     If you find that Spillane failed to supervise

2  members of the homicide bureau during the scope and

3  furtherance of his employer, then Spillane is responsible

4  and Nassau County is responsible for the tort of

5  respondeat superior.

6     And because the claims are virtually identical

7  between the parties, again, Mr. Scheck will be handling

8  that portion of the summation.

9     Now, folks, let's talk about what this case is

10  about.

11     This case is about the fact that Volpe and

12  Dempsey created a confession from public and nonpublic

13  facts that they gathered through the course of their

14  investigation, and they wrote out the confession.

15  Thereafter, they attributed personal knowledge to John

16  Kogut to make it appear as if he had personal knowledge

17  and actually participated and committed this crime.

18     Then they coerced him into signing it, took him

19  on an educational, quote/unquote, perp tour, and pounded

20  in his head the night before, before ADA George Peck, in a

21  Q and A session.

22     I told you in my opening statement there could

23  not be two greater versions of what transpired.  They are

24  polar opposite, on opposite sides of the grand canyon,

25  literally.

Closing Argument by Mr. Grandinette

5719

1          There's John Kogut, who tells you that he was

2     engaged in a ten-and-a-half-hour intense, hostile

3     interrogation.  His fundamental constitutional rights,

4     they were not denied; they were trampled.

5          He was told, shut up; sit down; you are full of

6     S; you are not leaving here until you tell us what we want

7     to know.  We hurt people; we're going to have you killed.

8          John Kogut had these facts pounded into his head

9     from 3 a.m. until 8:30, having been up for 24 hours until

10    they break him.  They broke him, and he signed that

11    statement.

12          And John Kogut told you that he did not provide

13    one fact in that confession to the police, not one.

14          Then we have the polar opposite version from the

15    defendants, right (indicating)?  Ten and a half hours of

16    interrogation; it was cordial.

17          Ladies and gentlemen, according to the defense,

18    nobody even raised their voice, nevertheless used a curse

19    word, during the entire ten and a half hours.

20          Also, John Kogut was so cooperative, not only

21    was he given his rights and understood his rights, and

22    freely and voluntarily waived his rights, he was freely

23    speaking to these detectives.  And it was such a cordial

24    atmosphere that in ten and a half hours, two experienced

25    homicide detectives didn't have to ask him any more than

5720

1    about six questions in ten and a half hours -- six

2    follow-up questions in a murder interrogation of ten and a

3    half hours.  Because all they had to say was, you know

4    what, John?  We know you are involved, John, and we think

5    there is a little more involved.  Come on, please be more

6    honest with us.

7              And John, according to them, would spew a

8    different version that was slightly different.

9              Then they would say, you know what, John?  We

10   know you are involved, and that's not quite right.  And lo

11   and behold, despite the fact that they only asked four to

12   six questions in ten and a half hours, they walk out of

13   that room that night with a seven-page detailed

14   confession, chock full of minute details contained in

15   their homicide file, confirming facts as the murder scene,

16   confirming the facts at the autopsy, confirming when

17   Theresa Fusco left work, the clothes she had on when she

18   left.  And despite that fact, they never provided John

19   Kogut with one fact.

20             According to John Kogut, they had photographs

21   all over the place.  All they did was tell John Kogut all

22   night long what he did, how he did it, and who he did it

23   with.

24             So how do you, as jurors, determine this great

25   divide?  I suggest to you it is relatively

5721

1    straightforward.

2            Let's cut to the chase.  Look at this confession

3    at its most material usage.  To Restivo, Hallstead and

4    Kogut the rape and murder of Theresa Fusco.  If you find

5    that that version in the confession is factually false,

6    you can be guaranteed that this confession was the product

7    of coercion.

8            Now why do I say that?

9            Let's take the defendants on their word:  John

10   Kogut wasn't pressured.  John Kogut wasn't coerced.

11           Given those facts, there is no one here that

12   wouldn't agree if he's not coerced and pressured, he would

13   never, ever, voluntarily falsely confess to a gang rape

14   and murder that he didn't commit, to guarantee that he and

15   two other people he didn't know all that well would go to

16   prison, probably for the remainder of their natural lives,

17   in a maximum security facility in the state of New York.

18           The other thing, folks, if they didn't do it,

19   how in God's name could John Kogut provide all the

20   detailed factual account that was in that confession?  It

21   would be impossible.

22           So how do you, as a jury, make the determination

23   of whether the account in that confession about the rape

24   and murder of Theresa Fusco is true or false?

25           I suggest to you it is relatively simple and

5722

1    straightforward, and it is not through the prism of 1984.

2    I don't care what the gas prices were in 1984.  What I

3    care about is getting this right.

4          And I invite you to the world of modern day

5    science and medicine, a world that the defense doesn't

6    want you to visit because they know that you will quickly

7    and accurately determine that the confession is false if

8    you apply the science of DNA.  Because the science of DNA

9    tells us unquestionably that John Halstead and Dennis

10   Restivo didn't rape her, that someone else did.  If they

11   didn't rape her, there is no motive to kill her, and that

12   confession is garbage.

13         Now, the DNA evidence is by far the singular

14   most significant evidence in this case, bar none.

15         Folks, its accuracy, its reliability, has been

16   acknowledged by prosecutors, judges, defense attorneys, A5

17   right, the chief of the Nassau County Appeals Bureau,

18   Peter Weinstein; the Nassau County District Attorney,

19   Dennis Dillon himself; Chief Justice William Donnino, the

20   judge who was involved in the criminal convictions.  It

21   was, folks, the fundamental evidence which formulated the

22   basis for the 2003 DNA stipulation vacating the criminal

23   convictions.  You will recognize those signatures.

24         Although this stipulation doesn't have the

25   signatures, you can take it into the jury room.  It states

5723

1    the fundamental basis of Judge Ort's June 11, 2003, order

2    vacating those criminal convictions.  It formed the basis

3    of Judge Ort's written decision dismissing the charges

4    against John Kogut on December 21, 2005, wherein he

5    concluded:  I believe that the scientific evidence in this

6    case proves that too many material facts set forth in the

7    defendant's confession are clearly not truthful.

8           And it was the fundamental piece of evidence

9    that resulted in the dismissal of the criminal convictions

10   of John Restivo and Dennis Halstead when the prosecutor,

11   Fred Klein, who tried the case originally in 1986, stood

12   up in front of Chief Judge William Donnino and said, point

13   blank, there is no evidence here.  We're moving to dismiss

14   the case.

15          MR. FREEMAN:  Objection.

16          THE COURT:  Ladies and gentlemen, the evidence

17   is for you to consider.  If it's properly in evidence,

18   you've seen it.  If you've been told to disregard it, you

19   disregard it.

20          MR. GRANDINETTE:  Ladies and gentlemen,

21   Mr. Scheck may address it, but bring it into the jury room

22   and read it.

23          Folks, there is also no dispute about the DNA

24   evidence amongst the attorneys in this room.  That's a

25   miracle.  There's one thing we agree on:  that is the

Closing Argument by Mr. Grandinette

5724

1   accuracy and the reliability of the DNA.

2          We've entered into a DNA stipulation in this

3   case.  What does that DNA stipulation say?

4          What it says, ladies and gentlemen, is the

5   following:

6          All three laboratories that conducted STD DNA

7   testing, including Lab Corp., Cellmark, identified the

8   same single intact profile from an unknown male as the

9   source of the semen found in Ms. Fusco's vagina.

10         All three labs reported that all three

11  defendants were all each excluded as the source of the

12  male DNA collected from Ms. Fusco.

13         All three laboratories performed STR, DNA

14  testing, and it was performed under scientifically

15  acceptable protocols.  And they identified the sperm in

16  Theresa Fusco as that unidentified male to the exclusion

17  of every other man on the planet earth.

18         Can you get any more definitive than that?  No.

19         So what I say to you is that you can quickly and

20  easily determine in this case -- just go back there.

21  There is no dispute.  Nobody disputes the DNA.  And the

22  DNA proves that the confession is false.

23         How do we know that?  Well, let's read the

24  confession:

25         While Dennis F'd her, I held her upper body

Closing Argument by Mr. Grandinette

5725

 1   down.  At this point she wasn't fighting too much.  By

 2   this time, I mean after Dennis fucked her, we were already

 3   in the cemetery.  John had stopped the van and yelled back

 4   to me and Dennis:  Let me get a piece.  Dennis pulled his

 5   pants up and was sitting in the seat by the passenger

 6   seat.  John was now fucking her.

 7          Dennis Halstead penetrated Theresa Fusco, and

 8   John Restivo having sex with her.  At any point anywhere

 9   in that confession, did they say they had condoms on nor

10   did they fail to ejaculate.

11          But that is the sperm that was recovered from

12   Theresa Fusco (indicating).

13          That confession is a fraud.  We've proved -- the

14   DNA, the science, proves that the confession is false.

15   They could not have raped her.

16          I want to stop for a second and look at the 1986

17   trial of John Kogut.

18          What did the defendant police officers -- what

19   was their theory then?

20          They said four basic things when they spoke in

21   front of the jury:  Listen, Mr. Baumann took and found

22   sperm in Theresa Fusco's vagina.  We've presented two

23   incredibly credible witnesses, Connie Napoli and Lisa

24   Kaplan.  Mom knew her daughter well; read her diary cover

25   to cover; discussed sex with her and swore to, and you

Closing Argument by Mr. Grandinette

5726

1    should believe -- and I agree with that statement

2    whole-heartedly -- that her daughter was --

3              MR. FREEMAN:  Objection.

4              THE COURT:  Ladies and gentlemen, opinions of

5    the attorneys as to the credibility, belief of the

6    evidence, is not for you to consider.

7              MR. GRANDINETTE:  Ladies and gentlemen, they

8    argued that Connie Napoli was a very credible witness.

9    They argued Lisa Kaplan knew, loved, best friend with

10   Theresa Fusco.  Three years like frick and frack.  Walked

11   home together.  Went home.  Spent a lot of time together.

12   They knew each other.

13             We've all had best friends, especially of that

14   age.  You share the most intimate details with your best

15   friend.

16             She testified at this trial, for three decades:

17   Theresa Fusco was a virgin.  She was my best friend.

18             That's what the police argued in '86.  They

19   said, look, she was a virgin, and there is sperm in

20   Theresa Fusco's vagina.  Look at John Kogut's confession.

21   He said he saw them have sex with her.  You can believe

22   beyond a reasonable doubt that it is them.  They did it.

23   It's their sperm.

24             They went a step further, because John Kogut

25   took the witness stand and he said, listen, I didn't do

5727

1   this.  I didn't know any of this.  They pounded this into

2   my head.  They forced me to sign this.  I wasn't even

3   there.  I was with Lisa Kaplan at the Atlantic School

4   field.

5          You know what they said.  Liar.  He's a liar.

6   Who will you believe, some drunkard, drug addict forced at

7   trial, or Volpe and Dempsey, two distinguished detectives

8   who dedicated their life to public service?

9          They said the same thing about Lisa Price.

10  She's an interested witness.  Don't believe her; it's the

11  fiancee.

12         And I acknowledge that John Kogut is an

13  interested witness.  Sure he is.  But ladies and

14  gentlemen, just because you are an interested witness

15  doesn't mean you dismiss that person's statements to you.

16         I suggest to you he would be the biggest fool on

17  earth to come to you and ask you for your help, something

18  he has been fighting for for 28 years, and step in the

19  courtroom and lie about it to guarantee that you wouldn't

20  help him.

21         Now, ladies and gentlemen, this is what they

22  argue.

23         Now, what did they do in 2002 when the DNA

24  results come back in, right, and they know that it just

25  got turned upside down on their head because it is not

Closing Argument by Mr. Grandinette

5728

1    their sperm?  What do they do?

2            Do they pursue truth, justice, search for the

3    true assailant?  They don't consider the perp here.

4            They consider two theories.  Detective O'Leary

5    sits down with the supervisor, Kuhn, and they said:  We

6    pursued two theories that we believe can still give

7    validity to the confession.  We can stand up to the jury

8    and say, if they had consensual sex, with that evidence,

9    or with a fourth man, but we couldn't or didn't pursue the

10   one perp theory because it would mean what?  That we would

11   have to acknowledge that that confession was false.

12           It is not just me saying it.  You remember the

13   questions and answers.  This is the questioning to

14   Detective O'Leary:

15           If you adopted a theory that TF was abducted,

16   raped and murdered by one perpetrator, then truly you

17   would have to acknowledge that the confession of John

18   Kogut was totally false and factually inaccurate.  Right?

19           Answer:  Yes, sir.

20           So despite the fact these DNA results came back,

21   they moved forward in 2005 with what I could only

22   categorize as cruel and intermittent, to reprosecute John

23   Kogut on the theory of consensual sex and a fourth man.

24           So in 2005, the same defendants stand in front

25   of a court and they say what?  They say, listen, remember

5729

1  what I told you back in 1986, that Theresa Fusco was a

2  virgin?  I really didn't mean that.  It's not what I

3  meant.  What I meant to tell you was that Theresa Fusco is

4  not a virgin.

5          Well, what is that you ask?

6          What about the fact that Restivo and Halstead's

7  sperm is not found in her vagina and it is someone else?

8          Oh, don't worry about that.  That's not all that

9  important.  They either didn't ejaculate or had condoms

10  on, or it was one of their buddies who ejaculated in her.

11          It is not short of outrageous.

12          The fourth-man theory, the most ridiculous thing

13  I ever heard, ladies and gentlemen.  Think about what they

14  told you, okay, that these three men were willing to go to

15  jail, probably for the remainder of their lives, or a good

16  portion of it, to protect the fourth man, the mystery man,

17  yet they are pursuing DNA evidence for years, the

18  scientific modality which will guarantee the identity of

19  the fourth man.

20          It is absurd.  It makes no sense.

21          And I know you all remember when I asked

22  Detective O'Leary.  He said, well, do you want me to

23  explain it to you?

24          I said, sure, explain it to the jury.  What were

25  you thinking?

5730

1          And here is the thought process.  The thought

2     process is maybe there is another guy, a fourth guy with

3     the plaintiffs, and he raped Theresa Fusco and he left.

4     Right?

5          And then what happens is these three guys are

6     worried that maybe Theresa Fusco will falsely accuse them

7     of the rape.  So rather than being falsely accused of a

8     crime they didn't commit, they kill her.  Sure, that makes

9     perfect sense.

10          Then the single perp theory.  She is walking

11     down Rockland.  Somebody raped her and killed her.

12          So on these two issue, ladies and gentlemen, I

13     want to go over what O'Leary omitted.  Here's the

14     testimony.

15          Question:  Irrespective of the logic behind this

16     fourth-man theory, would it be fair to tell the members of

17     the jury that you and other members of the homicide bureau

18     utilized every single resource available to you to see if

19     you could establish the fourth-man theory between 2002 and

20     the end of 2005?

21          Answer:  Yes, sir.

22          Question:  Basically, you dedicated three years

23     of your life to trying to establish this theory in part,

24     right?

25          Answer:  Yes, sir.

Closing Argument by Mr. Grandinette

5731

1      Question:  And would it be fair to say that as

2   you sit here today, you admit that you never found any

3   reliable evidence, any reliable evidence, to support a

4   fourth-man theory?  Correct?

5      Answer:  Yes, sir.

6      And the same holds true to the consensual sex

7   theory.

8      Question:  At any, rate the consensual sex

9   theory was explored in great detail through the DNA

10  exclusion, right?

11     Answer:  Yes.

12     Question:  And you did testify earlier that the

13  conclusion was that at the end of three years, trying to

14  see if you could find the consensual sexual partner, there

15  was no reliable evidence whatsoever to support that

16  hypothesis, correct?

17     Answer:  That's correct, sir.

18     Now, DNA, as I promised you in my opening

19  statement, also disproved both hypotheses.  Remember that

20  they tested every one of Theresa Fusco's known boyfriends.

21  They were excluded.  Any logical sexual partner in her

22  age.

23     In addition to the DNA, they spoke to the kids.

24  They spoke to Lisa, Connie.  Everybody consistently,

25  across the board, said she was a virgin.

Closing Argument by Mr. Grandinette

5732

1        In addition, ladies and gentlemen, they tested

2    the known associates of these men (indicating).  Take

3    Exhibit 684 with you into the jury room.  You will

4    recognize the names, right?  Charlie Restivo, Bachman,

5    Smyle, who justified testified last week, right, on

6    Friday; Skellington, the young man that John Kogut lived

7    with.  All of the known associates were excluded under the

8    fourth-man theory.

9        The police had no clue who did this.  O'Leary

10   admits this.  This DNA result corroborates what Lisa

11   Kaplan and Connie Napoli said about the best friend and

12   daughter.

13       Here's the questions, folks, about guessing,

14   okay?

15       Question:  So you were looking at some names

16   that came up in the investigation.  You figured, let's run

17   DNA samples and see if we can get a hit, right?

18       Answer:  Yes, sir.

19       Question:  So would it be fair to say that

20   really you had no clue who deposited the DNA in poor

21   Theresa Fusco?  At this point you are just, like,

22   guessing?

23       Answer:  If we knew who it was, we would go to

24   that person.

25       Question:  Right.

Closing Argument by Mr. Grandinette

5733

1    Answer:  So everything was like we didn't know

2    who it was.

3    Question:  Right.  But at this point in time

4    we're basically guessing.  We're throwing darts in a DNA

5    pool, right?

6    Answer:  You call it throwing darts.  I say that

7    we're trying to establish whose DNA it was as an

8    investigator.

9    Question:  Understood.  But there is no factual

10   basis prior to throwing a dart in the DNA pool.

11   Answer:  If the name was in the file somewhere,

12   we secured the DNA.  And we tried to test it to see if we

13   got lucky and got a hit, yes, sir.

14   Folks, it doesn't get any clearer than that,

15   that they were guessing in 2005.  Now, door God, if you

16   were guessing and you don't know, don't retry John Kogut

17   on these theories.

18   Don't suggest, as they will suggest here, that

19   DNA that was somehow found in Theresa Fusco has some

20   connection to these men or was the result of a consensual

21   partner.

22   Let's get real.

23   I want to emphasize just -- I mean, that's the

24   definition of malice, what they did.  Ill will, bad faith,

25   reckless disregard of John Kogut's rights.

Closing Argument by Mr. Grandinette

5734

1    You want to talk about an exclamation point?

2  Let's look at this list.

3    Detective O'Leary said that they tested unlikely

4  consensual partners, right, who may have been in proximity

5  to Theresa Fusco that night, okay.

6    Thomas Fusco was described as a loving, doting

7  father.

8    John Fusco, her brother, was tested secretly.

9    Thomas Gilhooley had an ironclad alibi, working

10  all night long.

11    There were over 200 people in that

12  establishment.  Do they mean to suggest the guy raped her?

13    Robert Martini, Lisa Kaplan's boyfriend; Lisa

14  Kaplan's brother and mother.

15    Facts.  Lisa Kaplan told you that I loved her

16  like one of my family, and she loved me.  If they are

17  testing these people, they are clueless.

18    Yet they will stand here and tell you it's

19  Kogut, Halstead and Restivo.

20    Charlotte Word, expert witnesses, unbelievable

21  credentials, testified, the majority of the time as an

22  expert witness on the prosecution.  She dispels any of the

23  defendants' theories as well.

24    Let's look at what she said.  And Mr. Scheck

25  will discuss the DNA in a little more detail, but I want

Closing Argument by Mr. Grandinette

5735

1    to discuss five points.

2              The sperm was deposited within 12 hours of

3    Theresa Fusco's death.  My opinion is that due to the

4    large number of sperm that were recovered and available

5    for testing in this case, it is the strongest likelihood

6    that the sperm was deposited very shortly before death,

7    her death.  They were not deposited 24 hours or even

8    12 hours before her death.

9              So she is projecting under 12 hours there was a

10   seminal deposit.

11             Next, there was only one male sperm donor.

12             How many individuals?  One.

13             She says that the medical evidence in the case

14   is inconsistent with the 2005 retrial theory that Theresa

15   Fusco could have been raped by two males after having

16   consensual sex.  And she explains that if that were the

17   case, that she would expect to find DNA from three men as

18   well in Theresa Fusco, and that was not the case here.

19             Four.  The medical evidence is inconsistent with

20   the 2005 retrial theory that Theresa Fusco could have been

21   raped by two males wearing condoms after she had

22   consensual sex.

23             And she said, no, what I would expect to see if

24   that happened would be a significant dilution of the sperm

25   count, and that's not what I saw here.

Closing Argument by Mr. Grandinette

5736

1      Five.  She said that if Theresa Fusco was

2  physically active after having consensual sex, it would

3  contribute to the dilution of the sperm count,

4  inconsistent with the medical evidence in this case.

5      She said, I would like to say again, common

6  sense tells me that being prone, walking around, would

7  contribute to more drainage and dilution of the sperm

8  count.

9      Uncontradicted testimony of the DNA expert tells

10 you know matter what theory, no matter what theory the

11 defendants elect, the science says it is impossible.

12     That proved that John Kogut's confession was

13 coerced.

14     But just in case you are not convinced, we

15 proved to you what Theresa Fusco did in the last 24 hours

16 of her life.  Let's look the a the timeline.

17     On November 9, 1984, she went out with Lisa

18 Kaplan, her best friend.  Certainly if she had consensual

19 sex, Lisa would have known about it.

20     On November 9, 1984, she gets up, showers, talks

21 to mom.  There were no injuries from her kneecaps down to

22 her shins.  We'll get back to that shortly.

23     In the morning she goes to dance class, right?

24     What happens at 12 noon, she goes and meets Lisa

25 Kaplan.  They were again together at Burger King.  Lisa

5737

1    goes back to Atlantic Avenue pharmacy.

2          3:30 she sees mom and her brother at the back of

3    the house.  Mom is excited.  She bought a new car.

4    Theresa got her learner's permit, is excited.

5          At 4 o'clock she's getting out of work.  Meets

6    Lisa 4:00 to 4:45.  They go into town.  It is Robert

7    Martini's birthday.  They will pick something up for him.

8    Lisa can't recall what they purchased, but they got

9    something because it was his birthday.

10          At 4:45, Lisa and Theresa are standing outside

11   Lisa's house, and they make definitive plans for after

12   work that Theresa will come and join them, Robert Martini

13   and Lisa, to hang out and celebrate his birthday.

14          Between 4:45 and 6:15, Theresa is home.  Gets

15   ready for work.  Comes down and eats.  Mom has an

16   opportunity to observe all the clothing she wears, which

17   she later reports to the police.

18          Prior to leaving the house, Theresa asks her

19   brother John?  Could you give me a ride home?  He says,

20   no, I'm going to the movies with my girlfriend.

21          Connie Napoli said before Theresa left the

22   house, she was definitive.  She said, mom, I'm going over

23   to Lisa's house.  And she was walking to Lisa's house

24   because she didn't have a ride.

25          At 6:28, she punches in to work.  At 9:47, she

5738

1    punches out of work.

2              9:50 is the last time she's seen alive by Joanne

3    Lenahan in the parking lot of Hot Skates.  Lenahan offers

4    to go to McDonalds; Theresa rejects it.  Why?  Because she

5    has plans, and those plans are to walk the most direct --

6    as testified by both Lisa and Connelly, southbound on

7    Rockland, make a left-hand turn right to Lisa's house on

8    Maldon Avenue.

9              Ladies and gentlemen, Theresa Fusco had no

10   opportunity to have consensual sex in the last 24 hours of

11   her life, nevertheless under 12.  It's clear.

12             We have a burden of proof by a preponderance of

13   the evidence.  I suggest to you that we far exceeded that.

14             Now, ladies and gentlemen, the defendants in

15   this case are stuck with the same bad-faith arguments that

16   were made at John Kogut's 2005 retrial.  That is, they

17   have to say that that DNA in Theresa Fusco was either from

18   a consensual partner or some fourth man, right?

19             And I suggest to you that is outrageous.  You

20   should discount it, and you should come back with a

21   verdict for the plaintiffs.

22             Folks, the science refutes these theories.  The

23   credible witnesses, Lisa Kaplan, Connie Napoli, Robert

24   Martini, Joann Lenahan, refuted it.  Common sense refutes

25   it.  Yet they stand up and they argue it again.

5739

1    Now, this is the very definition of malice.

2    I asked O'Leary, Detective O'Leary, if he ever

3 considered the proposition these men were innocent:

4    And as you mentioned earlier, you did not

5 consider the proposition that these men were innocent and

6 not involved with the crime at all?

7    Answer:  I did.

8    The lead investigators never considered that

9 these men were innocent.  The lead investigators never

10 even took the time to read the trial transcripts from

11 1986.  The lead investigators never even bothered to speak

12 to Dempsey.

13    Oh, he was in Pennsylvania, like he's somewhere

14 in Russia.  Pick up the phone.  Talk to the guy.  Consider

15 the possibility that these men are telling the truth,

16 giving the overwhelming medical and scientific evidence

17 proving that that confession was false.

18    Now, Mr. Freeman will stand up, he will say,

19 yes, Mr. Grandinette is crazy.  He deludes himself.  You

20 heard from Mr. O'Leary that Kelly and Trujillo were

21 assigned to a, quote/unquote, blind eye investigation.

22 They wanted to be fair and impartial, of course.

23    So according to them, if you believe them, they

24 take two guys.  One has no experience in homicide; one has

25 very little.  They assign them to admittedly the singular

5740

1  most difficult homicide case there is, 20 some-odd-years

2  case of murder.  They handcuffed them and they say, you

3  are not allowed to look at the homicide card.  Just go

4  out -- the body was found here -- and investigate.

5          And they go knocking on doors, and they come

6  back shortly and they say, the word on the street is that

7  these guys did it.

8          Well, I hate to sound a tad sarcastic, but I

9  say, no kidding.  This was a highly publicized murder

10  case.  At the time they did this investigation, these

11  three guys were serving 37 and a half years to life in

12  prison for the murder of Theresa Fusco.  If they went

13  knocking on the door and asked, do you know anything about

14  it, sure.  These guys raped and murdered her.

15          They did their investigation prior to the DNA

16  exoneration and vacated.  Remember O'Leary's testimony?

17  Eight days after June 11, 2003 --

18          MR. FREEMAN:  Objection, Judge.

19          THE COURT:  Ladies and gentlemen, your

20  recollection of the testimony controls.  Your

21  interpretation of what the testimony is also controls.

22          MR. FREEMAN:  I'll discuss it during the break.

23          MR. GRANDINETTE:  After eight days after the

24  vacatur, it's all hands on deck to reprosecute John Kogut.

25          Now, folks, I know Volpe did an investigation.

Closing Argument by Mr. Grandinette

5741

 1    He wrote a report, albeit ten years later.  He's the guy

 2    that wrote it.

 3           Kuhn and O'Leary wrote a report.  We saw, heard

 4    about that.

 5           Where is Trujillo and Kelly's report?  If they

 6    were assigned, where was any evidence showing you that

 7    these guys were truly assigned this task and that they

 8    took a report, and this is what they did, and this is the

 9    day they did it, and this is who they spoke to?

10           Ladies and gentlemen, we didn't hear any of

11    that.  And we're supposed to accept their word that they

12    did it?  If they did it, we would have seen it, and we

13    would have heard it.

14           Finally, ladies and gentlemen, I suggest to you

15    that you got to really question the defendants when they

16    ask you to count on witnesses, six witnesses, in the

17    Halstead and Restivo 1986 -- 6 out of 12 in their original

18    trial were tested as suspects in the reinvestigation.

19           You will recognize the names.  Howie Smyle was

20    the eighth guy that was tested after the exoneration in

21    July of 2003.

22           MR. FREEMAN:  Objection.

23           MR. GRANDINETTE:  And they will tell you, rely

24    on him as a basis for probable cause, even though we

25    expected he might be charged with murder.  Absurd.  They

Closing Argument by Mr. Grandinette

5742

1    are trying to sell you the Brooklyn Bridge.  The science

2    and proof will tell you these guys didn't rape her.

3         Judge, may I have a five-minute break?

4         THE COURT:  Yes.  Five minutes, no more, and be

5    back.

6         (Whereupon, at this time the jury exits the

7    courtroom.)

8         (Out of the presence of the jury.)

9         MR. FREEMAN:  Your Honor, Mr. Grandinette used

10   the word "exoneration" three times.  It's an intentional

11   violation of the court order.  I don't know how many times

12   we've discussed this.  And it is summation.

13        THE COURT:  Mr. Grandinette?

14        MR. FREEMAN:  And I'm going up the next time it

15   happens.

16        THE COURT:  Okay.

17        MR. FREEMAN:  And I don't want to do this to the

18   Court.  I don't want to do it to the jury.

19        THE COURT:  Mr. Grandinette, stop using the word

20   "exoneration."

21        MR. GRANDINETTE:  I didn't realize that --

22        THE COURT:  If you want, I'll charge the jury it

23   is not exoneration.

24        MR. GRANDINETTE:  I'll tell them I used the word

25   "exoneration"; it's a vacatur.  My apologies.

Closing Argument by Mr. Grandinette

5743

1          THE COURT:  You have three minutes.  I'll let

2     them know the proper term is vacate.

3          MR. GRANDINETTE:  Thanks, Judge.

4          (Whereupon, a recess was taken.)

5          MR. SCHECK:  Is there anything about the sound

6     here and the feedback?  I think it is too loud.

7          THE COURT:  Maybe you can figure out something

8     with Mr. Scheck.  The acoustics are a nightmare.

9          Mr. Grandinette, in your summation, did you say

10    anything about Mr. Scheck doing respondeat superior?

11         MR. GRANDINETTE:  What I said is that

12    Mr. Scheck's arguments on the supervision are applicable

13    to mine --

14         THE COURT:  I just wanted to make sure there is

15    no respondeat superior.

16         All right, let's just bring them in.

17         (Whereupon, the jury at this time enters the

18    courtroom.)

19         THE COURT:  Please be seated.

20         Ladies and gentlemen, during the course of the

21    summation, you may have heard the term "exonerate."  This

22    case does not involve exoneration.

23         The convictions were vacated, and the charges

24    were eventually dismissed.

25         Thank you.

Closing Argument by Mr. Grandinette

5744

1          MR. GRANDINETTE:  Okay.

2          All right, folks, what I'd like to talk to you

3     now about for a moment or two, more likely two, is that

4     there is independent expert forensic evidence that proves

5     the confession of John Kogut is false as to the rape and

6     murder of Theresa Fusco and that there is evidence that

7     the hair was planted independent of the postmortem hair

8     root banding.  And that comes from the defense expert,

9     Tamara Bloom, chief medical examiner, Nassau County ME's

10    office, whose profession is to interpret medical evidence

11    and what it means in relation to a crime.

12         And she testified in 2005 at John Kogut's

13    retrial on behalf of the People, and to a large extent it

14    was her testimony that also contributed to John Kogut's

15    acquittal.  Because her testimony --

16         MR. FREEMAN:  Objection.

17         MR. GRANDINETTE:  Because her testimony, ladies

18    and gentlemen, proves, proves, that the confession and the

19    murder could never have happened the way it says in the

20    confession.

21         So let's review it together, okay?

22         Before we do that, I want to mention one other

23    witness that the defense called.  ADA McCarty, now Judge

24    Edward McCarty.  And Judge McCarty told you that he was

25    befriended by Medical Examiner Bloom when he was a DA, and

5745

1   that he studied medicine, and that he's a professor of law

2   in addition to a judge, and he teaches medical evidence at

3   the Hofstra University School of Law.  I want you to

4   keep -- when going over Tamara Bloom's testimony, keep

5   this quote in mind:  I believe an assistant DA learns more

6   in the autopsy than from any other phase of the

7   investigation.

8           That is a powerful statement from a learned man

9   called by the defense.

10          Now, let's review what Tamara Bloom says.  She

11  says that the body and hair of Theresa Fusco was cleaned.

12  Because the body and hair of Theresa Fusco was cleaned, we

13  know that it was planted, okay?

14          Why do I say that?  Because Theresa Fusco's body

15  was found below the elevated railroad track.  There has to

16  be trains going there all day and night, five in the

17  morning to midnight, dust flying all over.  Naked.  Dirty.

18  She would have been full of dirt and debris.

19          Now, let's look at the autopsy photograph.  And

20  if you look right here -- these pictures are tough to see,

21  folks, but look at the autopsy photograph.  It's a better

22  shot over here.  Look at it in the jury room.  Her body

23  was washed clean and her hair was rinsed, but there is no

24  debris in it at all, at all.

25          And we know at the autopsy her hair was plucked,

5746

1    given to Waltman.  It wasn't counted.  And he took it back

2    to homicide, and it was planted in the van.

3           Nicholas Petraco testified that the Q-4 and Q-8

4    hairs were pristine.  They weren't damaged, and there was

5    no debris on it.

6           That van -- and first of all, ladies and

7    gentlemen, there's a stipulation, Court Exhibit 6.

8    According to the defense, they say Theresa Fusco left that

9    hair in the van November 10, 1984.  That van was searched

10   in March, okay?  That means it was in there for months.

11   It's a working van.  Could not have trailed the van to the

12   dump.  There would be dust and debris everywhere.  If the

13   hair of Theresa Fusco managed to find a little crevice

14   where someone didn't step on it over the course of five

15   and a half months, it would still have debris on it.

16          Go in your homes.  Look at the most awkward

17   place in your house.  There's dust and debris there.  It

18   would not escape all that traffic, all that dirt, all that

19   debris, all those people in such a confined space.  It

20   proves, absent the postmortem hair root banding, that that

21   was a hair plant, folks.

22          Now, in addition, Tamara Bloom says that the

23   most critical part of her testimony is this:  that Theresa

24   Fusco was strangled from the rear, okay.  Theresa Fusco

25   was strangled from the rear.

Closing Argument by Mr. Grandinette

5747

1          Now, let's read John Kogut's confession.  Okay.

2          I took out a blanket that was in the van.  I

3    spread it out on the ground.  Dennis and John then carried

4    her out of the van.  She is face up.  Now she starts to

5    regain consciousness.  She was a little dazed.  I gotta

6    tell.  I got to tell.  I got on top of her, put my knees

7    on her shoulders and covered her mouth.  I put my knees on

8    her shoulder and covered her mouth.  My back was to John

9    and Dennis, and one of them threw me a rope.

10          I took the rope, which was hard nylon.  I

11    wrapped it, double, around her neck.

12          She is here, ladies and gentlemen, flat on her

13    back.  John Kogut is on top of her shoulders.

14          What did Tamara Bloom tell us?  She said that

15    the markings on her neck indicated that Theresa Fusco got

16    her hands in that rope.  If his knees are over the

17    shoulders, he's on top of her with his hand covering her

18    mouth -- he's strangling her from the rear.  According to

19    that confession, John Kogut is on top of Theresa Fusco,

20    she is face up, and he's tightening the rope.

21          The independent medical evidence, which Judge

22    McCarty tells you is the most significant form of evidence

23    that a DA can learn from -- why?  Because it's objective.

24    It's not subject to manipulation.  It's not subject to

25    interpretation.  It's not character assassination.

Closing Argument by Mr. Grandinette

5748

 1          You know what?  Dennis is violently drunk.  It

 2   is what it is.  It's concrete, and it proves that John

 3   Kogut's confession is false.

 4          Ladies and gentlemen, here it is.  Strangled

 5   from the back, not from the front.

 6          Abrasions to the knees and lower legs.

 7          Struggle with the hands in the rope.

 8          And can't say how the rope was manipulated, if

 9   it was twisted like a cork screw.

10          Let's discuss these four points.

11          You see the abrasions here -- I don't want to

12   leave these pictures up -- that she said was from the

13   struggle with the hands, Theresa getting her hands in.  If

14   John had his knees on her shoulders, she's not getting her

15   hands in there.  And she said she was being strangled from

16   the back, not the front.

17          Now we'll talk about these deep-seated abrasions

18   to the knees and lower legs.  Remember earlier I said

19   nobody, nobody, ever saw any bruises to Theresa's knees or

20   lower shins.  So we have Theresa here, naked, being

21   strangled from the rear, okay.  And she's being strangled,

22   and she's fighting.  And she's on her knees, and she is

23   sustaining injury to her knees and her shins

24   (demonstrating).  And then, unfortunately, she falls,

25   right?

5749

1          Folks, I think the evidence is overwhelming,

2   right?  There's no injuries to her back.

3          I mean, Tamara Bloom explains it all.  The only

4   thing that she said that was consistent with their theory

5   is that the way the arm came to rest was in an unnatural

6   position.  Could have been consistent with being rolled

7   out of a blanket, okay?

8          But, folks, look.  Let's face it.  If she was on

9   her hands and knees, fighting for her life, we'll not sit

10  here and say which hand she used to grab.  And there is

11  nothing natural about what happened to poor Theresa Fusco.

12  But if she's fighting and struggling and loses

13  consciousness, she could have been lowered by her

14  assailant behind her, utilizing that very rope, and she

15  fell and ended in an awkward position with her arm here.

16  And he took the rope away, and he left (demonstrating.)

17          That medical evidence tells us a lot.  It tells

18  us that John Kogut's confession was the product of

19  coercion, and it was absolutely false.

20          Now, the last point that she makes is as

21  significant.  The medical evidence in this case can't

22  establish that Theresa Fusco was killed in another

23  location and then moved.

24          Their theory in that confession claims that

25  these men killed her in a cemetery, and the medical

5750

1    evidence does not support that.  Doesn't say it couldn't

2    happen, but it certainly doesn't says it did.

3           From Tamara Bloom's expertise, there was one

4    crime scene involved in the murder of Theresa Fusco, and

5    that was where her body lay.  It was not the cemetery.

6           Ladies and gentlemen, what you can conclude from

7    this is all the medical, all the science, disproves their

8    theory about how this happened and that that confession is

9    false.

10          Now, Mr. Freeman will get up here and he will

11   tell you, listen, Kogut was there.  Kogut had personal

12   knowledge.  Kogut knew that she used the phrase "I got to

13   tell, I got to tell," and he actually showed you how he

14   did it on the video.  That impugns personal knowledge.

15          Listen.  I don't care what John Kogut said on

16   the video.  He was part reporting what Dempsey and the

17   other said to him.  It can't in a million years change the

18   independent medical evidence that refutes how it happened.

19   All it does is prove that poor John Kogut was coerced and

20   pressured to do what he did, as he testified to in 1986

21   and as he testified to here.

22          That a phrase, "I got to tell, I got to tell,"

23   ladies and gentlemen, it's not some unique phrase.  And

24   Connie Napoli, in her state of mind, said, I never told

25   the detectives that.

Closing Argument by Mr. Grandinette

5751

1      With all due respect, I don't think anyone could

2   remember everything that they told the detectives when you

3   are sitting down having a conversation about the loss of

4   your daughter.

5      In addition to that, Volpe interviewed both

6   Mr. Napoli and John and other friends of hers.  If she

7   used the phrase all the time, there could have been a half

8   a dozen people who mentioned it.

9      But that's what Mr. Freeman, tomorrow, will come

10  and say.  He will play this confession (start and stop).

11  That's what he will show you.  He tightened it like this,

12  and he impugns personal knowledge.

13      Don't forget that the medical evidence directly

14  refutes it.  It's impossible.

15      Now, folks --

16      John, can you turn up the volume on that?

17      Judge, is there any way we can turn the volume

18  up?

19      THE COURT:  I believe it is all the way up.

20      MR. GRANDINETTE:  Ladies and gentlemen, while

21  we're on the subject matter of clips, George Peck, the ADA

22  who did this, said he got the confession a half hour

23  beforehand.  The only time he talked with John Kogut was

24  in that room in the presence of Joe Volpe, okay?  He had

25  no opportunity to speak to George Peck outside the

5752

1    presence of Joe Volpe.  Okay.

2          And, you know, if he did this and he had the

3    ability to remember in such minute detail what happened,

4    don't you think --

5          (Video clip played.)

6          (Start and stop.)

7          MR. GRANDINETTE:  Now, folks, if John Kogut did

8    this, right, and he could remember the minute details, I

9    would suggest to you that he could remember the date.  But

10   this is part of Joe Volpe's work record.  Because

11   remember, the medical examiner could not tell him the

12   exact time of death.  So guess who didn't remember the

13   date this happened?  John Kogut.

14         If John Kogut did this with -- all trial long,

15   the defense is trying to suggest that they knew Halstead

16   and the friends.  He stopped by his apartment a couple of

17   times with paychecks.  Doesn't remember socializing, but

18   what he did tell you, they got into a fight, and they

19   weren't talking.  They disliked each other.

20         Now if John committed this crime with Dennis

21   Halstead, you would expect he would know who he did it

22   with.  Let's listen.

23         (Video clip played.)

24         (Start and stop.)

25         MR. GRANDINETTE:  Okay.  So he doesn't even know

Closing Argument by Mr. Grandinette

5753

1    Dennis Halstead's name.  He called him Dennis Shapiro.

2    This is the guy he allegedly is friends with and gang

3    raped and strangled somebody.

4             And you will notice the complete absence of

5    phone records between the two, even the witnesses they

6    called, these girls.  They saw John Kogut once in early

7    winter of '84 at Halstead's apartment.

8             Now, folks, if he committed this murder, don't

9    you think he'd remember doing it?

10            Listen to this next clip where he tells George

11   Peck he doesn't even remember doing it.

12            And George Peck says:  You remember it now,

13   don't you?

14            And he says, I guess.

15            Listen.  It's very faint, but listen to what he

16   says at the end.

17            (Video clip played.)

18            (Start and stop.)

19            MR. GRANDINETTE:  Did you hear it?  Yes, right.

20            And if they did this, right, there is certainly

21   no records, phone records, meetings, nothing.  They got

22   together one time to discuss John Restivo asking these two

23   guys not to rip each other's heads off at a job.

24            ADA Peck had the statement, and he had to ask

25   John, utilizing that statement, because he didn't know any

5754

1    independent facts.  He told you that.  He wasn't involved.

2    The only thing he did was go to the crime scene.

3         And a portion of this -- and I'm not criticizing

4    this at all, but there were portions that he's really

5    stuck to try to ask some leading questions.  Here's a

6    couple of it.

7         (Video clip played.)

8         (Start and stop.)

9         MR. GRANDINETTE:  Okay.  Ladies and gentlemen,

10   at this point in time what I want to do is I want to talk

11   about what we have proved and what the credible evidence

12   is about what happened in this case, not the fantasy of

13   the consensual partner or the fourth-man theory.

14        Theresa Fusco has definitive plans after work,

15   right, to go to Lisa Kaplan's house.

16        Lisa Kaplan told you significantly that Theresa

17   didn't know any of these men.  A portion of the confession

18   says that John thought one of them knew her, and that's

19   why she got into the van.

20        Lisa Kaplan said they didn't know what Kim Beyer

21   said, what Regina Furhmann said, that Theresa didn't know

22   these guys.  But the evidence shows that Theresa had plans

23   to walk to Lisa's.  And the evidence shows that the

24   shortest route and the most direct route were for her to

25   walk southbound down Rockland.

5755

1    Detective Volpe spoke to and corroborated those

2    plans with Robert Martini, and he also spoke to Joann

3    Lenahan, who said that Theresa declined the offer to go to

4    McDonald's.

5         So, ladies and gentlemen, what the evidence

6    established in this case and what made sense was that

7    Theresa was walking southbound down Rockland Avenue.  As

8    she approached the dark corner, right, she would have to

9    cross over -- and I'm utilizing Plaintiffs' 194.  She'd

10   have to cross over to the west side of the street here

11   because the crosswalk is on the west side of Sunrise

12   Highway, okay.  The west side of Sunrise Highway is that

13   crosswalk.

14        So as Theresa approaches under the trestle, it's

15   on this side, not this side.  She can't cross.

16        So what happens is she crosses over.  Right

17   there she's grabbed, abducted, either driven down or

18   walked down, and she is raped, murdered, covered in leaves

19   and wooden pallets.  It's just not that complicated.

20        Now, ladies and gentlemen, that's what the

21   weight of the credible evidence proves.

22        What the defendants want you to believe, right,

23   and what they are suggesting and what the confession says

24   is that Theresa Fusco crossed Merrick Road.

25        In 28 years, they've never produced one witness,

5756

1    one piece of forensic medical trace, eyewitness evidence,

2    ever establishing that Theresa Fusco ever crossed Merrick

3    Road.

4            The confession says that John Kogut and Dennis

5    Halstead and Restivo picked up Theresa Fusco at the speed

6    limit sign (indicating).  Okay.  Look at where that speed

7    limit sign is.  Their theory is that Theresa Fusco changed

8    her mind, walked back to join her girlfriends at

9    McDonald's.

10           If that's the case, folks, why in God's name

11   would Theresa Fusco walk the opposite direction of

12   McDonald's, this way, if she came back up Rockland?  She

13   would simply walk down the sidewalk to McDonald's.  There

14   would be no rational reason that she would ever cross the

15   road.

16           They are also asking you to expect that a busy

17   roller skating rink, where the line forms in front of the

18   building and where there were 100 people leaving, 200

19   coming that night -- let's say one car fit three kids.

20   That's 100 cars dropping off, picking up.  It's a well

21   lit, moderately lit road.  It's wide open.  Nobody saw

22   her?

23           And the reason why nobody saw her is because she

24   never crossed.

25           Rochelle Bernstein tells us she walked out the

5757

1    side door.  Joann Lenahan tells you she was outside the

2    side door.  The credible evidence, the credible evidence,

3    is she never went to McDonald's, never crossed the road.

4    The confession is false.

5            Now, ladies and gentlemen, Rochelle Bernstein

6    said she got on the phone.  She was upset, right?

7            What will happen, Mr. Freeman will stand up here

8    Tuesday.  He will tell you she had definitive plans.  We

9    acknowledge that.  But we got by that.  We didn't expect

10   that.  So, therefore, she might have altered her plan.

11   Nonsense.

12           Employ your life's experience.  That is pure

13   speculation.

14           What I know from my life's experience and yours,

15   when you are upset, who do you want to see?  People close

16   to you.  She would have ran, not walked, to go see Lisa

17   Kaplan if she was upset.  It is her best friend, her

18   confidant.

19           It is based upon his opinion.  They may

20   speculate, perhaps Theresa Fusco took a different route

21   home.

22           I suggest to you, ladies and gentlemen, it is

23   ridiculous to suggest she would have walked, rather than

24   southbound, she would have walked this way (indicating),

25   all the way around and down that way.  It's crazy.

5758

1        And that, too, is nothing but pure speculation.

2        Now, folks, the lack of evidence in a criminal

3   case can be as powerful or more powerful than the presence

4   of evidence.

5        Let me say that again.  The lack of evidence in

6   a criminal case can be as powerful or more powerful than

7   the presence of evidence.

8        If you look at John Kogut's confession, he

9   identifies three crime scenes:  the stop sign where she is

10  picked up, the cemetery where they allegedly rap and kill

11  her, and then the area known as the fort.  Okay.

12       To this day, over the course of 27 years, no

13  medical, forensic, trace or eyewitness evidence was ever

14  found at that cemetery, and nobody can put Theresa Fusco

15  at that stop sign.  The lack of evidence proves that they

16  were never crime scenes.

17       Look, folks, when you commit a crime, you leave

18  a footprint.  It's the evidence.  This animal, whoever did

19  this to Theresa Fusco, left evidence.  He dropped the

20  rings.  He left those jeans inside out.  Maybe they were

21  the ones in the car.  The rope.  You always leave

22  evidence.

23       What the defendants would have you believe,

24  okay, they are trying to sell you the Brooklyn Bridge.

25  They'll have you believe these three guys, drunk and high,

5759

1   swept into a highly populated area, well lit public scene,

2   and committed the perfect crime.  Didn't even leave a

3   trace of evidence.

4          You either have to accept that, which is absurd,

5   or accept the proposition that in this case there is one

6   crime scene, and that is the fort.

7          And think about the other proposition they are

8   trying to tell you:  that these guys are familiar with the

9   area known as the fort.  And that area, right, is visited

10  often by children and people, and they go there to dump

11  the body?

12         Or, conversely, if you accept Marcello Baez's

13  testimony, if you accept the word, whatever you do, stay

14  out of the fort, that these guys will dump the body where

15  they believe the police is watching, and can you believe

16  they go into a wide open cemetery -- and I don't care what

17  Mr. Guerrero says.  Let's employ our common sense.  Okay?

18         That is as wide open as wide open is.  You don't

19  pull into a wide open lot to rape somebody, 15 feet from

20  the property line from a row of homes that can look out or

21  hear something or see unless you are a complete nut or

22  moron, and you will be leaving evidence all over.

23         But to this day, there is no such evidence.  And

24  the simple reason for that is, they are not perfect

25  criminals.  It's just pure, unadulterated fantasy, because

Closing Argument by Mr. Grandinette

5760

1   Volpe and the defendants theorized that that cemetery

2   played a role in this crime, and that's why they penned it

3   into John Kogut's confession.

4          Ladies and gentlemen, the defense is going to

5   say:  Why John Kogut?  Why would the police go after John

6   Kogut?  We have no beef with him.  Treated him cordially.

7   He was not upset.

8          Ladies and gentlemen, I explained to you when I

9   opened, I explained to you that John Kogut was a suspect

10  on March 25th, with -- John Halstead and Dennis were

11  suspects.

12         How did John Restivo become a suspect?  They say

13  that Harry Smyle was driving and that John made a comment:

14  They'll probably find her strangled somewhere, whether it

15  is in the cemetery or not in the cemetery, who cares.

16         Last Thursday you heard Sirianni's deposition

17  where he said five or six people made comments.  Many of

18  them said prior to the recovery of her body that she would

19  probably be found strangled somewhere, right, in a

20  cemetery.

21         People are discussing this in a big way in

22  Lynbrook.  It's big news.  Harry Smyle says he's obsessed

23  with it, okay.

24         Mr. Sirianni admitted a statement like that

25  doesn't make you a suspect.  You need more.

5761

1    So, Harry Smyle goes and gives this girl, Eileen

2    Tosner, a ride home.  And I'm sure he's scared.  He's

3    talking about the disappearance of this girl.  Tells her

4    mother, and then the police track down Harry Smyle.

5    Mr. Freeman will tell you hard work and great

6    detectives never stop until they found Harry Smyle.

7    Ladies and gentlemen, if you are a homicide

8    detective, I expect that you are a hard worker.  This case

9    is not about hard work.  This case is about rules and

10   breaking the rules and bending them beyond comprehension,

11   violating the constitution, right?

12   And what they did in this case, they pulled in

13   Harry Smyle -- listen, I don't have anything against Harry

14   Smyle -- and he told -- he came back from Vietnam.  The

15   man was wounded and suffered physically and mentally.

16   Suffered from posttraumatic stress syndrome.  He was on

17   Vicodin, Percodan, a very powerful narcotic medication,

18   and Xanax.

19   He told you from the day he penned that

20   statement that they wrote, they were with him right

21   through his grand jury and trial testimony, and that he

22   was so mentally unstable that he was hospitalized for a

23   nervous breakdown.  He tells you that they were putting

24   words into his mouth, right?

25   But the bottom line is this:  On March 5th,

5762

1    after he gave that statement, what do the police do?  They

2    go grab John Restivo.  John Restivo is brought in at 8:30,

3    okay, p.m.  The guy is held for 24 hours.

4           If John Restivo gave a voluntary statement, why

5    does it take 24 hours?

6           Same thing with John Cockerel.  If these guys

7    are cooperating and made voluntary statements, it should

8    take an hour, a half hour, not 24.

9           Bells have to go off, alarms, when we talk about

10   24 hours in police custody.

11          What does John Restivo tell you?  I told them,

12   yeah, I talked to Harry.  I don't know anything about this

13   girl, don't know anything.

14          You're a liar.  You're a liar.

15          Does that ring familiar?

16          Did anybody else like John Kogut say that they

17   wouldn't believe them?  They called him a liar.  They

18   pressured him.

19          Then what does John say?  John says that they

20   were physically and psychologically abusive.  Does that

21   ring a bell to anybody?

22          Then what does John Restivo say?  John Restivo

23   says they started drumming into my head over and over,

24   Halstead, cemetery, strangled, Halstead, cemetery,

25   strangled.  Does that sound familiar to anybody?

5763

1      And John Restivo said that there came a point in

2  time the following morning that they -- that he just

3  signed it.  He didn't see another way out.

4      Now what about this bit about Sharkey?  Jack

5  Sharkey, incredibly busy, working homicides in county

6  court.  Very, very busy.  That's why he's not involved in

7  this case.  Yet they go pull in Jack Sharkey.  Why?  It

8  wasn't by happenstance.

9      Jack Sharkey knew Joe Restivo, John's father.

10 He worked with him for five years.

11     Volpe and Dempsey were worried that John Restivo

12 wasn't playing ball, that John Restivo wasn't going in and

13 perpetrate the nonsense that he overheard this admission

14 from Dennis Halstead and put it all together on the toilet

15 bowl reading the paper.  They were worried that John

16 Restivo was going to say he abused them.

17     So they called in Jack Sharkey, and Jack Sharkey

18 says, hey, John, how are you?  Right?  I know your father

19 for five years.  We're all one happy family.  John, what

20 happened, John?  We need you.  We're counting on you.

21 You're our star witness, John.

22     I'm going to get some lunch.  Think about it.

23 Come back, have lunch.  Make sure John is on board.

24     If Jack Sharkey was walking in there to just

25 confirm what was in the paper, it would have taken

Closing Argument by Mr. Grandinette

5764

1    15 minutes.

2            John, how are you?  It's great to see you.  I

3    knew your father, a hell of a man.  Just go over this.

4    Listen, I know you might be scared.  Don't worry about it.

5    We're there for you.  We're in your corner.

6            Who cares if Restivo wanted to cooperate.  We

7    heard from Tim Cockerel.  Put him into the grand jury.  If

8    they didn't hear what they wanted, pulled him out.

9    Arrested him for perjury.  They don't need John Restivo's

10   permission.

11           What happens?  What does it tell us?  Why do we

12   have whistle blower laws?  Because every one of us suffer

13   from a trepidation that if we blow that whistle, if we are

14   at work and you see something and you say something, the

15   tables will be turned.  You go from the person who makes

16   the accusation to the target.  So you know what?  I'm

17   going to keep my mouth shut.  It's not worth it.

18           John Restivo wasn't a target; he was a star

19   witness.  He didn't implicate himself in any way.  There

20   was an admission.  But he walked out that door.  And

21   because John Restivo dared to tell the truth, he instantly

22   became a target.

23           He walked into Teddy Robinson's office.  Teddy,

24   this is what happened.  It's not the truth.  I need your

25   help, right?

Closing Argument by Mr. Grandinette

5765

1    So what happens?  Teddy reports it in a big way

2  to the commissioner of the police, head of the homicide

3  bureau, DA, eventually the governor of the State of New

4  York to start a criminal investigation.  But Robinson knew

5  the significance of this and the propriety and just how

6  far it would go.

7    Here's my point.  We know from Connaughton after

8  that report was made, Volpe tells him to tail Restivo.

9  Watch his house.  Watch his van.  He's going through the

10  dump.

11    Volpe admits during his deposition, Restivo is a

12  target.  He's a primary suspect.

13    Let me ask you something.  In the 24 hours that

14  he went from a star witness, when he signed that

15  statement, to when he made the report of impropriety, did

16  the police uncover one piece of evidence that would

17  suggest John Restivo was involved?  Absolutely not.  There

18  was nothing to suggest that Restivo was involved with this

19  crime, yet he becomes a primary target.

20    So the police didn't require evidence to make

21  you a target at all.

22    And John Kogut was the weak link in a chain that

23  brought the whole thing together.

24    Ladies and gentlemen, on 3/5-- excuse me.  The

25  defense will probably suggest that Teddy Robinson is a nut

5766

 1    job and that these letters were a prefabricated defensive

 2    strike, right?  That he made these reports to defend

 3    himself and they are self-serving.

 4            And before you accept that proposition, let me

 5    suggest this:  Boy, did Teddy Robinson hit the nail on the

 6    head, right?  Because no matter what they tell you, don't

 7    forget that 18 years later the DA that he wrote to saying

 8    that there was a gross impropriety that just occurred

 9    stood in front of the chief judge in Nassau County and

10    dismissed the charges against Dennis Halstead because they

11    didn't have a case.

12            Who wrote self-serving letters in this case?

13    You heard from police practices expert:  Mr. Spillane,

14    Dempsey, a whole host of people.

15            There's a stipulation.  The stipulation is, I

16    think, number four.  Nassau County Police Department has

17    no record documenting any investigation of complaint made

18    by attorney Theodore Robinson regarding the interrogation

19    of John Restivo and other witnesses, yet the deputy

20    commissioner of police wrote Theodore Robinson and said,

21    we investigated your claims.  They are without merit.

22            Every witness who testified said the proper

23    protocol is an IAD investigation.  Never happened.

24            The reinvestigators never considered impropriety

25    by Volpe and Dempsey, ever.  That is, they, the

Closing Argument by Mr. Grandinette

5767

1    defendants, were the ones who engaged in self-serving

2    conduct here.

3           And why is Dennis Halstead a target anyway?

4    Because his moral compass is off, right?  They engaged in

5    character assassination of Dennis Halstead because of his

6    moral compass.  And what Dennis Halstead did, hanging out

7    with younger girls, wasn't right.

8           But listen, ladies and gentlemen.  It doesn't

9    warrant the catastrophic leap they are asking you to make,

10   right, from what they consider the moral conduct to a

11   murder and a rapist.  It just doesn't compute.

12          And they flew Kim Beyer all the way here from

13   Arizona to say what?  That she was in Dennis's apartment

14   five or six times, and they were very nice people there.

15          Brian Skellington's girlfriend, sometimes they

16   watched TV.  Some of the five times they were there, they

17   drank beer and smoked pot, not at all times of which

18   Dennis Halstead introduced it.

19          She said -- and I'm grateful that she called

20   her -- that John Kogut was there in, I think it was,

21   January or February of 1984, and that John Kogut was an

22   absolute gentleman.  She had a curfew, and John Kogut

23   walked her home, made sure she got in her house safely,

24   and left.

25          Now, perhaps the point of calling these

5768

1   witnesses was to try to suggest there was no evidence that

2   Dennis had kids or a girlfriend.  Dennis told you that he

3   broke up with his girlfriend.  And you heard Jason

4   Halstead.  It speaks for himself.  He had children; he

5   loved them; they loved him.

6           Now, ladies and gentlemen, Regina Furhmann

7   testified, and she confirmed that John Kogut didn't know

8   Theresa Fusco either.

9           I'm sorry, I missed one point with respect to

10  Kim Beyer.

11          Kim Beyer said to you she only saw John there

12  once, she never saw him there again, and that she was

13  unaware if John and Dennis had a fight in that intervening

14  time period.

15          And John Kogut testified that in fact they did

16  have a fight, and that fight was at the gas station.  And

17  Dennis and he really, really, sort of hated each other.  A

18  strong dislike, let's put it that way.

19          Someone would probably say, when you go to the

20  jury room, you'd have to put a gun to my head before I'm

21  signing that confession.  And I can understand and

22  appreciate that.

23          But we have to remember who John Kogut was when

24  he walked through that door, folks, okay?  This was a kid

25  who at five years old was taken out of his home.  His

5769

1   parents were alcoholics and drug addicts back in 1984.

2   It's not like today, where they would pull you out of the

3   home relatively quick; people would pay attention.  This

4   was '84, and he was removed.  His parents came to see him

5   on a supervised visit rarely.

6           John told you that he went to kindergarten --

7   and he sort of laughed about it, you know.  He's the only

8   kid he knows who failed kindergarten.  What does that tell

9   you?  He wasn't sitting on mommy's lap learning Velveteen

10  Rabbit, learning his numbers or primary letters.

11          When he went to the Egington's house, he was in

12  hand-me-downs, and he was made fun of.  You know how kids

13  can be.  He was behind.

14          And the cruellest blow of all (pause), he's ten,

15  and they take him away from his sisters.  And the family

16  adopts him and leaves him -- ten.  And we wonder why John

17  Kogut has some alcohol, drug and emotional issues.

18          Angel Guardian Home sends him home with somebody

19  pumping him with drugs.  He goes to another home.  Pumps

20  gas.  Starts feeling comfortable and takes him there.

21          God, I'm sorry, I don't know what happened to

22  me.  Excuse me.

23          THE COURT:  Mr. Grandinette, now is a good time

24  to take a break.  I'll see you folks at 1:30.  Thank you.

25          (Whereupon, at this time the jury exits the

5770

1    courtroom.)

2              THE COURT:  All right.  I'll calculate the time

3    you have left, Mr. Grandinette, and you'll start up at

4    1:30.

5              51 minutes on the first part of your statement,

6    and then you started up at 11:33, and you went to 12:18.

7              You have about 34 minutes left.  All right?

8              MR. GRANDINETTE:  Yes.

9              THE COURT:  Now, if you please vacate, I can

10   handle my other two cases.

11             (Luncheon Recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Closing Argument by Mr. Grandinette

5771

```
 1              A F T E R N O O N    S E S S I O N

 2

 3

 4          (Whereupon, the following takes place in the

 5     absence of the jury.)

 6          MR. SCHECK:  We will need five minutes after he

 7     finishes?

 8          THE COURT:  Yes.

 9          MR. CASTELEIRO:  Judge, if I may, with respect

10     to the timing that Mr. Grandinette has left --

11          THE COURT:  31 minutes.

12          MR. CASTELEIRO:  I have it as 39.  He did 51

13     minutes initially.

14          THE COURT:  Right.

15          MR. CASTELEIRO:  Then he did like 45 and a half

16     minutes the second time, which comes out to 96 minutes,

17     which gives him 39 as opposed to 34.

18          THE COURT:  He gets 120.

19          MR. CASTELEIRO:  No, you said --

20          THE COURT:  If he needs it.

21          MR. CASTELEIRO:  Yes.

22          THE COURT:  So my calculation was off of 120.

23          MR. GRANDINETTE:  What was that, Judge?  Your

24     calculation?

25          THE COURT:  You had 31 minutes.
```

Summation/Grandinette

5772

1      MR. GRANDINETTE:  If I needed, I can go to 46.

2      THE COURT:  No.

3      MR. GRANDINETTE:  15 more minutes.

4      THE COURT:  Do you understand, Mr. Grandinette,

5   that Mr. Scheck has to come up here?

6      MR. GRANDINETTE:  Yes.  But I based my whole

7   summation based on the two hours and 15 minutes.

8      THE COURT:  You have the two hours and 15

9   minutes; if I see the jury drifting off, I will call you

10   down.

11      (Whereupon, the jury at this time entered the

12   courtroom.)

13      THE COURT:  Please be seated.  Sorry to pull you

14   away from the cookies.

15      A JUROR:  You give it to us and pull us out.

16      THE COURT:  The cookies are from Brooklyn.  I'm

17   not the provider of the cookies.

18      Mr. Grandinette, please resume.

19      MR. GRANDINETTE:  Thank you, your Honor.

20      Good afternoon, ladies and gentlemen.

21      Folks, when I talked about John Kogut's

22   background, I discussed it with you so we understand the

23   young man who walked through the door prior to that

24   interrogation started, with all his warts and all his

25   deficiencies, so we can fairly assess, you know, whether

Summation/Grandinette

5773

1    or not he had the tools in his toolbox of life at that

2    point in time to overcome what happened to him.  And he

3    just didn't.  He was no match for Volpe and Dempsey.

4            The point is that they were fully cognizant of

5    all of John Kogut's deficiencies, and they were fully

6    cognizant that John Kogut didn't have anybody.  There was

7    nobody who was going to come and help him.  There wasn't

8    going to be a Teddy Robinson.  There wasn't going to be a

9    parent.  There was not going to be anybody to care.

10           And on March 21, 1985, when John Kogut was

11   picked up, just to be questioned.  Why?  Because

12   apparently his name was listed on the Restivo interview as

13   a friend or worker, whatever it was.

14           And John tells you, fully cooperative.  Goes

15   right down.  Nothing to hide.  He is not a suspect.

16           What is important about the two hour interview

17   on March 21st, there are really three important things.

18           The first is when Volpe sat down with him on

19   March 21st, he had a pad and pen in his hand and he was

20   writing.  Absolutely no hesitation, no fear.

21           And John didn't stop talking when Volpe was

22   writing.

23           The second thing that is really significant for

24   you to focus on is when John testified, right, he

25   explained to you the focus of the interview was on John

5774

1    Restivo and Dennis Halstead, right?

2              A lot of time was spent on those two guys, John

3    didn't know why.

4              He said, yes, I worked for Allbright (ph), I

5    know Halstead.  He worked for him.  And he disliked

6    Halstead, and Volpe said, yeah, I'm gonna get that dirt

7    bag.

8              John had mentioned he met with them three weeks

9    before, not for some secret purpose or meeting, but

10   because Restivo wanted the guys to work together without

11   ripping each other's heads off.

12             Far from three willing co-conspirators.

13             Once again, there is no evidence of any witness

14   having these guys collaborate, talking to each other,

15   meeting, nothing.

16             So when the defense suggests that this was, you

17   know, a secret meeting to plot their course how to avoid

18   capture, ridiculous.

19             They had hundreds of hours of tapes on

20   Restivo -- on Halstead.  There is not one mention of John

21   Kogut.

22             Folks, what else was very, very important about

23   that meeting?

24             John Kogut expresses a complete and total

25   willingness to cooperate.  And he is not even questioned

5775

1   by Volpe about being a suspect.  He tells Volpe what 400

2   other people told him.  I heard about it from rumors, it

3   was in the paper, Ms. Skellington told me about it.

4   Right?

5           We signed a stipulation that is for your

6   consideration after her body was found, it was published

7   in the newspaper, she was found by the trestle, strangled

8   to death, sexually assaulted.  Everybody knew it, the

9   world knew it, the fliers were all over the case.

10          On March 25th, what happens?  John, on the

11  morning of the 25th, leaves, he works in physical labor.

12  He says he slept about five hours.  The polygraph

13  worksheet says six.

14          He gets up early in the morning and does

15  physical labor, spring clean-ups, on his feet, working all

16  day, he gets home, showers, takes off his shirt, sits

17  down, drinks a couple of beers, a couple of joints, and

18  there is a knock on the door.

19          He told you, listen, I was tired, and shot, I

20  didn't want to go.

21          What did he say to Lisa before he left?

22          She wanted to go.  No, you stay here and you

23  cook.  I'll be back for dinner.

24          That was his state of mind.

25          You know when he came back to that dinner?  18

Summation/Grandinette

5776

1    years later, 18 years.

2            Ladies and gentlemen, when he went to the police

3    department that night, John Kogut sat down and he was

4    quite candidly -- well, this is for you to decide.  You

5    look at the polygraph examination sheet and make some

6    determinations as to whether you think the guy was candid

7    and forthright.

8            He is in a police department speaking to

9    detectives about a murder and he is telling them, yeah, I

10   used drugs, yeah, I used cocaine, yes, I smoked pot, yes,

11   I smoked hash.

12           Back then in 1984, this was a big deal, right?

13           He tells them, what is the worst thing that ever

14   happened to you in your life?

15           Losing my sisters.

16           What is the best thing that happened?

17           My old lady, meaning Lisa Price.

18           This man was finally, finally, and that makes me

19   so angry, about to take --

20           MR. FREEMAN:  Objection, your Honor.

21           THE COURT:  Ladies and gentlemen, it is not

22   about Mr. Grandinette's anger or anything else.  This

23   trial is about facts.  You determine the facts.

24           Please continue.

25           MR. GRANDINETTE:  He was about to embark on

Summation/Grandinette

5777

1  something that eluded him his entire lifetime, the family,

2  a family.

3          He says, why am I taking this test?

4          To prove my innocence.  That was his state of

5  mind.

6          He was asked a series of five questions when it

7  is all said and done, and let's review them.

8          Did you murder Theresa Fusco?

9          No.

10          Are you the one who had sex with Theresa Fusco

11  just before she was murdered?

12          No.

13          Did you strangle Theresa Fusco to death?

14          No.

15          Did anyone tell you who murdered Theresa Fusco?

16          No.

17          About the murder of Theresa Fusco, are you now

18  deliberately withholding any information?

19          No.

20          You can't be much clearer.  He had no knowledge,

21  nor did he participate in the crime.

22          A JUROR:  Excuse me, your Honor.

23          I thought the results of the lie detector test

24  are not admissible.

25          THE COURT:  I can't answer questions, sir.  I

5778

1    can't answer questions.

2              JUROR NO. 1:  All right.

3              THE COURT:  The only thing I can tell you with

4    regard to the polygraph, the results of the polygraph are

5    not in this case.  All right?

6              Do not speculate as to that.

7              Of course, do not speculate to anything else

8    that is not in this case.

9              If you would.

10             MR. FREEMAN:  Your Honor, you could say not the

11   results.  That are --

12             THE COURT:  These are not results.  That is not

13   correct.

14             JUROR NO. 1:  I'm sorry, I misunderstood.

15             THE COURT:  There are no polygraph results here.

16             MR. GRANDINETTE:  Ladies and gentlemen, these

17   answers are very, very direct and simple.

18             John Kogut told them at 9:00 o'clock on the 25th

19   that he was not involved, nor did he have any knowledge,

20   period.

21             Yet, yet at 8:30 the following morning, after

22   having these facts pounded into his head all night long,

23   there is a seven page confession saying the exact

24   opposite.  And John explained to you how that happened.

25             Now, the first series of lies by Volpe and

5779

1    Dempsey begin with the rights card.  And the purpose of

2    the rights card, folks, is to give validity to an

3    otherwise totally invalid document, the rights card.

4          And Russell Fischer testified, the police

5    practices expert, that the fundamental foundational

6    document of any criminal interrogation is a rights card.

7          And we have in evidence Exhibit 135, the general

8    order dated 2/15/84, issued by the Nassau County PD to all

9    detectives.  Make sure you get the rights card done

10   correctly, because if you don't, then any admissions are

11   going to be dismissed.

12         This was, don't forget, Detective Volpe's

13   biggest case in his entire career.  Right?

14         And he calls in Dempsey, allegedly, for the

15   singular purpose to witness the rights card, to get it

16   right, and what happens?  The date is 3/26/85.

17         And they sit here and try to suggest to you that

18   that was an inadvertent error on the biggest case of his

19   career.

20         Nonsense.  Complete and utter nonsense.

21         What happened, ladies and gentlemen, that they,

22   too, were engaged in an intense, hostile interrogation.

23   They, too, were up all night.

24         You know what?  They were tired and they made a

25   mistake.  And when they handed John Kogut that confession,

5780

1    the fabricated confession, and got him to sign off on the

2    rights card at the same time, and they knew darn well they

3    couldn't get Kogut to execute another rights card.

4              What did they do?  They go and they write -- I'm

5    sorry, they go and they write in the top hand corner,

6    10:30 p.m., right here.  10:30.  They jot that in.  And

7    then they argue, oh, we just made a mistake on the date,

8    it was an inadvertent error.

9              This is a foundational document, the biggest

10   case in the man's career.

11             It wasn't an error.  It was a mistake.  That is

12   how you know that they are lying to you.

13             Now, folks, let's examine independent of what

14   John Kogut said or what the defendant said, and look at

15   the interrogation and examine it with respect to what

16   happened and see if it makes sense to you.  Okay?

17             What I mean by that is this:  What would we

18   expect in an interrogation, in a ten and a half hour

19   homicide interrogation, to be comprised of.

20             The first thing is, you would expect some note

21   taking, right?

22             Three trained, experienced homicide detectives,

23   in a murder investigation that they have been slaving over

24   for five and a half months, and for the first time they

25   have a man in their midst who allegedly has got diarrhea

5781

1    of the mouth and has personal knowledge and alleged

2    participation.

3            And not one detective, not one, not Martino, not

4    Dempsey, not Volpe, they don't write a word, two words, a

5    sentence.

6            Nothing.  It is absolutely preposterous.  The

7    reasons that they espoused to you are insulting.

8            I wanted to pay attention to what he was saying.

9            Excuse me, folks.  I watched you all write

10   notes, most of you, during the course of the trial.  Does

11   that mean that you weren't paying attention?

12           Ridiculous.

13           If I wanted to stare at who I was interrogating,

14   that is why Dempsey was there.

15           If there is any legitimacy whatsoever, excuse

16   me, John, I want to use the restroom.  And I go outside

17   with my little hands here -- ridiculous.

18           Look, they are trained to take notes, right?

19           The reason -- the other reason he gives you is

20   he doesn't want to change the setting.  I didn't want to

21   change the atmosphere.  If I took a note, he may stop

22   talking.

23           Are you kidding me?  John Kogut was telling

24   them, you know, drop dead, what are you guys, on drugs?  I

25   don't know a thing.  There was nothing to write.

Summation/Grandinette

5782

1          Until they started to concoct their little

2     Picasso of the perfect confession.

3          Now, ladies and gentlemen, on March 21st Volpe

4     was taking notes.

5          If John Kogut was as cooperative as they say,

6     why wouldn't they be writing notes.  It just doesn't make

7     any sense.  You wouldn't expect to see it to know they are

8     lying.

9          Folks, on the issue of note taking, Detective

10    Sirianni was asked this question and gave these answers:

11         Would it be fair to say that this would be the

12    first time in your lengthy career that you had ever seen

13    anything like that?

14         Let's see, ten and a half hour investigation,

15    interrogation of a murder suspect to ultimately -- who

16    ultimately confesses, that there is not one note?

17         Answer:  It would be unusual.

18         Question:  It would be a little more than

19    unusual.  Wouldn't it be fair to say that you have never

20    seen it in your career?

21         Answer:  During my career, no, not that I can

22    recall.

23         Question:  Right?

24         And you have been taking statements half of my

25    lifetime, right?

Summation/Grandinette

5783

1          Yes, sir.

2          This guy is a cop for 25 years, he is a homicide

3   detective his entire career.  He has never seen it?  Why?

4          Because they are lying.  It didn't happen.

5          Ladies and gentlemen, the defense is going to

6   argue -- the defense is going to argue that Volpe jotted

7   down notes after the fact.

8          If you have a suspect in your custody that is

9   admitting to a murder that you have been investigating for

10  five and a half months, and he is giving conflicting

11  statements, that is all the more reason to write it down

12  immediately.  He would never be able to, ever be able to

13  recollect all of the alleged statements that John made and

14  in the order that he made them.

15         It is all made up.

16         Now, what would you expect in a ten and a half

17  hour murder interrogation.

18         And interrogation, Fischer said, is a question

19  and answer statement, you are going to ask questions,

20  where were you on the night of November 10, 1985?  Who

21  were you with?

22         According to the detectives, they don't ask any

23  follow-up questions.

24         Ladies and gentlemen, you would have ten

25  questions in a second, at a minimum.

5784

1           Let me give you an example.  I was with two

2   guys, Restivo and Halstead, on November 10th doing a

3   moving job.

4           What is critically important in order for you to

5   conclude that these guys committed the crime, they had to

6   be together on November 10th, 1985.  If they weren't

7   together, and if there is no evidence that they were

8   together, this confession is again proven false.  And this

9   is a fact that Volpe and Dempsey didn't know.  They had to

10  make this fact up.  And that is where they get caught and

11  we will discuss it in two minutes.

12          What happens is this:

13          If a suspect says he was with these guys doing a

14  moving job, I don't know which.

15          The question would be, what time was the moving

16  job?  Were the homeowners home?  Were they moving to

17  Florida?  Was it a small moving job, big job?  Where did

18  you take the truck?  What did you do with the furniture,

19  John, after you loaded it?

20          So they can go and corroborate it.

21          Could you take us to where the moving job was?

22          There would be obviously a million follow-up

23  questions like that.

24          Even if there was a narrative form of question,

25  you know, what happened next?  What happened next?

5785

1    Eventually you will be following up with a lot of other

2    questions.

3            That is what we would expect and that is not

4    what happened here.

5            Folks, let's look at the confession and the

6    alibis, okay?

7            The reason you can be confident that this

8    confession is not worth the paper it is written on,

9    because we have proven to you that these three men could

10   not have been together.  They all have viable alibis,

11   okay?

12           November 10, 1984, there is a moving job, okay?

13           The moving job, however, was with John Kogut,

14   Charley Restivo and Donna Schneider on Scranton Avenue in

15   Lynbrook at the Cagan house.

16           That moving job was to move an upright piano

17   from the first floor to the second floor.  And John walked

18   from the Skellington house where he was living, 66

19   Glenmore.  It was a couple of blocks away off Union, as he

20   testified.  And he remembers the job because it is the

21   only job in which he didn't complete it.  They had to

22   leave the piano on the first floor.

23           Then he walked back home, got home about 6:30,

24   showered, went out with Lisa Price to Captain Videos, hung

25   out, drank some beer, went to the beer drop, parties in

Summation/Grandinette

5786

1    the Atlantic Avenue school field with Mugsy, and went to

2    the Lynbrook movie theater to watch Led Zeppelin.

3              You heard from Lisa Price, who told you that she

4    was with John, and that they were in the Atlantic Avenue

5    field and went to the movies.

6              Ladies and gentlemen, I want to ask you to

7    contemplate the following:

8              If Lisa Price wasn't with John Kogut that night

9    and she didn't know where he was, do you think she ever

10   would have married him in prison?

11             I mean, here is a woman who truly, truly was

12   confident that John Kogut was falsely accused and

13   maliciously prosecuted.

14             MR. FREEMAN:  Objection.

15             MR. GRANDINETTE:  Ladies and gentlemen,

16   actions --

17             THE COURT:  Ladies and gentlemen, Ms. Price in

18   this proceeding is of no consequence.

19             Please move on.

20             MR. GRANDINETTE:  Actions often speak louder

21   than voice.

22             What about Joseph Dragatto and Mugsy, we brought

23   him in because he was not the greatest witness in the

24   world, we let him in because there was a Joseph Dragatto,

25   his name was Mugsy, and he used to hang around at Atlantic

Summation/Grandinette

5787

1   Avenue and drink, and November 10th was his birthday.

2           Although he was not buddy buddy with John Kogut,

3   it is not something dreamed up.  It is real life.

4           Kenny Cockerel told Detective Kosiar, when asked

5   where were you, he said on November 10th I was at Gino's

6   and ran into Kogut and Lisa Price in the early evening,

7   they were drinking beers.

8           You don't have to just rely on John Kogut's

9   alibi.  Let's look at John Restivo's alibi, okay?

10          There is absolutely no dispute in this case

11  between the plaintiffs and the defendants that on

12  November 10th, 1984, from about 8:00 a.m. to at least

13  8:10, that Cockerel and John Restivo are sanding floors,

14  that Paul and Chris Lampersona are there with him.

15          Look at these receipts.  The receipts that are

16  in evidence are from Perez Tools, 11/11/84.  We know that

17  Perez Tools was closed on Sunday, so it is misdated.

18          There is no dispute from anybody about that.

19          On 11/10/84, there is a receipt in the name of

20  Lampersona that he picked up an edger, a sanding edger, he

21  picked it up around 12:15.  And on 11/10/84, there is a

22  receipt for approximately, I think it is 20 gallons of

23  polyurethane.

24          It is crystal clear, the following facts:

25          They were at the house.  They were doing a

5788

1    sanding job.  Chris and Paul Lampersona, Michael Cockerel,

2    John Restivo.

3         Joanne stopped by at noon to give them lunch,

4    right, and then Charley Restivo and Donna stopped by, and

5    then they left to do the job with John Kogut.

6         There was testimony that on November 10th, 1984,

7    neither John Kogut or Dennis Halstead came by the house in

8    Wantagh.  And we have the phone records.  There is no

9    evidence at all to suggest that there was even a telephone

10   conversation between Restivo, Halstead and Kogut.  Right?

11        Okay.  What else do we know, folks?

12        We know that the only dispute was what time

13   Michael Cockerel left.

14        Remember we heard testimony ad nauseum, was he

15   pressured from the defense or pressured from the police?

16   The reality is it doesn't matter.

17        Tom DeCrascenza was called last Friday by the

18   defense as their witness, and he solidified the issue.

19   Because he testified on May 10th he received a telephone

20   call from John Restivo.  And John Restivo asked him, he

21   needed a radiator moved.  And he came by the next Tuesday

22   and moved it.

23        He had a five minute conversation in which he

24   told you he got on the telephone with Michael Cockerel,

25   right?

5789

1          So he leaves -- let's say he leaves at 8:11, he

2     leaves the house.

3          He tells you he takes the only car, the station

4     wagon, and John Restivo is there without a car in Wantagh.

5          What else do we know from the phone records that

6     are not in dispute?  Okay?

7          We know John Restivo called his uncle, I think

8     it was Mr. Caponi, right, a two minute phone conversation

9     at 9:15 p.m.  He is in Wantagh.

10         Now, listen.  Here is what the defense is asking

11    you to accept, okay?  And I want you to contemplate this

12    in the jury room.

13         At 9:15 John Restivo leaves Wantagh.  He has no

14    car.  He gets over to -- he hasn't spoken to Halstead or

15    Kogut all day.  Somehow he gets over to Doxey Place, cab,

16    run, walk, I don't care.

17         He gets there to a van on blocks, okay?

18         He drives around frantically looking for Kogut

19    and Halstead and gets them in the blue van.  And then they

20    cruise around and get in front of Hot Skates at 9:50.

21    Theresa Fusco gets in, they gang rape her, strangle her

22    and dump her body and John rides home.  So he is home at

23    10:20 p.m. so he can have -- I'm sorry, 10:26, I got my

24    time off.  He gets home at 10:26 so he can have a 20

25    minute phone conversation, right, with Joanne.

Summation/Grandinette

5790

1           Hey, honey, how are you?

2           I'm doing great.  Just gang raped and murdered a

3      girl.

4           I mean, it is utterly preposterous, it is

5      insulting.

6           MR. FREEMAN:  Except.  It is 11 minutes and --

7           THE COURT:  Please, don't comment on the

8      evidence.

9           Ladies and gentlemen, it is your recollection of

10     the evidence in this case.

11          Please continue, Mr. Grandinette.

12          MR. GRANDINETTE:  Ladies and gentlemen, I think

13     that you all can understand how preposterous that proposal

14     is, and it just absolutely, positively didn't happen.

15          You know what happens in the criminal cases,

16     procedural rules preclude evidence --

17          MR. FREEMAN:  Objection.

18          THE COURT:  Sustained.

19          Ladies and gentlemen, ignore that comment.

20          Discontinue that, Mr. Grandinette.

21          MR. GRANDINETTE:  I will.

22          Ladies and gentlemen, it is all in front of you

23     at the same trial.  And when you see it together, you can

24     see that there is no dispute how clear it is that they

25     were not together.

Summation/Grandinette

5791

1    If there is no doubt, let's hear from the

2  retired FBI agent, Frank Meyers, about the name, and let's

3  listen to what Frank says.

4    (Videotape is played.)

5    The uncontroverted testimony of Frank Meyers

6  says that on November 10th, the car was on blocks, a lot

7  of people testified that the van had a problem with the

8  brakes, Harry Smyle, John Restivo, Michael Cockerel, they

9  all said that the van needed a brake -- a brake job.

10    There is nothing to contradict this.  They

11  weren't together on November 10th and weren't in a blue

12  van.  The confession is false.

13    If we look at all three men's alibis, you don't

14  forget Dennis Halstead's alibi.  You heard from Jason

15  Halstead.  He was at his father's house, and he remembers

16  the night based on the football schedule, right?  And he

17  came in and testified he was with his dad, his girlfriend,

18  rummaging through mom's -- Dennis' mother's belongings

19  because she was -- okay?

20    Collectively they were 9.9 miles from the crime

21  scene, and they were -- none were together.  The

22  confession is complete and utter nonsense.

23    Ladies and gentlemen, did they fabricate all the

24  receipts?  Did they fabricate all the telephone records?

25  Is it possible that all these witnesses, Lampersona,

5792

1   Cockerel, Joanne Egington's phone records, John Restivo's

2   phone records, Lisa Price, Joe Dragatto, John Kogut,

3   Dennis Halstead, Jason Halstead, they are all wrong, all

4   of them?

5        MR. FREEMAN:  The Lampersonas didn't testify.

6        THE COURT:  Ladies and gentlemen, your

7   recollection of the evidence controls.

8        MR. GRANDINETTE:  Lampersona's name is on the

9   receipt.  Take it into the jury room with you.  He rented

10   the edger.

11        Folks, folks, they are lying.

12        Ladies and gentlemen, the confession should be

13   logical.  One would expect the confession would make

14   sense.  And this confession makes no sense.

15        If you break it down and really pay attention,

16   which I invite you to, let's think about it for a second.

17        Three guys hanging out, relaxing, drinking a

18   couple of beers, smoking a joint after work.

19        They pick up a girl presumably one of them

20   knows, and almost instantaneously beat her, put her down

21   to the gang, stripped her and gang raped her?  No one says

22   a word.

23        What in God's name are you doing?  What are you

24   insane, stop it.

25        Without saying a word they all just join in,

5793

1  from relax, chilling out after a hard day's work, don't we

2  all do that?

3         Yes, let's gang rape and murder a girl.

4         It is insane.

5         If you listen to it and really digest it, it is

6  physically impossible, John Kogut is on top of her holding

7  her.  John Kogut is six foot two, and he is holding her

8  down on top of her, right?  Dennis Halstead is over six

9  feet.  And he says, as he is ripping her clothes off and

10 her bra off, and he looks back and Dennis' penis is inside

11 Theresa.

12        He would have to be on top of John Kogut's back

13 humping Theresa.

14        I mean, it is ludicrous.  Plus she has jeans on

15 that are tapered at the ankles, with white high tops.  It

16 is going to take effort to get the pants down, get the

17 sneakers off.

18        You know, if we look at this and examine it, it

19 is a bunch of nonsense.

20        The other part of his confession that is

21 absolutely crazy, which according to the confession they

22 pick her up at the stop sign.  And by the time they get

23 in -- here is the stop sign.

24        But by the time they get her to the cemetery,

25 they have this rope around her and they rape her.

Summation/Grandinette

5794

1          Does that make sense to anybody here?

2          Why in God's name do you rape a girl that you

3     know, right?  To ensure that you get caught?

4          And we heard testimony from three women who knew

5     Theresa well, and they all said Theresa didn't know these

6     guys.  But that was the excuse that Volpe put into the

7     confession to give credibility that she would have gotten

8     into the van, otherwise she wouldn't have gotten in the

9     van with three male strangers.

10          And why would you dump a body in a location that

11     you know people hang out and the cops are watching?

12          Folks, Volpe wrote this statement, which is a

13     powerful tool, and despite the fact that he claimed he

14     didn't -- he wasn't responsible for the content, nonsense.

15          Why didn't he hand John a pen and say, son,

16     write down what you did.  Don't worry about the spelling.

17          What did he do?  He wrote it.

18          Remember this question and this answer in the

19     deposition:

20          Question:  So, according to you, John Kogut, who

21     was in the back of the van drinking beer, smoking pot --

22     excuse me, that is my time for -- for drinking beer,

23     smoking pot, remembers that they made a turn, a left-hand

24     turn at a specific intersection, and it just so happens to

25     be directly across the street from Hot Skates.

Summation/Grandinette

5795

1          Did he know he was on Merrick Road?

2          No.  He said he made a left-hand turn and he

3     saw, you know, he saw the cemetery and saw Hot Skates.

4     But as far as Merrick Road, I don't recall him knowing

5     that was Merrick Road.

6          So Volpe puts in Merrick Road, Volpe put in the

7     word palace, and he put in the word McDonald's.  It is an

8     awesome tool when you are the author.

9          That was Volpe's craft, how he leaves all the

10    facts he knew into that confession, so when you read it,

11    this guy knew it all.  He was involved.  He did it.

12         Ladies and gentlemen, I want to review some of

13    the finer details in that confession that Volpe put in

14    that he knew, right?  He knew every single fact from the

15    investigation contained in that confession.

16         Theresa Fusco left Hot Skates 9:49.  There is

17    the time card.  It was between 8:00 and 10:00 p.m.

18         He said, or believed, John Restivo, Dennis

19    Halstead, the primary targets, they both worked for Move

20    Right.

21         I was with these two guys, one was John Restivo

22    who I worked for and the other Dennis Halstead, a guy from

23    Lynbrook I know, he also worked for Restivo back in

24    November of 1984.

25         He knew that John owned a blue Ford step van.  I

Summation/Grandinette

5796

1    was with John and Dennis in that van.  It is a blue Ford

2    step van with a side door that opens, this door is located

3    back from the right front passenger door.

4            Statement from Joanne Lenahan, he knows that

5    Joanne denied -- Theresa denied the offer to go to

6    McDonald's, yet the police theorized she changed her mind.

7            Lo and behold, how John Kogut uses the word,

8    according to them, McDonald's -- I'm sorry, it is not

9    there.

10           There it is, okay.

11           There is a girl working on Merrick Road by the

12   cemetery and heading towards McDonald's.

13           Not heading west or toward the city, but heading

14   toward McDonald's.  He was not by accident.

15           The age, the physical description provided by

16   Connie Napoli, Lisa Kaplan, duplicate clothing, right?

17   They had the jacket, they had jewelry, and look at what

18   her statement is, John's statement is.

19           Drunk and high at night, doesn't know this girl.

20   And in a dark violent setting five and a half months later

21   he draws a picture that is perfect.

22           I then opened the side door and I see this girl,

23   she was 15 or 16 years old, dark hair, medium long, she

24   had on a blue denim dungaree jacket, I think a dark top.

25   Remember no one could recall the color of the top, so John

5797

1    couldn't either, how convenient, right?

2           Dark pants and high-top sneakers.

3           What else?  TF was fired from Hot Skates.

4           Couldn't recall the content of the conversation

5    between Theresa Fusco and the person who allegedly knew

6    her.  But he did remember, forget about getting fired.

7           The autopsy report, how unbelievable is it that

8    John Kogut was able to corroborate independently five and

9    a half months later the medical evidence?

10          I would like to say that I hit her with a left

11   and a right before she fell from Dennis' grip.

12          The ME testified she had bruising under her left

13   and right eyes.

14          Of course, the murder weapon, Volpe was told it

15   was a hard nylon type rope wrapped double around her neck.

16          I took the rope, which is a hard nylon type and

17   I wrapped it double around the neck.

18          Unless you are a merchant marine, ladies and

19   gentlemen, or a mountain climber, I never heard anybody

20   talk about the type of rope in your hand, especially when

21   you are talking about a murder.

22          Is he kidding me?

23          You see, this was Joe Volpe's first big case and

24   he wanted to seal the deal.  He went overboard, and that

25   is how he got caught.

Summation/Grandinette

5798

1          Jewelry and pocketbook.

2          They know exactly the type of jewelry Theresa

3   Fusco was wearing that night.  They had Lisa Kaplan's half

4   heart necklace.

5          Here it is, I remember seeing a gold colored

6   chain with what looked like a double heart on it with a

7   piece broken off.

8          One of my personal favorites is that John

9   Kogut --

10         MR. FREEMAN:  Objection to his personal

11  favorites.

12         THE COURT:  Yes.

13         MR. GRANDINETTE:  Ladies and gentlemen, John

14  Kogut, in the confession it says that they knew they found

15  her without any jewelry or the clothing on her.

16         Of course, it says Dennis was taking the rest of

17  her jewelry and rings off.

18         Her pocketbook.  Her pocketbook, and put it in

19  the bag.

20         Her pocketbook was maroon or black with a strap.

21         Here is a guy drunk and high, engaged in a

22  violent setting, dark at night, and recalls all this?

23  What are you, kidding me?  John Kogut talking about maroon

24  bags with a strap?

25         It is ludicrous.

Summation/Grandinette

5799

1        There it is for you, take it back into the jury

2   room.  A detailed list, which is Exhibit 59-A, it gives

3   all the detailed account of the jewelry, the clothing.

4        And the pocketbook that Volpe and Dempsey had in

5   the file when they did the interrogation.

6        Body found, naked, no clothing on.  The same

7   thing.

8        According to John's confession, they disrobe

9   her, take the clothing and jewelry off and put it in a bag

10  and they are going to throw it away, comporting with the

11  physical evidence at the crime scene.

12       The cemetery played a key role.

13       By this time we were already in the cemetery.

14       Crime scene photos, body recovered naked.  The

15  same thing.

16       Recovery of jewelry at the crime scene.  What is

17  John Kogut allegedly telling Volpe?  I threw the jewelry I

18  had by the tracks.

19       Blanket with a different color border on it.

20  One of the crime scene photos displays a photo with a

21  different colored border.

22       Volpe could have framed him by saying it is a

23  moving van which is normally -- the moving blankets are

24  quilted with different colored borders, and Volpe knew

25  that.  And he knew that they utilized that van.

**Summation/Grandinette**

5800

1          How about the crime scene tour by Frank

2    Sirianni?  Remember these questions just last Thursday and

3    these answers?

4          John Kogut provided them absolutely no new

5    information, none, in the confession on the tour.

6          Question:  Okay.

7          Would it be fair to say that information you

8    knew was contained in that written confession?

9          Answer:  Yeah, I would say so.

10          Question:  So after you read that, John Kogut

11    provided you absolutely no new facts about this case?

12          Answer:  Nothing that I can recall.

13          Question:  And that holds true with his tour

14    that he took you on?  He didn't provide you with any new

15    facts that you didn't know or theorize?

16          Answer:  No.

17          So in essence the police learned nothing knew

18    from John Kogut new, right.

19          Not to my knowledge.

20          Now, the defense would have you -- would suggest

21    we provided all sorts of information they didn't know.

22    They were in a van, in a moving job.

23          We proved to you that those are false facts,

24    none of it were true.  They weren't together, they weren't

25    in a van.  They weren't doing a moving job that day.

Summation/Grandinette

5801

1          John Kogut provided them with nothing new.

2          Ladies and gentlemen, how about this one:  When

3     you think about the issue of credibility, you are working

4     with your colleagues for five and a half months dedicated

5     on solving a murder.  You are 25 feet away from the

6     interrogation room, you are working with three guys for a

7     substantial period of time.  You are sitting on a wire

8     twiddling your thumbs because nothing is going on.

9          Not one guy walked in the room and said, Frank,

10    give me a high five, the case is solved.

11          Ladies and gentlemen, just every aspect of this

12    case screams out fabrication.  Because it is inconsistent

13    with our life experiences.

14          You know, as far as Frank Sirianni goes, he

15    testified when Mr. Casteleiro was questioning him, in 26

16    or 27 years he never testified once, testifying three

17    times that John Kogut pointed down to the ground when he

18    brought him to the cemetery, ever.

19          And, you know, Frank Gueraro, the cemetery guy,

20    I don't know I have to mention much about his credibility,

21    the guy is in shackles and being a little dramatic.

22          Ladies and gentlemen, Frank Sirianni said that

23    the van pulled in this way.  Mr. Gueraro said the car --

24    that they drove in this way that day with John off of

25    Merrick.

Summation/Grandinette

5802

1    Gueraro says they drove in this way off of

2    Merrick, off of Ocean, excuse me.

3         Folks, we have proof by a preponderance of the

4    evidence that this confession is false, it is fabricated,

5    it is coerced.  Not just because of the DNA evidence, but

6    also based upon the fact that the consensual sex has been

7    disproven as admitted here by the reinvestigators, and

8    also based upon the independent medical evidence that

9    Theresa Fusco was strangled from behind and had bruising

10   and injury to her knees and shins.

11        There is overwhelming evidence, credible

12   evidence, that she walked southbound down Rockland Avenue.

13   There is overwhelming evidence that there was one crime

14   scene and not three crime scenes.  There is overwhelming

15   evidence that there were three alibis placing these men in

16   three separate locations and not together.

17        The weight of the evidence establishes that the

18   interrogation as depicted by the police is inconsistent

19   with common sense, and not credible.  But there is not one

20   note in a ten and a half hour indication.  There are just

21   three or four questions over the course of the

22   interrogation; that it was written by Volpe, controlled by

23   Volpe, and the facts contained therein otherwise known by

24   Volpe are false.

25        No facts in that confession were not known to

**Summation/Grandinette**

5803

1     the police.

2            And, ladies and gentlemen, we know, we know that

3     John Kogut was acquitted, right?

4            And in the words of Judge Ort, I believe that

5     the scientific evidence in this case proves that too many

6     material facts set forth in the defendant's confession are

7     clearly not truthful.  And that is what we are searching

8     for.  The Court will not accept the confession and

9     accordingly finds the defendant not guilty of murder in

10    the second degree under count one.

11           THE COURT:  Mr. Grandinette, your time is up.

12           MR. GRANDINETTE:  Yes.  I'm done.

13           Ladies and gentlemen, in the time of

14    Thanksgiving, there could be no greater thanks than John

15    Kogut could bestow upon you that finally --

16           MR. FREEMAN:  Judge.

17           THE COURT:  Ladies and gentlemen, the result of

18    this determination of the facts is intended not to please

19    or displease any of the parties.  Please move on.

20           MR. GRANDINETTE:  I will.

21           Folks, it is time through your verdict that we

22    recognize the truth of what happened.  And as much as we

23    can sympathize with the Fusco family, John Kogut was a

24    victim for a long time.

25           And I would like to thank you so much for your

Summation/Grandinette

5804

1    time and attention to this case.

2            THE COURT:  Thank you.

3            We will take a five minute break, folks, and see

4    you back then.

5            Don't talk about the case.

6            (Whereupon, at this time the jury leaves the

7    courtroom.)

8

9            (Whereupon, a recess was taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation/Scheck

5805

1

2          (Whereupon, the jury at this time entered the

3    courtroom.)

4          THE COURT:  Please be seated.

5          Ladies and gentlemen, Mr. Scheck will give his

6    summation with respect to plaintiffs Restivo and Halstead.

7          As I advised you repeatedly throughout this

8    trial, what the attorneys say is not the evidence.  It is

9    the attorneys' commenting on the facts.  And that is a --

10   if it is a fact you determine has not occurred after

11   reviewing the evidence, of course you will disregard it.

12         In addition, what the attorneys say about the

13   law is not necessarily the law that I will give you.

14         If you would, Mr. Scheck.

15         MR. SCHECK:  Thank you very much, your Honor.

16         THE COURT:  You bet.

17         MR. SCHECK:  Truth crushed to earth will rise

18   again, no lie can live forever, the arc of the universe is

19   long but it bends toward justice.

20         For the people sitting on the plaintiff's side

21   of the room, this has been a very long journey, seeking

22   justice.

23         They were waiting a long time to plead this

24   case, to present this evidence to you, a jury representing

25   the conscience of the community.  A jury that has promised

Summation/Scheck

5806

1    to judge this case without fear or favor on the facts,

2    without bias.  A jury that has literally braved the worst

3    national disaster this area has endured in a century.

4              We are deeply, deeply thankful for your

5    attention, for your patience, and for your perseverance.

6              We have three claims in this case.  A fair trial

7    claim, a malicious prosecution claim, and a supervisory

8    liability claim.

9              The fair trial claim turns on three kinds of

10   evidence.

11             Suppressed Brady material, which is the French

12   car, stripe jeans, rope.

13             Also fabrication, planting hairs, autopsy hairs

14   into the Q hairs taken from the van in unsealed envelopes.

15             Or, three, creating false witness statements by

16   coercion.

17             To win the fair trial claim, we only have to

18   prove by a preponderance evidence, more likely than not,

19   more likely right than wrong, just tipping the scale

20   slightly in the plaintiffs' favor, any one of those three.

21             And certainly together you will find there is

22   overwhelming proof that the rights to these plaintiffs for

23   a fair trial in 1986 was violated.

24             Here is something else to keep in mind when you

25   look at the jury sheet and hear the charge from the Judge

Summation/Scheck

5807

1   on the law about the fair trial claim, that issues about

2   probable cause and malice are not involved in the fair

3   trial claim.  But the second claim is what is known as

4   malicious prosecution.

5             The Judge will instruct you on the law.  But

6   when you look at malicious prosecution, you will learn

7   that once somebody is indicted, there is a presumption of

8   probable cause.

9             So the issue in this case is that the

10  plaintiffs -- again, more probable than not, more likely

11  right than wrong -- have to rebut the presumption of

12  probable cause.

13            And the ways we can rebut the presumption of

14  probable cause is by showing that the police did not make

15  a complete statement of the facts, or they suppressed

16  Brady material, or they misrepresented or falsified

17  evidence, planted hairs and coerced witness statements, or

18  otherwise acted in bad faith when presenting evidence to

19  the grand jury or district attorney, or they deviated so

20  egregiously from acceptable police practices so as to

21  demonstrate a reckless disregard for proper police

22  procedures.

23            I think you can see that the same facts that we

24  use to prove the fair trial claim, suppressed Brady

25  material, planted hairs, coerced false statements from

Summation/Scheck

5808

1   witnesses, that contains malicious prosecution too,

2   doesn't it.

3            As the required malice is concerned, malice is

4   just ill will or reckless disregard for rights.

5            If you are planting hair and coercing false

6   witness statements, and intentionally hiding exculpatory

7   evidence from the prosecutor, from the defense, from the

8   Court and from the jury, that is reckless disregard of

9   peoples' rights, ill will.

10           So the same facts here prove both the malicious

11  prosecution and the fair trial claim.

12           Let's go again to the DNA.

13           This case was over with the first witness, the

14  most important witness in the case.

15           DNA is powerful proof if you think about it

16  logically, that all of plaintiffs' claims of misconduct

17  are more probable than not.

18           If the defendants cannot explain the DNA -- and

19  I dare them to when they get up here tomorrow, dare them,

20  okay?  Then as a matter of simple logic, the plaintiffs

21  are innocent, they didn't rape or murder anybody.  And

22  what they have been saying for years about police

23  misconduct is more likely right than wrong.

24           Given the DNA, Theresa Fusco is not in the blue

25  van.  So it is more likely than not that hairs with

Summation/Scheck

5809

1    postmortem root banding were not in that van and were

2    placed from the autopsy envelopes, the K envelopes, into

3    the Q.

4            Given the DNA, isn't it more likely than not, as

5    Mr. Grandinette presented to you today, that the Kogut

6    confession is false and coerced?

7            Given the DNA, isn't it more likely than not

8    that Dempsey and Volpe are lying about the interrogation

9    of John Restivo on March 5th and 6th of 1985?

10           Given the DNA, isn't it more likely than not

11   that Michael Cockerel, Harry Smyle, Kenny Cockerel, were

12   coerced into falsely saying that John Restivo and Dennis

13   Halstead made admissions of a kind to them?

14           Given the DNA, isn't it more likely than not

15   that John Restivo was in Wantagh without a car, on the

16   phone with Joanne at 10:26 p.m. on November 10, arguing

17   about the cooking of the Cornish game hens and not with

18   Dennis Halstead, John Kogut in a blue van, abducting and

19   raping and murdering Theresa Fusco?

20           Given the DNA, isn't it more likely than not

21   that Jason Halstead's testimony that he gave here, and at

22   the 1986 trial, that on November 11th he remembers that

23   football game because it was raining out, because his

24   father's car broke down, and that the night before,

25   November 10th, he was with his dad and with his brother

Summation/Scheck

5810

1    going through the belongings from his grandmother?  Isn't

2    that more likely right than wrong?  Something that Jason

3    was able to remind his father who got mixed up about the

4    dates, and his father's lawyer just before the trial,

5    because that is something a teenager is going to remember

6    about a football game where the car broke down and it got

7    rained out?  He had reason to remember months later.

8              This is as Charlotte Word told you, the DNA

9    profile found in the semen in Theresa Fusco is the person

10   who committed the crime.  He may still be out there.

11             Now, as Dr. Ward told you, DNA profiles like

12   this did not start getting inputted into the DNA data bank

13   until the mid-2000s.  That is 21 years after this crime

14   was committed.  And that is just convicted felons at this

15   point being put into the DNA data bank.

16             So it may well be that the person who committed

17   this crime is dead, right?  In those 21 years?  Or the

18   person who committed this crime, well, maybe in a sense

19   will get lucky, because the person will go out and there

20   will be other crimes and there will be a DNA hit to

21   identify him?

22             But maybe worse, maybe worse, this person is out

23   there and committed another crime and just has never been

24   apprehended.

25             Now, take a look at this DNA chronology.

Summation/Scheck

5811

1    As Dr. Ward told you -- and you know, these

2   defendants from the beginning wanted the DNA tests before

3   the technology was even sophisticated enough to help.

4    But in 1994 and 1995, there were reliable tests

5   by CBR and Sunmark (ph) that excluded all three.  Their

6   convictions should have been vacated a long time ago.

7    But the police, and remember Volpe was still the

8   supporting detective that the police put in charge of this

9   investigation in 1994, they could not admit that these bad

10  guys were innocent.

11   Because this is not a case, as I discussed with

12  you in the opening, this is not a case of a police officer

13  who made an honest mistake and meant well.  He did his job

14  by the book and played by the rules.

15   No, if the police defendants admitted in 1994

16  and 2002, in 2005, to this very day, that the DNA is

17  right, that these plaintiffs are innocent, then it is

18  clear that all their claims of misconduct over all these

19  years are true and that Volpe and the police defendants in

20  this case betrayed the public trust, they betrayed the

21  victim's family, and they betrayed their fellow officers.

22  And they are not going to admit that.

23   So they had continued to fight this to the very

24  bitter end, doubling down on denial, continuing to cover

25  up, no matter how illogical or how desperate the arguments

Summation/Scheck

5812

1    become.

2         Now Charlotte Word told you the first step, and

3    Mr. Grandinette mentioned it, basic DNA.

4         What were the defendants going to have to say

5    when they get up to describe the DNA.

6         I will not bother with the fourth perpetrator

7    theory, that was insane.

8         What they will probably try to say, there was a

9    consensual partner and then these guys jumped her and

10   raped her.

11        The first is that there is a consensual partner,

12   the semen donor is a consensual partner that no one ever

13   found.  And then they raped her and ejaculated -- you will

14   see two or three more DNA profiles consistent with these

15   guys.

16        So the only theory that the defendant will try

17   to argue with you tomorrow, I would suspect, that there

18   was a consensual partner, and then Halstead and Restivo

19   either both wore condoms or they both did not ejaculate.

20   That was the only theory that they can present to you.

21        Now, we are here talking about what is more

22   rightly right than wrong, what is more probable than not.

23        To start with, the consensual partner and two

24   guys not ejaculating theory is highly improbable given

25   what Mr. Grandinette reviewed with you this morning.  And

Summation/Scheck

5813

1    that is that Theresa Fusco's day, when did she have the

2    consensual partner during all this period of time?

3            That is just improbable on the face of it given

4    her activities that day.

5            What is also inconsistent, and I hope you caught

6    this, it was a long time ago, she was the first witness.

7    But Charlotte Word also told you that the physical

8    evidence shows that it is inconsistent with this highly

9    improbable scenario that I predict they will try to sell

10   you tomorrow.

11           Here is why.

12           Dr. Word is one of the most prominent DNA

13   experts in the United States and in the world.  You can

14   tell that from her VC and her credentials.  But most

15   importantly since 1989 when this technology began, and she

16   has been doing nothing but rape and rape homicide cases.

17           As she told you, she had some contracts with the

18   City of New York, with Nassau County, all across the

19   world, where they would be looking at these rape and rape

20   homicide cases, the ones which were backlogged.

21           She has seen a lot of them, right?  She has

22   enormous experience about what you see.  And as

23   Mr. Grandinette mentioned, she is usually a prosecution

24   witness.

25           And they didn't bring anybody in to refute

Summation/Scheck

5814

1    anything she had to say because they can't.

2           And then she told you, what is the physical

3    evidence?

4           She said the concentration of the semen here is

5    inconsistent with the defense theory.

6           And what we know from the semen in this case is

7    that it is likely that it is within 12 hours of her death

8    it was deposited.  But she said very much on the recent

9    deposit side because, number one, there were a large

10   number of sperm that you can see on the slide, the swabs,

11   right, they take a look at the swab under the microscope

12   and see a lot of sperm.

13          In addition to that, those sperm had tails, and

14   when you see a lot of sperm and see sperm with tails, that

15   means that there is a high concentration.

16          Here is something else, a clean differential

17   extraction.  I should have brought the laser pointer with

18   me, I have it here.  Just take a look.

19          What Dr. Word explained to you, when you do a

20   DNA test, and this is a DNA test here, there is something

21   known as a differential extraction.

22          You see at the screen at the top, you pull that,

23   it says vaginal swab NSF.  It means non-sperm fraction.

24          Vaginal swab SF means sperm fraction, the sperm

25   fraction is DNA from Theresa Fusco.  They get the swab and

Summation/Scheck

5815

1   they do what is called a license or differential

2   extraction.  The sperm goes into one fraction, all the

3   sperm from the perpetrator, and then the non-sperm, which

4   is going to be skin cells, ordinarily from the victim,

5   that goes into the other fraction.

6          When you look at the non-sperm fraction, each of

7   the different DNA markers, do you see, and take the first

8   one, that is 15, 16, that is Theresa Fusco's DNA from her

9   skin cells.

10          The sperm fraction that just has a skin, that is

11   the DNA fraction from the sperm donor.  You are with me?

12          Ordinarily, what Dr. Word testified to, in a

13   case like this where the body has been around for a long

14   time, or just an ordinary sexual assault case, if it is

15   not a highly concentrated sample, right, if even it is

16   somebody that was raped earlier, 12 hours earlier, and

17   there was a consensual partner then and then there is a

18   rape, you are going to see carry-over of the victim's DNA

19   from the non-sperm fraction to the sperm fraction.  You

20   might see a faint 15 on the swab, or somewhere on the low

21   side as it goes on.

22          Based on the number of sperm on the microscope,

23   the tails on the sperm and the clean differential

24   extraction, Dr. Word said in her opinion that it is

25   unlikely that you can have a situation where there was a

Summation/Scheck

5816

1    consensual partner within 12 hours, and then two guys rape

2    her, either wearing condoms or not ejaculating, that is

3    inconsistent with the concentration of the semen.

4            She said the physical act of two subsequent

5    sexual intercourse would contribute to a significant loss

6    of those sperm.  The sperm would stick to the condom and

7    would be removed with the condom.  The sperm in the

8    vaginal cavity would likely be diluted and some removed

9    from the condom, just the physical act of the sexual

10   intercourse, I would think, would dilute the sample out

11   and would contribute to the recovery of a small, far

12   smaller number of sperm.

13           It is common sense, if she had a sexual partner

14   earlier in the day, she moves around and it would begin to

15   discharge.

16           That is the opinion based on thousands of rape

17   and rape murder cases that Dr. Word had done from 1989

18   going forward.  There is nothing to dispute that.

19           So just the physical evidence makes it more

20   likely than not that the highly probable suggestion that

21   there was a consensual partner and a rape by two guys who

22   didn't ejaculate or wear condoms, and it doesn't add up.

23   And that is more likely than not based on physical

24   evidence.

25           Let them get up tomorrow and explain to you the

5817

1    DNA.

2              They can't.

3              Now, lets move to the French car, striped jeans,

4    rope lead, the Brady violation.

5              Now, in order to make out our case, more likely

6    than not, more likely right than wrong, we have to prove,

7    A, it is favorable evidence.  And nobody is really

8    disputing that, I don't think.

9              Two, that it was deliberately withheld.

10             And, three, that it is material.

11             Now, by the term "material," we are talking here

12   about a, quote, reasonable chance it would have affected

13   the outcome of the trial.  Okay?

14             Now, when you think about that, what does it

15   mean, a reasonable chance that it would have affected the

16   outcome of the trial?

17             That doesn't mean if the jury had known about

18   the French, striped jeans, rope lead, they definitely

19   without question would have acquitted.  That is not what

20   it means.  It is a reasonable chance of a different

21   outcome.

22             It doesn't even mean it would have to be an

23   acquittal.  It could mean simply that one juror would have

24   a reasonable doubt that would prevent a conviction.  That

25   would be a reasonable chance that the outcome would be

Summation/Scheck

5818

1    changed.

2            Now -- or a reasonable probability of a

3    different outcome.

4            Frankly, when you look at the French car,

5    striped jeans, rope lead, this is not even a close call as

6    to whether or not it was material.

7            It is a huge reasonable doubt.  If you are the

8    jury and hearing about this car, and if that is the car

9    involved in this incident, and you have a reasonable doubt

10   about that, it is not the blue van and it can't be these

11   guys.

12           Also, by the way, when you are thinking about

13   the 1986 Restivo/Halstead trial, and as you saw from the

14   Fred Klein dismissal statement, the Kogut confession was

15   not presented to that jury.  They had like ambiguous

16   statements, oh, maybe we will find her in the cemetery

17   from Harry Smyle.  They had Michael Cockerel changing the

18   time that he left.  I mean, it is a very, very thin case.

19   Dennis Halstead saying I want to prove my innocence, were

20   you with these guys?  Yeah.

21           They will play that tape probably.

22           There is very little to this case to start with

23   except, arguably, for the hair in the car.

24           But the point here is that if it is the

25   French -- just think about how this French car lead would

**Summation/Scheck**

5819

1  have made a difference.  And let's turn to what it was.

2  And let's just keep the chronology in mind.

3           We know that this car, right, was stolen between

4  9:30 and 11:05 about a mile away, right, from where

5  Theresa Fusco left Hot Skates at about 9:45.  So the time

6  is the same.

7           Interestingly, before the car was stolen, the

8  plates were switched with another car.  Remember that?

9           And Fischer told you and Detective O'Leary

10  omitted, the cops omitted --

11           MR. FREEMAN:  Objection.

12           MR. SCHECK:  That -- the plates -- no evidence

13  when the plates were switched?

14           The man drove his car, parked it there, okay?

15  And then he gets out and sees that his car is stolen.  And

16  when his car is stolen, they see the license plates are

17  not his plates, they were switched.

18           Yes, maybe they switched the plates before he

19  drove to the home and went to the party.

20           Look, what the cops told you and what is

21  absolutely clear --

22           MR. FREEMAN:  I can't accept that.  He said

23  before --

24           THE COURT:  Come up here now.  Now.  Now.

25           Excuse us.

Summation/Scheck

5820

1                    (Continued on next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation/Scheck

5821

1          (Whereupon, at this time the following took

2     place at the sidebar.)

3          THE COURT:  In terms of the testimony of the

4     officers and Mr. French with regard to the car, the date

5     it was taken and the date it was recovered and the

6     switching of the plates, I do not know why we are here at

7     the sidebar.

8          What is your objection?

9          MR. FREEMAN:  He said before the car was stolen

10    the plates were switched.

11         MR. SCHECK:  What is the difference?

12         MR. FREEMAN:  He made a mistake.

13         THE COURT:  You are saying before the car was

14    stolen the plates were switched.

15         MR. SCHECK:  Sorry?

16         THE COURT:  You are saying before the car was

17    stolen the plates were switched.

18         MR. SCHECK:  I'm saying simultaneous to the car

19    being stolen the plates were switched.  That is obviously

20    what I said.

21         That was a ridiculous objection.

22         MR. GINSBERG:  Stop with the ridiculous

23    objection.

24         THE COURT:  I will dismiss the jury and we can

25    start all over again.

Summation/Scheck

5822

1          MR. GINSBERG:  He said before the car was stolen

2     the plates were switched.  And he objected.

3          THE COURT:  You can answer that in your

4     summation.

5          Let's move on.

6          (Continued on next page.)

Summation/Scheck

5823

1    (Whereupon, at this time the following takes

2    place in open court.)

3    MR. SCHECK:  Let's be clear if there is any

4    ambiguity in your mind as to what I'm saying, the man

5    drives to the party and parks his car around 9:50; when

6    his car was recovered, the plates were switched.

7    My point is O'Leary admitted and that Fischer

8    told you that when a car thief steals a car and switches

9    plates, right.

10    The time of the theft or just before the theft,

11    that is done ordinarily by people who are intending to use

12    the car in another crime.

13    It is inconsistent with a jury finding.  That is

14    what O'Leary admitted.  What Fischer told you, and that is

15    what cops know, and it is common sense.

16    Now, most important of all, still around the

17    time she goes missing, right, about a mile away, what is

18    in the car, blue striped jeans.

19    It is in the front seat and turned inside out.

20    Now, Fred Klein, the prosecutor, said, if those

21    were Theresa Fusco's jeans, to say that this was a big

22    deal would be an understand -- understatement, an

23    understatement.  A bigger than a big deal.

24    Look, the bottom line is that we know that when

25    on November 18th John and Lori French found the car in the

5824

1   parking lot and then took it to the Lynbrook Police

2   Department, or went to the Lynbrook Police Department and

3   said we got the car back and then cleaned it up, he gave

4   the police something in November.  Here is my car, and

5   there is lady's blue striped jeans turned inside out in

6   the back seat.  He gave it to them.  Gave it to them.

7          The Lynbrook cops, not realizing the connection

8   to this case, threw them away.

9          But in a criminal trial in 1986, a jury could

10  not rule out the possibility that those jeans that were

11  thrown away were Theresa Fusco's jeans?  Just imagine that

12  you are sitting there, and many of you have been jurors in

13  criminal cases, and you find out that the car was stolen

14  at or around the time she went missing, and there were

15  these jeans in the back seat and they were thrown away,

16  well, it is a big deal, isn't it?  You can't rule out the

17  possibility it is Theresa Fusco's jeans.  And that alone

18  is a big reasonable doubt in a case of this kind.

19          And also, in that car there is a hard nylon rope

20  identified by John French as the rope missing from his

21  car.

22          Remember, the medical examiner in this case told

23  Detective Volpe right away that a hard nylon rope is a

24  probable ligature instrument used to kill Theresa Fusco.

25          So, you know, they can't really argue that it

Summation/Scheck

5825

1   wouldn't have been material or made a difference to the

2   jury because Volpe didn't personally throw away the jeans.

3   It was the Lynbrook police.

4            That is true.  But the jury has a right to know

5   about it.  The prosecutor has to be made aware of this

6   car, when and how it was stolen.  That the jeans were

7   there.  That is what the law requires.  That is what the

8   Constitution requires.  That is what the fair trial

9   requires.  They didn't get one.

10           Now, it wasn't Joe Volpe's call to make about

11  whether this was favorable or material evidence.  That is

12  something he should have disclosed to the prosecutor and

13  the defense attorney should have known about it, and the

14  Court and the jury.

15           Now, let's talk about the jeans for a second.

16           Exhibit 161, the key exculpatory document, John

17  French himself realized when the body was found in

18  December, on December 6th, that his car was probably

19  involved in the Theresa Fusco homicide.  He immediately

20  saw the relevance of it because when it was stolen and

21  where it was stolen close by, and the existence of the

22  jeans in the car.

23           So he immediately called the police.  And this

24  document, 161, is the contemporaneous statement where he

25  talks about how he found it on Woodfield Road near the

Summation/Scheck

5826

1    railroad tracks on November 18th, and his sister Lori

2    found a pair of lady's blue jeans with stripes, inside

3    out, and found on the right rear floorboard halfway under

4    the right passenger seat.

5            That is the one contemporaneous statement that

6    we have as to where the jeans were.

7            Now that, of course, is consistent here.

8            At the trial we had the teletype alarm, 59-A,

9    the document Mr. Grand was talking about the description

10   of what she was wearing when she left.  There the

11   description is dark and light blue jeans tapered, and it

12   is consistent with a lady's striped blue jeans found in

13   the car.

14           Lori Gabberty French, all these years later,

15   told you I don't have a clear memory, I don't recall what

16   the jeans looked like.  But she said they were jeans,

17   denim in color, with stripes, and a tapered leg.

18           And that they were the kind of thing that a 16

19   year old would have worn.

20           The fact that the jeans were found inside out in

21   the back seat, that is very significant, too, because in a

22   hurried rape assault when you are taking off jeans, they

23   are obviously going to get turned inside out.

24           Now, to say something about the jeans, that the

25   Lynbrook police threw them away, the jury should have

Summation/Scheck

5827

1    known about it.

2          But what about the rope?  John French was

3    interviewed and said that there was a rope missing from

4    his car, a rope he had used to tie down mattresses and

5    things of that nature.

6          Now, let's again be clear about the chronology.

7    He calls in on December 6th and gives the statement, 161,

8    that he talks about.

9          He says that the rope is missing.

10         On November 7th Joe Volpe goes back to the

11   parking lot in Woodfield where the car was found and he

12   finds a rope.  This is the rope, right, this is the rope.

13         It appears from the picture to be a hard nylon

14   rope consistent with the ligature.

15         Take a look at the photograph.

16         This is the photo log, Woodfield Road, parking

17   lot, investigating officer, Joe Volpe, and the rope

18   displayed by IO, investigating officer, that is Joe Volpe.

19         Note, IO at the scene.  Volpe is at the scene,

20   and directed that the photos be taken.

21         Now, also, the same document, the photo log.

22         Do you remember Detective Caputo came here at

23   the end and described how the notations are made.

24         At the bottom of the photo log there is a thing,

25   evidence recovered at location, type of examination,

**Summation/Scheck**

5828

1    turned over, time and date.

2          What Caputo told you is that you see on some of

3    the photo logs, when a particular item of evidence is

4    seized and the crime scene technician, the one taking the

5    picture, is put in charge, that is all filled out by the

6    crime scene technician.  If it is not filled out, it means

7    somebody else took custody of it, did something with it,

8    and as Caputo told you.

9          Question:  First of all, the officer in charge,

10   the homicide officer in charge of the investigation,

11   doesn't he or she have some responsibility to make sure

12   that when a picture is taken, and then an important piece

13   of evidence at the crime scene is identified, right, that

14   there is some kind of paper trail and chain of custody as

15   to what happens to it?

16         Answer:  Yes, there should be.

17         Well, who is that person?  Joe Volpe, right?  He

18   signed the rope, knew it was significant, and had a

19   picture taken from it.

20         It is clear from this next exhibit, 163, a

21   statement from Sirianni, the same date, November 7th --

22   December 7th, Sirianni took the rope found in the parking

23   lot, showed it to John French.  And said, okay.  French

24   said, yes, he positively identified the rope as being

25   this.

Summation/Scheck

5829

1      Now, of course, at the examination at this trial

2  John French said, yes, obviously now looking at the

3  picture, I don't remember if that is the rope or not.

4  But, yes, he acknowledges that he remembers identifying

5  the rope through Sirianni, and, you know, that is the

6  rope.

7      If there is any doubt about this, that that

8  picture of the rope in the parking lot that Volpe directed

9  be taken, and then Sirianni showing it to French who

10 identifies it at the time, and if there is any doubt about

11 it, why not listen to what Detective Sirianni says.

12      (Video is played.)

13      So no doubt about it, the defense made it up and

14 tried to make it up here and say there is another rope.

15      But the chain of evidence from the documentation

16 is very clear.  It is a fair inference that that rope that

17 he took a picture of in the parking lot where the car was

18 found was the missing rope that he positively identified.

19      What happened to the rope?  A pretty good

20 question.

21      The last thing that we can find is that there

22 is, on December 9th, in Volpe's memo book, things to do.

23 And he says take rope out and ask questions.

24      That is it, because there is a stipulation.

25      I mean, we wanted to know at the beginning of

Summation/Scheck

5830

1   this trial, on or about September 17th -- 2012, when we

2   started the evidence here, a request was made of the

3   plaintiffs, where was the rope?

4           Detective Hillman, who works for them, searched

5   for the rope, right, and could not find either the rope

6   nor any document reflected in what happened to the rope.

7   And that is Volpe's responsibility.  Because there were

8   plenty of things taken in and brought over to the

9   Scientific Investigations Bureau.  And there has got to be

10  a chain of custody and some documents.  It is Volpe's

11  responsibility to tell you what happened to the rope.

12          Not just you.  The most important thing is the

13  jury in 1986.  Because we are talking about materiality

14  here, right?

15          New, let's say that the French lead had been

16  disclosed, because it is obviously favorable evidence, and

17  it is obviously something that should have been brought to

18  the attention of the prosecutors and the defense.

19          Say the jury heard it.  Well, the French car was

20  stolen in or around the time she went missing okay, signs

21  of struggle in the car, blue striped jeans turned inside

22  out and then there is an identification of a rope missing,

23  a rope.

24          Volpe might have said, well, the Lynbrook police

25  threw away the jeans.  But what will he say about the rope

Summation/Scheck

5831

1    if it is not there?  I threw it away, something consistent

2    with the ligature?

3            Why is it important to the jury in 1986?

4    Because in 1986 they could have asked the same question we

5    asked of O'Leary and of everybody else.  Because when you

6    see that rope, okay, as Max explained and O'Leary

7    admitted, you take a look at the rope and unravel it or

8    not and see if in the crevice of that rope if there were

9    any hairs that you can look at under a microscope and it

10   would be consistent with Theresa Fusco.

11           If the rope had hairs consistent with Theresa

12   Fusco, what kind of a trial would this be?  How reasonable

13   doubt is that?  You have a car stolen around that time,

14   striped jeans in the car, signs of a struggle in the car

15   with a broken windshield, and you have a rope.

16           The jury will say, if they threw away the rope,

17   we couldn't know if there was hairs in there?  They

18   couldn't say -- could have taken the rope and compared to

19   it the autopsy pictures.

20           This is huge evidence.  It is unconscionable

21   that it was thrown away.  And I will tell you why it is

22   also unconscionable, because in 1994 when those DNA tests

23   came back that excluded all three of these people, Max

24   Houck and O'Leary told you, and it is obvious, by 1994 we

25   had DNA testing.

Summation/Scheck

5832

1        If you keep the rope and can find the rope, and

2    they could find it in 1984, not only could you find hairs

3    that can be analyzed with potential DNA, and most

4    important we know now there are skin cells you contest.

5    And if they come back consistent with Theresa Fusco, end

6    of everything, right.

7        You notice on that rope as pointed out there is

8    some tape.  And that is what has, sometimes perpetrators

9    touch the rope with saliva, and you can get skin cells

10   from the perpetrator or you can get skin cells on those

11   tapes.  That is a very good source of DNA, and extract the

12   DNA from the tape.  And if the DNA from the tape matches

13   the semen, it is not an issue.

14       Now, in 1994 there is something called a form

15   262.  Talk about intentionally and deliberately hiding.

16       All of a sudden you heard Fred Klein and

17   everybody talk about it.  A 262 is a report by the end of

18   the case that the police fill out in Nassau County that

19   gives you a contemporaneous summary of all the steps in

20   the investigation.  And here they say it is eight pages

21   long.

22       Remember I showed it to Fred Klein and he said,

23   I never saw one of these eight years after the fact.  And

24   obviously Volpe wrote that in 1994 they have a DNA test

25   showing it is not these guys.  They got two of them.

Summation/Scheck

5833

1      He is writing out for the police who are in

2   charge of the investigation one of the investigative

3   steps.  And at the beginning of that investigation there

4   is no mention of this French car.

5      Boy, they took this pretty seriously.  As soon

6   as John French reported that his car was stolen and with

7   jeans in it, they immediately went with the flatbed truck

8   and picked it up and brought it to SIB, and he cleaned out

9   the vehicle, and there is no trace evidence or anything in

10  there because they cleaned it out.  But they certainly

11  were taking it very seriously.

12     How can you leave it out in the summary of the

13  investigation unless you are trying to hide it.

14     If he had come clean in 1994 and went back and

15  found the rope, they could have done DNA testing on the

16  rope in 1994, and certainly by 2002, 2003, when O'Leary

17  begins the reinvestigation, we have better DNA tests, and

18  if you can find the rope it makes a big, big difference.

19     Now, there is another stipulation that came in

20  late, but it is really worth looking at the full details

21  of it.  Peter Weinstein.  As we recall, he is the head of

22  the Appeals Bureau.  He was heavily involved in the post

23  conviction investigation of the case.  Peter Weinstein was

24  handling the DNA side of it.  Peter Weinstein, as the DNA

25  investigation would show you, was fielding FOIA requests,

Summation/Scheck

5834

1    freedom of information requests from the defense lawyers

2    asking for documents and statements and everything else in

3    the file.

4              Peter Weinstein and his assistant, Ms. Paviles,,

5    I believe, were the ones who went to the lab and found

6    that extra swab, right, they found a swab that hadn't been

7    there before, that nobody had seen before, that was

8    untouched, and that was the last swab we were able to get

9    tested.

10             Finally, no one could contest anything about the

11   DNA and that is when the convictions were vacated.

12             A lot of things in that lab you might be able to

13   find, including the rope.

14             But Peter Weinstein is clear in the stipulation

15   that to the best of his knowledge, looking at the case

16   very carefully, Fred Klein said it, too, they never heard

17   about this French car until we got the documents in this

18   civil case, they never heard of it.

19             That tells you something about how it was

20   intentionally withheld.

21             Now, the next issue in terms of materiality, you

22   have to look at how the defense could have handled the

23   French car, striped jeans, rope lead, at the 1986 criminal

24   trial.

25             And as Ted Robinson told you, and as you heard

Summation/Scheck

5835

1    from Mr. Grandinette, it was the defense theory at the

2    trial that Theresa Fusco was heading down -- out of Hot

3    Skates, down Rockland Avenue, toward her friend Lisa

4    Kaplan's house when she was abducted.  That was his

5    theory.

6              His theory was -- next slide.

7              This alleyway by Noble Furniture, right, where

8    you see the car, Robinson was saying that she was walking

9    down Rockland.  It is a dark area that down -- side of the

10   street, and that is where the abduction was made, and it

11   was going down that alleyway that eventually leads to the

12   crime scene.

13             That is what Robinson's theory was.

14             And you recall there was some dispute at one

15   point, there was a kind of typo in the court records

16   because there was an issue about whether it was grass

17   fragments or glass fragments, and Robinson was talking

18   about how during closing arguments, he was saying, I was

19   saying she was dragged down that alleyway, and that is how

20   the body got to the crime scene, something there.  And

21   that is why the jewelry was out in the directions that it

22   was.  And they made fun of the Hansel and Gretel trail,

23   and they were saying it was through that alleyway where

24   she was brought, and that is eventually where she was.

25             And there were, in fact, as we can establish

Summation/Scheck

5836

1    from this report, soil and glass particles in her

2    fingertips that also were, as Robinson argued to the jury,

3    point number four, and that is glass or a mirror on the

4    side.

5            He was arguing, basically, look, that is how the

6    body got there down that alleyway.

7            You heard Mr. Ferguson ad infinitum that

8    supposedly this happened in the cemetery and they drove to

9    Park Place, and then they drive down this area that is

10   this fence carrying the body and blankets, which is like

11   crazy, and then dumps it.

12           What Robinson was saying was straight ahead.

13   But the point is that car is down that alleyway, there is

14   jeans in the car, a rope, a hard nylon rope.  That is

15   very, very good stuff for a defense attorney to argue in a

16   criminal case and raise, one, two, three, four, five, six

17   huge reasonable doubts, that is what would have happened

18   if they disclosed this lead.

19           Now, the defense is going to argue, well, you

20   know, this French evidence was hiding in plain sight.

21           Then they will argue, as we predicted in the

22   opening, you should ignore the French car, rope lead,

23   because of Debbie Smith, because she is infirmed.

24           We will get to that.

25           The first thing we recognize about this hiding

Summation/Scheck

5837

1    in plain sight evidence is that Fred Klein and District

2    Attorney McCarty are very, very clear that the way this

3    works, that homicide detectives create a big file with a

4    lot of sub-folders in it.  The District Attorney, any time

5    they want, they can come and look at it.

6              The way it works is when they do the voluntary

7    disclosure form, that the prosecutor asks the lead

8    detective, the homicide detective, can you bring me the

9    crime scene pictures, bring me the relevant stuff.

10             They bring it to him and show him the crime

11   scene pictures and the various things.

12             It is the homicide detective, Joe Volpe, his

13   responsibility to show the relevant materials to the

14   prosecutor.  He is the one in charge of that process.

15             So we still say, look at all these logs of the

16   photographs, right?  They must have shown these pictures

17   to Fred Klein.

18             Well, you know, I would submit to you that there

19   is no particular reason to believe that Volpe is going to

20   start showing pictures of the car and then have to explain

21   this whole thing, which he knows will hurt his case, and

22   that is inconsistent with everything you know about Volpe.

23             Even if you accept the proposition that he

24   brought the pictures there, okay, what doesn't compute

25   about the defense argument is you can see the picture of

Summation/Scheck

5838

1    that car, right, all you want.  But if there is not one

2    single document there that tells you the relevance of that

3    car, not a document showing you when it was stolen, not a

4    document showing you that there was jeans in the car, like

5    document 161, or those others, or tells you about the

6    rope, tells you anything, then just seeing the picture is

7    not meeting your Brady disclosure requirement.  That is

8    hiding it, right?

9           And if you had any doubt about Volpe's

10   intentions and how that is going to happen -- by the way,

11   just to make sure that we understand what -- from Russ

12   Fischer, the police practice expert, the Brady practice

13   and how it works, and let's look at what Frank Sirianni

14   said, all right.

15          When asked about this whole French lead, right,

16   and he says, yeah, it should have been turned over.

17          Answer:  I'm assuming it was.

18          I'm not asking whether you didn't turn it over,

19   did you?

20          No.

21          That would have been Joe Volpe's job?

22          Answer:  He would have discussed it with Fred

23   Klein.

24          Question:  It would have been his duty to

25   discuss it with Fred Klein, right?

Summation/Scheck

5839

1       Answer:  He would have made Fred Klein aware of

2    it.

3       Well, were you present at any conversations

4    between Mr. Volpe and Mr. Klein?

5       Answer:  No.

6       Question:  You were relying on Mr. Volpe to do

7    his duty to disclose information that criminal defendants

8    have a right to as the carrying detective?

9       Answer:  Yes.

10      Now, the defense may get up here and say, well,

11   you heard Fred Klein, and he said I may have read these

12   documents, I may have not.

13      Fred Klein was clear.  He tried both the

14   Restivo/Halstead case and the Kogut case, and involved

15   with post conviction investigation.

16      Fred Klein said, I never heard a thing about

17   this French car lead until the plaintiffs in this

18   criminal -- in this civil case brought it to his

19   attention.  No, zero recollection of it.

20      And Fred Klein is not a stupid man.  He is a

21   smart prosecutor.  If someone came to him with Exhibit 161

22   and found out that there was this car that had been stolen

23   at or around the time she disappeared that had blue

24   striped jeans and a hard nylon rope.

25      THE COURT:  You have to slow down.

Summation/Scheck

5840

1          MR. SCHECK:  I apologize.  Harry is just doing

2     his job.

3          Fred Klein, that was -- if it was discussed with

4     him, do you think he would have forgotten?  Absolutely no

5     way in the world.

6          This was deliberately hidden by Joe Volpe

7     because it would have killed his case.  It is that

8     exculpatory.

9          If you have any doubts about that, let's talk

10    about Detective O'Leary and the way Volpe misled him.

11         Remember O'Leary in 2002 is assigned again by

12    the police department, now that we know exculpatory DNA

13    tests are on their way, to reinvestigate the case.

14         And at his deposition he said that he saw these

15    photos of the French car.

16         So he asked Volpe, hey, what is up with these?

17         And Volpe said, this car has nothing to do with

18    the homicide.  We looked into it.  We checked it out every

19    way.  It had nothing to do with it.

20         And the question was:  When you looked at these

21    photographs and you asked Volpe what they were about, he

22    told you they had nothing to do with this homicide, and

23    the lead was checked out and it had nothing to do with the

24    case, correct?

25         Yes.

Summation/Scheck

5841

1      THE COURT:  Mr. Scheck, you have to slow down.

2    In about ten minutes we will take a short break and let

3    Harry get the circulation back in his hands, and perhaps

4    his head.

5      MR. SCHECK:  His circulation in his head is

6    always good.

7      And then at trial when O'Leary got on the stand

8    at the trial, he told you, you remember, well, I have been

9    reading something about this in the newspaper, and then

10   before I got on the stand I saw some documents that the

11   defendant showed me, and then it started to come back that

12   maybe I had seen some of this, or maybe I heard something

13   about the jeans from Volpe, and he told me it was a crack

14   head's and a dump job.  I remember him saying that.

15     But even after that, look at these admissions.

16   Go back and have this O'Leary cross-examination read.

17     So even with all of that I asked him:

18     Question:  Putting all that together, wouldn't

19   you agree, all that about the French car, striped jeans,

20   rope lead, wouldn't you agree that this is that lead that

21   you should have known about and investigated when you

22   started up on this case in 2002?

23     Answer:  Yes, sir.

24     Question:  And that is what you understood to be

25   exculpatory evidence, correct?

5842

1              Answer:  Could have been, sir, yes.

2              And that's what is sometimes called Brady

3    material, correct?

4              Answer:  Yes, sir.

5              And the reason it is exculpatory evidence or

6    Brady material is that it points away from these three

7    plaintiffs?

8              Yes, sir.

9              And that's information that police officers have

10   an obligation to reveal to prosecutors, right?

11             Answer:  Yes.

12             But Detective Volpe had told you that the lead

13   had been completed and these pictures of cars had nothing

14   to do with this homicide, right?

15             Yes.

16             And you accepted his representation?

17             Answer:  Yes.

18             Just think about it.  If he has to mislead his

19   own guy in 2002, who has taken over the reinvestigation,

20   right, when he is being asked about the pictures, don't

21   you think that he was hiding this in 1986?  And even if he

22   was asked about the pictures, he would have done the same

23   damn thing?

24             Don't you think that O'Leary, who is making it

25   very clear that he was misled, because he should have gone

Summation/Scheck

5843

1    out and looked for that rope in 2002, God knows when it

2    disappeared.

3           Finally in this regard, take a look here.

4           Remember Detective Kuhn, working with O'Leary,

5    made an index of -- based on what is in the homicide file,

6    and they wrote down what appears in the folder and made an

7    index of it, and when you look at the index, there is

8    nothing in there about John French or in there about

9    Debbie Smith.

10          There is a -- something about the auto where

11   O'Leary testified he saw the pictures and he asked him

12   about it, and then he is saying maybe I saw some documents

13   in it now.

14          The point is that he was misled, and Kuhn and

15   O'Leary said he didn't pay that much attention to the

16   completely -- the lead file, because common sense tells

17   you that the French car could have been the car that was

18   used, wasn't it, when you look at all the evidence.

19          Now, the way they are going to say that this

20   whole French car thing was all about Debbie Smith, right.

21          Now, Debbie Smith, we all know, suffers from

22   mental illness, and she called in, and always had the

23   wrong weekend, and said she heard a scream and saw a car,

24   etcetera.

25          Now, you must reject, I'm sure, immediately as

5844

1   totally illogical the idea that you shouldn't pay

2   attention to -- as Brady material to the striped jeans,

3   French car, rope lead because Debbie Smith is a whack job

4   and she came in.

5            But here is something very disturbing about

6   Debbie Smith that tells you a lot about this case, okay.

7            Take a look at these documents.

8            She comes in, right, and she is first saying the

9   auto is beige or gray.

10           All of a sudden it is possibly tan, because the

11  car is gold.

12           Look at this.  She remembers -- they show her

13  the car and she says, yes, that is the car I saw that

14  night.  Except when I saw it that night it was dirty.  It

15  had garbage in it.  And it had a rope, and it had tools.

16           Now, the car she is looking at is a car that has

17  already been cleaned up by John French, right?  Because

18  when he got the car back, he cleaned it up, and the rope

19  is gone and the tools are gone.  And here is a clean car,

20  okay?  Think about it.

21           So if Debbie Smith, and we all agree that if she

22  stopped there at all, she was there on the wrong weekend,

23  and if she had seen a car, it is unlikely it is this car.

24           But where does she get this information about a

25  rope in the car, and it was previously dirty?  It is not

Summation/Scheck

5845

1    information she could know.

2           Do you know who knows that?  Volpe knows that

3    because John French told him.

4           So even Debbie Smith, you see the telltale signs

5    of suggested facts, and even in Debbie Smith as the

6    possible witness.

7           Finally we see she is calling up, although she

8    is saying November 17th, and she is saying in the last

9    communication on November 30, well, maybe it is

10   November 10.  Maybe I have the wrong weekend, because she

11   wants so much to be a witness.

12          We know from Pearson, her witness, who came --

13   they came and spoke to him, and he shows the dance card

14   and says plainly she is wrong.  Don't pay attention to

15   her.

16          But you know what, Pearson told you they took

17   notes and wrote it down.

18          As Russ Fischer told you, there is nothing in

19   the file about Pearson, okay?  And that she had the wrong

20   weekend.

21          Why?  Because in case they wanted to use her,

22   they didn't want to have that there.  That is the way Joe

23   Volpe was doing business.

24          Is this a good time?

25          THE COURT:  Now would be perfect.

Summation/Scheck

5846

1       Ladies and gentlemen, see you in about five

2    minutes.

3           (Whereupon, at this time the jury leaves the

4    courtroom.)

5

6           (Whereupon, a recess was taken.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation/Scheck

5847

1      (Whereupon, the jury at this time entered the

2   courtroom.)

3      THE COURT:  Please be seated.

4      We are ready to resume.

5      MR. SCHECK:  Thank you.

6      So that is the evidence about the French lead.

7      Favorable evidence, yes.  More likely than not,

8   deliberately withheld; more likely than not, a reasonable

9   probability that the -- it would have affected the

10  outcome.  And more likely than not the scales would have

11  slipped in our favor, the plaintiffs wouldn't be here.

12      But there is more, there is much more.

13      There is the issue of planting the hair.

14      Now, we are going to prove this to you, and we

15  have proven this to you with four different pieces of

16  direct and circumstantial evidence.

17      The first one is the postmortem root banding.

18      The second one is mechanical damage on Q-8 and

19  Q-4 hairs.  Remember there were two Q-8 hairs in one

20  envelope, in one quadrant of the hair, and one Q-4 with

21  postmortem root banding on it.

22      Proof of motive and opportunity, and proof

23  concerning Volpe's telltale lies in paragraph 10 of the

24  affidavit he filled out on March 29th, seeking a wiretap

25  extension that was after the search of the van.

Summation/Scheck

5848

1        So let's move to postmortem root banding first.

2        Now, what is postmortem root banding.

3        Postmortem root banding is an artifact of human

4   decomposition.  That is what it is.  It is in the area of

5   human decomposition.  It is decomposition that occurs in

6   this area of the hair when somebody dies and the body

7   begins to decompose.

8        As you recall, what happened is it didn't arise

9   in Kogut's trial, but in the other trial the hair examiner

10  saw patterns that said it looks pretty similar.

11        Then he took it up to Dr. DeForest, a leading

12  hair expert, who immediately started to look at it and

13  said this is called putrid, or postmortem root banding.  I

14  can tell you that these Q hairs come from a dead body.

15        And then he was asked who knows about it, and he

16  says Nick Petraco who works at the New York City Police

17  Department, and also at John Jay, he will know about it.

18  And then Petraco wound up testifying as a prosecution

19  witness at the 1986 trial, and DeForest testified for the

20  defense.  And as you saw, Petraco testified, as our

21  witness -- Houck testified as our witness, and DeForest

22  didn't testify because his testimony would have been

23  cumulative at this point.  But you know from what Petraco

24  has said, and what the evidence is, is his evidence at the

25  1986 trial.

Summation/Scheck

5849

1          Now, let's talk about Max Houck.  Max Houck, I'm

2     sure you will appreciate, is one of the leading forensic

3     scientists in the world.

4          This man started out as a, you know, as -- he

5     has degrees in anthropology.  Then we went to work as a

6     forensic anthropologist, like Bones, if you watch that

7     show, but a forensic anthropologist at the county medical

8     examiner's office, and where he was not doing forensic

9     hair analysis but also analysis of dead bodies for the

10    medical examiner's office.

11         Then quite an extraordinary thing happened, the

12    Branch Dividian case where all those people died, and

13    Houck was tasked to look at those bodies along with the

14    FBI and the Smithsonian Institute, because he had a lot of

15    fibers to analyze, exactly how and where they died,

16    etcetera.

17         His relationship became so strong with the FBI

18    and the Smithsonian that he became the first civilian that

19    the FBI ever hired in their trace evidence group.  And he

20    did hair analysis for them as well.

21         So he is the unique guy, he has very

22    sophisticated scientific background, and went on later to

23    get a Ph.D. in applied chemistry in Australia, take a look

24    at his CV in evidence, unbelievable publication list,

25    editor of all the big journals.  Most importantly, he

Summation/Scheck

5850

1    combines both practical experience in exactly the issues

2    we are looking at in this case, as well as a very

3    sophisticated understanding of the relevant discipline

4    which is forensic anthropology, the study of human

5    decomposition.

6           He went on to continue to work at the FBI for

7    quite a number of years and also the Smithsonian

8    Institute, doing hair analysis, and from there he went on

9    to the University of West Virginia and put together

10   probably the biggest forensic science program that

11   educated people all over the world and the United States

12   for ten years.

13          He left there and was doing classified work on

14   biometrics, as you recall.  And finally now he is running

15   the Washington -- the new crime lab at Washington DC.

16          And I think you can tell from the way he

17   testified that this is one of the -- you know, one of the

18   international or national credentials, this is one of the

19   leading people in the world.  And there is nobody they

20   brought in, whether a hair analyst or forensic,

21   anthropologist or anybody else, to rebut his -- his

22   testimony.  And it is unique because postmortem root

23   banding is an issue of human decomposition.

24          His opinion is that there was no known mechanism

25   of human decomposition that can produce postmortem root

Summation/Scheck

5851

1    banding on Q-8 and Q-4 hairs if shed from Theresa Fusco in

2    less than an hour after her death.

3          If you analyze this, how long could she have

4    been in the van dead according to the defense -- the Kogut

5    confession scenario, 15 minutes, 20 minutes, certainly

6    less than an hour.

7          The opinion we will review in a second is you

8    never have -- nobody had ever seen, if hairs were shed

9    from her while alive in the van, and subject to

10   environmental insult, you couldn't get the postmortem root

11   banding comparison and the degree of comparability which

12   is relevant.

13         You will recall this is the diagram used.  This

14   is what hair looks like in the human scalp.

15         You will recall that the bottom of the hair, the

16   very, very bottom is the soft -- the soft bulb, which has

17   the least keratin.

18         As you move up the shaft of the hair, they begin

19   to develop the keratin cross links, and at the top of the

20   hair it is very, very hard.  That is why you can look at

21   hair years and years later.

22         Now, what is peculiar about postmortem root

23   banding, and what they call putrid root, and first

24   identified by Petraco and DeForest, who was a co-author

25   arising out of this case, and what people realize is that

Summation/Scheck

5852

1    in this area, it is not the softest area. But the soft of

2    pre keratin area you get the precomposition keratinous.

3              And under the microscope it gets hard and has

4    the filaments, it is an artifact of decomposition.  And it

5    has a very distinct form in that it is usually seen in

6    about 45 millimeters above the root when pulled out of

7    somebody's head at autopsy, when they are dying, or

8    forcibly shed presumably after dying and decomposing,

9    about two millimeters below the scalp, okay.

10             So it is a very distinctive pattern that

11   happens.

12             And as Dr. Houck told you, they are not

13   completely sure of exactly what the mechanisms for

14   decomposition are.

15             I mean, we know it should have involved what we

16   know as autolysis.  And also the other process is known as

17   putrification, which is protein, which is protein

18   destruction, and arguably microbes coming in from the top,

19   where the hair is sticking out and moving down.

20             Exactly how that works is not known.  But a lot

21   of things that we don't know, all the precise mechanisms.

22   But in terms of the known mechanisms, these are the known

23   mechanisms involved in human decomposition.

24             And this is seen consistently for many, many

25   years, and certainly from the publication of the article

Summation/Scheck

5853

1    in 1988, you know, it was known as putrid root before

2    this, and there was an article by the Japanese guys, and

3    that in 1988 after this case when Petraco and DeForest

4    wrote the article for the Journal of Forensic Scientists,

5    everybody was on the lookout for this, it was known in the

6    community.

7           And Houck in 1990 was trained on it, everybody

8    was trained on it.  It is a very obvious important

9    phenomenon to know about if you are a hair analyst and you

10   are involved in the study of human decomposition.

11          Here is what he said, and it is very simple, and

12   that is given the process that he has known, he said there

13   is no known mechanism of human decomposition that could

14   create this postmortem root banding, right, in less than

15   an hour, much less 15 to 20 minutes.

16          So the notion that Theresa Fusco was in the van,

17   and she is dead for however long she was dead, according

18   to what we chose to believe, the false confession of

19   Kogut, and the hair came out of the decomposing body in

20   15, 20 minutes, there is no known mechanism of human

21   decomposition by which that hair could have this

22   postmortem root banding.  It couldn't happen.  All right?

23          So that is point one.

24          Point two -- so obviously if there is no known

25   mechanism, how did postmortem root banding hairs get into

Summation/Scheck

5854

1    that van if there is no known mechanism?

2              More likely than not, no?

3              Now, the question of timing.

4              The defense asked Dr. Houck, well, you can't

5    tell us, isn't there a -- you can't tell us to a

6    reasonable degree of scientific certainty exactly how long

7    it takes, you know, for postmortem root banding?

8              Well, there is certainly more work to be done on

9    figuring out exactly how long it takes for the hair from

10   the decomposing body to form postmortem root banding.  But

11   here is what we know that makes it an impossibility in

12   this case.

13             First, the earliest to report of postmortem root

14   banding was in 1988, and it was in the article that

15   DeForest and Petraco and everybody else wrote in this

16   case, because Petraco, in going through files, found a

17   case he thought and testified for the prosecution in this

18   case, well, I have seen it as early as eight to ten hours.

19             Now, Petraco would be the first to tell you that

20   since 1988 when this was specifically defined in this peer

21   review journal and people began looking for it, nobody has

22   ever seen anything close to postmortem root banding in a

23   body that is decomposing for less than eight to ten hours.

24             And, in fact, what Max Houck told you, and what

25   they are looking for.  And let's move ahead.

Summation/Scheck

5855

1      Here is the, you know, Max Houck and Petraco

2  told you that there is this whole community of forensic

3  hair analysts throughout the world, a scientific working

4  group that Houck headed, and the hair division headed by

5  Petraco, meetings all the time.  Annual meetings at the

6  American Academy of Forensic Scientists, and they meet in

7  Japan and all across the world, all the people getting

8  together in groups and they share and specifically on the

9  lookout, as Dr. Houck and Mr. Petraco told you, if

10  somebody had reported that they found postmortem root

11  banding taken from a corpse that had been decomposing less

12  than eight to twelve hours, that immediately would have

13  been worthy of publication, right?

14      And a number of articles and graduate student

15  theses were written on all of this.

16      And just at the time of the trial there was this

17  study by Koch, I can't remember how it is pronounced.  But

18  these are people that are trained under Houck at the FBI,

19  and if you recall it is the body farm.  It was an

20  experiment done between 2004 and 2007 where they take 23

21  bodies, and these are bodies donated to science.  It is in

22  Tennessee, and they bury them and do different things with

23  them.

24      Here they were looking at postmortem root

25  banding.  They take 23 bodies and put it in a number of

Summation/Scheck

5856

1    different environments, people from different ages.  And

2    they actually looked at 24,000 hair roots.  And every day

3    from a different section of the head they pull the hairs

4    from the decomposing body to see how long it took, to see

5    how environment affected it, and all the rest.

6              And what was the earliest they found?  If you

7    recall, the earliest they found is if you put a body in

8    like August or something, where the temperatures averaged

9    78 degrees, right, and in the trunk of a car and they got

10   banding in four days.

11             So, as Petraco, one of the first to write about

12   this, and Houck told you, that people had been looking,

13   right, they had been looking to see if there is a report

14   of postmortem root banding, hair root banding on a body

15   that has been decomposing for less than eight to ten

16   hours, and nobody had seen it.

17             So just as a simple fact, what are the

18   probabilities that a hair from a decomposing Theresa

19   Fusco, dead 15 to 20 minutes in that van, could produce

20   postmortem root banding?

21             Highly unlikely.  And in fact, as Dr. Houck had

22   said, a forensic anthropologist, the relevant discipline,

23   that there is no known mechanism that can bring that back.

24             Something else having to do with the degree of

25   decomposition.

Summation/Scheck

5857

1           And just think of this:  And that is on the one

2    hand, we have Theresa Fusco decomposing, you know, at the

3    scene of the crime, right, for 25 days, from November 10th

4    to December 5th when her body is found.

5           Then we have the police theory, the false

6    confession theory, that she is in that van for 15 to 20

7    minutes.

8           And what Petraco told you from examining the

9    hairs, right, is that the degree of decomposition, the

10   degree of postmortem root banding decomposition, was the

11   same or similar in the autopsy hairs and the Q-8 and Q-4

12   hairs.  And he said, Houck said, that is impossible.

13   There is no known mechanism where you can have -- and it

14   makes common sense, doesn't it?  If this is the

15   progressive phenomenon of decomposition and the body is

16   decomposing for 25 days, how can you pull hairs out of a

17   van where she is only dead for 25 minutes or something and

18   it will have the same degree of decomposition?  You can't.

19          That is because the hairs found in the Q-8 and

20   Q-4 envelopes were hairs from autopsy that was planted

21   there.

22          Isn't that the most likely explanation just from

23   the postmortem root banding, just from that alone?

24          And to be clear, postmortem root banding, just

25   to eliminate it, if it were a live hair from Theresa Fusco

Summation/Scheck

5858

1    shed in the van and then subjected to environmental

2    insults, could you see that postmortem root banding

3    pattern?

4              And the answer is that forensic scientists and

5    hair analysts have been looking for this certainly since

6    1988, and if not before, and no one had ever seen

7    postmortem root banding on a hair that came from a live

8    person then subjected to environmental insults.

9              There is a lot of study there where they bury

10   them in soil.

11             At the end of the article, the FBI did a study

12   that Houck testified to that is probably on its way to

13   publication presented at a meeting where they took a whole

14   bunch of hairs, live hairs, and put them in vans and cars,

15   and put them on windowsills, they buried them and put them

16   in potting soil and they could not produce the postmortem

17   root banding pattern, and they had two FBI agents look at

18   it, and they were able to successfully identify the real

19   postmortem root banding in 98 if not 100 percent of the

20   time versus those subjected to environmental insults, and

21   the two analysts checked with each other in a technical

22   review and got it right 100 percent of the time.

23             As the study concludes, aside from the FBI

24   study, the fact that thousands of cases have been examined

25   by the FBI analysts -- just the FBI alone, not to mention

Summation/Scheck

5859

1    everybody else in the world, no evidence -- no hairs with

2    this banding pattern have been reported in cases that are

3    not associated with the death of an individual.

4           So the postmortem root banding alone is

5    powerful, powerful evidence.  No mechanism.  From one of

6    the leading forensic anthropologists in the world, no

7    evidence regarding -- rebutting that.

8           Nick Petraco came in here, and Petraco

9    testified, you know, look, Petraco, Nick Petraco, he is

10   pretty impressive in his own right in terms of his work at

11   John Jay, and a huge list of publications, and he was a

12   hair analyst, and he was working at the NYPD at the time

13   of the case, and he is still supervising at NYPD, and the

14   one who published this article in the first place, and he

15   agreed with Petraco's opinion of postmortem root banding,

16   but he also examined the Q-8 to Q-4 hairs, and he found

17   that there was mechanical damage in debris, right, on

18   other hairs that were collected from the van.  But you

19   didn't see that mechanical damage in debris on the Q hairs

20   here.

21          In other words, that Q-8 hair with the

22   postmortem root banding, that is a pretty pristine hair

23   like the autopsy hairs which were washed.

24          But the Q hairs from the van, Petraco said he

25   looked at other Q hairs from the van, they had breakage

Summation/Scheck

5860

1    and debris.

2              Just take a look at the envelopes, we had

3    Detective Goldman show you the envelopes, here is an

4    unsealed envelope from the K hairs, right, the autopsy

5    hair, he showed you they were clean hair, and you saw them

6    yourself.

7              Then you have the Q-4 envelope, and you see what

8    they did is vacuumed different quadrants of the debris and

9    mechanical damage from the hair being stepped on.

10             So the Q-4 and Q-8 envelopes, there are debris

11   and mechanical breakage on the hairs.

12             Pretty powerful evidence.

13             Remember on cross-examination of Petraco,

14   Mr. Freeman said, well, isn't it possible, sir, that there

15   could have been these hairs, you know, Petraco was making

16   the point.  If this all happened on November 10th, 1984,

17   and they get the van on March 8th, 1985, and you are

18   vacuuming it, isn't it likely that those two Q-8 and Q-4

19   hairs that had the postmortem root banding on them,

20   wouldn't they have mechanical damage, too?  Wouldn't they

21   be stepped on if Theresa Fusco was really in that van,

22   right?

23             Well, Mr. Freeman said, well, isn't it possible,

24   haven't you ever seen cases where a hair could get stuck

25   in a nook or a cranny and not have mechanical breakage or

5861

1    debris on it?

2          Petraco said, yes, that is possible.

3          But think about it.  Think about it.  Your

4    verdict is only more likely than not, what is more likely

5    right than wrong, slight probabilities.  Think about this

6    as a logical matter.

7          Now they want you to believe that not only is

8    there postmortem root banding suddenly showing up on these

9    hairs that were there for 25 minutes that nobody has ever

10   seen before, and there is no known mechanism of

11   decomposition that can bring it about, a pretty unlikely

12   event, right?

13         But on top of that also these hairs that are

14   pristine have also to be in the nook and so there is no

15   mechanical breakage or debris on it.

16         You have to accept those unlikely propositions

17   in order to accept their theory that these were not

18   planted hairs.

19         But there is more.

20         You heard from Spillane on March 26th when they

21   brought in the van, and he is there at the biweekly

22   meetings and he is the commander, and they knew after the

23   Volpe confession and they get the van, they always knew at

24   a trial they could not introduce the Koch confession as

25   evidence against Halstead and Restivo.

Summation/Scheck

5862

```
1        His words on March 26th, the homicide team was
2    left with, quote, a very weak if non-existent case,
3    against Halstead and Restivo.
4        Now, you have to think about what really
5    happened here.  They got this confession from Kogut, and I
6    think it is a fair inference from the evidence that it was
7    coerced, right?
8        Volpe had just been part of that.
9        Now he knows, Spillane admits on March 26th,
10   they pull in the van, nothing on the other two, not
11   anything.  A very weak if non-existing case.
12       What can improve that case?  What can make that
13   case?
14       Well, we find a hair consistent with Theresa
15   Fusco in the van.
16       Well, really, good luck, you know.  All these
17   days later we can find that hair.
18       Now, that is the motive.  It is an obvious one.
19       What about opportunity?
20       Well, we know that we have the unsealed hairs,
21   and this is a lab that they take the autopsy hairs and
22   they put them in an envelope.  You know, you have seen it
23   on television, you have some idea of chain of custody.
24   This was not a case where they took the K hairs, sealed
25   the envelope, somebody put their signature on it, the next
```

Summation/Scheck

5863

1    person that opened it up opened it up, takes stuff out of

2    it, closing it, putting their signature on it, and the

3    process goes on and on.  We are not dealing with custody

4    like that for the K or Q hairs.

5              Those envelopes are all unsealed, and they are

6    all put into unlocked lockers.

7              So if you want to take some K hairs and put it

8    in some Q envelopes, it is not like you are going to have

9    any difficulty with chain of custody.  They are all

10   unsealed and unlocked lockers.

11             I forgot, SIB is Fort Knox.

12             There is no way in the world a homicide

13   detective can get in there and do this, ridiculous.

14             First of all, Birdsall saw Volpe around the lab

15   and there is testimony from Fraas that it would be unusual

16   in a homicide case for the SIB people not to see a

17   detective there trying to find out what do you got, what

18   is going on, right.

19             So then, you know, as everybody agreed, the

20   homicide unit is in one part of the hall, and just down

21   the hall is SIB, just down the hall, and all you have to

22   do is buzz in, say to somebody I want to get in, and you

23   buzz in.

24             There is no logbook, right, where somebody

25   signed in and out.

Summation/Scheck

5864

1      Now, we got some testimony, oh, there was a

2    supervisor there, you would have to be escorted.

3      Wait a second, we heard from Detective Sharkey,

4    right, didn't we, just the other day, when they approached

5    John Restivo and said, your dad, Joe, he worked here, we

6    are family, we are family.

7      I mean, they are not -- they are going to buzz

8    in the lead detective on a homicide case.  You know, I'm

9    Joe Volpe, we are working that case, we have all kinds of

10   evidence.

11     He is going to get buzzed in.  They don't

12   necessarily distrust him.  He is family.  It is not like

13   there is any kind of strict procedures going on here.

14   They don't lock the cabinets or seal the envelopes.

15     There is plenty of opportunity to make the

16   switch, right?  And there is certainly a motive.

17     And then finally, the last piece, one of the

18   telltale lies in paragraph 10 of this affidavit, again,

19   something that we discovered during the course of this

20   civil case.  And I think it is very, very telling, isn't

21   it?

22     Now, remember the timing.  The van is seized on

23   March 26th, and then on March 29th Volpe fills out an

24   affidavit with Prosecutor McCarty, seeking an extension of

25   a wiretap application.  Okay?

Summation/Scheck

5865

```
1         And the key here is that looking at paragraph 10

2    there are two assertions that he makes in this

3    paragraph 10.

4         One is that a search of the van has produced

5    hair consistent with Theresa Fusco's.  And the second is

6    that there is possible human blood.

7         And this was done at March 29th, 1985, at

8    4:04 p.m. is when it was actually filed.  And I think

9    Volpe acknowledged during the deposition he would have

10   gone in and spoken to McCarty and would have taken some

11   time before that, an hour or two, before the affidavit

12   that supported the application would have been filed.

13        So the problem was, first, let's talk about the

14   term consistent with.

15        As Dr. Houck told you, as Petraco told you and

16   Fraas told you, and it is known, it is clear, that the

17   strongest possible statement you can make about hair, the

18   strongest statement you can make about microscopic

19   examination, is that the questioned and the known hair

20   are, quote, consistent with each other.

21        They do that only after microscopic examination

22   and looking at all the details, and it is a long and

23   painstaking process.  But that is the strongest thing they

24   can say.

25        Here they say they found a hair consistent with
```

**Summation/Scheck**

5866

1    Theresa Fusco.

2          The problem, and you saw this when I was

3    deposing Volpe in his deposition because he had no idea

4    this was coming.

5          I mean he testified in the 1986 trial where the

6    issue of postmortem hair banding arose and accusations of

7    planting was made.

8          The same thing in the 2005 Kogut retrial.

9          Now he is being deposed and forgot all about

10   this affidavit, nobody had seen it before.

11         MR. FREEMAN:  Objection, your Honor.  That is

12   not so.

13         THE COURT:  Ladies and gentlemen, it is for you

14   to determine the evidence in this case.

15         MR. SCHECK:  I submit to you when you look at

16   Volpe's deposition, he forgot about this affidavit.  And

17   the fact is that when you want to go back and look at

18   Fraas' testimony, right, Fraas had described in his prior

19   testimony, and had to stick with it at the trial because

20   there is no choice here, and it is just common sense, that

21   how long it took him to analyze the hairs.

22         And the first step in the hair examination,

23   which he began on March 27th, 1985 at 10:00 a.m., is the

24   gross visual examination.  And he couldn't have finished

25   that in a single day.  And he worked ten hours on

Summation/Scheck

5867

1    March 27th.  And then he had nothing to report yet because

2    he obviously hadn't completed the analysis.

3              And then you go to step two, where he mounts the

4    hundreds of slides which took about 15 minutes at the

5    least per slide, which would be a minimum of 20 hours.

6    And that was just the Q hairs, right?  And he has now the

7    twenty K hairs.  And after that there is step four where

8    he has to go up and down each of these Q slides, right, to

9    identify the different microscope -- 30 or so microscopic

10   characteristics.

11             Then we get to step five, which is the

12   comparison with the K hairs.

13             What he said in his prior testimony, it would

14   take days or weeks.  And certainly by the time he finishes

15   mounting the slides, by any estimation, if this is all he

16   did during that period of time, all by March 30th, long

17   past the time that this affidavit is filed.

18             You see the Volpe deposition also and I show him

19   this affidavit and I say, you see a problem?

20             Yes, the problem is that he couldn't have been

21   told the hair consistent with Theresa Fusco was there

22   because they hadn't done it yet.

23             So what happens when Fraas testifies here at the

24   trial?

25             Now, look, you might have seen this going on,

Summation/Scheck

5868

1    this little song and dance.

2            When Fraas came here to testify, he already knew

3    that he had given prior testimony that locked Volpe in,

4    because he wasn't done with his examination, right?  And

5    he couldn't now say, you know, that it took less -- you

6    know he was finished by March 29th at 4:05, he couldn't

7    say that.  He had already sworn and common sense tells you

8    it took a lot longer than that.

9            He also previously testified he had no

10   independent recollection of doing this, which makes sense.

11   How did he remember this hair examination, exactly what

12   happened years ago.

13           But you saw it.  You knew he knew that it was a

14   problem.  So he started saying, I don't consider myself an

15   expert anymore.  I'm now living where, I can't remember

16   anymore, in Arizona.  And started speculating at the

17   request of the defense here.  Well, maybe I said, maybe I

18   could have said it was consistent with it when I did a

19   gross microscopic examination.  Maybe I said it to

20   somebody.  Because I got to give Volpe some life,

21   something to say, because he was caught in this lie in the

22   deposition.  And that is what is going on.

23           And then when Judge McCarty testified, he was

24   asked the question, well, when you put -- McCarty said,

25   look, I wrote down in the affidavit what Volpe told me.

Summation/Scheck

5869

1    He is the guy swearing to it.  He told me consistent, so I

2    wrote down consistent.

3           Then he was asked, if he told you

4    microscopically consistent, would you have written it

5    down?

6           Sure.

7           If he told you macroscopically consistent, you

8    would have written it down?

9           Sure.

10          If he said a brunette hair and I saw a brunette

11   hair in the van, would you have written it down?

12          Sure.

13          He told you what Russ Fischer told you that

14   robbery detectives and homicide detectives, and any

15   detective knew at the time, when you say consistent with,

16   what you are talking about is the strongest possible

17   statement you can make after a hair examination.  And that

18   is what Volpe said in that affidavit.

19          But if you have any doubt about Joe Volpe's

20   credibility, take a look at Birdsall, because possible

21   human blood.

22          So if you recall Birdsall as the serologist and

23   he is looking at the van, and he told you that there is a

24   chemical test done.

25          What a serologist does is they see a stain and

Summation/Scheck

5870

1   take part of the stain and apply a chemical to it and if

2   it turns a certain color, they say it is a presumptive

3   test for the possibility of human blood, a term of art,

4   and then you analyze the stain to see if it is human

5   blood, and then you would in those days do serological

6   typing and in these days you do DNA.  That is how the

7   process works.  The first test is the presumptive test for

8   possible human blood.

9              McCarty said as well when he testified that, you

10  know, he understood that when he said possible human

11  blood, it was a chemical test.

12             Lets go back to the prior slide.

13             Look at what Birdsall testified to.

14             He testified to:

15             Question:  Did you see anything that was

16  possibly human blood in that van.

17             No.

18             Question:  Did you tell anybody that you had

19  found anything that was possibly human blood in that van?

20             No.

21             You never told Detective Fraas that you found

22  possible human blood in that van?

23             Answer:  No.

24             Question:  You never told Detective Volpe that

25  you found possible human blood in the van?

Summation/Scheck

5871

1          Answer:  No.

2          Not your supervisor?  No.

3          Not anyone, right?  No.

4          Straight ahead stuff, right.

5          So how did we get possible human blood in the

6     van?

7          It is a stone cold lie.  It is a stone cold lie

8     that Volpe put it in there.

9          Look, they are going to try some other kind of

10    excuse.

11         You know, they had photographs.  They showed you

12    photographs of the van, and there is a stain in the

13    carpeting of the van.

14         So they can come in here and say Joe Volpe saw a

15    discoloration in the stain on the carpet of the van, and

16    that is why he said possible human blood.

17         It is illogical, specious, not worthy of your

18    contention, it is a big cold lie.

19         What will that tell you?  You will hear a charge

20    about credibility, right?

21         If you have a detective that is willing to tell

22    a stone cold lie, one that can be checked stupidly enough,

23    but I suppose he can say it is possible human blood and it

24    turned out it wasn't human blood, but he knew the hair

25    would check out because he made sure of that.

Summation/Scheck

5872

1          If you get somebody willing to swear to a lie in

2     an affidavit like that, you are free to discard anything

3     he would say, if he would swear in a sworn affidavit like

4     that.

5          So when you put all of this together, this is a

6     powerful, direct and circumstantial case.

7          The Judge will charge you on circumstantial

8     evidence, and circumstantial evidence has equal weight to

9     direct evidence.  They are both equally strong.

10         Remember, this is not a criminal case.  So we

11    don't have to prove to you beyond a reasonable doubt that

12    Volpe planted the hair or caused somebody to plant the

13    hair.  All we have to do is to show it is more probable

14    than not.

15         In terms of circumstantial evidence, the usual

16    analogy is, we have been in here all day, and maybe nobody

17    looked outside, and if somebody walked in with a wet

18    umbrella and it wasn't raining when we came in, it would

19    be circumstantial evidence that it is raining out now or

20    it rained during the day.

21         I got news for you, when it comes to hair

22    planting, postmortem root banding, hair banding, no way to

23    get it.  That is one, two, three, four wet umbrellas.

24         Mechanical damage to the hair?  That in addition

25    to the postmortem root banding, that was a great

5873

1    coincidence, too.  It is in the nooks and crannies,

2    another wet umbrella.

3            Motive and opportunity?

4            Volpe's telltale lies in paragraph 010.  What is

5    it?  I mean, what is it, really?

6            And if we have proven by a preponderance that

7    they planted the hair, I mean, is there any doubt that

8    that is not a fair trial?  Is there any doubt about

9    malicious prosecution?  Let's get real.

10           And this is very, very disturbing stuff when you

11   get down to it.

12           Okay, malicious prosecution, as I said before,

13   essentially the facts are the same.

14           We have to rebut probable cause by showing

15   misconduct, bad faith, falsified evidence, the Brady

16   material, the French car, striped jeans lead, the rope,

17   the fabrication of the hair.  Anyone would do it, just as

18   anyone would do it for the fair trial claim combined.

19           We are way, way towards meeting our burden.

20           But there is another area I will discuss in my

21   remaining moments with you, and that has to do with the

22   creation of false witness statements.

23           And you heard already about the Kogut

24   confession.  But I think the place to start in the false

25   witness statement is coercion and creating statements that

Summation/Scheck

5874

1    somebody should know is false is the John Restivo

2    March 5th, March 6th interrogation, where he is held

3    probably for more but at the very least from 2015 when

4    they acknowledge, and maybe it was 6:15 earlier, when he

5    gets out at 4:30, 20 hours and 20 minutes.

6                Now, you heard two versions.  You have the

7    Nassau County Police Department version.  And that is

8    Restivo is picked up.  He is brought in.  They take

9    pedigree information, who are your friends, etcetera.  He

10   is told he fails the polygraph test.

11               But in that form they also find out that he only

12   slept two hours the night before, two hours.  He has a

13   young kid at home.  Two hours.

14               They are bringing him in at 8:15.  He is on two

15   hours sleep.

16               By the time they finish with the pedigree and

17   telling him the details of the polygraph, it is 11:50.

18   And guess who walks in?

19               Volpe, and now comes Detective Dempsey.

20               The March 5th comes first, but the same thing

21   happened when they interrogate Kogut.

22               According to Dempsey, I was just there.  I

23   wasn't expecting it, and they said, hey, why don't you go

24   in and help Volpe at 11:50 with the interrogation.

25               This guy is basically the bad cop.  That is

Summation/Scheck

5875

1    basically the deal here.

2          He comes in at 11:50 and according to him a

3    verbal remand is given.  Because the plaintiff is in

4    custody.  And they gave him a verbal remand -- Miranda,

5    rather, and they have no rights card.  That is their

6    story.

7          Again, Dempsey is supposed to be the witness and

8    Volpe is the interrogator.

9          Then what goes on from 11:50 to 3:50 a.m.,

10   according to them, is a cordial, friendly conversation,

11   friendly discussion.  And he is on two hours sleep, there

12   all night.

13         Does he ask to call Joanne, who is home with the

14   baby?

15         No.

16         Is he asked to call -- does he ask to call a

17   lawyer?

18         No, very cordial and having a friendly

19   discussion.

20         Then around 3:50, just before they are about to

21   release him, before they tell him, just before they tell

22   him, John Restivo says, oh, you know, something is

23   bothering me.  I know something but I'm afraid to say.

24         Then at that point he starts giving the

25   statement from between 3:50 and 8:30 a.m., and Volpe signs

**Summation/Scheck**

5876

1   out, where Dennis Halstead out of the blue says, hey, I

2   fucked some girl and I fucked her up and I strangled her

3   and something having to do with the cemetery. And he

4   gives that statement there. And then he takes him out.

5          And then we have the latest version that you

6   heard from Sharkey, that between 9:30 a.m. and 4:00 p.m.,

7   you know, what happens is Sharkey comes in and again, out

8   of the blue, he knows something -- nothing about the

9   status of the case, and Volpe says, why don't you go in

10  and evaluate Mr. Restivo and his statement, evaluate.

11         Sharkey goes in there to do that?

12         He sees him sleeping, right?

13         Does he ask, how does this guy get here? What

14  happened? How long did he -- was he here? Has he been

15  fed? Does he sleep?

16         No. Nothing about it. Not a thing. He goes in

17  and reviews the statement two or three times until 12:00

18  o'clock, you know, where he lets him eat lunch and asks

19  him for his fullest cooperation. And from 2:00 to 4:00

20  there is more discussion and then they drive him home.

21  That is their version.

22         Now, there is a probable version as well. You

23  heard Detective Dempsey testify, and Dempsey says he was

24  there, he was there for the whole thing, from 8:30, you

25  know, all the way to the time he left with Sharkey.

Summation/Scheck

5877

1        Sharkey doesn't remember Dempsey there.  It is

2  in Dempsey's notation, and Dempsey testifies to it, kind

3  of an odd thing, right?

4        That is their version.  And you heard Dempsey

5  testifying, by the way, did he -- he didn't ask to call

6  Joanne or a lawyer?

7        Did you raise your voice?  No.

8        Did you curse?  No.

9        I always find it better to use honey.

10       Remember?

11       Never yelled, never touched him.  Very, very

12  friendly conversation until all of a sudden.

13       Then there is John's version, and you can see he

14  was plainly traumatized.  This was the worst thing that

15  ever happened to him.  He is brought in, and they ask him

16  pedigree questions, tell us who your friends are, show him

17  the picture of a young black kid and ask him, you know,

18  have you seen this guy?  Do you know something about the

19  homicide?  No, I don't.

20       They tell him he fails the polygraph and all of

21  a sudden 11:50 p.m. Dempsey comes in.  When Dempsey comes

22  in, it gets very ugly, and Dempsey grabs him by the neck,

23  is this the way you strangled her, and hits him with an

24  open hand, and then it starts, Halstead, cemetery, on and

25  on.

**Summation/Scheck**

5878

1      He asks to call a lawyer, they don't let him.

2      He asks to call his wife, they don't let him.

3      They tell him this is un-America, you have no

4  rights here.

5      Listen, let's get real, let's get real.  If

6  these two cops start doing it to you in an eight by eight

7  room, in a homicide room, you will get terrified, I don't

8  care who you are, as an American citizen, you are

9  terrified, it is unconstitutional.  It is a police state.

10  That is what they did.

11      Who do you believe?  Do you believe John Restivo

12  or these fairy tales telling you about the interrogation?

13      What does it tell you about the kind of police

14  department they were running in this case in this

15  investigation?

16      There were no rules anymore.  They broke them

17  all.

18      Now, John is so traumatized by this, and you

19  heard him.  He can't even remember Sharkey.  He doesn't

20  even remember him.  He was sleeping.

21      Now, look, whose scenario are you going to

22  believe?

23      Why did they bring Sharkey in here?  As Tony

24  Grandinette told you, first, go in there and in case there

25  is an attack on whether it is a coerced statement, they

Summation/Scheck

5879

1    have somebody in there to say I reviewed it, and again, it

2    was okay, and Dempsey was sitting right there.

3           Or they want to make him a star witness against

4    Dennis Halstead.

5           Frankly, they bring him in because he knows

6    John's father and says we are family.  Don't do anything

7    stupid.

8           But John Restivo did call Ted Robinson, and he

9    did complain.

10          And, of course, the DNA.  Why is he going to

11   suddenly say this with the DNA that he didn't rape her,

12   that he didn't do this?  It has got to be coerced, and

13   what John Restivo is saying is what happened.

14          I must say something here.  When Detective

15   Dempsey was cross-examined, you saw Mr. Halstead do

16   something inappropriate.  He was angry.  He apologized to

17   you and apologized to the Court.

18          And we thank you for bringing this to our

19   attention.  And we thank you for your willingness to put

20   it aside in a fair and impartial review of the evidence,

21   the evidence in this case.

22          Thank you very much.

23          Now, Harry Smyle, here is another witness.  He

24   is interrogated on March 5th, March 7th, the 27th.

25   Obviously he is a vulnerable witness.

Summation/Scheck

5880

1          He recalls they are all over him, feeding him

2    scenarios.

3          Nobody is saying John Restivo didn't say, maybe

4    they will find her strangled, like lots of people said.

5          Did John Restivo say, I know who did it, and I

6    will not tell you?

7          Smyle said that is something that they coerced

8    him and fed him to say.  He did say that.

9          The vulnerable witness who was fed scenarios.

10          Now, Kenny Cockerel, Michael Cockerel's brother,

11    is brought in on April 19th.  Remember, they are bringing

12    all these people in.  He is interrogated for ten and a

13    half hours.  And then he signs a statement where he says,

14    I walked into my brother Michael's place and I overheard

15    John Restivo say to my brother Michael as I'm walking into

16    the foyer, I got my piece of ass, but I didn't choke her.

17          That is what happens, he is picked up in the

18    morning and he is brought in, initially interrogated by

19    Volpe, 2:30 in the afternoon Allen comes in and they take

20    the statement from him.  He was pre-diabetic, and they

21    kept on offering him cakes and sweets, and he didn't take

22    that.  Maybe he was fed, at best they are saying 3:00 in

23    the afternoon.  And they had coffee, there he is, 21 years

24    old.

25          June 10th he goes into the grand jury.

Summation/Scheck

5881

1          He told it to Rick Arden and told it to his

2    brother Michael and told them they coerced a false

3    statement with respect to Restivo and Halstead, and he

4    goes into the grand jury on June 10th, you went through

5    the testimony.  He testified on June 10th he was coerced,

6    they were giving him scenarios, putting ideas in his head,

7    this thing never happened, Volpe was walking around with a

8    bat or a stick and tapping it, and he gave the statement.

9    That was in the morning.

10          Of course, for saying this, which is the truth,

11    they indict him for perjury.

12          What do they do?  They take him outside,

13    handcuff him, bring him to the precinct, it is Volpe,

14    Sirianni and Allen.  And he comes back in the afternoon.

15    And now he gives a new statement saying, I overheard

16    Restivo saying I was there, but I didn't choke her.  He

17    gets rid of I --  I got my piece of ass.

18          Of course, he says the police never did anything

19    to me.  It was a free and perfectly nice conversation.

20          How do you know it is a coerced statement?  How

21    do you know?  Because on June 17th Michael Cockerel went

22    into the grand jury and testified it never happened.

23          When Michael Cockerel came in here and

24    testified, not only did it not happen, he said.  He said

25    it was bullshit, his words.

5882

1    How did Kenny Cockerel testify to an overhearing

2    that is so incriminating if his own brother said it never

3    happened, right, unless they coerced him?

4    That is pretty good evidence of coercion of

5    false witness statements, and that is why we wanted Kenny

6    Cockerel to come in and testify, he didn't want it,

7    understandable.

8    We tried to get him deposed, he got service, and

9    threw it away.  When the marshal came, he pretended it was

10   somebody else, and we wind up deposing him at the time we

11   selected the jury, and I think you were all here and we

12   started evidence.

13   Finally he was forced to come in, because he

14   gave the story, because he didn't want to help the

15   plaintiffs in this case, he gave the story so nuts it is

16   not really believed.

17   Do you remember his story about how he had this

18   daughter, and the mother of his daughter, he was afraid of

19   Charley Restivo, who, by the way, was in jail through most

20   of this period, starting I think on November 11th or 12th,

21   all the way through Charley Restivo in jail, and he was

22   terrified of Charley Restivo, and he asked two friends,

23   Pauly and Mikey, Hell's Angels he met at the bar, and take

24   the mother of his daughter and take them to Newark Airport

25   and flying to Miami, the Hell's Angels flying her, and he

**Summation/Scheck**

5883

1   has never seen them again, and he went into the grand jury

2   and all he was doing is looking at the clock and waiting

3   to see when the Hell's Angels can get her out of town.

4          He goes over to his parents, they didn't buy him

5   a ticket in advance, the whole story is ludicrous.

6          Something he said because he didn't want to say

7   what the cops really did.

8          Now, Michael Cockerel, who worked for John.  And

9   he was interrogated first on April 2nd, 1985 for nine

10  hours and says he was intimidated.

11         They said, hey, we think you were there and

12  watched this, right?

13         He admits he was treated like a suspect.  And he

14  said, they started bringing everybody in, they brought in

15  everybody they knew, they were bringing them all in and

16  working them over for long periods of time.  And he

17  described it as an atmosphere of fear.

18         And the advice he gave to his brother, and he

19  testified to it was, he used the expression, he advised

20  his brother, you do what you gotta do.

21         I asked him what do you mean by you do what you

22  gotta do?

23         He said, do what you got to do to survive, do

24  what you got to do in court, tell the truth and lie, do

25  what you got to do?  Fair enough.

Summation/Scheck

5884

1          Yeah, fair enough.

2          And Michael Cockerel, you know, was -- he felt

3    after a while being pressured by the Restivos because he

4    is an important alibi witness, and he was certainly

5    receiving a lot of pressure from the cops.  And it was his

6    sworn testimony by the time he got to the grand jury on

7    June 17th, 1985, because initially John remembers him

8    going downstairs, when he slept over, and you try to

9    remember what happened on November 10th, 1984, when you

10   are starting to think about it, and you are asking your

11   questions about it in April, first he thought he slept

12   over and then spoke to his wife Dawn, who gave a statement

13   and saying I remember you came home at 11:05.  So that is

14   what he was telling the defense.

15          Then he goes to the grand jury and he says,

16   look, by June 17th I stopped talking to Restivo, the

17   defense team.  I wasn't talking to the defense then.  And

18   he gets on the witness stand and testifies before the

19   grand jury that he left about 9:00 or 10:00 p.m.  And he

20   also testified that this whole Kenny Cockerel overhear

21   thing never happened, okay?

22          Now, what happens next?

23          You know, Volpe can't live with 9:00 or 10:00

24   p.m., can he, he can't live with it, because Theresa Fusco

25   is leaving Hot Skates at 9:47.  So Cockerel is there on

Summation/Scheck

5885

1   November 10th to 9:00 or 10:00 p.m., Restivo has an air

2   tight alibi, and he can't live with it.

3           What happens?  On February 13th Michael Cockerel

4   tells him Volpe brings him into the precinct around

5   4:00 p.m. and says you are not telling us anything, by

6   3:20 a.m. there is a new statement, he is now saying I

7   left by 7:00 or 8:00 p.m., and by the way, the next day I

8   spoke to John on the telephone, November 11th, he sounded

9   kind of drunk or hung over and he says I got my dick wet

10  last night.

11          And that was not helpful testimony.  When

12  Michael Cockerel was called as an alibi witness at the

13  trial, and he is saying at 7:00 or 8:00 p.m. he is giving

14  the dick wet statement.

15          That came from Volpe on February 13th, 14th when

16  they brought him again and working him over.  And it is

17  just so obvious.

18          Now, just to show you how Michael at this

19  point -- do you remember when he was being cross-examined

20  at this trial, I was quoting to him his grand jury

21  testimony.  And in the grand jury on June 17th he was

22  asked by Mr. Klein -- remember this is when he is trying

23  to tell the truth as best he knew it -- how about you,

24  when did you leave?

25          Answer:  I don't know the particular time I

Summation/Scheck

5886

1   left.  My wife said I came home.

2           Question:  I don't want you to -- I don't want

3   to know what your wife said, I want to know based upon

4   your own recollection of that day when you left the house.

5           Answer:  Around 9:00 or 10:00 o'clock.

6           In the evening?

7           Yes.

8           How did you get back to your house?

9           Restivo's station wagon, the Chevy station

10  wagon.  You see that, sir?

11          Answer:  Yes, I do.

12          Now, if you were called at the trial, and

13  Michael Cockerel, if you recall, was trying to say, oh,

14  no, when Fred Klein interrupted me at the grand jury, I

15  was trying to say 7:00 or 8:00 p.m.

16          That is plainly not what was going on in the

17  grand jury.

18          Klein interrupted him because he was saying tell

19  me from your own memory, not based on what Dawn Cockerel

20  told you.

21          The next slide.

22          When Volpe brought him in and worked him over

23  from 4:20 -- 4:00 p.m. to 3:20 p.m. on February -- a.m. on

24  February 20th, 1986, and that is the kind of statement

25  that falsely convicts people at trial.

Summation/Scheck

5887

1          Now, let's talk about this alibi.

2          Your know, John Restivo, and I hate to say that

3     he is a lucky man in some respects, because there is

4     nothing lucky getting framed for murder and doing 18 years

5     in jail, is there?

6          But, you know, November 10th, 1984, he is pretty

7     lucky in that day and age, not in the digital day and age,

8     that he was actually doing a sanding job where he can get

9     a receipt from Price Tools, and that Paul Lampersona

10    rented him the edger and everybody was there, and they

11    remember, and Michael Cockerel was with him, and he had

12    telephone records of who he called, including the

13    telephone record that Joanne wasn't in the house, right?

14    She was pregnant and didn't want to be exposed to the

15    polyurethane.

16         The two had conversations for 11 or 12 minutes

17    from the Cockerel house to the -- to Joanne's mother's

18    house where she was.

19         How do you get past that?  You can't get past

20    that.

21         Watch, they call Tom DeCrascenza, right, and Tom

22    DeCrascenza, he spoke to Michael Cockerel on the phone.

23    Michael Cockerel is there.  And Michael Cockerel didn't

24    tell you that Joanne is there.

25         Tom is mistaken when he says I heard a voice in

Summation/Scheck

5888

1  the background that could have been Joanne and could have

2  been Lampersona, and could have been TV.  They were

3  watching TV.

4          Watch, they are going to get up and argue, Tom

5  DeCrascenza heard Joanne's voice in the background.  What

6  really happened here, sometime after Michael Cockerel left

7  at 8:00 p.m., Joanne came despite the polyurethane, and he

8  said I will go out again in the blue van and find my two

9  buddies, we are going to go out, get high and find Theresa

10  Fusco and committed the murder.

11          You can't get past that.  You can't get past

12  that.  Watch them try.

13          This is what you call doubling down on denial.

14  This is it.

15          So now let's go to the last claim, the

16  supervisory claim.  And you will see that there are two

17  forms of this claim that go to you concerning Lieutenant

18  Spillane, and there are two forms of proof, one option is

19  did he directly participate in a constitutional violation?

20          If you say yes to that, you can go directly to

21  liability.

22          Or, two, there is another way to prove the

23  liability, and that is by, if he is a supervisor acting

24  with deliberate indifference, and created a policy, a

25  custom and environment where unconstitutional practices

5889

1   can occur in the precinct, then he can be found liable

2   that way.

3           However, if you find him liable that way, then

4   the burden shifts to the defendants to prove by a

5   preponderance of the evidence that he has what is known as

6   qualified immunity, that is to say, that a reasonable

7   person in his position would not know that the conduct --

8   the Judge will charge you on precisely what that is -- but

9   the conduct that he was allowing to occur essentially in

10  creating an environment was not unconstitutional.

11          Now, there is no way that what was going on here

12  any supervisor can think wasn't unconstitutional.

13          Let's take a look at the time line.

14          Ted Robinson.  We know that as soon as John got

15  out of that precinct, he went to Ted Robinson, and

16  Robinson immediately called Dempsey.

17          There is an exhibit, Dempsey writing it down

18  where he says, I know you did terrible things to my

19  client.  You wouldn't let him call his lawyer, I -- you

20  had him there for 20 hours, they wouldn't take the notice

21  of appearance orally, and Robinson obviously got upset,

22  and he was hung up on, and he called again and spoke

23  directly to Lieutenant Spillane, right, repeating the same

24  kind of complaints.  He is right there.  He knows from the

25  jump exactly what is going on there.

5890

1      Robinson on March 19th, you can look at the

2  letter, it is in evidence.  Robinson sends a letter to

3  Commissioner Rozzi, and he is complaining about abuse by

4  Volpe, Dempsey, Spillane and Sharkey, complains about an

5  assault on John Restivo and about being deprived of phone

6  calls.

7      Depriving somebody in a 20 hour interrogation is

8  a deprivation of constitutional rights, you are a

9  supervisor, you have to know what is done with that.  You

10  are told by a lawyer, the head of the Criminal Bar

11  Association.  I don't care if they think Ted Robinson is

12  the most obnoxious person in the world, if you are a

13  supervisor in homicide, don't you have to take it

14  seriously?

15      He gets no relief and Robinson writes a letter

16  to the head of the Homicide Bureau complaining about this.

17      Finally on March 28th, 1985, Rozzi responds with

18  a form letter that is in evidence for you to look at,

19  saying, okay, we will conduct an inquiry, right?

20      Then by April 12th, you know, and that is after

21  Michael Cockerel has been brought in for ten hours,

22  Robinson told you he filed an Article 78 asking for

23  injunctive relief and saying we still have people being

24  harassed and worked over here, okay?

25      Finally, on May 20th, 1985, Robinson sends

Summation/Scheck

5891

1    another letter to the Police Commissioner saying the

2    misconduct continues.

3              And just if there is any doubt about what he is

4    talking about, he is talking about threats of violence

5    against potential witnesses, prolonged and illegal

6    detentions of citizens, and generally unacceptable

7    threatening and harassing behavior on the part of police.

8              This is serious unconstitutional stuff, isn't

9    it?

10             By this point, you know, if Spillane is not

11   directly participating, he is surely deliberately

12   indifferent about his supervising responsibilities, about

13   an environment at Homicide creating a custom and practice

14   with lengthy interrogations where people's constitutional

15   rights are violated.

16             No reasonable competent supervisor in Spillane's

17   position can fail to realize that these were

18   unconstitutional practices.

19             Now, let's look at this.  It came in as a

20   stipulation at the end of the case, but doesn't it tell

21   you everything you need to know, everything?

22             You know, they sent back a letter on

23   February 26th, and July 3rd, saying we conducted an

24   inquiry, and there is nothing to -- that you say here to

25   Mr. Robinson.

Summation/Scheck

5892

1    Now we have been through the court file and

2  there is not one single document indicating that Spillane

3  spoke to Volpe, to Dempsey, what is your side of the

4  story, what is going on, not one single person was

5  questioned about these accusations.  There is not one

6  piece of writing.

7    Now, you all work in institutions, and are

8  supervisors, and deal with supervision.

9    How is that possible, unless there is deliberate

10  indifference to what is going on.

11    Not just deliberate indifference, Spillane knows

12  what is going on.  He is in biweekly meetings.  He has got

13  a guy, it is his first homicide, right?  He is supporting

14  him with people like Dempsey, the designated bad cop.  How

15  can there not be one document, not one document?

16    How about this.

17    You would expect at least there would be one of

18  these cover your ass, little internal documents, where,

19  remember, this is the form about the rights cards.  And

20  this is put into place just a few months before all these

21  interrogations.

22    Why were they talking about the need for these

23  detectives to have somebody fill out the rights card and

24  sign it and read the rights right from the card?  Why?

25    Because several procedural errors on the part of

5893

1    uniformed and detective personnel, the failure of members

2    to adhere to established procedures.

3           In other words, there is a regulation right

4    there that says you got to use this rights card.

5           So would you expect at the very least, if you

6    believed everything that Volpe and Dempsey said, we never

7    did anything to Restivo.  It is a totally cordial

8    conversation from 11:50 to 4:00 in the morning?  We never

9    did anything to Kogut.

10          At the least, if you want to cover your ass,

11   somebody would say, but in the John Restivo case they

12   didn't even have him sign a rights card.  And in the Kogut

13   case there was a rights card signed but there was a

14   confusion about the case?

15          Now, even if you were doing a cover your ass

16   supervisory investigation memo, they had to acknowledge

17   that those improprieties occurred.

18          But, of course, they did nothing, nothing.

19   Because they didn't care at this point.  They can --

20   Spillane was deliberately different -- indifferent.

21          And this is the end.

22          In closing, I would like to share a thought with

23   you about the critical role that juries play in this, the

24   greatest democracy that the world has ever known.

25          We rely on juries to right wrongs; to speak

Summation/Scheck

5894

1    truth to power; to make sure that those who are sworn to

2    enforce our laws and obey our Constitution play by the

3    rules.  Our constitution is a brilliant document.  Its

4    rules are designed to protect the innocent.  But those

5    same rules protect all of us.  They protect the community.

6    They insure the public safety.  Because every time an

7    innocent man is convicted, the person who really committed

8    that crime goes free and perhaps commits more crimes.

9            So that is what is at stake in this case.

10   Constitutional rules that protect all citizens, no matter

11   who they are, race, religion, ethnic origin, no matter

12   what you think of them, these rules are designed to

13   protect all of us.  They are designed to protect the

14   public safety.  That is the genius of it.  That is why we

15   protect the innocent no matter who they may be, because

16   the guilty get away and then we are all at risk.

17           And constitutional rules that protect the

18   integrity of our system of justice.

19           Now, we have proven by a preponderance evidence,

20   more likely than not, that those rules were not just

21   violated, they were annihilated, annihilated by the action

22   of these defendants in this case.

23           Give us a verdict that finally, at the end of

24   this long arc of the moral universe, does justice.

25           Thank you.

Summation/Scheck

5895

1          THE COURT:  Thank you, Mr. Scheck.

2          Ladies and gentlemen, we will break for the

3    balance of the day.

4          Of course, I just want you to know that everyone

5    appreciates your service here.

6          Do not discuss this case with anyone.  If anyone

7    tries to influence you in any way, please immediately

8    report that to the Court without discussing it with the

9    other jurors.

10          Do not read, listen to, or view anything that

11    might be recorded in the media concerning the facts of

12    this case.

13          Of course, don't go on social media or converse

14    about the case on social media.

15          You are not to do any research, investigate on

16    your own as to the facts of the case.  And continue to

17    keep an open mind.

18          Tomorrow we will start at 9:30.  Please be on

19    time.

20          The defendants will give their closing

21    arguments, and then we will have a very brief rebuttal by

22    the plaintiff.

23          Have a nice evening and rest up.

24          Thank you.

25          Also, let Mr. Baran know about your Wednesday

Summation/Scheck

5896

1    schedule.

2              (Whereupon, at this time the jury leaves the

3    courtroom.)

4              THE COURT:  So --

5              MR. FREEMAN:  I have something, your Honor.

6              THE COURT:  You have something?

7              MR. FREEMAN:  Yes.

8              While I was preparing, I noticed on page 1457 of

9    the transcript that the limiting instruction on the use of

10   Judge Ort's decision was never finalized.  We talked about

11   it.  And I said we talked about it earlier, or would you

12   rather wait until later?

13             You said, I will wait for later.

14             THE COURT:  It never got dealt with?

15             MR. FREEMAN:  I'm handing up a short proposed

16   charge.

17             THE COURT:  All right.

18             MR. FREEMAN:  It doesn't have to be dealt with

19   tonight.

20             THE COURT:  All right.

21             I will see you folks tomorrow.

22             (Case on trial adjourned until 9:30 o'clock

23   a.m., Tuesday, November 20, 2012.)

24

25

**'**

**'84** [2] - 5753:7;
5769:4
**'86** [1] - 5726:18

**0**

**010** [1] - 5873:4
**06** [1] - 5697:14
**07030** [1] - 5698:6

**1**

**1** [2] - 5778:2, 14
**10** [10] - 5711:20;
5746:9; 5783:20;
5785:12; 5809:16;
5845:10; 5847:23;
5864:18; 5865:1, 3
**100** [5] - 5697:21;
5756:18, 20; 5858:19,
22
**10007** [1] - 5698:14
**10013** [1] - 5698:8
**10:00** [6] - 5795:17;
5866:23; 5884:19, 23;
5885:1; 5886:5
**10:20** [1] - 5789:23
**10:26** [3] - 5789:23;
5809:16
**10:30** [2] - 5780:6
**10th** [18] - 5784:2, 6;
5787:1, 5, 12; 5788:6,
19; 5791:6, 11;
5809:25; 5857:3;
5860:16; 5880:25;
5881:4; 5884:9; 5885:1;
5887:6
**11** [4] - 5723:1;
5740:17; 5790:6;
5887:16
**11/10/84** [2] -
5787:19, 21
**11/11/84** [1] - 5787:16
**114** [1] - 5698:3
**11501** [2] - 5698:3, 11
**11722** [1] - 5697:22
**11:05** [2] - 5819:4;
5884:13
**11:33** [1] - 5770:6
**11:50** [6] - 5874:17,
24; 5875:2, 9; 5877:21;
5893:8
**11th** [3] - 5809:22;
5882:20; 5885:8
**12** [10] - 5735:2, 8-9;
5736:24; 5738:11;
5741:17; 5814:7;
5815:16; 5816:1;

**5887:16**
**12/2/09** [1] - 5712:2
**120** [2] - 5771:18, 22
**12:00** [1] - 5876:17
**12:15** [1] - 5787:21
**12:18** [1] - 5770:6
**12:23** [1] - 5704:24
**12th** [2] - 5882:20;
5890:20
**135** [1] - 5779:7
**13th** [2] - 5885:3, 15
**1457** [1] - 5896:8
**14th** [1] - 5885:15
**15** [15] - 5702:5;
5759:19; 5764:1;
5772:3, 7-8; 5796:23;
5815:8, 20; 5851:5;
5853:15, 20; 5856:19;
5857:6; 5867:4
**16** [3] - 5796:23;
5815:8; 5826:18
**161** [5] - 5825:16, 24;
5827:7; 5838:5; 5839:21
**163** [1] - 5828:20
**17th** [6] - 5830:1;
5845:8; 5881:21;
5884:7, 16; 5885:21
**18** [6] - 5704:1;
5712:1; 5766:7;
5775:25; 5776:1; 5887:4
**18th** [2] - 5823:25;
5826:1
**19** [3] - 5697:8;
5704:3; 5712:2
**194** [1] - 5755:9
**1984** [18] - 5711:6, 20;
5722:1; 5736:17, 20;
5746:9; 5767:21;
5769:1; 5776:12;
5785:12; 5787:12;
5788:6; 5795:24;
5832:2; 5860:16;
5884:9; 5887:6
**1985** [13] - 5711:6;
5715:11; 5773:10;
5783:20; 5784:6;
5809:9; 5860:17;
5865:7; 5866:23;
5883:9; 5884:7;
5890:17, 25
**1986** [20] - 5714:6;
5723:11; 5725:16;
5729:1; 5739:11;
5741:17; 5750:20;
5806:23; 5809:22;
5818:13; 5824:9;
5830:13; 5831:3;
5834:23; 5842:21;

5887:16
**5848:19, 25; 5866:5;**
5886:24
**1988** [5] - 5853:1, 3;
5854:14, 20; 5858:6
**1989** [2] - 5813:15;
5816:17
**1990** [1] - 5853:7
**1994** [9] - 5811:4, 9,
15; 5831:22, 24;
5832:14, 24; 5833:14,
16
**1995** [1] - 5811:4
**19th** [2] - 5880:11;
5890:1
**1:30** [2] - 5769:24;
5770:4

**2**

**2** [4] - 5699:23;
5704:3; 5710:13, 24
**2/15/84** [1] - 5779:8
**20** [14] - 5740:1;
5787:22; 5789:24;
5851:5; 5853:15, 20;
5856:19; 5857:6;
5867:5; 5874:5;
5889:20; 5890:7;
5896:23
**200** [3] - 5698:5;
5734:11; 5756:18
**2002** [8] - 5727:23;
5730:19; 5811:16;
5833:16; 5840:11;
5841:22; 5842:19;
5843:1
**2003** [5] - 5722:22;
5723:1; 5740:17;
5741:21; 5833:16
**2004** [1] - 5855:20
**2005** [13] - 5714:9;
5716:6; 5723:4;
5728:21, 24; 5730:20;
5733:15; 5735:14, 20;
5738:16; 5744:12;
5811:16; 5866:8
**2006** [1] - 5702:23
**2007** [4] - 5708:17, 19;
5712:23; 5855:20
**2009** [13] - 5703:24;
5704:1-3; 5711:25;
5712:1
**2010** [3] - 5704:4;
5712:2, 24
**2011** [3] - 5704:13, 17;
5712:5
**2012** [4] - 5697:8;
5708:18; 5830:1;
5896:23

**2015** [1] - 5874:3
**20th** [2] - 5886:24;
5890:25
**21** [5] - 5723:4;
5773:10; 5810:13, 17;
5880:23
**21st** [3] - 5773:17, 19;
5782:3
**222** [1] - 5711:20
**23** [2] - 5855:20, 25
**24** [11] - 5704:2;
5712:2; 5719:9; 5735:7;
5736:15; 5738:10;
5762:3, 5, 8, 10;
5765:13
**24,000** [1] - 5856:2
**25** [7] - 5715:11;
5783:2; 5801:5; 5857:3,
16-17; 5861:9
**25th** [4] - 5760:10;
5775:10; 5778:18
**26** [4] - 5703:24;
5711:6, 25; 5801:15
**262** [2] - 5832:15, 17
**26th** [5] - 5861:20;
5862:1, 9; 5864:23;
5891:23
**27** [2] - 5758:12;
5801:16
**27th** [3] - 5866:23;
5867:1; 5879:24
**28** [2] - 5727:18;
5755:25
**28th** [1] - 5890:17
**29th** [4] - 5847:24;
5864:23; 5865:7; 5868:6
**2:00** [1] - 5876:19
**2:30** [1] - 5880:19
**2:42** [1] - 5704:7
**2nd** [1] - 5883:9

**3**

**3** [4] - 5704:12, 17;
5712:5; 5719:9
**3/26/85** [1] - 5779:16
**3/5** [1] - 5765:24
**30** [3] - 5698:13;
5845:9; 5867:9
**30th** [1] - 5867:16
**31** [2] - 5771:11, 25
**34** [2] - 5770:7;
5771:17
**37** [1] - 5740:11
**39** [2] - 5771:12, 17
**3:00** [1] - 5880:22
**3:20** [2] - 5885:6;

1

**5886**:23

**3:30** [1] - 5737:2

**3:50** [3] - 5875:9, 20, 25

**3rd** [1] - 5891:23

---

**4**

**4** [3] - 5704:2; 5712:1; 5737:5

**400** [1] - 5775:1

**45** [7] - 5707:5, 14, 16; 5710:11; 5712:10; 5771:15; 5852:6

**46** [1] - 5772:1

**4:00** [6] - 5737:6; 5876:6, 19; 5885:5; 5886:23; 5893:8

**4:04** [1] - 5865:8

**4:05** [1] - 5868:6

**4:20** [1] - 5886:23

**4:30** [1] - 5874:5

**4:45** [3] - 5737:6, 10, 14

---

**5**

**5** [6] - 5704:1; 5705:15, 17; 5711:4, 6, 25

**50** [1] - 5699:12

**500** [1] - 5698:5

**51** [2] - 5770:5; 5771:12

**59-A** [2] - 5799:2; 5826:8

**5th** [6] - 5761:25; 5809:9; 5857:4; 5874:2, 20; 5879:24

---

**6**

**6** [7] - 5703:7; 5704:2; 5705:16; 5711:17; 5712:1; 5741:17; 5746:7

**631** [1] - 5697:22

**66** [1] - 5785:18

**6695** [1] - 5697:4

**684** [1] - 5732:3

**6:15** [2] - 5737:14; 5874:4

**6:28** [1] - 5737:25

**6:30** [1] - 5785:23

**6th** [5] - 5706:8; 5809:9; 5825:18; 5827:7; 5874:2

---

**7**

**712-6105** [1] - 5697:22

---

**78** [2] - 5856:9; 5890:22

**7:00** [3] - 5885:7, 13; 5886:15

**7th** [5] - 5706:11; 5827:10; 5828:21; 5879:24

---

**8**

**8:00** [6] - 5787:12; 5795:17; 5885:7, 13; 5886:15; 5888:7

**8:10** [1] - 5787:13

**8:11** [1] - 5789:1

**8:15** [1] - 5874:14

**8:30** [5] - 5719:9; 5762:2; 5778:21; 5875:25; 5876:24

**8th** [1] - 5860:17

---

**9**

**9** [2] - 5736:17, 20

**9.9** [1] - 5791:20

**96** [1] - 5771:16

**98** [1] - 5858:19

**99** [1] - 5698:7

**9:00** [5] - 5778:18; 5884:19, 23; 5885:1; 5886:5

**9:15** [2] - 5789:9, 13

**9:30** [6] - 5697:9; 5700:8; 5819:4; 5876:6; 5895:18; 5896:22

**9:45** [1] - 5819:5

**9:47** [2] - 5737:25; 5884:25

**9:49** [1] - 5795:16

**9:50** [3] - 5738:2; 5789:20; 5823:5

**9th** [1] - 5829:22

---

**A**

**a.m** [10] - 5697:9; 5719:9; 5787:12; 5866:23; 5875:9, 25; 5876:6; 5885:6; 5886:23; 5896:23

**A5** [1] - 5722:16

**abandoning** [1] - 5717:17

**abducted** [3] - 5728:15; 5755:17; 5835:4

**abducting** [1] - 5809:18

**abduction** [1] - 5835:10

**ability** [1] - 5752:3

**able** [9] - 5700:5, 13; 5783:12; 5797:8; 5810:3; 5834:8, 12; 5858:18

**abrasions** [3] - 5748:6, 11, 17

**absence** [2] - 5753:4; 5771:5

**absent** [1] - 5746:20

**absolute** [1] - 5767:22

**absolutely** [11] - 5749:19; 5765:17; 5773:20; 5781:6; 5787:10; 5790:14; 5793:21; 5800:4, 11; 5819:21; 5840:4

**absurd** [3] - 5729:20; 5741:25; 5759:4

**abuse** [1] - 5890:3

**abused** [1] - 5763:16

**abusive** [1] - 5762:20

**Academy** [1] - 5855:6

**accept** [14] - 5713:20, 23; 5741:11; 5759:4, 12-13; 5766:4; 5789:11; 5803:8; 5819:22; 5837:23; 5861:16

**acceptable** [3] - 5705:12; 5724:15; 5807:20

**accepted** [1] - 5842:16

**accident** [1] - 5796:14

**according** [16] - 5719:17; 5720:7, 20; 5739:23; 5746:8; 5747:18; 5783:22; 5793:21; 5794:20; 5796:8; 5799:8; 5851:4; 5853:17; 5874:22; 5875:2, 10

**accordingly** [1] - 5803:9

**account** [3] - 5721:20, 23; 5799:3

**accuracy** [2] - 5722:15; 5724:1

**accurately** [1] - 5722:7

**accusation** [1] - 5764:16

**accusations** [2] - 5866:6; 5892:5

**accuse** [1] - 5730:6

**accused** [2] - 5730:7; 5786:12

**acknowledge** [6] -

---

**5727**:12; **5728**:11, 17; **5757**:9; **5874**:4; **5893**:16

**acknowledged** [2] - 5722:16; 5865:9

**acknowledges** [1] - 5829:4

**acoustics** [1] - 5743:8

**acquittal** [2] - 5744:15; 5817:23

**acquitted** [2] - 5803:3; 5817:19

**act** [2] - 5816:4, 9

**acted** [2] - 5716:3; 5807:18

**acting** [1] - 5888:23

**action** [2] - 5717:24; 5894:21

**actions** [2] - 5786:16, 20

**active** [1] - 5736:2

**activities** [1] - 5813:4

**ad** [2] - 5788:14; 5836:7

**ADA** [5] - 5716:14; 5718:20; 5744:23; 5751:21; 5753:24

**add** [2] - 5708:20; 5816:22

**addict** [1] - 5727:6

**addicts** [1] - 5769:1

**addition** [10] - 5699:22; 5700:4; 5731:23; 5732:1; 5745:2; 5746:22; 5751:5; 5805:12; 5814:13; 5872:24

**additional** [5] - 5702:6; 5705:1; 5706:10; 5711:21; 5712:20

**address** [1] - 5723:21

**adhere** [1] - 5893:2

**adjourned** [1] - 5896:22

**adjuster** [1] - 5700:1

**adjusters** [1] - 5700:19

**admissible** [1] - 5777:24

**admission** [2] - 5763:13; 5764:20

**admissions** [3] - 5779:10; 5809:13; 5841:15

**admit** [3] - 5731:2; 5811:9, 22

**admits** [4] - 5732:10; 5765:11; 5862:9; 5883:13

**admitted** [6] - 5760:24; 5802:7; 5811:15; 5823:7, 14; 5831:7

**admittedly** [1] - 5739:25

**admitting** [1] - 5783:9

**adopted** [1] - 5728:15

**adopts** [1] - 5769:16

**advance** [1] - 5883:5

**advice** [1] - 5883:18

**advise** [1] - 5704:14

**advised** [3] - 5712:25; 5805:7; 5883:19

**affected** [4] - 5817:12, 15; 5847:9; 5856:5

**affidavit** [12] - 5847:24; 5864:18, 24; 5865:11; 5866:10, 16; 5867:17, 19; 5868:25; 5869:18; 5872:2

**afraid** [2] - 5875:23; 5882:18

**afternoon** [5] - 5707:8; 5772:20; 5880:19, 23; 5881:14

**age** [6] - 5713:1; 5726:14; 5731:22; 5796:15; 5887:7

**agent** [1] - 5791:2

**agents** [1] - 5858:17

**ages** [1] - 5856:1

**ago** [3] - 5811:6; 5813:6; 5868:12

**agree** [8] - 5704:21; 5707:23; 5721:12; 5723:25; 5726:1; 5841:19; 5844:21

**agreed** [4] - 5705:7; 5706:18; 5859:15; 5863:19

**agreement** [1] - 5707:25

**ahead** [3] - 5836:12; 5854:25; 5871:4

**air** [1] - 5885:1

**Airport** [1] - 5882:24

**al** [2] - 5697:6, 13

**alarm** [1] - 5826:8

**alarms** [1] - 5762:9

**albeit** [1] - 5741:1

**alcohol** [1] - 5769:17

**alcoholics** [1] - 5769:1

**alibi** [8] - 5734:9; 5787:9; 5791:14; 5884:4; 5885:2, 12; 5887:1

**alibis** [4] - 5785:6, 10; 5791:13; 5802:15

**alive** [2] - 5738:2; 5851:9

**Allbright** [1] - 5774:4

**alleged** [2] - 5781:1; 5783:13

**allegedly** [6] - 5753:2; 5758:10; 5779:14; 5780:25; 5797:5; 5799:17

**Allen** [2] - 5880:19; 5881:14

**alleyway** [6] - 5835:7, 11, 19, 23; 5836:6, 13

**allow** [3] - 5699:19; 5702:18; 5707:4

**allowed** [1] - 5740:3

**allowing** [1] - 5889:9

**almost** [2] - 5703:7; 5792:20

**alone** [4] - 5824:17; 5857:23; 5858:25; 5859:4

**altered** [1] - 5757:10

**ambiguity** [1] - 5823:4

**ambiguous** [1] - 5818:15

**America** [1] - 5878:3

**American** [2] - 5855:6; 5878:8

**amount** [1] - 5704:10

**analogy** [1] - 5872:16

**analysis** [5] - 5849:9, 20; 5850:8; 5867:2

**analyst** [3] - 5850:20; 5853:9; 5859:12

**analysts** [4] - 5855:3; 5858:5, 21, 25

**analyze** [4] - 5849:15; 5851:3; 5866:21; 5870:4

**analyzed** [1] - 5832:3

**angel** [1] - 5769:18

**Angels** [3] - 5882:23, 25; 5883:3

**anger** [1] - 5776:22

**angry** [2] - 5776:19; 5879:16

**animal** [1] - 5758:18

**ankles** [1] - 5793:15

**ANNA** [1] - 5698:9

**annihilated** [2] - 5894:21

**annual** [1] - 5855:5

**Answer** [33] - 5728:19; 5730:21, 25; 5731:5, 11, 17; 5732:18, 23; 5733:1, 6, 11; 5739:7; 5782:17, 21; 5800:9, 12, 16; 5828:16; 5838:17, 22; 5839:1, 5, 9; 5841:23; 5842:1, 4, 11, 17; 5870:23; 5871:1; 5885:25; 5886:5, 11

**answer** [6] - 5777:25; 5778:1; 5783:19; 5794:18; 5822:3; 5858:4

**answers** [4] - 5728:13; 5778:17; 5782:10; 5800:3

**ANTHONY** [1] - 5698:4

**anthropologist** [4] - 5849:6; 5850:21; 5856:22

**anthropologists** [1] - 5859:6

**anthropology** [2] - 5849:5; 5850:4

**anyway** [1] - 5767:3

**apartment** [3] - 5752:16; 5753:7; 5767:13

**apologies** [1] - 5742:25

**apologize** [1] - 5840:1

**apologized** [2] - 5879:16

**Appeals** [2] - 5722:17; 5833:22

**appear** [2] - 5713:21; 5718:16

**appearance** [1] - 5889:21

**APPEARANCES** [1] - 5698:1

**applicable** [1] - 5743:12

**application** [2] - 5864:25; 5865:12

**applied** [1] - 5849:23

**apply** [2] - 5722:8; 5870:1

**appreciate** [2] - 5768:22; 5849:2

**appreciates** [1] - 5895:5

**apprehended** [1] -

**5810:24

**approached** [2] - 5755:8; 5864:4

**approaches** [1] - 5755:14

**appropriate** [3] - 5705:25; 5716:6, 9

**April** [6] - 5704:2; 5712:1; 5880:11; 5883:9; 5884:11; 5890:20

**arc** [2] - 5805:18; 5894:24

**Arden** [1] - 5881:1

**area** [14] - 5711:10; 5758:11; 5759:1, 9; 5806:3; 5835:9; 5836:9; 5848:4, 6; 5852:1; 5873:20

**arguably** [2] - 5818:23; 5852:18

**argue** [11] - 5727:22; 5738:25; 5780:7; 5783:6; 5812:17; 5824:25; 5836:15, 19, 21; 5888:4

**argued** [4] - 5726:8, 18; 5836:2

**arguing** [2] - 5809:16; 5836:5

**argument** [4] - 5706:6; 5713:21, 24; 5837:25

**arguments** [7] - 5705:23; 5713:21; 5738:15; 5743:12; 5811:25; 5835:18; 5895:21

**arise** [1] - 5848:8

**arising** [1] - 5851:25

**Arizona** [2] - 5767:13; 5868:16

**arm** [2] - 5749:5, 15

**arose** [1] - 5866:6

**arrest** [1] - 5715:8

**arrested** [1] - 5764:9

**art** [1] - 5870:3

**article** [6] - 5852:25; 5853:2, 4; 5854:14; 5858:11; 5859:14

**Article** [1] - 5890:22

**articles** [1] - 5855:14

**artifact** [2] - 5848:3; 5852:4

**aside** [2] - 5858:23; 5879:20

**aspect** [1] - 5801:11

**ass** [5] - 5880:16;

5881:17; 5892:18; 5893:10, 15

**assailant** [2] - 5728:3; 5749:14

**assassination** [2] - 5747:25; 5767:5

**assault** [3] - 5815:14; 5826:22; 5890:5

**assaulted** [2] - 5711:16; 5775:8

**assertions** [1] - 5865:2

**assess** [1] - 5772:25

**assessing** [1] - 5699:5

**assign** [1] - 5739:25

**assigned** [4] - 5739:21; 5741:6; 5840:11

**assistant** [2] - 5745:5; 5834:4

**assisted** [1] - 5697:24

**associated** [1] - 5859:3

**associates** [2] - 5732:2, 7

**Association** [1] - 5890:11

**assuming** [1] - 5838:17

**Atlantic** [5] - 5727:3; 5737:1; 5786:1, 4, 25

**atmosphere** [3] - 5719:24; 5781:21; 5883:17

**attack** [1] - 5878:25

**attention** [12] - 5769:3; 5781:8, 11; 5792:15; 5804:1; 5806:5; 5830:18; 5839:19; 5843:15; 5844:2; 5845:14; 5879:19

**ATTORNEY** [1] - 5698:10

**attorney** [4] - 5766:18; 5807:19; 5825:13; 5836:15

**Attorney** [3] - 5722:18; 5837:2, 4

**attorneys** [5] - 5722:16; 5723:24; 5726:5; 5805:8, 12

**attorneys'** [1] - 5805:9

**attributed** [1] - 5718:15

**audio** [1] - 5704:18

**audiotape** [5] - 5701:4, 6; 5708:13;

5712:22

**August** [1] - 5856:8

**Australia** [1] - 5849:23

**author** [2] - 5795:8; 5851:24

**auto** [2] - 5843:10; 5844:9

**autolysis** [1] - 5852:16

**autopsy** [17] - 5710:1; 5717:4; 5720:16; 5745:6, 19, 21, 25; 5797:7; 5806:13; 5809:2; 5831:19; 5852:7; 5857:11, 20; 5859:23; 5860:4; 5862:21

**available** [2] - 5730:18; 5735:4

**Avenue** [10] - 5711:11; 5737:1; 5738:8; 5755:7; 5785:14; 5786:1, 4; 5787:1; 5802:12; 5835:3

**averaged** [1] - 5856:8

**avoid** [1] - 5774:17

**aware** [2] - 5825:5; 5839:1

**awesome** [1] - 5795:8

**awkward** [2] - 5746:16; 5749:15

---

**B**

**baby** [1] - 5875:14

**Bachman** [1] - 5732:4

**background** [4] - 5772:22; 5849:22; 5888:1, 5

**backlogged** [1] - 5813:20

**bad** [9] - 5716:3, 22; 5733:24; 5738:15; 5807:18; 5811:9; 5873:15; 5874:25; 5892:14

**bad-faith** [1] - 5738:15

**Baez's** [1] - 5759:12

**bag** [1] - 5774:7; 5798:19; 5799:9

**bags** [1] - 5798:24

**balance** [1] - 5895:3

**ball** [1] - 5763:12

**banding** [43] - 5744:8; 5746:20; 5809:1; 5847:17, 21; 5848:1-3, 13; 5850:23; 5851:1,

11, 23; 5853:14, 22, 25; 5854:7, 10, 14, 22; 5855:11, 25; 5856:10, 14, 20; 5857:10, 23-24; 5858:2, 7, 17, 19; 5859:2, 4, 15, 22; 5860:19; 5861:8; 5866:6; 5872:22, 25

**bank** [2] - 5810:12, 15

**Bar** [1] - 5890:10

**bar** [2] - 5722:14; 5882:23

**Baran** [1] - 5895:25

**BARRY** [1] - 5698:8

**based** [13] - 5715:20; 5757:19; 5772:6; 5791:16; 5802:6, 8; 5815:22; 5816:16, 23; 5843:5; 5886:3, 19

**basic** [2] - 5725:20; 5812:3

**basis** [8] - 5699:19; 5715:8, 15; 5722:22; 5723:1; 5733:10; 5741:24

**bat** [1] - 5881:8

**Baumann** [1] - 5725:21

**beat** [1] - 5792:20

**became** [3] - 5764:22; 5849:17

**become** [3] - 5709:17; 5760:12; 5812:1

**becomes** [1] - 5765:19

**beef** [1] - 5760:6

**beer** [5] - 5767:17; 5785:25; 5794:21

**beers** [3] - 5775:17; 5787:7; 5792:18

**BEFORE** [1] - 5697:17

**beforehand** [1] - 5751:23

**befriended** [1] - 5744:25

**began** [4] - 5704:6; 5813:15; 5854:21; 5866:23

**begin** [4] - 5710:17; 5779:1; 5816:14; 5851:18

**beginning** [5] - 5701:12; 5709:18; 5811:2; 5829:25; 5833:3

**begins** [2] - 5833:17; 5848:7

**behalf** [4] - 5712:8; 5713:9; 5714:23; 5744:13

**behavior** [1] - 5891:7

**behind** [4] - 5730:15; 5749:14; 5769:13; 5802:9

**behold** [2] - 5720:11; 5796:7

**beige** [1] - 5844:9

**belief** [1] - 5726:5

**bell** [1] - 5762:21

**bells** [1] - 5762:9

**belongings** [2] - 5791:18; 5810:1

**belongs** [1] - 5704:20

**below** [2] - 5745:15; 5852:9

**bending** [1] - 5761:10

**bends** [1] - 5805:19

**beneath** [1] - 5711:13

**BENVENUTTI** [1] - 5698:9

**Bernstein** [2] - 5756:25; 5757:5

**beside** [1] - 5711:9

**best** [11] - 5726:9, 13-14, 17; 5732:11; 5736:18; 5757:17; 5776:16; 5834:15; 5880:22; 5885:23

**bestow** [1] - 5803:15

**bet** [1] - 5805:16

**betrayed** [3] - 5811:20

**better** [3] - 5745:21; 5833:17; 5877:9

**between** [16] - 5711:11; 5712:14; 5717:11; 5718:7; 5730:19; 5737:14; 5753:5; 5787:11; 5788:10; 5795:17; 5797:5; 5819:3; 5839:4; 5855:20; 5875:25; 5876:6

**Beyer** [4] - 5754:20; 5767:12; 5768:10

**beyond** [3] - 5726:22; 5761:10; 5872:11

**bias** [1] - 5806:2

**big** [15] - 5760:21; 5765:1; 5776:12; 5784:17; 5797:23; 5823:21, 23; 5824:16, 18; 5833:18; 5837:3; 5849:25; 5871:18

**bigger** [1] - 5823:23

**biggest** [5] - 5727:16; 5779:13, 18; 5780:9; 5850:10

4

5

biometrics [1] - 5850:14

Birdsall [4] - 5863:14; 5869:20, 22; 5870:13

birthday [4] - 5737:7, 9, 13; 5787:1

bit [1] - 5763:4

bitter [1] - 5811:24

biweekly [2] - 5861:21; 5892:12

black [2] - 5798:20; 5877:17

blank [1] - 5723:13

blanket [3] - 5747:2; 5749:7; 5799:19

blankets [2] - 5799:23; 5836:10

blind [1] - 5739:21

blocks [3] - 5785:19; 5789:17; 5791:6

blood [14] - 5865:6; 5869:21; 5870:3, 5, 8, 11, 16, 19, 22, 25; 5871:5, 16, 23

Bloom [6] - 5744:9, 25; 5745:10; 5746:22; 5747:14; 5749:3

Bloom's [2] - 5745:4; 5750:3

blow [2] - 5764:13; 5769:14

blower [1] - 5764:12

blue [19] - 5711:19; 5789:19; 5791:11; 5795:25; 5796:1, 24; 5808:24; 5809:18; 5818:10; 5823:18; 5824:5; 5826:2, 11-12; 5830:21; 5839:23; 5876:1, 8; 5888:8

board [2] - 5731:25; 5763:23

bodies [5] - 5849:9, 13; 5855:21, 25

body [34] - 5711:5, 9, 12; 5724:25; 5740:4; 5745:11, 14, 22; 5750:5; 5759:11, 14; 5760:18; 5775:6; 5789:22; 5794:10; 5799:6, 14; 5815:13; 5825:17; 5835:20; 5836:6, 10; 5848:6, 14; 5853:19; 5854:10, 23; 5855:19; 5856:4, 7, 14; 5857:4, 15

bones [1] - 5849:6

book [2] - 5811:14; 5829:22

border [2] - 5799:19, 21

borders [1] - 5799:24

bother [1] - 5812:6

bothered [1] - 5739:11

bothering [1] - 5875:23

bottom [6] - 5713:10; 5761:25; 5823:24; 5827:24; 5851:15

bought [1] - 5737:3

bowl [1] - 5763:15

boy [2] - 5766:5; 5833:5

boyfriend [1] - 5734:13

boyfriends [1] - 5731:20

bra [1] - 5793:10

Brady [12] - 5699:15; 5717:14; 5806:11; 5807:16, 24; 5817:4; 5838:7, 12; 5842:2, 6; 5844:2; 5873:15

brake [2] - 5791:9

brakes [1] - 5791:8

Branch [1] - 5849:12

braved [1] - 5806:2

break [11] - 5705:17; 5712:10, 14; 5719:10; 5740:22; 5742:3; 5769:24; 5792:15; 5804:3; 5841:2; 5895:2

breakage [4] - 5859:25; 5860:11, 25; 5861:15

breakdown [1] - 5761:23

breaking [2] - 5706:5; 5761:10

Brian [1] - 5767:15

Bridge [2] - 5742:1; 5758:24

brief [2] - 5717:1; 5895:21

brilliant [1] - 5894:3

bring [13] - 5701:18; 5710:19; 5723:21; 5743:16; 5813:25; 5837:8-10; 5856:23; 5861:11; 5878:23; 5879:5; 5881:13

bringing [6] - 5701:17; 5874:14; 5879:18; 5880:11;

5883:14

brings [1] - 5885:4

broke [5] - 5719:10; 5768:3; 5809:24; 5810:6; 5878:16

broken [2] - 5798:7; 5831:15

Brooklyn [3] - 5742:1; 5758:24; 5772:16

brother [12] - 5734:8, 14; 5737:2, 19; 5809:25; 5880:10, 14-15; 5881:2; 5882:2; 5883:18, 20

brought [21] - 5762:2; 5765:23; 5786:22; 5801:18; 5814:17; 5830:8, 17; 5833:8; 5835:24; 5837:24; 5839:18; 5850:20; 5861:21; 5874:8; 5877:15; 5880:11, 18; 5883:14; 5885:16; 5886:22; 5890:21

bruises [2] - 5711:15; 5748:19

bruising [2] - 5797:12; 5802:9

brunette [1] - 5869:10

BRUSTIN [1] - 5698:7

buddies [2] - 5729:10; 5888:9

buddy [2] - 5787:2

building [1] - 5756:18

bulb [1] - 5851:16

bullshit [1] - 5881:25

bunch [2] - 5793:19; 5858:14

burden [3] - 5738:12; 5873:19; 5889:4

bureau [4] - 5706:9; 5718:2; 5730:17; 5765:3

Bureau [4] - 5722:17; 5830:9; 5833:22; 5890:16

Burger [1] - 5736:25

buried [1] - 5858:15

bury [2] - 5855:22; 5858:9

business [1] - 5845:23

busy [3] - 5756:16; 5763:5

buy [1] - 5883:4

buzz [3] - 5863:22; 5864:7

buzzed [1] - 5864:11

BY [2] - 5698:4, 14

**C**

cab [1] - 5789:15

cabinets [1] - 5864:14

Cagan [1] - 5785:15

cakes [1] - 5880:21

calculate [1] - 5770:2

calculation [2] - 5771:22, 24

candid [1] - 5776:6

candidly [1] - 5776:4

cannot [3] - 5709:20, 22; 5808:18

canyon [1] - 5718:24

Caponi [1] - 5789:8

Captain [1] - 5785:24

capture [1] - 5774:18

Caputo [3] - 5827:22; 5828:2, 8

car [89] - 5700:6; 5737:3; 5756:19; 5758:21; 5789:3, 14; 5791:6; 5801:23; 5806:12; 5809:15, 24; 5810:6; 5817:3; 5818:4, 8, 23, 25; 5819:3, 7-8, 14-16; 5821:4, 9, 13, 16, 18; 5822:1; 5823:5, 8, 12, 18, 25; 5824:3, 13, 19, 21; 5825:6, 18, 22; 5826:13; 5827:4, 11; 5829:17; 5830:19, 21; 5831:13; 5833:4, 6; 5834:17, 23; 5835:8; 5836:13, 22; 5837:20; 5838:1, 3-4; 5839:17, 22; 5840:15, 17; 5841:19; 5843:17, 20, 23; 5844:3, 11, 13, 16, 18-19, 23, 25; 5856:9; 5873:16

card [18] - 5717:3; 5740:3; 5779:1-3, 6, 9, 15; 5780:2; 5795:17; 5845:13; 5875:5; 5892:23; 5893:4, 12

cards [1] - 5892:19

care [9] - 5722:2; 5750:15; 5759:16; 5773:9; 5789:16; 5878:8; 5890:11; 5893:19

career [7] - 5779:13, 19; 5780:10; 5782:12, 20-21; 5783:3

careful [1] - 5699:5

carefully [1] - 5834:16

6

cares [2] - 5760:15; 5764:6
carpet [1] - 5871:15
carpeting [1] - 5871:13
carried [1] - 5747:3
carry [1] - 5815:18
carry-over [1] - 5815:18
carrying [2] - 5836:10; 5839:8
cars [3] - 5756:20; 5842:13; 5858:14
case [125] - 5706:9; 5708:8, 12; 5711:3; 5713:12; 5715:23; 5716:15; 5717:2; 5718:9, 11; 5722:14; 5723:6, 11, 14; 5724:3, 20; 5735:5, 13, 17-18; 5736:4, 14; 5738:15; 5740:1, 10; 5743:22; 5749:21; 5754:12; 5755:6; 5756:10; 5758:3, 6; 5759:5; 5761:8, 12; 5763:7; 5766:11; 5775:9; 5778:5, 8; 5779:13, 18; 5780:10; 5787:10; 5790:10; 5797:23; 5800:11; 5801:10, 12; 5803:5; 5804:1, 5; 5805:24; 5806:1, 6; 5807:9; 5808:13; 5811:11, 20; 5814:6; 5815:13; 5817:5; 5818:18, 22; 5824:8, 18, 22; 5832:18; 5833:23; 5834:15, 18; 5836:16; 5837:21; 5839:14, 18; 5840:7, 13, 24; 5841:22; 5844:6; 5845:21; 5849:12; 5850:2; 5851:25; 5853:3; 5854:12, 16-18; 5859:13; 5862:2, 11-13, 24; 5863:16; 5864:8, 20; 5866:14; 5872:6, 10; 5876:9; 5878:14, 24; 5879:21; 5882:15; 5891:20; 5893:11, 13-14; 5894:9, 22; 5895:6, 12, 14, 16; 5896:22
cases [9] - 5770:10; 5790:15; 5813:16, 20; 5816:17; 5824:13; 5858:24; 5859:2;

5860:24
Casteleiro [2] - 5713:9; 5801:15
CASTELEIRO [7] - 5698:5; 5706:23; 5771:9, 12, 15, 19, 21
catastrophic [1] - 5767:9
categories [1] - 5714:5
categorize [1] - 5728:22
category [2] - 5716:24; 5717:22
caught [5] - 5784:10; 5794:3; 5797:25; 5813:5; 5868:21
caused [1] - 5872:12
cavity [1] - 5816:8
CBR [1] - 5811:5
celebrate [1] - 5737:13
cell [2] - 5700:11
Cellmark [1] - 5724:7
cells [5] - 5815:4, 9; 5832:4, 9
cemetery [23] - 5725:3; 5749:25; 5750:5; 5758:10, 14; 5759:16; 5760:1, 15, 20; 5762:24; 5793:24; 5795:3; 5796:12; 5799:12; 5801:18; 5818:16; 5836:8; 5876:3; 5877:24
Central [2] - 5697:6, 22
century [1] - 5806:3
certain [1] - 5870:2
certainly [15] - 5703:9; 5736:18; 5750:2; 5753:20; 5806:21; 5833:10, 16; 5851:5; 5852:25; 5854:8; 5858:5; 5864:16; 5867:14; 5884:4
certainty [1] - 5854:6
chain [7] - 5765:22; 5798:6; 5828:14; 5829:15; 5830:10; 5862:23; 5863:9
chance [4] - 5817:12, 15, 20, 25
change [3] - 5750:17; 5781:20
changed [3] - 5756:7;

5796:6; 5818:1
changing [1] - 5818:17
character [2] - 5747:25; 5767:5
characteristics [1] - 5867:10
charge [20] - 5699:22; 5701:10, 23; 5702:19; 5703:1; 5704:19; 5715:4; 5742:22; 5806:25; 5811:8; 5828:5, 9-10; 5833:2; 5837:14; 5871:19; 5872:7; 5889:8; 5896:16
charged [1] - 5741:25
charges [3] - 5723:3; 5743:23; 5766:10
Charley [5] - 5785:14; 5788:4; 5882:19, 21
Charlie [3] - 5709:13; 5710:19; 5732:4
Charlotte [4] - 5734:20; 5810:8; 5812:2; 5813:7
chase [1] - 5721:2
check [1] - 5871:25
checked [4] - 5840:18, 23; 5858:21; 5871:22
chemical [3] - 5869:24; 5870:1, 11
chemistry [1] - 5849:23
Chevy [1] - 5886:9
chief [3] - 5722:17; 5744:9; 5766:9
Chief [2] - 5722:19; 5723:12
children [2] - 5759:10; 5768:4
chilling [1] - 5793:1
chock [1] - 5720:14
choice [1] - 5866:20
choke [2] - 5880:16; 5881:16
chose [1] - 5853:18
Chris [2] - 5787:14; 5788:1
chronology [3] - 5810:25; 5819:2; 5827:6
circulation [2] - 5841:3, 5
circumstances [1] - 5703:1
circumstantial [6] - 5847:16; 5872:6-8, 15, 19
citizen [1] - 5878:8

citizens [2] - 5891:6; 5894:10
city [1] - 5796:13
City [3] - 5813:18; 5848:16
civil [3] - 5834:18; 5839:18; 5864:20
civilian [1] - 5849:18
claim [23] - 5699:6, 19; 5714:8, 10; 5717:11, 14, 17-18, 23; 5806:7-9, 17; 5807:1, 3, 24; 5808:11; 5873:18; 5888:15
claimed [1] - 5794:13
claims [13] - 5699:15; 5713:19; 5714:3, 5; 5715:1; 5716:24; 5717:22; 5718:6; 5749:24; 5766:21; 5806:6; 5808:16; 5811:18
class [1] - 5736:23
classified [1] - 5850:13
clean [7] - 5745:23; 5775:15; 5814:16; 5815:23; 5833:14; 5844:19; 5860:5
clean-ups [1] - 5775:15
cleaned [7] - 5745:11; 5824:3; 5833:8, 10; 5844:17
clear [16] - 5738:11; 5787:24; 5790:24; 5811:18; 5819:21; 5823:3; 5826:15; 5827:6; 5828:20; 5829:16; 5834:14; 5837:2; 5839:13; 5842:25; 5857:24; 5865:16
clearer [2] - 5733:14; 5777:20
clearly [3] - 5702:17; 5723:7; 5803:7
client [1] - 5889:19
climber [1] - 5797:19
clip [5] - 5752:5, 23; 5753:10, 17; 5754:7
clips [1] - 5751:21
clock [1] - 5883:2
close [5] - 5713:16; 5757:15; 5818:5; 5825:21; 5854:22
closed [1] - 5787:17

closing [4] - 5835:18; 5863:2; 5893:22; 5895:20

clothes [2] - 5720:17; 5793:9

clothing [6] - 5737:16; 5796:16; 5798:15; 5799:3, 6, 9

clue [2] - 5732:9, 20

clueless [1] - 5734:17

co [2] - 5774:12; 5851:24

co-author [1] - 5851:24

co-conspirators [1] - 5774:12

cocaine [1] - 5776:10

Cockerel [32] - 5762:6; 5764:7; 5787:4, 13; 5788:1, 13, 24; 5791:8; 5792:1; 5809:11; 5818:17; 5880:10; 5881:21, 23; 5882:1, 6; 5883:8; 5884:2, 20, 25; 5885:3, 12; 5886:13, 19; 5887:11, 17, 22-23; 5888:6; 5890:21

Cockerel's [1] - 5880:10

coerced [19] - 5717:6; 5718:18; 5721:10, 12; 5736:13; 5750:19; 5802:5; 5807:17, 25; 5809:6, 12; 5862:7; 5878:25; 5879:12; 5880:7; 5881:2, 5, 20; 5882:3

coercing [1] - 5808:5

coercion [5] - 5721:7; 5749:19; 5806:16; 5873:25; 5882:4

coffee [1] - 5880:23

cognizant [2] - 5773:4, 6

coincidence [1] - 5873:1

cold [4] - 5871:7, 18, 22

collaborate [1] - 5774:14

colleagues [2] - 5701:2; 5801:4

collected [2] - 5724:12; 5859:18

collectively [1] - 5791:20

colloquy [1] - 5704:9

color [4] - 5796:25; 5799:19; 5826:17; 5870:2

colored [3] - 5798:5; 5799:21, 24

combined [1] - 5873:18

combines [1] - 5850:1

comfortable [1] - 5769:20

coming [7] - 5699:25; 5710:6, 8; 5713:15; 5756:19; 5852:18; 5866:4

commander [1] - 5861:22

comment [4] - 5713:18; 5760:13; 5790:7, 19

commenting [2] - 5717:16; 5805:9

comments [3] - 5700:10; 5709:6; 5760:17

Commissioner [2] - 5890:3; 5891:1

commissioner [2] - 5765:2; 5766:20

commit [3] - 5721:14; 5730:8; 5758:17

commits [1] - 5894:8

committed [14] - 5715:9, 15; 5718:17; 5752:20; 5753:8; 5759:2; 5784:5; 5810:10, 14, 16, 18, 23; 5888:10; 5894:7

common [10] - 5736:5; 5738:24; 5759:17; 5802:19; 5816:13; 5823:15; 5843:16; 5857:14; 5866:20; 5868:7

communicated [1] - 5702:9

communication [1] - 5845:9

community [4] - 5805:25; 5853:6; 5855:2; 5894:5

comparability [1] - 5851:11

compared [1] - 5831:18

comparison [2] - 5851:11; 5867:12

compass [2] - 5767:4, 6

competent [1] - 5891:16

complain [1] - 5879:9

complaining [2] - 5890:3, 16

complains [1] - 5890:4

complaint [1] - 5766:17

complaints [1] - 5889:24

complete [8] - 5715:24; 5753:4; 5759:21; 5774:24; 5779:20; 5785:21; 5791:22; 5807:15

completed [2] - 5842:13; 5867:2

completely [2] - 5843:16; 5852:13

completes [2] - 5712:6; 5713:3

complicated [1] - 5755:19

comporting [1] - 5799:10

comprehension [1] - 5761:10

comprised [1] - 5780:19

compromise [1] - 5709:5

compute [2] - 5767:11; 5837:24

computer [1] - 5697:24

computer-assisted [1] - 5697:24

conceded [2] - 5714:18, 24

concentrated [1] - 5815:15

concentration [3] - 5814:4, 15; 5816:3

concerned [1] - 5808:3

concerning [3] - 5847:23; 5888:17; 5895:11

conclude [4] - 5699:15; 5715:14; 5750:6; 5784:5

concluded [1] - 5723:5

concludes [1] - 5858:23

conclusion [1] - 5731:13

concoct [1] - 5782:1

concrete [1] - 5748:2

condition [1] - 5713:2

condom [3] - 5816:6, 9

condoms [6] - 5725:9; 5729:9; 5735:21;

5812:19; 5816:2, 22

conduct [5] - 5767:2, 10; 5889:7, 9; 5890:19

conducted [3] - 5711:22; 5724:6; 5891:23

confer [1] - 5707:1

conferences [1] - 5708:14

conferring [1] - 5707:2

confess [1] - 5721:13

confesses [1] - 5782:16

confession [82] - 5715:13; 5716:2, 16, 18; 5717:2; 5718:12, 14; 5719:13; 5720:14; 5721:2, 5-6, 20, 23; 5722:7, 12; 5723:7; 5724:22, 24; 5725:9, 13-14; 5726:20; 5728:7, 11, 17; 5736:12; 5739:17; 5744:5, 18, 20; 5747:1, 19; 5748:3; 5749:18, 24; 5750:8; 5751:10, 22; 5754:17; 5755:23; 5756:4; 5757:4; 5758:8; 5760:3; 5768:21; 5778:23; 5779:25; 5780:1; 5782:2; 5784:8; 5785:5, 8; 5791:12, 22; 5792:12-14; 5793:20; 5794:7; 5795:10, 13, 15; 5798:14; 5799:8; 5800:5, 8; 5802:4, 25; 5803:6, 8; 5809:6; 5818:14; 5851:5; 5853:18; 5857:6; 5861:23; 5862:5; 5873:24

confidant [1] - 5757:18

confident [2] - 5785:7; 5786:12

confined [1] - 5746:19

confirm [1] - 5763:25

confirmed [1] - 5768:7

confirming [3] - 5720:15

conflicting [1] - 5783:10

confusing [1] - 5705:11

confusion [1] - 5893:14

Connaughton [1] -

5765:7

**connection** [2] - 5733:20; 5824:7

**Connelly** [1] - 5738:6

**Connie** [8] - 5725:23; 5726:8; 5731:24; 5732:11; 5737:21; 5738:23; 5750:24; 5796:16

**conscience** [1] - 5805:25

**consciousness** [2] - 5747:5; 5749:13

**consensual** [24] - 5728:8, 23; 5731:6, 8, 14; 5733:20; 5734:4; 5735:16, 22; 5736:2, 18; 5738:10, 18; 5754:13; 5802:6; 5812:9, 11-12, 18, 23; 5813:2; 5815:17; 5816:1, 21

**consenting** [1] - 5707:21

**consequence** [1] - 5786:18

**consider** [8] - 5723:17; 5726:6; 5728:3; 5739:5, 14; 5767:10; 5868:14

**consideration** [1] - 5775:6

**considered** [4] - 5706:21; 5739:3, 8; 5766:24

**consistent** [23] - 5713:22; 5749:4, 6; 5812:14; 5826:7, 12; 5827:14; 5831:1, 10-11; 5832:5; 5862:14; 5865:5, 14, 20, 25; 5867:21; 5868:18; 5869:1, 4, 7, 15

**consistently** [2] - 5731:24; 5852:24

**conspirators** [1] - 5774:12

**Constitution** [2] - 5825:8; 5894:2

**constitution** [2] - 5761:11; 5894:3

**constitutional** [7] - 5716:23; 5719:3; 5888:19; 5890:8; 5891:14; 5894:10, 17

**constraint** [1] - 5710:25

**construed** [1] - 5706:3

**contact** [1] - 5709:24

**contacted** [2] - 5700:12; 5709:11

**contained** [4] - 5720:14; 5795:15; 5800:8; 5802:23

**contains** [1] - 5808:1

**contemplate** [2] - 5786:7; 5789:11

**contemporaneous** [3] - 5825:24; 5826:5; 5832:19

**contend** [1] - 5711:18

**content** [2] - 5794:14; 5797:4

**contention** [3] - 5705:2, 15; 5871:18

**contentions** [1] - 5705:23

**contest** [2] - 5832:4; 5834:10

**continue** [5] - 5708:8; 5776:24; 5790:11; 5850:6; 5895:16

**continued** [3] - 5712:4; 5714:17; 5811:23

**Continued** [2] - 5820:1; 5822:6

**continues** [1] - 5891:2

**continuing** [1] - 5811:24

**contracts** [1] - 5813:17

**contradict** [1] - 5791:10

**contribute** [4] - 5736:3, 7; 5816:5, 11

**contributed** [1] - 5744:14

**controlled** [1] - 5802:22

**controls** [3] - 5740:20; 5792:7

**convenient** [1] - 5797:1

**conversation** [10] - 5751:3; 5788:10, 23; 5789:8, 25; 5797:4; 5875:10; 5877:12; 5881:19; 5893:8

**conversations** [2] - 5839:3; 5887:16

**converse** [1] - 5895:13

**conversely** [1] - 5759:12

**convicted** [3] -

5717:9; 5810:14; 5894:7

**conviction** [3] - 5817:24; 5833:23; 5839:15

**convictions** [8] - 5704:20; 5722:20, 23; 5723:2, 9; 5743:23; 5811:6; 5834:11

**convicts** [1] - 5886:25

**convinced** [1] - 5736:14

**cook** [1] - 5775:23

**cookies** [3] - 5772:14, 16

**cooking** [1] - 5809:17

**cooperate** [2] - 5764:6; 5774:25

**cooperating** [1] - 5762:7

**cooperation** [1] - 5876:19

**cooperative** [3] - 5719:20; 5773:14; 5782:5

**cop** [3] - 5783:2; 5874:25; 5892:14

**cops** [8] - 5794:11; 5819:10, 20; 5823:15; 5824:7; 5878:6; 5883:7; 5884:5

**copy** [2] - 5699:21; 5708:1

**cordial** [5] - 5719:16, 23; 5875:10, 18; 5893:7

**cordially** [1] - 5760:6

**cork** [1] - 5748:9

**corner** [3] - 5755:8; 5764:5; 5780:5

**Cornish** [1] - 5809:17

**CORNWALL** [10] - 5698:9; 5703:19, 23; 5704:1, 25; 5705:14; 5706:2, 16; 5708:18, 23

**Corp** [1] - 5724:7

**corpse** [1] - 5855:11

**correct** [8] - 5699:5; 5731:4, 16-17; 5778:13; 5840:24; 5841:25; 5842:3

**correctly** [3] - 5703:8; 5707:14; 5779:10

**corroborate** [2] - 5784:20; 5797:8

**corroborated** [1] - 5755:1

**corroborates** [1] -

5732:10

**counsel** [8] - 5699:18; 5700:10; 5703:13; 5707:1; 5712:4, 24; 5713:17, 24

**counsels'** [1] - 5713:20

**count** [5] - 5735:25; 5736:3, 8; 5741:16; 5803:10

**counted** [1] - 5746:1

**counting** [1] - 5763:20

**Country** [1] - 5698:3

**COUNTY** [3] - 5697:6, 13; 5698:10

**county** [2] - 5763:5; 5849:7

**County** [12] - 5706:8; 5717:23; 5718:4; 5722:17; 5744:9; 5766:9, 16; 5779:8; 5813:18; 5832:18; 5874:7

**couple** [6] - 5752:16; 5754:6; 5775:17; 5785:19; 5792:18

**course** [22] - 5715:22; 5718:13; 5739:22; 5743:20; 5746:14; 5758:12; 5774:17; 5778:7; 5781:10; 5797:14; 5798:16; 5802:21; 5805:11; 5826:7; 5829:1; 5864:19; 5879:10; 5881:10, 18; 5893:18; 5895:4, 13

**court** [9] - 5703:19; 5712:15; 5728:25; 5742:11; 5763:6; 5823:2; 5835:15; 5883:24; 5892:1

**COURT** [102] - 5697:1; 5699:7, 9, 12; 5700:12, 19, 21, 25; 5701:4, 6, 11, 19; 5703:17, 22, 25; 5704:8, 14, 22; 5705:7, 9, 13, 20; 5706:1, 7, 19, 25; 5707:11, 15, 19, 25; 5708:3, 19, 25; 5709:4, 11; 5710:3, 10, 13, 22; 5712:17, 20; 5713:6; 5723:16; 5726:4; 5740:19; 5742:4, 13, 16, 19, 22; 5743:1, 7, 14, 19; 5751:19; 5769:23; 5770:2, 9; 5771:8, 11, 14, 18, 20,

8

22, 25; 5772:2, 4, 8, 13, 16; 5776:21; 5777:25; 5778:3, 12, 15; 5786:17; 5790:7, 18; 5792:6; 5798:12; 5803:11, 17; 5804:2; 5805:4, 16; 5819:24; 5822:3; 5839:25; 5841:1; 5845:25; 5847:3; 5866:13; 5895:1; 5896:4, 6, 14, 17, 20

**Court** [13] - 5697:20; 5699:13; 5705:6; 5707:4; 5708:12; 5742:18; 5746:7; 5803:8; 5808:8; 5825:14; 5879:17; 5895:8

**Courthouse** [1] - 5697:5

**courtroom** [11] - 5710:21; 5727:19; 5742:7; 5743:18; 5770:1; 5772:12; 5804:7; 5805:3; 5846:4; 5847:2; 5896:3

**cover** [6] - 5725:24; 5811:24; 5892:18; 5893:10, 15

**covered** [4] - 5711:12; 5747:7; 5755:18

**covering** [2] - 5717:19; 5747:17

**crack** [1] - 5841:13

**craft** [1] - 5795:9

**crannies** [1] - 5873:1

**cranny** [1] - 5860:25

**crazy** [4] - 5739:19; 5757:25; 5793:21; 5836:11

**create** [2] - 5837:3; 5853:14

**created** [3] - 5717:2; 5718:12; 5888:24

**creating** [4] - 5806:15; 5873:25; 5889:10; 5891:13

**creation** [1] - 5873:22

**credentials** [3] - 5734:21; 5813:14; 5850:18

**credibility** [6] - 5726:5; 5794:7; 5801:3, 20; 5869:20; 5871:20

**credible** [9] - 5725:23; 5726:8;

5738:23; 5754:11; 5755:21; 5757:2; 5802:11, 19

**crevice** [2] - 5746:13; 5831:8

**crime** [44] - 5711:8; 5715:9, 12, 16; 5718:17; 5730:8; 5739:6; 5744:11; 5750:4; 5752:20; 5754:2; 5758:9, 16-17; 5759:2, 6; 5760:2; 5765:19; 5777:21; 5784:5; 5791:20; 5799:11, 14, 16, 20; 5800:1; 5802:13; 5810:10, 13, 17-18, 23; 5823:12; 5828:4, 6, 13; 5835:12, 20; 5837:9; 5850:15; 5857:3; 5894:8

**crimes** [2] - 5810:20; 5894:8

**criminal** [20] - 5714:7, 17, 22; 5717:8; 5722:20, 22; 5723:2, 9; 5758:2, 6; 5765:4; 5779:6; 5790:15; 5824:9, 13; 5834:23; 5836:16; 5839:7, 18; 5872:10

**Criminal** [1] - 5890:10

**criminals** [1] - 5759:25

**critical** [2] - 5746:23; 5893:23

**critically** [1] - 5784:4

**criticizing** [1] - 5754:3

**cross** [9] - 5755:9, 15; 5756:14; 5841:16; 5851:19; 5860:13; 5879:15; 5885:19

**cross-examination** [2] - 5841:16; 5860:13

**cross-examined** [2] - 5879:15; 5885:19

**crossed** [4] - 5755:24; 5756:2, 24; 5757:3

**crosses** [1] - 5755:16

**crosswalk** [2] - 5755:11, 13

**cruel** [1] - 5728:22

**cruellest** [1] - 5769:14

**cruise** [1] - 5789:20

**crushed** [1] - 5805:17

**cry** [1] - 5709:18

**crystal** [1] - 5787:24

**cumulative** [1] - 5848:23

**curfew** [1] - 5767:22

**curse** [2] - 5719:18; 5877:8

**custody** [9] - 5762:10; 5783:8; 5828:7, 14; 5830:10; 5862:23; 5863:3, 9; 5875:4

**custom** [2] - 5888:25; 5891:13

**cut** [1] - 5721:2

**CV** [2] - 5697:4; 5849:24

**D**

**DA** [6] - 5716:4; 5744:25; 5745:5; 5747:23; 5765:3; 5766:7

**dad** [3] - 5791:17; 5809:25; 5864:5

**damage** [7] - 5700:5; 5847:18; 5859:17, 19; 5860:9, 20; 5872:24

**damaged** [1] - 5746:4

**damn** [1] - 5842:23

**dance** [3] - 5736:23; 5845:13; 5868:1

**dare** [2] - 5808:19

**dared** [1] - 5764:21

**dark** [8] - 5755:8; 5796:20, 23-24; 5797:2; 5798:22; 5826:11; 5835:9

**darn** [1] - 5780:2

**dart** [1] - 5733:10

**darts** [2] - 5733:4, 6

**data** [2] - 5810:12, 15

**date** [11] - 5702:8; 5703:12, 14; 5752:9, 13; 5779:16; 5780:7; 5821:4; 5828:1, 21

**dated** [1] - 5779:8

**dates** [3] - 5703:22; 5810:4

**daughter** [7] - 5725:24; 5726:2; 5732:12; 5751:4; 5882:18, 24

**Dawn** [1] - 5886:19

**dawn** [1] - 5884:12

**day's** [1] - 5793:1

**days** [9] - 5740:17, 23; 5856:10; 5857:3, 16; 5862:17; 5867:14; 5870:5

**dazed** [1] - 5747:5

**DC** [1] - 5850:15

**dead** [9] - 5781:24; 5810:17; 5848:14; 5849:9; 5851:4; 5853:17; 5856:19; 5857:17

**deal** [7] - 5776:12; 5797:24; 5823:22; 5824:16; 5875:1; 5892:8

**dealing** [1] - 5863:3

**dealt** [2] - 5896:14, 18

**death** [12] - 5702:20; 5712:4; 5735:3, 6-8; 5752:12; 5775:8; 5777:13; 5814:7; 5851:2; 5859:3

**Debbie** [9] - 5836:23; 5843:9, 20-21; 5844:3, 6, 21; 5845:4

**DEBI** [1] - 5698:9

**debris** [14] - 5745:18, 24; 5746:5, 12, 15, 17, 19; 5859:17, 19; 5860:1, 8, 10; 5861:1, 15

**decades** [1] - 5726:16

**December** [12] - 5702:23; 5704:3; 5706:8, 11; 5711:6; 5723:4; 5825:18; 5827:7; 5828:22; 5829:22; 5857:4

**decide** [1] - 5776:4

**decision** [3] - 5714:25; 5723:3; 5896:10

**deck** [1] - 5740:24

**declined** [2] - 5712:25; 5755:3

**decompose** [1] - 5848:7

**decomposing** [10] - 5852:8; 5853:19; 5854:10, 23; 5855:11; 5856:4, 15, 18; 5857:2, 16

**decomposition** [18] - 5848:4; 5850:5, 23, 25; 5852:4, 14, 23; 5853:10, 13, 21; 5856:25; 5857:9, 15, 18; 5861:11

**DeCrascenza** [4] - 5788:17; 5887:21; 5888:5

**DeCrescenzo** [1] - 5709:3

**dedicated** [4] -

5711:1; 5727:8;
5730:22; 5801:4

**deep** [1] - 5748:17

**deep-seated** [1] -
5748:17

**deeply** [2] - 5806:4

**defend** [1] - 5766:2

**defendant** [9] -
5704:16, 23; 5707:12;
5715:7; 5725:18;
5780:14; 5803:9;
5812:16; 5841:11

**defendant's** [3] -
5715:6; 5723:7; 5803:6

**Defendants** [4] -
5697:7, 14; 5698:10;
5712:23

**defendants** [22] -
5711:18; 5719:15;
5721:9; 5724:11;
5728:24; 5736:11;
5738:14; 5741:15;
5755:22; 5758:23;
5760:1; 5767:1;
5787:11; 5808:18;
5811:2, 15, 19; 5812:4;
5839:7; 5889:4;
5894:22; 5895:20

**defendants'** [2] -
5705:1; 5734:23

**Defendants'** [1] -
5711:20

**defense** [39] - 5699:17;
5702:1; 5712:3;
5719:17; 5722:5, 16;
5744:8, 23; 5745:9;
5746:8; 5752:15;
5760:4; 5765:25;
5774:16; 5783:5;
5788:15, 18; 5789:10;
5800:20; 5808:7;
5814:5; 5825:13;
5829:13; 5830:18;
5834:1, 22; 5835:1;
5836:15, 19; 5837:25;
5839:10; 5848:20;
5851:4; 5854:4;
5868:17; 5884:14, 17

**defensive** [1] - 5766:1

**deficiencies** [2] -
5772:25; 5773:5

**define** [1] - 5715:3

**defined** [1] - 5854:20

**definitely** [1] -
5817:18

**definition** [2] -
5733:24; 5739:1

**definitive** [5] -

5724:18; 5737:11, 22;
5754:14; 5757:8

**DeForest** [6] -
5848:11, 19, 21;
5851:24; 5853:3;
5854:15

**degree** [7] - 5803:10;
5851:11; 5854:6;
5856:24; 5857:9, 18

**degrees** [2] - 5849:5;
5856:9

**deliberate** [3] -
5888:24; 5892:9, 11

**deliberately** [7] -
5777:18; 5817:9;
5832:15; 5840:6;
5847:8; 5891:11;
5893:20

**deliberations** [1] -
5707:22

**deludes** [1] - 5739:19

**demand** [1] - 5710:16

**democracy** [1] -
5893:24

**demonstrate** [1] -
5807:21

**demonstrating** [1] -
5749:16

**demonstrating)** [1] -
5748:24

**Dempsey** [34] - 5718:12;
5727:7; 5739:12;
5750:16; 5763:11;
5766:14, 25; 5773:3;
5779:1, 14; 5781:4, 14;
5784:9; 5799:4; 5809:8;
5874:19, 22; 5875:7;
5876:23; 5877:1, 4,
21-22; 5879:2, 15;
5889:16; 5890:4;
5892:3, 14; 5893:6

**Dempsey's** [1] - 5877:2

**denial** [2] - 5811:24;
5888:13

**denied** [4] - 5699:12;
5719:4; 5796:5

**denim** [2] - 5796:24;
5826:17

**Dennis** [42] - 5708:15;
5712:23; 5722:9, 19;
5723:10; 5724:25;
5725:2, 4, 7; 5747:3,
9; 5748:1; 5752:20;
5753:1; 5756:4;
5760:10; 5763:14;
5766:10; 5767:3, 5-6,
18; 5768:2, 13, 17;
5774:1; 5788:7;

5791:14; 5792:3;
5793:8; 5795:18, 22;
5796:1; 5798:16;
5809:12, 18; 5818:19;
5876:1; 5879:4

**Dennis'** [3] - 5791:18;
5793:10; 5797:11

**Dennis's** [1] - 5767:13

**Department** [5] -
5766:16; 5824:2;
5848:17; 5874:7

**department** [4] -
5776:3, 8; 5840:12;
5878:14

**departments** [1] -
5715:23

**depicted** [2] -
5711:19; 5802:18

**depose** [5] - 5701:21;
5702:12, 18, 22;
5703:15

**deposed** [2] - 5866:9;
5882:8

**deposing** [2] - 5866:3;
5882:10

**deposit** [2] - 5735:10;
5814:9

**deposited** [5] -
5732:20; 5735:2, 6-7;
5814:8

**deposition** [17] -
5702:3, 17; 5703:4;
5704:3, 5, 15; 5708:21;
5712:3; 5760:16;
5765:11; 5794:19;
5840:14; 5865:9;
5866:3, 16; 5867:18;
5868:22

**depositions** [3] -
5703:17; 5711:22

**deprivation** [1] -
5890:8

**deprived** [1] - 5890:5

**depriving** [1] - 5890:7

**deputy** [1] - 5766:19

**describe** [1] - 5812:5

**described** [4] -
5734:6; 5827:23;
5866:18; 5883:17

**description** [3] -
5796:15; 5826:9, 11

**designated** [1] -
5892:14

**designed** [3] - 5894:4,
12

**desperate** [1] -
5811:25

**despite** [5] - 5720:11,
18; 5728:20; 5794:13;
5888:7

**destruction** [1] -
5852:18

**detail** [3] - 5731:9;
5734:25; 5752:3

**detailed** [4] -
5720:13; 5721:20;
5799:2

**details** [8] - 5705:3;
5720:14; 5726:14;
5752:8; 5795:13;
5833:20; 5865:22;
5874:17

**detective** [15] -
5728:4; 5761:8; 5781:3;
5783:3; 5811:8; 5837:8,
12; 5839:8; 5863:13,
17; 5864:8; 5869:15;
5871:21; 5893:1

**Detective** [23] -
5728:14; 5729:22;
5734:3; 5739:2; 5755:1;
5779:12; 5782:9;
5787:4; 5819:9;
5824:23; 5827:22;
5829:11; 5830:4;
5840:10; 5842:12;
5843:4; 5860:3; 5864:3;
5870:21, 24; 5874:19;
5876:23; 5879:14

**detectives** [14] -
5719:23, 25; 5727:7;
5750:25; 5751:2;
5761:6; 5776:9; 5779:9;
5780:22; 5783:22;
5837:3; 5869:14;
5892:23

**detector** [1] - 5777:23

**detentions** [1] -
5891:6

**determination** [2] -
5721:22; 5803:18

**determinations** [1] -
5776:6

**determine** [6] -
5720:24; 5722:7;
5724:20; 5776:23;
5805:10; 5866:14

**develop** [1] - 5851:19

**deviated** [1] - 5807:19

**deviations** [1] -
5716:8

**diabetic** [1] - 5880:20

**diagram** [1] - 5851:13

**diarrhea** [1] - 5780:25

**diary** [1] - 5725:24

**dick** [2] - 5885:9, 14

**died** [4] - 5704:12, 17; 5849:12, 15

**dies** [1] - 5848:6

**difference** [4] - 5819:1; 5821:11; 5825:1; 5833:18

**different** [18] - 5706:22; 5720:8; 5757:20; 5799:19, 21, 24; 5815:7; 5817:20; 5818:3; 5847:15; 5855:22; 5856:1, 3; 5860:8; 5867:9; 5893:20

**differential** [4] - 5814:16, 21; 5815:1, 23

**difficult** [1] - 5740:1

**difficulty** [2] - 5708:6; 5863:9

**digest** [1] - 5793:5

**digital** [1] - 5887:7

**Dillon** [1] - 5722:19

**dilute** [1] - 5816:10

**diluted** [1] - 5816:8

**dilution** [3] - 5735:24; 5736:3, 7

**dinner** [2] - 5775:23, 25

**direct** [6] - 5738:5; 5754:24; 5778:17; 5847:16; 5872:6, 9

**directed** [2] - 5827:20; 5829:8

**direction** [1] - 5756:11

**directions** [1] - 5835:21

**directly** [6] - 5751:13; 5794:25; 5888:19; 5889:23; 5891:11

**dirt** [3] - 5745:18; 5746:18; 5774:6

**dirty** [3] - 5745:17; 5844:14, 25

**disappearance** [1] - 5761:3

**disappeared** [2] - 5839:23; 5843:2

**disaster** [1] - 5806:3

**discard** [1] - 5872:2

**discharge** [1] - 5816:15

**discipline** [2] - 5850:3; 5856:22

**disclose** [1] - 5839:7

**disclosed** [3] - 5825:12; 5830:16; 5836:18

**disclosure** [3] - 5715:24; 5837:7; 5838:7

**discoloration** [1] - 5871:15

**discontinue** [1] - 5790:20

**discount** [1] - 5738:20

**discovered** [1] - 5864:19

**discovery** [1] - 5711:5

**discretely** [1] - 5710:9

**discretion** [1] - 5703:16

**discuss** [9] - 5734:25; 5735:1; 5740:22; 5748:10; 5753:22; 5784:11; 5838:25; 5873:20; 5895:6

**discussed** [6] - 5725:25; 5742:12; 5772:22; 5811:11; 5838:22; 5840:3

**discussing** [3] - 5717:13; 5760:21; 5895:8

**discussion** [3] - 5875:11, 19; 5876:20

**dislike** [1] - 5768:18

**disliked** [2] - 5752:19; 5774:5

**dismiss** [3] - 5723:13; 5727:15; 5821:24

**dismissal** [2] - 5723:9; 5818:14

**dismissed** [3] - 5743:24; 5766:10; 5779:11

**dismissing** [1] - 5723:3

**dispels** [1] - 5734:22

**displayed** [1] - 5827:18

**displays** [1] - 5799:20

**displease** [1] - 5803:19

**disproved** [1] - 5731:19

**disproven** [1] - 5802:7

**disproves** [1] - 5750:7

**dispute** [9] - 5723:23; 5724:21; 5787:10, 18; 5788:12; 5789:6; 5790:24; 5816:18; 5835:14

**disputes** [1] - 5724:21

**disputing** [1] - 5817:8

**disregard** [8] - 5716:22; 5723:18; 5733:25; 5805:11; 5807:21; 5808:4, 8

**disrobe** [1] - 5799:8

**distinct** [1] - 5852:5

**distinction** [1] - 5717:10

**distinctive** [1] - 5852:10

**distinguished** [1] - 5727:7

**district** [1] - 5807:19

**DISTRICT** [2] - 5697:1

**District** [4] - 5697:21; 5722:18; 5837:1, 4

**distrust** [1] - 5864:12

**disturbing** [2] - 5844:5; 5873:10

**divide** [1] - 5720:25

**Dividian** [1] - 5849:12

**division** [1] - 5855:4

**DNA** [79] - 5722:8, 13, 22; 5723:23; 5724:1-3, 6, 12-13, 21-22; 5725:14; 5727:23; 5728:20; 5729:17; 5731:9, 18, 23; 5732:10, 17, 20; 5733:4, 7, 10, 12, 19; 5734:25; 5735:17; 5736:9; 5738:17; 5740:15; 5802:5; 5808:12, 15, 18, 24; 5809:4, 7, 10, 14, 20; 5810:8, 11-12, 15, 20, 25; 5811:2, 16; 5812:3, 5, 14; 5813:12; 5814:20, 25; 5815:7, 11, 18; 5817:1; 5831:22, 25; 5832:3, 11-12, 24; 5833:15, 17, 24; 5834:11; 5840:12; 5870:6; 5879:10

**document** [17] - 5705:5; 5779:3, 6; 5780:9; 5825:16, 24; 5826:9; 5827:21; 5830:6; 5838:2-5; 5892:2, 15; 5894:3

**documentation** [1] - 5829:15

**documenting** [1] - 5766:17

**documents** [10] -

5717:7; 5830:10; 5834:2, 17; 5839:12; 5841:10; 5843:12; 5844:7; 5892:18

**donated** [1] - 5855:21

**done** [15] - 5702:13; 5777:7; 5779:9; 5803:12; 5816:17; 5823:11; 5833:15; 5842:22; 5854:8; 5855:20; 5865:7; 5867:22; 5868:4; 5869:24; 5890:9

**Donna** [2] - 5785:14; 5788:4

**Donnino** [2] - 5722:19; 5723:12

**donor** [3] - 5735:11; 5812:12; 5815:11

**door** [12] - 5733:15; 5740:13; 5757:1; 5764:20; 5768:24; 5772:23; 5775:18; 5796:2, 22

**doors** [1] - 5740:5

**doting** [1] - 5734:6

**double** [4] - 5747:11; 5797:15, 17; 5798:6

**doubling** [2] - 5811:24; 5888:13

**doubt** [16] - 5726:22; 5791:1; 5817:24; 5818:7, 9; 5824:18; 5829:7, 10, 13; 5831:13; 5838:9; 5869:19; 5872:11; 5873:7; 5891:3

**doubts** [2] - 5836:17; 5840:9

**down** [58] - 5719:5; 5725:1; 5727:25; 5728:5; 5730:11; 5736:21; 5737:15; 5751:3; 5754:25; 5755:7, 17-18; 5756:13; 5757:25; 5761:4; 5772:10; 5773:15, 18; 5775:17; 5776:3; 5783:7, 11; 5792:15, 20; 5793:8, 16; 5794:16; 5801:17; 5802:12; 5809:24; 5810:6; 5811:24; 5827:4; 5835:2, 9, 11, 19; 5836:6, 9, 13; 5839:25; 5841:1; 5843:6; 5845:17; 5852:19; 5863:20; 5867:8; 5868:25;

5869:2, 5, 8, 11;
5873:11; 5888:13;
5889:17
**downs** [1] - 5769:12
**downstairs** [1] -
5884:8
**Doxey** [1] - 5789:15
**dozen** [1] - 5751:8
**Dr** [13] - 5810:11;
5811:1; 5813:12;
5814:19; 5815:12, 24;
5816:17; 5848:11;
5852:12; 5854:4;
5855:9; 5856:21;
5865:15
**Dragatto** [3] -
5786:22, 24; 5792:2
**dragged** [2] - 5708:6;
5835:19
**drainage** [1] - 5736:7
**dramatic** [1] - 5801:21
**drank** [2] - 5767:17;
5785:25
**draws** [1] - 5796:21
**dreamed** [1] - 5787:3
**drifting** [1] - 5772:9
**drink** [1] - 5787:1
**drinking** [4] - 5787:7;
5792:17; 5794:21
**drinks** [1] - 5775:17
**drive** [2] - 5836:9;
5876:20
**driven** [1] - 5755:17
**drives** [2] - 5789:18;
5823:5
**driving** [1] - 5760:13
**drop** [2] - 5781:24;
5785:25
**dropped** [1] - 5758:19
**dropping** [1] - 5756:20
**drove** [5] - 5801:24;
5802:1; 5819:14, 19;
5836:8
**drug** [3] - 5727:6;
5769:1, 17
**drugs** [3] - 5769:19;
5776:10; 5781:24
**drumming** [1] - 5762:23
**drunk** [5] - 5748:1;
5758:25; 5796:19;
5798:21; 5885:9
**drunkard** [1] - 5727:6
**due** [4] - 5716:25;
5717:11; 5735:3; 5751:1
**dump** [7] - 5746:12;
5759:10, 14; 5765:10;
5789:22; 5794:10;

5841:14
**dumps** [1] - 5836:11
**dungaree** [1] - 5796:24
**duplicate** [1] -
5796:16
**during** [17] - 5705:17;
5709:25; 5715:21;
5717:7; 5718:2;
5719:19; 5740:22;
5743:20; 5765:11;
5781:10; 5782:21;
5813:2; 5835:18;
5864:19; 5865:9;
5867:16; 5872:20
**dust** [3] - 5745:17;
5746:12, 17
**duty** [2] - 5838:24;
5839:7
**dying** [2] - 5852:7

---

## E

**e-mail** [1] - 5703:14
**earliest** [3] -
5854:13; 5856:6
**early** [4] - 5753:6;
5775:14; 5787:6;
5854:18
**earth** [3] - 5724:17;
5727:17; 5805:17
**easily** [1] - 5724:20
**EASTERN** [1] - 5697:1
**easy** [2] - 5714:14;
5716:14
**eat** [1] - 5876:18
**eats** [1] - 5737:15
**Econoline** [1] -
5711:19
**edger** [4] - 5787:20;
5792:10; 5887:10
**editor** [1] - 5849:25
**educated** [1] - 5850:11
**educational** [1] -
5718:19
**Edward** [1] - 5744:24
**effectuate** [1] -
5707:24
**efficiently** [1] -
5705:19
**effort** [2] - 5707:4;
5793:16
**Egington's** [2] -
5769:11; 5792:1
**egregious** [1] - 5716:8
**egregiously** [1] -
5807:20
**eight** [13] - 5703:20;
5704:15; 5711:22;

5740:17, 23; 5832:20,
23; 5854:18, 23;
5855:12; 5856:15;
5878:6
**eighth** [1] - 5741:20
**Eileen** [1] - 5761:1
**either** [9] - 5729:9;
5738:17; 5755:17;
5759:4; 5768:8; 5797:1;
5812:19; 5816:2; 5830:5
**ejaculate** [4] -
5725:10; 5729:9;
5812:19; 5816:22
**ejaculated** [2] -
5729:10; 5812:13
**ejaculating** [2] -
5812:24; 5816:2
**elect** [1] - 5736:11
**element** [3] - 5714:18,
24; 5717:12
**elements** [3] -
5714:12, 16, 25
**elevated** [1] - 5745:15
**eliminate** [1] -
5857:25
**ELMO** [1] - 5705:25
**eluded** [1] - 5777:1
**embark** [1] - 5776:25
**emotional** [2] -
5709:17; 5769:17
**emphasize** [1] -
5733:23
**employ** [2] - 5757:12;
5759:17
**employees** [1] -
5717:24
**employer** [1] - 5718:3
**end** [13] - 5702:3, 10;
5730:20; 5731:13;
5753:16; 5811:24;
5827:23; 5832:5, 17;
5858:11; 5891:20;
5893:21; 5894:23
**ended** [2] - 5704:6;
5749:15
**endure** [1] - 5713:15
**endured** [1] - 5806:3
**enforce** [1] - 5894:2
**engaged** [5] - 5719:2;
5767:1, 4; 5779:22;
5798:21
**enormous** [1] - 5813:22
**ensure** [1] - 5794:3
**entered** [4] - 5724:2;
5772:11; 5805:2; 5847:1
**enters** [2] - 5710:20;
5743:17

**entire** [4] - 5719:19;
5777:1; 5779:13; 5783:12
**entry's** [1] - 5706:3
**envelope** [5] -
5847:20; 5860:4, 7;
5862:22, 25
**envelopes** [10] -
5806:14; 5809:2;
5857:20; 5860:2, 10;
5863:5, 8; 5864:14
**environment** [4] -
5856:5; 5888:25;
5889:10; 5891:13
**environmental** [4] -
5851:10; 5858:1, 8, 20
**environments** [1] -
5856:1
**equal** [1] - 5872:8
**equally** [1] - 5872:9
**error** [3] - 5779:18;
5780:8, 11
**errors** [1] - 5892:25
**escape** [1] - 5746:18
**escorted** [1] - 5864:2
**especially** [2] -
5726:13; 5797:20
**espoused** [1] - 5781:7
**ESQ** [9] - 5698:4, 8-9,
12, 14
**essence** [2] - 5716:20;
5800:17
**essentially** [2] -
5873:13; 5889:9
**establish** [5] -
5730:19, 23; 5733:7;
5749:22; 5835:25
**established** [2] -
5755:6; 5893:2
**establishes** [1] -
5802:17
**establishing** [1] -
5756:2
**establishment** [1] -
5734:12
**estimate** [1] - 5700:8
**estimation** [1] -
5867:15
**et** [2] - 5697:6, 13
**etcetera** [4] -
5699:16; 5843:24;
5849:16; 5874:9
**ethnic** [1] - 5894:11
**evaluate** [2] - 5876:10
**evening** [3] - 5787:6;
5886:6; 5895:23
**event** [1] - 5861:12

13

eventually [5] - 5743:24; 5765:3; 5785:1; 5835:11, 24

everywhere [1] - 5746:12

evidence [141] - 5699:14; 5706:21; 5713:18, 23; 5715:12; 5716:1, 3, 21; 5722:13, 21; 5723:5, 8, 13, 16-17, 24; 5726:6; 5728:8; 5729:17; 5731:3, 15; 5735:13, 19; 5736:4; 5738:13; 5739:16; 5741:6; 5744:4, 6, 10; 5745:2; 5747:21; 5749:1, 17, 21; 5750:1, 18; 5751:13; 5754:11, 22-23; 5755:5, 21; 5756:1; 5757:2; 5758:2, 4-5, 7, 13, 15, 18-19, 22; 5759:3, 22-23; 5765:16, 20; 5768:1; 5774:13; 5779:7; 5784:7; 5787:16; 5788:9; 5790:8, 10, 16; 5792:7; 5797:9; 5799:11; 5802:4, 8, 11-13, 15, 17; 5803:5; 5805:8, 11, 24; 5806:10, 18; 5807:17; 5808:7; 5813:8; 5814:3; 5816:19, 24; 5817:7; 5819:12; 5825:11; 5827:25; 5828:3, 13; 5829:15; 5830:2, 16; 5831:20; 5833:9; 5836:20; 5837:1; 5841:25; 5842:5; 5843:18; 5847:6, 16; 5848:24; 5849:19, 24; 5859:1, 5, 7; 5860:12; 5861:25; 5862:6; 5864:10; 5866:14; 5872:8, 15, 19; 5873:15; 5879:20; 5882:4, 12; 5889:5; 5890:2, 18; 5894:19

exact [2] - 5752:12; 5778:23

exactly [9] - 5798:2; 5849:15; 5850:1; 5852:13, 20; 5854:6, 9; 5868:11; 5889:25

examination [13] - 5776:5; 5827:25; 5829:1; 5841:16; 5860:13; 5865:19, 21; 5866:22, 24; 5868:4,

11, 19; 5869:17

examine [5] - 5703:10; 5704:16; 5780:13, 15; 5793:18

examined [4] - 5858:24; 5859:16; 5879:15; 5885:19

examiner [4] - 5744:9; 5752:11; 5824:22; 5848:9

Examiner [1] - 5744:25

examiner's [2] - 5849:8, 10

examining [1] - 5857:8

example [1] - 5784:1

exceeded [1] - 5738:13

except [3] - 5790:6; 5818:23; 5844:14

exchange [1] - 5702:6

exchanges [1] - 5703:6

excited [2] - 5737:3

exclamation [1] - 5734:1

excluded [5] - 5724:11; 5731:21; 5732:7; 5811:5; 5831:23

exclusion [2] - 5724:16; 5731:10

exculpatory [7] - 5699:17; 5808:6; 5825:16; 5840:8, 12; 5841:25; 5842:5

excuse [11] - 5707:21; 5765:24; 5769:22; 5777:22; 5781:9, 15; 5794:6, 22; 5802:2; 5819:25; 5871:10

execute [1] - 5780:3

exhibit [4] - 5706:6, 20; 5828:20; 5889:17

Exhibit [7] - 5711:20; 5732:3; 5746:7; 5779:7; 5799:2; 5825:16; 5839:21

exhibits [3] - 5706:6, 10, 13

existence [1] - 5825:21

existent [1] - 5862:2

existing [1] - 5862:11

exits [2] - 5742:6; 5769:25

exonerate [1] - 5743:21

exoneration [7] - 5740:16; 5741:20; 5742:10, 20, 23, 25;

5743:22

expect [14] - 5735:17, 23; 5752:21; 5756:16; 5757:9; 5761:8; 5780:18, 20; 5782:7; 5783:16; 5785:3; 5792:13; 5892:17; 5893:5

expected [1] - 5741:25

expecting [1] - 5874:23

experience [5] - 5739:24; 5757:12, 14; 5813:22; 5850:1

experienced [2] - 5719:24; 5780:22

experiences [1] - 5801:13

experiment [1] - 5855:20

expert [10] - 5734:20, 22; 5736:9; 5744:4, 8; 5766:13; 5779:5; 5838:12; 5848:12; 5868:15

expertise [1] - 5750:3

experts [1] - 5813:13

explain [6] - 5709:23; 5729:23; 5808:18; 5816:25; 5837:20

explained [6] - 5760:8; 5773:25; 5778:24; 5814:19; 5831:6

explaining [1] - 5709:25

explains [2] - 5735:16; 5749:3

explanation [1] - 5857:22

explored [1] - 5731:9

exposed [1] - 5887:14

expresses [1] - 5774:24

expression [1] - 5883:19

extension [2] - 5847:25; 5864:24

extent [1] - 5744:13

extra [1] - 5834:6

extract [1] - 5832:11

extraction [4] - 5814:17, 21; 5815:2, 24

extraordinary [1] - 5849:11

extremely [1] - 5711:1

eye [1] - 5739:21

eyes [1] - 5797:13

eyewitness [2] - 5756:1; 5758:13

**F**

F'd [1] - 5724:25

fabricate [2] - 5791:23

fabricated [5] - 5715:13; 5716:18; 5717:2; 5780:1; 5802:4

fabricating [2] - 5699:16; 5716:21

fabrication [3] - 5801:12; 5806:13; 5873:17

face [4] - 5747:4, 20; 5749:8; 5813:3

facility [1] - 5721:17

fact [25] - 5701:12; 5702:9; 5718:11; 5719:13; 5720:11, 18-19; 5728:20; 5729:6; 5768:15; 5783:7; 5784:9; 5794:13; 5795:14; 5802:6; 5805:10; 5826:20; 5832:23; 5835:25; 5854:24; 5856:17, 21; 5858:24; 5866:17

factors [2] - 5715:21; 5716:11

facts [33] - 5713:18, 22, 25; 5715:25; 5718:13; 5719:8; 5720:15; 5721:11; 5723:6; 5734:15; 5754:1; 5776:23; 5778:22; 5787:24; 5795:10; 5800:11, 15, 23; 5802:23, 25; 5803:6, 18; 5805:9; 5806:1; 5807:15, 23; 5808:10; 5845:5; 5873:13; 5895:11, 16

factual [2] - 5721:20; 5733:9

factually [2] - 5721:5; 5728:18

fail [2] - 5725:10; 5891:17

failed [4] - 5715:24; 5716:5; 5718:1; 5769:8

fails [2] - 5874:10; 5877:20

failure [1] - 5893:1

faint [2] - 5753:15; 5815:20

**fair** [24] - 5716:25; 5730:16; 5731:1; 5732:19; 5739:22; 5782:11, 19; 5800:7; 5806:6, 9, 17, 23; 5807:1, 24; 5808:11; 5825:8; 5829:16; 5862:6; 5873:8, 18; 5879:20; 5883:25; 5884:1

**fairly** [1] - 5772:25

**fairy** [1] - 5878:12

**faith** [5] - 5716:3; 5733:24; 5738:15; 5807:18; 5873:15

**falls** [1] - 5748:24

**false** [29] - 5721:5, 24; 5722:7; 5724:22; 5725:14; 5728:11, 18; 5739:17; 5744:5; 5748:3; 5749:19; 5750:9; 5757:4; 5784:8; 5791:12; 5800:23; 5802:4, 24; 5806:15; 5807:25; 5808:5; 5809:6; 5853:18; 5857:5; 5873:22, 24; 5874:1; 5881:2; 5882:5

**falsely** [6] - 5721:13; 5730:6; 5786:12; 5809:12; 5886:25

**falsified** [3] - 5716:1; 5807:16; 5873:15

**familiar** [3] - 5759:8; 5762:15, 25

**family** [11] - 5734:16; 5763:19; 5769:15; 5777:1; 5803:23; 5811:21; 5864:6, 12; 5879:6

**fantasy** [2] - 5754:12; 5759:25

**far** [7] - 5722:13; 5738:13; 5765:6; 5774:12; 5795:4; 5801:14; 5816:11

**farm** [1] - 5855:19

**father** [6] - 5734:7; 5763:9, 18; 5764:3; 5810:3; 5879:6

**father's** [3] - 5791:15; 5809:24; 5810:4

**fault** [1] - 5701:17

**favor** [3] - 5806:1, 20; 5847:11

**favorable** [6] -

5702:19; 5714:22; 5817:7; 5825:11; 5835:16; 5847:7

**favorites** [2] - 5798:8, 11

**FBI** [11] - 5791:2; 5849:14, 17, 19; 5850:6; 5855:18; 5858:11, 17, 23, 25

**fear** [3] - 5773:20; 5806:1; 5883:17

**February** [6] - 5767:21; 5885:3, 15; 5886:23; 5891:23

**fed** [4] - 5876:15; 5880:8, 22

**federal** [4] - 5714:7, 10, 13

**Federal** [1] - 5697:21

**feedback** [1] - 5743:6

**feeding** [1] - 5880:1

**feet** [4] - 5759:19; 5775:15; 5793:9; 5801:5

**fell** [2] - 5749:15; 5797:11

**fellow** [1] - 5811:21

**felons** [1] - 5810:14

**felony** [2] - 5701:19; 5704:20

**felt** [1] - 5884:2

**fence** [1] - 5836:10

**FERGUSON** [1] - 5698:12

**Ferguson** [1] - 5836:7

**few** [1] - 5892:20

**fiancee** [1] - 5727:11

**fibers** [1] - 5849:15

**field** [3] - 5727:4; 5786:1, 5

**fielding** [1] - 5833:25

**fight** [5] - 5752:18; 5768:13, 16; 5811:23

**fighting** [5] - 5725:1; 5727:18; 5748:22; 5749:9, 12

**figure** [1] - 5743:7

**figured** [1] - 5732:16

**figuring** [1] - 5854:9

**filaments** [1] - 5852:4

**file** [9] - 5720:15; 5733:11; 5799:5; 5834:3; 5837:3; 5843:5, 16; 5845:19; 5892:1

**filed** [6] - 5702:23; 5706:17; 5865:8, 12; 5867:17; 5890:22

**files** [1] - 5854:16

**fill** [2] - 5832:18; 5892:23

**filled** [3] - 5828:5; 5847:24

**fills** [1] - 5864:23

**finalized** [1] - 5896:10

**finally** [14] - 5717:21; 5741:14; 5776:18; 5803:15; 5834:10; 5843:3; 5845:7; 5850:14; 5864:17; 5882:13; 5890:17, 25; 5894:23

**finer** [1] - 5795:13

**fingertips** [1] - 5836:2

**finish** [1] - 5874:16

**finished** [3] - 5703:4; 5866:24; 5868:6

**finishes** [2] - 5771:7; 5867:14

**fired** [2] - 5797:3, 6

**first** [41] - 5709:25; 5711:4; 5712:9, 13; 5714:2, 5; 5746:6; 5770:5; 5773:18; 5778:25; 5780:20, 24; 5782:12; 5785:17, 22; 5797:23; 5808:13; 5812:2, 11; 5813:6; 5815:7; 5828:9; 5836:25; 5844:8; 5847:17; 5848:1; 5849:18; 5851:23; 5854:13, 19; 5856:11; 5859:14; 5863:14; 5865:13; 5866:22; 5870:7; 5874:20; 5878:24; 5883:9; 5884:11; 5892:13

**Fischer** [9] - 5716:10; 5779:4; 5783:18; 5819:9; 5823:7, 14; 5838:12; 5845:18; 5869:13

**fit** [1] - 5756:19

**five** [31] - 5702:4; 5703:8; 5715:21; 5716:8, 11; 5735:1; 5736:1; 5742:3; 5745:16; 5746:14; 5760:17; 5763:10, 19; 5767:14, 16; 5768:25; 5771:6; 5775:12; 5777:6; 5780:24; 5783:10; 5788:23; 5796:20; 5797:8; 5801:4, 10; 5804:3;

5836:16; 5846:1; 5867:11

**five-minute** [1] - 5743:2

**flat** [1] - 5747:12

**flatbed** [1] - 5833:7

**flew** [1] - 5767:12

**fliers** [1] - 5775:9

**floor** [3] - 5785:17, 22

**floorboard** [1] - 5826:3

**floors** [1] - 5787:13

**Florida** [1] - 5784:17

**flying** [3] - 5745:17; 5882:25

**focus** [3] - 5709:19; 5773:24

**FOIA** [1] - 5833:25

**folder** [1] - 5843:6

**folders** [1] - 5837:4

**folks** [41] - 5715:10, 18; 5716:20, 24; 5718:9; 5721:18; 5722:15, 21; 5723:23; 5732:13; 5733:14; 5738:22; 5740:25; 5744:2; 5745:21; 5746:21; 5749:1, 8; 5751:15; 5752:7; 5753:8; 5756:10; 5758:2, 17; 5768:24; 5769:24; 5772:21; 5774:22; 5779:2; 5780:13; 5781:9; 5782:9; 5785:5; 5788:11; 5792:11; 5794:12; 5802:3; 5803:21; 5804:3; 5896:21

**follow** [3] - 5720:2; 5783:23; 5784:22

**follow-up** [3] - 5720:2; 5783:23; 5784:22

**following** [12] - 5707:3; 5711:5, 8; 5724:5; 5763:2; 5771:4; 5778:21; 5785:1; 5786:7; 5787:24; 5821:1; 5823:1

**follows** [2] - 5711:17, 21

**fool** [1] - 5727:16

**foot** [1] - 5793:7

**football** [3] - 5791:16; 5809:23; 5810:6

**footnote** [1] - 5705:17

footnotes [1] -
5705:10

footprint [1] -
5758:18

forced [3] - 5727:2, 6;
5882:13

forcibly [1] - 5852:8

Ford [2] - 5795:25;
5796:1

Forensic [2] - 5853:4;
5855:6

forensic [14] -
5744:4; 5756:1;
5758:13; 5849:2, 6-8;
5850:4, 10, 20; 5855:2;
5856:22; 5858:4; 5859:6

forever [1] - 5805:18

forget [5] - 5751:13;
5766:7; 5779:12;
5791:14; 5797:6

forgot [3] - 5863:11;
5866:9, 16

forgotten [1] - 5840:4

form [9] - 5747:22;
5784:24; 5832:14;
5837:7; 5852:5;
5854:10; 5874:11;
5890:18; 5892:19

formed [1] - 5723:2

forms [3] - 5756:17;
5888:17

formulated [1] -
5722:21

fort [4] - 5758:11;
5759:6, 9, 14

Fort [1] - 5863:11

forth [2] - 5723:6;
5803:6

forthright [1] -
5776:7

Forward [1] - 5711:19

forward [2] - 5728:21;
5816:18

foundational [2] -
5779:5; 5780:9

four [15] - 5703:9;
5706:13; 5711:16;
5720:11; 5725:20;
5735:19; 5748:10;
5766:16; 5802:21;
5836:3, 16; 5847:15;
5856:10; 5867:7;
5872:23

fourth [16] - 5714:21,
23; 5716:5; 5728:9, 23;
5729:12, 16, 19;
5730:2, 16, 19; 5731:4;

5732:8; 5738:18;
5754:13; 5812:6

fourth-man [6] -
5729:12; 5730:16, 19;
5731:4; 5732:8; 5754:13

foyer [1] - 5880:16

Fraas [6] - 5863:15;
5865:16; 5866:18;
5867:23; 5868:2;
5870:21

Fraas' [1] - 5866:18

frack [1] - 5726:10

fraction [10] -
5814:23-25; 5815:2,
5-6, 10-11, 19

fragments [2] -
5835:17

framed [2] - 5799:22;
5887:4

Frank [9] - 5791:2, 5;
5800:1; 5801:9, 14, 19,
22; 5838:13

frankly [3] - 5708:6;
5818:4; 5879:5

frantically [1] -
5789:18

fraud [2] - 5725:13

Fred [17] - 5723:11;
5818:14; 5823:20;
5832:16, 22; 5834:16;
5837:1, 17; 5838:22,
25; 5839:1, 11, 13, 16,
20; 5840:3; 5886:14

free [5] - 5713:20;
5714:1; 5872:2;
5881:19; 5894:8

freedom [1] - 5834:1

freely [2] - 5719:22

FREEMAN [48] - 5698:13;
5700:23; 5701:1, 5, 9,
16, 20; 5703:2;
5704:12, 21, 24;
5705:8, 10, 18, 21;
5706:4; 5707:13, 20;
5710:7; 5712:16, 18;
5723:15; 5726:3;
5740:18, 22; 5741:22;
5742:9, 14, 17;
5744:16; 5776:20;
5778:10; 5786:14;
5790:6, 17; 5792:5;
5798:10; 5803:16;
5819:11, 22; 5821:9,
12; 5866:11; 5896:5, 7,
15, 18

freeman [3] - 5702:3,
7; 5707:9

Freeman [7] - 5739:18;

5750:10; 5751:9;
5757:7; 5761:5;
5860:14, 23

Freeman's [1] - 5704:6

French [38] - 5706:8;
5717:15; 5806:11;
5817:3, 18; 5818:4, 25;
5821:4; 5823:25;
5824:20; 5825:17;
5826:14; 5827:2;
5828:23; 5829:2, 9;
5830:15, 19; 5833:4, 6;
5834:17, 23; 5836:20,
22; 5838:15; 5839:17;
5840:15; 5841:19;
5843:8, 17, 20; 5844:3,
17; 5845:3; 5847:6;
5873:16

frick [1] - 5726:10

Friday [3] - 5701:13;
5732:6; 5788:17

friend [8] - 5726:9,
15, 17; 5732:11;
5736:18; 5757:17;
5773:13; 5835:3

friendly [4] -
5875:10, 18; 5877:12

friends [7] - 5726:13;
5751:6; 5752:16;
5753:2; 5874:9;
5877:16; 5882:22

front [11] - 5723:12;
5725:21; 5728:24;
5748:5, 16; 5756:17;
5766:9; 5789:20;
5790:22; 5796:3;
5823:19

fucked [3] - 5725:2;
5876:2

fucking [1] - 5725:6

full [5] - 5715:24;
5719:5; 5720:14;
5745:18; 5833:20

fullest [1] - 5876:19

fully [3] - 5773:4, 14

fun [2] - 5769:12;
5835:22

fundamental [5] -
5719:3; 5722:21;
5723:1, 8; 5779:5

Furhmann [2] -
5754:21; 5768:6

furniture [2] -
5784:18; 5835:7

furtherance [1] -
5718:3

Fusco [82] - 5717:4;
5720:17; 5721:4, 24;

5724:12, 16; 5725:7,
12; 5726:10, 17;
5729:1, 3; 5730:3, 6;
5732:21; 5733:19;
5734:5, 8; 5735:15, 18,
20; 5736:1, 15; 5738:9,
17; 5740:12; 5744:6;
5745:11; 5746:8, 13,
24; 5747:15, 19;
5749:11, 22; 5750:4;
5754:14; 5755:24;
5756:2, 5, 7, 11;
5757:20; 5758:14, 19;
5768:8; 5777:8, 10, 13,
15, 17; 5789:21;
5795:16; 5797:5;
5798:3; 5802:9;
5803:23; 5808:24;
5809:19; 5810:9;
5814:25; 5819:5;
5824:24; 5825:19;
5831:10, 12; 5832:5;
5835:2; 5851:1;
5853:16; 5856:19;
5857:2, 25; 5860:21;
5862:15; 5866:1;
5867:21; 5884:24;
5888:10

Fusco's [15] - 5705:4;
5711:5, 18; 5724:9;
5725:22; 5726:20;
5731:20; 5735:3;
5745:14; 5813:1;
5815:8; 5823:21;
5824:11, 17; 5865:5

---

**G**

Gabberty [1] - 5826:14

gallons [1] - 5787:22

game [3] - 5809:17, 23;
5810:6

gang [7] - 5721:13;
5753:2; 5789:21;
5790:2; 5792:21; 5793:3

garbage [2] - 5722:12;
5844:15

gas [3] - 5722:2;
5768:16; 5769:20

gathered [1] - 5718:13

general [1] - 5779:7

generally [1] - 5891:6

genius [1] - 5894:14

gentleman [1] -
5767:22

gentlemen [71] -
5713:9; 5715:5;
5717:10, 13, 21;
5719:17; 5723:16, 20;
5724:4; 5726:4, 7;

**gonna** [1] - 5774:6
**gotta** [3] - 5747:5;
5883:20, 22
**governor** [1] - 5765:3
**grab** [2] - 5749:10;
5762:2
**grabbed** [1] - 5755:17
**grabs** [1] - 5877:22
**graduate** [1] - 5855:14
**grand** [18] - 5716:4,
13; 5718:24; 5761:21;
5764:7; 5807:19;
5826:9; 5880:25;
5881:4, 22; 5883:1;
5884:6, 15, 19;
5885:20; 5886:14, 17
**GRANDINETTE** [51] -
5698:2, 4; 5699:2, 8,
10; 5700:11, 17, 20;
5701:22; 5703:12;
5704:10; 5707:2, 17;
5708:1; 5709:23;
5710:5, 9, 11; 5713:5,
8; 5723:20; 5726:7;
5740:23; 5741:23;
5742:21, 24; 5743:3,
11; 5744:1, 17;
5751:20; 5752:7, 25;
5753:19; 5754:9;
5770:8; 5771:23;
5772:1, 3, 6, 19;
5776:25; 5778:16;
5786:15, 20; 5790:12,
21; 5792:8; 5798:13;
5803:12, 20
**Grandinette** [25] -
5700:22; 5703:5;
5707:13; 5712:7;
5713:4; 5739:19;
5742:9, 13, 19; 5743:9;
5769:23; 5770:3;
5771:10; 5772:4, 18;
5790:11, 20; 5803:11;
5809:5; 5812:3, 25;
5813:23; 5835:1;
5878:24
**Grandinette's** [2] -
5707:23; 5776:22
**grandmother** [1] -
5810:1
**grass** [1] - 5835:16
**grateful** [1] - 5767:19
**grave** [1] - 5702:15
**gray** [1] - 5844:9
**great** [7] - 5713:11;
5720:24; 5731:9;
5761:5; 5764:2; 5790:2;
5872:25

5727:14, 21; 5729:13;
5730:12; 5732:1;
5738:9, 14; 5740:19;
5741:10, 14; 5743:20;
5744:18; 5746:7;
5747:12; 5748:4;
5750:6, 23; 5751:20;
5754:9; 5755:5, 20;
5757:5, 22; 5760:4, 8;
5761:7; 5765:24;
5767:8; 5768:6;
5772:20; 5776:2, 21;
5778:16; 5779:21;
5782:3; 5783:5, 24;
5786:6, 15, 17; 5790:9,
12, 19, 22; 5791:23;
5792:6, 12; 5795:10;
5797:19; 5798:13;
5801:2, 11, 22; 5803:2,
13, 17; 5805:5; 5846:1;
5866:13; 5895:2
**George** [5] - 5718:20;
5751:21, 25; 5753:10,
12
**Gilhooley** [1] - 5734:9
**Gino's** [1] - 5787:5
**GINSBERG** [4] -
5698:13, 15; 5821:22;
5822:1
**girl** [11] - 5761:1, 3;
5762:13; 5790:3;
5792:19; 5793:3;
5794:2; 5796:11, 19,
22; 5876:2
**girlfriend** [5] -
5737:20; 5767:15;
5768:2; 5791:17
**girlfriends** [1] -
5756:8
**girls** [2] - 5753:6;
5767:7
**given** [15] - 5701:8;
5719:21; 5721:11;
5746:1; 5808:24;
5809:4, 7, 10, 14, 20;
5812:24; 5813:3;
5853:12; 5868:3; 5875:3
**glass** [3] - 5835:17;
5836:1, 3
**Glenmore** [1] - 5785:19
**God** [3] - 5733:15;
5769:21; 5843:1
**God's** [4] - 5721:19;
5756:10; 5792:23;
5794:2
**gold** [2] - 5798:5;
5844:11
**Goldman** [1] - 5860:3

**greater** [2] - 5718:23;
5803:14
**greatest** [2] -
5786:23; 5893:24
**greatly** [1] - 5709:17
**Gretel** [1] - 5835:22
**grip** [1] - 5797:11
**gross** [3] - 5766:8;
5866:24; 5868:19
**ground** [3] - 5706:5;
5747:3; 5801:17
**group** [2] - 5849:19;
5855:4
**groups** [1] - 5855:8
**guarantee** [3] -
5721:14; 5727:19;
5729:18
**guaranteed** [1] -
5721:6
**Guardian** [1] - 5769:18
**Gueraro** [3] - 5801:19,
23; 5802:1
**Guerrero** [1] - 5759:17
**guess** [3] - 5752:12;
5753:14; 5874:18
**guessing** [5] -
5732:13, 22; 5733:4, 15
**guilty** [2] - 5803:9;
5894:16
**gun** [1] - 5768:20
**guy** [23] - 5730:2;
5734:12; 5739:14;
5741:1, 20; 5753:2;
5762:3; 5776:6; 5783:2;
5795:11, 22; 5798:21;
5801:9, 19, 21;
5842:19; 5849:21;
5869:1; 5874:25;
5876:13; 5877:18;
5892:13
**guys** [34] - 5730:5;
5739:24; 5740:7, 11,
14; 5741:7; 5742:2;
5753:23; 5754:22;
5758:25; 5759:8, 14;
5762:6; 5774:2, 10, 14;
5781:24; 5784:2, 5, 13;
5792:17; 5794:6;
5795:21; 5801:6;
5811:10; 5812:9, 15,
24; 5816:1, 21;
5818:11, 20; 5832:25;
5853:2

| H |
| --- |

**hair** [73] - 5705:2, 15;
5711:18; 5716:2;
5717:3; 5744:7;

5745:11, 23, 25;
5746:9, 13, 20-21;
5796:23; 5808:5;
5818:23; 5847:13, 20;
5848:6, 9, 12; 5849:9,
20; 5850:8, 20;
5851:14, 18, 20-21;
5852:19; 5853:9, 19,
21; 5854:9; 5855:3;
5856:2, 14, 18;
5857:25; 5858:5, 7;
5859:12, 21-22; 5860:5,
9, 24; 5862:14, 17;
5865:5, 17, 19, 25;
5866:6, 22; 5867:21;
5868:11; 5869:10, 17;
5871:24; 5872:12,
21-22, 24; 5873:7, 17
**hairs** [49] - 5746:4;
5806:13; 5807:17, 25;
5808:25; 5831:9, 11,
17; 5832:2; 5847:19;
5848:14; 5851:1, 8;
5853:25; 5856:3;
5857:9, 11-12, 16,
19-20; 5858:14; 5859:1,
16, 18-19, 23-25;
5860:4, 11, 15, 19;
5861:9, 13, 18;
5862:20, 24; 5863:4, 7;
5866:21; 5867:6, 12
**half** [27] - 5703:20;
5711:24; 5719:2, 15,
19, 24; 5720:1, 3, 12;
5740:11; 5746:15;
5751:7, 22; 5762:8;
5771:15; 5780:18, 24;
5782:14, 24; 5783:10,
16; 5796:20; 5797:9;
5798:3; 5801:4;
5802:20; 5880:13
**halfway** [1] - 5826:3
**hall** [3] - 5863:20
**Hallstead** [1] - 5721:3
**Halstead** [47] -
5708:15; 5712:23;
5722:9; 5723:10;
5725:7; 5734:19;
5741:17; 5752:15, 21;
5756:5; 5760:10;
5762:24; 5763:14;
5766:10; 5767:3, 5-6,
18; 5768:4; 5774:1,
5-6, 20; 5784:2;
5788:7, 10; 5789:14,
19; 5791:15; 5792:3;
5793:8; 5795:19, 22;
5805:6; 5809:13, 18;
5812:18; 5818:19;
5861:25; 5862:3;

5876:1; 5877:24;
5879:4, 15; 5881:3

**Halstead's** [6] -
5717:18; 5729:6;
5753:1, 7; 5791:14;
5809:21

**ham** [2] - 5716:17, 19

**hand** [14] - 5705:16;
5706:14; 5738:7;
5747:17; 5749:10;
5769:12; 5773:19;
5780:5; 5794:15, 23;
5795:2; 5797:20;
5857:2; 5877:24

**hand-me-downs** [1] -
5769:12

**handcuff** [1] - 5881:13

**handcuffed** [1] -
5740:2

**handed** [1] - 5779:25

**handing** [1] - 5896:15

**handle** [1] - 5770:10

**handled** [1] - 5834:22

**handling** [2] - 5718:7;
5833:24

**hands** [9] - 5740:24;
5747:16; 5748:7, 13,
15; 5749:9; 5781:17;
5841:3

**hang** [3] - 5737:13;
5786:25; 5794:11

**hanging** [2] - 5767:6;
5792:17

**Hansel** [1] - 5835:22

**happenstance** [1] -
5763:8

**happy** [2] - 5708:10;
5763:19

**harassed** [1] - 5890:24

**harassing** [1] - 5891:7

**hard** [14] - 5747:10;
5761:5, 8-9; 5793:1;
5797:15; 5824:19, 23;
5827:13; 5836:14;
5839:24; 5851:20;
5852:3

**Harry** [14] - 5760:13,
22; 5761:1, 4, 6, 13;
5762:12; 5791:8;
5809:11; 5818:17;
5840:1; 5841:3; 5879:23

**HARRY** [1] - 5697:20

**hash** [1] - 5776:11

**hate** [2] - 5740:8;
5887:2

**hated** [1] - 5768:17

**head** [17] - 5718:20;

5719:8; 5727:2, 25;
5762:23; 5765:2;
5766:6; 5768:20;
5778:22; 5833:21;
5841:4; 5852:7; 5856:3;
5881:6; 5890:10, 16

**head's** [1] - 5841:14

**headed** [2] - 5855:4

**heading** [4] - 5796:12;
5835:2

**heads** [2] - 5753:23;
5774:11

**health** [3] - 5702:11,
14

**hear** [8] - 5707:5;
5741:10; 5753:19;
5759:21; 5764:8;
5791:1; 5806:25;
5871:19

**heard** [40] - 5701:22;
5707:13; 5708:14;
5716:17; 5717:15;
5729:13; 5739:20;
5741:3, 13; 5743:21;
5760:16; 5764:7;
5766:13; 5768:3;
5775:2; 5786:3;
5788:14; 5791:14;
5794:4; 5797:19;
5830:19; 5832:16;
5834:16, 18, 25;
5836:7; 5839:11, 16;
5841:12; 5843:23;
5861:20; 5864:3;
5873:23; 5874:6;
5876:6, 23; 5877:4;
5878:19; 5887:25;
5888:5

**hearing** [1] - 5818:8

**heart** [3] - 5713:10;
5798:4, 6

**heartedly** [1] - 5726:2

**heated** [1] - 5702:6

**heavily** [1] - 5833:22

**held** [4] - 5711:25;
5724:25; 5762:3; 5874:2

**hell** [1] - 5764:3

**Hell's** [3] - 5882:23,
25; 5883:3

**help** [7] - 5727:17, 20;
5764:25; 5773:7;
5811:3; 5874:24;
5882:14

**helpful** [1] - 5885:11

**hens** [1] - 5809:17

**hesitation** [1] -
5773:20

**hidden** [1] - 5840:6

**hide** [2] - 5773:15;
5833:13

**hiding** [6] - 5808:6;
5832:15; 5836:20, 25;
5838:8; 5842:21

**high** [8] - 5758:25;
5793:15; 5796:19;
5797:2; 5798:21;
5801:10; 5814:15;
5888:9

**high-top** [1] - 5797:2

**highly** [7] - 5740:9;
5759:1; 5812:24;
5813:8; 5815:15;
5816:20; 5856:21

**Highway** [2] - 5755:12

**Hillman** [1] - 5830:4

**himself** [6] - 5722:19;
5739:19; 5764:19;
5766:3; 5768:4; 5825:17

**hired** [1] - 5849:19

**hit** [5] - 5732:17;
5733:13; 5766:5;
5797:10; 5810:20

**hits** [1] - 5877:23

**Hoboken** [1] - 5698:6

**HOFFMANN** [1] - 5698:9

**Hofstra** [1] - 5745:3

**hold** [1] - 5708:9

**holding** [2] - 5793:6;
5800:13

**holds** [2] - 5731:6;
5800:13

**home** [25] - 5700:5;
5726:11; 5737:14, 19;
5757:21; 5761:2;
5767:23; 5768:25;
5769:3, 18-19; 5775:16;
5784:16; 5785:23;
5789:22, 24; 5819:19;
5874:13; 5875:13;
5876:20; 5884:13;
5886:1

**Home** [1] - 5769:18

**homeowners** [1] -
5784:16

**homes** [2] - 5746:16;
5759:20

**homicide** [35] -
5706:9; 5718:2;
5719:25; 5720:15;
5730:17; 5739:24;
5740:1, 3; 5746:2;
5761:7; 5765:2;
5780:19, 22; 5783:2;
5813:16, 20; 5825:19;
5828:10; 5837:3, 8, 12;
5840:18, 22; 5842:14;
5843:5; 5862:1;

5863:12, 16, 20;
5864:8; 5869:14;
5877:19; 5878:7;
5890:13; 5892:13

**Homicide** [2] -
5890:16; 5891:13

**homicides** [1] - 5763:5

**honest** [2] - 5720:6;
5811:13

**honey** [2] - 5790:1;
5877:9

**Honor** [17] - 5700:23;
5701:5; 5703:2, 23;
5704:25; 5706:4;
5707:2; 5708:24;
5710:7; 5742:9;
5772:19; 5776:20;
5777:22; 5778:10;
5805:15; 5866:11;
5896:5

**HONORABLE** [1] -
5697:18

**hope** [2] - 5713:23;
5813:5

**hospitalized** [1] -
5761:22

**host** [1] - 5766:14

**hostile** [2] - 5719:2;
5779:22

**Hot** [9] - 5738:3;
5789:20; 5794:25;
5795:3, 16; 5797:3;
5819:5; 5835:2; 5884:25

**Houck** [18] - 5831:24;
5848:21; 5849:1, 13;
5852:12; 5853:7;
5854:4, 24; 5855:1, 4,
9, 18; 5856:12, 21;
5857:12; 5858:12;
5865:15

**hour** [17] - 5703:20;
5711:24; 5719:2;
5751:22; 5762:8;
5773:16; 5780:18;
5782:14; 5783:17;
5802:20; 5851:2, 6;
5853:15; 5865:11;
5890:7

**hours** [41] - 5700:22;
5719:9, 15, 19, 24;
5720:1, 3, 12; 5735:2,
7-9; 5736:15; 5738:10;
5762:3, 5, 10; 5765:13;
5772:7; 5774:19;
5775:12; 5814:7;
5815:16; 5816:1;
5854:18, 23; 5855:12;
5856:16; 5866:25;
5867:5; 5874:5, 12-13,

18

15; 5875:11; 5880:13; 5883:10; 5889:20; 5890:21

**house** [25] - 5708:5; 5737:3, 11, 18, 22-23; 5738:7; 5746:17; 5754:15; 5765:9; 5767:23; 5769:11; 5785:15, 18; 5787:25; 5788:7; 5789:2; 5791:15; 5835:4; 5886:4, 8; 5887:13, 17

**Howie** [1] - 5741:19

**Hudson** [1] - 5698:7

**huge** [4] - 5818:7; 5831:20; 5836:17; 5859:11

**human** [24] - 5848:3, 5; 5850:4, 23, 25; 5851:14; 5852:23; 5853:10, 13, 20; 5865:6; 5869:21; 5870:3, 8, 10, 16, 19, 22, 25; 5871:5, 16, 23

**humping** [1] - 5793:13

**hundreds** [2] - 5774:19; 5867:4

**hung** [3] - 5785:24; 5885:9; 5889:22

**hurricane** [1] - 5713:13

**hurried** [1] - 5826:22

**hurt** [2] - 5719:7; 5837:21

**hypotheses** [1] - 5731:19

**hypothesis** [1] - 5731:16

---

**I**

**IAD** [1] - 5766:23

**idea** [4] - 5700:13; 5844:1; 5862:23; 5866:3

**ideas** [1] - 5881:6

**identical** [3] - 5714:13; 5717:18; 5718:6

**identification** [1] - 5830:22

**identified** [8] - 5706:12; 5724:7, 15; 5824:20; 5828:13, 24; 5829:18; 5851:24

**identifies** [2] - 5758:9; 5829:10

**identify** [3] - 5810:21; 5858:18; 5867:9

**identifying** [1] - 5829:4

**identity** [1] - 5729:18

**ignore** [2] - 5790:19; 5836:22

**ill** [4] - 5716:22; 5733:24; 5808:4, 9

**illegal** [1] - 5891:5

**illness** [1] - 5843:22

**illogical** [4] - 5714:1; 5811:25; 5844:1; 5871:17

**imagine** [1] - 5824:11

**immediately** [6] - 5783:12; 5825:19, 23; 5833:7; 5843:25; 5848:12; 5855:12; 5889:16; 5895:7

**immunity** [1] - 5889:6

**impact** [1] - 5709:17

**impacted** [1] - 5708:12

**impartial** [2] - 5739:22; 5879:20

**impeachment** [1] - 5699:17

**implicate** [1] - 5764:19

**important** [13] - 5729:9; 5773:16; 5774:22; 5784:4; 5808:14; 5823:16; 5828:12; 5830:12; 5831:3; 5832:4; 5853:8; 5884:4

**importantly** [2] - 5813:15; 5849:25

**impossibility** [1] - 5854:11

**impossible** [5] - 5721:21; 5736:11; 5751:14; 5793:6; 5857:12

**impressive** [1] - 5859:10

**improbable** [3] - 5812:24; 5813:3, 9

**improprieties** [1] - 5893:17

**impropriety** [3] - 5765:15; 5766:8, 24

**improve** [1] - 5862:12

**impugns** [2] - 5750:14; 5751:12

**inaccurate** [1] - 5728:18

**inadvertent** [2] - 5779:18; 5780:8

**inappropriate** [2] - 5701:24; 5879:16

**incident** [1] - 5818:9

**include** [1] - 5704:19

**including** [3] - 5724:7; 5834:13; 5887:12

**inconsistent** [12] - 5713:25; 5735:14, 19; 5736:4; 5801:12; 5802:18; 5813:5, 8; 5814:5; 5816:3; 5823:13; 5837:22

**incredible** [1] - 5707:4

**incredibly** [2] - 5725:23; 5763:5

**incriminating** [1] - 5882:2

**independent** [8] - 5744:4, 7; 5747:21; 5750:18; 5754:1; 5780:13; 5802:8; 5868:10

**independently** [1] - 5797:8

**index** [3] - 5843:5, 7

**indicated** [4] - 5701:14; 5710:14; 5712:9; 5747:15

**indicating** [3] - 5719:15; 5757:24; 5892:2

**indicating)** [3] - 5725:12; 5732:2; 5756:6

**indication** [1] - 5802:20

**indict** [3] - 5716:17, 19; 5881:11

**indicted** [1] - 5807:7

**indictment** [3] - 5715:19; 5716:13, 15

**indifference** [3] - 5888:24; 5892:10

**indifferent** [2] - 5891:12; 5893:20

**individual** [1] - 5859:3

**individuals** [1] - 5735:12

**inference** [3] - 5702:19; 5829:16; 5862:6

**infinitum** [1] - 5836:7

**infirmed** [1] - 5836:23

**influence** [2] - 5709:22; 5895:7

**information** [10] - 5777:18; 5800:5, 7, 21; 5834:1; 5839:7; 5842:9; 5844:24; 5845:1; 5874:9

**injunctive** [1] - 5890:23

**injuries** [2] - 5736:21; 5749:2

**injury** [2] - 5748:23; 5802:10

**innocence** [2] - 5777:4; 5818:19

**innocent** [9] - 5739:3, 5, 9; 5808:21; 5811:10, 17; 5894:4, 7, 15

**inputted** [1] - 5810:12

**inquiry** [3] - 5716:5; 5890:19; 5891:24

**insane** [3] - 5792:24; 5793:4; 5812:7

**inside** [8] - 5758:20; 5793:10; 5823:19; 5824:5; 5826:2, 20, 23; 5830:21

**inspect** [3] - 5708:15; 5712:24

**instantaneously** [1] - 5792:20

**instantly** [1] - 5764:21

**Institute** [2] - 5849:14; 5850:8

**instituted** [2] - 5714:17, 20

**institutions** [1] - 5892:7

**instruct** [2] - 5715:18; 5807:5

**instruction** [2] - 5701:18; 5896:9

**instrument** [1] - 5824:24

**insult** [1] - 5851:10

**insulting** [2] - 5781:7; 5790:5

**insults** [3] - 5858:2, 8, 20

**insurance** [1] - 5700:1

**insure** [1] - 5894:6

**intact** [1] - 5724:8

**integrity** [1] - 5894:18

**intend** [1] - 5708:13

**intended** [1] - 5803:18

**intending** [1] - 5823:11

**intends** [1] - 5702:7

**intense** [2] - 5719:2; 5779:22

**intent** [1] - 5716:22

**intention** [2] - 5702:9; 5703:10

**intentional** [1] - 5742:10

**intentionally** [3] - 5808:6; 5832:15; 5834:20

**intentions** [1] - 5838:10

**intercourse** [2] - 5816:5, 10

**interested** [3] - 5727:10, 13

**interestingly** [1] - 5819:7

**intermittent** [1] - 5728:22

**internal** [1] - 5892:18

**international** [1] - 5850:18

**interpret** [1] - 5744:10

**interpretation** [2] - 5740:21; 5747:25

**interrogate** [1] - 5874:21

**interrogated** [4] - 5879:24; 5880:12, 18; 5883:9

**interrogating** [1] - 5781:13

**interrogation** [24] - 5711:7; 5715:11; 5719:3, 16; 5720:2; 5766:18; 5772:24; 5779:6, 22; 5780:15, 18-19; 5782:15; 5783:17; 5799:5; 5801:6; 5802:18, 22; 5809:8; 5874:2, 24; 5878:12; 5890:7

**interrogations** [2] - 5891:14; 5892:21

**interrogator** [1] - 5875:8

**interrupted** [2] - 5886:14, 18

**intersection** [1] - 5794:24

**intervening** [1] - 5768:13

**interview** [3] - 5773:12, 16, 25

**interviewed** [2] -

**intimate** [1] - 5726:14

**intimidated** [1] - 5883:10

**introduce** [1] - 5861:24

**introduced** [3] - 5716:16; 5717:7; 5767:18

**invalid** [1] - 5779:3

**investigate** [2] - 5740:4; 5895:15

**investigated** [2] - 5766:21; 5841:21

**investigating** [3] - 5783:9; 5827:17

**investigation** [24] - 5718:14; 5732:16; 5739:21; 5740:10, 15, 25; 5745:7; 5765:4; 5766:17, 23; 5780:23; 5782:14; 5795:15; 5811:9; 5828:10; 5832:20; 5833:2, 13, 23, 25; 5839:15; 5878:15; 5893:16

**Investigations** [1] - 5830:9

**investigative** [1] - 5833:2

**investigator** [1] - 5733:8

**investigators** [3] - 5739:8, 11

**invitation** [1] - 5708:18

**invite** [2] - 5722:4; 5792:16

**invited** [2] - 5708:15; 5712:23

**involve** [1] - 5743:22

**involved** [20] - 5720:4, 10; 5722:20; 5739:6; 5750:4; 5754:1; 5763:6; 5765:17; 5778:19; 5795:11; 5807:2; 5818:9; 5825:19; 5833:22; 5839:14; 5852:15, 23; 5853:10

**IO** [2] - 5827:18

**ironclad** [1] - 5734:9

**irrespective** [1] - 5730:15

**Island** [1] - 5711:10

**Islip** [2] - 5697:6, 22

**issue** [12] - 5706:24;

5730:12; 5782:9; 5788:18; 5801:3; 5807:9; 5832:13; 5834:21; 5835:16; 5847:13; 5850:23; 5866:6

**issued** [1] - 5779:8

**issues** [6] - 5702:11, 14, 16; 5769:17; 5807:1; 5850:1

**item** [1] - 5828:3

## J

**Jack** [6] - 5763:4, 7, 9, 17, 24

**jacket** [2] - 5796:17, 24

**jail** [4] - 5729:15; 5882:19, 21; 5887:5

**January** [6] - 5703:24; 5704:12, 17; 5711:25; 5712:5; 5767:21

**Japan** [1] - 5855:7

**Japanese** [1] - 5853:2

**Jason** [5] - 5768:3; 5791:14; 5792:3; 5809:21; 5810:2

**Jay** [2] - 5848:17; 5859:11

**jeans** [38] - 5758:20; 5793:14; 5806:12; 5817:3, 18; 5818:5; 5823:18, 21; 5824:5, 10-11, 15, 17; 5825:2, 6, 15, 22; 5826:2, 6, 11-12, 16, 20, 22, 24; 5830:21, 25; 5831:14; 5833:7; 5834:23; 5836:14; 5838:4; 5839:24; 5841:13, 19; 5844:2; 5873:16

**jeopardize** [1] - 5709:21

**Jersey** [1] - 5698:6

**jewelry** [10] - 5796:17; 5798:1, 15, 17; 5799:3, 9, 16-17; 5835:21

**Joann** [3] - 5738:24; 5755:2; 5757:1

**JOANNA** [1] - 5697:18

**Joanne** [13] - 5738:2; 5788:3; 5789:25; 5792:1; 5796:4; 5809:16; 5875:13; 5877:6; 5887:13, 24; 5888:1, 7

**Joanne's** [2] - 5887:17; 5888:5

**job** [24] - 5753:23; 5766:1; 5784:3, 14, 16-17, 21; 5785:12, 16, 20-21; 5788:1, 5; 5791:9; 5800:22, 25; 5811:13; 5838:21; 5840:2; 5841:14; 5844:3; 5887:8

**Joe** [22] - 5701:20; 5702:1, 10; 5703:7; 5751:24; 5752:1, 10; 5763:9; 5792:2; 5797:23; 5825:10; 5827:10, 17-18; 5837:12; 5838:21; 5840:6; 5845:22; 5864:5, 9; 5869:19; 5871:14

**joe** [1] - 5828:17

**JOHN** [2] - 5697:3, 10

**John** [219] - 5706:8; 5711:7; 5712:8; 5713:9; 5714:3, 23; 5715:8, 10, 15; 5716:15; 5717:4, 6, 14; 5718:15; 5719:1, 8, 12, 20; 5720:4, 7, 9, 18, 20-21; 5721:9, 19; 5722:9; 5723:4, 10; 5725:3, 6, 8, 17; 5726:20, 24; 5727:12; 5728:17, 22; 5732:6; 5733:16, 25; 5734:8; 5736:12; 5737:19; 5738:16; 5740:24; 5744:5, 12, 14; 5747:1, 3, 8, 13, 19; 5748:2, 14; 5749:18; 5750:15, 19; 5751:6, 16, 23; 5752:7, 13-14, 20; 5753:6, 22, 25; 5754:18; 5756:4; 5758:8; 5760:3, 5, 9-10, 12-13; 5762:2, 4, 6, 11, 16, 19, 22; 5763:1, 11-12, 15, 18-21, 23; 5764:2, 9, 18, 21; 5765:17, 22; 5766:19; 5767:20-22; 5768:7, 11, 13, 15, 23; 5769:6, 16; 5772:21; 5773:5, 10, 14, 21, 24-25; 5774:2, 8, 20, 24; 5775:10; 5776:3; 5778:18, 24; 5779:25; 5780:14; 5781:16, 23; 5782:5; 5783:13; 5784:19; 5785:13, 17; 5786:4, 8, 12; 5787:2, 8-9, 13; 5788:2, 5, 7, 20; 5789:4, 7, 13, 22;

5791:8; 5792:1; 5793:6, 12; 5794:15, 20; 5795:18, 21, 25; 5796:1, 7, 25; 5797:8; 5798:8, 13, 23; 5799:17; 5800:4, 10, 18; 5801:1, 17, 24; 5803:3, 14, 23; 5809:9, 12, 15, 18; 5823:25; 5824:20; 5825:16; 5827:2; 5828:23; 5829:2; 5833:6; 5843:8; 5844:17; 5845:3; 5848:17; 5859:11; 5864:5; 5874:1; 5875:22; 5878:11, 18; 5879:8, 13; 5880:3, 5, 15; 5883:8; 5884:7; 5885:8; 5887:2; 5889:14; 5890:5; 5893:11

**John's** [5] - 5763:9; 5796:18; 5799:8; 5877:13; 5879:6

**join** [3] - 5737:12; 5756:8; 5792:25

**joint** [1] - 5792:18

**joints** [1] - 5775:17

**Joseph** [8] - 5702:12; 5703:11, 15; 5704:12; 5711:22; 5712:5; 5786:22, 24

**jot** [1] - 5780:6

**jotted** [1] - 5783:6

**journal** [1] - 5854:21

**Journal** [1] - 5853:4

**journals** [1] - 5849:25

**journey** [1] - 5805:21

**Judge** [27] - 5701:22; 5702:14; 5703:12; 5706:23; 5707:17; 5715:3, 18; 5716:14; 5723:1, 3, 12; 5740:18; 5742:3; 5743:3; 5744:23; 5747:21; 5751:17; 5771:9, 23; 5803:4; 5806:25; 5807:5; 5868:23; 5872:7; 5889:8; 5896:10

**judge** [5] - 5722:20; 5745:2; 5766:9; 5803:16; 5806:1

**judges** [1] - 5722:16

**July** [2] - 5741:21; 5891:23

**jump** [1] - 5889:25

**jumped** [1] - 5812:9

**June** [9] - 5723:1;

5740:17; 5880:25; 5881:4, 21; 5884:7, 16; 5885:21

**juries** [2] - 5893:23, 25

**JUROR** [4] - 5772:15; 5777:22; 5778:2, 14

**Juror** [3] - 5699:23; 5710:13, 24

**juror** [6] - 5700:1; 5707:7, 10; 5709:11; 5711:1; 5817:23

**juror's** [1] - 5707:4

**jurors** [6] - 5700:24; 5705:18; 5713:12; 5720:24; 5824:12; 5895:9

**jury** [87] - 5699:3, 14, 20; 5704:14; 5705:22, 25; 5706:6, 14-15, 17, 20-21, 24; 5707:22; 5708:11, 25; 5709:10, 13, 19; 5710:18-20; 5716:4, 13; 5721:22; 5722:25; 5723:21; 5725:21; 5728:7; 5729:24; 5730:17; 5732:3; 5742:6, 8, 18, 22; 5743:17; 5745:22; 5761:21; 5764:7; 5768:20; 5769:25; 5771:5; 5772:9, 11; 5789:12; 5792:9; 5799:1; 5804:6; 5805:2, 24-25; 5806:2, 25; 5807:19; 5808:8; 5817:17; 5818:8, 15; 5821:24; 5823:13; 5824:9; 5825:2, 4, 14; 5826:25; 5830:13, 19; 5831:3, 16; 5836:2; 5846:3; 5847:1; 5880:25; 5881:4, 22; 5882:11; 5883:1; 5884:6, 15, 19; 5885:20; 5886:14, 17; 5896:2

**justice** [5] - 5728:2; 5805:19, 22; 5894:18, 24

**Justice** [1] - 5722:19

**justified** [1] - 5732:5

---

**K**

**Kaplan** [12] - 5725:24; 5726:9; 5727:3; 5732:11; 5734:15; 5736:18, 25; 5738:23; 5754:16, 20; 5757:17;

5796:16

**Kaplan's** [5] - 5734:13; 5754:15; 5798:3; 5835:4

**keep** [7] - 5745:4; 5764:17; 5806:24; 5819:2; 5832:1; 5895:17

**Kelly** [1] - 5739:20

**Kelly's** [1] - 5741:5

**Kenny** [6] - 5787:4; 5809:11; 5880:10; 5882:1, 5; 5884:20

**kept** [1] - 5880:21

**keratin** [3] - 5851:17, 19; 5852:2

**keratinous** [1] - 5852:2

**key** [3] - 5799:12; 5825:16; 5865:1

**kid** [4] - 5768:24; 5769:8; 5874:13; 5877:17

**kidding** [4] - 5740:9; 5781:23; 5797:22; 5798:23

**kids** [4] - 5731:23; 5756:19; 5768:2; 5769:12

**kill** [4] - 5722:11; 5730:8; 5758:10; 5824:24

**killed** [5] - 5719:7; 5730:11; 5749:22, 25; 5840:7

**Kim** [4] - 5754:20; 5767:12; 5768:10

**kind** [14] - 5705:23; 5809:13; 5824:18; 5826:18; 5828:14; 5831:12; 5835:15; 5864:13; 5871:9; 5877:2; 5878:13; 5885:9; 5886:24; 5889:24

**kindergarten** [2] - 5769:6, 8

**kinds** [2] - 5806:9; 5864:9

**King** [1] - 5736:25

**Klein** [20] - 5723:11; 5818:14; 5823:20; 5832:16, 22; 5834:16; 5837:1, 17; 5838:23; 25; 5839:1, 4, 11, 13, 16, 20; 5840:3; 5885:22; 5886:14, 18

**kneecaps** [1] - 5736:21

**knees** [11] - 5747:6,

16; 5748:6, 14, 18-19, 22-23; 5749:9; 5802:10

**knock** [1] - 5775:18

**knocking** [2] - 5740:5, 13

**knowing** [2] - 5715:6; 5795:4

**knowledge** [11] - 5704:24; 5718:15; 5750:12, 14; 5751:12; 5777:20; 5778:19; 5781:1; 5800:19; 5834:15

**known** [33] - 5731:20; 5732:2, 7; 5736:19; 5758:11; 5759:9; 5802:23, 25; 5807:3; 5814:21; 5817:17; 5825:13; 5827:1; 5841:21; 5850:24; 5852:16, 20, 22; 5853:1, 5, 12-13, 20, 24; 5854:1; 5856:23; 5857:13; 5861:10; 5865:16, 19; 5889:5; 5893:24

**knows** [13] - 5769:8; 5792:20; 5796:4; 5837:21; 5843:1; 5845:2; 5848:15; 5862:9; 5876:8; 5879:5; 5889:24; 5892:11

**Knox** [1] - 5863:11

**Koch** [2] - 5855:17; 5861:24

**KOGUT** [1] - 5697:3

**Kogut** [108] - 5711:7; 5712:8; 5713:9; 5714:23; 5715:8, 10, 15; 5716:15; 5717:6; 5718:16; 5719:1, 8, 12, 20; 5720:19-21; 5721:4, 10, 19; 5723:4; 5725:17; 5726:24; 5727:12; 5728:18, 23; 5732:6; 5733:16; 5734:19; 5740:24; 5744:5; 5747:13, 19; 5750:11, 15, 19; 5751:23; 5752:7, 13-14; 5753:6; 5756:4; 5760:5, 9; 5762:16; 5765:22; 5767:20-22; 5768:7, 15, 23; 5769:17; 5773:6, 10; 5774:21, 24; 5776:3; 5778:18; 5779:25; 5780:3, 14; 5781:23; 5782:5; 5785:13; 5786:8, 12;

5787:2, 6; 5788:5, 7, 10; 5789:15, 18; 5792:2; 5793:6; 5794:20; 5796:7; 5797:8; 5798:9, 14, 23; 5799:17; 5800:4, 10, 18; 5801:1, 17; 5803:3, 15, 23; 5809:5, 18; 5818:14; 5839:14; 5851:4; 5853:19; 5862:5; 5866:8; 5873:23; 5874:21; 5893:9, 12

**Kogut's** [18] - 5714:3; 5716:23; 5726:20; 5733:25; 5736:12; 5738:16; 5744:12, 14; 5747:1; 5748:3; 5749:18; 5758:8; 5760:3; 5772:21; 5773:5; 5787:8; 5793:12; 5848:9

**Kosiar** [1] - 5787:4

**Kuhn** [4] - 5728:5; 5741:3; 5843:4, 14

---

L

---

**Lab** [1] - 5724:7

**lab** [5] - 5834:5, 12; 5850:15; 5862:21; 5863:14

**labeled** [2] - 5705:14; 5706:2

**labor** [2] - 5775:11, 15

**laboratories** [2] - 5724:6, 13

**labs** [1] - 5724:10

**lack** [3] - 5758:2, 5, 15

**ladies** [71] - 5713:8; 5715:5; 5717:10, 13, 21; 5719:17; 5723:16, 20; 5724:4; 5726:4, 7; 5727:13, 21; 5729:13; 5730:12; 5732:1; 5738:9, 14; 5740:19; 5741:10, 14; 5743:20; 5744:17; 5746:6; 5747:12; 5748:4; 5750:6, 23; 5751:20; 5754:9; 5755:5, 20; 5757:5, 22; 5760:4, 8; 5761:7; 5765:24; 5767:8; 5768:6; 5772:20; 5776:2, 21; 5778:16; 5779:21; 5782:3; 5783:5, 24; 5786:6, 15, 17; 5790:9, 12, 19, 22; 5791:23;

5792:6, 12; 5795:12; 5797:18; 5798:13; 5801:2, 11, 22; 5803:2, 13, 17; 5805:5; 5846:1; 5866:13; 5895:2

**lady** [1] - 5776:17

**lady's** [3] - 5824:5; 5826:2, 12

**Lampersona** [6] - 5787:14, 20; 5788:1; 5791:25; 5887:9; 5888:2

**Lampersona's** [1] - 5792:8

**Lampersonas** [1] - 5792:5

**lap** [1] - 5769:9

**large** [3] - 5735:4; 5744:13; 5814:9

**laser** [1] - 5814:17

**last** [18] - 5699:25; 5701:25; 5704:3; 5712:3; 5732:5; 5736:15; 5738:2, 10; 5749:20; 5760:16; 5788:17; 5800:2; 5829:21; 5834:8; 5845:8; 5864:17; 5885:10; 5888:15

**lasted** [1] - 5711:23

**late** [1] - 5833:20

**latest** [1] - 5876:5

**laughed** [1] - 5769:7

**Law** [1] - 5745:3

**law** [9] - 5699:10; 5717:23, 25; 5745:1; 5805:13; 5807:1, 5; 5825:7

**laws** [2] - 5764:12; 5894:2

**lawsuit** [1] - 5702:23

**lawyer** [6] - 5810:4; 5875:17; 5877:6; 5878:1; 5889:19; 5890:10

**lawyers** [1] - 5834:1

**lay** [1] - 5750:5

**lead** [23] - 5739:8, 11; 5817:4, 18; 5818:5, 25; 5830:15; 5834:23; 5836:18, 22; 5837:7; 5838:15; 5839:17; 5840:23; 5841:20; 5842:12; 5843:16; 5844:3; 5847:6; 5864:8; 5873:16

**leading** [5] - 5754:5; 5848:11; 5849:2; 5850:19; 5859:6

**leads** [1] - 5835:11

**leap** [1] - 5767:9

**learn** [2] - 5747:23; 5807:6

**learned** [2] - 5745:8; 5800:17

**learner's** [1] - 5737:4

**learning** [2] - 5769:9

**learns** [1] - 5745:5

**least** [9] - 5708:8, 10; 5787:12; 5851:17; 5867:5; 5874:3; 5892:17; 5893:5, 10

**leave** [8] - 5703:16; 5748:12; 5758:17, 21; 5759:2; 5785:22; 5833:12; 5885:24

**leaves** [12] - 5711:13; 5755:18; 5769:16; 5775:11; 5789:1, 13; 5795:9; 5804:6; 5846:3; 5896:2

**leaving** [5] - 5719:6; 5737:18; 5756:18; 5759:22; 5884:25

**Led** [1] - 5786:2

**LEE** [1] - 5698:15

**left** [33] - 5711:19; 5720:17; 5730:3; 5737:21; 5738:7; 5746:8; 5749:16; 5758:19; 5767:24; 5770:3, 7; 5771:10; 5775:21; 5788:5, 13; 5794:23; 5795:2, 16; 5797:10, 12; 5818:18; 5819:5; 5826:10; 5850:13; 5862:2; 5876:25; 5884:19; 5885:7; 5886:1, 4; 5888:6

**left-hand** [3] - 5738:7; 5794:23; 5795:2

**leg** [1] - 5826:17

**legitimacy** [1] - 5781:15

**legs** [2] - 5748:6, 18

**Lenahan** [6] - 5738:3, 24; 5755:3; 5757:1; 5796:4

**lengthy** [2] - 5782:12; 5891:14

**less** [8] - 5851:2, 6; 5853:14; 5854:23; 5855:11; 5856:15; 5868:5

**letter** [7] - 5703:14; 5890:2, 15, 18; 5891:1,

22

**letters** [3] - 5766:1, 12; 5769:10

**level** [1] - 5714:11

**liability** [3] - 5806:8; 5888:21, 23

**liable** [3] - 5717:24; 5889:1, 3

**liar** [5] - 5727:5; 5762:14, 17

**liberty** [1] - 5717:9

**license** [2] - 5815:1; 5819:16

**lie** [10] - 5727:19; 5777:23; 5805:18; 5868:21; 5871:7, 18, 22; 5872:1; 5883:24

**lies** [4] - 5778:25; 5847:23; 5864:18; 5873:4

**Lieutenant** [2] - 5888:17; 5889:23

**life** [11] - 5727:8; 5730:23; 5736:16; 5738:11; 5740:11; 5749:9; 5773:1; 5776:14; 5787:3; 5801:13; 5868:20

**life's** [2] - 5757:12, 14

**lifetime** [2] - 5777:1; 5782:25

**ligature** [3] - 5824:24; 5827:14; 5831:2

**light** [2] - 5707:3; 5826:11

**likelihood** [1] - 5735:5

**likely** [27] - 5744:3; 5806:18; 5807:10; 5808:23, 25; 5809:4, 7, 10, 14, 20; 5810:2; 5814:7; 5816:8, 20, 23; 5817:5; 5847:7, 10; 5854:2; 5857:22; 5860:18; 5861:4; 5894:20

**likewise** [2] - 5714:1, 24

**LIMANI** [1] - 5698:15

**limit** [2] - 5756:6

**limiting** [1] - 5896:9

**line** [6] - 5706:22; 5756:17; 5759:20; 5761:25; 5823:24; 5889:13

**link** [1] - 5765:22

**links** [2] - 5715:12; 5851:19

**Lisa** [33] - 5725:23; 5726:9; 5727:3, 9; 5731:24; 5732:10; 5734:13, 15; 5736:17, 19, 24-25; 5737:6, 8, 10, 13; 5738:6, 23; 5754:15, 20; 5757:16; 5775:21; 5776:17; 5785:24; 5786:3, 8; 5787:6; 5792:2; 5796:16; 5798:3; 5835:3

**Lisa's** [5] - 5737:11, 23; 5738:7; 5754:23

**list** [5] - 5706:13; 5734:2; 5799:2; 5849:24; 5859:11

**listed** [1] - 5773:12

**listen** [20] - 5703:14; 5725:21; 5726:25; 5728:25; 5750:11, 15; 5752:22; 5753:10, 15; 5761:13; 5764:4; 5767:8; 5775:19; 5789:10; 5791:3; 5793:5; 5829:11; 5878:5; 5895:10

**lit** [3] - 5756:21; 5759:1

**literally** [2] - 5718:25; 5806:2

**live** [7] - 5805:18; 5857:25; 5858:7, 14; 5884:23; 5885:2

**lived** [1] - 5732:6

**lives** [2] - 5721:16; 5729:15

**living** [2] - 5785:18; 5868:15

**lo** [2] - 5720:10; 5796:7

**loaded** [1] - 5784:19

**located** [2] - 5711:9; 5796:2

**location** [3] - 5749:23; 5794:10; 5827:25

**locations** [1] - 5802:16

**lock** [1] - 5864:14

**locked** [1] - 5868:3

**lockers** [2] - 5863:6, 10

**locusts** [1] - 5713:15

**log** [3] - 5827:16, 21, 24

**logbook** [1] - 5863:24

**logic** [2] - 5730:15; 5808:20

**logical** [3] - 5731:21; 5792:13; 5861:6

**logically** [1] - 5808:16

**logs** [2] - 5828:3; 5837:15

**look** [72] - 5701:13, 25; 5721:2; 5725:16; 5726:19; 5734:2, 24; 5736:16; 5740:3; 5745:19-22; 5746:16; 5749:8; 5756:6; 5758:8, 17; 5759:20; 5776:5; 5780:14; 5781:18; 5785:5; 5787:9, 15; 5791:13; 5793:18; 5796:17; 5806:25; 5807:6; 5810:25; 5814:11, 18; 5815:6; 5818:4; 5819:20; 5823:24; 5827:15; 5831:7, 9; 5834:22; 5836:5; 5837:5, 15; 5838:13; 5841:15; 5843:3, 7, 18; 5844:7, 12; 5848:12; 5849:13, 23; 5851:20; 5858:17; 5859:9; 5860:2; 5866:15, 17; 5867:25; 5868:25; 5869:20; 5870:13; 5871:9; 5878:21; 5884:16; 5889:13; 5890:1, 18; 5891:19

**looked** [9] - 5699:2; 5798:6; 5826:16; 5840:18, 20; 5843:1; 5856:2; 5859:25; 5872:17

**looking** [18] - 5732:15; 5789:18; 5813:19; 5829:2; 5833:20; 5834:15; 5844:16; 5850:2; 5854:21, 25; 5855:24; 5856:12; 5858:5; 5865:1, 22; 5869:23; 5883:2

**lookout** [2] - 5853:5; 5855:9

**looks** [4] - 5700:14; 5793:10; 5848:10; 5851:14

**Lori** [3] - 5823:25; 5826:1, 14

**loses** [1] - 5749:12

**losing** [2] - 5707:7; 5776:15

**loss** [3] - 5707:10; 5751:3; 5816:5

**lost** [2] - 5700:6; 5717:9

**loud** [1] - 5743:6

**louder** [1] - 5786:20

**LOUIS** [1] - 5698:14

**loved** [5] - 5726:9; 5734:15; 5768:5

**loving** [1] - 5734:6

**low** [1] - 5815:20

**lower** [3] - 5748:6, 18, 20

**lowered** [1] - 5749:13

**luck** [1] - 5862:16

**lucky** [5] - 5733:13; 5810:19; 5887:3, 7

**ludicrous** [3] - 5793:14; 5798:25; 5883:5

**lunch** [5] - 5712:10; 5763:22; 5788:3; 5876:18

**Luncheon** [1] - 5770:11

**lying** [5] - 5780:12; 5782:8; 5783:4; 5792:11; 5809:8

**Lynbrook** [10] - 5760:22; 5785:15; 5786:2; 5795:23; 5824:1, 7; 5825:3; 5826:25; 5830:24

**M**

**macroscopically** [1] - 5869:7

**Magistrate** [1] - 5703:19

**mail** [1] - 5703:14

**majority** [1] - 5734:21

**Maldon** [1] - 5738:8

**male** [5] - 5724:8, 12, 16; 5735:11; 5794:9

**males** [2] - 5735:15, 21

**malice** [11] - 5714:21; 5715:2, 17-18; 5716:20; 5733:24; 5739:1; 5807:2; 5808:3

**malicious** [17] - 5699:9, 11; 5714:6, 10, 13, 16; 5715:1; 5717:11, 25; 5806:7; 5807:4, 6; 5808:1, 10; 5873:9, 12

**maliciously** [1] - 5786:13

**man** [27] - 5702:15;

5724:17; 5728:9, 23; 5729:12, 16, 19; 5730:16, 19; 5731:4; 5732:6, 8; 5738:18; 5745:8; 5754:13; 5761:15; 5764:3; 5772:23; 5776:18; 5780:25; 5819:14; 5823:4; 5839:20; 5849:4; 5887:3; 5894:7

**man's** [1] - 5780:10

**managed** [1] - 5746:13

**manipulated** [1] - 5748:8

**manipulation** [1] - 5747:24

**Marcello** [1] - 5759:12

**March** [34] - 5704:1; 5711:6, 25; 5712:1; 5715:11; 5746:10; 5760:10; 5761:25; 5773:10, 17, 19; 5775:10; 5782:3; 5809:9; 5847:24; 5860:17; 5861:20; 5862:1, 9; 5864:23; 5865:7; 5866:23; 5867:1, 16; 5868:6; 5874:2, 20; 5879:24; 5890:1, 17

**marine** [1] - 5797:18

**markers** [1] - 5815:7

**markings** [1] - 5747:15

**maroon** [2] - 5798:20, 23

**married** [1] - 5786:10

**marshal** [1] - 5882:9

**Martini** [4] - 5734:13; 5737:12; 5738:24; 5755:2

**Martini's** [1] - 5737:7

**Martino** [1] - 5781:3

**match** [1] - 5773:3

**matches** [1] - 5832:12

**material** [16] - 5699:16; 5721:3; 5723:6; 5803:6; 5806:11; 5807:16, 25; 5817:10; 5818:6; 5825:1, 11; 5842:3, 6; 5844:2; 5873:16

**materiality** [2] - 5830:13; 5834:21

**materials** [2] - 5717:15; 5837:13

**matter** [11] - 5736:10; 5751:21; 5766:6; 5788:16; 5808:20;

5811:25; 5861:6;
5894:10, 15

**mattresses** [1] -
5827:4

**max** [2] - 5831:6;
5849:1

**Max** [4] - 5831:23;
5849:1; 5854:24; 5855:1

**maximum** [1] - 5721:17

**McCarty** [11] - 5716:14;
5744:23; 5747:22;
5837:2; 5864:24;
5865:10; 5868:23;
5870:9

**McDonald's** [10] -
5755:4; 5756:9, 12-13;
5757:3; 5795:7; 5796:6,
8, 12, 14

**McDonalds** [1] - 5738:4

**ME** [1] - 5797:12

**ME's** [1] - 5744:9

**mean** [24] - 5725:2;
5727:15; 5728:10;
5729:2; 5733:23;
5734:12; 5749:3;
5780:17; 5781:11;
5786:11; 5790:4;
5793:14; 5817:15, 17,
22-23; 5818:18;
5829:25; 5852:15;
5864:7; 5866:5; 5873:5,
7; 5883:21

**meaning** [1] - 5776:17

**means** [9] - 5715:5;
5717:23; 5744:11;
5746:10; 5814:15,
23-24; 5817:20; 5828:6

**meant** [3] - 5729:3;
5811:13

**mechanical** [10] -
5697:24; 5847:18;
5859:17, 19; 5860:9,
11, 20, 25; 5861:15;
5872:24

**mechanism** [9] -
5850:24; 5853:13, 20,
25; 5854:1; 5856:23;
5857:13; 5859:5;
5861:10

**mechanisms** [4] -
5852:13, 21

**media** [3] - 5895:11, 13

**medical** [22] - 5735:13,
19; 5736:4; 5739:16;
5744:9; 5745:2;
5747:21; 5749:17, 21,
25; 5750:7, 18;
5751:13; 5752:11;

**5756:1**; 5758:13;
5797:9; 5802:8;
5824:22; 5849:7, 10

**Medical** [1] - 5744:25

**medication** [1] -
5761:17

**medicine** [2] - 5722:5;
5745:1

**medium** [1] - 5796:23

**meet** [3] - 5699:25;
5700:19; 5855:6

**meeting** [8] - 5699:24;
5774:9, 15, 17, 23;
5838:7; 5858:13;
5873:19

**meetings** [5] -
5753:21; 5855:5;
5861:22; 5892:12

**meets** [2] - 5736:24;
5737:5

**member** [1] - 5709:20

**members** [4] - 5718:2;
5730:16; 5893:1

**memo** [2] - 5829:22;
5893:16

**memory** [2] - 5826:15;
5886:19

**men** [12] - 5729:14;
5732:2; 5733:20;
5735:17; 5739:3, 5, 9,
15; 5749:25; 5754:17;
5785:9; 5802:15

**men's** [1] - 5791:13

**mental** [1] - 5843:22

**mentally** [2] -
5761:15, 22

**mention** [5] - 5744:22;
5774:20; 5801:20;
5833:4; 5858:25

**mentioned** [5] -
5739:4; 5751:8; 5774:8;
5812:3; 5813:23

**merchant** [1] - 5797:18

**merely** [1] - 5716:16

**merit** [1] - 5766:21

**Merrick** [9] - 5755:24;
5756:2; 5795:1, 4-6;
5796:11; 5801:25;
5802:2

**met** [2] - 5774:8;
5882:23

**Meyers** [2] - 5791:2, 5

**Miami** [1] - 5882:25

**Michael** [23] - 5788:1,
13, 24; 5791:8;
5809:11; 5818:17;
5880:10, 15; 5881:2,

21, 23; 5883:8; 5884:2;
5885:3, 12, 18;
5886:13; 5887:11,
22-23; 5888:6; 5890:21

**MICHAEL** [1] - 5698:12

**Michael's** [1] -
5880:14

**microbes** [1] - 5852:18

**microscope** [5] -
5814:11; 5815:22;
5831:9; 5852:3; 5867:9

**microscopic** [4] -
5865:18, 21; 5867:9;
5868:19

**microscopically** [1] -
5869:4

**mid-2000s** [1] -
5810:13

**middle** [1] - 5700:21

**midnight** [1] - 5745:17

**midst** [1] - 5780:25

**might** [8] - 5741:25;
5757:10; 5764:4;
5815:20; 5830:24;
5834:12; 5867:25;
5895:11

**Mikey** [1] - 5882:23

**mile** [2] - 5819:4;
5823:17

**miles** [1] - 5791:20

**millimeters** [2] -
5852:6, 9

**million** [2] - 5750:17;
5784:22

**mind** [10] - 5745:5;
5750:24; 5756:8;
5775:24; 5777:5;
5796:6; 5806:24;
5819:2; 5823:4; 5895:17

**mine** [2] - 5706:12;
5743:13

**Mineola** [2] - 5698:3,
11

**minimum** [2] - 5783:25;
5867:5

**minute** [8] - 5720:14;
5742:3; 5752:3, 8;
5788:23; 5789:8, 25;
5804:3

**minutes** [38] - 5702:4;
5703:8; 5707:5, 14, 16;
5710:11; 5712:10;
5742:4; 5743:1; 5764:1;
5770:5, 7; 5771:6, 11,
13, 16, 25; 5772:3, 7,
9; 5784:11; 5790:6;
5841:2; 5846:2; 5851:5;
5853:15, 20; 5856:19;

**5857:7**, 17; 5861:9;
5867:4; 5874:5; 5887:16

**miracle** [1] - 5723:25

**Miranda** [1] - 5875:4

**mirror** [1] - 5836:3

**misconduct** [6] -
5717:6; 5808:16, 23;
5811:18; 5873:15;
5891:2

**misdated** [1] - 5787:17

**mislead** [1] - 5842:18

**misled** [3] - 5840:10;
5842:25; 5843:14

**misrepresented** [3] -
5716:2, 4; 5807:16

**missed** [1] - 5768:9

**missing** [9] - 5710:24;
5823:17; 5824:14, 20;
5827:3, 9; 5829:18;
5830:20, 22

**mistake** [6] - 5717:17;
5779:25; 5780:7, 11;
5811:13; 5821:12

**mistaken** [1] - 5887:25

**misunderstood** [1] -
5778:14

**mixed** [1] - 5810:3

**modality** [1] - 5729:18

**model** [1] - 5700:1

**moderately** [1] -
5756:21

**modern** [1] - 5722:4

**mom** [6] - 5725:24;
5736:21; 5737:2, 15, 22

**mom's** [1] - 5791:18

**moment** [3] - 5701:1;
5706:23; 5744:3

**moments** [1] - 5873:21

**mommy's** [1] - 5769:9

**month** [1] - 5708:8

**months** [9] - 5746:10,
15; 5780:24; 5783:10;
5796:20; 5797:9;
5801:4; 5810:7; 5892:20

**moral** [4] - 5767:4, 6,
10; 5894:24

**morning** [15] - 5699:2;
5707:9; 5709:16;
5713:8; 5736:23;
5745:17; 5763:2;
5775:11, 14; 5778:21;
5812:25; 5880:18;
5881:9; 5893:8

**moron** [1] - 5759:22

**most** [22] - 5709:2;
5721:3; 5722:14;
5726:14; 5729:12;

5738:5; 5740:1;
5746:16, 23; 5747:22;
5754:24; 5781:10;
5808:14; 5813:12, 14;
5823:16; 5830:12;
5832:3; 5849:25;
5857:22; 5882:19;
5890:12
**mother** [4] - 5734:14;
5761:4; 5882:18, 24
**mother's** [2] -
5791:18; 5887:17
**motion** [1] - 5699:12
**motive** [5] - 5722:11;
5847:22; 5862:18;
5864:16; 5873:3
**mountain** [1] - 5797:19
**mounting** [1] - 5867:15
**mounts** [1] - 5867:3
**mouth** [6] - 5747:7, 18;
5761:24; 5764:17;
5781:1
**move** [8] - 5785:16;
5786:19; 5803:19;
5817:3; 5822:5; 5848:1;
5851:18; 5854:25
**Move** [1] - 5795:19
**moved** [4] - 5728:21;
5749:23; 5788:21
**moves** [1] - 5816:14
**movie** [1] - 5786:2
**movies** [2] - 5737:20;
5786:5
**moving** [15] - 5723:13;
5784:3, 14-17, 21;
5785:12, 16; 5799:23;
5800:22, 25; 5852:19
**MR** [117] - 5699:2, 8,
10; 5700:11, 17, 20,
23; 5701:1, 5, 9, 16,
20, 22; 5703:2, 12;
5704:10, 12, 21, 24;
5705:8, 10, 18, 21;
5706:4, 23; 5707:2, 13,
17, 20; 5708:1; 5709:3,
23; 5710:5, 7, 9, 11;
5712:16, 18; 5713:5, 8;
5723:15, 20; 5726:3, 7;
5740:18, 22-23;
5741:22; 5742:9, 14,
17, 21, 24; 5743:3, 5,
11; 5744:1, 16-17;
5751:20; 5752:7, 25;
5753:19; 5754:9;
5770:8; 5771:6, 9, 12,
15, 19, 21, 23; 5772:1,
3, 6, 19; 5776:20, 25;
5778:10, 16; 5786:14,

20; 5790:6, 12, 17, 23;
5792:5, 8; 5798:10, 13;
5803:12, 16, 20;
5805:15, 17; 5819:11,
22; 5821:9, 11-12, 15,
18, 22; 5822:1; 5823:3;
5840:1; 5841:5; 5847:5;
5866:11, 15; 5896:5, 7,
15, 18
**MS** [9] - 5703:19, 23;
5704:1, 25; 5705:14;
5706:2, 16; 5708:18, 23
**Mugsy** [3] - 5786:1, 22,
25
**murder** [31] - 5705:4;
5720:2, 15; 5721:4, 14,
24; 5740:2, 9, 12;
5741:25; 5744:6, 19;
5750:4; 5753:8;
5767:11; 5776:9;
5777:8, 17; 5780:23;
5782:15; 5783:9, 17;
5793:3; 5797:14, 21;
5801:5; 5803:9;
5808:21; 5816:17;
5887:4; 5888:10
**murdered** [6] -
5728:16; 5740:14;
5755:18; 5777:11, 15;
5790:2
**murdering** [1] -
5809:19
**must** [4] - 5709:19;
5837:16; 5843:25;
5879:14
**mystery** [1] - 5729:16

---

**N**

**N.Y** [1] - 5697:6
**NADJIA** [1] - 5698:15
**nail** [1] - 5766:5
**naked** [4] - 5745:17;
5748:20; 5799:6, 14
**name** [11] - 5721:19;
5733:11; 5753:1;
5756:10; 5773:12;
5786:25; 5787:19;
5791:2; 5792:8, 23;
5794:2
**names** [3] - 5732:4, 15;
5741:19
**Napoli** [10] - 5709:16,
23; 5725:23; 5726:8;
5732:11; 5737:21;
5738:23; 5750:24;
5751:6; 5796:16
**narcotic** [1] - 5761:17
**narrative** [1] -

5784:24
**Nassau** [12] - 5706:8;
5717:23; 5718:4;
5722:17; 5744:9;
5766:9, 16; 5779:8;
5813:18; 5832:18;
5874:7
**NASSAU** [3] - 5697:6,
13; 5698:10
**national** [2] - 5806:3;
5850:18
**natural** [2] - 5721:16;
5749:11
**nature** [1] - 5827:5
**nauseum** [1] - 5788:14
**near** [1] - 5825:25
**necessarily** [2] -
5805:13; 5864:12
**neck** [6] - 5711:15;
5747:11, 15; 5797:15,
17; 5877:22
**necklace** [1] - 5798:4
**need** [9] - 5701:1;
5714:18; 5760:25;
5763:20; 5764:9, 24;
5771:6; 5891:21;
5892:22
**needed** [3] - 5772:1;
5788:21; 5791:9
**needs** [2] - 5712:14;
5771:20
**nervous** [1] - 5761:23
**NEUFELD** [1] - 5698:7
**never** [46] - 5702:9;
5703:12-14; 5720:18;
5721:13; 5731:2;
5739:8, 11; 5744:19;
5750:24; 5755:25;
5756:24; 5757:3;
5758:16; 5761:6;
5766:23; 5768:12;
5782:19; 5783:3, 12;
5797:19; 5801:16;
5810:23; 5832:23;
5834:16, 18; 5839:16;
5851:8; 5870:21, 24;
5877:11; 5881:7, 18,
22; 5882:2; 5883:1;
5884:21; 5893:6, 8;
5896:10, 14
**nevertheless** [2] -
5719:18; 5738:11
**NEW** [1] - 5697:1
**new** [13] - 5705:5;
5706:5; 5737:3; 5800:4,
11, 14, 18; 5801:1;
5830:15; 5850:15;
5881:15; 5885:6

**New** [12] - 5697:22;
5698:3, 6, 8, 11, 14;
5721:17; 5765:3;
5813:18; 5848:16
**Newark** [1] - 5882:24
**news** [6] - 5699:23;
5705:3, 14; 5714:12;
5760:22; 5872:21
**newspaper** [2] -
5775:7; 5841:9
**newspapers** [1] -
5711:7
**next** [15] - 5735:11;
5742:14; 5753:10;
5784:25; 5788:21;
5820:1; 5822:6;
5828:20; 5834:21;
5835:6; 5862:25;
5884:22; 5885:7;
5886:21
**nice** [4] - 5710:22;
5767:14; 5881:19;
5895:23
**Nicholas** [1] - 5746:3
**Nick** [2] - 5848:16;
5859:9
**nick** [1] - 5859:8
**night** [23] - 5699:3;
5718:20; 5720:13, 22;
5734:5, 10; 5745:16;
5756:19; 5776:3;
5778:22; 5779:23;
5783:20; 5786:8;
5791:16; 5796:19;
5798:3, 22; 5809:24;
5844:14; 5874:12;
5875:12; 5885:10
**nightmare** [1] - 5743:8
**nine** [2] - 5708:9;
5883:9
**NO** [2] - 5778:2, 14
**noble** [1] - 5835:7
**nobody** [18] - 5719:18;
5724:21; 5748:19;
5756:21, 23; 5758:14;
5773:7; 5817:7; 5834:7;
5850:19; 5851:8;
5854:21; 5856:16;
5861:9; 5866:10;
5872:16; 5880:3
**non** [6] - 5814:23;
5815:3, 6, 19; 5862:2,
11
**non-existent** [1] -
5862:2
**non-existing** [1] -
5862:11
**non-sperm** [4] -

24

5814:23; 5815:3, 6, 19
**none** [4] - 5722:14;
5791:21; 5800:5, 24
**nonpublic** [1] -
5718:12
**nonsense** [7] -
5757:11; 5763:13;
5779:20; 5791:22;
5793:19; 5794:14
**nook** [2] - 5860:25;
5861:14
**nooks** [1] - 5873:1
**noon** [2] - 5736:24;
5788:3
**NOOTER** [1] - 5698:13
**normally** [1] - 5799:23
**north** [1] - 5711:10
**notation** [1] - 5877:2
**notations** [1] -
5827:23
**note** [7] - 5712:7;
5780:20; 5781:21;
5782:9, 16; 5802:20;
5827:19
**noted** [1] - 5704:5
**notes** [6] - 5781:10,
18; 5782:4, 6; 5783:7;
5845:17
**nothing** [30] - 5749:11;
5753:21; 5758:1;
5765:18; 5773:15;
5774:15; 5781:6, 25;
5791:10; 5800:12, 17;
5801:1, 8; 5813:16;
5816:18; 5840:17, 19,
22-23; 5842:13; 5843:8;
5845:18; 5862:10;
5867:1; 5876:8, 16;
5887:4; 5891:24;
5893:18
**notice** [3] - 5753:4;
5832:7; 5889:20
**noticed** [1] - 5896:8
**notion** [1] - 5853:16
**November** [39] -
5697:8; 5704:2;
5711:20; 5712:2;
5736:17, 20; 5746:9;
5783:20; 5784:2, 6;
5785:12; 5787:1, 5, 12;
5788:6; 5791:6, 11;
5795:24; 5809:16, 22,
25; 5823:25; 5824:4;
5826:1; 5827:10;
5828:21; 5845:8-10;
5857:3; 5860:16;
5882:20; 5884:9;
5885:1, 8; 5887:6;

5896:23
**NSF** [1] - 5814:23
**nude** [1] - 5711:12
**number** [12] - 5705:15;
5715:23; 5735:4;
5766:16; 5814:9;
5815:22; 5816:12;
5836:3; 5850:7;
5855:14, 25
**numbers** [1] - 5769:10
**nut** [2] - 5759:21;
5765:25
**nuts** [1] - 5882:15
**nylon** [8] - 5747:10;
5797:15; 5824:19, 23;
5827:13; 5836:14;
5839:24
**NYPD** [2] - 5859:12

---

**O**

**o'clock** [6] - 5703:7;
5737:5; 5778:18;
5876:18; 5886:5;
5896:22
**O'Leary** [25] - 5728:4,
14; 5729:22; 5730:13;
5732:9; 5734:3; 5739:2,
20; 5741:3; 5819:9;
5823:7, 14; 5831:5, 24;
5833:16; 5840:10;
5841:7, 16; 5842:24;
5843:4, 11, 15
**O'Leary's** [1] -
5740:16
**obey** [1] - 5894:2
**object** [2] - 5705:21;
5711:15
**objected** [1] - 5822:2
**objection** [15] -
5699:4; 5723:15;
5726:3; 5740:18;
5741:22; 5744:16;
5776:20; 5786:14;
5790:17; 5798:10;
5819:11; 5821:8, 21,
23; 5866:11
**objective** [1] -
5747:23
**obligation** [1] -
5842:10
**obnoxious** [1] -
5890:12
**observe** [1] - 5737:16
**obsessed** [1] - 5760:22
**obvious** [4] - 5831:24;
5853:8; 5862:18;
5885:17
**obviously** [11] -

5784:22; 5821:19;
5826:23; 5829:2;
5830:16; 5832:24;
5853:24; 5867:2;
5879:25; 5889:21
**occur** [2] - 5889:1, 9
**occurred** [3] - 5766:8;
5805:10; 5893:17
**occurs** [1] - 5848:5
**ocean** [1] - 5802:2
**odd** [2] - 5740:1;
5877:3
**OF** [4] - 5697:1, 6-7;
5698:10
**offer** [3] - 5708:14;
5755:3; 5796:5
**offering** [1] - 5880:21
**offers** [1] - 5738:3
**office** [4] - 5744:10;
5764:23; 5849:8, 10
**OFFICE** [1] - 5698:10
**officer** [5] - 5811:12;
5827:17; 5828:9
**officers** [4] -
5725:18; 5811:21;
5821:4; 5842:9
**often** [2] - 5759:10;
5786:20
**Old** [1] - 5698:3
**old** [6] - 5716:19;
5768:25; 5776:17;
5796:23; 5826:19;
5880:24
**omitted** [3] - 5730:13;
5819:10
**once** [6] - 5700:2;
5753:6; 5768:12;
5774:13; 5801:16;
5807:7
**one** [98] - 5701:16;
5705:1; 5706:11;
5708:20; 5710:10;
5711:9; 5712:20;
5715:23; 5716:11;
5719:13; 5720:19;
5721:11; 5723:25;
5728:10, 16; 5729:10;
5731:20; 5734:16;
5735:11; 5739:24;
5744:22; 5747:9;
5750:3; 5753:22;
5754:18; 5755:25;
5756:1, 19; 5759:5;
5763:19; 5764:12;
5765:16; 5768:9;
5774:20; 5777:10;
5781:3; 5782:16;
5792:13, 19, 21;

5795:21; 5796:25;
5798:8; 5799:20;
5801:2, 9; 5802:13, 19;
5803:10; 5806:20;
5812:12; 5813:12;
5814:9; 5815:2, 8;
5817:23; 5825:9;
5826:5; 5828:4;
5832:23; 5833:2;
5834:10; 5835:14;
5836:16; 5837:14;
5838:1; 5847:17-20;
5849:2; 5850:17;
5853:23; 5856:11;
5857:1; 5858:6; 5859:5,
14; 5862:18; 5863:20;
5864:17; 5865:4;
5871:22; 5872:23;
5888:18; 5892:2, 4-5,
15, 17
**One** [1] - 5698:11
**ones** [4] - 5758:21;
5767:1; 5813:20; 5834:5
**oOo** [1] - 5698:18
**open** [8] - 5756:21;
5759:16, 18-19; 5823:2;
5877:24; 5895:17
**opened** [4] - 5760:9;
5796:22; 5863:1
**opening** [4] - 5718:22;
5731:18; 5811:12;
5836:22
**opens** [1] - 5796:2
**opinion** [7] - 5735:3;
5757:19; 5815:24;
5816:16; 5850:24;
5851:7; 5859:15
**opinions** [1] - 5726:4
**opportunity** [10] -
5701:8; 5702:22;
5713:17; 5737:16;
5738:10; 5751:25;
5847:22; 5862:19;
5864:15; 5873:3
**opposed** [1] - 5771:17
**opposite** [5] -
5718:24; 5719:14;
5756:11; 5778:24
**option** [1] - 5888:18
**orally** [1] - 5889:21
**order** [8] - 5703:19;
5723:1; 5742:11;
5779:8; 5783:14;
5784:4; 5817:5; 5861:17
**ordinarily** [3] -
5815:4, 12; 5823:11
**ordinary** [1] - 5815:14
**oriented** [1] - 5706:3

**origin** [1] - 5894:11

**original** [2] - 5714:6; 5741:17

**originally** [1] - 5723:11

**Ort** [1] - 5803:4

**Ort's** [3] - 5723:1, 3; 5896:10

**otherwise** [4] - 5779:3; 5794:8; 5802:23; 5807:18

**ourselves** [1] - 5706:24

**outcome** [6] - 5817:13, 16, 21, 25; 5818:3; 5847:10

**outrageous** [3] - 5703:3; 5729:11; 5738:19

**outside** [6] - 5737:10; 5751:25; 5757:1; 5781:16; 5872:17; 5881:12

**outstanding** [1] - 5708:22

**overboard** [1] - 5797:24

**overcome** [1] - 5773:2

**overhear** [1] - 5884:20

**overheard** [3] - 5763:13; 5880:14; 5881:15

**overhearing** [1] - 5882:1

**overwhelming** [6] - 5739:16; 5749:1; 5802:11, 13-14; 5806:22

**OWEN** [1] - 5697:20

**own** [6] - 5842:19; 5859:10; 5882:2; 5886:4, 19; 5895:16

**owned** [1] - 5795:25

---

**P**

**p.m** [21] - 5704:6; 5762:3; 5780:6; 5789:9, 23; 5795:17; 5809:16; 5865:8; 5876:6; 5877:21; 5884:19, 24; 5885:1, 5, 7, 13; 5886:15, 23; 5888:7

**pad** [1] - 5773:19

**page** [6] - 5708:1; 5720:13; 5778:23; 5820:1; 5822:6; 5896:8

**pages** [3] - 5703:10; 5706:14; 5832:20

**painstaking** [1] - 5865:23

**pair** [1] - 5826:2

**palace** [1] - 5795:7

**pallet** [1] - 5711:13

**pallets** [1] - 5755:19

**pants** [3] - 5725:5; 5793:16; 5797:2

**paper** [5] - 5763:15, 25; 5775:3; 5785:8; 5828:14

**paragraph** [5] - 5847:23; 5864:18; 5865:1, 3; 5873:4

**parent** [1] - 5773:9

**parents** [3] - 5769:1, 4; 5883:4

**Park** [2] - 5711:11; 5836:9

**parked** [1] - 5819:14

**parking** [7] - 5738:3; 5824:1; 5827:11, 16; 5828:22; 5829:8, 17

**parks** [1] - 5823:5

**part** [23] - 5699:21; 5707:22; 5709:24; 5710:3, 10; 5712:9, 13-14; 5713:21; 5730:23; 5746:23; 5750:16; 5752:10; 5770:5; 5793:20; 5862:8; 5863:20; 5870:1; 5891:7; 5892:25

**participate** [2] - 5777:21; 5888:19

**participated** [1] - 5718:17

**participating** [1] - 5891:11

**participation** [1] - 5781:2

**particles** [1] - 5836:1

**particular** [4] - 5710:25; 5828:3; 5837:19; 5885:25

**parties** [3] - 5718:7; 5785:25; 5803:19

**partner** [15] - 5731:14, 21; 5733:21; 5738:18; 5754:13; 5812:9, 11-12, 18, 23; 5813:2; 5815:17; 5816:1, 13, 21

**partners** [1] - 5734:4

**party** [2] - 5819:19; 5823:5

**passed** [2] - 5701:21; 5702:24

**passenger** [3] - 5725:5; 5796:3; 5826:4

**past** [5] - 5867:17; 5887:19; 5888:11

**patience** [1] - 5806:5

**pattern** [4] - 5852:10; 5858:3, 17; 5859:2

**patterns** [1] - 5848:10

**PAUL** [1] - 5698:5

**Paul** [4] - 5713:9; 5787:14; 5788:1; 5887:9

**Pauly** [1] - 5882:23

**pause** [1] - 5769:14

**Paviles** [1] - 5834:4

**pay** [6] - 5769:3; 5781:8; 5792:15; 5843:15; 5844:1; 5845:14

**paychecks** [1] - 5752:17

**paying** [1] - 5781:11

**PD** [1] - 5779:8

**Pearson** [3] - 5845:12, 16, 19

**peck** [1] - 5753:12

**Peck** [5] - 5718:20; 5751:21, 25; 5753:11, 24

**peculiar** [1] - 5851:22

**pedigree** [3] - 5874:9, 16; 5877:16

**peer** [1] - 5854:20

**pen** [2] - 5773:19; 5794:15

**penetrated** [1] - 5725:7

**penis** [1] - 5793:10

**penned** [2] - 5760:2; 5761:19

**Pennsylvania** [1] - 5739:13

**people** [35] - 5719:7; 5721:15; 5734:11, 17; 5746:19; 5751:8; 5756:18; 5757:15; 5759:10; 5760:17, 21; 5766:14; 5767:14; 5769:3; 5775:2; 5791:7; 5794:11; 5805:20; 5823:11; 5831:23; 5849:12; 5850:11, 19; 5851:25; 5854:21; 5855:7, 18; 5856:1, 12; 5863:16; 5880:4, 12; 5886:25; 5890:23; 5892:14

**People** [1] - 5744:13

**people's** [1] - 5891:14

**peoples'** [1] - 5808:9

**per** [1] - 5867:5

**percent** [2] - 5858:19, 22

**Percodan** [1] - 5761:17

**Perez** [2] - 5787:16

**perfect** [6] - 5730:9; 5759:2, 24; 5782:2; 5796:21; 5845:25

**perfectly** [1] - 5881:19

**performed** [2] - 5724:13

**perhaps** [4] - 5757:20; 5767:25; 5841:3; 5894:8

**period** [6] - 5768:14; 5778:20; 5801:7; 5813:2; 5867:16; 5882:20

**periods** [1] - 5883:16

**perjury** [2] - 5764:9; 5881:11

**permission** [1] - 5764:10

**permit** [1] - 5737:4

**perp** [4] - 5718:19; 5728:3, 10; 5730:10

**perpetrate** [1] - 5763:13

**perpetrator** [4] - 5728:16; 5812:6; 5815:3; 5832:10

**perpetrators** [1] - 5832:8

**perseverance** [1] - 5806:5

**person** [18] - 5715:5, 14; 5732:24; 5764:15; 5797:5; 5810:9, 16, 18-19, 22; 5828:17; 5858:8; 5863:1; 5889:7; 5890:12; 5892:4; 5894:7

**person's** [1] - 5727:15

**personal** [9] - 5713:11; 5718:15; 5750:11, 14; 5751:12; 5781:1; 5798:8, 10

**personally** [1] - 5825:2

**personnel** [1] - 5893:1

**persons** [1] - 5704:22

**Peter** [6] - 5722:18; 5833:21, 23-24; 5834:4, 14

**Petraco** [24] - 5746:3; 5848:16, 18, 20, 23;

5851:24; 5853:3;
5854:15, 19; 5855:1, 5,
9; 5856:11; 5857:8;
5859:8, 24; 5860:13,
15; 5861:2; 5865:15

**Petraco's** [1] -
5859:15

**ph** [2] - 5774:4; 5811:5

**Ph.D** [1] - 5849:23

**pharmacy** [1] - 5737:1

**phase** [1] - 5745:6

**phenomenon** [2] -
5853:9; 5857:15

**phone** [15] - 5700:11;
5739:14; 5753:5, 21;
5757:6; 5788:8; 5789:5,
8, 25; 5792:1; 5809:16;
5887:22; 5890:5

**photo** [5] - 5799:20;
5827:16, 21, 24; 5828:3

**photograph** [3] -
5745:19, 21; 5827:15

**photographs** [6] -
5710:1; 5720:20;
5837:16; 5840:21;
5871:11

**photos** [4] - 5799:14,
20; 5827:20; 5840:15

**phrase** [6] - 5708:20;
5716:17; 5750:12,
22-23; 5751:7

**phrases** [1] - 5705:22

**physical** [10] -
5775:11, 15; 5796:15;
5799:11; 5813:7;
5814:2; 5816:4, 9, 19,
23

**physically** [4] -
5736:2; 5761:15;
5762:20; 5793:6

**piano** [2] - 5785:16, 22

**Picasso** [1] - 5782:2

**pick** [4] - 5737:7;
5739:14; 5792:19;
5793:22

**picked** [8] - 5756:5;
5758:10; 5773:11;
5787:20; 5833:8;
5874:8; 5880:17

**picking** [1] - 5756:20

**picture** [11] - 5796:21;
5827:13; 5828:5, 12,
19; 5829:3, 8, 17;
5837:25; 5838:6;
5877:17

**pictures** [12] -
5745:20; 5748:12;
5831:19; 5837:9, 11,

16, 20, 24; 5842:13;
20, 22; 5843:11

**piece** [11] - 5715:12;
5723:8; 5725:4; 5756:1;
5765:16; 5798:7;
5828:12; 5864:17;
5880:16; 5881:17;
5892:6

**pieces** [1] - 5847:15

**place** [9] - 5720:21;
5746:17; 5771:4;
5821:2; 5823:2;
5859:14; 5873:24;
5880:14; 5892:20

**Place** [3] - 5711:11;
5789:15; 5836:9

**placed** [1] - 5809:2

**placing** [1] - 5802:15

**plain** [2] - 5836:20;
5837:1

**plainly** [3] - 5845:14;
5877:14; 5886:16

**Plaintiff** [2] -
5697:4, 11

**plaintiff** [8] -
5703:18; 5706:3;
5708:14; 5712:8, 22;
5717:5; 5875:3; 5895:22

**plaintiff's** [1] -
5805:20

**plaintiff-oriented**
[1] - 5706:3

**plaintiffs** [21] -
5699:13; 5701:7;
5703:3; 5704:15;
5708:15; 5711:23;
5712:22, 24; 5730:3;
5738:21; 5787:11;
5805:6; 5806:22;
5807:10; 5808:20;
5811:17; 5830:3;
5839:17; 5842:7;
5847:11; 5882:15

**Plaintiffs** [1] -
5698:2

**Plaintiffs'** [1] -
5755:9

**plaintiffs'** [8] -
5703:13; 5705:23;
5706:2; 5707:6; 5708:7;
5712:23; 5806:20;
5808:16

**plan** [2] - 5710:11;
5757:10

**planet** [1] - 5724:17

**plans** [7] - 5737:11;
5738:5; 5754:14, 22;
5755:2; 5757:8

plant [3] - 5716:2;
5746:21; 5872:12

**planted** [10] - 5717:3;
5744:7; 5745:13;
5746:2; 5807:17, 25;
5857:20; 5861:18;
5872:12; 5873:7

**planting** [6] -
5716:21; 5806:13;
5808:5; 5847:13;
5866:7; 5872:22

**plates** [14] - 5819:8,
12-13, 16-18; 5821:6,
10, 14, 17, 19; 5822:2;
5823:6, 9

**play** [4] - 5751:10;
5818:21; 5893:23;
5894:2

**played** [11] - 5712:17;
5713:1; 5752:5, 23;
5753:17; 5754:7;
5760:2; 5791:4;
5799:12; 5811:14;
5829:12

**playing** [1] - 5763:12

**Plaza** [1] - 5697:21

**plead** [1] - 5805:23

**plenty** [2] - 5830:8;
5864:15

**plot** [1] - 5774:17

**plucked** [1] - 5745:25

**plumber** [3] - 5699:24;
5700:15; 5710:14

**plumbers** [2] - 5709:2;
5710:15

**plus** [1] - 5793:14

**pocketbook** [5] -
5798:1, 18, 20; 5799:4

**point** [29] - 5723:12;
5725:1, 8; 5732:21;
5733:3; 5734:1;
5749:20; 5754:10;
5763:1; 5765:7;
5767:25; 5768:9;
5773:2, 4; 5810:15;
5818:24; 5823:7;
5835:15; 5836:3, 13;
5843:14; 5848:23;
5853:23; 5860:16;
5875:24; 5885:19;
5891:10; 5893:19

**pointed** [2] - 5801:17;
5832:7

**pointer** [1] - 5814:17

**points** [3] - 5735:1;
5748:10; 5842:6

**polar** [2] - 5718:24;
5719:14

**Police** [6] - 5766:16;
5824:1; 5848:16;
5874:7; 5891:1

**police** [51] - 5715:14,
23; 5716:9; 5717:1;
5719:13; 5725:18;
5726:18; 5732:9;
5737:17; 5759:15;
5760:5; 5761:4; 5762:1,
10; 5765:2, 16, 20;
5766:13, 20; 5776:2, 8;
5779:4; 5788:15;
5796:6; 5800:17;
5802:18; 5803:1;
5807:14, 20-21;
5808:22; 5811:7, 12,
15, 19; 5824:4; 5825:3,
23; 5826:25; 5830:24;
5832:18; 5833:1;
5838:12; 5840:12;
5842:9; 5857:5; 5878:9,
13; 5881:18; 5891:7

**policy** [1] - 5888:24

**polygraph** [8] -
5775:12; 5776:5;
5778:4, 15; 5874:10,
17; 5877:20

**polyurethane** [3] -
5787:23; 5887:15;
5888:7

**pool** [2] - 5733:5, 10

**poor** [3] - 5732:20;
5749:11; 5750:19

**populated** [1] - 5759:1

**portion** [4] - 5718:8;
5729:16; 5754:3, 17

**portions** [1] - 5754:4

**position** [6] -
5707:11, 23; 5749:6,
15; 5889:7; 5891:17

**positively** [4] -
5706:12; 5790:14;
5828:24; 5829:18

**possibility** [4] -
5739:15; 5824:10, 17;
5870:3

**possible** [17] -
5791:25; 5845:6;
5860:14, 23; 5861:2;
5865:6, 17; 5869:16,
20; 5870:8, 10, 22, 25;
5871:5, 16, 23; 5892:9

**possibly** [4] -
5715:14; 5844:10;
5870:16, 19

**post** [2] - 5833:22;
5839:15

**postmortem** [39] -

5744:7; 5746:20; 5809:1; 5847:17, 21; 5848:1-3, 13; 5850:22, 25; 5851:10, 22; 5853:14, 22, 25; 5854:7, 10, 13, 22; 5855:10, 24; 5856:14, 20; 5857:10, 23-24; 5858:2, 7, 16, 19; 5859:4, 15, 22; 5860:19; 5861:8; 5866:6; 5872:22, 25

**posttraumatic** [1] - 5761:16

**pot** [4] - 5767:17; 5776:10; 5794:21, 23

**potential** [2] - 5832:3; 5891:5

**potting** [1] - 5858:16

**pounded** [4] - 5718:19; 5719:8; 5727:1; 5778:22

**power** [1] - 5894:1

**powerful** [12] - 5745:8; 5758:3, 6; 5761:17; 5794:13; 5808:15; 5859:5; 5860:12; 5872:6

**practical** [1] - 5850:1

**practice** [3] - 5838:12; 5891:13

**practices** [5] - 5766:13; 5779:5; 5807:20; 5888:25; 5891:18

**pre** [2] - 5852:2; 5880:20

**pre-diabetic** [1] - 5880:20

**precinct** [4] - 5881:13; 5885:4; 5889:1, 15

**precise** [1] - 5852:21

**precisely** [1] - 5889:8

**preclude** [1] - 5790:16

**precomposition** [1] - 5852:2

**predict** [1] - 5813:9

**predicted** [1] - 5836:21

**prefabricated** [1] - 5766:1

**prefer** [1] - 5707:21

**pregnant** [1] - 5887:14

**preparing** [1] - 5896:8

**preponderance** [6] - 5738:12; 5802:3; 5806:18; 5873:6;

5889:5; 5894:19

**preposterous** [3] - 5781:6; 5790:4, 13

**presence** [6] - 5709:10; 5742:8; 5751:24; 5752:1; 5758:3, 7

**present** [3] - 5805:24; 5812:20; 5839:3

**presented** [5] - 5716:3; 5725:22; 5809:5; 5818:15; 5858:13

**presenting** [2] - 5717:20; 5807:18

**preservation** [1] - 5702:17

**pressed** [1] - 5702:14

**pressure** [1] - 5884:5

**pressured** [7] - 5721:10, 12; 5750:20; 5762:18; 5788:15; 5884:3

**presumably** [2] - 5792:19; 5852:8

**presumption** [6] - 5715:19; 5716:12; 5807:7, 11, 13

**presumptive** [2] - 5870:2, 7

**pretended** [1] - 5882:9

**pretty** [9] - 5829:19; 5833:5; 5848:10; 5859:10, 22; 5860:12; 5861:11; 5882:4; 5887:6

**prevent** [2] - 5717:19; 5817:24

**previously** [2] - 5844:25; 5868:9

**price** [3] - 5776:17; 5786:17; 5787:6

**Price** [6] - 5727:9; 5785:24; 5786:3, 8; 5792:2; 5887:9

**prices** [1] - 5722:2

**primary** [4] - 5765:12, 19; 5769:10; 5795:19

**print** [1] - 5705:5

**prism** [1] - 5722:1

**prison** [3] - 5721:16; 5740:12; 5786:10

**pristine** [3] - 5746:4; 5859:22; 5861:14

**pro** [1] - 5699:9

**probabilities** [2] - 5856:18; 5861:5

**probability** [2] -

5818:2; 5847:9

**probable** [20] - 5714:20; 5715:1, 3-4, 19; 5716:13; 5717:12; 5741:24; 5807:2, 8, 10, 12, 14; 5808:17; 5812:22; 5816:20; 5824:24; 5872:13; 5873:14; 5876:22

**problem** [6] - 5791:7; 5865:13; 5866:2; 5867:19; 5868:14

**procedural** [2] - 5790:16; 5892:25

**procedures** [3] - 5807:22; 5864:13; 5893:2

**proceeded** [1] - 5702:5

**proceeding** [3] - 5714:17, 23; 5786:18

**PROCEEDINGS** [1] - 5697:7

**proceedings** [1] - 5717:8

**Proceedings** [1] - 5697:24

**process** [10] - 5716:25; 5717:11; 5730:1; 5837:14; 5852:16; 5853:12; 5863:3; 5865:23; 5870:7

**produce** [3] - 5850:25; 5856:19; 5858:16

**produced** [3] - 5697:24; 5755:25; 5865:4

**product** [2] - 5721:6; 5749:18

**profession** [1] - 5744:10

**professor** [1] - 5745:1

**proffered** [1] - 5703:13

**profile** [2] - 5724:8; 5810:9

**profiles** [2] - 5810:11; 5812:14

**program** [1] - 5850:10

**progressive** [1] - 5857:15

**projecting** [1] - 5735:9

**prolonged** [1] - 5891:5

**prominent** [1] - 5813:12

**promised** [2] - 5731:18; 5805:25

**prompt** [1] - 5709:2

**prone** [1] - 5736:6

**pronounced** [1] - 5855:17

**proof** [8] - 5738:12; 5742:2; 5802:3; 5806:22; 5808:15; 5847:22; 5888:18

**proper** [4] - 5702:21; 5743:2; 5766:22; 5807:21

**properly** [1] - 5723:17

**property** [1] - 5759:20

**proposal** [1] - 5790:13

**proposed** [1] - 5896:15

**proposition** [6] - 5739:3, 5; 5759:5, 7; 5766:4; 5837:23

**propositions** [1] - 5861:16

**propriety** [1] - 5765:5

**prosecuted** [1] - 5786:13

**prosecution** [19] - 5714:6, 8, 10, 13, 16; 5715:1; 5717:11, 25; 5734:22; 5806:7; 5807:4, 6; 5808:1, 11; 5813:23; 5848:18; 5854:17; 5873:9, 12

**prosecutor** [8] - 5723:10; 5808:7; 5823:20; 5825:5, 12; 5837:7, 14; 5839:21

**Prosecutor** [1] - 5864:24

**prosecutors** [3] - 5722:16; 5830:18; 5842:10

**protect** [9] - 5729:16; 5894:4, 10, 13, 15, 17

**protein** [2] - 5852:17

**protocol** [1] - 5766:23

**protocols** [2] - 5716:9; 5724:15

**prove** [11] - 5750:19; 5777:4; 5806:18; 5807:24; 5808:10; 5817:6; 5818:19; 5847:14; 5872:11; 5888:22; 5889:4

**proved** [8] - 5715:21; 5716:9, 12; 5725:13; 5736:12, 15; 5754:11; 5800:23

**proven** [6] - 5717:5; 5784:8; 5785:9;

5847:15; 5873:6;
5894:19

**proves** [11] - 5723:6;
5724:22; 5725:14;
5744:4, 18; 5746:20;
5748:2; 5755:21;
5758:15; 5803:5

**provide** [3] - 5719:12;
5721:19; 5800:14

**provided** [7] -
5699:14; 5720:18;
5796:15; 5800:4, 11,
21; 5801:1

**provider** [1] - 5772:17

**providing** [1] -
5699:16

**proving** [1] - 5739:17

**proximity** [1] - 5734:4

**psychologically** [1] -
5762:20

**public** [7] - 5709:20;
5718:12; 5727:8;
5759:1; 5811:20;
5894:6, 14

**publication** [4] -
5849:24; 5852:25;
5855:13; 5858:13

**publications** [1] -
5859:11

**publicized** [1] -
5740:9

**published** [2] -
5775:6; 5859:14

**pull** [9] - 5759:19;
5763:7; 5769:2;
5772:13, 15; 5814:22;
5856:3; 5857:16;
5862:10

**pulled** [5] - 5725:4;
5761:12; 5764:8;
5801:23; 5852:6

**pumping** [1] - 5769:19

**pumps** [1] - 5769:19

**punches** [2] - 5737:25;
5738:1

**purchased** [1] - 5737:8

**pure** [3] - 5757:12;
5758:1; 5759:25

**purpose** [4] - 5702:16;
5774:9; 5779:1, 15

**purposes** [1] - 5699:17

**pursue** [2] - 5728:2, 9

**pursued** [2] - 5714:21;
5728:6

**pursuing** [1] - 5729:17

**put** [37] - 5701:6, 12;
5706:15; 5707:20;

5715:6; 5747:6;
5758:14; 5763:14;
5764:7; 5768:18, 20;
5792:20; 5794:6;
5795:6, 13; 5798:18;
5799:9; 5810:15;
5811:8; 5828:5; 5850:9;
5855:25; 5856:7;
5858:14; 5862:22, 25;
5863:6; 5868:24;
5871:8; 5872:5;
5879:19; 5892:20

**putrid** [3] - 5848:13;
5851:23; 5853:1

**putrification** [1] -
5852:17

**puts** [1] - 5795:6

**putting** [5] - 5701:10;
5761:23; 5841:18;
5863:2; 5881:6

---

## Q

**Q-4** [10] - 5746:3;
5847:19; 5851:1;
5857:11, 20; 5859:16;
5860:7, 10, 18

**Q-8** [10] - 5746:3;
5847:18; 5851:1;
5857:11, 19; 5859:16,
21; 5860:10, 18

**quadrant** [1] - 5847:20

**quadrants** [1] - 5860:8

**qualified** [1] - 5889:6

**quarter** [5] - 5707:19;
5708:3; 5709:4, 8, 14

**questioned** [4] -
5773:11; 5774:25;
5865:19; 5892:5

**questioning** [4] -
5702:4; 5704:6;
5728:13; 5801:15

**questions** [21] -
5702:1, 8; 5720:1, 12;
5728:13; 5732:13;
5754:5; 5777:6, 25;
5778:1; 5783:19, 23,
25; 5784:23; 5785:2;
5800:2; 5802:21;
5829:23; 5877:16;
5884:11

**quick** [1] - 5769:3

**quickly** [2] - 5722:6;
5724:19

**quilted** [1] - 5799:24

**quite** [6] - 5708:6;
5714:3; 5720:10;
5776:4; 5849:11; 5850:7

**quote** [4] - 5745:5;

5817:12; 5862:2;
5865:20

**quote/unquote** [2] -
5718:19; 5739:21

**quoting** [1] - 5885:20

---

## R

**Rabbit** [1] - 5769:10

**race** [1] - 5894:11

**radiator** [1] - 5788:21

**Rail** [1] - 5711:10

**railroad** [2] -
5745:15; 5826:1

**rained** [2] - 5810:7;
5872:20

**raining** [3] - 5809:23;
5872:18

**raise** [2] - 5836:16;
5877:7

**raised** [1] - 5719:18

**ran** [2] - 5757:16;
5787:6

**rap** [1] - 5758:10

**RAPAPORT** [1] - 5697:20

**rape** [26] - 5705:4;
5721:4, 13, 23;
5722:10; 5730:7;
5742:2; 5744:5;
5759:19; 5789:21;
5793:3, 25; 5794:2;
5808:21; 5813:16, 19;
5815:18; 5816:1, 16-17,
21; 5826:22; 5879:11

**raped** [15] - 5725:15;
5728:16; 5730:3, 11;
5734:12; 5735:15, 21;
5740:14; 5753:3;
5755:18; 5790:2;
5792:21; 5812:10, 13;
5815:16

**raping** [1] - 5809:19

**rapist** [1] - 5767:11

**rarely** [1] - 5769:5

**rate** [1] - 5731:8

**rather** [4] - 5730:7;
5757:23; 5875:5;
5896:12

**rational** [2] -
5715:15; 5756:14

**read** [13] - 5702:8;
5708:25; 5723:22;
5724:23; 5725:24;
5739:10; 5747:1;
5795:10; 5800:10;
5839:11; 5841:16;
5892:24; 5895:10

**reading** [2] - 5763:15;

5841:9

**reads** [1] - 5711:17

**ready** [2] - 5737:15;
5847:4

**real** [6] - 5733:22;
5787:3; 5858:18;
5873:9; 5878:5

**reality** [1] - 5788:16

**realize** [3] - 5742:21;
5851:25; 5891:17

**realized** [1] - 5825:17

**realizing** [1] - 5824:7

**really** [21] - 5729:2;
5732:20; 5741:15;
5754:4; 5768:17;
5773:17, 23; 5792:15;
5793:5; 5817:7;
5824:25; 5833:20;
5860:21; 5862:4, 16;
5873:5; 5882:16;
5883:7; 5888:6; 5894:7

**rear** [5] - 5746:24;
5747:18; 5748:21;
5826:3

**reason** [10] - 5756:14,
23; 5759:24; 5781:19;
5783:11; 5785:7;
5810:7; 5837:19; 5842:5

**reasonable** [23] -
5699:14; 5700:8;
5709:5; 5715:6, 8, 14;
5726:22; 5817:12, 15,
20, 24-25; 5818:2, 7,
9; 5824:18; 5831:12;
5836:17; 5847:8;
5854:6; 5872:11;
5889:6; 5891:16

**reasoning** [1] -
5706:22

**reasons** [1] - 5781:7

**rebut** [4] - 5807:11,
13; 5850:21; 5873:14

**rebuts** [1] - 5716:12

**rebuttable** [1] -
5715:20

**rebuttal** [2] - 5710:4;
5895:21

**rebutting** [1] - 5859:7

**receipt** [4] - 5787:19,
22; 5792:9; 5887:9

**receipts** [3] -
5787:15; 5791:24

**received** [1] - 5788:19

**receiving** [2] -
5699:3; 5884:5

**recent** [1] - 5814:8

**Recess** [1] - 5770:11

**recess** [5] - 5709:9; 5710:12; 5743:4; 5804:9; 5846:6
**reckless** [5] - 5716:22; 5733:25; 5807:21; 5808:4, 8
**recognize** [5] - 5722:23; 5732:4; 5741:19; 5803:22; 5836:25
**recollect** [1] - 5783:13
**recollection** [7] - 5713:25; 5740:20; 5790:9; 5792:7; 5839:19; 5868:10; 5886:4
**record** [3] - 5752:10; 5766:17; 5887:13
**recorded** [2] - 5697:24; 5895:11
**records** [10] - 5753:5, 21; 5788:8; 5789:5; 5791:24; 5792:1; 5835:15; 5887:12
**recovered** [6] - 5725:11; 5735:4; 5799:14; 5821:5; 5823:6; 5827:25
**recovery** [3] - 5760:18; 5799:16; 5816:11
**refer** [2] - 5706:9
**reflected** [1] - 5830:6
**refute** [1] - 5813:25
**refuted** [1] - 5738:24
**refutes** [4] - 5738:22, 24; 5750:18; 5751:14
**regain** [1] - 5747:5
**regard** [3] - 5778:4; 5821:4; 5843:3
**regarding** [5] - 5705:1; 5706:9; 5711:3; 5766:18; 5859:7
**Regina** [2] - 5754:21; 5768:6
**regulation** [1] - 5893:3
**reinvestigate** [1] - 5840:13
**reinvestigation** [4] - 5716:7; 5741:18; 5833:17; 5842:19
**reinvestigators** [2] - 5766:24; 5802:7
**reject** [3] - 5713:20; 5714:1; 5843:25

**rejects** [1] - 5738:2
**relate** [1] - 5713:18
**related** [1] - 5705:3
**relating** [1] - 5705:3
**relation** [1] - 5744:11
**relationship** [1] - 5849:17
**relatively** [3] - 5720:25; 5721:25; 5769:3
**relax** [1] - 5793:1
**relaxing** [1] - 5792:17
**release** [3] - 5700:7; 5710:25; 5875:21
**relevance** [2] - 5825:20; 5838:2
**relevant** [5] - 5837:9, 13; 5850:3; 5851:12; 5856:22
**reliability** [2] - 5722:15; 5724:1
**reliable** [4] - 5731:3, 15; 5811:4
**relief** [2] - 5890:15, 23
**religion** [1] - 5894:11
**rely** [3] - 5741:23; 5787:8; 5893:25
**relying** [1] - 5839:6
**remainder** [2] - 5721:16; 5729:15
**remaining** [1] - 5873:21
**remand** [2] - 5875:3
**remember** [56] - 5703:8; 5728:12, 25; 5729:21; 5731:19; 5740:16; 5748:18; 5751:2; 5752:3, 8-9, 11-12, 17; 5753:9, 11-12; 5768:23; 5788:14; 5794:18; 5796:25; 5797:6; 5798:5; 5800:2; 5810:5, 7; 5811:7; 5819:8; 5824:22; 5827:22; 5829:3; 5832:22; 5840:11; 5841:8, 14; 5843:4; 5847:19; 5855:17; 5860:13; 5864:22; 5868:11, 15; 5872:10; 5877:1, 10; 5878:19; 5880:11; 5882:17; 5884:9, 13; 5885:19, 22; 5887:11; 5892:19
**remembers** [7] - 5785:20; 5791:15;

**5794**:23; 5809:22; 5829:4; 5844:12; 5884:7
**remind** [2] - 5716:13; 5810:3
**reminder** [1] - 5717:1
**removed** [4] - 5705:10; 5769:4; 5816:7
**render** [1] - 5708:10
**rented** [2] - 5792:9; 5887:10
**repeatedly** [1] - 5805:7
**repeating** [1] - 5889:23
**replace** [1] - 5700:9
**report** [14] - 5705:14; 5741:1, 3, 5, 8; 5765:8, 15; 5797:7; 5832:17; 5836:1; 5854:13; 5856:13; 5867:1; 5895:8
**reported** [6] - 5700:4; 5711:7; 5724:10; 5833:6; 5855:10; 5859:2
**Reporter** [1] - 5697:20
**reporter** [1] - 5712:15
**reporting** [1] - 5750:16
**reports** [4] - 5705:3; 5737:17; 5765:1; 5766:2
**representation** [1] - 5842:16
**representing** [1] - 5805:24
**reprosecute** [2] - 5728:22; 5740:24
**request** [5] - 5699:3; 5707:3; 5708:19; 5830:2; 5868:17
**requested** [2] - 5705:2; 5712:22
**requests** [2] - 5833:25; 5834:1
**require** [1] - 5765:20
**required** [1] - 5808:3
**requirement** [1] - 5838:7
**requires** [3] - 5825:7
**research** [1] - 5895:15
**resource** [1] - 5730:18
**respect** [9] - 5714:9; 5715:17; 5716:18; 5751:1; 5768:9; 5771:9; 5780:15; 5805:6; 5881:3
**respects** [1] - 5887:3
**respondeat** [5] - 5699:6; 5717:22;

**5718**:5; 5743:10, 15
**responds** [1] - 5890:17
**response** [1] - 5709:13
**responsibilities** [1] - 5891:12
**responsibility** [4] - 5828:11; 5830:7, 11; 5837:13
**responsible** [3] - 5718:3; 5794:14
**rest** [5] - 5699:23; 5749:5; 5798:16; 5856:5; 5895:23
**RESTIVO** [1] - 5697:10
**Restivo** [78] - 5721:3; 5722:10; 5723:10; 5725:8; 5729:6; 5732:4; 5734:19; 5741:17; 5753:22; 5756:5; 5760:12; 5762:2, 4, 11, 22; 5763:1, 9, 11-12, 16; 5764:6, 18, 21; 5765:8, 11, 17-18; 5766:19; 5773:12; 5774:1, 10, 20; 5784:2; 5785:14; 5787:13; 5788:2, 4, 10, 20; 5789:4, 7, 13; 5791:8; 5795:18, 21, 23; 5805:6; 5809:9, 12, 15; 5812:18; 5861:25; 5862:3; 5864:5; 5874:1, 8; 5875:22; 5876:10; 5878:11; 5879:8, 13; 5880:3, 5, 15; 5881:3, 16; 5882:19, 21-22; 5884:16; 5885:1; 5887:2; 5890:5; 5893:7, 11
**Restivo's** [6] - 5717:4, 18; 5764:9; 5787:9; 5792:1; 5886:9
**Restivo/Halstead** [2] - 5818:13; 5839:14
**Restivos** [1] - 5884:3
**restroom** [1] - 5781:16
**result** [5] - 5707:24; 5717:8; 5732:10; 5733:20; 5803:17
**resulted** [1] - 5723:9
**results** [7] - 5727:24; 5728:20; 5777:23; 5778:4, 11-12, 15
**resume** [3] - 5712:11; 5772:18; 5847:4
**retired** [1] - 5791:2
**retrial** [6] - 5714:9; 5735:14, 20; 5738:16;

31

5744:13; 5866:8

**retry** [1] - 5733:16
**return** [2] - 5700:9, 14
**reveal** [1] - 5842:10
**review** [9] - 5714:3;
5744:21; 5745:10;
5777:7; 5795:12;
5851:7; 5854:21;
5858:22; 5879:20
**reviewed** [2] -
5812:25; 5879:1
**reviewing** [1] -
5805:11
**reviews** [1] - 5876:17
**Rick** [1] - 5881:1
**rid** [1] - 5881:17
**ride** [3] - 5737:19, 24;
5761:2
**rides** [1] - 5789:22
**ridiculous** [8] -
5729:12; 5757:23;
5774:18; 5781:12, 17;
5821:21; 5863:13
**rightly** [1] - 5812:22
**rights** [30] - 5716:23,
25; 5717:1, 3; 5719:3,
21-22; 5733:25;
5779:1-3, 6, 9, 15;
5780:2; 5806:22;
5808:4, 9; 5875:5;
5878:4; 5890:8;
5891:15; 5892:19,
23-24; 5893:4, 12
**ring** [2] - 5762:15, 21
**rings** [2] - 5758:20;
5798:17
**rink** [1] - 5756:17
**rinsed** [1] - 5745:23
**rip** [1] - 5753:23
**ripping** [2] - 5774:11;
5793:9
**rise** [1] - 5805:17
**risk** [1] - 5894:16
**road** [3] - 5756:15, 21;
5757:3
**Road** [11] - 5698:12;
5711:10; 5755:24;
5756:3; 5795:1, 4-6;
5796:11; 5825:25;
5827:16
**robbery** [1] - 5869:14
**Robert** [5] - 5734:13;
5737:6, 12; 5738:23;
5755:2
**Robinson** [23] -
5765:4, 25; 5766:5, 18,
20; 5773:8; 5834:25;

5835:8, 17; 5836:2, 23;
5879:8; 5889:14-16, 21;
5890:1, 11, 15, 22, 25;
5891:25
**Robinson's** [2] -
5764:23; 5835:13
**Rochelle** [2] -
5756:25; 5757:5
**Rockland** [9] -
5711:11; 5730:11;
5738:7; 5754:25;
5755:7; 5756:12;
5802:12; 5835:3, 9
**role** [3] - 5760:2;
5799:12; 5893:23
**rolled** [1] - 5749:6
**roller** [1] - 5756:17
**room** [17] - 5709:13;
5720:13; 5722:25;
5723:21, 24; 5732:3;
5745:22; 5751:24;
5768:20; 5789:12;
5792:9; 5799:2; 5801:6,
9; 5805:21; 5878:7
**root** [42] - 5744:8;
5746:20; 5809:1;
5847:17, 21; 5848:1-3,
13; 5850:22, 25;
5851:10, 22-23; 5852:6;
5853:1, 14, 22, 25;
5854:7, 10, 13, 22;
5855:10, 24; 5856:14,
20; 5857:10, 23-24;
5858:2, 7, 17, 19;
5859:4, 15, 22;
5860:19; 5861:8;
5872:22, 25
**roots** [1] - 5856:2
**rope** [79] - 5706:12;
5711:14; 5747:9, 16,
20; 5748:7; 5749:14,
16; 5758:21; 5793:25;
5797:15, 20; 5806:12;
5817:4, 18; 5818:5;
5824:19, 23; 5827:2-4,
9, 12, 14, 17; 5828:18,
22, 24; 5829:3, 5-6, 8,
14, 16, 18-19, 23;
5830:3, 5-6, 11, 22-23,
25; 5831:6-8, 11,
15-16, 18; 5832:1, 7,
9; 5833:15, 18;
5834:13, 23; 5836:14,
22; 5838:6; 5839:24;
5841:20; 5843:1;
5844:3, 15, 18, 25;
5873:16
**route** [3] - 5754:24;
5757:20

row [1] - 5759:20
**Rozzi** [2] - 5890:3, 17
**rule** [2] - 5824:10, 16
**Rule** [1] - 5699:12
**rules** [12] - 5761:9;
5790:16; 5811:14;
5878:16; 5894:3-5, 10,
12, 17, 20
**rulings** [1] - 5704:11
**rummaging** [1] -
5791:18
**rumors** [1] - 5775:2
**run** [2] - 5732:16;
5789:16
**running** [2] - 5850:14;
5878:14
**Russ** [4] - 5716:9;
5838:11; 5845:18;
5869:13
**Russell** [1] - 5779:4
**Russia** [1] - 5739:14

---

### S

**sacrifice** [1] -
5713:11
**safely** [1] - 5767:23
**safety** [2] - 5894:6, 14
**saliva** [1] - 5832:9
**sample** [2] - 5815:15;
5816:10
**samples** [1] - 5732:17
**sanding** [4] - 5787:13,
20; 5788:1; 5887:8
**sandwich** [2] - 5716:18
**Sandy** [1] - 5710:16
**sandy** [1] - 5711:2
**sarcastic** [1] - 5740:8
**sat** [2] - 5773:18;
5776:3
**saw** [31] - 5726:21;
5735:25; 5741:3;
5748:19; 5753:6;
5756:21, 23; 5768:11;
5795:3; 5818:13;
5825:20; 5832:23;
5840:14; 5841:10;
5843:11, 23; 5844:13;
5848:10, 20; 5860:5;
5863:14; 5866:2;
5868:13; 5869:10;
5871:14; 5879:15
**scale** [1] - 5806:19
**scales** [1] - 5847:10
**scalp** [2] - 5851:14;
5852:9
**scared** [2] - 5761:2;
5764:4

**scenario** [3] - 5813:9;
5851:5; 5878:21
**scenarios** [3] -
5880:2, 9; 5881:6
**scene** [22] - 5720:15;
5750:4; 5754:2; 5759:1,
6; 5791:21; 5799:11,
14, 16, 20; 5800:1;
5802:14; 5827:19;
5828:4, 6, 13; 5835:12,
20; 5837:9, 11; 5857:3
**scenes** [3] - 5758:9,
16; 5802:14
**Scheck** [11] - 5717:19;
5718:7; 5723:21;
5734:24; 5743:8, 10;
5772:5; 5805:5, 14;
5841:1; 5895:1
**SCHECK** [16] - 5698:7;
5709:3; 5743:5; 5771:6;
5805:15, 17; 5819:12;
5821:11, 15, 18;
5823:3; 5840:1; 5841:5;
5847:5; 5866:15
**Scheck's** [1] - 5743:12
**schedule** [2] -
5791:16; 5896:1
**Schneider** [1] -
5785:14
**School** [2] - 5727:3;
5745:3
**school** [1] - 5786:1
**science** [10] - 5722:5,
8; 5725:14; 5736:11;
5738:22; 5742:1;
5750:7; 5850:10;
5855:21
**scientific** [7] -
5723:5; 5729:18;
5739:16; 5803:5;
5849:22; 5854:6; 5855:3
**Scientific** [1] -
5830:9
**scientifically** [1] -
5724:14
**Scientists** [2] -
5853:4; 5855:6
**scientists** [2] -
5849:3; 5858:4
**scope** [1] - 5718:2
**Scranton** [1] - 5785:14
**scream** [1] - 5843:23
**screams** [1] - 5801:12
**screen** [2] - 5706:15;
5814:22
**screw** [1] - 5748:9
**seal** [2] - 5797:24;

5864:14

**sealed** [1] - 5862:24
**search** [3] - 5728:2; 5847:25; 5865:4
**searched** [2] - 5746:9; 5830:4
**searching** [1] - 5803:7
**seat** [7] - 5725:5; 5823:19; 5824:6, 15; 5826:4, 21
**seated** [6] - 5710:22; 5743:19; 5748:17; 5772:13; 5805:4; 5847:3
**second** [16] - 5699:21; 5714:20; 5716:24; 5725:16; 5771:16; 5773:23; 5783:25; 5785:17; 5792:16; 5825:15; 5847:18; 5851:7; 5864:3; 5865:5
**secret** [2] - 5774:9, 17
**secretly** [1] - 5734:8
**section** [1] - 5856:3
**secured** [1] - 5733:12
**security** [1] - 5721:17
**see** [67] - 5701:9, 13; 5709:8, 13; 5710:22; 5712:12; 5730:18; 5731:14; 5732:17; 5733:12; 5735:23; 5745:20; 5748:11; 5757:15; 5759:21; 5763:3; 5764:2, 14; 5769:4, 24; 5772:9; 5780:16; 5782:7, 14; 5790:23; 5796:22; 5797:23; 5804:3; 5807:23; 5812:14; 5813:22; 5814:10, 12, 14, 22; 5815:7, 18, 20; 5819:16; 5828:2; 5831:6, 8; 5835:8; 5837:25; 5845:4, 7; 5846:1; 5856:4, 13; 5858:2; 5859:19; 5860:7; 5863:16; 5867:18; 5869:25; 5870:4, 15; 5877:13; 5883:3; 5886:10; 5888:16; 5896:21
**seeing** [2] - 5798:5; 5838:6
**seeking** [3] - 5805:21; 5847:24; 5864:24
**sees** [3] - 5737:2; 5819:15; 5876:12
**seized** [2] - 5828:4;

5864:22

**selected** [1] - 5882:11
**self** [3] - 5766:3, 12; 5767:1
**self-serving** [3] - 5766:3, 12; 5767:1
**sell** [3] - 5742:1; 5758:24; 5813:9
**semen** [7] - 5724:9; 5810:9; 5812:12; 5814:4, 6; 5816:3; 5832:13
**seminal** [1] - 5735:10
**sends** [3] - 5769:18; 5890:2, 25
**sense** [20] - 5729:20; 5730:9; 5736:6; 5738:24; 5755:6; 5759:17; 5780:16; 5782:7; 5792:14; 5794:1; 5802:19; 5810:18; 5816:13; 5823:15; 5843:16; 5857:14; 5866:20; 5868:7, 10
**sent** [1] - 5891:22
**sentence** [1] - 5781:5
**separate** [1] - 5802:16
**September** [1] - 5830:1
**series** [2] - 5777:6; 5778:25
**SERIO** [1] - 5698:2
**serious** [1] - 5891:8
**seriously** [3] - 5833:5, 11; 5890:14
**serological** [1] - 5870:5
**serologist** [2] - 5869:22, 25
**service** [3] - 5727:8; 5882:8; 5895:5
**serving** [4] - 5740:11; 5766:3, 12; 5767:1
**session** [1] - 5718:21
**sessions** [2] - 5703:20; 5704:15
**set** [3] - 5703:14; 5723:6; 5803:6
**setting** [3] - 5781:20; 5796:20; 5798:22
**seven** [2] - 5720:13; 5778:23
**seven-page** [1] - 5720:13
**several** [2] - 5702:13; 5892:25
**sex** [14] - 5725:8, 25;

5726:21; 5728:8, 23; 5731:6, 8; 5735:16, 22; 5736:2, 19; 5738:10; 5777:10; 5802:6
**sexual** [6] - 5731:14, 21; 5815:14; 5816:5, 9, 13
**sexually** [2] - 5711:16; 5775:8
**SEYBERT** [1] - 5697:18
**SF** [1] - 5814:24
**shackles** [1] - 5801:21
**shaft** [1] - 5851:18
**Shapiro** [1] - 5753:1
**share** [3] - 5726:14; 5855:8; 5893:22
**Sharkey** [16] - 5763:4, 7, 9, 17, 24; 5864:3; 5876:6, 11, 25; 5877:1; 5878:19, 23; 5890:4
**shed** [4] - 5851:1, 8; 5852:8; 5858:1
**sheet** [4] - 5699:4; 5709:7; 5776:5; 5806:25
**shifts** [1] - 5889:4
**shins** [4] - 5736:22; 5748:20, 23; 5802:10
**shirt** [1] - 5775:16
**shoes** [1] - 5715:6
**short** [4] - 5710:12; 5729:11; 5841:2; 5896:15
**shortest** [1] - 5754:24
**shortly** [3] - 5735:6; 5736:22; 5740:6
**shot** [2] - 5745:22; 5775:19
**shoulder** [1] - 5747:8
**shoulders** [4] - 5747:7, 13, 17; 5748:14
**show** [11] - 5751:11; 5833:25; 5837:10, 13; 5844:12; 5849:7; 5860:3; 5867:18; 5872:13; 5877:16; 5885:18
**showed** [6] - 5750:13; 5828:23; 5832:22; 5841:11; 5860:5; 5871:11
**showered** [1] - 5785:24
**showers** [2] - 5736:20; 5775:16
**showing** [9] - 5741:6; 5807:14; 5829:9; 5832:25; 5837:20; 5838:3; 5861:8; 5873:14

**shown** [1] - 5837:16
**shows** [4] - 5754:22; 5813:8; 5845:13
**shut** [2] - 5719:5; 5764:17
**SIB** [4] - 5833:8; 5863:11, 16, 21
**sick** [1] - 5700:2
**side** [17] - 5711:10; 5755:10-12, 15; 5757:1; 5796:2, 22; 5805:20; 5814:9; 5815:21; 5833:24; 5835:9; 5836:4; 5892:3
**sidebar** [3] - 5705:2; 5821:2, 7
**sides** [2] - 5706:17; 5718:24
**sidewalk** [1] - 5756:13
**sight** [2] - 5836:20; 5837:1
**sign** [10] - 5727:2; 5756:6; 5758:9, 15; 5780:1; 5793:22; 5892:24; 5893:12
**signal** [1] - 5710:5
**signature** [2] - 5862:25; 5863:2
**signatures** [2] - 5722:23, 25
**signed** [8] - 5706:11; 5719:10; 5763:3; 5765:14; 5775:5; 5828:18; 5863:25; 5893:13
**significance** [1] - 5765:5
**significant** [8] - 5722:14; 5735:24; 5747:22; 5749:21; 5773:23; 5816:5; 5826:21; 5828:18
**significantly** [1] - 5754:16
**signing** [3] - 5717:6; 5718:18; 5768:21
**signs** [5] - 5830:20; 5831:14; 5845:4; 5875:25; 5880:13
**silence** [1] - 5717:17
**similar** [3] - 5711:15; 5848:10; 5857:11
**simple** [7] - 5708:4; 5721:25; 5759:24; 5778:17; 5808:20; 5853:11; 5856:17
**simply** [2] - 5756:13;

5817:23

**simultaneous** [1] - 5821:18

**single** [8] - 5724:8; 5730:10, 18; 5795:14; 5838:2; 5866:25; 5892:2, 4

**singular** [4] - 5715:12; 5722:13; 5739:25; 5779:15

**Sirianni** [12] - 5760:24; 5782:10; 5800:2; 5801:14, 22; 5828:21; 5829:5, 9, 11; 5838:13; 5881:14

**Sirianni's** [1] - 5760:16

**sister** [1] - 5826:1

**sisters** [2] - 5769:15; 5776:15

**sit** [5] - 5713:12; 5719:5; 5731:2; 5749:9; 5779:17

**sits** [2] - 5728:5; 5775:16

**sitting** [7] - 5725:5; 5751:3; 5769:9; 5801:7; 5805:20; 5824:12; 5879:2

**situation** [1] - 5815:25

**six** [11] - 5708:10; 5720:1, 12; 5741:16; 5760:17; 5767:14; 5775:13; 5793:7; 5836:16

**Skates** [9] - 5738:3; 5789:20; 5794:25; 5795:3, 16; 5797:3; 5819:5; 5835:3; 5884:25

**skating** [1] - 5756:17

**Skellington** [3] - 5732:6; 5775:3; 5785:18

**Skellington's** [1] - 5767:15

**skin** [6] - 5815:4, 9-10; 5832:4, 9

**slaving** [1] - 5780:23

**sleep** [3] - 5874:15; 5875:11; 5876:15

**sleeping** [2] - 5876:12; 5878:20

**slept** [4] - 5775:12; 5874:12; 5884:8, 11

**slide** [5] - 5814:10; 5835:6; 5867:5; 5870:12; 5886:21

**slides** [3] - 5867:4, 8,

**slight** [1] - 5861:5

**slightly** [2] - 5720:8; 5806:20

**slipped** [1] - 5847:11

**slow** [2] - 5839:25; 5841:1

**small** [2] - 5784:17; 5816:11

**smaller** [1] - 5816:12

**smart** [1] - 5839:21

**Smith** [9] - 5836:23; 5843:9, 20-21; 5844:3, 6, 21; 5845:4

**Smithsonian** [3] - 5849:14, 18; 5850:7

**smoked** [3] - 5767:17; 5776:10

**smoking** [3] - 5792:18; 5794:21, 23

**Smyle** [14] - 5732:5; 5741:19; 5760:13, 22; 5761:1, 4, 6, 13-14; 5791:8; 5809:11; 5818:17; 5879:23; 5880:7

**sneakers** [2] - 5793:17; 5797:2

**snowstorm** [1] - 5713:14

**social** [2] - 5895:13

**socializing** [1] - 5752:17

**soft** [3] - 5851:16; 5852:1

**softest** [1] - 5852:1

**soil** [3] - 5836:1; 5858:10, 16

**solidified** [1] - 5788:18

**solved** [1] - 5801:10

**solving** [1] - 5801:5

**some-odd-years** [1] - 5740:1

**someone** [5] - 5722:10; 5729:7; 5746:14; 5768:19; 5839:21

**sometime** [1] - 5888:6

**sometimes** [3] - 5767:15; 5832:8; 5842:2

**somewhere** [5] - 5733:11; 5739:13; 5760:14, 19; 5815:20

**son** [1] - 5794:15

**song** [1] - 5868:1

**soon** [2] - 5833:5; 5889:14

**sophisticated** [3] - 5811:3; 5849:22; 5850:3

**sorrow** [1] - 5708:6

**sorry** [9] - 5712:20; 5768:9; 5769:21; 5772:13; 5778:14; 5780:5; 5789:23; 5796:8; 5821:15

**sort** [2] - 5768:17; 5769:7

**sorts** [1] - 5800:21

**sound** [3] - 5740:8; 5743:5; 5762:25

**sounded** [1] - 5885:8

**source** [3] - 5724:9, 11; 5832:11

**southbound** [5] - 5738:6; 5754:25; 5755:7; 5757:24; 5802:12

**space** [1] - 5746:19

**speaking** [2] - 5719:23; 5776:8

**speaks** [1] - 5768:4

**specific** [2] - 5702:25; 5794:24

**specifically** [2] - 5854:20; 5855:8

**specious** [1] - 5871:17

**speculate** [3] - 5757:20; 5778:6

**speculating** [1] - 5868:16

**speculation** [2] - 5757:13; 5758:1

**speed** [2] - 5756:5

**spelling** [1] - 5794:16

**spent** [3] - 5704:8; 5726:11; 5774:2

**sperm** [36] - 5724:15; 5725:11, 22; 5726:19, 23; 5728:1; 5729:7; 5735:2, 4, 6, 11, 24; 5736:3, 7; 5814:10, 12-14, 23-24; 5815:2, 6, 10-11, 19, 22-23; 5816:6, 12

**spew** [1] - 5720:7

**Spillane** [12] - 5718:1, 3; 5766:13; 5861:20; 5862:9; 5888:18; 5889:23; 5890:4; 5891:10; 5892:2, 11; 5893:20

**Spillane's** [1] - 5891:16

**spoken** [2] - 5789:14;

5865:10

**spread** [1] - 5747:3

**spring** [1] - 5775:15

**stain** [5] - 5869:25; 5870:1, 4; 5871:12, 15

**stake** [1] - 5894:9

**stand** [10] - 5726:25; 5728:7, 24; 5734:18; 5738:25; 5739:18; 5757:7; 5841:7, 10; 5884:18

**standing** [1] - 5737:10

**stands** [1] - 5699:6

**star** [4] - 5763:21; 5764:18; 5765:14; 5879:3

**stare** [1] - 5781:13

**start** [17] - 5707:10; 5709:15; 5751:10; 5752:6, 24; 5753:18; 5754:8; 5765:4; 5770:3; 5810:12; 5812:23; 5818:22; 5821:25; 5837:20; 5873:24; 5878:6; 5895:18

**started** [15] - 5703:4; 5712:3; 5762:23; 5770:6; 5772:24; 5782:1; 5830:2; 5841:11, 22; 5848:12; 5849:4; 5868:14, 16; 5882:12; 5883:14

**starting** [2] - 5882:20; 5884:10

**starts** [4] - 5747:4; 5769:20; 5875:24; 5877:24

**state** [12] - 5699:10; 5714:7, 10, 12, 15; 5717:23; 5721:17; 5750:24; 5775:24; 5777:4; 5878:9

**State** [1] - 5765:3

**statement** [44] - 5706:12; 5718:22; 5719:11; 5726:1; 5731:19; 5745:8; 5753:24; 5760:24; 5761:20; 5762:1, 4; 5765:15; 5770:5; 5783:19; 5794:12; 5796:4, 18; 5807:15; 5818:14; 5825:24; 5826:5; 5827:7; 5828:21; 5865:17; 5869:17; 5873:25; 5875:25; 5876:4, 10, 17; 5878:25; 5880:13,

20; 5881:3, 8, 15, 20; 5884:12; 5885:6, 14; 5886:24

**statements** [14] - 5727:15; 5762:7; 5782:24; 5783:11, 13; 5806:15; 5807:17, 25; 5808:6; 5818:16; 5834:2; 5873:22, 25; 5882:5

**STATES** [1] - 5697:1

**states** [1] - 5722:25

**States** [3] - 5697:21; 5813:13; 5850:11

**station** [4] - 5768:16; 5789:3; 5886:9

**status** [1] - 5876:9

**stay** [2] - 5759:13; 5775:22

**stayed** [1] - 5700:3

**STD** [1] - 5724:6

**steals** [1] - 5823:8

**stenography** [1] - 5697:24

**step** [12] - 5709:19; 5710:2; 5726:24; 5727:18; 5746:14; 5795:25; 5796:2; 5812:2; 5866:22; 5867:3, 7, 11

**stepped** [2] - 5860:9, 21

**steps** [2] - 5832:19; 5833:3

**stick** [3] - 5816:6; 5866:19; 5881:8

**sticking** [1] - 5852:19

**still** [8] - 5728:6; 5746:15; 5810:10; 5811:7; 5823:16; 5837:15; 5859:13; 5890:23

**stip** [3] - 5705:15

**stipulated** [1] - 5706:16

**stipulation** [24] - 5701:7; 5704:18; 5705:12, 15-16; 5708:13, 20; 5711:4, 17, 21; 5712:19, 21; 5722:22, 24; 5724:2; 5746:7; 5766:15; 5775:5; 5829:24; 5833:19; 5834:14; 5891:20

**stipulations** [7] - 5704:19; 5705:1; 5708:22; 5710:18;

5711:3; 5712:6; 5713:2

**stolen** [18] - 5819:3, 7, 15-16; 5821:9, 14, 17, 19; 5822:1; 5824:13; 5825:6, 20-21; 5830:20; 5831:13; 5833:6; 5838:3; 5839:22

**stone** [3] - 5871:7, 22

**stood** [2] - 5723:11; 5766:9

**stop** [15] - 5725:16; 5742:19; 5752:6, 24; 5753:18; 5754:8; 5758:9, 15; 5761:6; 5773:21; 5781:21; 5792:24; 5793:22; 5821:22

**stop)** [1] - 5751:10

**stopped** [7] - 5702:2; 5725:3; 5752:16; 5788:3; 5844:22; 5884:16

**storm** [1] - 5710:16

**story** [7] - 5700:17; 5875:6; 5882:14, 17; 5883:5; 5892:4

**STR** [1] - 5724:13

**straight** [2] - 5836:12; 5871:4

**straightforward** [2] - 5721:1; 5722:1

**strangers** [1] - 5794:9

**strangle** [2] - 5777:13; 5789:21

**strangled** [17] - 5711:14; 5746:24; 5748:4, 15, 21; 5753:3; 5760:14, 19; 5762:24; 5775:7; 5802:9; 5876:2; 5877:23; 5880:4

**strangling** [1] - 5747:18

**strap** [2] - 5798:20, 24

**Street** [4] - 5698:5, 7, 11, 13

**street** [4] - 5740:6; 5755:10; 5794:25; 5835:10

**stress** [1] - 5761:16

**strict** [1] - 5864:13

**strike** [1] - 5766:2

**stripe** [1] - 5806:12

**striped** [13] - 5817:3, 18; 5818:5; 5823:18; 5824:5; 5826:12; 5830:21; 5831:14; 5834:23; 5839:24; 5841:19; 5844:2;

5873:16

**stripes** [2] - 5826:2, 17

**stripped** [1] - 5792:21

**strong** [4] - 5710:16; 5768:18; 5849:17; 5872:9

**strongest** [5] - 5735:5; 5865:17, 23; 5869:16

**struggle** [4] - 5748:7, 13; 5830:21; 5831:14

**struggling** [1] - 5749:12

**stuck** [3] - 5738:15; 5754:5; 5860:24

**student** [1] - 5855:14

**studied** [1] - 5745:1

**study** [7] - 5850:4; 5853:10; 5855:17; 5858:9, 11, 23

**stuff** [6] - 5836:15; 5837:9; 5863:1; 5871:4; 5873:10; 5891:8

**stupid** [2] - 5839:20; 5879:7

**stupidly** [1] - 5871:22

**sub** [1] - 5837:4

**sub-folders** [1] - 5837:4

**subject** [4] - 5747:24; 5751:21; 5851:9

**subjected** [3] - 5858:1, 8, 20

**submit** [2] - 5837:18; 5866:15

**submitted** [1] - 5701:10

**subsequent** [1] - 5816:4

**substance** [1] - 5705:5

**substantial** [3] - 5700:5; 5704:10; 5801:7

**substantially** [1] - 5700:14

**substitute** [1] - 5705:17

**successfully** [1] - 5858:18

**sudden** [4] - 5832:16; 5844:10; 5877:12, 21

**suddenly** [2] - 5861:8; 5879:11

**suffer** [1] - 5764:12

**suffered** [2] - 5761:15

**suffers** [1] - 5843:21

**sufficient** [2] -

5699:14; 5701:7

**suggest** [23] - 5707:17; 5716:19; 5720:25; 5721:25; 5727:16; 5733:18; 5734:12; 5738:13, 19; 5741:14; 5752:9, 15; 5757:22; 5765:17, 25; 5766:5; 5768:1; 5779:17; 5788:9; 5800:20

**suggested** [2] - 5707:14; 5845:5

**suggesting** [1] - 5755:23

**suggestion** [3] - 5706:5; 5707:24; 5816:20

**suggests** [1] - 5774:16

**Suite** [1] - 5698:5

**sum** [1] - 5712:7

**summary** [2] - 5832:19; 5833:12

**summation** [14] - 5705:24; 5706:20; 5709:24; 5710:17; 5712:9, 13; 5713:17; 5718:8; 5742:12; 5743:9, 21; 5772:7; 5805:6; 5822:4

**summations** [2] - 5707:6, 9

**Sunday** [1] - 5787:17

**Sunmark** [1] - 5811:5

**Sunrise** [2] - 5755:11

**super** [1] - 5710:16

**superior** [5] - 5699:6; 5717:22; 5718:5; 5743:10, 15

**supervise** [1] - 5718:1

**supervised** [1] - 5769:5

**supervising** [2] - 5859:13; 5891:12

**supervision** [2] - 5743:12; 5892:8

**supervisor** [8] - 5728:5; 5864:2; 5871:2; 5888:23; 5889:12; 5890:9, 13; 5891:16

**supervisors** [1] - 5892:8

**supervisory** [3] - 5806:7; 5888:16; 5893:16

**support** [3] - 5731:3, 15; 5750:1

**supported** [1] -

**5865**:12

**supporting** [2] -
5811:8; 5892:13

**suppose** [1] - 5871:23

**supposed** [3] -
5699:25; 5741:11;
5875:7

**supposedly** [1] -
5836:8

**suppressed** [3] -
5806:11; 5807:15, 24

**surely** [1] - 5891:11

**survive** [1] - 5883:23

**suspect** [12] - 5715:10;
5760:9, 12, 25;
5765:12; 5773:15;
5775:1; 5782:15;
5783:8; 5784:13;
5812:17; 5883:13

**suspects** [2] -
5741:18; 5760:11

**sustained** [1] - 5708:5

**Sustained** [1] -
5790:18

**sustaining** [1] -
5748:23

**swab** [8] - 5814:11,
23-25; 5815:20; 5834:6,
8

**swabs** [1] - 5814:10

**swear** [2] - 5872:1, 3

**swearing** [1] - 5869:1

**sweets** [1] - 5880:21

**swept** [1] - 5759:1

**switch** [1] - 5864:16

**switched** [10] -
5819:8, 13, 17-18;
5821:10, 14, 17, 19;
5822:2; 5823:6

**switches** [1] - 5823:8

**switching** [1] - 5821:6

**swore** [1] - 5725:25

**sworn** [4] - 5868:7;
5872:3; 5884:6; 5894:1

**sympathize** [1] -
5803:23

**sympathy** [1] - 5709:21

**syndrome** [1] - 5761:16

**system** [1] - 5894:18

---

**T**

**tables** [1] - 5764:15

**tad** [1] - 5740:8

**tail** [1] - 5765:8

**tails** [3] - 5814:13;
5815:23

**tales** [1] - 5878:12

**talks** [3] - 5736:20;
5825:25; 5827:8

**Tamara** [7] - 5744:9;
5745:4, 10; 5746:22;
5747:14; 5749:3; 5750:3

**tan** [1] - 5844:10

**tape** [5] - 5708:16;
5818:21; 5832:8, 12

**tapered** [3] - 5793:15;
5826:11, 17

**tapes** [7] - 5712:16,
24-25; 5713:1; 5774:19;
5832:11

**tapping** [1] - 5881:8

**target** [7] - 5764:16,
18, 22; 5765:12, 19,
21; 5767:3

**targets** [1] - 5795:19

**task** [1] - 5741:7

**tasked** [1] - 5849:13

**teaches** [1] - 5745:2

**team** [2] - 5862:1;
5884:17

**technical** [1] -
5858:21

**technician** [2] -
5828:4, 6

**technology** [2] -
5811:3; 5813:15

**Ted** [5] - 5834:25;
5879:8; 5889:14;
5890:11

**Teddy** [6] - 5764:23;
5765:1, 25; 5766:5;
5773:8

**teenager** [1] - 5810:5

**telephone** [7] -
5788:9, 19, 24;
5791:24; 5885:8;
5887:12

**teletype** [1] - 5826:8

**television** [1] -
5862:23

**telltale** [4] - 5845:4;
5847:23; 5864:18;
5873:4

**temperatures** [1] -
5856:8

**ten** [29] - 5703:9;
5707:19; 5708:4;
5709:5, 8, 15; 5719:2,
15, 19, 24; 5720:1, 12;
5741:1; 5769:14, 16;
5780:18; 5782:14;
5783:16, 24; 5802:20;
5841:2; 5850:12;

**tales** [1] - 5878:12

**ten-and-a-half-hour**
[1] - 5719:2

**Tennessee** [1] -
5855:22

**term** [5] - 5743:2, 21;
5817:11; 5865:14;
5870:3

**termination** [1] -
5714:22

**terms** [7] - 5699:15;
5704:18; 5821:3;
5834:21; 5852:22;
5859:10; 5872:15

**terrible** [1] - 5889:18

**terrified** [3] -
5878:7, 9; 5882:22

**test** [12] - 5733:12;
5777:3, 23; 5814:20;
5832:24; 5869:24;
5870:3, 7, 11; 5874:10

**tested** [7] - 5731:20;
5732:1; 5734:3, 8;
5741:18, 20; 5834:9

**testified** [40] -
5726:16; 5732:5;
5734:21; 5738:6;
5744:12; 5746:3;
5750:20; 5766:22;
5768:7, 15; 5773:24;
5779:4; 5785:20;
5788:19; 5791:7, 17;
5797:12; 5801:15;
5815:12; 5843:11;
5848:19-21; 5850:17;
5854:17; 5858:12;
5859:9; 5866:5; 5868:9,
23; 5870:9, 13-14;
5881:5, 22, 24;
5883:19; 5884:20

**testifies** [3] -
5867:23; 5877:2;
5884:18

**testify** [7] - 5731:12;
5792:5; 5848:22;
5868:2; 5876:23;
5882:1, 6

**testifying** [4] -
5704:22; 5801:16;
5848:18; 5877:5

**testimony** [31] -
5717:15; 5730:14;
5736:9; 5740:16, 20-21;
5744:14, 17; 5745:4;
5746:23; 5759:13;
5761:21; 5788:6, 14;
5791:5; 5794:4;

**5854**:18, 23; 5856:15;
5866:25; 5880:12;
5890:21

**ten-and-a-half-hour**
[1] - 5719:2

**Tennessee** [1] -
5855:22

**5809**:21; 5821:3;
5848:22; 5850:22;
5863:15; 5864:1;
5866:18; 5867:13;
5868:3; 5881:5; 5884:6;
5885:11, 21

**testing** [6] - 5724:7,
14; 5734:17; 5735:5;
5831:25; 5833:15

**tests** [5] - 5811:2, 4;
5831:22; 5833:17;
5840:13

**TF** [2] - 5728:15;
5797:3

**thankful** [1] - 5806:4

**Thanksgiving** [1] -
5803:14

**THE** [102] - 5698:10;
5699:7, 9, 12; 5700:12,
19, 21, 25; 5701:4, 6,
11, 19; 5703:17, 22,
25; 5704:8, 14, 22;
5705:7, 9, 13, 20;
5706:1, 7, 19, 25;
5707:11, 15, 19, 25;
5708:3, 19, 25; 5709:4,
11; 5710:3, 10, 13, 22;
5712:17, 20; 5713:6;
5723:16; 5726:4;
5740:19; 5742:4, 13,
16, 19, 22; 5743:1, 7,
14, 19; 5751:19;
5769:23; 5770:2, 9;
5771:8, 11, 14, 18, 20,
22, 25; 5772:2, 4, 8,
13, 16; 5776:21;
5777:25; 5778:3, 12,
15; 5786:17; 5790:7,
18; 5792:6; 5798:12;
5803:11, 17; 5804:2;
5805:4, 16; 5819:24;
5821:3, 13, 16, 24;
5822:3; 5839:25;
5841:1; 5845:25;
5847:3; 5866:13;
5895:1; 5896:4, 6, 14,
17, 20

**theater** [1] - 5786:2

**theft** [2] - 5823:10

**Theodore** [2] -
5766:18, 20

**theories** [5] - 5728:4,
6; 5733:17; 5734:23;
5738:22

**theorize** [1] - 5800:15

**theorized** [2] -
5760:1; 5796:6

**theory** [34] - 5725:19;
5728:10, 15, 23;

36

5729:12; 5730:10, 16, 19, 23; 5731:4, 7, 9; 5732:8; 5735:14, 20; 5736:10; 5749:4, 24; 5750:8; 5754:13; 5756:7; 5812:7, 16, 20, 24; 5814:5; 5835:1, 5-6, 13; 5857:5; 5861:17

**thereafter** [2] - 5717:3; 5718:15

**therefore** [1] - 5757:10

**therein** [1] - 5802:23

**Theresa** [111] - 5711:5, 18; 5717:4; 5720:17; 5721:4, 24; 5724:16; 5725:7, 12, 22; 5726:10, 17, 20; 5729:1, 3; 5730:3, 6; 5731:20; 5732:21; 5733:19; 5734:5; 5735:3, 14, 18, 20; 5736:1, 15; 5737:4, 10, 12, 14, 18, 21; 5738:4, 9, 17; 5740:12; 5744:6; 5745:11, 14; 5746:8, 13, 23-24; 5747:15, 19; 5748:13, 20; 5749:11, 22; 5750:4; 5754:14, 16, 21-22; 5755:3, 7, 14, 24; 5756:2, 5, 7, 11; 5757:20; 5758:14, 19; 5768:8; 5777:8, 10, 13, 15, 17; 5789:21; 5793:11, 13; 5794:5; 5795:16; 5796:5; 5797:5; 5798:2; 5802:9; 5808:24; 5809:19; 5810:9; 5813:1; 5814:25; 5815:8; 5819:5; 5823:21; 5824:11, 17, 24; 5825:19; 5831:10; 5832:5; 5835:2; 5851:1; 5853:16; 5856:18; 5857:2, 25; 5860:21; 5862:14; 5865:5; 5866:1; 5867:21; 5884:24; 5888:9

**Theresa's** [1] - 5748:19

**theses** [1] - 5855:15

**they've** [1] - 5755:25

**thief** [1] - 5823:8

**thin** [1] - 5818:18

**thinking** [2] - 5729:25; 5818:12

**third** [2] - 5709:12;

5717:21

**Thomas** [2] - 5734:6, 9

**thousands** [2] - 5816:16; 5858:24

**threatening** [1] - 5891:7

**threats** [1] - 5891:4

**three** [47] - 5700:22; 5711:14; 5714:5; 5724:6, 10, 13; 5726:10, 16; 5729:14; 5730:5, 22; 5731:13; 5735:17; 5740:11; 5742:10; 5743:1; 5756:19; 5758:9, 25; 5773:17; 5774:8, 12; 5780:22; 5785:9; 5791:13; 5792:17; 5794:4, 9; 5801:6, 16; 5802:14-16, 21; 5806:6, 9, 15, 20; 5811:5; 5812:14; 5817:10; 5831:23; 5836:16; 5842:6; 5872:23; 5876:17

**threw** [8] - 5747:9; 5799:17; 5824:8; 5826:25; 5830:25; 5831:1, 16; 5882:9

**throughout** [2] - 5805:7; 5855:3

**throw** [2] - 5799:10; 5825:2

**throwing** [3] - 5733:4, 6, 10

**thrown** [3] - 5824:11, 15; 5831:21

**thumbs** [1] - 5801:8

**Thursday** [2] - 5760:16; 5800:2

**ticket** [1] - 5883:5

**tie** [1] - 5827:4

**tight** [1] - 5885:2

**tightened** [1] - 5751:11

**tightening** [1] - 5747:20

**Tim** [1] - 5764:7

**timeline** [3] - 5706:2, 16; 5736:16

**timing** [3] - 5771:10; 5854:3; 5864:22

**tipping** [1] - 5806:19

**tired** [2] - 5775:19; 5779:24

**today** [6] - 5699:23; 5707:6; 5711:2; 5731:2; 5769:2; 5809:5

**together** [25] - 5713:13; 5726:11; 5736:25; 5744:21; 5753:22; 5763:14; 5765:23; 5774:10; 5784:6-8; 5785:10; 5790:23, 25; 5791:11, 21; 5800:24; 5802:16; 5806:21; 5841:18; 5850:9; 5851:8; 5872:5

**toilet** [1] - 5763:14

**Tom** [5] - 5788:17; 5887:21, 25; 5888:4

**tomorrow** [10] - 5699:25; 5700:18; 5707:8; 5751:9; 5808:19; 5812:17; 5813:10; 5816:25; 5895:18; 5896:21

**tonight** [1] - 5896:19

**Tony** [1] - 5878:23

**took** [28] - 5718:18; 5725:21; 5726:25; 5739:10; 5741:8; 5746:1; 5747:2, 10; 5749:16; 5757:20; 5781:21; 5797:16; 5800:14; 5821:1; 5824:1; 5828:7, 22; 5829:17; 5833:5; 5845:16; 5848:11; 5856:4; 5858:13; 5862:24; 5866:21; 5867:4; 5868:5, 8

**tool** [2] - 5794:13; 5795:8

**toolbox** [1] - 5773:1

**Tools** [3] - 5787:16; 5887:9

**tools** [3] - 5773:1; 5844:15, 19

**top** [15] - 5747:6, 13, 17, 19; 5780:5; 5793:6, 8, 12; 5796:24; 5797:2; 5814:22; 5851:19; 5852:18; 5861:13

**tops** [1] - 5793:15

**torso** [1] - 5711:15

**tort** [2] - 5717:25; 5718:4

**torture** [1] - 5717:20

**Tosner** [1] - 5761:2

**total** [1] - 5774:24

**totally** [4] - 5728:18; 5779:3; 5844:1; 5893:7

**touch** [1] - 5832:9

**touched** [1] - 5877:11

**tough** [1] - 5745:20

**tour** [4] - 5718:19; 5800:1, 5, 13

**toward** [4] - 5796:13; 5805:19; 5835:3

**towards** [2] - 5796:12; 5873:19

**town** [2] - 5737:6; 5883:3

**trace** [5] - 5756:1; 5758:13; 5759:3; 5833:9; 5849:19

**track** [2] - 5745:15; 5761:4

**tracks** [4] - 5711:10; 5799:18; 5826:1

**traffic** [1] - 5746:18

**trail** [2] - 5828:14; 5835:22

**trailed** [1] - 5746:11

**trained** [5] - 5780:22; 5781:18; 5853:7; 5855:18

**trains** [1] - 5745:16

**trampled** [1] - 5719:4

**TRANSCRIPT** [1] - 5697:7

**transcript** [9] - 5697:24; 5701:13, 25; 5702:1, 8, 11; 5708:2; 5896:9

**transcription** [1] - 5697:24

**transcripts** [1] - 5739:10

**transpired** [1] - 5718:23

**traumatized** [2] - 5877:14; 5878:18

**treated** [2] - 5760:6; 5883:13

**trepidation** [1] - 5764:13

**trestle** [2] - 5755:14; 5775:7

**trial** [57] - 5703:11; 5706:17; 5709:17, 21; 5714:7; 5715:22; 5716:25; 5725:17; 5726:16; 5727:7; 5739:10; 5741:18; 5752:14; 5761:21; 5776:23; 5781:10; 5790:23; 5805:8; 5806:6, 9, 17, 23; 5807:1, 3, 24; 5808:11; 5809:22; 5810:4; 5817:13, 16; 5818:13; 5824:9; 5825:8; 5826:8;

5829:1; 5830:1;
5831:12; 5834:24;
5835:2; 5841:7; 5848:9,
19, 25; 5855:16;
5861:24; 5866:5, 19;
5867:24; 5873:8, 18;
5885:13, 20; 5886:12,
25; 5896:22
**tried** [5] - 5723:11;
5733:12; 5829:14;
5839:13; 5882:8
**tries** [1] - 5895:7
**truck** [2] - 5784:18;
5833:7
**true** [7] - 5721:24;
5728:3; 5731:6;
5800:13, 24; 5811:19;
5825:4
**Trujillo** [2] -
5739:20; 5741:5
**truly** [5] - 5703:2;
5728:16; 5741:7;
5786:11
**trunk** [1] - 5856:9
**trust** [1] - 5811:20
**truth** [10] - 5728:2;
5739:15; 5764:21, 24;
5803:22; 5805:17;
5881:10; 5883:24;
5885:23; 5894:1
**truthful** [2] - 5723:7;
5803:7
**try** [9] - 5754:5;
5768:1; 5779:17;
5812:8, 16; 5813:9;
5871:9; 5884:8; 5888:12
**trying** [13] - 5717:19;
5730:23; 5731:13;
5733:7; 5742:1;
5752:15; 5758:24;
5759:8; 5833:13;
5863:17; 5885:22;
5886:13, 15
**Tuesday** [3] - 5757:8;
5788:21; 5896:23
**turn** [8] - 5738:7;
5751:16; 5794:23;
5795:2; 5819:1; 5838:18
**turned** [9] - 5727:25;
5764:15; 5823:19;
5824:5; 5826:23;
5828:1; 5830:21;
5838:16; 5871:24
**turns** [2] - 5806:9;
5870:2
**TV** [3] - 5767:16;
5888:2
**twelve** [1] - 5855:12

**twenty** [1] - 5867:7
**twice** [1] - 5700:3
**twiddling** [1] - 5801:8
**twisted** [1] - 5748:9
**two** [70] - 5701:3;
5704:25; 5708:23;
5709:24; 5710:3;
5711:3, 12; 5714:25;
5716:1; 5718:23;
5719:24; 5721:15;
5725:22; 5727:7;
5728:4, 6; 5730:12;
5735:15, 21; 5739:24;
5744:3; 5753:5, 22;
5770:10; 5772:7;
5773:16; 5774:2;
5781:4; 5784:1, 11;
5789:8; 5793:7;
5795:21; 5812:14, 23;
5816:1, 4, 21; 5817:9;
5832:25; 5836:16;
5847:19; 5852:9;
5853:24; 5858:17, 21;
5860:18; 5862:10;
5865:2, 11; 5867:3;
5872:23; 5874:6, 12-14;
5875:11; 5876:17;
5878:6; 5882:22;
5887:16; 5888:8, 16,
18, 22
**type** [5] - 5797:15, 20;
5798:2; 5827:25
**typing** [1] - 5870:6
**typo** [1] - 5835:15

## U

**U.S** [1] - 5697:5
**U.S.D.J** [1] - 5697:18
**ugly** [1] - 5877:22
**ultimately** [2] -
5782:15
**umbrella** [2] -
5872:18; 5873:2
**umbrellas** [1] -
5872:23
**un-America** [1] -
5878:3
**unable** [2] - 5701:21;
5704:16
**unacceptable** [1] -
5891:6
**unadulterated** [1] -
5759:25
**unavailable** [1] -
5707:8
**unaware** [1] - 5768:13
**unbelievable** [3] -
5734:20; 5797:7;

5849:24
**uncle** [1] - 5789:7
**unconscionable** [2] -
5831:20, 22
**unconstitutional** [6]
- 5878:9; 5888:25;
5889:10, 12; 5891:8, 18
**uncontradicted** [1] -
5736:9
**uncontroverted** [1] -
5791:5
**uncover** [1] - 5765:16
**under** [13] - 5702:25;
5724:14; 5732:7;
5735:9; 5738:11;
5755:14; 5797:12;
5803:10; 5814:11;
5826:3; 5831:9; 5852:3;
5855:18
**understandable** [1] -
5882:7
**understatement** [1] -
5823:22
**understood** [4] -
5719:21; 5733:9;
5841:24; 5870:10
**unfortunately** [1] -
5748:24
**unidentified** [1] -
5724:16
**uniformed** [1] - 5893:1
**Union** [1] - 5785:19
**unique** [3] - 5750:23;
5849:21; 5850:22
**unit** [1] - 5863:20
**UNITED** [1] - 5697:1
**United** [3] - 5697:21;
5813:13; 5850:11
**universe** [2] -
5805:18; 5894:24
**University** [2] -
5745:3; 5850:9
**unknown** [1] - 5724:8
**unless** [5] - 5759:21;
5797:18; 5833:13;
5882:3; 5892:9
**unlikely** [6] - 5734:3;
5815:25; 5844:23;
5856:21; 5861:11, 16
**unlocked** [2] - 5863:6,
10
**unnatural** [1] - 5749:5
**unquestionably** [1] -
5722:9
**unravel** [1] - 5831:7
**unsealed** [5] -
5806:14; 5860:4;

5862:20; 5863:5, 10
**unstable** [1] - 5761:22
**untouched** [1] - 5834:8
**unusual** [3] - 5782:17,
19; 5863:15
**unwarranted** [1] -
5703:1
**up** [83] - 5701:17;
5705:16; 5706:15, 21;
5710:6, 8; 5712:7;
5715:11; 5719:5, 9;
5720:2; 5723:12;
5725:5; 5728:7;
5732:16; 5736:20;
5737:7; 5738:25;
5739:14, 18; 5742:14;
5747:4, 20; 5748:12;
5750:10; 5751:16,
18-19; 5756:5, 12, 20;
5757:7; 5758:10;
5768:3; 5770:3, 6;
5772:5; 5773:11;
5775:14; 5779:23;
5783:15, 23; 5784:10,
22; 5785:1; 5787:3,
20-21; 5792:19;
5793:22; 5803:11;
5808:19; 5810:3;
5811:25; 5812:5;
5816:22, 25; 5819:24;
5824:3; 5829:13;
5833:8; 5839:10;
5840:16; 5841:22;
5844:17; 5845:7;
5848:11, 18; 5851:18;
5861:8; 5863:1; 5867:8;
5874:8; 5876:2;
5880:17; 5882:10;
5888:4; 5889:22;
5895:23; 5896:15
**upper** [1] - 5724:25
**upright** [1] - 5785:16
**ups** [1] - 5775:15
**upset** [6] - 5710:1;
5757:6, 15, 17; 5760:7;
5889:21
**upside** [1] - 5727:25
**usage** [1] - 5721:3
**uses** [1] - 5796:7
**usual** [1] - 5872:15
**utilized** [2] -
5730:18; 5799:25
**utilizing** [3] -
5749:14; 5753:25;
5755:9
**utmost** [1] - 5709:21
**utter** [2] - 5779:20;
5791:22

**utterly** [1] - 5790:4

## V

**vacate** [2] - 5743:2; 5770:9
**vacated** [4] - 5740:16; 5743:23; 5811:6; 5834:11
**vacating** [2] - 5722:22; 5723:2
**vacatur** [2] - 5740:24; 5742:25
**vacuumed** [1] - 5860:8
**vacuuming** [1] - 5860:18
**vagina** [4] - 5724:9; 5725:22; 5726:20; 5729:7
**vaginal** [3] - 5814:23; 5816:8
**validity** [2] - 5728:7; 5779:2
**van** [65] - 5711:19; 5717:4; 5725:3; 5746:2, 6, 9, 11; 5747:2, 4; 5754:19; 5765:9; 5789:17, 19; 5791:7, 9, 12; 5794:8, 21; 5795:25; 5796:1; 5799:23, 25; 5800:22, 25; 5801:23; 5806:14; 5808:25; 5809:1, 18; 5818:10; 5847:25; 5851:4, 9; 5853:16; 5854:1; 5856:19; 5857:6, 17; 5858:1; 5859:18, 24-25; 5860:17, 21; 5861:21, 23; 5862:10, 15; 5864:22; 5865:4; 5869:11, 23; 5870:16, 19, 22, 25; 5871:6, 12-13, 15; 5888:8
**vans** [1] - 5858:14
**various** [1] - 5837:11
**VC** [1] - 5813:14
**vehicle** [1] - 5833:9
**Velveteen** [1] - 5769:9
**verbal** [2] - 5875:3
**verdict** [9] - 5699:3; 5708:7, 10; 5709:6, 22; 5738:21; 5803:21; 5861:4; 5894:23
**version** [9] - 5719:14; 5720:8; 5721:5; 5874:7; 5876:5, 21-22; 5877:4, 13
**versions** [2] -

5718:23; 5874:6
**versus** [1] - 5858:20
**Vesey** [1] - 5698:13
**viable** [1] - 5785:10
**Vicodin** [1] - 5761:17
**victim** [2] - 5803:24; 5815:4
**victim's** [2] - 5811:21; 5815:18
**video** [7] - 5750:14, 16; 5752:5, 23; 5753:17; 5754:7; 5829:12
**Videos** [1] - 5785:24
**videotape** [2] - 5702:16; 5791:4
**Vietnam** [1] - 5761:14
**view** [1] - 5895:10
**violated** [4] - 5699:18; 5806:23; 5891:15; 5894:21
**violating** [1] - 5761:11
**violation** [6] - 5714:14; 5717:14; 5742:11; 5817:4; 5888:19
**violence** [1] - 5891:4
**violent** [2] - 5796:20; 5798:22
**violently** [1] - 5748:1
**virgin** [5] - 5726:17, 19; 5729:2, 4; 5731:25
**Virginia** [1] - 5850:9
**virtually** [1] - 5718:6
**visit** [2] - 5722:6; 5769:5
**visited** [1] - 5759:9
**visual** [1] - 5866:24
**voice** [5] - 5719:18; 5786:21; 5877:7; 5887:25; 5888:5
**Volpe** [106] - 5701:20; 5702:1, 10, 12; 5703:7, 11, 15, 18; 5704:12, 16; 5711:22; 5712:5; 5718:11; 5727:7; 5740:25; 5751:5, 24; 5752:1; 5755:1; 5760:1; 5763:11; 5765:8, 11; 5766:25; 5773:3, 18, 21; 5774:6; 5775:1; 5778:25; 5781:4; 5782:3; 5783:6; 5784:9; 5794:6, 12; 5795:6, 13; 5797:14; 5799:4, 17, 22, 24; 5802:22-24;

5809:8; 5811:7, 19; 5824:23; 5825:2; 5827:10, 17-19; 5828:17; 5829:8; 5830:24; 5832:24; 5837:12, 19, 22; 5839:4, 6; 5840:6, 10, 16-17, 21; 5841:13; 5842:12; 5845:2, 23; 5861:23; 5862:8; 5863:14; 5864:9, 23; 5865:9; 5866:3; 5867:18; 5868:3, 20, 25; 5869:18; 5870:24; 5871:8, 14; 5872:12; 5874:19, 24; 5875:8, 25; 5876:9; 5880:19; 5881:7, 13; 5884:23; 5885:4, 15; 5886:22; 5890:4; 5892:3; 5893:6
**Volpe's** [14] - 5752:10; 5779:12; 5795:9; 5797:23; 5825:10; 5829:22; 5830:7, 10; 5838:9, 21; 5847:23; 5866:16; 5869:19; 5873:4
**volume** [2] - 5751:16
**voluntarily** [2] - 5719:22; 5721:13
**voluntary** [3] - 5762:4, 7; 5837:6
**vulnerable** [2] - 5879:25; 5880:9

## W

**wagon** [3] - 5789:4; 5886:9
**wait** [7] - 5703:3; 5707:14, 17; 5709:4; 5864:3; 5896:12
**waiting** [4] - 5707:15; 5709:1; 5805:23; 5883:2
**waived** [1] - 5719:22
**walk** [7] - 5720:12; 5738:5; 5754:23, 25; 5756:11, 13; 5789:16
**walked** [18] - 5726:10; 5755:18; 5756:8, 25; 5757:16, 23-24; 5764:20, 23; 5767:23; 5768:24; 5772:23; 5785:17, 23; 5801:9; 5802:12; 5872:17; 5880:14
**walking** [8] - 5730:10; 5736:6; 5737:23; 5755:7; 5763:24; 5835:8; 5880:15; 5881:7

**walks** [1] - 5874:18
**Wall** [1] - 5703:20
**Waltman** [1] - 5746:1
**Wantagh** [5] - 5788:8; 5789:4, 9, 13; 5809:15
**wants** [1] - 5845:11
**ward** [2] - 5810:11; 5811:1
**warning** [1] - 5709:24
**warrant** [1] - 5767:9
**warts** [1] - 5772:24
**washed** [2] - 5745:23; 5859:23
**Washington** [3] - 5698:5; 5850:15
**watch** [7] - 5765:9; 5786:2; 5849:6; 5887:21; 5888:4, 12
**watched** [3] - 5767:16; 5781:9; 5883:12
**watching** [3] - 5759:15; 5794:11; 5888:3
**ways** [1] - 5807:13
**weak** [3] - 5765:22; 5862:2, 11
**weapon** [1] - 5797:14
**wear** [1] - 5816:22
**wearing** [4] - 5735:21; 5798:3; 5816:2; 5826:10
**wears** [1] - 5737:16
**Wednesday** [1] - 5895:25
**week** [1] - 5732:5
**weekend** [4] - 5843:23; 5844:22; 5845:10, 20
**weeks** [2] - 5774:8; 5867:14
**weight** [3] - 5755:21; 5802:17; 5872:8
**Weinstein** [6] - 5722:18; 5833:21, 23-24; 5834:4, 14
**welcome** [2] - 5706:15; 5713:6
**west** [5] - 5755:10-12; 5796:13; 5850:9
**West** [1] - 5698:11
**wet** [5] - 5872:17, 23; 5873:2; 5885:9, 14
**whack** [1] - 5844:3
**whatsoever** [2] - 5731:15; 5781:15
**wherein** [1] - 5723:4
**whistle** [2] - 5764:12
**white** [1] - 5793:15

**whole** [15] - 5702:16; 5706:21; 5713:21; 5726:2; 5765:23; 5766:14; 5772:6; 5837:21; 5838:15; 5843:20; 5855:2; 5858:13; 5876:24; 5883:5; 5884:20

**whole-heartedly** [1] - 5726:2

**WICKER** [1] - 5697:20

**wide** [5] - 5756:21; 5759:16, 18

**wife** [4] - 5878:2; 5884:12; 5886:1, 3

**William** [2] - 5722:19; 5723:12

**willing** [4] - 5729:14; 5774:12; 5871:21; 5872:1

**willingness** [2] - 5774:25; 5879:19

**win** [1] - 5806:17

**wind** [1] - 5882:10

**windowsills** [1] - 5858:15

**windshield** [1] - 5831:15

**winter** [1] - 5753:7

**wire** [2] - 5711:14; 5801:7

**wiretap** [2] - 5847:24; 5864:25

**wise** [1] - 5705:20

**wish** [2] - 5705:24; 5710:1

**wishes** [1] - 5705:6

**withheld** [3] - 5817:9; 5834:20; 5847:8

**withholding** [1] - 5777:18

**witness** [40] - 5726:8, 25; 5727:10, 13-14; 5734:22; 5744:23; 5755:25; 5763:21; 5764:19; 5765:14; 5766:22; 5774:13; 5779:15; 5786:23; 5788:18; 5806:15; 5807:17; 5808:6, 13-14; 5813:6, 24; 5845:6, 11-12; 5848:19, 21; 5873:22, 25; 5875:7; 5879:3, 23, 25; 5880:9; 5882:5; 5884:4, 18; 5885:12

**witnesses** [11] - 5725:23; 5734:20;

5738:23; 5741:16; 5753:5; 5766:19; 5768:1; 5791:25; 5808:1; 5891:5

**woman** [2] - 5708:5; 5786:11

**women** [1] - 5794:4

**wonder** [1] - 5769:16

**wooden** [2] - 5711:13; 5755:19

**Woodfield** [3] - 5825:25; 5827:11, 16

**Word** [4] - 5734:20; 5810:8; 5812:2; 5813:7

**word** [19] - 5719:19; 5721:9; 5740:6; 5741:11; 5742:10, 19, 24; 5759:13; 5781:4; 5792:22, 25; 5795:7; 5796:7; 5813:12; 5814:19; 5815:12, 24; 5816:17

**words** [9] - 5701:14; 5705:22; 5761:24; 5781:4; 5803:4; 5859:21; 5862:1; 5881:25; 5893:3

**wore** [1] - 5812:19

**worker** [2] - 5761:8; 5773:13

**works** [8] - 5775:11; 5830:4; 5837:3, 6; 5838:13; 5848:16; 5852:20; 5870:7

**worksheet** [1] - 5775:13

**world** [18] - 5709:2; 5722:4; 5775:9; 5786:24; 5813:13, 19; 5840:5; 5849:3; 5850:11, 19; 5855:3, 7; 5859:1, 6; 5863:12; 5890:12; 5893:24

**worn** [1] - 5826:19

**worried** [3] - 5730:6; 5763:11, 15

**worry** [4] - 5714:18; 5729:8; 5764:4; 5794:16

**worse** [2] - 5810:22

**worst** [3] - 5776:13; 5806:2; 5877:14

**worth** [3] - 5764:17; 5785:8; 5833:20

**worthy** [2] - 5855:13; 5871:17

**wound** [1] - 5848:18

**wounded** [1] - 5761:15

**wrapped** [3] - 5747:11;

5797:15, 17

**write** [8] - 5780:4; 5781:4, 9, 25; 5783:11; 5794:16; 5856:11

**writes** [1] - 5890:15

**writing** [6] - 5773:20, 22; 5782:6; 5833:1; 5889:17; 5892:6

**written** [8] - 5723:3; 5785:8; 5800:8; 5802:22; 5855:15; 5869:4, 8, 11

**wrongs** [1] - 5893:25

**wrote** [17] - 5718:14; 5741:1-3; 5761:20; 5766:7, 12, 20; 5794:12, 17; 5832:24; 5843:6; 5845:17; 5853:4; 5854:15; 5868:25; 5869:2

| X |
|---|

**Xanax** [1] - 5761:18

| Y |
|---|

**year** [1] - 5826:19

**years** [36] - 5702:13, 24; 5726:10; 5727:18; 5729:17; 5730:22; 5731:13; 5740:1, 11; 5741:1; 5750:17; 5755:25; 5758:12; 5763:10, 19; 5766:7; 5768:25; 5776:1; 5783:2; 5796:23; 5801:16; 5808:22; 5810:13, 17; 5811:19; 5826:14; 5832:23; 5850:7, 12; 5851:21; 5852:25; 5868:12; 5880:23; 5887:4

**yelled** [2] - 5725:3; 5877:11

**YORK** [1] - 5697:1

**York** [11] - 5697:22; 5698:3, 8, 11, 14; 5721:17; 5765:4; 5813:18; 5848:16

**young** [4] - 5732:6; 5772:23; 5874:13; 5877:17

**younger** [1] - 5767:7

**yourself** [1] - 5860:6

| Z |
|---|

**Zeppelin** [1] - 5786:2

**zero** [1] - 5839:19